Wendy H. Schwartz (WS-1862)
**REED SMITH LLP**
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax (212) 521-5450
Attorneys for Defendants Glingrow Holding Ltd
and Rias Trading

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

PAGANE MARITIME LTD.                          :        <u>ECF Case</u>
                                                                :
                                      Plaintiff,         :        07 Civ. 10726 (PKL)
                                                                :
                        v.                                    :        <u>ORDER TO SHOW CAUSE</u>
                                                                :
GLINGROW HOLDING LTD. and          :
RIAS TRADING,                                      :
                                                                :
                                      Defendants.      :
-------------------------------------------------------------x

        Upon reading and filing the Declaration of Sergey Chumak, dated January 10,

2008, together with the exhibits annexed thereto, the accompanying Memorandum of

Law, the Amended Verified Complaint filed in this action, and upon all the prior

pleadings and proceedings had herein, it is hereby

        **ORDERED**, that plaintiff Pagane Maritime Ltd. ("Plaintiff") show cause before

this Court, at Room 17c, United States Courthouse, 500 Pearl Street, New York, New

York 10007, on the 16th day of January, 2008, at 2:00 PM, which is within 4 court days

from today pursuant to Local Admiralty Rule E.1, *AS REVISED BY THIS ORDER* why an Order should not be issued,

pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6) and Rule E of the Supplemental Rules of

Civil Procedure for Certain Admiralty and Maritime Claims:

1

(a)    Dismissing the Verified Complaint as against defendant Rias Trading.

("Rias") with prejudice;

(b)    Vacating this Court's Order for Issuance of Process of Maritime

Attachment granted to Pagane Maritime Limited as to the assets of Rias (the "Attachment

Order");

(c)    Granting Rias costs and disbursements and ordering such other and further

relief as the Court deems just and proper; and it is further

**ORDERED**, that service by fax and email of a copy of this Order, and the papers

upon which it is based, upon Plaintiff's counsel, Charles E. Murphy, Esq., Lennon

Murphy & Lennon, LLC., 420 Lexington Avenue, Suite 300, New York, New York

*12:00 NOON on*

10170 on or before January 11, 2008, shall be deemed good and sufficient service

thereof; and it is further

*5:00 AM on*

**ORDERED**, that Plaintiff shall serve answering papers, if any, on or before

January 15, 2008, by fax and email to Reed Smith LLP, 599 Lexington Avenue, New

York, New York 10022, Attention: Wendy H. Schwartz, Esq., fax number (212) 521-

5450, email address: wschwartz@reedsmith.com; and it is further

*AT THE CALL OF THE CASE*

**ORDERED**, that Defendant shall serve reply papers, if any, ~~on or before January~~

~~___, 2008 by fax and email to Plaintiff's counsel at the address listed above.~~

Dated: New York, New York
         January 10, 2008

SO ORDERED:

_____
United States District Judge

2       (PART I)

Wendy H. Schwartz (WS-1862)
**REED SMITH LLP**
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax (212) 521-5450
Attorneys for Defendants
Glingrow Holding Ltd. and Rias Trading.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

| | | |
|---|---|---|
| PAGANE MARITIME LTD. | : | <u>ECF Case</u> |
| | : | |
| Plaintiff, | : | 07 Civ. 10726 (PKL) |
| | : | |
| v. | : | DECLARATION OF |
| | : | SERGEY CHUMAK |
| GLINGROW HOLDING LTD. and | : | |
| RIAS TRADING, | : | |
| | : | |
| Defendants. | : | |

-------------------------------------------------------------x

I, Sergey Chumak, hereby declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. §1746, that the following is true and correct:

1.     I am the Operations Manager of Rias Trading ("Rias"), one of the named defendants in this action.   I make this Declaration on behalf of Rias in support of its emergency motion, pursuant to Rule E of the Supplemental Rules of Civil Procedure for Certain Admiralty and Maritime Claims, to dismiss the complaint filed by plaintiff Pagane Maritime Ltd. ("Plaintiff" or "Pagane") against Rias, and to vacate the attachment of Rias' assets in New York.

2.    This motion is made on an expedited basis because Rias' assets have now *twice* wrongfully been made subject to restraint in this action, despite the fact that Rias has no connection to the agreement which forms the basis of this action.

3.    Because any monetary transaction Rias might make from anywhere in the world has the possibility of being routed through a New York bank, Rias' ability to conduct business is significantly affected by the current attachment order

**B. Rias' Business and the Dispute**

4.    Rias, whose full name is RIAS Trading SA, is a Swiss company based in Lausanne, Switzerland.

5.    Rias engages in the international trade of fertilizer, food products, especially cereals, and meat and dairy products.

6.    Glingrow is a company organized under the laws of Cyprus.

7.    Glingrow engages in the business of providing chartering services.

8.    Rias and Glingrow are affiliates in the sense that they have some owners in common.  However, Rias and Glingrow are separate companies, with separate locations, separate employees and separate management.

9.    Rias contracted with co-defendant Glingrow Holding Ltd. ("Glingrow"), to obtain a vessel to ship grain to Aqaba, Jordan.

10.    Glingrow chartered a vessel, the M/V Pagane, via a charter party agreement with a company called Bulcom Ltd ("Bulcom").

11.    Rias then entered into a separate charter party agreement with Glingrow for use of that vessel.

2

12.    Pursuant to instructions from Glingrow, for certain invoices Rias received from Glingrow, Rias paid the money to Bulcom.  This was to satisfy obligations that Rias had to Glingrow.

13.    As admitted by Plaintiff in the Complaint, Rias was not named in the charter party agreement between Glingrow and Bulcom (the "Charter Agreement"), which is the agreement sued upon.

14.    Rias has no contractual relationship with Bulcom, nor with the Plaintiff, the alleged owner of the M/V "Pagane," who claims that Bulcom was its agent.

15.    Neither Plaintiff nor Bulcom is a party to the charter party agreement between Rias and Glingrow.

16.    A dispute has now arisen between Plaintiff and Glingrow regarding fees for use of the vessel under the Charter Agreement.

17.    This dispute does not concern the separate contract between Glingrow and Rias.

18.    In the Amended Complaint in this matter at ¶11, Plaintiff alleges that it has commenced arbitration against "the Defendant" (not "Defendants") in London.  Rias is not a party to that arbitration.  Exhibit 3 to Amended Complaint references Bulcom as the plaintiff in that arbitration.

C.    **This Action**

19.    This action was initially filed on or about November 30, 2007, by Bulcom. A true and correct copy of the Verified Complaint is attached as Exhibit A.

20.    On or about November 30, 2007, the Court entered an Attachment Order against Glingrow and Rias.

21.     On or about December 20, 2007, pursuant to a Consent Order, the funds under attachment in this action were to be released.  The payment of the released funds by the garnishee bank(s) was not to be subject to any further attachment in New York.

22.     A copy of the Consent Order is attached as Exhibit B.

23.     On December 20, 2007 an Amended Verified Complaint was filed, substituting Pagane for Bulcom Ltd as Plaintiff.

24.     A true and correct copy of the Amended Verified Complaint is attached as Exhibit C.

25.     On December 28, 2007 a new attachment issued against Glingrow and Rias.  A true and correct copy of the docket sheet reflecting the new attachment is attached as Exhibit D.

26.     By this application, Rias seeks vacation of the new attachment as against it, and dismissal from this action.

27.     No prior application for the relief requested herein or similar relief has ever been made by Rias to this or to any other Court.


Executed on:   January 10, 2008

Sergey Chumak

# EXHIBIT A

# JUDGE LEISURE

# 07 CV 10726

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BULCOM LTD.,

                Plaintiff,

    - against -

GLINGROW HOLDING LTD. and
RIAS TRADING,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X



## VERIFIED COMPLAINT

Plaintiff, BULCOM LTD., ("Plaintiff"), by and through its attorneys, Lennon, Murphy &

Lennon, LLC as and for its Verified Complaint against the Defendants, GLINGROW

HOLDING LTD. ("Glingrow") and RIAS TRADING ("Rias") (collectively "Defendants")

alleges, upon information and belief, as follows:

    1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the

breach of maritime contract of charter. This matter also arises under the Court's federal question

jurisdiction within the meaning of 28 United States § 1331 and the New York Convention on the

Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201 *et seq.*) and/or the

Federal Arbitration Act (9 U.S.C. § 1 *et seq.*).

    2.    At all times material to this action, Plaintiff was, and still is, a foreign corporation,

or other business entity, organized under, and existing by virtue of foreign law and was at all

material times the disponent owner[1] of the motor vessel "PAGANE" (hereinafter the "Vessel").

---

[1] A "disponent owner" controls the commercial operations of a vessel having taken the vessel on charter from the registered owner of the vessel. The disponent owner usually time charters the vessel from the registered owner and then sub-charters the vessel to charterers.

3.    Upon information and belief, Defendant Glingrow was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of the laws of Cyprus Belarus with a place of business at 15, Boumpoulinas, Povek Building, Apt. No. 301, Nicosia, Cyprus and was at all material times the Charterer of the Vessel.

4.    Upon information and belief, Defendant Rias was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law and was at all material times the alias, partner, joint venturer and/or paying, or receiving, agent of the Defendant Glingrow.

5.    By a charter party dated October 17, 2007 Plaintiff time chartered the Vessel to Defendant Glingrow for one time chartered trip (duration about 30 days) via the Black Sea for the carriage of any lawful bulk grain cargo to Aqaba, Jordan. A copy of the charter party is attached hereto as Exhibit 1.

6.    The charter party was made on the NYPE form inclusive of clauses 8, 59 and 60 by which the NYPE Interclub Agreement, and its scheme for settlement of cargo claims that may arise under the charter party, was expressly incorporated into the charter party.

7.    Plaintiff delivered the Vessel into the service of the Defendant Glingrow at Kerch, Ukraine and has at all times fully performed its duties and obligations under the charter party.

8.    A dispute has arisen between the parties regarding Defendant Glingrow's failure to pay the hire for its use of the vessel which is due and owing to Plaintiff under the charter party contract. Clause 4 of the charter party requires Defendant Glingrow to pay for the use and hire of the Vessel at the rate of $60,000 per day, pro rata, including overtime, payable in advance every 15 days.

2

9.      In breach of its obligation to pay hire the Defendant Glingrow failed to remit payment to the Plaintiff on or about November 21, 2007 when a 15 day advance hire payment of became due and owing to the Plaintiff. A copy of Plaintiff's provisional hire statement, reflecting the sum of $594,848.97 due to the Plaintiff for unpaid hire, is attached hereto as Exhibit 2.

10.     In further breach of its charter party obligations, the Defendant Glingrow has caused liability for the Plaintiff's account in respect of claim brought by non-party cargo receivers, Jordanian Ministry of Industry and Trade ("MIT"), based, *inter alia*, on allegations of cargo shortage and cargo contamination. Plaintiff will settled MIT's shortage claim for $153,470.00 and MIT's contamination claim for US$ 289,091.50 and seeks indemnity from Defendants for such payment as per the charter party which incorporated the Interclub Agreement.

11.     As a result of Defendant Glingrow's breaches of the charter party due as aforesaid, Plaintiff has sustained damages in the total principal amount of $1,037,410.40, exclusive of interest, arbitration costs and attorneys fees.

12.     Pursuant to the charter party, disputes between the parties are to be submitted to arbitration in London subject to English law. Plaintiff has commenced London arbitration against Defendant by appointment of its arbitrator Mr. Christopher Moss. A copy of Plaintiff's arbitration appointment is attached hereto as Exhibit 3.

13.     This action is brought in order to obtain jurisdiction over Defendants and also to obtain security for Plaintiff's claims and in aid of arbitration proceedings.

14.     Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law. Section 63 of the English Arbitration Act of 1996 specifically allows for

recovery of these items as part of an award in favor of the prevailing party. As best as can now

be estimated, Plaintiff expects to recover the following amounts at arbitration as the prevailing

party:        A.    Principal claims:                        $1,037,410.40 ;

                [i.     Unpaid hire:   $594,848.97]
                [ii.    Indemnity for cargo shortage claim: $153,470]
                [iii.   Indemnity for cargo contamination claim: $289,091.50]

        B.    Estimated interest on claims -
                3 years at 5.5% compounded quarterly:         $171,172.71 ;

        C.    Estimated arbitration costs:                  $75,000; and

        D.    Estimated attorneys' fees and expenses:       $150,000.00.

        Total:                                        $1,433,583.10 .

    15.    The Defendants cannot be found within this District within the meaning of

Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal

Rules of Civil Procedure, but, upon information and belief, Defendants have, or will have during

the pendency of this action, assets within this District and subject to the jurisdiction of this Court,

held in the hands of garnishees within the District which are believed to be due and owing to the

Defendants.

    16.    Upon information and belief, Defendant Rias acts as paying agent, and/or

receiving agent, or arranges for other non-parties to satisfy the debts and obligations of

Defendant Glingrow, and/or receive payments being made to Defendant Glingrow.

    17.    Although Rias was not named in the charter party, and had no formal relationship

to the charter of the M/V "PAGANE" it paid initial hire owing to Plaintiff from Glingrow.

    18.    It is not common practice in the maritime industry, nor any other business, for an

independent company to pay another company's debt, where it has no formal relationship to the

underlying contract.

Nov.90  2007  2:04PM    earson, Mursby & Leeron  LLC    No.2539   P. 6

19.    The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the Defendants held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendants and to secure the Plaintiff's claim as described above.

WHEREFORE, Plaintiff prays:

A.    That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Complaint failing which default judgment be entered against it;

B.    That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of $1,433,583.10 belonging to, due or being transferred to, from, or for the benefit of the Defendants, including but not limited to such property as may be held, received or transferred in Defendants' name(s) or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

C.    That the Court retain jurisdiction to compel the Defendants to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

D.    That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

E.    That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court;

F.    That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

G.    That the Plaintiff has such other, further and different relief as the Court may deem just and proper.

Dated:    New York, NY
          November 30, 2007


                        The Plaintiff,
                        BULCOM LTD.


                    By: _Charles E. Murphy_
                        Charles E. Murphy
                        Kevin J. Lennon
                        LENNON, MURPHY & LENNON, LLC
                        420 Lexington Avenue, Suite 300
                        New York, NY 10170
                        (212) 490-6050 – phone
                        (212) 490-6070 – facsimile
                        cem@lenmur.com
                        kjl@lenmur.com

6

## ATTORNEY'S VERIFICATION

State of New York      )
                       )        ss.:     City of New York
County of New York     )

1.      My name is Charles E. Murphy.

2.      I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.      I am a partner in the firm of Lennon, Murphy & Lennon, LLC attorneys for the Plaintiff.

4.      I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.      The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.      The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.      I am authorized to make this Verification on behalf of the Plaintiff.

Dated:        New York, NY
              November 30, 2007

                                        _____
                                        Charles E. Murphy

7

# EXHIBIT 1

# TIME CHARTER

GOVERNMENT FORM

Approved by the New York Produce Exchange

November 6th, 1913-Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1. **This Charter Party**, made and concluded in Novorossiysk ....................................................   17th day of October 2007 ....19.....
2. Between ...Messrs Bulcom Ltd......................as disponent........................................................................................................
3. Owners of the good ..........Steamship/Motorship "Pagana"......Description as per Clause 29 of........................................................
4. of......... tons gross register, and ........ tons net register, having engines of......................................Indicated horse power
5. and with full machinery and equipment in a thoroughly efficient state, and classed ........................................................................
6. of about ..................................................cubic feet bale capacity and about...................................... tons of 2240 lbs
7. deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity
8. allowing a minimum of fifty tons) on a draft of........ feet.........inches on.......................Summer freeboard inclusive of permanent bunkers
9. which are of the capacity of about................... tons of fuel, and capable of steaming, fully laden, under good weather
10. conditions about .................... knots on a consumption of about.................... of best Welsh coal—best grade fuel oil-best grade Diesel oil
11. now ....... trading .........................................................................................................................................................
12. ...............and ...Messrs GLINGROW HOLDING LTD............................................Charterers of the City of ...Nicosia, Cyprus.........

13. **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14. about 1 time Charter trip via safe ports, safe berths, safe anchorages always afloat, always within IWL, via Black sea with bulk lawful grain to Aqaba, Jordan. Duration about 30 days.
15. within below mentioned trading limits.
16. Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17. the fulfillment of this Charter Party. Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations hereunder.
18. Vessel to be placed at the disposal of the Charterers, at on dropping outward pilot Kerch at any time day or night Sundays and Holidays included.
19.
20. In such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No.6), as
21. the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No.5, Vessel on her delivery to be
22. ready to receive cargo with clean-swept holds and tight, staunch, strong and every way fitted for the service, having water ballast, (See Clause 42) winches
    and

23. donkey-boiler with sufficient steam power, or, if not equipped with donkey-boiler, then other power sufficient to run all the winches at one and the same
24. time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25. dise, including petroleum or its products, in proper containers, excluding (See Clause 32)......................................................................
26. (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,
27. all necessary fittings and other requirements to be for account of Charterers), in such lawful trades between safe port and/or ports in British North
28. America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or
29. Mexico, and/or South America ..............................................................................................................................................
30. and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

31. October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season between White Sea, Black Sea and the Baltic.
32. (See Clause 31)
33.
34.
35. as the Charterers or their Agents shall direct, on the following conditions:
36. 1. That whilst on hire the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the
37. insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler and domestic water, lubricating oil, vessel's garbage removal unless compulsory and maintain her class and keep
38. the vessel in a thoroughly efficient state in hull, holds and hatchcovers, machinery and equipment with all certificates necessary to comply with current requirements at all ports of call and canals for and during the service. (See Clause 48 and 49).
39. 2. That, whilst on hire, the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, compulsory and customary Pilotages, Turkish strait pilotage, Agencies, boatage on Charterers business for clearance and cargo purpose only, Commissions, canal dues and tolls,
40. Consular Charges (except those pertaining to the Crew and flag), and all other usual expenses except those before stated, but when the vessel puts into
41. a port for causes for which Owners are vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42. illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43. charter to be for Charterers account including loading expenses should port authorities order crew ashore for safety reasons. All other fumigations to be for charterers account after vessel has been under charter for a continuous period
44. of six months or more.
45. Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, as permitted under this Charterparty, but
46. Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47. for dunnage, they making good any damage thereto.
48. 3. That the Charterers at the port of delivery, and the Owners at the port of re-delivery, shall take over and pay for all fuel remaining on
49. board the vessel at the current prices in the respective ports, the vessel to be delivered with not more than ..................tons and not more than
50. ..................tons and to be delivered with not less than................tons. (See Clause 30).
51. 4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of US$ 10000,00 per day pro rata including overtime payable in advance every 15 days, First payment within 3 banking days upon delivery.
52. ......................United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and
53. stores, on.........summer freeboard, per Calendar Month commencing on and from the hour day of her delivery, as aforesaid, and at
54. and after the same rate for any part of a day month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55. wear and tear excepted, to the Owners (unless lost) at on dropping last outward sea pilot Aqaba, any time day or night, Sundays and Holidays
56. Included......................unless otherwise mutually agreed. Charterers are to give Owners not less than...................days
57. notice of vessel's expected date of re-delivery, and probable port. (See Clause 38)
58. 5. Payment of said hire to be made as per clause 35 in New York in cash by transfer in United States Currency, every 15 days semi-monthly in advance, and for the last 15 days half month or
59. part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60. due, if so required by Owners, unless bank guarantee or deposit is made by Charterers, otherwise failing the punctual and regular payment of the
61. hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62. terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day
63. following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they
64. to have the privilege of using vessel at once, such time used to count as hire.

65. ~~Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject~~
66. ~~to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application~~
67. ~~of such advances.~~
68. 6. That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any wharf or place that Charterers or their Agents may
69. direct, provided the vessel can safely lie always afloat at any time of tide, except at such places *in East Coast South America* where it is customary for similar size vessels to safely
70. lie aground.
71. 7. That the whole reach of the Vessel's Hold, Decks and usual places of loading (not more than she can reasonably stow and carry, *compatible with vessel's seaworthiness, also*
72. accommodations for Supercargo, if carried, shall be at Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73. tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodation allow. Charterers~~
74. ~~paying Owners ...................... per day per passenger for accommodation and meals. However, it is agreed that in case any fines or extra expenses are~~
75. ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~ *No passengers.*
76. 8. That the Captain shall prosecute his voyage with the utmost despatch, and shall render all customary assistance with ship's crew and
77. boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78. agency; and Charterers are to load, stow, and trim, *lash, secure and discharge* the cargo at their *risk and expense* under the supervision of the Captain, *all cargo claims to be settled in accordance with NYPE Interclub Agreement as amended in September 1996 (See Clauses 59/60),* who is to sign Bills of Lading for
79. ~~cargo as presented, in conformity with Mate's or Tally Clerk's receipts.~~
80. 9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81. receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
82. 10. That the Charterers shall have the permission to appoint a Supercargo, who shall accompany the vessel *against signing Owners' P and I Club boarding LOI,* and see that voyage is prosecuted
83. ~~with the utmost despatch.~~ He is to be furnished with free accommodation, and same fare as provided for Captain's table. Charterers paying at the
84. rate of *USD 10.00 (Ten Dollars)* $~~1.00~~ per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their agents, to victual Tally
85. Clerks, Stevedore's Foreman, etc., ~~Charterers paying at the current rate per meal, for all such victualling.~~ *(See Clause 37)*
86. 11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, *and / or telecommunication with copy to Owners,* and the
87. Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88. terers, their Agents or Supercargo, when required, with a true copy of daily Logs, *abstracts in English,* showing the course of the vessel and distance run and the con-
89. sumption of fuel.
90. 12. That the Captain shall use diligence in caring for the ventilation of the cargo. *Vessel has natural ventilation.*
91. 13. ~~That the Charterers shall have the option of continuing this charter for a further period of .......................................................~~
92. ~~....................................................................... days previous to the expiration of the first named term, or any desired option,~~
93. ~~on giving written notice thereof to the Owners or their Agents ...................................................................~~
94. 14. That if required by Charterers, time not to commence before *00:01 hours Local Time 18th October 2007* ....................and should vessel
95. ~~not~~ have *given written notice of readiness* been delivered on or before *23:59 hours Local Time 18th October 2007...* ~~but not later than 4 p.m.~~ Charterers or
96. their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
97. 15. That in the event of the loss of time from deficiency and/or default of men or *including strike* of Officers and / or crew or deficiency of stores, fire, breakdown or damages to hull, machinery or equipment,

98.   grounding, detection by average accidents to ship or cargo, *unless resulting from inherent vice, quality or defect to the cargo*, drydocking for the purpose of examination or painting bottom, or by any other cause

99.   preventing the full working of the vessel *unless same is caused by Charterers or by following their instructions*, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by

100.  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101.  thereof, and all extra *directly related* expenses shall be deducted from the hire *duly substantiated.*

102.  16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103.  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104.  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout the Charter Party, always mutually excepted.

105.  The vessels shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property.

106.

107.  17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London ~~New York~~,*

108.  one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for

109.  the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial *shipping* men. *(See Clause 80.)*

       *General Average / Arbitration in London. This Charter Party shall be governed by and construed in accordance with English Law.*

110.  18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-

111.  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112.  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113.  might have priority over the title and interest of the owners in the vessel.

114.  19. That all derelicts and salvage shall be for Owners' account and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

116.  Crew's proportion. General Average shall be adjusted, stated and settled, according to ~~Rules 1 to 15 inclusive, 17 to 22, inclusive, and Rule F of~~

116.  ~~York-Antwerp Rules 1974 as amended 1994 at London *(See Clause 66)*~~ ~~1924~~ at such port or place in the United States as may be selected by the carrier,

       ~~and as to matters not provided for by these~~

117.  ~~Rules, according to the law and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~

118.  ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~

119.  ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~

120.  ~~bond and such additional security as may be required before delivery of the goods. Such cash deposit as the carrier~~

121.  ~~or his agents may deem sufficient as additional security for the contribution of the goods for any salvage and special charges thereon, shall, if~~

122.  ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~

123.  ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in the special account at the~~

124.  ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~

125.  ~~United States money.~~

126.  ~~In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~

127.  ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~

128.  ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~

129.  ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~

130.  ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if salving ship or~~

131.  ~~ships belonged to strangers.~~

132.  Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. *(See Clause 66)*

133.  20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and *shall be for~~*

       Owners' account. The*

134.  ~~cost of replacing same, to be allowed by Owners.~~

135.  ~~21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~

136. ~~convenient place, bottom cleaned and painted whenever Charterers and the Captain think necessary, at least once in every six months, reckoning from~~
137. ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138. *(See Clause 70)* .........................
139.
140. ~~22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~
141. ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
142. ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel~~ *lights as on board lanterns and oil*

143. for night work, *free of expense to Charterers*, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The

144. ~~Charterers to have the use of any gear on board the vessel.~~
145. 23. Vessel to work night and day, if required by Charterers, ~~and all winches to be at Charterers' disposal during loading and discharging:~~
146. ~~steamer to provide one winchman per hatch to work winches day and night, as required. Charterers agreeing to pay officers, engineers, winchmen,~~
147. ~~deck hands and donkeyman for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148. ~~part, or labour unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
149. ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
150. ~~thereby.~~
151. 24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152. in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
153. etc.," in respect of all cargo shipped under this Charter to or from the United States of America. It is further subject to the following clauses, both
154. of which are to be included in all bills of lading issued hereunder:

U.S.A. Clause Paramount
155.
156. This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157. 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158. any of its rights or immunities or an increase of any of its responsibilities or liabilities under the said Act. If any term of this bill of lading
159. be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

Both to Blame Collision Clause
160.
161. If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
162. Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
163. hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
164. or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
165. carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non carrying ship or her
166. owners as part of their claim against the carrying ship or carrier.
167. 25. The vessel shall not be required to enter any ice-bound port or any port where lights or light-ships have been or are about to be with-
168. drawn by reason of ice, or where there is risk that in ordinary course of things the vessel will not be able on account of ice to safely enter the
169. port or to get out after having completed loading or discharging. *Ice free ports / trading, Vessel not to force ice or follow ice-breakers.*
170. 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners to remain responsible for the
171. navigation of the vessel, *acts of pilots and tugboats except of strikes not against the Owners,* insurance, crew, and all other matters, *except for time Charterers' responsibility as agreed in this Charter and Rider,* same as when trading for their own account.
172. 27. A commission of *1.25 %* per cent is payable by the Vessel and Owners to ....*DIAMANT / ODESSA* ...............................
173.
174. on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175    28. An address commission of 2 ½ per cent is payable to .....*Charterers*................. on the hire earned and paid under this Charter.

*Additional Clause 29 to 82 as attached are to be fully incorporated in this Charter Party.*

THE OWNERS        *THE CHARTERERS*

This Charter Party is a computer generated copy of the NYPE(Reversed 3rd October, 1946) from printed under licence from the Association Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

**Clause 29  Vessels description**
M/V PAGANE - GEARLESS SD BC
PANAMA FLG-BLT 1982
54158 MTS DWAT ON 12.35 M SSW
GRT/NRT - 32976/20521
LOA/BEAM - 220/32.20M
DEPTH MOULDED 17 M
GRAIN IN MAIN HOLDS - 2443031.66 CFT (HA CMNGS INCLDD)
7 HOLDS/10 HATCHES
HATCH SIZES - ALL 11.60 BY 15.40M
HOLDS SIZE:
-HOLD #1 - 17.50m X 32m (AFT PART)
-HOLD #2 - 29.70m X 32m
-HOLD #3 - 18.00m X 32m
-HOLD #4 - 27.90m X 32m
-HOLD #5 - 18.00m X 32m
-HOLD #6 - 30.60m X 32m
-HOLD #7 - 15.30m X 32m (FORE PART)
HEIGHT OF ALL HOLDS - 17.90m INCLUDING COAMINGS.
MCGREGOR SIDE ROLLING TYPE - HYDRAULIC
SPEED-CONSUMPTION UNDER GOOD WEATHER AND SMOOTH WATER CONDITIONS:
ABT 11.5KN ON ABT 33MT LADEN/31MT BALLAST IFO 180 CST PLUS ABT 3.5 MT
MGO AT SEA, PORT CONS ABT 2.5 MT MGO.
VSL BURNS MGO WHILST MANOUVRING AND NAVIGATING IN NARROW WATERS,
ENTERING-LEAVING PORT, SAILING IN CONFINED WATERS, RIVERS, CANALS,
ESTUARIES AND ON STAND BY.
FUEL CAP: ABT 2000 MT IFO 180 CST ISO 8217 RME 25
ABT 300 MT MGO ISO 8217 DMA
TPC ABT 61.0 T/CM
CONSTS ABT 500 EXCL. FW
NATURAL VENTILATION, NOT C02 FTD
CGO HOLD GRAIN B/DOWN
NO1 223328.52
NO2 473521.17
NO3 282491.75
NO4 449107.91
NO5 282491.75
NO6 492979.74
NO7 239110.80
- ALL ABT AND WOG -
OWNERS: PAGANE MARITIME LTD.
CLASS: RMRS
PANDI: INGOSTTRAKH
H+M: ALLIANZ
ISM / ISPS OK
CALL SIGN: 3 E B Z 9
INMARSAT 'C' TLX: 457127110

- HATCH SIZES: ALL 11.60 BY 15.40 M
- OWNERS GTEE AIR DFT (DISTANCE WL TO THC) IN FULL BALLAST CONDITION TO BE
  MAX 12.00 M
- LAST THREE CARGOES: STEELS, IRON ORE, CLINKER

7

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

I.    VSL'S STOWAGE PLAN:
      -HOLD #1 - 5190.75mts - FULL
      -HOLD #2 - 10400.00mts - SLACK
      -HOLD #3 - EMPTY
      -HOLD #4 - 10444.48mts - FULL
      -HOLD #5 - EMPTY
      -HOLD #6 - 11464.77mts - FULL
      -HOLD #7 - 4000.00 - SLACK

      TTL 41500mts
      DRAFT FORE=10.39m MID=10.54m AFT=10.70m
      ALL ABOVE ESTIMATIONS DONE ON BSS TRIMMED ENDS.IF LOADING WILL BE
      WITH UNTRIMMED ENDS THEN STOWAGE PLAN CHANGE WILL BE .
      II. WE NEED MIN 48 HRS TO BALLAST/DEBALAST HOLDS NoS 3+5.
      III. RCVD MSG FM GLOBAL AGENCY ASKING FOR SOME VSL'S DETAILS.STILL
      NOT REVERT,WAIT YR CONFORMATION AND INSTR.

- OWNRS WILL CONSIDER AIR DFT (DISTANCE WL TO THC) IN FULL BALLAST
INCLUDING BALLASTING CARGO HOLDS NO3 AND NO5 AND ACHEAVING REQUIRED
BY TERMINAL DRAFT ON HOLD NO 7 BY TRIMING THE VESSEL, BUT TIME LOST FOR
BALLASTING/DEBALLASTIN AND PREPARING CARGO HOLDS IN SUITABLE
CONDITION FOR LOADING ALWAYS TO BE FOR AND ACCOUNT OF CHARTERES

- OWNERS CONFIRM VSL IS GRAIN CLEAN AND HAS ON BOARD VALID DOCUMENTS
OF AUTHORIZATION FOR CARRIAGE OF GRAINS IN BULK.
- OWNERS CONFIRM THAT VESSEL IS SUITABLE FOR GRAB DISCHARGE.
- OWNERS CONFIRM VESSEL IS CLASSED HIGHEST LLOYD'S CLASS AND ISM / ISPS
CODE FITTED FOR THE WHOLE DURATION OF VOYAGE.
- OWNERS CONFIRM VESSEL HAS ALL VALID DOCUMENTS/CERTIFICATES AVAILABLE
ON BOARD FOR LOADING AND DRAFT SURVEY.
- OWNERS CONFIRM THAT VESSEL IS NOT BLACKLISTED FOR LOAD AND/OR
DISCHARGE COUNTRIES / PORTS AND SUITABLE FOR THIS TRADE.
- OWNERSHIP/CLASS/PANDI CLUB/H+M INSURANCE NOT TO BE CHANGED
THROUGHOUT WHOLE TRIP DURATION.

FOR
- ACC GLINGROW HOLDING LTD., NICOSIA, CYPRUS
RECENT DEALS:
C/P 28/08/2007 "GRAND MARKELA" ON TCT NOVO/SAUDI ARABIA 50'000 MTS BARLEY
D/OWNERS C. TRANSPORT
C/P 23/08/2007 "ERNEST" ON TCT NOVO/AQABA 33'000 MTS WHEAT
D/OWNERS - CARGILL INTERNATIONAL S.A.
C/P 21/08/2007 "SOUTHGATE" ON TCT NOVO/DAMIETTA 24'000 MTS WHEAT
D/OWNERS - NOBLE RESOURCES S.A.
C/P 20/07/2007 "THOR CONFIDENCE" ON VOYAGE BSS NOVO/ADEN 23200 MTS WHEAT
OWNERS - THORESEEN
C/P 20/06/2007 "SILVERGATE" ON VOYAGE BSS NOVO/AQABA 50'000 MTS BARLEY
D/OWNERS - INDUSTRIAL CARRIERS
C/P 01/06/2007 "LEROS" ON TCT NOVO/ADEN—HODEIDAH 40'500 MTS WHEAT
D/OWNER - CUSTODIA

8

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

### Clause 30 Bunker Clause

Bunker on delivery to be as on board (expect IFO about 328 mts and MGO about 55 mts).
Bunker on redelivery to be about same quantity (not less) as actually on delivery. Charterers will pay cost of bunker on delivery together with 1st hire.
Bunker prices - IFO USD 435 / MGO 745 per mt, same prices on redelivery

### Clause 31 Trading Exclusions

One time Charter Trip to Aqaba / Jordan.

### Clause 32 Cargo Trading Clause

Cargo is grain.

### Clause 33 –Deleted.

### Clause 34

Owners guarantee that the vessel is an easy trimming bulk carrier suitable for loading / carrying / discharging a full and complete cargo of any / all kinds of grain in bulk without bagging / strapping/securing. The vessel to have on board at all times all relevant grain loading booklets / manuals / certificates and hold end trimming table and vessel to be able to load grain without shifting boards / grain fittings in accordance with 1991 amendments the International Convention of SOLAS 1974 and has dispensation from trimming holds ends.

### Clause 35 Hire Payment

Hire and all monies due to the Owners under this Charter Party will be paid to Owners' bank account. Charterers will not agree to the assignment of hire, monies due under this Charter Party or the Charter Party itself in any circumstances whatsoever.

First hire shall be paid within 3 banking days after vessel's delivery together with value of bunkers. Thereafter, hire shall be settled every 15 days in advance. Greenwich Mean Time (G.M.T.) shall be applied for hire calculation purpose.

Notwithstanding anything contained herein to the contrary, if any time during the currency of this Charter, hire shall become due on or during a Saturday, Sunday or national holiday or outside normal office hours, or at any time which for reasons beyond their reasonable control would prevent Charterers from effecting payment of hire on the due date, payment of hire is to be made on the banking day immediately preceding the date on which hire becomes due. Where there is any failure to make hire payment on the due date because of an oversight or negligence or error or omission of Charterers' employees, Bankers or Agents or otherwise for any reason where there is absence of intention to fail to make payment as set out, Charterers shall be given by Owners 3 banking days' notice to rectify the failure, where so rectified the payment shall stand as punctual and regular payment.

### Clause 36 Charterers' Deduction

Charterers have no right to deduct any Owners' expenses from the Charter hire. It is understood that Owners will forward to load and/or discharge agent in advance any funds required for Owners' expenses.

<u>M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007</u>

### Clause 37 Communication/Entertainment/Victualling
Charterers shall pay US$ 1,250.- per month or pro rata in lieu of communication / entertainment / victualling.

### Clause 38 Delivery/Redelivery Notice
Delivery Notices:     on fixing and then daily notices.

Redelivery Notices:     15 days approximate and 5/3/2/1 days definite notice of redelivery date and port.

### Clause 39  Stevedore Damage Clause
Stevedores shall be employed at the risk of and paid for by the Charterers. It is understood that all tallying is to be for Charterers' account.

Charterers shall not be responsible for any damage suffered by the vessel and/or her equipment whilst loading or unloading, unless such damage is notified to Charterers' representatives/Agents in writing by the Master latest within 24 hours after the occurrence, except in case of hidden damages which to be reported latest upon completion of discharge.

In the event of stevedore damage:

a)     Such damage to be entered into the vessel's log book.

b)     Master shall also have notified the stevedores or parties responsible for such damage in writing or telex/cable with copy to Charterers.

c)     If the damage caused as above by Charterers or their stevedores affects the vessel's seaworthiness or cargo worthiness or is subject to Classification requirements then all such damage is to be repaired to the satisfaction of the vessel's Classification Society prior to leaving the loading/discharging port. Vessel remaining on hire and costs being borne by Charterers.

d)     Damages not affecting seaworthiness or cargo worthiness or is not subject to classification requirements may be repaired later together with Owners' work at Owners' time and at Charterers' expenses. Owners to provide Charterers with copies of original invoices and if required, to advise Charterers' nature of work necessary to repair damages.

e)     Master will make every attempt to obtain written acknowledgement from the party causing the damage but this without prejudice to paragraphs 'a' through 'd'.

### Clause 40 P and I Club
Owners guarantee that the vessel is fully covered by the Ingosstrakh. Charterers have the benefit of Owners' cover granted by the P and I Club so far as the Club Rules permit.

Trip to Jordan always as per vessel's P and I club requirements which are:

= subject to previous written notification to Ingosstrakh;
= loading/discharging surveys carried out by approved surveyor of Ingosstrakh;

M/V "PAGANE" - GI.INGROW - C/P DATED 17th OCTOBER 2007

**Clause 41 Return Insurance**
As far as rules permit, the Charterers to have the benefit of any return insurance premium receivable by Owners from their underwriters, as and when received by Owners, by reason of vessel being in port all such time on hire.

**Clause 42 War Risk**
Basic war risk insurance premium for worldwide trading to be for Owners' account, and additional premiums for hull and machinery and Officers/crew for trading to restricted area, also crew war bonus, if any, to be for Charterers' account. The orders of Owners' war risk underwriters always to be followed.

The vessel's hull and machinery value of fixing is USD 5,200,000.-

**Clause 43 On/Off-Hire Survey**
Charterers to appoint a surveyor acting on their behalf for performing a joint on and off hire bunker and condition survey. Joint on hire survey to be in Owners' time unless vessel already loading and joint off hire survey to be in Charterers' time. Expenses for on/off hire survey to be shared equally between Owners and Charterers.

**Clause 44 Hold Cleaning**
On arrival first load port, vessel to be grain clean and ready in every respect and in all compartments to receive Charterers' cargo to local surveyors' and/or competent authorities' satisfaction, failing which vessel to be off-hire from the time of rejection until passed again. Owners to take immediate corrective steps to expedite cleaning as fast as possible including the use of shore labour. If vessel fails inspection, all bunkers consumed after rejection and extra expenses incurred as a direct result to be for Owners' account, until vessel has been passed in all compartments again.

Charterers' option to redeliver the vessel unclean paying USD 5,000.00 in lieu of hold cleaning.

**Clause 45 Bills of Lading**
The Owners undertake to instruct the Master to authorise Charterers or Charterers' Agents if required to issue and sign Bill(s) of Lading on Charterers' usual form on Owners' and Master's behalf for cargo as presented in conformity with Mate's receipts. Charterers to keep Owners harmless should Charterers' servants not issue Bills of Lading per Owners'/Master's strict authority.

Should original Bill(s) of Lading not be available prior to vessels' arrival to the discharging port(s) in time, Owners to agree to release entire cargo without production of original Bill(s) of Lading, if so requested by Charterers or their agent(s), against a fax presentation of Letter of Indemnity under Owners' P and I Club wording which to be singly signed by Charterers or signed by sub-Charterers together with Charterers' joint signature.

No liner or through Bills of Lading or Seaway Bill may be issued/used during the currency of present Charter Party.

Charterers are not to issue or cause to be issued Bs/L which are subject to Hamburg rules.

**Clause 46 ISM Clause**
From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both

11

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Owners shall indemnify Charterers for any and all loss, expense and/or damage and/or consequences sustained by Charterers resulting from partial or full non-compliance with this clause. Any and all delays to the vessel resulting from such partial or full non-compliance with this clause shall not count as laytime or, if laytime has expired, as time on demurrage respectively, as the case may be, as on-hire time.

## Clause 47 Deratisation Certificate
The vessel to have valid deratisation certificate and/or equivalent fumigation certificate on board at time of delivery. The validity of which is to be maintained by Owners in their time and at their expense during the currency of this Charter Party.

## Clause 48 Quarantine/Smuggling
Normal quarantine time and expenses for entering ports shall be for Charterers' account. The Owners shall be liable for any delay in quarantine arising from the Master or any of the deck or engine Officers or crew having communication with the shore at any infected area without the written consent or instructions of Charterers or their Agents, also for any loss of time through detention by customs or other authorities caused by smuggling or their infraction of local law on the part of the Master or any of the deck or engine crew. Any delay, expenses and/or fines incurred on account of smuggling, if caused by the Charterers' supercargo and/or their staff or Agents are to be for Charterers' account. Likewise, if any delay in quarantine arises as a result of Charterers' trading of the vessel and/or misinstructions or lack of proper instructions by Charterers or their Agents, servants or representatives such delay is to be for Charterers' account.

## Clause 49 Health Certificate
The Owners shall arrange at their expense that Master, Officers and crew of vessel hold valid vaccination certificates against yellow fever, smallpox, cholera or other necessary health certificates during the Charter.

## Clause 50 Vessel's Equipment
Vessel's equipment shall comply with the regulations of the countries in which vessel will be employed and Owners are to ensure that vessel is at all times in possession of valid and up-to-date certificates as required. If stevedores, longshoremen or other workmen are not permitted to work due to failure of the Master and/or the Owners and/or Owners' Agents to comply with the aforementioned regulations or because the vessel is not in possession of such valid and up-to-date certificates as required, then Charterers may suspend hire for the time thereby lost and Owners shall pay all proven extra direct expenses incurred incidental to and resulting from such failure.

## Clause 51 Safety Regulation
It is understood that the vessel will comply with all safety regulations and/or requirements in effect at ports of loading and/or discharging. It is agreed that should the vessel not meet safety rules and regulations, Owners will take corrective action and vessel is to be off-hire.

## Clause 52 Canal Certificate

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

The vessel is fully fitted for Panama/Suez Canal transit and in possession of valid necessary certificate on board, in conformity with current canal regulations/requirements.

### Clause 53 Crew Service
During the currency of this Charter Party and provided weather and local stevedore and port regulations permit, Charterers to have the option to use crew to perform the following services as a means toward an efficient cargo operation:

a)   At each port all of the hatch opening and closing;
b)   Preparing vessel for sea;
c)   Removal and disposal of dunnage to be for Charterers' account;
d)   Gangway watchmen for the vessel to be for Owners' account.
      Compulsory cargo watchmen to be for Charterers' account;
e)   Before and upon arrival at a port, vessel's Officers/crew to shape up vessel's hatches, and gangway in order to commence loading and/or discharging without delay. Opening/closing of all hatchcovers and erecting and dismantling of shifting boards, if necessary, shall be done by Officers/crew provided shore regulations permit.

### Clause 54 War Cancellation
If war breaks out between any two or more of the following countries: United Kingdom, U.S.A., C.I.S., P.R.C., Japan, directly affecting the performance of this Charter, both Owners and Charterers shall have the option of cancelling this Charter whereupon Charterers shall redeliver vessel to Owners, if she has cargo on board after discharge thereof at destination, or, if debarred from reaching or entering it, at a near, open and safe port as directed by Charterers, or if she has no cargo on board, at a port at which she stays or if at sea at a near and safe port as directed by Charterers. In all cases, hire shall be paid until vessel's redelivery.

### Clause 55 Requisition
Should the vessel be requisitioned by any government or governmental authority due to Owners/Managers/vessel's fault, or due to vessel's flag or Ownership during the period of this Charter, she shall be off-hire during the period of such requisition and any hire or other compensation paid by any government or governmental authority in respect of such requisition shall be for Owners' account.

### Clause 56 Extra Period
Should the vessel be placed off-hire during the currency of this Charter for any reason whatsoever, the Charterers have the option of adding all or any part of such off-hire period to the original period.

### Clause 57 Cancellation Clause
If the vessel is placed off-hire more than 30 consecutive days, Charterers have the right to cancel the balance period of this Charter by giving notice to Owners without prejudice to any other right the Charterers may have under this Charter and provided vessel is free of cargo.

### Clause 58 Capture/Seizure/Arrest
Should the vessel be seized or detained or arrested or delayed by any authority during the currency of this Charter Party, the Charterers' liability for seizure or detention or arrest or delay is ceased immediately from the time of her seizure or detention or arrest or delay and all time lost by this reason shall be treated as off-hire until the time of her release unless such seizure or detention or arrest or delay is occasioned by any personal act or omission or default of Charterers or their Agents. Extra

13

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

expenses incurred directly from above seizure or detention or arrest or delay to be for Owners' account.

### Clause 59 Cargo Claim

Cargo Claims To Be Settled As Per NYPE Interclub Agreement 1996

### Clause 60 Small Claims Procedure Clause

Notwithstanding anything contained in the Arbitration Clause to the contrary, should neither the claims nor the counterclaims exceed USD 100.000.00 exclusive of interest on the sum claimed, costs of the arbitration and legal expenses, if any, it is hereby agreed the dispute is to be governed by the London Maritime Arbitrators' Association Small Claim Procedure, revised 1st January, 1994.

### Clause 61 Deviation/Put Back

Should the vessel put back whilst on voyage by reason of an accident or breakdown or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness or accident to the crew or any person on board the vessel or by reason of the refusal of he Master or crew to perform duties, the hire shall be suspended from the time of inefficiency, unless caused by Charterers and/or Charterers' servants until the vessel is again efficient in the same position (or in Charterers' option at a point equidistant to the vessel's next destination) and voyage resumed therefrom. All direct expenses incurred including bunkers consumption during the period of suspended hire shall be for Owners' account.

### Clause 62 Water Pollution
A.    For Bulk Carriers:

(1)    Owners warrant that throughout the currency of this Charter they will provide the vessel with the following certificates:

    (a)    Certificates issued pursuant to Section 311 (p) of the U.S. Federal Water Pollution Control Act, as amended (Title 33 U.S Code, Section 1321(p)) up to (insert the date upon which such certificate(s) is/are due to expire).

    (b)    Certificates issued pursuant to Section 1016(a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended in accordance with Part 138 of Coast Guard Regulations 33 CFR, from (indicate the earliest date upon which the Owners may be required to deliver the vessel into the Charter or, if later, the date inserted in sub-paragraph (a) above), so long as these can be obtained by the Owners from or by (identify the applicable scheme or schemes).

(2)    Notwithstanding anything whether printed or typed herein to the contrary:

    (a)    Save as required for compliance with paragraph (1) hereof, Owners shall not be required or establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter.

14

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

(b) Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(c) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any Bills of Lading issued pursuant to this Charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or water, other than to the extent provided in paragraph (1) hereof.

### Clause 63 Owners' Agents
Charterers may agree to have their Agents attend to the Owners' matters such as delivery, redelivery, general average, drydocking, repair, hospitalisation, repatriation of crew, supply of the vessel's stores and provisions, etc., with Owners paying Charterers' Agents actual expenses including attendance fee and agency fee according to the Charterers' tariff rate. Charterers may also agree to have their Agents to attend to trivial Owners' matters, such as, cash advance, crew mail, arranging shore pass with Owners paying actual expenses including attendance fee, if any, but without agency fee. (See Clause 36).

### Clause 64 Taxes
Export and/or import permits for Charterers' cargo to be at Charterers' risk and expense. Taxation or levies on cargo or freight to be for Charterers' account and to be paid by Charterers.

### Clause 65 Paramount Clause
General Paramount Clause to apply

### Clause 66 Additional Clause
New Jason Clause, P and I Bunkering Clause, New Both-to-Blame Collision Clause and Baltime War Risk Clause, as attached, to be incorporated in this Charter Party and all Bill(s) of Lading issued hereunder.

### Clause 67 Drydock Clause
The Owners have no option to make her drydock during this Charter period except emergency cases, or unless otherwise agreed.

### Clause 68 - Deleted

### Clause 69 Bulk Carrier Safety Clause
(A) The Charterers shall instruct the terminal operators or their representatives to cooperate with the Master in completing the IMO Ship/Shore Safety Checklist and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

(B) In addition to the above and notwithstanding any provision in this Charter Party in respect of

15

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

loading/discharging rates, the Charterers shall instruct the terminal operators to load/discharge the vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the vessel's draught, trim, stability, stress or any other factor which may affect the safety of the vessel.

(C)  At any time during cargo operations, the Master may, if he deems it necessary for reasons of safety of the vessel, instruct the terminal operators or their representatives to slow down or stop the loading or discharging.

(D)  Compliance with the provisions of this Clause shall not affect the counting of hire.

**Clause 70 Stowaway Clause**
Any time lost including but not limited to time on demurrage and any losses, liabilities and cost incurred by reason of stowaways on board shall be for Owners' account.

**Clause 71 Ocean Route Clause**
Evidence of weather conditions to be taken from independent weather bureau reports. Owners to be represented by the findings of 'Aerospace' Ocean Routing Company. In case of dispute between Owners and Charterers' ocean routing companies, the matter to be taken into further arbitration. In any case, Master always entitled to choose vessel's routing related to vessel and crew safety.

Owners' ocean routing company full style/address as follows:

Aerospace & Marine International Corporation,
6920 Santa Teresa Boulevard, Suite 209,
San Jose, CA 95119, U.S.A.
Tel:       408-360-0440
Fax:       408-360-0450
Tlx:       149158
Email:     ops@weather3000.com
Web-port:  www.amlwx.com

**Clause 72 Mobile Crane Clause**
Deleted.

**Clause 73 Split Bills of Lading Clause**
Charterers and/or Agents are hereby authorised by Owners/Master to split Bills of Lading and issue ship delivery orders in negotiable and transferable forms against collection of full set of original Bills of Lading. Delivery orders to conform with all terms and conditions and exceptions of Bills of Lading and shall not prejudice shipowners' rights.

**Clause 74 Oil  Pollution**
As a condition of this Charter Party, Owners guarantee that Owners and vessel are and will remain throughout the currency of the Charter Party insured for pollution liability with respect to trading within, to and from ranges and areas specified in this Charter, said insurance to have a limit of not less than U.S.$1 billion. At any time before or subsequent to the fixture date of this Charter, Owners, upon reasonable notice from Charterers, shall furnish to Charterers or its representative proof, satisfactory to Charterers, of such insurance. Without prejudice to Charterers' other rights, Owners shall indemnify Charterers for any and all loss, expense and/or damage sustained by Charterers resulting

16

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

from non-compliance with this Clause. Any and all delay to the vessel resulting from such non-compliance shall not count as laytime or, if laytime has expired, as time on demurrage.

**Clause 75**
Vessel's crew contracts are bona fide employment agreement.

**Clause 76**
The vessel to remain always in seaworthy trim/condition to safely sail between ports/berths to Master's satisfaction.

**Clause 77**
Deleted.

**Clause 78 ISPS Clause**
(a)    (i)    From the date of coming into force of the International Code for the security of ships and of port facilities and the relevant amendments to chapter XI of SOLAS (ISPS code) in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the vessel and "the company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The owners shall provide the Charterers with the full style contact details of the company security officer (CSO).

       (ii)    Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this clause shall be for the Owners' account.

(b)    (i)    The Charterers shall provide the CSO and the ship security officer (SSO)/master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-Charter Parties they enter into during the period of this Charter Party contain the following provision:

              "The Charterers shall provide the owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

       (ii)    Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this clause shall be for the Charterers' account.

(c)    Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result

17

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

solely from the owners' negligence, crew's nationality/visa issues, or costs or expenses
directly arising from vessel's ownership or other crewing matters.

(d) If either party makes a payment which is for the other party's account according to this clause, the
other party shall indemnify the paying party.

### Clause 79
All negotiations/trade are to be made in accordance with English Law. English Law to apply.
Arbitration, if any, to be in London in accordance with the Arbitration Clause of the Charter Party.

### Clause 80
Charterers have the option to perform a general condition survey of the vessel at any time. Survey to
be at Charterers' time and expenses.

### Clause 81
Owners to provide following certificates as per L/C requirements (see attached):

1.  Certificate issued and signed by (P and I) Club or their representative or by their agent to the
    effect that the carrying vessel is a member to that (p and I) club having representative or agent in
    Jordan.

2.  Certificate issued and signed by shipping register or their agent certifying that the carrying
    vessel is classified 100a1 or its equivalent and free from any outstanding recommendations.

### Clause 82

Negotiations and fixture, if any, to be kept private & confidential by all parties involved.

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

## BOTH-TO-BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

### New Both-to-Blame Collision Clause

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact"
and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

### New Jason Clause

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.
If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery"

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

19

<u>M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007</u>

## BALTIME 1939 WAR CLAUSE

(A)  The vessel unless the consent of the Owners be first obtained not to be ordered nor continue to any place or on any voyage nor be used on any service which will bring her within a zone which is dangerous as the result of any actual or threatened act of war, war hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or state whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of Sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any Government or Ruler.

(B)  Should the vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (1) the Owners to be entitled from time to time to insure their interests in the vessel and/or hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand; and (2) notwithstanding the terms of Clause 11, hire to be paid for all time lost including any loss owing to loss of or injury to the Master, Officers or crew or to the action of the crew in refusing to proceed in such zone or to be exposed to such risks.

(C)  In the event of the wages of the Master, Officers and crew or the cost of provisions and/or stores for deck and/or engine room and/or insurance premiums being increased by reason of or during the existence of any of the matters mentioned in section (A) the amount of any increase to be added to the hire and paid by the Charterers on production of the Owners' account therefore, such account being rendered monthly.

(D)  The vessel to have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other wise whatsoever given by the Government of the nation under whose flag the vessel sails or any other Government or any person (or body) acting or purporting to act with the authority of such Government or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such orders or directions.

(E)  In the event of the nation under whose flag the vessel sails becoming involved in war, hostilities, warlike operations, revolution or civil commotion, both the Owners and the Charterers may cancel the Charter and, unless otherwise agreed, the vessel to be redelivered to the Owners at the port of destination or, if prevented through the provisions of Section (A) from reaching or entering it, then at a near open and safe port at the Owners' option, after discharge of any cargo on board.

(F)  If in compliance with the provisions of this clause anything is done or is not done, such not to be deemed a deviation.

Section (C) is optional and should be considered deleted unless agreed according to Baltime 1939.

<u>M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007</u>

## P. AND I. BUNKER CLAUSE

The vessel shall have liberty as part of the Contract Voyage to proceed to any port or ports at which bunker oil is available for the purpose of bunkering at any stage of the voyage whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the ports of loading or discharge named in this Charter and may there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks and deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

## BIMCO STANDARD ISM CLAUSE

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by the failure on the part of the Owners or 'the Company' to comply with the ISM Code shall be for Owners' account.

## SECA CLAUSE

During the currency of this contract the performing vessel will consume bunkers in accordance with ISO 8217 specifications. In the event that emissions regulations, laws or guidelines require or recommend the stemming or consumption of bunkers with a quality that has a higher value than the price for high sulphur fuel oil, then such excess price will be paid for by Charterers for bunkers consumed whilst in an emission controlled area. Upon request Owners to provide documentary proof for such price differential together with the actual bunker consumption in these emission controlled areas.

## BUNKER FUEL SULPHUR CONTENT CLAUSE FOR
## TIME CHARTER PARTIES 2005

(A) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the vessel is ordered to trade within that zone. The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with regulations 14 and 18 of Marpol Annex VI, including the guidelines in respect of sampling and the provision of bunker delivery notes.

21

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this sub-Clause (A).

(B)   Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with sub-Clause (A), the Owners warrant that:

    (i)   The vessel shall comply with regulations 14 and 18 of Marpol Annex VI and with the requirements of any emission control zone; and

    (ii)   The vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the vessel with fuels in accordance with sub-Clause (A), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the vessel's failure to comply with regulations 14 and 18 of Marpol Annex VI.

(C)   For the purpose of this Clause, 'emission control zone' shall mean zones as stipulated in Marpol Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the E.U. and the U.S. Environmental Protection Agency.

22

# EXHIBIT 2

From: 35725586698          Page: 1/1    Date: 11/29/2007 15:25:30 PM

## Provisional  Hire statement MV PAGANE
## cp dd 17.10.2007/GLINGROW HOLDING LTD.
### Voyage PAG/2007/03/TC

| | | | | US$ **Debit** |
|---|---|---|---|---|
| Hire from: | | | | |
| 18.10.2007 01:00 GMT DOP KERCH | | | | |
| 01.12.2007 13:00 GMT | | | | |
| 44,708333 | days | @ | 60 000,00 | 2 682 500,00 |
| Bunkers on delivery: | | | | |
| 365,257 | IFO mts | @ | 435,00 | 158 886,80 |
| 46,649 | MDO mts | @ | 745,00 | 34 754,27 |
| | | | | 6 000,00 |
| ILOHC | | | | 1 544,67 |
| C / V / E | 37,00000 | @ | 1 250,00 | m/r   2 882 679,73 |
| | | | | subtotal   debit |

| | | | | **Credit** |
|---|---|---|---|---|
| less: | | | | |
| commission | 3,75 % | | | 108 593,75 |
| Owners expenses: | | | | |
| on-hire survey | 50% | | | 400,00 |
| off-hire survey | 50% | | | 750,00 |
| Off-hire: | | | | |
| at Iport Novo | 6,701389 | days | | 387 065,21 |
| bunker consumed | | | | 11 970,66 |
| at Suez Canal | 1,587639 | days | | 87 066,15 |
| bunker consumed. | | | | 2 807,98 |
| Bunkers on re-delivery: | | | | |
| 365,257 | IFO mts | @ | 435,00 | 158 886,80 |
| 15,000 | MDO mts | @ | 745,00 | 11 475,00 |
| Payments: | | | | 1 061 013,00 |
| 1. | | | | 440 966,15 |
| 2. | | | | 26 164,84 |
| 3. | | | | |
| | | | subtotal   credit | 2 287 830,77 |
| grand total in favour OWNERS | | | debit | 584 848,97 |
| payment to be arranged to: | | | | |

| | |
|---|---|
| BENEFICIARY | BULCOM LTD. |
| ACC. No: | 72673/ZG |
| WITH: | BNP PARIBAS (SUISSE) S.A. |
| | PLACE DE HOLLANDE, 2 |
| | *CH-1211, GENEVA 11* |
| | SWITZERLAND |
| SWIFT: | BPPBCHGG |
| IBAN: | CH69 0868 6001 0725 7300 Z |

This fax was received by GFI FAX maker fax server. For more information visit: http://www.gfi.com

# EXHIBIT 3

From: Marianne Brookes
Sent: 29 November 2007 11:50
To: arbitration@christophermoss.com
Subject: M/V Pagane C/P DD.17.10.2007

Dear Sir,

We act for Bulcom Ltd, the disponent owners of the above vessel.

Under a time charter on the NYPE form (copy attached), disponent owners chartered their vessel to Glingrow Holding Ltd for 1 time charter trip for the carriage of grain from the Black Sea to Aqaba.

Under Clause 17 of the charterparty, any disputes between owners and charterers shall be referred to three persons in London and be determined in accordance with English Law.

Disputes have arisen between the parties. You are hereby appointed as owners' arbitrator. Kindly confirm acceptance of your appointment.

Best regards,

Brookes & Co.

Brookes & Co., Solicitors, 60 Lombard Street, London, EC3V 9EA, United Kingdom.
Tel: +44 (0)20 3159 4330  Fax: +44 (0)20 7691 7773.  General office email address: mail@brookes-and-co.co.uk
Principal: Marianne Brookes
Brookes & Co. is regulated by the Solicitors Regulation Authority
Confidentiality Note
The contents of this email and any attachments are strictly confidential and must not be copied to, used by or disclosed to any person other than the named recipient(s). Please let us know immediately by telephoning +44 (0)20 3159 4330 if this email has been sent to you in error.

EXHIBIT B

Dec. 19. 2007  4:26PM    Lennon, Murphy & Lennon LLC                    No. 2811   P. 3

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __12. 21. 07__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

BULCOM LTD.,                                   :        07 CV 10726

                              Plaintiff,       :        ECF CASE

        - against -                            :        CONSENT ORDER

GLINGROW HOLDING LTD. and                      :
RIAS TRADING,                                  :

                              Defendants.      :
-----------------------------------------------------------------X

        It is hereby stipulated and agreed between the parties, by their undersigned attorneys, that

the funds that are currently under attachment in this action are to be released.  The garnishee

bank(s) are hereby instructed to release the attached funds pursuant to joint instructions to be

provided by letter and signed by the undersigned counsel.  The payment of the released funds by

the garnishee bank(s) shall not be subject to any further attachment in New York after those

funds are released by the garnishee bank(s).

The Plaintiff                                  The Defendants
BULCOM LTD.                                    GLINGROW HOLDING LTD. and
                                               RIAS TRADING

By: _____                    By: _____
    Kevin J. Lennon                                Thomas L. Tisdale
LENNON, MURPHY & LENNON LLC                     TISDALE LAW OFFICES, LLC
420 Lexington Avenue, Suite 300                 11 West 42nd Street, Suite 900
New York, NY 10170                              New York, NY 10036
(212) 490-6050                                  (212) 354-0025 – phone
(212) 490-6070                                  (212) 869-0067 – fax
klennon@lenmur.com                             ttisdale@tisdale-law.com

SO ORDERED:                    12/20/07

_____
Honorable Peter K. Leisure, U.S.D.J.

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

PAGANE MARITIME LTD.,

                    Plaintiff,

    - against -

GLINGROW HOLDING LTD. and
RIAS TRADING,

                  Defendants.

-------------------------------------------------------X



## AMENDED VERIFIED COMPLAINT

Plaintiff, PAGANE MARITIME LTD[1], ("Plaintiff"), by and through its attorneys,

Lennon, Murphy & Lennon, LLC, as and for its Amended Verified Complaint against the

Defendants, GLINGROW HOLDING LTD. ("Glingrow") and RIAS TRADING ("Rias")

(collectively "Defendants") alleges, upon information and belief, as follows:

    1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the

breach of maritime contract of charter. This matter also arises under the Court's federal question

jurisdiction within the meaning of 28 United States § 1331 and the New York Convention on the

Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201 *et seq.*) and/or the

Federal Arbitration Act (9 U.S.C. § 1 *et seq.*).

---

[1] This action was originally filed in the name of Bulcom Ltd. However, the charter party discussed in the Complaint was erroneously drawn by the broker reflecting Bulcom Ltd. instead of Pagane Maritime Ltd. Plaintiff is substituing the correct party in interest pursuant to Fed. R. Civ. P. 17(a) and this action shall be deemed to have been commenced in the name of Pagane Maritime Ltd as the real party in interest.

2.      At all times material to this action, Plaintiff was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law and was at all material times the disponent owner[2] of the motor vessel "PAGANE" (hereinafter the "Vessel").

3.      Upon information and belief, Defendant Glingrow was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of the laws of Cyprus Belarus with a place of business at 15, Boumpoulinas, Povek Building, Apt. No. 301, Nicosia, Cyprus and was at all material times the Charterer of the Vessel.

4.      Upon information and belief, Defendant Rias was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law and was at all material times the alias, partner, joint venturer and/or paying, or receiving, agent of the Defendant Glingrow.

5.      By a charter party dated October 17, 2007 Plaintiff time chartered the Vessel to Defendant Glingrow for one time chartered trip (duration about 30 days) via the Black Sea for the carriage of any lawful bulk grain cargo to Aqaba, Jordan. A copy of the charter party is attached hereto as Exhibit 1.[3]

6.      Plaintiff delivered the Vessel into the service of the Defendant Glingrow at Kertch, Ukraine and has at all times fully performed its duties and obligations under the charter party.

7.      A dispute has arisen between the parties regarding Defendant Glingrow's failure to pay the hire for its use of the vessel which is due and owing to Plaintiff under the charter party contract. Clause 4 of the charter party requires Defendant Glingrow to pay for the use and hire

---

[2] A 'disponent owner' controls the commercial operations of a vessel having taken the vessel on charter from the registered owner of the vessel. The disponent owner usually time charters the vessel from the registered owner and then sub-charters the vessel to charterers.

[3] Please note that the annexed charter party incorrectly identifies Bulcom Ltd. as the disponent vessel owner.

of the Vessel at the rate of $60,000 per day, pro rata, including overtime, payable in advance every 15 days.

8.       In breach of its obligation to pay hire the Defendant Glingrow failed to remit payment to the Plaintiff on or about November 21, 2007 when a 15 day advance hire payment of became due and owing to the Plaintiff.

9.       Defendant Glingrow did remit a partial payment of the outstanding hire due to the Plaintiff but there remains a balance unpaid of $498,754.67. A copy of the Plaintiff's revised provisional hire statement is attached hereto as Exhibit 2.

10.      As a result of Defendant Glingrow's breaches of the charter party due as aforesaid, Plaintiff has sustained damages in the total principal amount of $498,754.67, exclusive of interest, arbitration costs and attorneys fees.

11.      Pursuant to the charter party, disputes between the parties are to be submitted to arbitration in London subject to English law. Plaintiff has commenced London arbitration against Defendant by appointment of its arbitrator Mr. Christopher Moss. A copy of Plaintiff's arbitration appointment is attached hereto as Exhibit 3.

12.      This action is brought in order to obtain jurisdiction over Defendants and also to obtain security for Plaintiff's claims and in aid of arbitration proceedings.

13.      Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law. Section 63 of the English Arbitration Act of 1996 specifically allows for recovery of these items as part of an award in favor of the prevailing party. As best as can now be estimated, Plaintiff expects to recover the following amounts at arbitration as the prevailing party:

| | | |
|---|---|---|
| A. | Unpaid hire: | $498,754.67; |
| B. | Estimated interest on claims - 3 years at 6.0% compounded quarterly: | $89,775.84; |

3

| C. | Estimated arbitration costs: | $30,000; and |
| D. | Estimated attorneys' fees and expenses: | $70,000.00. |
| **Total:** | | **$688,530.51.** |

14. The Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendants have, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendants.

15. Upon information and belief, Defendant Rias acts as paying agent, and/or receiving agent, or arranges for other non-parties to satisfy the debts and obligations of Defendant Glingrow, and/or receive payments being made to Defendant Glingrow.

16. Although Rias was not named in the charter party, and had no formal relationship to the charter of the M/V "PAGANE" it paid initial hire owing to Plaintiff from Glingrow.

17. It is not common practice in the maritime industry, nor any other business, for an independent company to pay another company's debt, where it has no formal relationship to the underlying contract.

18. The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the Defendants held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendants and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A.       That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Amended Complaint failing which default judgment be entered against it;

B.       That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of $688,530.51 belonging to, due or being transferred to, from, or for the benefit of the Defendants, including but not limited to such property as may be held, received or transferred in Defendants' name(s) or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Amended Complaint;

C.       That the Court retain jurisdiction to compel the Defendants to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

D.       That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

E.       That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court;

5

F.       That this Court award Plaintiff the attorneys' fees and costs incurred in this

action; and

G.       That the Plaintiff has such other, further and different relief as the Court

may deem just and proper.

Dated:        New York, NY
              December 20, 2007


                              The Plaintiff,
                              PAGANE MARITIME LTD.


                       By: _____

                              Charles E. Murphy
                              Kevin J. Lennon
                              LENNON, MURPHY & LENNON, LLC
                              420 Lexington Avenue, Suite 300
                              New York, NY 10170
                              (212) 490-6050 - phone
                              (212) 490-6070 - facsimile
                              cem@lenmur.com
                              kjl@lenmur.com

## ATTORNEY'S VERIFICATION

State of New York   )
                )   ss.:   City of New York
County of New York )

1.    My name is Charles E. Murphy.

2.    I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.    I am a partner in the firm of Lennon, Murphy & Lennon, LLC attorneys for the Plaintiff.

4.    I have read the foregoing Amended Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.    The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.    The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated:    New York, NY
           December 20, 2007

Charles E. Murphy

# EXHIBIT 1

# TIME CHARTER

GOVERNMENT FORM
Approved by the New York Produce Exchange
November 6th, 1913–Amended October 20th, 1921 ; August 6th, 1931 ; October 3rd, 1946

1.  **This Charter Party,** made and concluded in *Novorossiysk* ..................................... *17th* day of *October 2007* ...*49*....
2.  Between ...*Messrs Bulcom Ltd.* .................................. as disponent
3.  Owners of the good ......*Panama Flag*..... Steamship/Motorship. *"Pagana"*... Description *as per Clause 29* of .........
4.  of ............ tons gross register, and ......................... tons net register, having engines of ................. indicated horse-power
5.  and with hull, machinery and equipment in a thoroughly efficient state, and classed .....................................................
6.  at ................................................. cubic feet bale capacity, and about ..................................... tons of 2240 lbs.
7.  deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,
8.  allowing a minimum of fifty tons) on a draft of ............... feet ............. inches on ...............................................
9.  which are of the capacity of about ................................................ Summer freeboard, inclusive of permanent bunkers,
10. conditions about .................. knots on a consumption of about .......... tons of fuel, and capable of steaming, fully laden, under good weather
11. now .......... *trading* ...................................................................... of best Welsh coal—best grade fuel oil—best grade Diesel oil
12.

................................. and ... *Messrs GLINGROW HOLDING LTD.* ...................................... Charterers of the City of ...*Nicosia, Cyprus.*..........

13.  **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14.  about *1 time Charter trip via safe ports, safe berths, safe anchorages always afloat, always within IWL, via Black sea with bulk lawful grain to Aqaba,*
     *Jordan. Duration about 30 days.*
15.  within below mentioned trading limits.
16.  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17.  the fulfillment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations hereunder.*
18.  Vessel to be placed at the disposal of the Charterers, at *on dropping outward pilot Kertch at any time day or night Sundays and Holidays included.*
19.
20.  in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No.6), as
21.  the Charterers may direct. If such dock, wharf or place be not available for time to count as provided for in clause No.5, Vessel on her delivery to be
22.  ready to receive cargo with clean-swept holds and tight, staunch, strong and every way fitted for the service, having water ballast, *(See Clause 42)* winches
     and
23.  donkey boiler with sufficient steam power, or if not equipped with donkey boiler—then other power sufficient to run all the winches at one and the same
24.  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25.  dise, including petroleum or its products, in proper containers, excluding *(See Clause 32).*
26.  (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,
27.  all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North
28.  America—and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or
29.  Mexico—and/or South America
30.  and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, and/or Magdalena River, River St. Lawrence between

~~October 31st and May 15th, Hudson Bay and all unsafe ports, also excluding, when out of season, White Sea, Black Sea and the Baltic.~~ *(See Clause 31)*

as the Charterers or their Agents shall direct, on the following conditions:

1. That *whilst on hire* the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler *and domestic* water, *lubricating oil, vessel's garbage removal unless compulsory* and maintain her class and keep the vessel in a thoroughly efficient state in hull, *holds and hatchcovers,* machinery and equipment *with all certificates necessary to comply with current requirements at all ports of call and canals* for and during the service. *(See Clause 48 and 49).*

2. That, *whilst on hire,* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory and customary* Pilotages, *Turkish strait pilotage* , Agencies, *boatage on Charterers' business for clearance and cargo purpose only,* Commissions, *canal dues and tolls,* Consular Charges (except those pertaining to the Crew *and flag*), and all other usual expenses except those before stated, but when the vessel puts into a port for causes for which ~~Owners are~~ *vessel is* responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this charter to be for Charterers account *including loading expenses should port authorities order crew ashore for safety reasons.* ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period of six months or more.~~

Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, *as permitted under this Charterparty,* ~~but~~ Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards for dunnage, they making good any damage thereto.

3. ~~That the Charterers, at the port of re-delivery, and the Owners, at the port of delivery, shall take over and pay for all fuel remaining on board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~ ........ ~~tons and not more than~~ ........ tons. *(See Clause 30).*

4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *US$ 60000.00 per day pro rata including overtime payable in advance every 15 days. First payment within 3 banking days upon delivery.*

5. Payment of said hire to be made *as per clause 35 in New York in cash* in United States Currency, *every 15 days semi-monthly* in advance, ~~........ United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and stores, on ........ summer freeboard, per Calendar Month,~~ commencing on and from the ~~hour~~ *day* of her delivery, as aforesaid, and at and after the same rate for any part of a ~~day~~ *month*; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary wear and tear excepted, to the Owners (unless lost) at *or dropping last outward sea pilot Aqaba,* any time day or night, *Sundays and Holidays included* ........ unless otherwise mutually agreed. ~~Charterers are to give Owners not less than~~ ........ ~~days notice of vessel's expected date of re-delivery, and probable port.~~ *(See Clause 38)* and for the last 15 days half-month or part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes due, if so required by Owners, unless bank guarantee or deposit is made by Charterers, otherwise failing the punctual and regular payment of the hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they to have the privilege of using vessel at once, such time used to count as hire.~~

65. ~~Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject~~
66. ~~to 2-1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application~~
67. ~~of such advances.~~
68. 6. That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any wharf or place that Charterers or their Agents may
69. direct, provided the vessel can safely lie always afloat at any time of tide, except at such places *in East Coast South America* where it is customary for similar
70. size vessels to safely
71. lie aground.

7. That the whole reach of the Vessel's Hold, Decks and usual places of loading (not more than she can reasonably stow and carry), *compatible with
72. vessel's seaworthiness,* also
73. accommodations for Supercargo, if carried, shall be at Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
74. tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~
75. ~~paying Owners ............... per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expense are~~
76. ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense. No passengers.~~
77. 8. That the Captain shall prosecute his voyage with the utmost dispatch, and shall render all customary assistance with ship's crew and
78. boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
79. agency; and Charterers are to load, stow, and trim, *lash, secure and discharge* the cargo at their *risk and expense* under the supervision of the Captain, *all
80. cargo claims to be settled in accordance with NYPE Interclub Agreement as amended in September 1996 (See Clauses 59/60), who is to sign
81. Bills of Lading for
82. cargo as presented, in conformity with Mate's or Tally Clerk's receipts.*

9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
83. receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

10. That the Charterers shall have the permission to appoint a Supercargo, who shall accompany the vessel *against signing Owners' P and I Club
84. boarding LOI, and see that voyage is prosecuted*
85. *with the utmost despatch.* He is to be furnished with free accommodation, and same fare as provided for Captain's table. Charterers paying at the
86. rate of *USD 10.00 (Ten Dollars) $1.00* per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their agents, to
87. victual Tally
88. Clerks, Stevedore's Foreman, etc., ~~Charterers paying at the current rate per meal, for all such victualling. (See Clause 37)~~

11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, *and / or
89. telecommunication with copy to Owners,* and the

12. Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
90. terers, their Agents or Supercargo, when required, with a true copy of daily Logs, *abstracts in English,* showing the course of the vessel and distance run and
91. the con-
92. sumption of fuel.

13. That the Captain shall use diligence in caring for the ventilation of the cargo. *Vessel has natural ventilation.*

14. ~~That the Charterers shall have the option of continuing this charter for a further period of ...............~~
93. ~~on giving written notice thereof to the Owners or their Agents ............... days previous to the expiration of the first named term or any declared option.~~
94. 15. That if required by Charterers, time not to commence before *00:01 hours Local Time 15th October 2007 ...............and should vessel
95. not have ~~given written notice of readiness been delivered~~ on or before *23:59 hours Local Time 15th October 2007 ....... but not later than 4 p.m.* Charterers or
96. their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
97. 15. That in the event of the loss of time from deficiency *and/or* default of men *or including strike of Officers and / or crew or deficiency of stores,*
fire, breakdown or damages to hull, machinery or equipment,

98. grounding, detection by average accidents to ship or cargo, *unless resulting from inherent vice, quality or defect to the cargo*, drydocking for the purpose of examination or painting bottom, or by any other cause
99. preventing the full working of the vessel *unless same is caused by Charterers or by following their instructions*, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
100. defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101. thereof, and all extra *directly related* expenses shall be deducted from the hire *duly substantiated*.
102. 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103. returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104. Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105. The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106. purpose of saving life and property.
107.
108. 17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London* ~~New-York~~,
109. one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for

the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial *shipping* men. (See Clause 60.)
*General Average / Arbitration in London. This Charter Party shall be governed by and construed in accordance with English Law.*

110. 18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
111. age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112. deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113. might have priority over the title and interest of the owners in the vessel.
114.
115. 19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
116. Crew's proportion. General Average shall be adjusted, stated and settled, according to ~~Rule 1 to 16, inclusive, 17 to 22, inclusive and Rule F of~~ York-Antwerp Rules ~~1974~~ *as amended 1994 at London (See Clause 66)* ~~1924, at each port or place in the United States as may be selected by the carrier,~~
117. and as to matters not provided for by these ~~Rules, according to the law and usages at the port of New-York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
118. ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currencies shall be converted at~~
119. ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120. ~~bond and such additional security as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121. or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
122. required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. ~~Such deposit shall, at the option of the~~
123. ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in the special account at the~~
124. ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125. ~~United States money.~~
126. ~~In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127. ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128. ~~goods, the shippers and the consignees, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129. ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130. ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131. ~~ships belonged to strangers.~~
132.
133. Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. (See Clause 66)
134. 20. Fuel used by the vessel while of hire, ~~also for cooking, condensing water, or for grates and stoves~~ to be agreed to as to quantity, *and shall be for Owners' account.* ~~the cost of replacing same, to be allowed by Owners.~~
135. 21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a

136. ~~convenient place, bottom cleaned and painted whenever Charterers and the Captain think necessary, at least once in every six months, reckoning from~~
137. ~~time of last painting, and payment of the hire is to be suspended until she is again in proper state for the service.~~
138.
139. ~~(See Clause 70)~~
140.
141. 22. ~~Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks), capable of handling lifts up to three tons, also~~
142. ~~providing ropes, falls, slings and blocks. It vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
    ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel ~~lights as on board~~ ~~lanterns and oil~~ for
143. night work, ~~free of expense to Charterers,~~ and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at
144. Charterers' expense. ~~The~~
145. ~~Charterers to have the use of any gear on board the vessel.~~
146. ~~23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;~~
147. ~~steamer to provide one winchman per hatch to work winches day and night, as required. Charterers agreeing to pay officers, engineers, winchmen,~~
148. ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
149. ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
150. ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
151. ~~thereby.~~
152. ~~24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
153. ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels;~~
154. ~~etc." in respect of all cargo shipped under this Charter to or from the United States of America. It is further subject to the following clauses, both~~
155. ~~of which are to be included in all bills of lading issued hereunder:~~

U.S.A. Clause Paramount

This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
156.
157. 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158. any of its rights or immunities or an increase of any of its responsibilities or liabilities under the said Act. If any term of this bill of lading
159. be repugnant to said Act to any extent, such term shall be void to that extent, but no further.
160.
    Both to Blame Collision Clause
161. ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162. ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163. ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164. ~~or liability represents loss of or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165. ~~carrying ship or her owners to the owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her~~
166. ~~owners as part of their claim against the carrying ship or carrier.~~
167. ~~25. The vessel shall not be required to enter any ice-bound port or any port where lights or light-ships have been or are about to be with-~~
168. ~~drawn by reason of ice, or where there is risk that in ordinary course of things the vessel will not be able on account of ice to safely enter the~~
169. ~~port or to get out after having completed loading or discharging. Ice free ports / trading, Vessel not to force ice or follow ice-breakers.~~
170. 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners to remain responsible for the
171. navigation of the vessel, acts of pilots and tugboats except of strikes *not against the Owners,* insurance, crew, and all other matters, *except for time*
    *Charterers' responsibility as agreed in this Charter and Rider,* same as when trading for their own account.
172. 27. A commission of *1.25* 2¼ per cent is payable by the Vessel and Owners to ........DIAMANT / ODESSA ...................................
173.
174. on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175

28. An address commission of 2 ¼ per cent is payable to ......Charterers................ on the hire earned and paid under this Charter.

*Additional Clause 29 to 82 as attached are to be fully incorporated in this Charter Party.*

**THE OWNERS**

**THE CHARTERERS**

This Charter Party is a computer generated copy of the NYPE(Reversed 3rd October, 1946) from printed under licence from the Association Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

**Clause 29  Vessels description**
M/V PAGANE - GEARLESS SD BC
PANAMA FLG-BLT 1982
54158 MTS DWAT ON 12.35 M SSW
GRT/NRT - 32976/20521
LOA/BEAM - 220/32.20M
DEPTH MOULDED 17 M
GRAIN IN MAIN HOLDS - 2443031.66 CFT (HA CMNGS INCLDD)
7 HOLDS/10 HATCHES
HATCH SIZES - ALL 11.60 BY 15.40M
HOLDS SIZE:
-HOLD #1 - 17.50m X 32m (AFT PART)
-HOLD #2 - 29.70m X 32m
-HOLD #3 - 18.00m X 32m
-HOLD #4 - 27.90m X 32m
-HOLD #5 - 18.00m X 32m
-HOLD #6 - 30.60m X 32m
-HOLD #7 - 15.30m X 32m (FORE PART)
HEIGHT OF ALL HOLDS - 17.90m INCLUDING COAMINGS.
MCGREGOR SIDE ROLLING TYPE - HYDRAULIC
SPEED+CONSUMPTION UNDER GOOD WEATHER AND SMOOTH WATER CONDITIONS:
ABT 11.5KN ON ABT 33MT LADEN/31MT BALLAST IFO 180 CST PLUS ABT 3.5 MT
MGO AT SEA, PORT CONS ABT 2.5 MT MGO.
VSL BURNS MGO WHILST MANOUVRING AND NAVIGATING IN NARROW WATERS,
ENTERING-LEAVING PORT, SAILING IN CONFINED WATERS, RIVERS, CANALS,
ESTUARIES AND ON STAND BY.
FUEL CAP: ABT 2000 MT IFO 180 CST ISO 8217 RME 25
ABT 300 MT MGO ISO 8217 DMA
TPC ABT 61.0 T/CM
CONSTS ABT 500 ECXL. FW
NATURAL VENTILATION, NOT C02 FTD
CGO HOLD GRAIN B/DOWN
NO1 223328.52
NO2 473521.17
NO3 282491.75
NO4 449107.91
NO5 282491.75
NO6 492979.74
NO7 239110.80
- ALL ABT AND WOG -
OWNERS: PAGANE MARITIME LTD.
CLASS: RMRS
PANDI: ENGOSTTRAKH
H+M: ALLIANZ
ISM / ISPS OK
CALL SIGN: 3 E B Z 9
INMARSAT 'C' TLX: 437127110

- HATCH SIZES: ALL 11.60 BY 15.40 M
- OWNERS GTEE AIR DFT (DISTANCE WL. TO THC) IN FULL BALLAST CONDITION TO BE
  MAX 12.00 M
- LAST THREE CARGOES: STEELS, IRON ORE, CLINKER

7

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

I.   VSL'S STOWAGE PLAN:
     -HOLD #1 - 5190.75mts - FULL
     -HOLD #2 - 10400.00mts - SLACK
     -HOLD #3 - EMPTY
     -HOLD #4 - 10444.48mts - FULL
     -HOLD #5 - EMPTY
     -HOLD #6 - 11464.77mts - FULL
     -HOLD #7 - 4000.00 - SLACK
     -------------------------------------------
     TTL 41500mts
     DRAFT FORE=10.39m MID=10.54m AFT=10.70m
     ALL ABOVE ESTIMATIONS DONE ON BSS TRIMMED ENDS.IF LOADING WILL BE
     WITH UNTRIMMED ENDS THEN STOWAGE PLAN CHANGE WILL BE .
     II. WE NEED MIN 48 HRS TO BALLAST/DEBALAST HOLDS NoS 3÷5.
     III. RCVD MSG FM GLOBAL AGENCY ASKING FOR SOME VSL'S DETAILS.STILL
     NOT REVERT,WAIT YR CONFORMATION AND INSTR.

- OWNRS WILL CONSIDER AIR DFT (DISTANCE WL TO THC) IN FULL BALLAST
INCLUDING BALLASTING CARGO HOLDS NO3 AND NO5 AND ACHEAVING REQUIRED
BY TERMINAL  DRAFT ON HOLD NO 7 BY TRIMING THE VESSEL, BUT TIME LOST FOR
BALLASTING/DEBALLASTIN AND PREPARING CARGO HOLDS IN SUITABLE
CONDITION FOR LOADING ALWAYS TO BE FOR AND ACCOUNT OF CHARTERES

- OWNERS CONFIRM VSL IS GRAIN CLEAN AND HAS ON BOARD VALID DOCUMENTS
  OF AUTHORIZATION FOR CARRIAGE OF GRAINS IN BULK.
- OWNERS CONFIRM THAT VESSEL IS SUITABLE FOR GRAB DISCHARGE.
- OWNERS CONFIRM VESSEL IS CLASSED HIGHEST LLOYD'S CLASS AND ISM / ISPS
  CODE FITTED FOR THE WHOLE DURATION OF VOYAGE.
- OWNERS CONFIRM VESSEL HAS ALL VALID DOCUMENTS/CERTIFICATES AVAILABLE
  ON BOARD FOR LOADING AND DRAFT SURVEY.
- OWNERS CONFIRM THAT VESSEL IS NOT BLACKLISTED FOR LOAD AND/OR
  DISCHARGE COUNTRIES / PORTS AND SUITABLE FOR THIS TRADE.
- OWNERSHIP/CLASS/PANDI CLUB/H—M INSURANCE NOT TO BE CHANGED
  THROUGHOUT WHOLE TRIP DURATION.

FOR
- ACC GLINGROW HOLDING LTD., NICOSIA, CYPRUS
RECENT DEALS:
C/P 28/08/2007 "GRAND MARKELA" ON TCT NOVO/SAUDI ARABIA 50'000 MTS BARLEY
D/OWNERS C. TRANSPORT
C/P 23/08/2007 "ERNEST" ON TCT NOVO/AQABA 33'000 MTS WHEAT
D/OWNERS - CARGILL INTERNATIONAL S.A.
C/P 21/08/2007 "SOUTHGATE" ON TCT NOVO/DAMIETTA 24'000 MTS WHEAT
D/OWNERS - NOBLE RESOURCES S.A.
C/P 20/07/2007 "THOR CONFIDENCE" ON VOYAGE BSS NOVO/ADEN 23200 MTS WHEAT
OWNERS - THORESEEN
C/P 20/06/2007 "SILVERGATE" ON VOYAGE BSS NOVO/AQABA 50'000 MTS BARLEY
D/OWNERS - INDUSTRIAL CARRIERS
C/P 01/06/2007 "LEROS" ON TCT NOVO/ADEN+HODEIDAII 40'500 MTS WHEAT
D/OWNER - CUSTODIA

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

### Clause 30 Bunker Clause

Bunker on delivery to be as on board (expect IFO about 328 mts and MGO about 55 mts).
Bunker on redelivery to be about same quantity (not less) as actually on delivery. Charterers will pay cost of bunker on delivery together with 1st hire.
Bunker prices - IFO USD 435 / MGO 745 per mt, same prices on redelivery

### Clause 31 Trading Exclusions

One time Charter Trip to Aqaba / Jordan.

### Clause 32 Cargo Trading Clause

Cargo is grain.

### Clause 33 –Deleted.

### Clause 34

Owners guarantee that the vessel is an easy trimming bulk carrier suitable for loading / carrying / discharging a full and complete cargo of any / all kinds of grain in bulk without bagging / strapping/securing. The vessel to have on board at all times all relevant grain loading booklets / manuals / certificates and hold end trimming table and vessel to be able to load grain without shifting boards / grain fittings in accordance with 1991 amendments the International Convention of SOLAS 1974 and has dispensation from trimming holds ends.

### Clause 35 Hire Payment

Hire and all monies due to the Owners under this Charter Party will be paid to Owners' bank account. Charterers will not agree to the assignment of hire, monies due under this Charter Party or the Charter Party itself in any circumstances whatsoever.

First hire shall be paid within 3 banking days after vessel's delivery together with value of bunkers. Thereafter, hire shall be settled every 15 days in advance. Greenwich Mean Time (G.M.T.) shall be applied for hire calculation purpose.

Notwithstanding anything contained herein to the contrary, if any time during the currency of this Charter, hire shall become due on or during a Saturday, Sunday or national holiday or outside normal office hours, or at any time which for reasons beyond their reasonable control would prevent Charterers from effecting payment of hire on the due date, payment of hire is to be made on the banking day immediately preceding the date on which hire becomes due. Where there is any failure to make hire payment on the due date because of an oversight or negligence or error or omission of Charterers' employees, Bankers or Agents or otherwise for any reason where there is absence of intention to fail to make payment as set out, Charterers shall be given by Owners 3 banking days' notice to rectify the failure, where so rectified the payment shall stand as punctual and regular payment.

### Clause 36 Charterers' Deduction

Charterers have no right to deduct any Owners' expenses from the Charter hire. It is understood that Owners will forward to load and/or discharge agent in advance any funds required for Owners' expenses.

9

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

**Clause 37 Communication/Entertainment/Victualling**
Charterers shall pay US$ 1,250.- per month or pro rata in lieu of communication / entertainment / victualling.

**Clause 38 Delivery/Redelivery Notice**
Delivery Notices:      on fixing and then daily notices.

Redelivery Notices:    15 days approximate and 5/3/2/1 days definite notice of redelivery
                       date and port.

**Clause 39  Stevedore Damage Clause**
Stevedores shall be employed at the risk of and paid for by the Charterers. It is understood that all tallying is to be for Charterers' account.

Charterers shall not be responsible for any damage suffered by the vessel and/or her equipment whilst loading or unloading, unless such damage is notified to Charterers' representatives/Agents in writing by the Master latest within 24 hours after the occurrence, except in case of hidden damages which to be reported latest upon completion of discharge.

In the event of stevedore damage:

a)     Such damage to be entered into the vessel's log book.

b)     Master shall also have notified the stevedores or parties responsible for such damage in writing or telex/cable with copy to Charterers.

c)     If the damage caused as above by Charterers or their stevedores affects the vessel's seaworthiness or cargo worthiness or is subject to Classification requirements then all such damage is to be repaired to the satisfaction of the vessel's Classification Society prior to leaving the loading/discharging port. Vessel remaining on hire and costs being borne by Charterers.

d)     Damages not affecting seaworthiness or cargo worthiness or is not subject to classification requirements may be repaired later together with Owners' work at Owners' time and at Charterers' expenses. Owners to provide Charterers with copies of original invoices and if required, to advise Charterers' nature of work necessary to repair damages.

e)     Master will make every attempt to obtain written acknowledgement from the party causing the damage but this without prejudice to paragraphs 'a' through 'd'.

**Clause 40 P and I Club**
Owners guarantee that the vessel is fully covered by the Ingosstrakh. Charterers have the benefit of Owners' cover granted by the P and I Club so far as the Club Rules permit.

Trip to Jordan always as per vessel's P and I club requirements which are:

= subject to previous written notification to Ingosstrakh;
= loading/discharging surveys carried out by approved surveyor of Ingosstrakh;

10

M/V "PAGANE" - GLENGROW - C/P DATED 17th OCTOBER 2007

### Clause 41 Return Insurance
As far as rules permit, the Charterers to have the benefit of any return Insurance premium receivable by Owners from their underwriters, as and when received by Owners, by reason of vessel being in port all such time on hire.

### Clause 42 War Risk
Basic war risk insurance premium for worldwide trading to be for Owners' account, and additional premiums for hull and machinery and Officers/crew for trading to restricted area, also crew war bonus, if any, to be for Charterers' account. The orders of Owners' war risk underwriters always to be followed.

The vessel's hull and machinery value of fixing is USD 5,200,000.-

### Clause 43 On/Off-Hire Survey
Charterers to appoint a surveyor acting on their behalf for performing a joint on and off hire bunker and condition survey. Joint on hire survey to be in Owners' time unless vessel already loading and joint off hire survey to be in Charterers' time. Expenses for on/off hire survey to be shared equally between Owners and Charterers.

### Clause 44 Hold Cleaning
On arrival first load port, vessel to be grain clean and ready in every respect and in all compartments to receive Charterers' cargo to local surveyors' and/or competent authorities' satisfaction, failing which vessel to be off-hire from the time of rejection until passed again. Owners to take immediate corrective steps to expedite cleaning as fast as possible including the use of shore labour. If vessel fails inspection, all bunkers consumed after rejection and extra expenses incurred as a direct result to be for Owners' account, until vessel has been passed in all compartments again.

Charterers' option to redeliver the vessel unclean paying USD 5,000.00 in lieu of hold cleaning.

### Clause 45 Bills of Lading
The Owners undertake to instruct the Master to authorise Charterers or Charterers' Agents if required to issue and sign Bill(s) of Lading on Charterers' usual form on Owners' and Master's behalf for cargo as presented in conformity with Mate's receipts. Charterers to keep Owners harmless should Charterers' servants not issue Bills of Lading per Owners'/Master's strict authority.

Should original Bill(s) of Lading not be available prior to vessels' arrival to the discharging port(s) in time, Owners to agree to release entire cargo without production of original Bill(s) of Lading, if so requested by Charterers or their agent(s), against a fax presentation of Letter of Indemnity under Owners' P and I Club wording which to be singly signed by Charterers or signed by sub-Charterers together with Charterers' joint signature.

No liner or through Bills of Lading or Seaway Bill may be issued/used during the currency of present Charter Party.

Charterers are not to issue or cause to be issued Bs/L which are subject to Hamburg rules.

### Clause 46 ISM Clause
From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both

11

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Owners shall indemnify Charterers for any and all loss, expense and/or damage and/or consequences sustained by Charterers resulting from partial or full non-compliance with this clause. Any and all delays to the vessel resulting from such partial or full non-compliance with this clause shall not count as laytime or, if laytime has expired, as time on demurrage respectively, as the case may be, as on-hire time.

## Clause 47 Deratisation Certificate
The vessel to have valid deratisation certificate and/or equivalent fumigation certificate on board at time of delivery. The validity of which is to be maintained by Owners in their time and at their expense during the currency of this Charter Party.

## Clause 48 Quarantine/Smuggling
Normal quarantine time and expenses for entering ports shall be for Charterers' account. The Owners shall be liable for any delay in quarantine arising from the Master or any of the deck or engine Officers or crew having communication with the shore at any infected area without the written consent or instructions of Charterers or their Agents, also for any loss of time through detention by customs or other authorities caused by smuggling or their infraction of local law on the part of the Master or any of the deck or engine crew. Any delay, expenses and/or fines incurred on account of smuggling, if caused by the Charterers' supercargo and/or their staff or Agents are to be for Charterers' account. Likewise, if any delay in quarantine arises as a result of Charterers' trading of the vessel and/or misinstructions or lack of proper instructions by Charterers or their Agents, servants or representatives such delay is to be for Charterers' account.

## Clause 49 Health Certificate
The Owners shall arrange at their expense that Master, Officers and crew of vessel hold valid vaccination certificates against yellow fever, smallpox, cholera or other necessary health certificates during the Charter.

## Clause 50 Vessel's Equipment
Vessel's equipment shall comply with the regulations of the countries in which vessel will be employed and Owners are to ensure that vessel is at all times in possession of valid and up-to-date certificates as required. If stevedores, longshoremen or other workmen are not permitted to work due to failure of the Master and/or the Owners and/or Owners' Agents to comply with the aforementioned regulations or because the vessel is not in possession of such valid and up-to-date certificates as required, then Charterers may suspend hire for the time thereby lost and Owners shall pay all proven extra direct expenses incurred incidental to and resulting from such failure.

## Clause 51 Safety Regulation
It is understood that the vessel will comply with all safety regulations and/or requirements in effect at ports of loading and/or discharging. It is agreed that should the vessel not meet safety rules and regulations, Owners will take corrective action and vessel is to be off-hire.

## Clause 52 Canal Certificate

<u>M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007</u>

The vessel is fully fitted for Panama/Suez Canal transit and in possession of valid necessary certificate on board, in conformity with current canal regulations/requirements.

### Clause 53 Crew Service

During the currency of this Charter Party and provided weather and local stevedore and port regulations permit, Charterers to have the option to use crew to perform the following services as a means toward an efficient cargo operation:

a)   At each port all of the hatch opening and closing;
b)   Preparing vessel for sea;
c)   Removal and disposal of dunnage to be for Charterers' account;
d)   Gangway watchmen for the vessel to be for Owners' account.
     Compulsory cargo watchmen to be for Charterers' account;
e)   Before and upon arrival at a port, vessel's Officers/crew to shape up vessel's hatches, and gangway in order to commence loading and/or discharging without delay. Opening/closing of all hatchcovers and erecting and dismantling of shifting boards, if necessary, shall be done by Officers/crew provided shore regulations permit.

### Clause 54 War Cancellation

If war breaks out between any two or more of the following countries: United Kingdom, U.S.A., C.I.S., P.R.C., Japan, directly affecting the performance of this Charter, both Owners and Charterers shall have the option of cancelling this Charter whereupon Charterers shall redeliver vessel to Owners, if she has cargo on board after discharge thereof at destination, or, if debarred from reaching or entering it, at a near, open and safe port as directed by Charterers, or if she has no cargo on board, at a port at which she stays or if at sea at a near and safe port as directed by Charterers. In all cases, hire shall be paid until vessel's redelivery.

### Clause 55 Requisition

Should the vessel be requisitioned by any government or governmental authority due to Owners/Managers/vessel's fault, or due to vessel's flag or Ownership during the period of this Charter, she shall be off-hire during the period of such requisition and any hire or other compensation paid by any government or governmental authority in respect of such requisition shall be for Owners' account.

### Clause 56 Extra Period

Should the vessel be placed off-hire during the currency of this Charter for any reason whatsoever, the Charterers have the option of adding all or any part of such off-hire period to the original period.

### Clause 57 Cancellation Clause

If the vessel is placed off-hire more than 30 consecutive days, Charterers have the right to cancel the balance period of this Charter by giving notice to Owners without prejudice to any other right the Charterers may have under this Charter and provided vessel is free of cargo.

### Clause 58 Capture/Seizure/Arrest

Should the vessel be seized or detained or arrested or delayed by any authority during the currency of this Charter Party, the Charterers' liability for seizure or detention or arrest or delay is ceased immediately from the time of her seizure or detention or arrest or delay and all time lost by this reason shall be treated as off-hire until the time of her release unless such seizure or detention or arrest or delay is occasioned by any personal act or omission or default of Charterers or their Agents. Extra

13

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

expenses incurred directly from above seizure or detention or arrest or delay to be for Owners' account.

### Clause 59 Cargo Claim

Cargo Claims To Be Settled As Per NYPE Interclub Agreement 1996

### Clause 60 Small Claims Procedure Clause

Notwithstanding anything contained in the Arbitration Clause to the contrary, should neither the claims nor the counterclaims exceed USD 100,000.00 exclusive of interest on the sum claimed, costs of the arbitration and legal expenses, if any, it is hereby agreed the dispute is to be governed by the London Maritime Arbitrators' Association Small Claim Procedure, revised 1st January, 1994.

### Clause 61 Deviation/Put Back

Should the vessel put back whilst on voyage by reason of an accident or breakdown or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness or accident to the crew or any person on board the vessel or by reason of the refusal of he Master or crew to perform duties, the hire shall be suspended from the time of inefficiency, unless caused by Charterers and/or Charterers' servants until the vessel is again efficient in the same position (or in Charterers' option at a point equidistant to the vessel's next destination) and voyage resumed therefrom. All direct expenses incurred including bunkers consumption during the period of suspended hire shall be for Owners' account.

### Clause 62 Water Pollution
A.  For Bulk Carriers:

(1)  Owners warrant that throughout the currency of this Charter they will provide the vessel with the following certificates:

    (a)  Certificates issued pursuant to Section 311 (p) of the U.S. Federal Water Pollution Control Act, as amended (Title 33 U.S Code, Section 1321(p)) up to (insert the date upon which such certificate(s) is/are due to expire).

    (b)  Certificates issued pursuant to Section 1016(a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended in accordance with Part 138 of Coast Guard Regulations 33 CFR, from (indicate the earliest date upon which the Owners may be required to deliver the vessel into the Charter or, if later, the date inserted in sub-paragraph (a) above), so long as these can be obtained by the Owners from or by (identify the applicable scheme or schemes).

(2)  Notwithstanding anything whether printed or typed herein to the contrary:

    (a)  Save as required for compliance with paragraph (1) hereof, Owners shall not be required or establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter.

14

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

(b)  Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(c)  Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any Bills of Lading issued pursuant to this Charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or water, other than to the extent provided in paragraph (1) hereof.

### Clause 63 Owners' Agents
Charterers may agree to have their Agents attend to the Owners' matters such as delivery, redelivery, general average, drydocking, repair, hospitalisation, repatriation of crew, supply of the vessel's stores and provisions, etc., with Owners paying Charterers' Agents actual expenses including attendance fee and agency fee according to the Charterers' tariff rate. Charterers may also agree to have their Agents to attend to trivial Owners' matters, such as, cash advance, crew mail, arranging shore pass with Owners paying actual expenses including attendance fee, if any, but without agency fee. (See Clause 36).

### Clause 64 Taxes
Export and/or import permits for Charterers' cargo to be at Charterers' risk and expense. Taxation or levies on cargo or freight to be for Charterers' account and to be paid by Charterers.

### Clause 65 Paramount Clause
General Paramount Clause to apply

### Clause 66 Additional Clause
New Jason Clause, P and I Bunkering Clause, New Both-to-Blame Collision Clause and Baltime War Risk Clause, as attached, to be incorporated in this Charter Party and all Bill(s) of Lading issued hereunder.

### Clause 67 Drydock Clause
The Owners have no option to make her drydock during this Charter period except emergency cases, or unless otherwise agreed.

### Clause 68 - Deleted

### Clause 69 Bulk Carrier Safety Clause
(A)  The Charterers shall instruct the terminal operators or their representatives to cooperate with the Master in completing the IMO Ship/Shore Safety Checklist and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

(B)  In addition to the above and notwithstanding any provision in this Charter Party in respect of

15

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

loading/discharging rates, the Charterers shall instruct the terminal operators to load/discharge the vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the vessel's draught, trim, stability, stress or any other factor which may affect the safety of the vessel.

(C)  At any time during cargo operations, the Master may, if he deems it necessary for reasons of safety of the vessel, instruct the terminal operators or their representatives to slow down or stop the loading or discharging.

(D)  Compliance with the provisions of this Clause shall not affect the counting of hire.

### Clause 70 Stowaway Clause
Any time lost including but not limited to time on demurrage and any losses, liabilities and cost incurred by reason of stowaways on board shall be for Owners' account.

### Clause 71 Ocean Route Clause
Evidence of weather conditions to be taken from independent weather bureau reports. Owners to be represented by the findings of 'Aerospace' Ocean Routing Company. In case of dispute between Owners and Charterers' ocean routing companies, the matter to be taken into further arbitration. In any case, Master always entitled to choose vessel's routing related to vessel and crew safety.

Owners' ocean routing company full style/address as follows:

Aerospace & Marine International Corporation,
6920 Santa Teresa Boulevard, Suite 209,
San Jose, CA 95119, U.S.A.
Tel:        408-360-0440
Fax:       408-360-0450
Tlx:        149158
Email:     ops@weather3000.com
Web-port:  www.amlwx.com

### Clause 72 Mobile Crane Clause
Deleted.

### Clause 73 Split Bills of Lading Clause
Charterers and/or Agents are hereby authorised by Owners/Master to split Bills of Lading and issue ship delivery orders in negotiable and transferable forms against collection of full set of original Bills of Lading. Delivery orders to conform with all terms and conditions and exceptions of Bills of Lading and shall not prejudice shipowners' rights.

### Clause 74 Oil Pollution
As a condition of this Charter Party, Owners guarantee that Owners and vessel are and will remain throughout the currency of the Charter Party insured for pollution liability with respect to trading within, to and from ranges and areas specified in this Charter, said insurance to have a limit of not less than U.S.$1 billion. At any time before or subsequent to the fixture date of this Charter, Owners, upon reasonable notice from Charterers, shall furnish to Charterers or its representative proof, satisfactory to Charterers, of such insurance. Without prejudice to Charterers' other rights, Owners shall indemnify Charterers for any and all loss, expense and/or damage sustained by Charterers resulting

16

<u>M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007</u>

from non-compliance with this Clause. Any and all delay to the vessel resulting from such non-compliance shall not count as laytime or, if laytime has expired, as time on demurrage.

<u>Clause 75</u>
Vessel's crew contracts are bona fide employment agreement.

<u>Clause 76</u>
The vessel to remain always in seaworthy trim/condition to safely sail between ports/berths to Master's satisfaction.

<u>Clause 77</u>
Deleted.

<u>Clause 78 ISPS Clause</u>
(a)  (i)  From the date of coming into force of the International Code for the security of ships and of port facilities and the relevant amendments to chapter XI of SOLAS (ISPS code) in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the vessel and "the company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The owners shall provide the Charterers with the full style contact details of the company security officer (CSO).

    (ii)  Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this clause shall be for the Owners' account.

(b)  (i)  The Charterers shall provide the CSO and the ship security officer (SSO)/master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-Charter Parties they enter into during the period of this Charter Party contain the following provision:

    "The Charterers shall provide the owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

    (ii)  Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this clause shall be for the Charterers' account.

(c)  Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result

17

<u>M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007</u>

solely from the owners' negligence, crew's nationality/visa issues, or costs or expenses directly arising from vessel's ownership or other crewing matters.

(d) If either party makes a payment which is for the other party's account according to this clause, the other party shall indemnify the paying party.

<u>Clause 79</u>
All negotiations/trade are to be made in accordance with English Law. English Law to apply. Arbitration, if any, to be in London in accordance with the Arbitration Clause of the Charter Party.

<u>Clause 80</u>
Charterers have the option to perform a general condition survey of the vessel at any time. Survey to be at Charterers' time and expenses.

<u>Clause 81</u>
Owners to provide following certificates as per L/C requirements (see attached):

1.    Certificate issued and signed by (P and I) Club or their representative or by their agent to the effect that the carrying vessel is a member to that (p and i) club having representative or agent in Jordan.

2.    Certificate issued and signed by shipping register or their agent certifying that the carrying vessel is classified 100a1 or its equivalent and free from any outstanding recommendations.

<u>Clause 82</u>

Negotiations and fixture, if any, to be kept private & confidential by all parties involved.

<u>M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007</u>

## BOTH-TO-BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

### New Both-to-Blame Collision Clause

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact"
and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

### New Jason Clause

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.
If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery"

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

M/V "PAGANE" - GLENGROW - C/P DATED 17th OCTOBER 2007

## BALTIME 1939 WAR CLAUSE

(A)  The vessel unless the consent of the Owners be first obtained not to be ordered nor continue to any place or on any voyage nor be used on any service which will bring her within a zone which is dangerous as the result of any actual or threatened act of war, war hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or state whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of Sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any Government or Ruler.

(B)  Should the vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (1) the Owners to be entitled from time to time to insure their interests in the vessel and/or hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand; and (2) notwithstanding the terms of Clause 11, hire to be paid for all time lost including any loss owing to loss of or injury to the Master, Officers or crew or to the action of the crew in refusing to proceed in such zone or to be exposed to such risks.

(C)  In the event of the wages of the Master, Officers and crew or the cost of provisions and/or stores for deck and/or engine room and/or insurance premiums being increased by reason of or during the existence of any of the matters mentioned in section (A) the amount of any increase to be added to the hire and paid by the Charterers on production of the Owners' account therefore, such account being rendered monthly.

(D)  The vessel to have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other wise whatsoever given by the Government of the nation under whose flag the vessel sails or any other Government or any person (or body) acting or purporting to act with the authority of such Government or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such orders or directions.

(E)  In the event of the nation under whose flag the vessel sails becoming involved in war, hostilities, warlike operations, revolution or civil commotion, both the Owners and the Charterers may cancel the Charter and, unless otherwise agreed, the vessel to be redelivered to the Owners at the port of destination or, if prevented through the provisions of Section (A) from reaching or entering it, then at a near open and safe port at the Owners' option, after discharge of any cargo on board.

(F)  If in compliance with the provisions of this clause anything is done or is not done, such not to be deemed a deviation.

Section (C) is optional and should be considered deleted unless agreed according to Baltime 1939.

20

M/V "PAGANE" - GLINCROW - C/P DATED 17th OCTOBER 2007

## P. AND I. BUNKER CLAUSE

The vessel shall have liberty as part of the Contract Voyage to proceed to any port or ports at which bunker oil is available for the purpose of bunkering at any stage of the voyage whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the ports of loading or discharge named in this Charter and may there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks and deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

## BIMCO STANDARD ISM CLAUSE

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by the failure on the part of the Owners or 'the Company' to comply with the ISM Code shall be for Owners' account.

## SECA CLAUSE

During the currency of this contract the performing vessel will consume bunkers in accordance with ISO 8217 specifications. In the event that emissions regulations, laws or guidelines require or recommend the stemming or consumption of bunkers with a quality that has a higher value than the price for high sulphur fuel oil, then such excess price will be paid for by Charterers for bunkers consumed whilst in an emission controlled area. Upon request Owners to provide documentary proof for such price differential together with the actual bunker consumption in these emission controlled areas.

## BUNKER FUEL SULPHUR CONTENT CLAUSE FOR
## TIME CHARTER PARTIES 2005

(A) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the vessel is ordered to trade within that zone. The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with regulations 14 and 18 of Marpol Annex VI, including the guidelines in respect of sampling and the provision of bunker delivery notes.

21

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this sub-Clause (A).

(B)   Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with sub-Clause (A), the Owners warrant that:

(i)   The vessel shall comply with regulations 14 and 18 of Marpol Annex VI and with the requirements of any emission control zone; and

(ii)  The vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the vessel with fuels in accordance with sub-Clause (A), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the vessel's failure to comply with regulations 14 and 18 of Marpol Annex VI.

(C)   For the purpose of this Clause, 'emission control zone' shall mean zones as stipulated in Marpol Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the E.U. and the U.S. Environmental Protection Agency.

22

# EXHIBIT 2

## Provisional Hire statement MV PAGANE
## cp dd 17.10.2007/GLINGROW HOLDING LTD.
### Voyage PAG/2007/03/TC

|  |  |  |  |  | US$ Debit |
|---|---|---|---|---|---|
| Hire from: |  |  |  |  |  |
| 18.10.2007 01:00 GMT DOP KERCH |  |  |  |  |  |
| 06.12.2007 15:30 GMT DLOSP AQABA |  |  |  |  |  |
| 48,604187 | days | @ | 60 000,00 |  | 2 916 250,00 |
| Bunkers on delivery: |  |  |  |  |  |
| 365,257 | IFO mts | @ | 435,00 |  | 158 886,80 |
| 46,645 | MDO mts | @ | 745,00 |  | 34 751,27 |
| Owners bunker consumed in Aqaba: |  |  |  |  |  |
| 32,900 | MDO mts | @ | 745,00 |  | 24 510,50 |
| ILOHC |  |  |  |  | 5 000,00 |
| C/V/E | 40,38574 | @ | 1 250,00 | m/r | 1 683,13 |
| Difference in bunker prices: ($890-$745)x46,645mt |  |  |  |  | 6 763,67 |
|  |  |  |  |  |  |
|  |  | subtotal | debit |  | 3 141 081,76 |
|  |  |  |  |  |  |
|  |  |  |  |  | **Credit** |
| less: |  |  |  |  |  |
| commission | 3,75 % |  |  |  | 109 359,35 |
|  |  |  |  |  |  |
| Owners expenses: |  |  |  |  |  |
| on-hire survey | 50% |  |  |  | 400,00 |
| off-hire survey | 50% |  |  |  | 750,00 |
|  |  |  |  |  |  |
| Off-hire: |  |  |  |  |  |
| at iport Novo | 6,701369 | days |  |  | 387 005,24 |
| bunker consumed |  |  |  |  | 11 970,55 |
| at Suez Canal | 1,507639 | days |  |  | 87 066,15 |
| bunker consumed |  |  |  |  | 2 807,98 |
|  |  |  |  |  |  |
| Bunkers on re-delivery: |  |  |  |  |  |
| 407,500 | IFO mts | @ | 435,00 |  | 177 262,50 |
| 0,000 | MDO mts | @ | 745,00 |  | 0,00 |
|  |  |  |  |  |  |
| Payments: |  |  |  |  |  |
| 1. |  |  |  |  | 1 061 013,00 |
| 2. |  |  |  |  | 440 968,18 |
| 3. |  |  |  |  | 353 723,97 |
|  |  | subtotal | credit |  | 2 642 327,03 |
|  |  |  |  |  |  |
| grand total in favour OWNERS |  |  | debit |  | 498 754,67 |
| payment to be arranged to: |  |  |  |  |  |

| | |
|---|---|
| BENEFICIARY | BULCOM LTD. |
| ACC. No: | 72673/2G |
| WITH: | BNP PARIBAS (SUISSE) S.A. |
|  | PLACE DE HOLLANDE, 2 |
|  | CH-1211, GENEVA 11 |
|  | SWITZERLAND |
| SWIFT: | BPPBCHGG |
| IBAN: | CH69 0868 6001 0728 7300 2 |

Please always quote our invoice number when effecting payments.



# EXHIBIT 3

**From:** Marianne Brookes
**Sent:** 29 November 2007 11:50
**To:** arbitration@christophermoss.com
**Subject:** M/V Pagane C/P DD.17.10.2007

Dear Sir,

We act for Bulcom Ltd, the disponent owners of the above vessel.

Under a time charter on the NYPE form (copy attached), disponent owners chartered their vessel to Glingrow Holding Ltd for 1 time charter trip for the carriage of grain from the Black Sea to Aqaba.

Under Clause 17 of the charterparty, any disputes between owners and charterers shall be referred to three persons in London and be determined in accordance with English Law.

Disputes have arisen between the parties. You are hereby appointed as owners' arbitrator. Kindly confirm acceptance of your appointment.

Best regards,

Brookes & Co.

Brookes & Co., Solicitors, 60 Lombard Street, London, EC3V 9EA, United Kingdom.
Tel: +44 (0)20 3159 4330  Fax: +44 (0)20 7691 7773.  General office email address: mail@brookes-and-co.co.uk
Principal: Marianne Brookes
Brookes & Co. is regulated by the Solicitors Regulation Authority
Confidentiality Note
The contents of this email and any attachments are strictly confidential and must not be copied to, used by or disclosed to any person other than the
named recipient(s). Please let us know immediately by telephoning +44 (0)20 3159 4330 if this email has been sent to you in error.

# EXHIBIT D



ECF

# U.S. District Court
## United States District Court for the Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:07-cv-10726-PKL

Pagane Maritime Ltd. v. Glingrow Holding Ltd. et al

Assigned to: Judge Peter K. Leisure

Demand: $1,400,000

Cause: 28:1333 Admiralty

Date Filed: 11/30/2007

Jury Demand: None

Nature of Suit: 120 Contract: Marine

Jurisdiction: Federal Question

**Plaintiff**

**Bulcom Ltd.**
*TERMINATED: 12/20/2007*

represented by **Charles Edmund Murphy**
Lennon, Murphy & Lennon, LLC
The GrayBar Building
420 Lexington Avenue
Suite 300
New York, NY 10170
(212) 490-6050
Fax: (212) 490-6070
Email: cem@lenmur.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Pagane Maritime Ltd**

represented by **Charles Edmund Murphy**
Lennon, Murphy & Lennon, LLC
420 Lexington Avenue
Suite 300
New York, NY 10170
(212) 490-6050
Fax: (212) 490-6070
Email: cem@lenmur.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Glingrow Holding Ltd.**

**Defendant**

**Rias Trading**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/30/2007 | 1 | COMPLAINT against Glingrow Holding Ltd., Rias Trading. (Filing Fee $ 350.00, Receipt Number 634721)Document filed by Bulcom Ltd.. (mbe) (Entered: 12/05/2007) |
| 11/30/2007 | | SUMMONS ISSUED as to Glingrow Holding Ltd., Rias Trading. (mbe) (Entered: 12/05/2007) |
| 11/30/2007 | | Magistrate Judge Ronald L. Ellis is so designated. (mbe) (Entered: 12/05/2007) |
| 11/30/2007 | | Case Designated ECF. (mbe) (Entered: 12/05/2007) |
| 11/30/2007 | 2 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Bulcom Ltd..(mbe) (Entered: 12/05/2007) |
| 12/04/2007 | | MARITIME ATTACHMENT AND GARNISHMENT ISSUED as to Glingrow Holding Ltd., Rias Trading on 11/30/2007 in the amount of $1,433,583.10. (jpo) (Entered: 12/10/2007) |
| 12/04/2007 | 4 | EX PARTE ORDER FOR PROCESS OF MARITIME ATTACHMENT pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, the Clerk of Court shall issue Process of Maritime Attachment and Garnishment against all tangible or intangible property, credits, letters of credit, etc. or any other funds of property up to the amount of $1,433,583.10 belonging to, due or being transferred to, from or for the benefit of the Defendant, including but not limited but not limited to such property as may be held, received or transferred in Defendant's name(s), or as may be held, received or transferred for its benefit at, moving though, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishes to be named, or later identified, on whom a copy of the Process of Maritime Attachment and Garnishment may be served. Supplemental process enforcing the Court's Order may be issued by the Clerk upon application without further Order of the Court. Pursuant to F.R.C.P. 5(b)(2)(D) each garnishee may consent, in writing, to accept service by any other means. So Ordered. (Signed by Judge Peter K. Leisure on 11/30/07) (jco) (Entered: 12/17/2007) |
| 12/06/2007 | 3 | AFFIDAVIT of Kevin J. Lennon in Support. Document filed by Bulcom Ltd.. (Lennon, Kevin) (Entered: 12/06/2007) |
| 12/20/2007 | 6 | AMENDED COMPLAINT amending 1 Complaint against Glingrow Holding Ltd., Rias Trading. Document filed by Pagane Maritime Ltd. Related document: 1 Complaint filed by Bulcom Ltd. (jco) (Entered: 12/27/2007) |
| 12/21/2007 | 5 | CONSENT ORDER: The funds that are currently under attachment in this action are to be released. The garnishee bank(s) are hereby instructed to release the attached funds pursuant to joint instructions to be provided by letter and signed by the undersigned counsel. The Payment of the release funds by the garnishee bank(s) shall not be subject to any further |



| | | |
|---|---|---|
| | | attachment in New York after those funds are released by the garnishee bank(s). (Signed by Judge Peter K. Leisure on 12/20/2007) (jar) (Entered: 12/21/2007) |
| 12/28/2007 | | MARITIME ATTACHMENT AND GARNISHMENT ISSUED as to Glingrow Holding Ltd., Rias Trading on 12/28/07 in the amount of $688,530.51. (tro) (Entered: 01/03/2008) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/07/2008 11:24:19 | | |
| **PACER Login:** rs0055 | **Client Code:** | 999995/20001/3235 |
| **Description:** Docket Report | **Search Criteria:** | 1:07-cv-10726-PKL |
| **Billable Pages:** 2 | **Cost:** | 0.16 |