LENNON, MURPHY & LENNON LLC
Attorneys for Plaintiff
PAGANE MARITIME LTD.
The Gray Bar Building
420 Lexington Avenue, Suite 300
New York, NY 10170
(212) 490-6050 - phone
(212) 490-6070 - facsimile
Kevin J. Lennon
Charles E. Murphy

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------X
PAGANE MARITIME LTD.,                    :        07-CV-10726  (PKL)

                Plaintiff,       :        **ECF CASE**
   - against -

                        :        **DECLARATION OF**
GLINGROW HOLDING LTD. and                          **KEVIN J. LENNON IN**
RIAS TRADING,                            :        **OPPOSITION TO MOTION TO**
                                 **VACATE MARITIME ATTACHMENT**
          Defendant.       :
----------------------------------------------------X

KEVIN J. LENNON, having been duly sworn, deposes and states the following upon the

penalties of perjury as per 28 U.S.C. § 1746:

    1.    I am a member admitted to the Bar of this Honorable Court and am a partner in

the firm of Lennon, Murphy & Lennon LLC, attorneys for the Plaintiff, PAGANE MARITIME

LTD. ("Pagane").

    2.    I submit this Declaration in opposition to Defendant RIAS TRADING's ("Rias")

motion for an Order vacating the Plaintiff's maritime attachment and dismissing Plaintiff's

Complaint against RIAS.

    3.    After Plaintiff had served Notices of Attachment on the Defendants[1] there

followed negotiations between the parties' London solicitors culminating in the agreement to

---

[1] Please see full and complete copies of Plaintiff's Notices of Attachment annexed as Exhibits 1 and 2.

have the funds attached in New York remitted to London to be held in an escrow account. At no

time did Rias ever reserve any rights in respect of the attached funds.

4.      The Court is directed to the Declaration of Matthew Moore, and the Exhibits

attached thereto, for a review of the pertinent correspondence exchanged by counsel on the issue

of the agreement on the disposition of the attached funds. Importantly, Reed Smith, Rias current

New York attorneys were not involved in those discussions and have no personal knowledge of

the same.

5.      The Court is further directed to Exhibit 3 attached hereto which are

communications involving the undersigned regarding the disposition of the attached funds. Each

communication is briefly described for the Court:

A.      12/14/07 email timed at 9:18 AM from Lennon, Murphy & Lennon ("LML") to
More Fisher Brown ("MFB") passing copies of the Notices of Attachment served on Defendants
and identifying the sums restrained;
B.      12/17/07 email timed at 2:07 PM from LML to MFB relating that Defendants
should appoint New York counsel to sign off on the contemplated Consent Order;
C.      12/17/07 email timed at 2:09 PM from LML to Ince & Co. recapping agreement
that Pagane will cease and desist further service of the Rule B attachment as Defendants agreed
to proposal for funds attached in New York to be transferred to an escrow account in London to
be held as security for Pagane's claims;
D.      12/17/07 email timed at 2:31 PM from LML to Tisdale Law Office (TLO) passing
draft proposed Consent Order and discussing procedure for release of funds to London escrow
account;
E.      12/17/07 email timed at 2:38 PM from LML to MFB discussing Consent Order
and release of funds to London escrow account;
F.      1/7/08 email timed at 2:06 PM from LML to TLO requesting comments from
TLO re manner in which attached funds to serve as security for Pagane's claims are to be
released to London escrow account.
G.      1/15/08 email timed at 3:02 PM from TLO to LML confirming, *inter alia*, LML
understanding that funds were to be wired to either Ince & Co. or MFB trust accounts which are
held in London.

6.      It is very apparent that the attached funds were to serve as security for Plaintiff's

claims against Glingrow which are to be resolved in London arbitration.

7.      As can be seen from the supporting communications, the parties' New York lawyers, the undersigned and Thomas L. Tisdale, executed and submitted to Judge Leisure on December 17, 2007 a Consent Order.

8.      The Consent Order directed that the funds under attachment in New York be released and remitted pursuant to joint instructions from counsel.  Judge Leisure 'So Ordered' the Consent Order on December 20, 2007.  See Declaration of Sergey Chumak at ¶21, Exhibit B).

9.      After the Consent Order was submitted by the parties to the Court, the Plaintiff ceased and desisted further service of the attachment order and process of maritime attachment and garnishment ("PMAG") on the New York garnishees.

10.     The Plaintiff's action in this regard was in reliance upon the understanding that the attached funds would be remitted to a London escrow account to be held as security for Plaintiff's claims.

11.     Further, Plaintiff's agreement to cease and desist from further service of the PMAG was premised on the understanding that there were ongoing negotiations between the parties' London solicitors regarding "top up" security for the Plaintiff's claims since the funds attached in New York did not fully secure the Plaintiff's claims.

12.     It is undeniable that based upon the representation made by Defendants that the Consent Order was submitted and the Plaintiff thereafter allowed Glingrow and Rias to utilize the New York banking system to carry out their commercial banking activities in U.S. dollars free of any risk that such funds would be restrained by the PMAG to further secure Plaintiff's claims.

13.     After the Consent Order had been submitted, we were instructed by our client to amend the attachment in order to (a) substitute Pagane Maritime Ltd. in lieu of Bulcom Ltd. in order to bring the action in the name of the real party in interest; and (b) to eliminate and/or reduce the claims asserted to reflect developments since the time that the attachment had been filed on November 30, 2007.

14.     The amended papers were filed with the Court on December 20, 2007. The amended Ex Parte Order was issued by Chief Judge Wood[2] on December 28, 2007 and the quantum of the attachment was reduced from $1,433,583.10 to $688,530.51.

15.     After the Ex Parte Order was issued we obtained a fresh PMAG and had the same served on the garnishee banks in order to attach in Pagane's name the funds previously attached in Bulcom's name. Thus, whether in Pagane or Bulcom's name, the Consent Order endorsed by Judge Leisure is binding upon the Plaintiff's interests, as well as those of the defendant.

16.     Thereafter, despite the cease and desist agreement and due to oversight of the undersigned, the attachment was mistakenly again served on the garnishee banks. A review of our records shows that daily service on the garnishees was made only on January 2, 3 and 4. A small additional sum of $6,767 which referred to the Defendant Rias was attached on December 31, 2007. However, in light of the parties' prior agreements and the Consent Order, as above described, those funds were subsequently released on January 7, 2008. We also issued a second cease and desist notice to the garnishee banks.

17.     Again, and consistent with the parties' agreement and the Consent Order, no further service of the attachment has been made and the parties are effectively in the same position as they were in on December 20, 2007 when Judge Leisure 'So Ordered' the Consent Order.

_____

[2] Chief Judge Wood was sitting as Part I Judge at the time.

4

18.    By virtue of the Consent Order, Glingrow and Rias have waived any right to challenge the attachment of their funds in New York. It is inescapable that that the funds that Rias now seeks to release from attachment are the very same funds that the parties have agreed to remit to a London escrow account to be held pending resolution of arbitration and which are the subject of the Consent Order.

19.    Rias offers no valid basis, nor any basis at all, upon which it is entitled to vacate the attachment of funds that are the subject of the parties' agreement and the Consent Order. While Rias is entitled to seek vacatur of the attachment Order as to any future funds restrained in New York under the existing attachment order and PMAG, the simple fact is that there are no such funds currently under attachment, in particular because in reliance on the parties' above-described agreement, and the Consent Order, Plaintiff has agreed to cease and desist from seeking to attach such funds.

20.    There is no justifiable basis at all upon which Rias is entitled to the relief it seeks by way of its Order to Show Cause. Allowing Rias to disregard agreements and Court endorsed Consent Orders would be tantamount to undermining the integrity of any settlement agreement and court order.

Executed at Southport, CT this 15th day of January, 2008.

Kevin J. Lennon

# EXHIBIT 1

# LENNON, MURPHY & LENNON, LLC — *Attorneys at Law*

The GrayBar Building
420 Lexington Ave., Suite 300
New York, NY 10170
*phone* (212) 490-6050
*fax* (212) 490-6070

Patrick F. Lennon - *pfl@lenmur.com*
Charles E. Murpay — *cem@lenmur.com*
Kevin J. Lennon — *kjl@lenmur.com*
Nancy R. Peterson - *nrp@lenmur.com*

Tide Mill Landing
2425 Post Road
Southport, CT 06890
*phone* (203) 256-8600
*fax* (203) 256-8615

December 10, 2007

**_VIA Express Courier_**
Glingrow Holding Ltd.
15, Boumpoulinas
Povek Building, Apt. No. 301
Nicosia, Cyprus.

Re:    **Bulcom Ltd. v. Glingrow Holding Ltd. and Rias Trading**
       Docket Number: 07 Civ. 10726
       Our Reference Number: 07-1306

Dear Sir or Madam:

We represent the Plaintiff, Bulcom Ltd in the above referenced lawsuit. We write to advise you that pursuant to an Ex Parte order of maritime attachment and garnishment issued in the above referenced lawsuit, your property was attached on or about December 7, 2007 at Deutsche Bank in the amounts of $22,125.00 and $96,281.12.

Please find enclosed herein a copy of all pleadings filed in the above referenced lawsuit including, but not limited to, the Summons and Complaint. Please also find enclosed copies of the Ex Parte Order and Writ of Maritime Attachment and Garnishment as well as a copy of Judge Leisure's rules. If you have any questions or concerns, please contact us at your convenience. This letter is sent pursuant to Local Rule B.2 of the Local Rules for the United States District Court for the Southern District of New York.

Kind regards,

Mary Fedorchak

/Enclosures

JUDGE LEISURE

07  CV  10726

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

BULCOM LTD.,

                Plaintiff,

     - against -

GLINGROW HOLDING LTD. and
RIAS TRADING,

            Defendants.

-----------------------------------------------------------X

07 CV _____

ECF CASE

## AFFIDAVIT IN SUPPORT OF PRAYER FOR MARITIME ATTACHMENT

State of Connecticut  }
               }   ss:  Town of Southport
County of Fairfield  }

Kevin J. Lennon, being duly sworn, deposes and says:

1.    I am a member of the Bar of this Court and represent the Plaintiff herein. I am familiar with the facts of this case and make this Affidavit in support of Plaintiff's prayer for the issuance of a Writ of Maritime Attachment and Garnishment, pursuant to Rule B of the Supplemental Admiralty Rules of the Federal Rules of Civil Procedure.

### DEFENDANTS ARE NOT PRESENT IN THE DISTRICT

2.    I have attempted to locate the Defendants, GLINGROW HOLDING LTD. and RIAS TRADING within this District. As part of my investigation to locate the Defendants within this District, I checked the telephone company information directory, as well as the white and yellow pages for New York listed on the Internet or World Wide Web, and did not find any listing for the Defendants. Finally, I checked the New York State Department of Corporations' online database which showed no listings or registration for the Defendants.

3.    I submit based on the foregoing that the Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

4.    Upon information and belief, the Defendants have, or will have during the pendency of this action, tangible and intangible property within this District and subject to the jurisdiction of this Court, held in the hands of or in the hands of garnishees within this District, which are believed to be due and owing to the Defendants.

5.    This is Plaintiff's first request for this relief made to any Court.

### PRAYER FOR RELIEF FOR ORDER ALLOWING SPECIAL PROCESS SERVER

6.    Plaintiff seeks an Order pursuant to Rule 4(c) of the Federal Rules of Civil Procedure, for an Order appointing Patrick F. Lennon, Kevin J. Lennon, Charles E. Murphy, Nancy Peterson or any other partner, associate, paralegal or agent of Lennon, Murphy & Lennon, LLC, or any process server employed by Gotham Process Servers, in addition to the United States Marshal, to serve the Ex Parte Order and Process of Maritime Attachment and Garnishment, together with any interrogatories, upon the garnishee(s), together with any other garnishee(s) who (based upon information developed subsequent hereto by the Plaintiff) may hold assets of, for or on account of, the Defendants.

7.    Plaintiff seeks to serve the prayed for Process of Maritime Attachment and Garnishment with all deliberate speed so that it may be fully protected against the potential of being unable to satisfy a judgment/award ultimately obtained by Plaintiff and entered against the Defendant.

8.    To the extent that this application for an Order appointing a special process server with respect to this attachment and garnishment does not involve a restraint of physical property, there is no need to require that the service be effected by the Marshal as it involves simple delivery of the Process of Maritime Attachment and Garnishment to the various garnishees to be identified in the writ.

### PRAYER FOR RELIEF TO SERVE LATER IDENTIFIED GARNISHEES

9.    Plaintiff also respectfully requests that the Court grant it leave to serve any additional garnishee(s) who may, upon information and belief obtained in the course of this litigation, to be holding, or believed to be holding, property of the Defendants, within this District. Obtaining leave of Court at this time to serve any later identified garnishees will allow for prompt service of the Process of Maritime Attachment and Garnishment without the need to present to the Court amended Process seeking simply to identify other garnishee(s).

### PRAYER FOR RELIEF TO DEEM SERVICE CONTINUOUS

10.    Further, in order to avoid the need to repetitively serve the garnishees/banks, Plaintiff respectfully seeks further leave of the Court, as set out in the accompanying Ex Parte Order for Process of Maritime Attachment, for any process that is served on a garnishee to be deemed effective and continuous service of process throughout any given day on which process is served through the next day, provided that process is served the next day, and to authorize service of process via facsimile or e-mail following initial *in personam* service.

-3-

Dated:       November 30, 2007
             Southport, CT

Kevin J. Lennon

Sworn and subscribed to before me
this 30th day of November 2007.

NOTARY PUBLIC

—4—

**JUDGE LEISURE**

**07  CV  10726**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

BULCOM LTD.,

               Plaintiff,

   - against -

GLINGROW HOLDING LTD. and
RIAS TRADING,

              Defendants.
-----------------------------------------------------------X



### DISCLOSURE OF INTERESTED PARTIES
### PURSUANT TO FEDERAL RULE 7.1

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure to enable judges and

magistrates of the court to evaluate possible disqualification or recusal, the undersigned attorney

of record for the Plaintiff certifies that the following are corporate parents, subsidiaries, or

affiliates of the Plaintiff:   NONE.

Dated: November 30, 2007
      New York, NY

                      The Plaintiff,
                      BULCOM LTD.

                      By: _____
                      Charles E. Murphy  CM-2125
                      Kevin J. Lennon
                      LENNON, MURPHY & LENNON, LLC
                      The Gray Bar Building
                      420 Lexington Avenue, Suite 300
                      New York, NY 10170
                      (212) 490-6050 - phone
                      (212) 490-6070 - fax
                      cem@lenmur.com
                      kjl@lenmur.com

Nov 30. 2007  1:04PM    Lennon, Murphy & Lennon LLC                    No.2553  P. 2

**JUDGE LEISURE**



07 CV 10726

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------X
BULCOM LTD.,                                       :
                                                   :
                         Plaintiff,                :
                                                   :
         - against -                               :
                                                   :
GLINGROW HOLDING LTD. and                          :
RIAS TRADING,                                      :
                                                   :
                         Defendants.               :
--------------------------------------------------X

## VERIFIED COMPLAINT

Plaintiff, BULCOM LTD., ("Plaintiff"), by and through its attorneys, Lennon, Murphy &
Lennon, LLC as and for its Verified Complaint against the Defendants, GLINGROW
HOLDING LTD. ("Glingrow") and RIAS TRADING ("Rias") (collectively "Defendants")
alleges, upon information and belief, as follows:

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the
Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the
breach of maritime contract of charter. This matter also arises under the Court's federal question
jurisdiction within the meaning of 28 United States § 1331 and the New York Convention on the
Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201 *et seq.*) and/or the
Federal Arbitration Act (9 U.S.C. § 1 *et seq.*).

2.      At all times material to this action, Plaintiff was, and still is, a foreign corporation,
or other business entity, organized under, and existing by virtue of foreign law and was at all
material times the disponent owner[1] of the motor vessel "PAGANE" (hereinafter the "Vessel"),

---

[1] A "disponent owner" controls the commercial operations of a vessel having taken the vessel on charter from the registered owner of the vessel. The disponent owner usually time charters the vessel from the registered owner and then sub-charters the vessel to charterers.

3.    Upon information and belief, Defendant Glingrow was, and still is, a foreign
corporation, or other business entity, organized under, and existing by virtue of the laws of
Cyprus Belarus with a place of business at 15, Bouxupontinas, Povek Building, Apt. No. 301,
Nicosia, Cyprus and was at all material times the Charterer of the Vessel.

4.    Upon information and belief, Defendant Rias was, and still is, a foreign
corporation, or other business entity, organized under, and existing by virtue of foreign law and
was at all material times the alias, partner, joint venturer and/or paying, or receiving, agent of the
Defendant Glingrow.

5.    By a charter party dated October 17, 2007 Plaintiff time chartered the Vessel to
Defendant Glingrow for one time chartered trip (duration about 30 days) via the Black Sea for
the carriage of any lawful bulk grain cargo to Aqaba, Jordan.  A copy of the charter party is
attached hereto as Exhibit 1.

6.    The charter party was made on the NYPE form inclusive of clauses 8, 59 and 60
by which the NYPE Interclub Agreement, and its scheme for settlement of cargo claims that may
arise under the charter party, was expressly incorporated into the charter party.

7.    Plaintiff delivered the Vessel into the service of the Defendant Glingrow at
Kerich, Ukraine and has at all times fully performed its duties and obligations under the charter
party.

8.    A dispute has arisen between the parties regarding Defendant Glingrow's failure
to pay the hire for its use of the vessel which is due and owing to Plaintiff under the charter party
contract.  Clause 4 of the charter party requires Defendant Glingrow to pay for the use and hire
of the Vessel at the rate of $60,000 per day, pro rata, including overtime, payable in advance
every 15 days.

2

9.    In breach of its obligation to pay hire the Defendant Glingrow failed to remit payment to the Plaintiff on or about November 21, 2007 when a 15 day advance hire payment of hire was due and owing to the Plaintiff. A copy of Plaintiff's provisional hire statement, reflecting the sum of $594,848.97 due to the Plaintiff for unpaid hire, is attached hereto as Exhibit 2

10.    In further breach of its charter party obligations, the Defendant Glingrow has ceased liability for the Plaintiff's account in respect of claim brought by non-party cargo receivers, Jordanian Ministry of Industry and Trade ("MIT"), based, inter alia, on allegations of cargo shortage and cargo contamination. Plaintiff will settled MIT's shortage claim for $113,479.00 and MIT's contamination claim for US$ 288,091.50 and seeks indemnity from Defendants for each payment as per the charter party which incorporated the Interclub Agreement.

11.    As a result of Defendant Glingrow's breaches of the charter party due as aforesaid, Plaintiff has sustained damages in the total principal amount of $1,037,410.40, exclusive of interest, arbitration costs and attorneys fees.

12.    Pursuant to the charter party, disputes between the parties are to be submitted to arbitration in London subject to English law. Plaintiff has commenced London arbitration against Defendant by appointment of its arbitrator Mr. Christopher Moss. A copy of Plaintiff's arbitration appointment is attached hereto as Exhibit 3.

13.    This action is brought in order to obtain jurisdiction over Defendants and also to obtain security for Plaintiff's claims and in aid of arbitration proceedings.

14.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law. Section 63 of the English Arbitration Act of 1996 specifically allows for

3

recovery of these items as part of an award in favor of the prevailing party. As best as can now

be estimated, Plaintiff expects to recover the following amounts at arbitration as the prevailing

party:          A.      Principal claims:                                    $1,037,419.40 ;

              [i.      Unpaid hire:   $594,848.97]
              [ii.     Indemnity for cargo shortage claim: $153,470]
              [iii.    Indemnity for cargo contamination claim: $289,091.50]

        B.      Estimated interest on claims -
              3 years at 5.5% compounded quarterly:          $171,172.71 ;

        C.      Estimated arbitration costs:                   $75,000; and

        D.      Estimated attorneys' fees and expenses:        $150,000.00.

        Total:                                                 $1,433,583.10 .

15.     The Defendants cannot be found within this District within the meaning of

Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal

Rules of Civil Procedure, but, upon information and belief, Defendants have, or will have during

the pendency of this action, assets within this District and subject to the jurisdiction of this Court,

held in the hands of garnishees within the District which are believed to be due and owing to the

Defendants.

16.     Upon information and belief, Defendant Riss acts as paying agent, and/or

receiving agent, or arranges for other non-parties to satisfy the debts and obligations of

Defendant Glingrow, and/or receive payments being made to Defendant Glingrow.

17.     Although Riss was not named in the charter party, and had no formal relationship

to the charter of the M/V "PAGANE" it paid initial hire owing to Plaintiff from Glingrow.

18.     It is not common practice in the maritime industry, nor any other business, for an

independent company to pay another company's debt, where it has no formal relationship to the

underlying contract

4

19.     The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the Defendants held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendants and to secure the Plaintiff's claim as described above. .

WHEREFORE, Plaintiff prays:

A.      That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Complaint failing which default judgment be entered against it;

B.      That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of $1,433,583.19 belonging to, due or being transferred to, from, or for the benefit of the Defendants, including but not limited to such property as may be held, received or transferred in Defendants' name(s) or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

    C.    That the Court retain jurisdiction to compel the Defendants to arbitrate in

accordance with the United States Arbitration Act, 9 U.S.C. § 1 et seq.;

    D.    That this Court retain jurisdiction over this matter through the entry of any

judgment or award associated with any of the claims currently pending, or which may be

initiated in the future, including any appeals thereof;

    E.    That this Court recognize and confirm any arbitration award(s) or judgment(s)

rendered on the claims set forth herein as a Judgment of this Court;

    F.    That this Court award Plaintiff the attorneys' fees and costs incurred in this

action; and

    G.    That the Plaintiff has such other, further and different relief as the Court

may deem just and proper.

Dated:    New York, NY
        November 30, 2007

                The Plaintiff,
                BULCOM LTD.

                By: _____
                Charles E. Murphy
                Kevin J. Lennon
                LENNON, MURPHY & LENNON, LLC
                420 Lexington Avenue, Suite 300
                New York, NY 10170
                (212) 490-6050 - phone
                (212) 490-6070 - facsimile
                cem@lenmur.com
                kjl@lenmur.com

Nov. 30, 2007  2:05PM    Lennon, Murphy & Lennon LLC                No. 2553   P. 8

## ATTORNEY'S VERIFICATION

State of New York }
                  }        ss.:    City of New York
County of New York )

1.    My name is Charles E. Murphy.

2.    I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.    I am a partner in the firm of Lennon, Murphy & Lennon, LLC attorneys for the Plaintiff.

4.    I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.    The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.    The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated:        New York, NY
              November 30, 2007 .

                                     _____
                                     Charles E. Murphy

# EXHIBIT 1

# TIME CHARTER

GOVERNMENT FORM

Approved by the New York Produce Exchange

November 6th, 1913-Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1. **This Charter Party**, made and concluded in *Novorossiysk* .................................................... *17th* day of *October 2007* ...19...
2. Between, *Messrs Bulcom Ltd.*........................ *as disponent*
3. Owners of the good .....*Panama Flag*..........Steamship/Motorship "*Pagani*" ...*Description as per Clause 29 of*...
4. of..............tons (gross-register)-and............tons-net-register--having-engines-of............................indicated-horse-power
5. and-with-hull, machinery-and-equipment-in-a-thoroughly-efficient-state, and-classed...............................tons-of-2240-lbs
6. at............of-about............caloid-foot-bale-capacity, and-about,............................................................................
7. deadweight-capacity (cargo-and-bunkers, including-fresh-water-and-stores-not-exceeding-one-and-half-percent-of-ship's-deadweight-capacity
8. allowing-a-minimum-of-fifty-tons)-on-a-draft-of............feet............inches-on..............................Summer-freeboard-inclusive-of-permanent bunkers—
9. which-are-of-the-capacity-of-about,..................................................................tons-of-fuel,-and-capable-of-steaming,-fully-laden,-under-good-weather
10. conditions about .........knots-on-a-consumption-of-about..........................................................of-best-Welsh-coal--best-grade-fuel-oil-best-grade-Diesel-oil,
11. now .........trading......................................................................................................................................................................
12. ....................and .. *Messrs GLINGROW HOLDINS LTD.* ...........................................................................................

13. ...................................................................................Charterers of the City of ..*Nicosia, Cyprus*...................................

14. **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for *about 3 thru Charter trip via safe ports, safe berths, safe anchorages always afloat, always within IWL, via Black sea with bulk lawful grain to Aqaba, Jordan. Duration about 30 days.*

15. within below mentioned trading limits.
16. Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17. the fulfillment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations hereunder.*
18. Vessel to be placed at the disposal of the Charterers, at *on dropping outward pilot Kerch at any time day or night Suntoys and Holidays included.*
19. ......................................................................................................................................................................
20. In such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, *except its otherwise provided in clause No 6*), as
21. the Charterers may direct. If such dock, wharf or place be not available, time to count as provided for in clause No.5. Vessel on her delivery to be
22. ready to receive cargo with clean-swept holds and tight, staunch, strong and every way fitted for the service, *having water ballast, (See Clause 42)* winches,
23. and
24. donkey-boiler-with sufficient-steam-power, or-if-not-equipped-with-donkey-boiler, then other-power-sufficient-to-run-all-the-winches-at-one-and-the-same
25. time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
26. dise, including-petroleum-or-its-products-in-proper-containers, excluding *(See Clause 32)*
27. (vessel-is-not-to-be-employed-in-the-carriage-of-Live-Stock, but Charterers-are-to-have-the-privilege-of-shipping-a-small-number-on-deck-at-their-risk,
28. all-necessary-fittings-and-other-requirements-to-be-for-account-of-Charterers)-in-such-lawful-trades-between-safe-port-and/or-ports-in-British-North
29. America-and/or-United-States-of-America, and/or-West-Indies, and/or-Central-America, and/or-Caribbean-Sea, and/or-Gulf-of-Mexico, and/or .........and/or-Europe
30. Mexico,-and/or-South-America................................................................................................................and/or-.........St.-Lawrence-between
and/or-Africa,-and/or-Asia-and/or-Australia,-and/or-Tasmania,-and/or-New-Zealand,-but-excluding-Magdalena River, River-St.-Lawrence-between

31. ~~Greater-31st and May 15th, Hudson Bay and at unsafe ports, also excluding, when out of season, White Sea, Black Sea and the Baltic,~~
32. *(See Clause 31)*
33. .........................................................................................................................................................
34. ..........
35. as the Charterers or their Agents shall direct, on the following conditions:
36. 1. That *whilst on hire* the Owners shall provide and pay for all provisions, wages and consular shipping fees and discharging fees of the Crew; shall pay for the
37. Insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler *and domestic water, lubricating oil, vessel's*
    *garbage removal unless compulsory* and maintain her class and keep
38. the vessel in a thoroughly efficient state in hull, *holds and hatchcovers,* machinery and equipment *with all certificates necessary to comply with current*
    *requirements at all ports of call and canals* for and during the service. *(See Clause 49 and 69).*
39. 2. That, *whilst on hire,* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory and customary*
    Pilotages, *Turkish strait pilotage ,* Agencles, *towage* on Charterers business for clearance and *barge purpose only,* Commissions, *canal dues and*
    *tolls,*
40. Consular Charges (except those pertaining to the Crew *and flag),* and all other usual expenses except those before stated, but when the vessel puts into
41. a port for causes for which *Owners are vessel is* responsible, then all such charges Incurred shall be paid by the Owners. Fumigations ordered because of
42. Illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43. charter to be for Charterers account *Including loading expenses should port authorities order crew ashore for safety reasons.* All other fumigations to be
    ~~for charterers account after vessel has been on charter for a continuous period~~
44. ~~of six months or more.~~
45. Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, *as permitted under*
    *this Charterparty,* but
46. Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47. for dunnage, they making good any damage thereto.
48. ~~3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining in~~
49. ~~bunkers vessel at the current prices in the respective ports, the vessel to be delivered with not less than ........... tons and not more than~~
50. ~~.........................tons and to be re-delivered with not less than.......................tons and not more than........................tons. (See Clause 38).~~
51. 4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *US$ 90000.00 per day pro rata Including overtime payable in*
    *advance every 15 days. First payment within 3 banking  days upon delivery.*
52. ...................................................................United States Currency per ton on vessel's total deadweight carrying capacity, Including bunkers and
53. ~~stores-on~~ ...........................summer freeboard, per Calendar Month, commencing on and from the *hour day* of her delivery, as aforesaid, and at
54. and after the same rate for any part of a day *month,* hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55. wear and tear excepted, to the Owners (unless lost) *on dropping last outward sea pilot Again,* any time day *or night, Sundays and Holidays*
56. *Included* ..........................unless otherwise mutually agreed. Charterers are to give Owners not less than.............................................days
57. notice of vessel's expected date and probably port ~~of re-delivery, and probable port. (See Clause 38)~~
58. 5. Payment of said hire to be made as *per clause 45* In *New-York-in-cash* by *transfer* in United States Currency, *every 15 days semi-monthly* In
    advance, and for the last *15 days* half-month or
59. part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60. due, if so required by Owners, unless bank guarantee or deposit is made by Charterers, otherwise falling the punctual and regular payment of the
61. hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62. terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day
63. following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they
64. to have the privilege of using vessel at once, such time used to count as hire.

55. ~~Cash for vessel's ordinary disbursements~~ at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
56. ~~to 2-1/2% commission and such advances shall be deducted from the hire.~~ The Charterers, however, shall in no way be responsible for the application
57. of such advances.
60. 6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place that Charterers or their Agents may
69. direct, provided the vessel can safely lie always afloat at any time of tide, except at such places *in East Coast South America* where it is customary for similar
size vessels to safely
70. lie aground.
71. 7. That the whole reach of the Vessel's Hold, Decks and usual places of loading (not more than she can reasonably stow and carry), *compatible with*
*vessel's seaworthiness*, also

72. accommodations for Supercargo, if carried, shall be at Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73. tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of ~~passengers as far as accommodations allow. Charterers~~
74. ~~paying Owners......................... per day per passenger for accommodations and meals. However, it is agreed that in case any time or extra compensation~~
75. ~~accrued in the sequences of the carriage of passengers, Charterers are to bear such risk and expense.~~ *No passengers.*
76. 8. That the Captain shall prosecute his voyage with the utmost despatch, and shall render all customary assistance with ship's crew and
77. boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78. agency; and Charterers are to load, stow, and trim, *lash, secure and discharge* the cargo at their *risk and* expense under the supervision of the Captain, *all*
*cargo claims to be settled in accordance with NYPE Interclub Agreement as amended in September 1996 (Sub Clauses 69/60), who is to sign*
bills of lading for

79. ~~cargo as presented, in conformity with Mate's or Tally Clerk's receipts.~~
80. 9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81. receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
82. 10. That the Charterers shall have the permission to appoint a Supercargo, who shall accompany the vessel *against signing Owners' P and I Club*
*boarding LOI, and see that voyage is prosecuted*
83. with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table. Charterers paying at the
84. rate of *USD 10.00 (Ten Dollars)* $1.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their agents, to
victual Tally

85. Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, ~~for all such victualling, (See Clause 37)~~
88. 11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, *and / or*
*telecommunication with copy to Owners, and the*
87. Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88. terers, their Agents or Supercargo, when required, with a true copy of daily Logs, *abstracts in English,* showing the course of the vessel and distance run and
the con-
sumption of fuel.

89. 12. That the Captain shall use diligence in caring for the ventilation of the cargo. *Vessel has natural ventilation.*
90. 13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~...........................days previous to the expiration of the first named term, or any declared option.
91. 14. That if required by Charterers, time not to commence before *00:01 hours Local Time 16th October 2007*...............and should vessel
92. not have given written notice to the Owners or their Agents...........*from delivery* on or before *23:59 hours Local Time 18th October 2007*,... but not later than 4 p.m. Charterers or
93. their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
96. 16. That in the event of the loss of time from deficiency *and/or default* of men or *including strike of Officers and / or crew or deficiency of stores,*
97. fire, breakdown or damages to hull, machinery or equipment,

98. grounding, detection by average accidents to ship or cargo, unless resulting from inherent vice, quality or defect to the cargo, drydocking for the purpose of examination or painting bottom, or by any other cause

99. preventing the full working of the vessel unless same is caused by Charterers or by following their instructions, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by

100. defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101. thereof, and all extra directly related expenses shall be deducted from the hire duly substantiated.
102.    16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103. returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104. Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105.    The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106. purpose of saving life and property.
107.    17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at London New York,
108. one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
109. the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial shipping men. (See Clause 60.)
     General Average / Arbitration in London. This Charter Party shall be governed by and construed in accordance with English Law.
110.    18. That the Owners shall have a lien upon all cargoes, and all sub-freights and all sub-hire for any amounts due under this Charter, including General Aver-
111. age contribution, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112. deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113. might have priority over the title and interest of the owners in the vessel.
114.    19. That all derelicts and salvage shall be for Owners' account and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115. Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules--to 15, inclusive, 17 to 22, inclusive, and Rule F of
116. York-Antwerp Rules 1974 as amended 1994 at London (See Clause 66.) 40 21, at each port or place in the United States as may be selected by the Carrier,
     and as to matters not provided for by these
117. Rules, according to the law and usage of the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into
118. United States money at the rate prevailing on the dates and allowances for damage to cargo claimed in foreign currency shall be converted at
119. the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
120. bond and such additional security as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
121. or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
122. required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
123. carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in trust by the adjuster with
124. power of adjustment and in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in
125. United States money.
126.    In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever,
127. whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the
128. goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,
129. losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the
130. goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the salving ship or ships belonged to
131. strangers.
132.    Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. (See Clause 86)
133.    20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and shall be for
     Owners' account. the
134. cost of repairing same, to be allowed by Owners.
135.    21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a

136.
137.
138.
139.
140.
141.   ~~22. Owners shall maintain the gear of the ship as fitted, providing gear for all derricks capable of handling... Owners are to provide necessary gear for~~
142.   ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lights as on board lanterns and oil~~
       ~~(See Clause 70)~~

143.   night work, *free of expense to Charterers*, and Vessel to give use of electric light when so fitted, but any additional lights over those on board to be at
       Charterers' expense. The

144.   Charterers to have the use of any gear on board the Vessel.
145.   23. Vessel to work, night and day, if required by Charterers, ~~and all winches to at Charterers' disposal during loading and discharging~~
146.
147.
148.
149.
150.
151.
152.
153.
154.
155.
156.                                    U.S.A. Clause Paramount
157.   This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
158.   16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
159.   any of its rights or immunities or an increase of any of its responsibilities or liabilities under the said Act. If any term of this bill of lading
160.   be repugnant to said Act to any extent, such term shall be void to that extent, but no further.
                                       ~~Both-to-Blame Collision Clause~~
161.
162.
163.
164.
165.
166.
167.
168.   25. The vessel shall not be required to enter any ice-bound port or any port where lights or light-ships have been or are about to be with-
169.   drawn by reason of ice, or where there is risk that in ordinary course of things the vessel will not be able on account of ice to safely enter the
170.   port or to get out after having completed loading or discharging. *Ice free ports / loading, Vessel not to force ice or follow ice-breakers.*
171.   26. Nothing herein stated is to be construed as a release of the vessel to the Time Charterers. The Owners to remain responsible for the
       navigation of the vessel, *acts of pilots and tugboats except of strikes* just against the Owners, insurance, crew, and all other matters, *except for their*
       *Charterers' responsibility as agreed in this Charter and Rider,* same as when trading for their own account.  ..... DIAMANT / ODESSA .........
172.   27. A commission of 1.2132-% per cent is payable by the Vessel and Owners to .....
173.
174.   on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

176

28. An address commission of 2 ¼ per cent is payable to .....*Charterers*.............. on the hire carned and paid under this Charter.

*Additional Clause 29 to 82 as attached are to be fully incorporated in this Charter Party.*

THE OWNERS                                    THE CHARTERERS

This Charter Party is a computer generated copy of the NYPE(Reversed 3rd October, 1946) form printed under licence from the Association Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

<u>M/V "PAGANE" - GLINGEOW - C/P DATED 12th OCTOBER 2007</u>

Clause 29  Vessels description
M/V PAGANE - GEARLESS SD BC
PANAMA FLG-BLT 1982
54158 MTS DWAT ON 12.35 M SSW
GRT/NRT - 32976/20521
LOA/BEAM - 220/32.20M
DEPTH MOULDED 17 M
GRAIN IN MAIN HOLDS - 2443031.66 CFT (HA CMNGS INCLDD)
7 HOLDS/10 HATCHES
HATCH SIZES - ALL 11.60 BY 15.40M
HOLDS SIZE:
-HOLD #1 - 17.50m X 32m (AFT PART)
-HOLD #2 - 29.70m X 32m
-HOLD #3 - 18.80m X 32m
-HOLD #4 - 27.90m X 32m
-HOLD #5 - 18.00m X 32m
-HOLD #6 - 30.60m X 32m
-HOLD #7 - 15.30m X 32m (FORE PART)
HEIGHT OF ALL HOLDS - 17.90m INCLUDING COAMINGS.
MCGREGOR SIDE ROLLING TYPE - HYDRAULIC
SPEED-CONSUMPTION UNDER GOOD WEATHER AND SMOOTH WATER CONDITIONS:
ABT 11.5KN ON ABT 33MT LADEN/31MT BALLAST IFO 180 CST PLUS ABT 3.5 MT
MGO AT SEA, PORT CONS ABT 2.5 MT MGO.
VSL BURNS MGO WHILST MANOUVRING AND NAVIGATING IN NARROW WATERS,
ENTERING-LEAVING PORT, SAILING IN CONFINED WATERS, RIVERS, CANALS,
ESTUARIES AND ON STANDBY.
FUEL CAP: ABT 2000 MT IFO 180 CST ISO 8217 RME 25
ABT 300 MT MGO ISO 8217 DMA
TPC ABT 61.0 T/CM
CONSTS ABT 500 BCXL, FW
NATURAL VENTILATION, NOT CO2 FTD
CGO HOLD GRAIN B/DOWN
NO1 223328.52
NO2 473521.17
NO3 282491.75
NO4 449107.91
NO5 282491.75
NO6 492979.74
NO7 239110.80
- ALL ABT AND WOG -
OWNERS: PAGANE MARITIME LTD.
CLASS: RMRS
PANDI: INGOSTTRAKH
H+M: ALLIANZ
ISM/ ISPS OK
CALL SIGN: 3 E B Z 9
INMARSAT 'C' FLX: 457127118

- HATCH SIZES: ALL 11.60 BY 15.40 M
- OWNERS GTEE AIR DFT (DISTANCE WL TO TEC) IN FULL BALLAST CONDITION TO BE
  MAX 12.00 M
- LAST THREE CARGOES: STEELS, IRON ORE, CLINKER

7

M/V "TAGANE" - GLENGROW - C/P DATED 17th OCTOBER 2007

I.    VSL'S STOWAGE PLAN:
      -HOLD #1 - 5190.75mts - FULL
      -HOLD #2 - 10480.00mts - SLACK
      -HOLD #3 - EMPTY
      -HOLD #4 - 10444.48mts - FULL
      -HOLD #5 - EMPTY
      -HOLD #6 - 11464.73mts - FULL
      -HOLD #7 - 4080.00 - SLACK
      ------------------------------------
      TTL 41500mts
      DRAFT FORE=10.39m MID=10.54m AFT=10.70m
      ALL ABOVE ESTIMATIONS DONE ON BSS TRIMMED ENDS.IF LOADING WILL
      BE
      WITE UNTRIMMED ENDS THEN STOWAGE PLAN CHANGE WILL BE .
      II. WE NEED MIN 48 HRS TO BALLAST/DEBALAST HOLDS NoS 3+5.
      III. RCVD MSG FM GLOBAL AGENCY ASKING FOR SOME VSL'S
      DETAILS.STILL .
      NOT REVERT, WAIT YR CONFORMATION AND INSTR.

- OWNRS WILL CONSIDER AIR DFT (DISTANCE WL TO THC) IN FULL BALLAST
INCLUDING BALLASTING CAEGO HOLDS NOS AND NoS AND ACHEAVING REQUIRED
BY TERMINAL DRAFT ON HOLD NO 7 BY TRIMING THE VESSEL, BUT TIME LOST FOR
BALLASTING/DEBALLASTIN AND PREPARING CARGO HOLDS IN SUITABLE
CONDITION FOR LOADING ALWAYS TO BE FOR AND ACCOUNT OF CHARTERES

- OWNERS.CONFIRM VSL IS GRAIN CLEAN AND HAS ON BOARD VALID DOCUMENTS
OF AUTHORIZATION FOR CARRIAGE OF GRAINS IN BULK.
- OWNERS CONFIRM THAT VESSEL IS SUITABLE FOR GRAB DISCHARGE.
- OWNERS CONFIRM VESSEL IS CLASSED HIGHEST LLOYD'S CLASS AND ISM / ISPS
CODE FITTED FOR THE WHOLE DURATION OF VOYAGE.
- OWNERS CONFIRM VESSEL HAS ALL VALID DOCUMENTS/CERTIFICATES AVAILABLE
ON BOARD FOR LOADING AND DRAFT SURVEY.
- OWNERS CONFIRM THAT VESSEL IS NOT BLACKLISTED FOR LOAD ANEVOR
DISCHARGE COUNTRIES / PORTS AND SUITABLE FOR THIS TRADE.
- OWNERSHIP/CLASS/PANDI CLUB/H+M INSURANCE NOT TO BE CHANGED
THROUGHOUT WHOLE TRIP DURATION.

FOR
- ACC GLINGROW HOLDING LTD_ NICOSIA, CYPRUS
RECENT DEALS:
C/P 25/08/2007 "GRAND MARKELA" ON TCT NOVO/SAUDI ARABIA 50'000 MTS BARLEY
D/OWNERS C. TRANSPORT
C/P 23/08/2007 "ERNEST" ON TCT NOVO/AQABA 33'000 MTS WHEAT
D/OWNERS - CARGILL INTERNATIONAL S.A.
C/P 21/08/2007 "SOUTHGATE" ON TCT NOVO/DAMIETTA 24'000 MTS WHEAT
D/OWNERS - NOBLE RESOURCES S.A.
C/P 26/07/2007 "THOR CONFIDENCE" ON VOYAGE BSS NOVO/ADEN 23200 MTS WHEAT
OWNERS - THORESEEN
C/P 20/06/2007 "SILVERGATE" ON VOYAGE BSS NOVO/AQABA 50'000 MTS BARLEY
D/OWNERS - INDUSTRIAL CARRIERS
C/P 01/06/2007 "LEROS" ON TCT NOVO/ADEN-HODEIDAE 49500 MTS WHEAT
D/OWNER - CUSTODIA

<u>MV "PAGANE" - SUNGROW - CP DATED 17th OCTOBER 2007</u>

### Clause 30 Bunker Clause

Bunker on delivery to be as on board (expect IFO about 328 mts and MGO about 55 mts).
Bunker on redelivery to be about same quantity (not less) as actually on delivery. Charterers will pay
cost of bunker on delivery together with 1st hire.
Bunker prices - IFO USD 435 / MGO 745 per mt, same prices on redelivery

### Clause 31 Trading Exclusions

One time Charter Trip to Aqaba / Jordan.

### Clause 32 Cargo Trading Clause

Cargo is grain.

### Clause 33 - Deleted.

### Clause 34

Owners guarantee that the vessel is an easy trimming bulk carrier suitable for loading / carrying /
discharging a full and complete cargo of any / all kinds of grain in bulk without bagging /
strapping/securing. The vessel to have on board at all times all relevant grain loading booklets /
manuals / certificates and hold and trimming table and vessel to be able to load grain without shifting
boards / grain fittings in accordance with 1991 amendments the International Convention of SOLAS
1974 and has dispensation from trimming holds ends.

### Clause 35 Hire Payment

Hire and all monies due to the Owners under this Charter Party will be paid to Owners' bank account.
Charterers will not agree to the assignment of hire, monies due under this Charter Party or the Charter
Party itself in any circumstances whatsoever.

First hire shall be paid within 3 banking days after vessel's delivery together with value of bunkers.
Thereafter, hire shall be settled every 15 days in advance. Greenwich Mean Time (G.M.T.) shall be
applied for hire calculation purpose.

Notwithstanding anything contained herein to the contrary, if any time during the currency of this
Charter, hire shall become due on or during a Saturday, Sunday or national holiday or outside normal
office hours, or at any time which for reasons beyond their reasonable control would prevent
Charterers from effecting payment of hire on the due date, payment of hire is to be made on the
banking day immediately preceding the date on which hire becomes due. Where there is any failure to
make hire payment on the due date because of an oversight or negligence or error or omission of
Charterers' employees, Bankers or Agents or otherwise for any reason where there is absence of
intention to fail to make payment as set out, Charterers shall be given by Owners 3 banking days'
notice to rectify the failure, where so rectified the payment shall stand as principal and regular
payment.

### Clause 36 Charterers' Deduction

Charterers have no right to deduct any Owners' expenses from the Charter hire. It is understood that
Owners will forward to load and/or discharge agent in advance any funds required for Owners'
expenses.

9

M/V "PAGANI" - GLENGROW - C/P DATED 12th OCTOBER 2007

### Clause 37 Communication/Entertainment/Victualling

Charterers shall pay US\$ 1,250.- per month or pro rata in lieu of communication / entertainment / victualling.

### Clause 38 Delivery/Redelivery Notice

Delivery Notices:      on fixing and then daily notices.

Redelivery Notices:      15 days approximate and 5/3/2/1 days definite notice of redelivery date and port.

### Clause 39 Stevedore Damage Clause

Stevedores shall be employed at the risk of and paid for by the Charterers. It is understood that all tallying is to be for Charterers' account.

Charterers shall not be responsible for any damage suffered by the vessel and/or her equipment whilst loading or unloading, unless such damage is notified to Charterers' representatives/Agents in writing by the Master latest within 24 hours after the occurrence, except in case of hidden damages which to be reported latest upon completion of discharge.

In the event of stevedore damage:

a)      Such damage to be entered into the vessel's log book.

b)      Master shall also have notified the stevedores or parties responsible for such damage in writing or telex/cable with copy to Charterers.

c)      If the damage caused as above by Charterers or their stevedores affects the vessel's seaworthiness or cargo worthiness or is subject to Classification requirements then all such damage is to be repaired to the satisfaction of the vessel's Classification Society prior to leaving the loading/discharging port. Vessel remaining on hire and costs being borne by Charterers.

d)      Damages not affecting seaworthiness or cargo worthiness or is not subject to classification requirements may be repaired later together with Owners' work at Owners' time and at Charterers' expenses. Owners to provide Charterers with copies of original invoices and if required, to advise Charterers' nature of work necessary to repair damages.

e)      Master will make every attempt to obtain written acknowledgement from the party causing the damage but this without prejudice to paragraphs 'a' through 'd'.

### Clause 40 P and I Club

Owners guarantee that the vessel is fully covered by the Ingosstrakh. Charterers have the benefit of Owners' cover granted by the P and I Club so far as the Club Rules permit.

Trip to Jordan always as per vessel's P and I club requirements which are:

= subject to previous written notification to Ingosstrakh;
= loading/discharging surveys carried out by approved surveyor of Ingosstrakh;

.10

<u>M/V "PAGANE" - CH INGROW - CP DATED 17th OCTOBER 2007</u>

#### Clause 41 Return Insurance

As far as rules permit, the Charterers to have the benefit of any return insurance premium receivable by Owners from their underwriters, as and when received by Owners, by reason of vessel being in port all such time on hire.

#### Clause 42 War Risk

Basic war risk insurance premium for worldwide trading to be for Owners' account, and additional premiums for hull and machinery and Officers/crew for trading to restricted area, also crew war boxes, if any, to be for Charterers' account. The orders of Owners' war risk underwriters always to be followed.

The vessel's hull and machinery value of fixing is USD 5.290.000,-

#### Clause 43 On/Off-Hire Survey

Charterers to appoint a surveyor acting on their behalf for performing a joint on and off hire bunker and condition survey. Joint on hire survey to be in Owners' time unless vessel already loading and joint off hire survey to be in Charterers' time. Expenses for on/off hire survey to be shared equally between Owners and Charterers.

#### Clause 44 Hold Cleaning

On arrival first load port, vessel to be grain clean and ready in every respect and in all compartments to receive Charterers' cargo to local surveyors' and/or competent authorities' satisfaction, failing which vessel to be off-hire from the time of rejection until passed again. Owners to take immediate corrective steps to expedite cleaning as fast as possible including the use of shore labour. If vessel fails inspection, all bunkers consumed after rejection and extra expenses incurred as a direct result to be for Owners' account, until vessel has been passed in all compartments again.

Charterers' option to redeliver the vessel unclean paying USD 5.000,00 in lieu of hold cleaning.

#### Clause 45 Bills of Lading

The Owners undertake to instruct the Master to authorise Charterers or Charterers' Agents if required to issue and sign Bill(s) of Lading on Charterers' usual form on Owners' and Master's behalf for cargo as presented in conformity with Mate's receipts. Charterers to keep Owners harmless should Charterers' servants not issue Bills of Lading per Owners'/Master's strict authority.

Should original Bill(s) of Lading not be available prior to vessels' arrival to the discharging port(s) in time, Owners to agree to release entire cargo without production of original Bill(s) of Lading, if so requested by Charterers or their agent(s), against a fax presentation of Letter of Indemnity under Owners' P and I Club wording which to be singly signed by Charterers or signed by sub-Charterers together with Charterers' joint signature.

No liner or through Bills of Lading or Seaway Bill may be issued/used during the currency of present Charter Party.

Charterers are not to issue or cause to be issued Bs/L which are subject to Hamburg rules.

#### Clause 46 ISM Clause

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both

11

M/V "FAGANE" - GLENGROW - C/P DATED 17th OCTOBER 2007

the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Owners shall indemnify Charterers for any and all loss, expense and/or damage and/or consequences sustained by Charterers resulting from partial or full non-compliance with this clause. Any and all delays to the vessel resulting from such partial or full non-compliance with this clause shall not count as laytime or, if laytime has expired, as time on demurrage respectively, as the case may be, as on-hire time.

### Clause 47 Deratisation Certificate
The vessel to have valid deratisation certificate and/or equivalent fumigation certificate on board at time of delivery. The validity of which is to be maintained by Owners in their time and at their expense during the currency of this Charter Party.

### Clause 48 Quarantine/Smuggling
Normal quarantine time and expenses for entering ports shall be for Charterers' account. The Owners shall be liable for any delay in quarantine arising from the Master or any of the deck or engine Officers or crew having communication with the shore at any infected area without the written consent or instructions of Charterers or their Agents, also for any loss of time through detention by customs or other authorities caused by smuggling or their infraction of local law on the part of the Master or any of the deck or engine crew. Any delay, expenses and/or fines incurred on account of smuggling, if caused by the Charterers' supercargo and/or their staff or Agents are to be for Charterers' account. Likewise, if any delay in quarantine arises as a result of Charterers' trading of the vessel and/or misinstructions or lack of proper instructions by Charterers or their Agents, servants or representatives such delay is to be for Charterers' account.

### Clause 49 Health Certificate
The Owners shall arrange at their expense that Master, Officers and crew of vessel held valid vaccination certificates against yellow fever, smallpox, cholera or other necessary health certificates during the Charter.

### Clause 50 Vessel's Equipment
Vessel's equipment shall comply with the regulations of the countries in which vessel will be employed and Owners are to ensure that vessel is at all times in possession of valid and up-to-date certificates as required. If stevedores, longshoremen or other workmen are not permitted to work due to failure of the Master and/or the Owners and/or Owners' Agents to comply with the aforementioned regulations or because the vessel is not in possession of such valid and up-to-date certificates as required, then Charterers may suspend hire for the time thereby lost and Owners shall pay all proven extra direct expenses incurred incidental to and resulting from such failure.

### Clause 51 Safety Regulation
It is understood that the vessel will comply with all safety regulations and/or requirements in effect at ports of loading and/or discharging. It is agreed that should the vessel not meet safety rules and regulations, Owners will take corrective action and vessel is to be off-hire.

### Clause 52 Canal Certificate

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

The vessel is fully fitted for Panama/Suez Canal transit and in possession of valid necessary certificate on board, in conformity with current canal regulations/requirements.

### Clause 53 Crew Service

During the currency of this Charter Party and provided weather and local stevedore and port regulations permit, Charterers to have the option to use crew to perform the following services as a means toward an efficient cargo operation:

a) At each port all of the hatch opening and closing;
b) Preparing vessel for sea;
c) Removal and disposal of dunnage to be for Charterers' account;
d) Gangway watchmen for the vessel to be for Owners' account.
   Compulsory cargo watchmen to be for Charterers' account;
e) Before and upon arrival at a port, vessel's Officers/crew to shape up vessel's hatches, and gangway in order to commence loading and/or discharging without delay. Opening/closing of all hatchcovers and erecting and dismantling of shifting boards, if necessary, shall be done by Officers/crew provided shore regulations permit.

### Clause 54 War Cancellation

If war breaks out between any two or more of the following countries: United Kingdom, U.S.A., C.I.S., P.R.C., Japan, directly affecting the performance of this Charter, both Owners and Charterers shall have the option of cancelling this Charter whereupon Charterers shall redeliver vessel to Owners, if she has cargo on board after discharge thereof at destination, or, if debarred from reaching or entering it, at a near, open and safe port as directed by Charterers, or if she has no cargo on board, at a port at which she stays or if at sea at a near and safe port as directed by Charterers. In all cases, hire shall be paid until vessel's redelivery.

### Clause 55 Requisition

Should the vessel be requisitioned by any government or governmental authority due to Owners/Managers/vessel's fault, or due to vessel's flag or Ownership during the period of this Charter, she shall be off-hire during the period of such requisition and any hire or other compensation paid by any government or governmental authority in respect of such requisition shall be for Owners' account.

### Clause 56 Extra Period

Should the vessel be placed off-hire during the currency of this Charter for any reason whatsoever, the Charterers have the option of adding all or any part of such off-hire period to the original period.

### Clause 57 Cancellation Clause

If the vessel is placed off-hire more than 30 consecutive days, Charterers have the right to cancel the balance period of this Charter by giving notice to Owners without prejudice to any other right the Charterers may have under this Charter and provided vessel is free of cargo.

### Clause 58 Capture/Seizure/Arrest

Should the vessel be seized or detained or arrested or delayed by any authority during the currency of this Charter Party, the Charterers' liability for seizure or detention or arrest or delay is ceased immediately from the time of her seizure or detention or arrest or delay and all time lost by this reason shall be treated as off-hire until the time of her release unless such seizure or detention or arrest or delay is occasioned by any personal act or omission or default of Charterers or their Agents. Extra

13

M/V "PAGANE" - GLINGROW- CP DATED 17th OCTOBER 2007

expenses incurred directly from above seizure or detention or arrest or delay to be for Owners' account.

## Clause 59 Cargo Claim

Cargo Claims To Be Settled As Per NYPE Interclub Agreement 1996

## Clause 60 Small Claims Procedure Clause

Notwithstanding anything contained in the Arbitration Clause to the contrary, should neither the claims nor the counterclaims exceed USD 100,000.00 exclusive of interest on the sum claimed, costs of the arbitration and legal expenses, if any, it is hereby agreed the dispute is to be governed by the London Maritime Arbitrators' Association Small Claim Procedure, revised 1st January, 1984.

## Clause 61 Deviation/Put Back

Should the vessel put back whilst on voyage by reason of an accident or breakdown or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness or accident to the crew or any person on board the vessel or by reason of the refusal of he Master or crew to perform duties, the hire shall be suspended from the time of inefficiency, unless caused by Charterers and/or Charterers' servants until the vessel is again efficient in the same position (or in Charterers' option at a point equidistant to the vessel's next destination) and voyage resumed therefrom. All direct expenses incurred including bunkers consumption during the period of suspended hire shall be for Owners' account.

## Clause 62 Water Pollution
A.   For Bulk Carriers:

(1)   Owners warrant that throughout the currency of this Charter they will provide the vessel with the following certificates:

    (a)   Certificates issued pursuant to Section 311 (p) of the U.S. Federal Water Pollution Control Act, as amended (Title 33 U.S Code, Section 1321(p)) up to (insert the date upon which such certificate(s) is/are due to expire).

    (b)   Certificates issued pursuant to Section 1016(a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended in accordance with Part 138 of Coast Guard Regulations 33 CFR, from (indicate the earliest date upon which the Owners may be required to deliver the vessel into the Charter or, if later, the date inserted in sub-paragraph (a) above), so long as these can be obtained by the Owners from or by (identify the applicable scheme or schemes).

(2)   Notwithstanding anything whether printed or typed herein to the contrary:

    (a)   Save as required for compliance with paragraph (1) hereof, Owners shall not be required or establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter.

14

M/V "PAGANE" - GLENGROW - UPDATED 17th OCTOBER 2007

    (b)    Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

    (c)    Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any Bills of Lading issued pursuant to this Charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

### Clause 63 Owners' Agents
Charterers may agree to have their Agents attend to the Owners' matters such as delivery, redelivery, general average, drydocking, repair, hospitalisation, repatriation of crew, supply of the vessel's stores and provisions, etc., with Owners paying Charterers' Agents actual expenses including attendance fee and agency fee according to the Charterers' tariff rate. Charterers may also agree to have their Agents to attend to trivial Owners' matters, such as, cash advance, crew mail, arranging shore pass with Owners paying actual expenses including attendance fee, if any, but without agency fee. (See Clause 36).

### Clause 64 Taxes
Export and/or import permits for Charterers' cargo to be at Charterers' risk and expense. Taxation or levies on cargo or freight to be for Charterers' account and to be paid by Charterers.

### Clause 65 Paramount Clause
General Paramount Clause to apply

### Clause 66 Additional Clause
New Jason Clause, P and I Bunkering Clause, New Both-to-Blame Collision Clause and Baltime War Risk Clause, as attached, to be incorporated in this Charter Party and all Bill(s) of Lading issued hereunder.

### Clause 67 Drydock Clause
The Owners have no option to make her drydock during this Charter period except emergency cases, or unless otherwise agreed.

### Clause 68 - Deleted

### Clause 69 Bulk Carrier Safety Clause
    (A)    The Charterers shall instruct the terminal operators or their representatives to cooperate with the Master in completing the IMO Ship/Shore Safety Checklist and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

    (B)    In addition to the above and notwithstanding any provision in this Charter Party in respect of

15

M/V "PAGANE" - GLENGROW - C/P DATED 17th OCTOBER 2007

loading/discharging rates, the Charterers shall instruct the terminal operators to load/discharge the vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the vessel's draught, trim, stability, stress or any other factor which may affect the safety of the vessel.

(C) At any time during cargo operations, the Master may, if he deems it necessary for reasons of safety of the vessel, instruct the terminal operators or their representatives to slow down or stop the loading or discharging.

(D) Compliance with the provisions of this Clause shall not affect the counting of hire.

### Clause 70 Stowaway Clause

Any time lost including but not limited to time on demurrage and any losses, liabilities and cost incurred by reason of stowaways on board shall be for Owners' account.

### Clause 71 Ocean Route Clause

Evidence of weather conditions to be taken from independent weather bureau reports. Owners to be represented by the findings of 'Aerospace' Ocean Routing Company. In case of dispute between Owners and Charterers' ocean routing companies, the matter to be taken into further arbitration. In any case, Master always entitled to choose vessel's routing related to vessel and crew safety.

Owners' ocean routing company full style/address as follows:

Aerospace & Marine International Corporation,
5920 Santa Teresa Boulevard, Suite 209,
San Jose, CA 95119, U.S.A.
Tel:     408-360-8440
Fax:     408-360-0450
Tlx:     149158
Email:   ops@weather3000.com
Web-port: www.amiwx.com

### Clause 72 Mobile Crane Clause

Deleted.

### Clause 73 Split Bills of Lading Clause

Charterers and/or Agents are hereby authorised by Owners/Master to split Bills of Lading and issue ship delivery orders in negotiable and transferable forms against collection of full set of original Bills of Lading. Delivery orders to conform with all terms and conditions and exceptions of Bills of Lading and shall not prejudice shipowners' rights.

### Clause 74 Oil Pollution

As a condition of this Charter Party, Owners guarantee that Owners and vessel are and will remain throughout the currency of the Charter Party insured for pollution liability with respect to trading within, to and from ranges and areas specified in this Charter, said insurance to have a limit of not less than U.S.$1 billion. At any time before or subsequent to the fixture date of this Charter, Owners, upon reasonable notice from Charterers, shall furnish to Charterers or its representative proof, satisfactory to Charterers, of such insurance. Without prejudice to Charterers' other rights, Owners shall indemnify Charterers for any and all loss, expense and/or damage sustained by Charterers resulting

16

M/V "PAGANEL" - GLENGROW - UPDATED 17th OCTOBER 2007

from non-compliance with this Clause. Any and all delay to the vessel resulting from such non-compliance shall not count as laytime or, if laytime has expired, as time or demurrage.

#### Clause 75
Vessel's crew contracts are bona fide employment agreement.

#### Clause 76
The vessel to remain always in seaworthy trim/condition to safely sail between ports/berths to Master's satisfaction.

#### Clause 77
Deleted.

#### Clause 78 ISPS Clause

(a)  (i)  From the date of coming into force of the International Code for the security of ships and of port facilities and the relevant amendments to chapter XI of SOLAS (ISPS code) in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the vessel and "the company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The owners shall provide the Charterers with the full style contact details of the company security officer (CSO).

(ii)  Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this clause shall be for the Owners' account.

(b)  (i)  The Charterers shall provide the CSO and the ship security officer (SSO)/master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-Charter Parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the owners with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

(ii)  Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this clause shall be for the Charterers' account.

(c)  Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result

13

M/V "PAGANE" - GLASGROW - CPDATED 17th OCTOBER 2007

solely from the owners' negligence, crew's nationality/visa issues, or costs or expenses directly arising from vessel's ownership or other crewing matters.

(d) If either party makes a payment which is for the other party's account according to this clause, the other party shall indemnify the paying party.

### Clause 79
All negotiations/trade are to be made in accordance with English Law. English Law to apply. Arbitration, if any, to be in London in accordance with the Arbitration Clause of the Charter Party.

### Clause 80
Charterers have the option to perform a general condition survey of the vessel at any time. Survey to be at Charterers' time and expenses.

### Clause 81
Owners to provide following certificates as per L/C requirements (see attached):

1.  Certificate issued and signed by (P and I) Club or their representative or by their agent to the effect that the carrying vessel is a member to that (p and I) club having representative or agent in Jordan.

2.  Certificate issued and signed by shipping register or their agent certifying that the carrying vessel is classified 100a1 or its equivalent and free from any outstanding recommendations.

### Clause 82

Negotiations and fixture, if any, to be kept private & confidential by all parties involved.

18

M/V "PAGANE" - GLINGROW - UPDATED 17th OCTOBER 2007

## BOTH-TO-BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

### New Both-to-Blame Collision Clause

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact"

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

### New Jason Clause

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery"

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

19

M/V "PAGANE" - GLENGROW - C/P DATED 17th OCTOBER 2007

## BALTIME 1939 WAR CLAUSE

(A)  The vessel unless the consent of the Owners be first obtained not to be ordered nor continue to any place or on any voyage nor be used on any service which will bring her within a zone which is dangerous as the result of any actual or threatened act of war, war hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or state whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of Sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any Government or Ruler.

(B)  Should the vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (1) the Owners to be entitled from time to time to insure their interests in the vessel and/or hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand; and (2) notwithstanding the terms of Clause 11, hire to be paid for all time lost including any loss owing to loss of or injury to the Master, Officers or crew or to the action of the crew in refusing to proceed in such zone or to be exposed to such risks.

(C)  In the event of the wages of the Master, Officers and crew or the cost of provisions and/or stores for deck and/or engine room and/or insurance premiums being increased by reason of or during the existence of any of the matters mentioned in section (A) the amount of any increase to be added to the hire and paid by the Charterers on production of the Owners' account therefore, such account being rendered monthly.

(D)  The vessel to have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other wise whatsoever given by the Government of the nation under whose flag the vessel sails or any other Government or any person (or body) acting or purporting to act with the authority of such Government or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such orders or directions.

(E)  In the event of the nation under whose flag the vessel sails becoming involved in war, hostilities, warlike operations, revolution or civil commotion, both the Owners and the Charterers may cancel the Charter and, unless otherwise agreed, the vessel to be redelivered to the Owners at the port of destination or, if prevented through the provisions of Section (A) from reaching or entering it, then at a near open and safe port at the Owners' option, after discharge of any cargo in board.

(F)  If in compliance with the provisions of this clause anything is done or is not done, such not to be deemed a deviation.

Section (C) is optional and should be considered deleted unless agreed according to Baltime 1939.

20

<u>M/V "PACANE" - GLINGROW - C/P DATED 17th OCTOBER 2007</u>

## P. AND I BUNKER CLAUSE

The vessel shall have liberty as part of the Contract Voyage to proceed to any port or ports at which bunker oil is available for the purpose of bunkering at any stage of the voyage whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the ports of loading or discharge named in this Charter and may there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks and deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

## BIMCO STANDARD ISM CLAUSE

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the Company" (as defined by the ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by the failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for Owners' account.

## SECA CLAUSE

During the currency of this contract the performing vessel will consume bunkers in accordance with ISO 8217 specifications. In the event that emissions regulations, laws or guidelines require or recommend the stemming or consumption of bunkers with a quality that has a higher value than the price for high sulphur fuel oil, then such excess price will be paid for by Charterers for bunkers consumed whilst in an emission controlled area. Upon request Owners to provide documentary proof for such price differential together with the actual bunker consumption in these emission controlled areas.

## BUNKER FUEL SULPHUR CONTENT CLAUSE FOR
## TIME CHARTER PARTIES 2005

(A) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the vessel is ordered to trade within that zone. The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with regulations 14 and 18 of Marpol Annex VI, including the guidelines in respect of sampling and the provision of bunker delivery notes.

M/V "PAGANE" - GLENGROW - UPDATED 17th OCTOBER 2007

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this sub-Clause (A).

(B)   Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with sub-Clause (A), the Owners warrant that:

    (i)   The vessel shall comply with regulations 14 and 18 of Marpol Annex VI and with the requirements of any emission control zone; and

    (ii)  The vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zones.

Subject to having supplied the vessel with fuels in accordance with sub-Clause (A), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the vessel's failure to comply with regulations 14 and 18 of Marpol Annex VI.

(C)   For the purpose of this Clause, 'emission control zone' shall mean zones as stipulated in Marpol Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the E.U. and the U.S. Environmental Protection Agency.

# EXHIBIT 2

## Provisional Hire statement MV PAGANE
## cp dd 17.10.2007/GLINGROW HOLDING LTD.
### Voyage PAG/2007/03/TC

|  |  |  |  | US$ Debit |
|---|---|---|---|---|
| **Hire from:** |  |  |  |  |
| 18.10.2007 01:00 GMT DOP KERGH |  |  |  |  |
| 31.12.2007 18:00 GMT |  |  |  |  |
| 44,736333 | days | @ | 50 000,00 | 2 692 500,00 |
| Bunkers on delivery: |  |  |  |  |
| 355,257 | IFO mts | @ | 435,98 | 155 285,80 |
| 49,849 | MDO mts | @ | 745,20 | 34 751,25 |
|  |  |  |  | 5 000,00 |
| ILOHC |  |  |  | 1 544,65 |
| C I Y / E | 37,00000 | @ | 1 250,80 | 2 832 679,73 |
|  |  |  | subtotal | net debit |

|  |  |  | Credit |
|---|---|---|---|
| less: |  |  | 700 593,75 |
| commission | 3,75 % |  |  |
| Owners expenses: |  |  |  |
| on-hire survey | 50% |  | 500,50 |
| off-hire survey | 50% |  | 750,00 |
| Off-hire: |  |  |  |
| at port Novo | 6,701353 | days | 387 096,21 |
| bunker consumed |  |  | 15 970,96 |
| at Suez Canal | 1,597629 | days | 92 086,15 |
| bunker consumed |  |  | 2 807,98 |
| Bunkers on re-delivery: |  |  |  |
| 366,257 | IFO mts | @ | 435,50 | 158 896,80 |
| 15,000 | MDO mts | @ | 745,00 | 11 175,00 |
| Payments: |  |  |  |
| 1. |  |  | 1 464 543,00 |
| 2. |  |  | 240 598,16 |
| 3. |  |  | 26 184,84 |
|  |  | subtotal | credit | 2 287 633,77 |
| grand total in favour OWNERS |  | debit | 594 845,97 |
| payment to be arranged to: |  |  |  |

| SENEFICIARY | BULCOM LTD. |
|---|---|
| ACC. No: | 72673/5G |
| WITH: | BNP PARIBAS (SUISSE) S.A. |
|  | PLACE DE HOLLANDE, 2 |
|  | CH-1211, GENEVA 11 |
|  | SWITZERLAND |
| SWIFT: | BPPBCHGG |
| IBAN: | CH59 1368 5005 0126 7303 2 |

# EXHIBIT 3

**From:** Marianne Brookes
**Sent:** 29 November 2007 11:58
**To:** arbitration@christophermoss.com
**Subject:** M/V Pagane C/P DD.17.10.2007

Dear Sir,

We act for Butcom Ltd, the disponent owners of the above vessel.

Under a time charter on the NYPE form (copy attached), disponent owners chartered their vessel to Glingrow Holding Ltd for 1 time charter trip for the carriage of grain from the Black Sea to Aqaba.

Under Clause 17 of the charterparty, any disputes between owners and charterers shall be referred to three persons in London and be determined in accordance with English Law.

Disputes have arisen between the parties. You are hereby appointed as owners' arbitrator. Kindly confirm acceptance of your appointment.

Best regards,

Brookes & Co.

Brookes & Co., Solicitors, 69 Lombard Street, London, EC3V 9EA, United Kingdom.
Tel: +44 (0)20 3159 4330   Fax: +44 (0)20 7691 7773.   General office email address: mail@brookes-and-co.co.uk
Principal: Marianne Brookes
Brookes & Co. is regulated by the Solicitors Regulation Authority
Confidentiality Note
The contents of this email and any attachments are strictly confidential and must not be copied to, used by or disclosed to any person other than the named recipient(s). Please let us know immediately by telephoning +44 (0)20 3159 4330 if this email has been sent to you in error.

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

_____Southern_____ District of _____New York_____

BULCOM LTD.,

**SUMMONS IN A CIVIL ACTION**

V.

GLINGROW HOLDING LTD

CASE NUMBER:

# 07 CV 10726

# JUDGE LEISURE

TO: (Name and address of Defendant)

GLINGROW HOLDING LTD.
15, Bournpoulinas Street
Povek Building, Apt. No. 301
Nicosie
Cyprus

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Lennon, Murphy & Lennon
420 Lexington Avenue, Suite 300
New York, NY 10170

an answer to the complaint which is served on you with this summons, within _____20_____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

NOV. 3 0 2007

J. MICHAEL McMAHON

CLERK

(By) DEPUTY CLERK

DATE

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |

| NAME OF SERVER *(PRINT)* | TITLE |
|---|---|
| | |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____     _____
                    *Date*              *Signature of Server*

                                  _____
                                    *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

Southern _____ District of _____ New York _____

BULCOM LTD.

## SUMMONS IN A CIVIL ACTION

V.

GLINGROW HOLDING LTD.

CASE NUMBER:

07 CV 10726

TO: (Name and address of Defendant)

RIAS TRADING

JUDGE LEISURE

YOU ARE HEREBY SUMMONED and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Lennon, Murphy & Lennon, LLP
420 Lexington Avenue
Suite 300
New York, NY 10170

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

## J. MICHAEL McMAHON

_____
CLERK

DATE    NOV 30 2007

_____
(By) DEPUTY CLERK

AO 440 (Rev. 8/91) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |

| NAME OF SERVER *(PRINT)* | TITLE |
|---|---|
| | |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____       _____
                    Date                              *Signature of Server*


                                    _____
                                              *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

[ c. 4. 2007  9:02AM   Lennon, Murphy & Lennon 1LC                 No 2573   P  2
Nov. 30. 2007  2:09PM   Lennon, Murphy & Lennon LLC                No.2153   P. 11

## JUDGE LEISURE    07  CV  10726

_____ MENT OF THE UNITED STATES OF AMERICA

To the Marshal of the Southern District of New York (or designated process server) - GREETINGS:

WHEREAS a Verified Complaint has been filed in the United States District Court for the Southern District of New York on the 30th day of November 2007 by

BULCOM LTD.,

Plaintiff

against

GLINGROW HOLDING LTD. and RIAS TRADING,

Defendants,

In a certain action for breach of maritime contract wherein it is alleged that there is due and owing from the Defendants to the said Plaintiff the amount $1,433,583.10 and praying for process of maritime attachment and garnishment against the said Defendants,

WHEREAS, this process is issued pursuant to such prayer and requires that a garnishee(s) shall serve their answer(s), together with answers to any interrogatories served with the Complaint, within 20 days after service of process upon him and requires that Defendants shall serve their answers within 30 days after process has been executed, whether by attachment of property or service on the garnishee.

NOW, THEREFORE, we do hereby command you that if the said Defendants cannot be found within the District you attach goods and chattels to the amount sued for, and if such property cannot be found that you attach other property, credit and effects to the amount sued for in the hands of:

ABN Amro, American Express Bank, Bank of America, Bank of New York Mellon, Barclay's Bank, BNP Paribas, Calyon, Citibank, Deutsche Bank, HSBC Bank USA Bank, J.P. Morgan Chase, Societe Generale, Standard Chartered Bank, UBS, and/or Wachovia Bank N.A

to wit: property, letters of credit, deposits, funds, credits, bills of lading, debts, settlement agreements, or other assets, tangible or intangible, in whatever form of:

GLINGROW HOLDING LTD. and/or RIAS TRADING

and that you promptly after execution of this process, file the same in this court with your return thereon.

WITNESS, the Honorable, _____ Judge of said Court, this ___ day of November 2007, and of our Independence the two-hundred and thirty-first.

Lennon, Murphy & Lennon, LLC                          J. MICHAEL McMAHON
Attorneys for Plaintiff                                        Clerk
The Gray Bar Building
420 Lexington Avenue, Suite 300                      By _____
New York, NY 10170                                          Deputy Clerk
Phone (212) 490-6050

NOTE: This Process is issued pursuant to Rule B(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure and/or New York Civil Practice Law and Rules, Article 62.

A CERTIFIED COPY
J. MICHAEL McMAHON,                              CLERK

BY _____
DEPUTY CLERK

**JUDGE LEISURE**    07 CV 10726

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

BULCOM LTD.,

                            Plaintiff,

         - against -

GLINGROW HOLDING LTD. and
RIAS TRADING,

                            Defendants.

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
ECF CASE

**EX PARTE ORDER
FOR PROCESS
OF MARITIME
ATTACHMENT**

WHEREAS, on November 30, 2007 Plaintiff, BULCOM LTD., filed a Verified Complaint, herein for damages amounting to $1,433,585.10 inclusive of interest, costs and reasonable attorney's fee, and praying for the issuance of Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Admiralty Rules for Certain Admiralty and Maritime Claims of the Federal Rules and Civil Procedure; and

WHEREAS, the Process of Maritime Attachment and Garnishment would command that the United States Marshal, or other designated process server, attach any and all of the Defendants' property within the District of this Court; and

WHEREAS, the Court has reviewed the Verified Complaint and the Supporting Affidavit, and the conditions of Supplemental Admiralty Rule B appearing to exist;

NOW, upon motion of the Plaintiff, it is hereby:

ORDERED, that pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, the Clerk of the Court shall issue Process of Maritime Attachment and Garnishment against all tangible or intangible property, credits, letters of credit, bill, or lading, effects, debts and monies, electronic funds transfers, freights, sub-freights, charter hire, sub-

charter hire or any other funds or property up to the amount of **$1,433,583.10** belonging to, due
or being transferred to, from or for the benefit of the Defendant(s), including but not limited to
such property as may be held, received or transferred in Defendants' name(s) or as may be held,
received or transferred for its benefit at, moving through, or within the possession, custody or
control of banking/financial institutions and/or other institutions or such other garnishees to be
named on whom a copy of the Process of Maritime Attachment and Garnishment may be served;
and it is further

    **ORDERED** that supplemental process enforcing the Court's Order may be issued by the
Clerk upon application without further Order of the Court; and it is further

    **ORDERED** that following initial service by the U.S. Marshal, or other designated
process server, upon each garnishee, that supplemental service of the Process of Maritime
Attachment and Garnishment, as well as this Order, may be made by way of facsimile
transmission or other verifiable electronic means, including e-mail, to each garnishee; and it is
further

    **ORDERED** that service on any garnishee as described above is deemed effective
continuous service throughout the day from the time of such service through the opening of the
garnishee's business the next business day; and it is further

    **ORDERED** that pursuant to Federal Rule of Civil Procedure 5(b)(2)(D) each garnishee
may consent, in writing, to accept service by any other means.

Dated: November **30**, 2007        SO ORDERED:

                                      *John F. Keenan*
                                      U.S.D.J.

                                    A CERTIFIED COPY      CLERK
                                    J. MICHAEL McMAHON,

                                    BY                    DEPUTY CLERK

Effective March 1, 2004

## INDIVIDUAL PRACTICES OF
## JUDGE PETER K. LEISURE
### Senior U.S. District Judge

Unless otherwise ordered by Judge Leisure, effective immediately, matters before Judge Leisure shall be conducted in accordance with the following practices:

### 1. Communications With Chambers

A. **Letters.** Copies of letter to chambers shall simultaneously be delivered to all counsel. Copies of correspondence between counsel shall not be sent to the court.

B. **Telephone Calls.** Except as provided in Paragraph 1(D) below, telephone calls to chambers are permitted only in emergency situations requiring immediate attention. In such situations only, call chambers at 212-805-0226.

C. **Faxes.** Faxes to chambers are not permitted, unless prior approval has been obtained.

D. **Docketing, Scheduling, and Calendar Matters.** For docketing, scheduling and calendar matters, call Eileen Chan at 212-805-0109.

E. **Requests for Adjournments or Extensions of Time.** All requests for adjournments or extensions of time must state (1) the original date, (2) the number of previous requests for adjournment or extension, (3) whether these previous requests were granted or denied, and (4) whether the adversary consents, and, if not, the reasons given by the adversary for refusing to consent. If the requested adjournment or extension affects any other scheduled dates, a proposed Revised Scheduling Order (reflecting only business days) must be attached. If the request is for an adjournment of a court appearance, absent an emergency it must be made at least 48 hours prior to the scheduled appearance. If the request is for an extension of time for service of motion papers, absent an emergency it must be made five business days prior to the original deadline for service.

### 2. Motions

A. **Pre-Motion Conferences in Civil Cases.** For discovery motions, follow Local Civil Rule 37.2. For motions other than discovery motions, a pre-motion conference with the court is required before making any motion, except motion to dismiss in lieu of an answer. To arrange a pre-motion conference, the moving party shall submit a letter not to exceed three pages in length setting forth the basis for the anticipated motion.

**B. Courtesy Copies.** Courtesy copies of all motion papers, marked as such, must be submitted to chambers at the same time as they are filed. Courtesy copies of interrogatories and notices of depositions are not to be sent to chambers.

**C. Memoranda of Law.** Unless prior permission has been granted, memoranda of law in support of and in opposition to motions are limited to 25 pages, and reply memoranda are limited to 10 pages. Memoranda of 10 pages or more must contain a table of contents. All memoranda of law must describe the applicable standard of decision governing the underlying motion.

**D. Oral Argument on Motions.** Parties may request oral argument by letter at the time their moving or opposing or reply papers are filed. The court will determine whether argument will be heard and, if so, will advise counsel of the argument date.

### 3. Pretrial Procedures

#### A. Joint Pretrial Orders in Civil Cases.

Unless otherwise ordered by the Court, within 30 days from the date for the completion of discovery in a civil case, the parties shall submit to the court for its approval a joint pretrial order, which shall include the following:

i. The full caption of the action.

ii. The names, addresses (including firm names), and telephone and fax numbers of trial counsel.

iii. A brief statement by plaintiff as to the basis of subject matter jurisdiction, and a brief statement by each other party as to the presence or absence of subject matter jurisdiction. Such statements shall include citations to all statutes relied on and relevant facts as to citizenship and jurisdictional amount.

iv. A brief summary by each party of the claims and defenses that party has asserted which remain to be tried, without recital of evidentiary matter but including citations to all statutes relied on. Such summaries shall identify all claims and defenses previously asserted which are not to be tried.

v. A statement by each party as to whether the case is to be tried with or without a jury, and the number of trial days needed.

vi. A statement as to whether or not all parties have consented to trial of the case by a magistrate judge (without identifying which parties have or have not so consented).

vii. Any stipulations or agreed statements of fact or law which have been agreed to by all parties.

2

viii. A statement by each party as to the witnesses whose testimony is to be offered in its case in chief, indicating whether such witnesses will testify in person or by deposition.

ix. A designation by each party of deposition testimony to be offered in its case in chief, with any cross-designations and objections by any other party.

x. A list by each party of exhibits to be offered in its case in chief, with one star indicating exhibits to which no party objects on grounds of authenticity, and two stars indicating exhibits to which no party objects on any ground.

**B. Filings Prior to Trial in Civil Cases.** Unless otherwise ordered by the Court, at the same time the parties file the joint pretrial order, they shall also file the following:

i. In jury cases, requests to charge and proposed voir dire questions. When feasible, proposed jury-charges should also be submitted on a 3.5" diskette in WordPerfect version 5.1 or higher format;

ii. In nonjury cases, a statement of the elements of each claim or defense involving such party, together with a summary of the facts relied upon to establish each element;

iii. In all cases, motions addressing any evidentiary or other issues which should be resolved in limine; and

iv. In any case where such party believes it would be useful, a pretrial memorandum.

## 4. Ready for Trial

Cases marked ready for trial may be given a firm trial date or be placed on a ready trial calendar subject to five (5) working days' notice. When a matter is placed on the trial-ready calendar, it is the responsibility of counsel for each side to keep the Court informed of their availability.

## 5. Orders to Show Cause

All proposed orders to show cause must first be brought to the Orders Clerk for approval, and then to Chambers. Unless special cause is shown, the Court will not issue an order to show cause unless the requesting party's adversaries have been notified and afforded an opportunity to appear before the Court to oppose the request. A party seeking an order to show cause must arrange with the Court a time to appear that is agreeable to the Court and any adversary counsel wishing to appear.

3

## 6. Default Judgments

In general, applications for the entry of a default judgment must be by order to show cause, returnable on a date set by the Court, with proper notice to the defaulting party.

4

# EXHIBIT 2

# LENNON, MURPHY & LENNON, LLC — *Attorneys at Law*

The GrayBar Building
420 Lexington Ave., Suite 300
New York, NY 10170
*phone* (212) 490-6050
*fax* (212) 490-6070

Patrick F. Lennon - *pfl@lenmur.com*
Charles E. Murphy — *cem@lenmur.com*
Kevin J. Lennon — *kjl@lenmur.com*
Nancy R. Peterson - *nrp@lenmur.com*

Tide Mill Landing
2425 Post Road
Southport, CT 06890
*phone* (203) 256-8600
*fax* (203) 256-8615

December 10, 2007

***VIA Express Courier***
Rias Trading
Rue du Grand-6
1000 Lausanne
Switzerland

Re:     **Bulcom Ltd. v. Glingrow Holding Ltd. and Rias Trading**
        Docket Number: 07 Civ. 10726
        Our Reference Number: 07-1306

Dear Sir or Madam:

We represent the Plaintiff, Bulcom Ltd in the above referenced lawsuit. We write to advise you that pursuant to an Ex Parte order of maritime attachment and garnishment issued in the above referenced lawsuit, your property was attached on or about December 7, 2007 at BNP Paribas in the amounts listed below.

$11,135.00
$262,671.38
$6,629.15
$3,895.14
$273,195.67

Please find enclosed herein a copy of all pleadings filed in the above referenced lawsuit including, but not limited to, the Summons and Complaint. Please also find enclosed copies of the Ex Parte Order and Writ of Maritime Attachment and Garnishment as well as a copy of Judge Leisure's rules. If you have any questions or concerns, please contact us at your convenience. This letter is sent pursuant to Local Rule B.2 of the Local Rules for the United States District Court for the Southern District of New York.

Kind regards,

Mary Fedorchak

/Enclosures

JUDGE LEISURE

07 CV 10726

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X

BULCOM LTD.,

                     Plaintiff,

      - against -

GLINGROW HOLDING LTD. and
RIAS TRADING,

                  Defendants.

---------------------------------------------------------X

07 CV _____

ECF CASE

## AFFIDAVIT IN SUPPORT OF PRAYER FOR MARITIME ATTACHMENT

State of Connecticut  )
                )  ss: Town of Southport
County of Fairfield   )

Kevin J. Lennon, being duly sworn, deposes and says:

1.    I am a member of the Bar of this Court and represent the Plaintiff herein. I am familiar with the facts of this case and make this Affidavit in support of Plaintiff's prayer for the issuance of a Writ of Maritime Attachment and Garnishment, pursuant to Rule B of the Supplemental Admiralty Rules of the Federal Rules of Civil Procedure.

## DEFENDANTS ARE NOT PRESENT IN THE DISTRICT

2.    I have attempted to locate the Defendants, GLINGROW HOLDING LTD. and RIAS TRADING within this District. As part of my investigation to locate the Defendants within this District, I checked the telephone company information directory, as well as the white and yellow pages for New York listed on the Internet or World Wide Web, and did not find any listing for the Defendants. Finally, I checked the New York State Department of Corporations' online database which showed no listings or registration for the Defendants.

3.     I submit based on the foregoing that the Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims.

4.     Upon information and belief, the Defendants have, or will have during the pendency of this action, tangible and intangible property within this District and subject to the jurisdiction of this Court, held in the hands of in the hands of garnishees within this District, which are believed to be due and owing to the Defendants.

5.     This is Plaintiff's first request for this relief made to any Court.

## PRAYER FOR RELIEF FOR ORDER ALLOWING SPECIAL PROCESS SERVER

6.     Plaintiff seeks an Order pursuant to Rule 4(c) of the Federal Rules of Civil Procedure, for an Order appointing Patrick F. Lennon, Kevin J. Lennon, Charles E. Murphy, Nancy Peterson or any other partner, associate, paralegal or agent of Lennon, Murphy & Lennon, LLC, or any process server employed by Gotham Process Servers, in addition to the United States Marshal, to serve the Ex Parte Order and Process of Maritime Attachment and Garnishment, together with any interrogatories, upon the garnishee(s), together with any other garnishee(s) who (based upon information developed subsequent hereto by the Plaintiff) may hold assets of, for or on account of, the Defendants.

7.     Plaintiff seeks to serve the prayed for Process of Maritime Attachment and Garnishment with all deliberate speed so that it may be fully protected against the potential of being unable to satisfy a judgment/award ultimately obtained by Plaintiff and entered against the Defendant.

-2-

8.    To the extent that this application for an Order appointing a special process server with respect to this attachment and garnishment does not involve a restraint of physical property, there is no need to require that the service be effected by the Marshal as it involves simple delivery of the Process of Maritime Attachment and Garnishment to the various garnishees to be identified in the writ.

## PRAYER FOR RELIEF TO SERVE LATER IDENTIFIED GARNISHEES

9.    Plaintiff also respectfully requests that the Court grant it leave to serve any additional garnishee(s) who may, upon information and belief obtained in the course of this litigation, to be holding, or believed to be holding, property of the Defendants, within this District. Obtaining leave of Court at this time to serve any later identified garnishees will allow for prompt service of the Process of Maritime Attachment and Garnishment without the need to present to the Court amended Process seeking simply to identify other garnishee(s).

## PRAYER FOR RELIEF TO DEEM SERVICE CONTINUOUS

10.    Further, in order to avoid the need to repetitively serve the garnishees/banks, Plaintiff respectfully seeks further leave of the Court, as set out in the accompanying Ex Parte Order for Process of Maritime Attachment, for any process that is served on a garnishee to be deemed effective and continuous service of process throughout any given day on which process is served through the next day, provided that process is served the next day, and to authorize service of process via facsimile or e-mail following initial *in personam* service.

—3—

Dated:        November 30, 2007
              Southport, CT

_____
Kevin J. Lennon

Sworn and subscribed to before me
this 30th day of November 2007.

_____
NOTARY PUBLIC

—4—

**JUDGE LEISURE**

**07 CV 10726**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------X

BULCOM LTD.,

                    Plaintiff,

    - against -

GLINGROW HOLDING LTD. and
RIAS TRADING,

                    Defendants.

-------------------------------------------------X



## DISCLOSURE OF INTERESTED PARTIES
## PURSUANT TO FEDERAL RULE 7.1

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure to enable judges and

magistrates of the court to evaluate possible disqualification or recusal, the undersigned attorney

of record for the Plaintiff certifies that the following are corporate parents, subsidiaries, or

affiliates of the Plaintiff:    NONE.

Dated: November 30, 2007
    New York, NY

                        The Plaintiff,
                        BULCOM LTD.

                        By: _____

                        Charles E. Murphy   CM 2125
                        Kevin J. Lennon
                        LENNON, MURPHY & LENNON, LLC
                        The Gray Bar Building
                        420 Lexington Avenue, Suite 300
                        New York, NY 10170
                        (212) 490-6050 - phone
                        (212) 490-6070 - fax
                        cem@lenmur.com
                        kjl@lenmur.com

Nov. 30. 2007  2:04PM    Lennon, Murphy & Lennon LLC                    No. 2553   P. 2

**JUDGE LEISURE**

**07  CV  10726**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------X

BULCOM LTD.,

                 Plaintiff,

  -against-

GLINGROW HOLDING LTD. and
RIAS TRADING,

                 Defendants.

--------------------------------------------X



### VERIFIED COMPLAINT

Plaintiff, BULCOM LTD., ("Plaintiff"), by and through its attorneys, Lennon, Murphy &
Lennon, LLC as and for its Verified Complaint against the Defendants, GLINGROW
HOLDING LTD. ("Glingrow") and RIAS TRADING ("Rias") (collectively "Defendants")
alleges, upon information and belief, as follows:

    1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the
Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the
breach of maritime contract of charter. This matter also arises under the Court's federal question
jurisdiction within the meaning of 28 United States § 1331 and the New York Convention on the
Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201 *et seq.*) and/or the
Federal Arbitration Act (9 U.S.C. § 1 *et seq.*).

    2.    At all times material to this action, Plaintiff was, and still is, a foreign corporation,
or other business entity, organized under, and existing by virtue of foreign law and was at all
material times the disponent owner[1] of the motor vessel "PAGANE" (hereinafter the "Vessel"),

---

[1] A "disponent owner" controls the commercial operation of a vessel having taken the vessel on charter from the registered owner of the vessel. The disponent owners usually time charters the vessel from the registered owner and then sub-charters the vessel to shippers.

3.    Upon information and belief, Defendant Glingrow was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of the laws of Cyprus Belarus with a place of business at 15, Bouuponitsas, Povek Building, Apt. No. 301, Nicosia, Cyprus and was at all material times the Charterer of the Vessel.

4.    Upon information and belief, Defendant Rias was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law and was, at all material times the alias, partner, joint venturer and/or paying, or receiving, agent of the Defendant Glingrow.

5.    By a charter party dated October 17, 2007 Plaintiff time chartered the Vessel to Defendant Glingrow for one time chartered trip (duration about 30 days) via the Black Sea for the carriage of any lawful bulk grain cargo to Aqaba, Jordan. A copy of the charter party is attached hereto as Exhibit 1.

6.    The charter party was made on the NYPE form inclusive of clauses 8, 59 and 60 by which the NYPE Interclub Agreement, and its scheme for settlement of cargo claims that may arise under the charter party, was expressly incorporated into the charter party.

7.    Plaintiff delivered the Vessel into the service of the Defendant Glingrow at Kerich, Ukraine and has at all times fully performed its duties and obligations under the charter party.

8.    A dispute has arisen between the parties regarding Defendant Glingrow's failure to pay the hire for its use of the vessel which is due and owing to Plaintiff under the charter party contract. Clause 4 of the charter party requires Defendant Glingrow to pay for the use and hire of the Vessel at the rate of $60,000 per day, pro rata, including overtime, payable in advance every 15 days.

Nov.16  2007  2:34PM    Landau, Marsky & Larson Lic                    No. 2553   P. 4

9.    In breach of its obligation to pay hire the Defendant Glingrow failed to remit payment to the Plaintiff on or about November 21, 2007 when a 15 day advance hire payment of became due and owing to the Plaintiff. A copy of Plaintiff's provisional hire statement, reflecting the sum of $594,848.97 due to the Plaintiff for unpaid hire, is attached hereto as Exhibit 2

10.    In further breach of its charter party obligations, the Defendant Glingrow has caused liability for the Plaintiff's account in respect of claim brought by non-party cargo receivers, Jordanian Ministry of Industry and Trade ("MIT"), based, inter alia, on allegations of cargo shortage and cargo contamination. Plaintiff will settled MIT's shortage claim for $113,479.00 and MIT's contamination claim for US$ 289,091.50 and seeks indemnity from Defendants for such payment as per the charter party which incorporated the Interclub Agreement.

11.    As a result of Defendant Glingrow's breaches of the charter party due as aforesaid, Plaintiff has sustained damages in the total principal amount of $1,037,410.40, exclusive of interest, arbitration costs and attorneys fees.

12.    Pursuant to the charter party, disputes between the parties are to be submitted to arbitration in London subject to English law. Plaintiff has commenced London arbitration against Defendant by appointment of its arbitrator Mr. Christopher Moss. A copy of Plaintiff's arbitration appointment is attached hereto as Exhibit 3.

13.    This action is brought in order to obtain jurisdiction over Defendants and also to obtain security for Plaintiff's claims and in aid of arbitration proceedings.

14.    Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law. Section 63 of the English Arbitration Act of 1996 specifically allows for

5

recovery of these items as part of an award in favor of the prevailing party. As best as can now

be estimated, Plaintiff expects to recover the following amounts at arbitration as the prevailing

party:       A.     Principal claims:                          $1,037,410.40 ;

             [i.    Unpaid hire:  $594,848.97]
             [ii.   Indemnity for cargo shortage claim: $153,470]
             [iii.  Indemnity for cargo contamination claim: $289,091.50]

             B.     Estimated interest on claims -
                    3 years at 5.5% compounded quarterly:     $171,172.71 ;

             C.     Estimated arbitration costs:              $75,000; and

             D.     Estimated attorneys' fees and expenses:   $150,000.00.

             Total:                                           $1,433,583.29 .

15.     The Defendants cannot be found within this District within the meaning of

Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal

Rules of Civil Procedure, but, upon information and belief, Defendants have, or will have during

the pendency of this action, assets within this District and subject to the jurisdiction of this Court,

held in the hands of garnishees within the District which are believed to be due and owing to the

Defendants.

16.     Upon information and belief, Defendant Riza acts as paying agent, and/or

receiving agent, or arranges for other non-parties to satisfy the debts and obligations of

Defendant Olingrow, and/or receive payments being made to Defendant Olingrow.

17.     Although Riza was not named in the charter party, and had no formal relationship

to the charter of the M/V "PAGANE" it paid initial hire owing to Plaintiff from Olingrow.

18.     It is not common practice in the maritime industry, nor any other business, for an

independent company to pay another company's debt, where it has no formal relationship to the

underlying contract.

4

19.    The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the Defendants held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendants and to secure the Plaintiff's claim as described above.

WHEREFORE, Plaintiff prays:

A.    That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Complaint failing which default judgment be entered against it;

B.    That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of $1,433,383.10 belonging to, due or being transferred to, from, or for the benefit of the Defendants, including but not limited to such property as may be held, received or transferred in Defendants' name(s) or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

5

C.     That the Court retain jurisdiction to compel the Defendants to arbitrate in

accordance with the United States Arbitration Act, 9 U.S.C. § 1 et seq.;

D.     That this Court retain jurisdiction over this matter through the entry of any

judgment or award associated with any of the claims currently pending, or which may be

initiated in the future, including any appeals thereof;

E.     That this Court recognize and confirm any arbitration award(s) or judgment(s)

rendered on the claims set forth herein as a Judgment of this Court;

F. .    That this Court award Plaintiff the attorneys' fees and costs incurred in this

action; and

G.     That the Plaintiff has such other, further and different relief as the Court

may deem just and proper.

Dated:     New York, NY
           November 30, 2007

                              The Plaintiff,
                              SULCOM LTD.

                              By: _____
                              Charles E. Murphy
                              Kevin J. Lennon
                              LENNON, MURPHY & LENNON, LLC
                              420 Lexington Avenue, Suite 300
                              New York, NY 10170
                              (212) 490-6050 - phone
                              (212) 490-6070 - facsimile
                              cem@lenmur.com
                              kjl@lenmur.com

Nov. 30. 2007  2 05PM   Lennon, Murphy & Lennon LLC                    No. 2569   P. 3

## ATTORNEY'S VERIFICATION

State of New York  }
                   }   ss.:   City of New York
County of New York }

1.  My name is Charles E. Murphy.

2.  I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.  I am a partner in the firm of Lennon, Murphy & Lennon, LLC attorneys for the Plaintiff.

4.  I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.  The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.  The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.  I am authorized to make this Verification on behalf of the Plaintiff.

Dated:       New York, NY
             November 30, 2007

                                        _____
                                        Charles E. Murphy

7

# EXHIBIT 1

# TIME CHARTER

GOVERNMENT FORM

Approved by the New York Produce Exchange

November 6th, 1913–Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

**This Charter Party**, made and concluded in Novorossiysk ................................................ 17th day of October 2007 ....19....

1. Between ..Mosera Batoon Ltd.,........as disponent ...................................................................................................................................
2. Owners of the good .....Panama Flag .........Steel ship/Motorship ..."Pagano" ..Description as per Clause 19 of.................................................
3. of........... tons gross-register and .............tons-net-register, having engines of .........................................................indicated-horse-power
4. and with hull, machinery and equipment in a thoroughly efficient state, and classed ...............................................................................
5. et.............................. of about...................... cubic-feet-bale-capacity, and about.............................. tons of 2240-lbs.
6. deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,
7. allowing a minimum of fifty tons) on a draft of ................feet...... inches on ...........Summer-freeboard, inclusive of permanent bunkers,
8. which are of the capacity of about............, knots-on-a-consumption-of-about............ of best Welsh coal best grade fuel oil-best-grade Diesel oil,
10. conditions about ..............knots on a consumption of about ..................................................of best Welsh coal best grade fuel oil-best-grade Diesel oil,
11. now ............trading............................................................................................................................................................................
12. ................................and .. Messrs GLMGROW HOLDING LTD. ...............................Charterers of the City of ...Nicosia, Cyprus. ......................

**Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

13. about 1 time Charter trip via safe ports, safe berths, safe anchorages always afloat, always within IWL, via Black sea with bulk lawful grain to Aqaba,
14. Jordan, Duration about 30 days.
    within below mentioned trading limits.

15. Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
16. the fulfillment of this Charter Party. Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations hereunder.
17. Vessel to be placed at the disposal of the Charterers, at on dropping outward pilot Kerch at any time day or night Sundays and Holidays included.
18. ....................................................................................................................................................................................................
19. in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except in cases of tide, provided in clause No.6), the
20. the Charterers may direct. If such dock wharf or place be not available lime to count as provided for in clause No.6, Vessel on her delivery to be
21. ready to receive cargo with clean swept holds and tight, staunch, strong and in every way fitted for the service, having water ballast, (See Clause 42) winches
22. and

23. donkey-boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
24. time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25. dise, including petroleum or its products, in proper containers, excluding (See Clause 32) .....................................................................................
26. (works not to be employed in the carriage of Live Stock but Charterers are to have the privilege of shipping a small number on deck at their risk
27. all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North
28. America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or
29. Mexico, and/or South America ........................................................................................................and/or Europe
30. and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

31.
32.
33.    Cochin Hsi et and May 45th, Hudson Bay and all unsafe ports, also excluding when out of season, White Sea, Black Sea and the Baltic,
34.    (See Clause 31)
35.    as the Charterers or their Agents shall direct, on the following conditions:
36.    1. That whilst on hire the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the
37.    insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler and domestic water, lubricating oil, vessel's garbage removal unless compulsory and maintain her clean and keep
38.    the vessel in a thoroughly efficient state in hull, holds and hatchcovers, machinery and equipment with all certificates necessary to comply with current requirements at all ports of call and canals for and during the service. (See Clause 49 and 40).
39.    2. That, whilst on hire, the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, compulsory and customary Pilotages, Turkish strait pilotage, Agencies, Commissions, boatage on Charterers business for clearance and cargo purposes only, Commissions, canal dues and tolls.
40.    Consular Charges (except those pertaining to the Crew and flag), and all other usual expenses except those before stated, but when the vessel puts into
41.    a port for causes for which Owners are vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42.    illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43.    charter to be for Charterers account including bunking expenses should port authorities order crew ashore for safety reasons. All other fumigations to be
44.    for charterers account after vessel has been on charter for a continuous period
45.    of six months or more.
46.    Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite  for a special trade or unusual cargo, so permitted under this Charterparty, but
47.    Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
48.    for dunnage, they making good any damage thereto.
49.    3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining in .................tons and not exceed....................tons. (See Clause 30).
50.    bound the vessel at the current prices in the respective ports, the vessel to be delivered with not less than....................tons and not exceeding
51.    ............tons and to be re-delivered with not less than.........................tons. (See Clause 30).
52.    4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of US$ 60000.00 per day pro rata including overtime payable in advance every 15 days. First payment within 3 banking  days upon delivery.
53.    ...........................................United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and stores-on....................summer freeboard per Calendar Month commencing on and from the hour day of her delivery, as aforesaid, and at
54.    and after the same rate for any part of a day monthly hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55.    wear and tear excepted, to the Owners (unless lost) at on dropping last outward sea pilot Kyaiks, any time day or night, Sundays and Holidays
56.    included ....................Unless otherwise mutually agreed. Charterers are to give Charterers not less than....................days
57.    notice of vessel expected date of re-delivery and probable port. (See Clause 33)
58.    (k. Payment of said hire to be made as per clause 35 in New-York-in-cash by transfer in United States Currency, every 15 days semi-monthly in advance, and for the last 15 days half-month or
59.    part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60.    due, if so required by Owners, unless bank guarantee or deposit is made by Charterers, otherwise failing the punctual and regular payment of the
61.    hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62.    terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers, Time to count from 7 a.m. on the working-day
63.    following that on which written notice of readiness has been given to the Charterers or their Agents before 4 p.m., but if required by Charterers, they
64.    to have the privilege of using vessel at once, such time used to count as hire.

85. ~~Cash for vessels ordinary disbursements at any port may be advanced as required by the Captain,~~ by the Charterer or their Agents, subject
66. ~~to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application~~
67. ~~of such advances.~~
68. 8. That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any wharf or place that Charterers or their Agents may
69. direct, provided the vessel can safely lie always afloat at any time of tide, except at such places *In East Coast South America* where it is customary for similar
70. sized vessels to safely
71. lie aground.
   7. That the whole reach of the Vessel's Hold, Decks and usual places of loading (not more than she can reasonably stow and carry), *compatible with*
   *vessel's seaworthiness, also*
72. accommodations for Supercargo, If carried, shall be at Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73. tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~
74. ~~paying Owners........... per day per passenger for accommodations and meals. However, it is agreed that in case any three or extra expenses are~~
75. ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense No passengers.~~
76. 8. That the Captain [although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
77. agency; and Charterers are to load, stow, and trim, *lash, secure and discharge* the cargo at their *risk and* expense under the supervision of the Captain, *all*
78. *cargo claims to be settled in accordance with NYPE Interclub Agreement as amended in September 1996 (96a Clauses 60/50). who is to sign*
   Bills-of-lading-for
79. ~~cargo as presented, in conformity with Mate's or Tally-Clerk's receipts.~~
80. 9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81. receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
82. 10. That the Charterers shall have the permission to appoint a Supercargo, who shall accompany the vessel *against signing Owners' P and I Club*
   *boarding LOI, and see that-voyage is prosecuted*
83. with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table. Charterers paying at the
84. rate of *USD 10.00 (Ten Dollars) $1.00* per day, Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their agents, to
   victual Tally
85. Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal for all such victualling. *(See Clause 37)*
86. 11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, *and / or*
   *telecommunication with copy to Owners,* and the
87. Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88. terers, their Agents or Supercargo, when required, with a true copy of daily Logs, *abstracts in English,* showing the course of the vessel and distance run and
   the con-
89. sumption of fuel.
90. 12. That the Captain shall use diligence in caring for the ventilation of the cargo. *Vessel has natural ventilation.*
91. 13. ~~That the Charterers shall have the option of continuing the charter for a further period of~~
92. on giving written notice thereof to the Owners or their Agents..................................... ~~days previous to the expiration of the first named term, or any declared option.~~
93. 14. That if required by Charterers, time not to commence before *02:01 hours* Local Time *18th October 2007..................................and should vessel*
94. not have given written notice of readiness *been delivered* on or before *23:59 hours* Local Time *18th October 2007.... but not later than 4 p.m.* Charterers or
95. their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
96. 15. That in the event of the loss of time from deficiency *and/or default* of men or *including strike of Officers and / or crew or* deficiency of stores,
97. fire, breakdown or damages to hull, machinery or equipment,

90. grounding, detection by average accidents to ship or cargo, *unless resulting from interest vice, quality or defect to the cargo*, drydocking for the purpose of examination or painting bottom, or by any other cause

99. preventing the full working of the vessel *unless same is caused by Charterers or by following their instructions*, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by

100. defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101. thereof, and all extra *directly related* expenses shall be deducted from the hire *duly substantiated.*

102. 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103. returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104. Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105. The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106. purpose of saving life and property.

107. 17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London* New York,
108. one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
109. the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial *shipping* men. *(See Clause 60.)*
   *General Average / Arbitration In London. This Charter Party shall be governed by and construed in accordance with English Law.*

110. 18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
111. age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112. deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113. might have priority over the title and interest of the owners in the vessel.
114. 19. That all derelicts and salvage shall be for Owners' account and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

116. Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, ~~17 to 22, inclusive, and Rule F of~~
116. ~~York-Antwerp Rules 1974 as amended 1994 at London (See Clause 96).~~ *York-Antwerp Rules 1974 as amended 1994 at London (See Clause 96).* Such port or place in the United States as may be selected by the carrier,
   ~~and as to matters not provided for by these~~

117. ~~Rules, according to the law and usages of the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
118. ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
119. ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120. ~~bond and such additional security as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121. ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
122. ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
123. ~~carrier, be payable in United States money and be applied to the adjuster. When so remitted the deposit shall be held in the special account at the~~
124. ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125. ~~United States money.~~

126. ~~In the event of accident, danger, damage, or disaster, before or after the commencement of the voyage resulting from any cause whatsoever,~~
127. ~~whether due to negligence or not, for which or for the consequence of which, the carrier is not responsible by statute, contract, or otherwise, the~~
128. ~~goods, the shippers and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129. ~~losses, or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the~~
130. ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as a fully and in the same manner as if such salving ship or~~
131. ~~ships belonged to strangers.~~

132. Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. *(See Clause 96)*
133. 20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to, as to quantity, and *shall be for*

   *Owners' account, the*
   ~~cost of replacing same, to be allowed by Owners.~~

134. 21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
135.

136. ~~communication piece, bottom clearance and painted whenever Charterers and the Captain think it necessary, at least once in every six months, reckoning from~~
137. ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138. ~~(See Clause 76)~~

140. ~~22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~
141. ~~providing ropes, falls, slings and blocks, if vessel is fitted with derricks of exceptional heavier lifts. Owners are to provide necessary gear for~~
142. ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *lights as on board* lanterns and oil~~
for

143. night work, *free of expense to Charterers*, and vessel to give use of electric light when so filled, but any additional lights over those on board to be at Charterers' expense. The

144. ~~Charterers to have the use of any gear on board the vessel.~~
145. ~~23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;~~
146. ~~steamer to provide one winchman per hatch to work winches day and night, as required. Charterers are deemed to pay officers, or (i)overs, winchmen,~~
147. ~~dock hands and donkeyman for overtime work time to accordance with the working hours and rates stated at the whole whole articles, if the rules of the~~
148. ~~port, or labor unions, prevent steam from driving Winches, shore Watchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
149. ~~insufficient power to operate Winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
150. thereby.

151. ~~24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
152. ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels;~~
153. ~~etc." In respect of all cargo shipped under this Charter to or from the United States of America. It is further subject to the following clauses, both~~
154. ~~of which are to be included in all bills of lading issued hereunder.~~

155. U.S.A. Clause Paramount
156. ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157. ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158. ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under the said Act. If any term of this bill of lading~~
159. ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160. Both-to-Blame Collision Clause
161. ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162. ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163. ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164. ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non~~
165. ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166. ~~owners as part of their claim against the carrying ship or carrier.~~

167. ~~25. The vessel shall not be required to enter any ice-bound port or any port where there is risk that in ordinary course of things the vessel will not be able on account of ice be able to safely enter the~~
168. ~~port or to get out after having completed loading or discharging. Ice free ports / trading, Vessel not to force ice or follow ice-breakers.~~
169. ~~26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners to remain responsible for the~~
170. ~~navigation of the vessel, acts of pilots and tugboats not against the Owners, insurance, crew, and all other matters, except for time~~
171. ~~Charterers' responsibility as agreed in this Charter and Rider, same as when trading for their own account.~~

172. ...*DIAMANT / ODESSA*...
173. ~~27. A commission of *1.25 2¼* per cent is payable by the Vessel and Owners to ...... *DIAMANT / ODESSA*.~~

174. on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

176

28. An address commission of 2 ½ per cent is payable to .....*Charterers*.................. on the hire earned and paid under this Charter.

*Additional Clause 29 to 92 as attached are to be fully incorporated in this Charter Party.*

THE OWNERS

THE CHARTERERS

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) from printed under licence from the Association Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

M/V "PAGANE"- GLINGROW - C/P DATED 17th OCTOBER 2007

Clause 29 Vessels description
M/V PAGANE – GEARLESS SD BC
PANAMA FLG-BLT 1982
54158 MTS DWAT ON 12.35 M SSW
GRT/NRT - 32976/20523
LOA/BEAM - 220/32.20M
DEPTH MOULDED 17 M
GRAIN IN MAIN HOLDS - 2443031.66 CFT (HA CMNGS INCLDD)
7 HOLDS/10 HATCHES
HATCH SIZES – ALL 11.60 BY 15.40M
HOLDS SIZE:
-HOLD #1 - 17.50m X 32m (AFT PART)
-HOLD #2 - 29.70m X 32m
-HOLD #3 – 18.00m X 32m
-HOLD #4 - 27.90m X 32m
-HOLD #5 - 18.00m X 32m
-HOLD #6 - 30.60m X 32m
-HOLD #7 - 15.30m X 32m (FORE PART)
HEIGHT OF ALL HOLDS - 17.90m INCLUDING COAMINGS.
MCGREGOR SIDE ROLLING TYPE - HYDRAULIC
SPEED–CONSUMPTION UNDER GOOD WEATHER AND SMOOTH WATER CONDITIONS:
ABT 11.5KN ON ABT 33MT LADEN/31MT BALLAST IFO 180 CST PLUS ABT 3.5 MT
MGO AT SEA, PORT CONS ABT 2.5MT MGO.
VSL BURNS MGO WHILST MANOUVRING AND NAVIGATING IN NARROW WATERS,
ENTERING-LEAVING PORT, SAILING IN CONFINED WATERS, RIVERS, CANALS,
ESTUARIES AND ON STAND BY.
FUEL CAP: ABT 2000 MT IFO 180 CST ISO 8217 RMD 25
ABT 300 MT MGO ISO 8217 DMA
TPC ABT 61.9 T/CM
CONSTS ABT 500 BCXL. FW
NATURAL VENTILATION, NOT CO2 FTD
CGO HOLD GRAIN B/DOWN
NO1 223528.52
NO2 473521.17
NO3 282491.75
NO4 449107.91
NO5 282491.75
NO6 492979.34
NO7 239110.80
- ALL ABT AND WOG -
OWNERS: PAGANE MARITIME LTD.
CLASS: RMRS
PANDI: INGOSTTRAKH
H-M: ALLIANZ
ISM / ISPS OK
CALL SIGN: 3 E B Z9
INMARSAT 'C' FLX: 457127710

- HATCH SIZES: ALL 11.60 BY 15.40 M
- OWNERS GTEE AIR DFT (DISTANCE WL TO TEC) IN FULL BALLAST CONDITION TO BE
  MAX 12.00 M
- LAST THREE CARGOES: STEELS, IRON ORE, CLINKER

7

<u>M/V "PAGANE" - GLENGROW - C/P DATED 17th OCTOBER 2007</u>

I.    VSL'S STOWAGE PLAN:
      -HOLD #1 - 5190.75mts - FULL
      -HOLD #2 - 10400.00mts - SLACK
      -HOLD #3 - EMPTY
      -HOLD #4 - 10444.48mts - FULL
      -HOLD #5 - EMPTY
      -HOLD #6 - 11464.77mts - FULL
      -HOLD #7 - 4000.00 - SLACK
      _____

      TTL 41900mts
      DRAFT FORE=10.39m MID=10.54m AFT=10.70m
      ALL ABOVE ESTIMATIONS DONE ON BSS TRIMMED ENDS.IF LOADING WILL
      BE
      WITE UNTRIMMED ENDS THEN STOWAGE PLAN CHANGE WILL BE.
      II. WE NEED MIN 48 HRS TO BALLAST/DEBALAST HOLDS NoS 3+5.
      III. RCVD MSG FM GLOBAL AGENCY ASKING FOR SOME VSL'S
      DETAILS.STILL -
      NOT REVERT, WAIT YR CONFORMATION AND INSTR.

- OWNRS WILL CONSIDER AIR DFT (DISTANCE WL TO THC) IN FULL BALLAST
INCLUDING BALLASTING CARGO HOLDS NOS AND NOS AND ACHEAVING REQUIRED
BY TERMINAL DRAFT ON HOLD NO 7 BY TRIMING THE VESSEL, BUT TIME LOST FOR
BALLASTING/DEBALLASTIN AND PREPARING CARGO HOLDS IN SUITABLE
CONDITION FOR LOADING ALWAYS TO BE FOR AND ACCOUNT OF CHARTERES

- OWNERS.CONFIRM VSL IS GRAIN CLEAN AND HAS ON BOARD VALID DOCUMENTS
OF AUTHORIZATION FOR CARRIAGE OF GRAINS IN BULK.
- OWNERS CONFIRM TEAT VESSEL IS SUITABLE FOR GRAB DISCHARGE.
- OWNERS CONFIRM VESSEL IS CLASSED HIGHEST LLOYD'S CLASS AND ISM / ISPS
CODE FITTED FOR THE WHOLE DURATION OF VOYAGE.
- OWNERS CONFIRM VESSEL HAS ALL VALID DOCUMENTS/CERTIFICATES AVAILABLE
ON BOARD FOR LOADING AND DRAFT SURVEY.
- OWNERS CONFIRM THAT VESSEL IS NOT BLACKLISTED FOR LOAD AND/OR
DISCHARGE COUNTRIES / PORTS AND SUITABLE FOR THIS TRADE.
- OWNERSHIP/CLASS/P.AND.I. CLUB/H+M INSURANCE NOT TO BE CHANGED
THROUGHOUT WHOLE TRIP DURATION.

FOR
- ACC GLINGROW HOLDING LTD., NICOSIA, CYPRUS
RECENT DEALS:
C/P 28/08/2007 "GRAND MARKELA" ON TCT NOVO/SAUDI ARABIA 50'000 MTS BARLEY
D/OWNERS C. TRANSPORT
C/P 23/08/2007 "ERNEST" ON TCT NOVO/AQABA 33'000 MTS WHEAT
D/OWNERS - CARGILL INTERNATIONAL S.A.
C/P 21/08/2007 "SOUTHGATE" ON TCT NOVO/DAMIETTA 24'000 MTS WHEAT
D/OWNERS - NOBLE RESOURCES S.A.
C/P 26/07/2007 "THOR CONFIDENCE" ON VOYAGE BSS NOVO/ADEN 23200 MTS WHEAT
OWNERS - THORESEEN
C/P 20/06/2007 "SILVERGATE" ON VOYAGE BSS NOVO/AQABA 50'000 MTS BARLEY
D/OWNERS - INDUSTRIAL CARRIERS
C/P 01/06/2007 "LEROS" ON TCT NOVO/ADEN-HODEIDAH 40500 MTS WHEAT
D/OWNER - CUSTODIA

<u>M/V "PACANE" – ELINGROW - C/P DATED 17th OCTOBER 2007</u>

### Clause 30 Bunker Clause

Bunker on delivery to be as on board (expect IFO about 328 mts and MGO about 55 mts).
Bunker on redelivery to be about same quantity (not less) as actually on delivery. Charterers will pay
cost of bunker on delivery together with 1st hire.
Bunker prices - IFO USD 435 / MGO 745 per mt, same prices on redelivery

### Clause 31 Trading Exclusions

One time Charter Trip to Aqaba / Jordan.

### Clause 32 Cargo Trading Clause

Cargo is grain.

### Clause 33 – Deleted.

### Clause 34

Owners guarantee that the vessel is an easy trimming bulk carrier suitable for loading / carrying /
discharging a full and complete cargo of any / all kinds of grain in bulk without bagging /
strapping/securing. The vessel to have on board at all times all relevant grain loading booklets /
manuals / certificates and hold and trimming table and vessel to be able to load grain without shifting
boards / grain fittings in accordance with 1991 amendments the International Convention of SOLAS
1974 and has dispensation from trimming holds ends.

### Clause 35 Hire Payment

Hire and all monies due to the Owners under this Charter Party will be paid to Owners' bank account.
Charterers will not agree to the assignment of hire, monies due under this Charter Party or the Charter
Party itself in any circumstances whatsoever.

First hire shall be paid within 3 banking days after vessel's delivery together with value of bunkers.
Thereafter, hire shall be settled every 15 days in advance. Greenwich Mean Time (G.M.T.) shall be
applied for hire calculation purpose.

Notwithstanding anything contained herein to the contrary, if any time during the currency of this
Charter, hire shall become due on or during a Saturday, Sunday or national holiday or outside normal
office hours, or at any time which for reasons beyond their reasonable control would prevent
Charterers from effecting payment of hire on the due date, payment of hire is to be made on the
banking day immediately preceding the date on which hire becomes due. Where there is any failure to
make hire payment on the due date because of an oversight or negligence or error or omission of
Charterers' employees, Bankers or Agents or otherwise for any reason where there is absence of
intention to fail to make payment as set out, Charterers shall be given by Owners 3 banking days'
notice to rectify the failure, where so rectified the payment shall stand as punctual and regular
payment.

### Clause 36 Charterers' Deduction

Charterers have no right to deduct any Owners' expenses from the Charter hire. It is understood that
Owners will forward to load and/or discharge agent in advance any funds required for Owners'
expenses.

9

M/V "PAGANI" - GLENGROW - C/P DATED 17th OCTOBER 2007

### Clause 37 Communication/Entertainment/Victualling

Charterers shall pay US$ 1,258.- per month or pro rata in lieu of communication / entertainment / victualling.

### Clause 38 Delivery/Redelivery Notice

Delivery Notices:    on fixing and then daily notices.

Redelivery Notices:    15 days approximate and 5/3/2/1 days definite notice of redelivery date and port.

### Clause 39 Stevedore Damage Clause

Stevedores shall be employed at the risk of and paid for by the Charterers. It is understood that all tallying is to be for Charterers' account.

Charterers shall not be responsible for any damage suffered by the vessel and/or her equipment whilst loading or unloading, unless such damage is notified to Charterers' representatives/Agents in writing by the Master latest within 24 hours after the occurrence, except in case of hidden damages which to be reported latest upon completion of discharge.

In the event of stevedore damages:

a)    Such damage to be entered into the vessel's log book.

b)    Master shall also have notified the stevedores or parties responsible for such damage in writing or telex/cable with copy to Charterers.

c)    If the damage caused as above by Charterers or their stevedores affects the vessel's seaworthiness or cargo worthiness or is subject to Classification requirements then all such damage is to be repaired to the satisfaction of the vessel's Classification Society prior to leaving the loading/discharging port. Vessel remaining on hire and costs being borne by Charterers.

d)    Damages not affecting seaworthiness or cargo worthiness or is not subject to classification requirements may be repaired later together with Owners' work at Owners' time and at Charterers' expenses. Owners to provide Charterers with copies of original invoices and if required, to advise Charterers' nature of work necessary to repair damages.

e)    Master will make every attempt to obtain written acknowledgement from the party causing the damage but this without prejudice to paragraphs "a" through 'd'.

### Clause 40 P and I Club

Owners guarantee that the vessel is fully covered by the Ingosstrakh. Charterers have the benefit of Owners' cover granted by the P and I Club so far as the Club Rules permit.

Trip to Jordan always as per vessel's P and I club requirements which are:

= subject to previous written notification to Ingosstrakh;
= loading/discharging surveys carried out by approved surveyor of Ingosstrakh;

.16

MV "PAGANE" - GUINGROW - C/P DATED 17th OCTOBER 2007

### Clause 41 Return Insurance

As far as rules permit, the Charterers to have the benefit of any return insurance premium receivable by Owners from their underwriters, as and when received by Owners, by reason of vessel being in port all such time on hire.

### Clause 42 War Risk

Basic war risk insurance premium for worldwide trading to be for Owners' account, and additional premiums for hull and machinery and Officers/crew for trading to restricted area, also crew war bonus, if any, to be for Charterers' account. The orders of Owners' war risk underwriters always to be followed.

The vessel's hull and machinery value of fixing is USD 5.200,000,-

### Clause 43 On/Off-Hire Survey

Charterers to appoint a surveyor acting on their behalf for performing a joint on and off hire bunker and condition survey. Joint on hire survey to be in Owners' time unless vessel already loading and joint off hire survey to be in Charterers' time. Expenses for on/off hire survey to be shared equally between Owners and Charterers.

### Clause 44 Hold Cleaning

On arrival first load port, vessel to be grain clean and ready in every respect and in all compartments to receive Charterers' cargo to local surveyors' and/or competent authorities' satisfaction, failing which vessel to be off-hire from the time of rejection until passed again. Owners to take immediate corrective steps to expedite cleaning as fast as possible including the use of shore labour. If vessel fails inspection, all bunkers consumed after rejection and extra expenses incurred as a direct result to be for Owners' account, until vessel has been passed in all compartments again.

Charterers' option to redeliver the vessel unclean paying USD 5.000,00 in lieu of hold cleaning.

### Clause 45 Bills of Lading

The Owners undertake to instruct the Master to authorise Charterers or Charterers' Agents if required to issue and sign Bill(s) of Lading on Charterers' usual form on Owners' and Master's behalf for cargo as presented in conformity with Mate's receipts. Charterers to keep Owners harmless should Charterers' servants not issue Bills of Lading per Owners'/Master's strict authority.

Should original Bill(s) of Lading not be available prior to vessels' arrival to the discharging port(s) in time, Owners to agree to release entire cargo without production of original Bill(s) of Lading, if so requested by Charterers or their agent(s), against a fax presentation of Letter of Indemnity under Owners' P and I Club wording which to be singly signed by Charterers or signed by sub-Charterers together with Charterers' joint signature.

No liner or through Bills of Lading or Seaway Bill may be issued/used during the currency of present Charter Party.

Charterers are not to issue or cause to be issued Bs/L which are subject to Hamburg rules.

### Clause 46 ISM Clause

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both

11

the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Owners shall indemnify Charterers for any and all loss, expense and/or damage and/or consequences sustained by Charterers resulting from partial or full non-compliance with this clause. Any and all delays to the vessel resulting from such partial or full non-compliance with this clause shall not count as laytime or, if laytime has expired, as time on demurrage respectively, as the case may be, as on-hire time.

### Clause 47 Deratisation Certificate

The vessel to have valid deratisation certificate and/or equivalent fumigation certificate on board at time of delivery. The validity of which is to be maintained by Owners in their time and at their expense during the currency of this Charter Party.

### Clause 48 Quarantine/Smuggling

Normal quarantine time and expenses for entering ports shall be for Charterers' account. The Owners shall be liable for any delay in quarantine arising from the Master or any of the deck or engine Officers or crew having communication with the shore at any infected area without the written consent or instructions of Charterers or their Agents, also for any loss of time through detention by customs or other authorities caused by smuggling or their infraction of local law on the part of the Master or any of the deck or engine crew. Any delay, expenses and/or fines incurred on account of smuggling, if caused by the Charterers' supercargo and/or their staff or Agents are to be for Charterers' account. Likewise, if any delay in quarantine arises as a result of Charterers' trading of the vessel and/or misinstructions or lack of proper instructions by Charterers or their Agents, servants or representatives such delay is to be for Charterers' account.

### Clause 49 Health Certificate

The Owners shall arrange at their expense that Master, Officers and crew of vessel hold valid vaccination certificates against yellow fever, smallpox, cholera or other necessary health certificates during the Charter.

### Clause 50 Vessel's Equipment

Vessel's equipment shall comply with the regulations of the countries in which vessel will be employed and Owners are to ensure that vessel is at all times in possession of valid and up-to-date certificates as required. If stevedores, longshoremen or other workmen are not permitted to work due to failure of the Master and/or the Owners and/or Owners' Agents to comply with the aforementioned regulations or because the vessel is not in possession of such valid and up-to-date certificates as required, then Charterers may suspend hire for the time thereby lost and Owners shall pay all proven extra direct expenses incurred incidental to and resulting from such failure.

### Clause 51 Safety Regulation

It is understood that the vessel will comply with all safety regulations and/or requirements in effect at ports of loading and/or discharging. It is agreed that should the vessel not meet safety rules and regulations, Owners will take corrective action and vessel is to be off-hire.

### Clause 52 Canal Certificate

12

MV "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

The vessel is fully fitted for Panama/Suez Canal transit and in possession of valid necessary certificate on board, in conformity with current canal regulations/requirements.

## Clause 53 Crew Service

During the currency of this Charter Party and provided weather and local stevedore and port regulations permit, Charterers to have the option to use crew to perform the following services as a means toward an efficient cargo operation:

a)  At each port all of the hatch opening and closing;

b)  Preparing vessel for sea;

c)  Removal and disposal of dunnage to be for Charterers' account;

d)  Gangway watchmen for the vessel to be for Owners' account.
    Compulsory cargo watchmen to be for Charterers' account

e)  Before and upon arrival at a port, vessel's Officers/crew to shape up vessel's hatches, and gangway in order to commence loading and/or discharging without delay. Opening/closing of all hatchcovers and erecting and dismantling of shifting boards, if necessary, shall be done by Officers/crew provided shore regulations permit.

## Clause 54 War Cancellation

If war breaks out between any two or more of the following countries: United Kingdom, U.S.A., C.I.S., P.R.C., Japan, directly affecting the performance of this Charter, both Owners and Charterers shall have the option of cancelling this Charter whereupon Charterers shall redeliver vessel to Owners, if she has cargo on board after discharge thereof at destination, or, if debarred from reaching or entering it, at a near, open and safe port as directed by Charterers, or if she has no cargo on board, at a port at which she stays or if at sea at a near and safe port as directed by Charterers, in all cases, hire shall be paid until vessel's redelivery.

## Clause 55 Requisition

Should the vessel be requisitioned by any government or governmental authority due to Owners/Managers/vessel's fault, or due to vessel's flag or Ownership during the period of this Charter, she shall be off-hire during the period of such requisition and any hire or other compensation paid by any government or governmental authority in respect of such requisition shall be for Owners' account.

## Clause 56 Extra Period

Should the vessel be placed off-hire during the currency of this Charter for any reason whatsoever, the Charterers have the option of adding all or any part of such off-hire period to the original period.

## Clause 57 Cancellation Clause

If the vessel is placed off-hire more than 30 consecutive days, Charterers have the right to cancel the balance period of this Charter by giving notice to Owners without prejudice to any other right the Charterers may have under this Charter and provided vessel is free of cargo.

## Clause 58 Capture/Seizure/Arrest

Should the vessel be seized or detained or arrested or delayed by any authority during the currency of this Charter Party, the Charterers' liability for seizure or detention or arrest or delay is ceased immediately from the time of her seizure or detention or arrest or delay and all time lost by this reason shall be treated as off-hire until the time of her release unless such seizure or detention or arrest or delay is occasioned by any personal act or omission or default of Charterers or their Agents. Extra

13

expenses incurred directly from above seizure or detention or arrest or delay to be for Owners' account.

## Clause 59 Cargo Claim

Cargo Claims To Be Settled As Per NYPE Interclub Agreement 1996

## Clause 60 Small Claims Procedure Clause

Notwithstanding anything contained in the Arbitration Clause to the contrary, should neither the claims nor the counterclaims exceed USD 100,000.00, exclusive of interest on the sum claimed, costs of the arbitration and legal expenses, if any, it is hereby agreed the dispute is to be governed by the London Maritime Arbitrators' Association Small Claim Procedure, revised 1st January, 1994.

## Clause 61 Deviation/Put Back

Should the vessel put back whilst on voyage by reason of an accident or breakdown or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness or accident to the crew or any person on board the vessel or by reason of the refusal of the Master or crew to perform duties, the hire shall be suspended from the time of inefficiency, unless caused by Charterers and/or Charterers' servants until the vessel is again efficient in the same position (or in Charterers' option at a point equidistant to the vessel's next destination) and voyage resumed therefrom. All direct expenses incurred including bunkers consumption during the period of suspended hire shall be for Owners' account.

## Clause 62 Water Pollution
A.   For Bulk Carriers:

(1)   Owners warrant that throughout the currency of this Charter they will provide the vessel with the following certificates:

   (a)   Certificates issued pursuant to Section 311 (p) of the U.S. Federal Water Pollution Control Act, as amended (Title 33 U.S Code, Section 1321(p)) up to (insert the date upon which such certificate(s) is/are due to expire).

   (b)   Certificates issued pursuant to Section 1016(a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended in accordance with Part 138 of Coast Guard Regulations 33 CFR, from (indicate the earliest date upon which the Owners may be required to deliver the vessel into the Charter or, if later, the date inserted in sub-paragraph (a) above), so long as these can be obtained by the Owners from or by (identify the applicable scheme or schemes).

(2)   Notwithstanding anything whether printed or typed herein to the contrary:

   (a)   Save as required for compliance with paragraph (1) hereof, Owners shall not be required or establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter.

14

M/V "PAGANE" - GLENGROW - C/P DATED 12th OCTOBER 2007

(b)   Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(c)   Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any Bills of Lading issued pursuant to this Charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or water, other than to the extent provided in paragraph (1) hereof.

### Clause 63 Owners' Agents

Charterers may agree to have their Agents attend to the Owners' matters such as delivery, redelivery, general average, drydocking, repair, hospitalisation, repatriation of crew, supply of the vessel's stores and provisions, etc., with Owners paying Charterers' Agents actual expenses including attendance fee and agency fee according to the Charterers' tariff rate. Charterers may also agree to have their Agents to attend to trivial Owners' matters, such as, bank advance, crew mail, arranging shore pass with Owners paying actual expenses including attendance fee, if any, but without agency fee. [See Clause 36].

### Clause 64 Taxes

Export and/or import permits for Charterers' cargo to be at Charterers' risk and expense. Taxation or levies on cargo or freight to be for Charterers' account and to be paid by Charterers.

### Clause 65 Paramount Clause

General Paramount Clause to apply

### Clause 66 Additional Clause

New Jason Clause, P and I Bunkering Clause, New Both-to-Blame Collision Clause and Baltime War Risk Clause, as attached, to be incorporated in this Charter Party and all Bill(s) of Lading issued hereunder.

### Clause 67 Drydock Clause

The Owners have no option to make her drydock during this Charter period except emergency cases, or unless otherwise agreed.

### Clause 68 - Deleted

### Clause 69 Bulk Carrier Safety Clause

(A)   The Charterers shall instruct the terminal operators or their representatives to cooperate with the Master in completing the IMO Ship/Shore Safety Checklist and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

(B)   In addition to the above and notwithstanding any provision in this Charter Party in respect of

M/V "PAGANE" - GLENGROW - C/P DATED 17th OCTOBER 2007

loading/discharging rates, the Charterers shall instruct the terminal operators to load/discharge the vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the vessel's draught, trim, stability, stress or any other factor which may affect the safety of the vessel.

(C)  At any time during cargo operations, the Master may, if he deems it necessary for reasons of safety of the vessel, instruct the terminal operators or their representatives to slow down or stop the loading or discharging.

(D)  Compliance with the provisions of this Clause shall not affect the counting of hire.

### Clause 70 Stowaway Clause

Any time lost including but not limited to time on demurrage and any losses, liabilities and cost incurred by reason of stowaways on board shall be for Owners' account.

### Clause 71 Ocean Route Clause

Evidence of weather conditions to be taken from independent weather bureau reports. Owners to be represented by the findings of 'Aerospace' Ocean Routing Company. In case of dispute between Owners and Charterers' ocean routing companies, the master to be taken into further arbitration. In any case, Master always entitled to choose vessel's routing related to vessel and crew safety.

Owners' ocean routing company full style/address as follows:

Aerospace & Marine International Corporation,
6520 Santa Teresa Boulevard, Suite 209,
San Jose, CA 95119, U.S.A.
Tel:       408-360-0440
Fax:      408-360-0430
Tlx:       149158
Email:    ops@weather3000.com
Web-port:  www.amiwx.com

### Clause 72 Mobile Crane Clause

Deleted.

### Clause 73 Split Bills of Lading Clause

Charterers and/or Agents are hereby authorised by Owners/Master to split Bills of Lading and issue ship delivery orders in negotiable and transferable forms against collection of full set of original Bills of Lading. Delivery orders to conform with all terms and conditions and exceptions of Bills of Lading and shall not prejudice shipowners' rights.

### Clause 74 Oil Pollution

As a condition of this Charter Party, Owners guarantee that Owners and vessel are and will remain throughout the currency of the Charter Party insured for pollution liability with respect to trading within, to and from ranges and areas specified in this Charter, said insurance to have a limit of not less than U.S.$1 billion. At any time before or subsequent to the fixture date of this Charter, Owners, upon reasonable notice from Charterers, shall furnish to Charterers or its representative proof, satisfactory to Charterers, of such insurance. Without prejudice to Charterers' other rights, Owners shall indemnify Charterers for any and all loss, expense and/or damage sustained by Charterers resulting

16

## M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

from non-compliance with this Clause. Any and all delay to the vessel resulting from such non-compliance shall not count as laytime or, if laytime has expired, as time on demurrage.

### Clause 75
Vessel's crew contracts are bona fide employment agreement.

### Clause 76
The vessel to remain always in seaworthy trim/condition to safely sail between ports/berths to Master's satisfaction.

### Clause 77
Deleted.

### Clause 78 ISPS Clause
(a)  (i)  From the date of coming into force of the International Code for the security of
          ships and of port facilities and the relevant amendments to chapter XI of SOLAS (ISPS
          code) in relation to the vessel and thereafter during the currency of this Charter Party, the
          Owners shall procure that both the vessel and "the company" (as defined by the ISPS
          Code) shall comply with the requirements of the ISPS Code relating to the vessel and "the
          company". Upon request the Owners shall provide a copy of the relevant International
          Ship Security Certificate (or the Interim International Ship Security Certificate) to the
          Charterers. The owners shall provide the Charterers with the full style contact details of
          the company security officer (CSO).

     (ii)  Except as otherwise provided in this Charter Party, loss, damage, expense or delay,
           excluding consequential loss, caused by failure on the part of the Owners or "the
           Company" to comply with the requirements of the ISPS Code or this clause shall be for
           the Owners' account.

(b)  (i)  The Charterers shall provide the CSO and the ship security officer (SSO)/master
          with their full style contact details and, where sub-letting is permitted under the terms of
          this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise
          provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all
          sub-Charter Parties they enter into during the period of this Charter Party contain the
          following provision:

          "The Charterers shall provide the owners with their full style contact details and, where
          sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact
          details of all sub-Charterers are likewise provided to the Owners".

     (ii)  Except as otherwise provided in this Charter Party, loss, damage, expense or delay,
           excluding consequential loss, caused by failure on the part of the Charterers to comply
           with this clause shall be for the Charterers' account.

(c)  Notwithstanding anything else contained in this Charter Party all delay, costs or
     expenses whatsoever arising out of or related to security regulations or measures
     required by the port facility in accordance with the ISPS Code including, but not
     limited to, security guards, launch services, tug escorts, port security fees or taxes and
     inspections, shall be for the Charterers' account, unless such costs or expenses result

17

M/V "PAGANE" - GLENGROW - C/PDATED 17th OCTOBER 2007

solely from the owners' negligence, crew's nationality/visa issues, or costs or expenses directly arising from vessel's ownership or other crewing matters.

(d) If either party makes a payment which is for the other party's account according to this clause, the other party shall indemnify the paying party.

## Clause 79
All negotiations/trade are to be made in accordance with English Law. English Law to apply. Arbitration, if any, to be in London in accordance with the Arbitration Clause of the Charter Party.

## Clause 80
Charterers have the option to perform a general condition survey of the vessel at any time. Survey to be at Charterers' time and expenses.

## Clause 81
Owners to provide following certificates as per L/C requirements (see attached):

1.   Certificate issued and signed by (P and I) Club or their representative or by their agent to the effect that the carrying vessel is a member to that (p and I) club having representative or agent in Jordan.

2.   Certificate issued and signed by shipping register or their agent certifying that the carrying vessel is classified 100a1 or its equivalent and free from any outstanding recommendations.

## Clause 82
Negotiations and fixture, if any, to be kept private & confidential by all parties involved.

18

## M/V "PAGANE" - GUINGROW - C/P DATED 17th OCTOBER 2007

### BOTH-TO-BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

#### New Both-to-Blame Collision Clause

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact"
and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

### GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

#### New Jason Clause

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery"

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

M/V "PAGANE" - GLENGROW - CP DATED 17th OCTOBER 2007

## BALTIME 1939 WAR CLAUSE

(A)  The vessel unless the consent of the Owners be first obtained not to be ordered nor continue to any place or on any voyage nor be used on any service which will bring her within a zone which is dangerous as the result of any actual or threatened act of war, war hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or state whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of Sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any Government or Ruler.

(B)  Should the vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (1) the Owners to be entitled from time to time to insure their interests in the vessel and/or hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand; and (2) notwithstanding the terms of Clause 11, hire to be paid for all time lost including any loss owing to loss of or injury to the Master, Officers or crew or to the action of the crew in refusing to proceed in such zone or to be exposed to such risks.

(C)  In the event of the wages of the Master, Officers and crew or the cost of provisions and/or stores for deck and/or engine room and/or insurance premiums being increased by reason of or during the existence of any of the matters mentioned in section (A) the amount of any increase to be added to the hire and paid by the Charterers on production of the Owners' account therefore, such account being rendered monthly.

(D)  The vessel to have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other wise whatsoever given by the Government of the nation under whose flag the vessel sails or any other Government or any person (or body) acting or purporting to act with the authority of such Government or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such orders or directions.

(E)  In the event of the nation under whose flag the vessel sails becoming involved in war, hostilities, warlike operations, revolution or civil commotion, both the Owners and the Charterers may cancel the Charter and, unless otherwise agreed, the vessel to be redelivered to the Owners at the port of destination or, if prevented through the provisions of Section (A) from reaching or entering it, then at a near open and safe port at the Owners' option, after discharge of any cargo in board.

(F)  If in compliance with the provisions of this clause anything is done or is not done, such not to be deemed a deviation.

Section (C) is optional and should be considered deleted unless agreed according to Baltime 1939.

30

<u>M/V "PAGANE" - GLENGROW - C/P DATED 17th OCTOBER 2007</u>

### P. AND I. BUNKER CLAUSE

The vessel shall have liberty as part of the Contract Voyage to proceed to any port or ports at which bunker oil is available for the purpose of bunkering at any stage of the voyage whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the ports of loading or discharge named in this Charter and may there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks and deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

### BIMCO STANDARD ISM CLAUSE

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by the failure on the part of the Owners or 'the Company' to comply with the ISM Code shall be for Owners' account.

### SECA CLAUSE

During the currency of this contract the performing vessel will consume bunkers in accordance with ISO 8217 specifications. In the event that emissions regulations, laws or guidelines require or recommend the stemming or consumption of bunkers with a quality that has a higher value than the price for high sulphur fuel oil, then such excess price will be paid for by Charterers for bunkers consumed whilst in an emission controlled area. Upon request Owners to provide documentary proof for such price differential together with the actual bunker consumption in these emission controlled areas.

### BUNKER FUEL SULPHUR CONTENT CLAUSE FOR
### TIME CHARTER PARTIES 2005

(A) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the vessel is ordered to trade within that zone. The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with regulations 14 and 18 of Marpol Annex VI, including the guidelines in respect of sampling and the provision of bunker delivery notes.

21

<u>M/V "PAGANE" - GLINGROW - UPDATED 17th OCTOBER 2007</u>

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this sub-Clause (A).

(B)   Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with sub-Clause (A), the Owners warrant that:

   (i)   The vessel shall comply with regulations 14 and 18 of Marpol Annex VI and with the requirements of any emission control zone; and

   (ii)   The vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the vessel with fuels in accordance with sub-Clause (A), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the vessel's failure to comply with regulations 14 and 18 of Marpol Annex VI.

(C)   For the purpose of this Clause, 'emission control zone' shall mean zones as stipulated in Marpol Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the E.U. and the U.S. Environmental Protection Agency.

# EXHIBIT 2

From: 05725386998     Page: 1/1     Date: 11/29/2007 15:25:31 PM

## Provisional Hire statement MV PAGANE
### cp dd 17.10.2007/SLENGROW HOLDING LTD.
#### Voyage PAG/2007/03/TC

|  |  |  |  |  | US$ Debit |
|---|---|---|---|---|---|
| Hire from: | | | | | |
| 16.10.2007 21:06 GMT DOP KERCH | | | | | |
| 01.12.2007 43:00 GMT | | | | | |
| 44,788333 | days | @ | 60 000,00 | | 2 682 500,00 |
| Bunkers on delivery: | | | | | |
| 385,257 | IFO mts | @ | 436,00 | | 153 885,80 |
| 46,848 | MDO mts | @ | 745,00 | | 34 791,27 |
| I.O.HC | | | | | 5 000,00 |
| C / V / E | 37,00000 | @ | 1 250,60 mt | | 1 541,97 |
| | | | subtotal | debit | 2 882 879,73 |

|  |  |  |  |  | Credit |
|---|---|---|---|---|---|
| less: | | | | | 108 023,75 |
| commission | 3,75 % | | | | |
| Owners expenses: | | | | | |
| on-hire survey | 50% | | | | 400,30 |
| off-hire survey | 50% | | | | 750,80 |
| Off-hire: | | | | | |
| at iport NOVO | 6,701389 | days | | | 387 806,21 |
| bunker consumed | | | | | 11 970,36 |
| at Suez Canal | 1,597629 | days | | | 65 086,15 |
| bunker consumed | | | | | 2 867,98 |
| Bunkers on re-delivery: | | | | | |
| 385,257 | IFO mts | @ | 436,00 | | 153 886,80 |
| 15,000 | MDO mts | @ | 745,00 | | 11 175,00 |
| Payments: | | | | | |
| 1. | | | | | 1 861 043,30 |
| 2. | | | | | 440 959,48 |
| 3. | | | | | 25 164,14 |
| | | | subtotal | credit | 2 267 830,77 |

| | | | | grand total in favour OWNERS | debit | 594 842,97 |
|---|---|---|---|---|---|---|

payment to be arranged to:

| BENEFICIARY | BULCOM LTD. |
|---|---|
| ACC. No: | 72613/23 |
| WITH: | BNP PARIBAS (SUISSE) S.A. |
| | PLACE DE HOLLANDE, 2 |
| | CH-1211, GENEVA 11 |
| | SWITZERLAND |
| SWIFT: | BPPBCHGG |
| IBAN: | CH59 0868 5001 0725 7300 Z |

This fax was received by BF FAX maker for server. For more information visit http://www.ali.com

# EXHIBIT 3

**From:** Marianne Brookes
**Sent:** 29 November 2007 11:50
**To:** arbitration@christophermoss.com
**Subject:** M/V Pagane C/P DD.17.10.2007

Dear Sir,

We act for Butcom Ltd. the disponent owners of the above vessel.

Under a time charter on the NYPE form (copy attached), disponent owners chartered their vessel to Glingrow Holding Ltd for 1 time charter trip for the carriage of grain from the Black Sea to Agaba.

Under Clause 17 of the charterparty, any disputes between owners and charterers shall be referred to three persons in London and be determined in accordance with English Law.

Disputes have arisen between the parties. You are hereby appointed as owners' arbitrator. Kindly confirm acceptance of your appointment.

Best regards,

Brookes & Co.

Brookes & Co., Solicitors, 80 Lombard Street, London, EC3V 9EA, United Kingdom.
Tel: +44 (0)20 3159 4330  Fax: +44 (0)20 7681 7773.  General office email address: mail@brookes-and-co.co.uk
Principal: Marianne Brookes
Brookes & Co. is regulated by the Solicitors Regulation Authority
Confidentiality Note
The contents of this email and any attachments are strictly confidential and must not be copied to, used by or disclosed to any person other than the named recipient(s). Please let us know immediately by telephoning +44 (0)20 3159 4330 if this email has been sent to you in error.

AO 440 (Rev. 891) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

_____ Southern _____    District of    _____ New York _____

BULCOM LTD.,

## SUMMONS IN A CIVIL ACTION

V.

GLINGROW HOLDING LTD

CASE NUMBER:

# 07  CV  10726

# JUDGE LEISURE

TO: (Name and address of Defendant)

GLINGROW HOLDING LTD.
15, Boumpoulinas Street
Pevex Building, Apt. No. 301
Nicosia
Cyprus

YOU ARE HEREBY SUMMONED and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Lennon, Murphy & Lennon
420 Lexington Avenue, Suite 300
New York, NY 10170

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

NOV. 3 0 2007

J. MICHAEL McMAHON

CLERK                                    DATE

(By) DEPUTY CLERK

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |

| NAME OF SERVER (PRINT) | TITLE |
|---|---|
| | |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____       _____
                          Date                                    Signature of Server

_____
Address of Server

[1] As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

Southern _____ District of _____ New York

BULCOM LTD.

### SUMMONS IN A CIVIL ACTION

V.

GLINGROW HOLDING LTD.

CASE NUMBER:

## 07 CV 10726

TO: (Name and address of Defendant)

RIAS TRADING

YOU ARE HEREBY SUMMONED and required to serve on PLAINTIFF'S ATTORNEY (name and address)

Lennon, Murphy & Lennon, LLP
420 Lexington Avenue
Suite 300
New York, NY 10170

an answer to the complaint which is served on you with this summons, within _____ 20 _____ days after service
of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you
for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the
Clerk of this Court within a reasonable period of time after service.

## J. MICHAEL McMAHON

CLERK

(By) DEPUTY CLERK

DATE    NOV 2 9 2007

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |

| NAME OF SERVER (PRINT) | TITLE |
|---|---|
| | |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____
　　　　　　　　　Date　　　　　　　　　　Signature of Server

_____
Address of Server

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

[ c. 4. 2007  9:08AM    Lennon, Murphy & Lennon 1LC           No 2373   P. 2
Nov. 30. 2007  2:08PM.  Leakon, Marpay & Lennon LLC          No. 2353   P. 11

**JUDGE LEISURE**

**07    CV    10726**

IN THE DISTRICT COURT OF THE UNITED STATES OF AMERICA

To the Marshal of the Southern District of New York (or designated process server) - GREETINGS:

WHEREAS a Verified Complaint has been filed in the United States District Court for the Southern District of New York on the 30th day of November 2007 by

## BULCOM LTD.,

### Plaintiff

### against

## GLINGROW HOLDING LTD. and RIAS TRADING,

### Defendants.

in a certain action for breach of maritime contract wherein it is alleged that there is due and owing from the Defendant to the said Plaintiff the amount $1,433,583.30 and praying for process of maritime attachment and garnishment against the said Defendants.

WHEREAS, this process is issued pursuant to such prayer and requires that a garnishee(s) shall serve their answer(s), together with answers to any interrogatories served with the Complaint, within 20 days after service of process upon him and requires that Defendants shall serve their answers within 30 days after the process has been executed, whether by attachment of property or service on the garnishee.

NOW, THEREFORE, we do hereby command you that if the said Defendants cannot be found within the District, you attach goods and chattels to the amount sued for; and if such property cannot be found that you attach other property, credit and effects to the amount sued for in the hands of

ABN Amro, American Express Bank, Bank of America, Bank of New York Mellon, Barclay's Bank, BNP Paribas, Calyon, Citibank, Deutsche Bank, HSBC Bank USA Bank J.P. Morgan Chase, Societe Generale, Standard Chartered Bank, UBS, and/or Wachovia Bank N.A.

to wit: property, letters of credit, deposits, funds, credits, bills of lading, debts, settlement agreement(s) or other assets, tangible or intangible, in whatever form of

## GLINGROW HOLDING LTD. and/or RIAS TRADING

and that you promptly after execution of this process, file the same in this court with your return thereon.

WITNESS, the Honorable, *Peter K. Leisure* Judge of said Court, this _4_ day of *December* 2007, and of our Independence the two-hundred and thirty-first.

Lennon, Murphy & Lennon, LLC          J. MICHAEL McMAHON
Attorneys for Plaintiff                    Clerk
The Gray Bar Building
420 Lexington Avenue, Suite 300       By: _____
New York, NY 10170                         Deputy Clerk
Phone: (212) 490-6050

NOTE: *This Process is issued pursuant to Rule B(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure and/or New York Civil Practice Law and Rules, Article 52.*

A CERTIFIED COPY
J. MICHAEL McMAHON,          CLERK

BY _____
DEPUTY CLERK

N. 30. 2007 2:05PM    Lennon, Murphy & Lennon LLC                    No. 2553   P. 9

# JUDGE LEISURE                07 CV 10726

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X

BULCOM LTD.,

        Plaintiff,

  - against -

GLINGROW HOLDING LTD. and
RIAS TRADING,

        Defendants.
-------------------------------------X

USDC SDNY
DOCUMENT
97 CV ELECTRONICALLY FILED
ECF CASE
12/4/07

**EX PARTE ORDER
FOR PROCESS
OF MARITIME
ATTACHMENT**

WHEREAS, on November 30, 2007 Plaintiff, BULCOM LTD., filed a Verified

Complaint, herein for damages amounting to **$1,433,585.10** inclusive of interest, costs and

reasonable attorney's fee, and praying for the issuance of Process of Maritime Attachment and

Garnishment pursuant to Rule B of the Supplemental Admiralty Rules for Certain Admiralty and

Maritime Claims of the Federal Rules and Civil Procedure; and

WHEREAS, the Process of Maritime Attachment and Garnishment would command that

the United States Marshal, or other designated process server, attach any and all of the

Defendants' property within the District of this Court; and

WHEREAS, the Court has reviewed the Verified Complaint and the Supporting

Affidavit, and the conditions of Supplemental Admiralty Rule B appearing to exist:

NOW, upon motion of the Plaintiff, it is hereby:

ORDERED, that pursuant to Rule B of the Supplemental Rules for Certain Admiralty

and Maritime Claims, the Clerk of the Court shall issue Process of Maritime Attachment and

Garnishment against all tangible or intangible property, credits, letters of credit, bill of lading,

effects, debts and monies, electronic funds transfers, freights, sub-freights, charter hire, sub-

charter hire or any other funds or property up to the amount of $1,433,583.10 belonging to, due or being transferred to, from or for the benefit of the Defendant(s), including but not limited to such property as may be held, received or transferred in Defendants' name(s) or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named on whom a copy of the Process of Maritime Attachment and Garnishment may be served; and it is further

ORDERED that supplemental process enforcing the Court's Order may be issued by the Clerk upon application without further Order of the Court; and it is further

ORDERED that following initial service by the U.S. Marshal, or other designated process server, upon each garnishee, that supplemental service of the Process of Maritime Attachment and Garnishment, as well as this Order, may be made by way of facsimile transmission or other verifiable electronic means, including e-mail, to each garnishee; and it is further

ORDERED that service on any garnishee as described above is deemed effective continuous service throughout the day from the time of such service through the opening of the garnishee's business the next business day; and it is further

ORDERED that pursuant to Federal Rule of Civil Procedure 5(b)(2)(D) each garnishee may consent, in writing, to accept service by any other means.

Dated: November 30, 2007                    SO ORDERED:

                                            U.S.D.J.

                                            A CERTIFIED COPY
                                            J. MICHAEL McMAHON,          CLERK

                                            BY
                                                    DEPUTY CLERK

Effective March 1, 2004

INDIVIDUAL PRACTICES OF
JUDGE PETER K. LEISURE
Senior U.S. District Judge

Unless otherwise ordered by Judge Leisure, effective immediately, matters before Judge Leisure shall be conducted in accordance with the following practices:

## 1. Communications With Chambers

A. **Letters.** Copies of letter to chambers shall simultaneously be delivered to all counsel. Copies of correspondence between counsel shall not be sent to the court.

B. **Telephone Calls.** Except as provided in Paragraph 1(D) below, telephone calls to chambers are permitted only in emergency situations requiring immediate attention. In such situations only, call chambers at 212-805-6226.

C. **Faxes.** Faxes to chambers are not permitted, unless prior approval has been obtained.

D. **Docketing, Scheduling, and Calendar Matters.** For docketing, scheduling and calendar matters, call Eileen Chan at 212-805-0109.

E. **Requests for Adjournments or Extensions of Time.** All requests for adjournments or extensions of time must state (1) the original date, (2) the number of previous requests for adjournment or extension, (3) whether these previous requests were granted or denied, and (4) whether the adversary consents, and, if not, the reasons given by the adversary for refusing to consent. If the requested adjournment or extension affects any other scheduled dates, a proposed Revised Scheduling Order (reflecting only business days) must be attached. If the request is for an adjournment of a court appearance, absent an emergency it must be made at least 48 hours prior to the scheduled appearance. If the request is for an extension of time for service of motion papers, absent an emergency it must be made five business days prior to the original deadline for service.

## 2. Motions

A. **Pre-Motion Conferences in Civil Cases.** For discovery motions, follow Local Civil Rule 37.2. For motions other than discovery motions, a pre-motion conference with the court is required before making any motion, except motion to dismiss in lieu of an answer. To arrange a pre-motion conference, the moving party shall submit a letter not to exceed three pages in length setting forth the basis for the anticipated motion.

B. **Courtesy Copies.** Courtesy copies of all motion papers, marked as such, must be submitted to chambers at the same time as they are filed. Courtesy copies of interrogatories and notices of depositions are not to be sent to chambers.

C. **Memoranda of Law.** Unless prior permission has been granted, memoranda of law in support of and in opposition to motions are limited to 25 pages, and reply memoranda are limited to 10 pages. Memoranda of 10 pages or more must contain a table of contents. All memoranda of law must describe the applicable standard of decision governing the underlying motion.

D. **Oral Argument on Motions.** Parties may request oral argument by letter at the time their moving or opposing or reply papers are filed. The court will determine whether argument will be heard and, if so, will advise counsel of the argument date.

### 3. Pretrial Procedures

#### A. Joint Pretrial Orders in Civil Cases.

Unless otherwise ordered by the Court, within 30 days from the date for the completion of discovery in a civil case, the parties shall submit to the court for its approval a joint pretrial order, which shall include the following:

i. The full caption of the action.

ii. The names, addresses (including firm names), and telephone and fax numbers of trial counsel.

iii. A brief statement by plaintiff as to the basis of subject matter jurisdiction, and a brief statement by each other party as to the presence or absence of subject matter jurisdiction. Such statements shall include citations to all statutes relied on and relevant facts as to citizenship and jurisdictional amount.

iv. A brief summary by each party of the claims and defenses that party has asserted which remain to be tried, without recital of evidentiary matter but including citations to all statutes relied on. Such summaries shall identify all claims and defenses previously asserted which are not to be tried.

v. A statement by each party as to whether the case is to be tried with or without a jury, and the number of trial days needed.

vi. A statement as to whether or not all parties have consented to trial of the case by a magistrate judge (without identifying which parties have or have not so consented).

vii. Any stipulations or agreed statements of fact or law which have been agreed to by all parties.

2

viii. A statement by each party as to the witnesses whose testimony is to be offered in its case in chief, indicating whether such witnesses will testify in person or by deposition.

ix. A designation by each party of deposition testimony to be offered in its case in chief, with any cross-designations and objections by any other party.

x. A list by each party of exhibits to be offered in its case in chief, with one star indicating exhibits to which no party objects on grounds of authenticity, and two stars indicating exhibits to which no party objects on any ground.

B. **Filings Prior to Trial in Civil Cases.** Unless otherwise ordered by the Court, at the same time the parties file the joint pretrial order, they shall also file the following:

i. In jury cases, requests to charge and proposed voir dire questions. When feasible, proposed jury charges should also be submitted on a 3.5" diskette in WordPerfect version 5.1 or higher format;

ii. In nonjury cases, a statement of the elements of each claim or defense involving such party, together with a summary of the facts relied upon to establish each element;

iii. In all cases, motions addressing any evidentiary or other issues which should be resolved in limine; and

iv. In any case where such party believes it would be useful, a pretrial memorandum.

## 4. Ready for Trial

Cases marked ready for trial may be given a firm trial date or be placed on a ready trial calendar subject to five (5) working days' notice. When a matter is placed on the trial-ready calendar, it is the responsibility of counsel for each side to keep the Court informed of their availability.

## 5. Orders to Show Cause

All proposed orders to show cause must first be brought to the Orders Clerk for approval, and then to Chambers. Unless special cause is shown, the Court will not issue an order to show cause unless the requesting party's adversaries have been notified and afforded an opportunity to appear before the Court to oppose the request. A party seeking an order to show cause must arrange with the Court a time to appear that is agreeable to the Court and any adversary counsel wishing to appear.

3

## 6. Default Judgments

In general, applications for the entry of a default judgment must be by order to show cause, returnable on a date set by the Court, with proper notice to the defaulting party.

# EXHIBIT 3



## Kevin J. Lennon

| | |
|---|---|
| **From:** | Kevin J. Lennon |
| **Sent:** | Friday, December 14, 2007 9:18 AM |
| **To:** | 'Mark Seward' |
| **Subject:** | RE: PAGANE |
| **Attachments:** | Rias Trading.01.Dec 10 2007.pdf; Glingrow.01.Dec 10 2007.pdf |
| **TimeMattersID:** | M2CD99A1FFDC5480 |
| **TM Matter No:** | 1306-07 |
| **TM Matter Reference:** | Bulcom Ltd. v. Glingrow Holdings Ltd (RB) |

Our ref.:    07-1306

Dear Mark:

Note yours below.  Thanks.

Here is what has been restrained thus far:

| | |
|---|---|
| BNP Paribas: | $11,135; $262,671.38; $6,629.15 and $3,895.14 |
| Deutsche Bank: | $22,125; and $96,281.12 |
| TOTAL: | $402,736.79 |

See PDFs of notices served on Glingrow and Rias annexed.

Kind regards,


*Kevin J. Lennon*
Lennon, Murphy & Lennon, LLC  www.lenmur.com

The Gray Bar Building, 420 Lexington Avenue, Ste 300, New York, NY  10170
P (212) 490-6050
F (212) 490-6070

Tide Mill Landing, 2425 Post Road, Ste 302, Southport, CT  06890
P (203) 256-8600
F (203) 256-8615

*\*\*\* NOTICE \*\*\* This message is being sent by a lawyer.  It may contain attorney-client or attorney work product information subject to legal privilege.  If you receive this message in error, please notify the sender.  Thank you.*

**From:** Mark Seward [mailto:MSeward@m-f-b.co.uk]
**Sent:** Friday, December 14, 2007 7:13 AM
**To:** Kevin J. Lennon
**Subject:** PAGANE


Kevin

1/11/2008

I have sent this to Ince. May I have a breakdown of what has been caught

thanks

Kind regards
**Mark Seward**
Partner

(direct)  +44 20 7330 8006
(mobile) +44 7971 049333

**M   F   B**      45 MOORFIELDS  •  LONDON  •  EC2Y 9AE
S O L I C I T O R S      Tel: +44(0) 20 7330 8000  •  Fax: +44(0) 20 7256 6778  •  Web: www.m-f-b.co.uk

The season's greetings from the partners and staff at MFB.

We will be making donations to the Mission to Seafarers and the RNLI in lieu of sending Christmas cards this year.

This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential.  If you are not the intended recipient or if you have received this message in error, please notify us immediately at postmaster@m-f-b.co.uk and delete it from your computer.

Internet communications cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this message, or any attachment, that have arisen as a result of e-mail transmission.

This email has been scanned by the MessageLabs Email Security System. For more information please visit http://www.messagelabs.com/email

1/11/2008

## Kevin J. Lennon

| | |
|---|---|
| **From:** | Kevin J. Lennon |
| **Sent:** | Monday, December 17, 2007 2:07 PM |
| **To:** | 'Mark Seward' |
| **Subject:** | RE: PAGANE |
| **TimeMattersID:** | M94AC9A227E17661 |
| **TM Matter No:** | 1306-07 |
| **TM Matter Reference:** | Bulcom Ltd. v. Glingrow Holdings Ltd (RB) |

Mark:

    Yeah, I think so.

Kind regards,

**Kevin J. Lennon**
Lennon, Murphy & Lennon, LLC   www.lenmur.com

The Gray Bar Building, 420 Lexington Avenue, Ste 300, New York, NY 10170
P (212) 490-6050
F (212) 490-6070

Tide Mill Landing, 2425 Post Road, Ste 302, Southport, CT 06890
P (203) 256-8600
F (203) 256-8615

*** NOTICE *** *This message is being sent by a lawyer. It may contain attorney-client or attorney work product information subject to legal privilege. If you receive this message in error, please notify the sender. Thank you.*

---

**From:** Mark Seward [mailto:MSeward@m-f-b.co.uk]
**Sent:** Monday, December 17, 2007 12:31 PM
**To:** Kevin J. Lennon
**Subject:** PAGANE

I have agreed via Ince; to save time will I need Tom or some other NY lawyer to sign the consent order??

Kind regards
**Mark Seward**
Partner

(direct)  +44 20 7330 8006
(mobile) +44 7971 049333

---

**M   F   B**    45 MOORFIELDS  •  LONDON  •  EC2Y 9AE

1/11/2008

**S O L I C I T O R S**      Tel: +44(0) 20 7330 8000  •  Fax: +44(0) 20 7256 6778  •  Web: www.m-f-b.co.uk

The season's greetings from the partners and staff at MFB.

We will be making donations to the Mission to Seafarers and the RNLI in lieu of sending Christmas cards this year.

This message (and any associated files) is intended only for the
use of the individual or entity to which it is addressed and may
contain information that is confidential.  If you are not the intended recipient
or if you have received this message in error, please notify us immediately at
postmaster@m-f-b.co.uk and delete it from your computer.

Internet communications cannot be guaranteed to be secure or error-free
as information could be intercepted, corrupted, lost, destroyed, arrive
late or incomplete, or contain viruses. Therefore, we do not accept
responsibility for any errors or omissions that are present in this
message, or any attachment, that have arisen as a result of e-mail
transmission.

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email



**Kevin J. Lennon**

| | |
|---|---|
| **From:** | Kevin J. Lennon |
| **Sent:** | Monday, December 17, 2007 2:09 PM |
| **To:** | 'Matthew Moore' |
| **Cc:** | Nick Burgess |
| **Subject:** | RE: PAGANE - WP |
| **Importance:** | High |
| **TimeMattersID:** | MB7BC9A22063C345 |
| **TM Matter No:** | 1306-07 |
| **TM Matter Reference:** | Bulcom Ltd. v. Glingrow Holdings Ltd (RB) |

Our ref.:      07-1306

Dear Matthew:

        Thanks for yours.  We will issue a cease and desist notice and send you a copy.  Thanks.

Kind regards,


*Kevin J. Lennon*
Lennon, Murphy & Lennon, LLC  www.lenmur.com

The Gray Bar Building, 420 Lexington Avenue, Ste 300, New York, NY  10170
P (212) 490-6050
F (212) 490-6070

Tide Mill Landing, 2425 Post Road, Ste 302, Southport, CT  06890
P (203) 256-8600
F (203) 256-8615

*\*\*\* NOTICE \*\*\* This message is being sent by a lawyer.  It may contain attorney-client or attorney work product information subject to legal privilege.  If you receive this message in error, please notify the sender.  Thank you.*

---

**From:** Matthew Moore [mailto:matthew.moore@incelaw.com]
**Sent:** Monday, December 17, 2007 12:40 PM
**To:** Kevin J. Lennon
**Cc:** Nick Burgess
**Subject:** FW: PAGANE - WP


Dear Kevin,

We are told that MFB's clients agree the approach set out at 1 - 4 below.

Please will you arrange for further attachments to be temporarily suspended pending the establishment of the escrow account in London and the settlement of the cargo claim. We will keep you advised of progress with the escrow and claim, and let you know when the Rule B can be discontinued.

1/11/2008

Many thanks.

Best regards,
Matthew Moore
Ince & Co.

---

**From:** Matthew Moore
**Sent:** 17 December 2007 16:47
**To:** 'Mark Seward'
**Cc:** Nick Burgess
**Subject:** FW: PAGANE - WP

Dear Mark,

For the avoidance of any doubt, we set out below our understanding of what is being proposed:

1. The $393,000 caught pursuant to the Rule B will be held in New York pending it being transferred to an escrow account in London. This money will stand as security for our Clients' claim for hire and related expenses, plus interest and costs.

2. Glingrow will settle their contribution to the cargo shortage claim by making a payment of US$ 76,735 to us or our client (to be confirmed).

3. We will instruct our Clients' New York lawyers to seek to ensure that no further funds are attached or detained pending the escrow being established and the cargo claim being settled.

4. The Rule B will be discontinued/withdrawn when (a) the cargo shortage settlement monies amounting to US$ 76,735 have be paid and (b) the US$ 393,000 has been transferred into escrow in London.

If you are in a position to confirm this approach is in order we will send the requisite instructions to our Clients' lawyers in New York.

Best regards,
Matthew Moore
Ince & Co.

---

**From:** Mark Seward [mailto:MSeward@m-f-b.co.uk]
**Sent:** 17 December 2007 16:11
**To:** Matthew Moore
**Cc:** Kevin J. Lennon
**Subject:** PAGANE - WP

Matthew

As we discussed, I suggest that the amount that you currently have detained (I understand c$393,000) be held by you in NY and transferred to an escrow on terms to be agreed - I will forward a draft in a moment as well as a draft consent order for the NY Court. If you need someone to appear on my side I will arrange it.

Glingrow will pay 50% of the shortage claim in full and final settlement of "cargo claims"

1/11/2008

In return you will immediately cease serving pmags and undertake not to re-attach

You will withdraw the Rule B, by consent, upon receipt of the 50% referred to above.

Please take urgent instructions as we need this account released> while recent experience counsel's me against hope, this should be do-able today


thanks

Kind regards
**Mark Seward**
Partner


(direct)  +44 20 7330 8006
(mobile) +44 7971 049333


**M F B**    45 MOORFIELDS  •  LONDON  •  EC2Y 9AE
S O L I C I T O R S    Tel: +44(0) 20 7330 8000  •  Fax:+44(0) 20 7256 6778  •  Web: www.m-f-b.co.uk

The season's greetings from the partners and staff at MFB.

We will be making donations to the Mission to Seafarers and the RNLI in lieu of sending Christmas cards this year.

This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential.  If you are not the intended recipient or if you have received this message in error, please notify us immediately at postmaster@m-f-b.co.uk and delete it from your computer.

Internet communications cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this message, or any attachment, that have arisen as a result of e-mail transmission.

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

Ince & Co International Law Firm

Dubai Hamburg Hong Kong Le Havre London
Paris Piraeus Shanghai Singapore

Web **www.incelaw.com**

International House
1 St. Katharine's Way
London E1W 1AY
DX 1070 LONDON CITY

Tel +44 20 7481 0010

Fax +44 20 7481 4968

Chambers & Partners Global Shipping Law Firm of the Year 2007

This message (and any attachments) is confidential to the intended recipient and may be privileged.
If you are not the intended recipient you should contact us and must not make any use of it.

1/11/2008

# Kevin J. Lennon

| | |
|---|---|
| **From:** | Kevin J. Lennon |
| **Sent:** | Monday, December 17, 2007 2:31 PM |
| **To:** | 'Thomas Tisdale' |
| **Cc:** | 'Mark Seward'; 'Matthew Moore'; Nick Burgess |
| **Subject:** | RE: PAGANE [BULCOM v GLINGROW HOLDING AND RIAS TRADING] |
| **Importance:** | High |
| **Attachments:** | Consent Order.01.Dec 17 2007.doc |
| **TimeMattersID:** | MBCCB9A22C458895 |
| **TM Matter No:** | 1306-07 |
| **TM Matter Reference:** | Bulcom Ltd. v. Glingrow Holdings Ltd (RB) |

Our ref.:     07-1306

Dear Tom:

In response to your below email please see a draft proposed Consent Order attached.  Please let me have your comments.

Once the Order is agreed we can have it sent in to Judge Leisure for him to So Order and can then start drafting the joint letter for release of the funds.  In this respect, to London counsel reading in copy, please provide us with the details of the escrow account where these funds are to be sent to stand as security for Bulcom's claims against Glingrow.

Thanks very much and happy holidays to all.

Kind regards,

*Kevin J. Lennon*
Lennon, Murphy & Lennon, LLC   www.lenmur.com

The Gray Bar Building, 420 Lexington Avenue, Ste 300, New York, NY  10170
P (212) 490-6050
F (212) 490-6070

Tide Mill Landing, 2425 Post Road, Ste 302, Southport, CT  06890
P (203) 256-8600
F (203) 256-8615

*** NOTICE *** *This message is being sent by a lawyer.  It may contain attorney-client or attorney work product information subject to legal privilege.  If you receive this message in error, please notify the sender.  Thank you.*

**From:** Thomas Tisdale [mailto:ttisdale@tisdale-law.com]
**Sent:** Monday, December 17, 2007 1:36 PM
**To:** Kevin J. Lennon
**Subject:** RE: PAGANE

Kevin,

I assume its the same type of agreements used in British Marine.  Can you please draft them up so that we can get rid of both today?

Tom


*Thomas L. Tisdale*

*11 West 42nd Street, Suite 900*

*New York, NY 10036*

*(212) 354-0025*

*Fax: (212) 869-0067*

*10 Spruce Street*

*Southport, CT 06890*

*(203) 254-8474*

*Fax: (203) 254-1641*

\*\*\**NOTICE*\*\*\*
*This message is being sent by a lawyer. It may contain attorney-client or attorney work-product information subject to legal privilege. If you receive this email in error, please notify the sender. Thank you.*

> -----Original Message-----
> **From:** Mark Seward [mailto:MSeward@m-f-b.co.uk]
> **Sent:** Monday, December 17, 2007 12:58 PM
> **To:** Matthew Moore; Nick Burgess
> **Cc:** Kevin J. Lennon; Thomas Tisdale
> **Subject:** PAGANE
> **Importance:** High
>
>
> Matthew, for the avoidance of doubt that needs to be done with ceasing pmags today and preferably signing the consent order and lodging it.
>
> As we discussed, we will pay the 50% of the shortage (ie half the $153k) now but will require in due course that pagane have paid it. Not controversial I hope.
>
> I copy in Tom who will sign for me (when I have filled him in about the case)
>
> Kind regards
> **Mark Seward**
> Partner
>
> (direct)  +44 20 7330 8006
> (mobile) +44 7971 049333

**M   F   B**          45 MOORFIELDS  •  LONDON  •  EC2Y 9AE
S O L I C I T O R S          Tel: +44(0) 20 7330 8000  •  Fax: +44(0) 20 7256 6778  •  Web: www.m-f-b.co.uk

The season's greetings from the partners and staff at MFB.

We will be making donations to the Mission to Seafarers and the RNLI in lieu of sending Christmas cards this year.

This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential.  If you are not the intended recipient or if you have received this message in error, please notify us immediately at postmaster@m-f-b.co.uk and delete it from your computer.

Internet communications cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this message, or any attachment, that have arisen as a result of e-mail transmission.

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

1/11/2008



## Kevin J. Lennon

| | |
|---|---|
| **From:** | Kevin J. Lennon |
| **Sent:** | Monday, December 17, 2007 2:38 PM |
| **To:** | 'Mark Seward'; ttisdale@tisdale-law.com |
| **Cc:** | matthew.moore@incelaw.com; nick.burgess@incelaw.com |
| **Subject:** | RE: PAGANE [BULCOM v GLINGROW HOLDING AND RIAS TRADING] |
| **TimeMattersID:** | M71949A22F990320 |
| **TM Matter No:** | 1306-07 |
| **TM Matter Reference:** | Bulcom Ltd. v. Glingrow Holdings Ltd (RB) |

Our ref.:        07-1306

Thanks Mark. I will look for comments from Tom regarding the draft Order and Matt/Nick regarding where the funds are to be held. On that front is there an escrow agreement agreed?

FYI – the banks will not release w/o a signed Order and there is no way to ensure Judge Leisure will sign it w/in today.

Further, and again I will look for Matt/Nick to confirm – I had thought that the funds in NY would be released once the 50% of the cargo claim had been paid or perhaps that was for dismissal of the NY attachment? Please let me know. Thank you.

Kind regards,


*Kevin J. Lennon*
Lennon, Murphy & Lennon, LLC   www.lenmur.com

The Gray Bar Building, 420 Lexington Avenue, Ste 300, New York, NY 10170
P (212) 490-6050
F (212) 490-6070

Tide Mill Landing, 2425 Post Road, Ste 302, Southport, CT 06890
P (203) 256-8600
F (203) 256-8615

*\*\*\* NOTICE \*\*\* This message is being sent by a lawyer. It may contain attorney-client or attorney work product information subject to legal privilege. If you receive this message in error, please notify the sender. Thank you.*

---

**From:** Mark Seward [mailto:MSeward@m-f-b.co.uk]
**Sent:** Monday, December 17, 2007 2:41 PM
**To:** Kevin J. Lennon; ttisdale@tisdale-law.com
**Cc:** matthew.moore@incelaw.com; nick.burgess@incelaw.com
**Subject:** Re: PAGANE [BULCOM v GLINGROW HOLDING AND RIAS TRADING]


That looks fine to me unless Tom has any particular comments

Kevin, you have my bank details. But if Ince prefer to hold the money I do not mind. I just do not want to delay beyond today

Mark

----- Original Message -----
From: Kevin J. Lennon <klennon@lenmur.com>
To: Thomas Tisdale <ttisdale@tisdale-law.com>
Cc: Mark Seward; Matthew Moore <matthew.moore@incelaw.com>; Nick Burgess <nick.burgess@incelaw.com>
Sent: Mon Dec 17 19:30:42 2007
Subject: RE: PAGANE  [BULCOM v GLINGROW HOLDING AND RIAS TRADING]

Our ref.:       07-1306

Dear Tom:

        In response to your below email please see a draft proposed Consent Order attached.  Please let me have your comments.

Once the Order is agreed we can have it sent in to Judge Leisure for him to So Order and can then start drafting the joint letter for release of the funds.  In this respect, to London counsel reading in copy, please provide us with the details of the escrow account where these funds are to be sent to stand as security for Bulcom's claims against Glingrow.

Thanks very much and happy holidays to all.

Kind regards,

Kevin J. Lennon

Lennon, Murphy & Lennon, LLC   www.lenmur.com <http://www.lenmur.com>

The Gray Bar Building, 420 Lexington Avenue, Ste 300, New York, NY  10170

P (212) 490-6050

F (212) 490-6070

Tide Mill Landing, 2425 Post Road, Ste 302, Southport, CT  06890

P (203) 256-8600

F (203) 256-8615

1/11/2008

*** NOTICE *** This message is being sent by a lawyer. It may contain attorney-client or attorney work product information subject to legal privilege. If you receive this message in error, please notify the sender. Thank you.

---

From: Thomas Tisdale [mailto:ttisdale@tisdale-law.com]
Sent: Monday, December 17, 2007 1:36 PM
To: Kevin J. Lennon
Subject: RE: PAGANE

Kevin,

I assume its the same type of agreements used in British Marine. Can you please draft them up so that we can get rid of both today?

Tom

Thomas L. Tisdale

11 West 42nd Street, Suite 900

New York, NY  10036

(212) 354-0025

Fax: (212) 869-0067

10 Spruce Street

Southport, CT  06890

(203) 254-8474

Fax: (203) 254-1641

***NOTICE***
This message is being sent by a lawyer. It may contain attorney-client or attorney work-product information subject to legal privilege. If you receive this email in error, please notify the sender. Thank you.

    -----Original Message-----
    From: Mark Seward [mailto:MSeward@m-f-b.co.uk]
    Sent: Monday, December 17, 2007 12:58 PM
    To: Matthew Moore; Nick Burgess
    Cc: Kevin J. Lennon; Thomas Tisdale
    Subject: PAGANE
    Importance: High

Matthew, for the avoidance of doubt that needs to be done with ceasing pmags today and preferably signing the consent order and lodging it.

As we discussed, we will pay the 50% of the shortage (ie half the $153k) now but will require in due course that pagane have paid it. Not controversial I hope.

I copy in Tom who will sign for me (when I have filled him in about the case)

Kind regards

Mark Seward

Partner

(direct)  +44 20 7330 8006

(mobile) +44 7971 049333

---

M   F   B     45 MOORFIELDS  w  LONDON  w  EC2Y 9AE

S O L I C I T O R S     Tel: +44(0) 20 7330 8000  w  Fax: +44(0) 20 7256 6778  w  Web: www.m-f-b.co.uk
<file:///C:\Program%20Files\Exclaimer\www.m-f-b.co.uk>

---

The season's greetings from the partners and staff at MFB.

We will be making donations to the Mission to Seafarers and the RNLI in lieu of sending Christmas cards this year.

<http://www.m-f-b.co.uk/>

This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential.  If you are not the intended recipient or if you have received this message in error, please notify us immediately at postmaster@m-f-b.co.uk and delete it from your computer.

Internet communications cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this message, or any attachment, that have arisen as a result of e-mail transmission.

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email

This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential.  If you are not the intended recipient or if you have received this message in error, please notify us immediately at postmaster@m-f-b.co.uk and delete it from your computer.

Internet communications cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. Therefore, we do not accept responsibility for any errors or omissions that are present in this message, or any attachment, that have arisen as a result of e-mail transmission.

This email has been scanned by the MessageLabs Email Security System.
For more information please visit http://www.messagelabs.com/email



## Kevin J. Lennon

| | |
|---|---|
| **From:** | Kevin J. Lennon |
| **Sent:** | Monday, January 07, 2008 2:06 PM |
| **To:** | 'Lauren C. Davies' |
| **Subject:** | Pagane v. Glingrow and Rias Trading |
| **Attachments:** | Consent Order - Dec 17 2007 - SO ORDERED.pdf |
| **TimeMattersID:** | M82749A373BB6741 |
| **TM Matter No:** | 1306-07 |
| **TM Matter Reference:** | Pageane - Bulcom Ltd. v. Glingrow Holdings Ltd (RB) |

Our ref.:    07-1306

Dear Lauren:

Further to our telecom this morning please note the following:

1.    The attachment is currently being served.  I think that we may have re-started when the amendment was made but am not sure.  In any case, we are issuing a further cease and desist today reserving the right to re-commence if negotiations on security in London do not fully secure the claim;

2.    The $6,767 attached at Deutsche Bank last week in the name of Rias Trading is being released;

3.    The total attached to our knowledge is as follows:

   a.  BNP - $11,135; $262,671.38; $6,629.15 and $3,895.14; and
   b.  Deutsche Bank - $22,125; and $96,281.12.

   TOTAL: $402,736.79

Please let us know if you have received any instructions from London regarding how the funds under attachment (and which are subject to the Order for Release – see copy attached) are to be disposed of in accordance with the agreement to have the same form the basis for security for our client's claim.  Thanks.

Kind regards,


*Kevin J. Lennon*
Lennon, Murphy & Lennon, LLC  www.lenmur.com

The Gray Bar Building, 420 Lexington Avenue, Ste 300, New York, NY  10170
P (212) 490-6050
F (212) 490-6070

Tide Mill Landing, 2425 Post Road, Ste 302, Southport, CT  06890
P (203) 256-8600
F (203) 256-8615

*** NOTICE *** *This message is being sent by a lawyer.  It may contain attorney-client or attorney work product information subject to legal privilege.  If you receive this message in error, please notify the sender.  Thank you.*

## Kevin J. Lennon

**From:**   Thomas Tisdale [ttisdale@tisdale-law.com]
**Sent:**   Tuesday, January 15, 2008 3:02 PM
**To:**     Kevin J. Lennon
**Subject:** RE: Pagane v. Glingrow and Rias Trading

See below


*Thomas L. Tisdale*

*11 West 42nd Street, Suite 900*

*New York, NY 10036*

*(212) 354-0025*

*Fax: (212) 869-0067*

*10 Spruce Street*

*Southport, CT 06890*

*(203) 254-8474*

*Fax: (203) 254-1641*

***NOTICE***
*This message is being sent by a lawyer. It may contain attorney-client or attorney work-product information subject to legal privilege. If you receive this email in error, please notify the sender. Thank you.*

        -----Original Message-----
        **From:** Kevin J. Lennon [mailto:klennon@lenmur.com]
        **Sent:** Tuesday, January 15, 2008 2:47 PM
        **To:** Thomas Tisdale
        **Subject:** Pagane v. Glingrow and Rias Trading
        **Importance:** High

        Our ref.:      07-1306

        Dear Tom:

                As per our conversation earlier today can you please by way of a return message confirm the
        following:

                1.      You were instructed by MFB – Mark Seward to act on behalf of Glingrow Holding and
                        Rias Trading;[Thomas Tisdale]  Agreed
                2.      That you so acted in signing and submitting the Consent Order to Judge Leisure (see PDF
                        copy attached); [Thomas Tisdale] Agreed and
                3.      It was your understanding based on your personal knowledge and a review of the file your

office maintains in this matter that the parties had agreed that the funds subject to the Consent Order were to be remitted to London via joint instructions (by your firm and our firm) to the garnishees but the account in which those funds were to be held, either at an account maintained by Pagane or Glingrow's London solicitors had not yet been agreed.[Thomas Tisdale] Agreed except to say that I understood the funds were going to be wired to either Ince's or MFB's trust accounts. As to what was agreed by them, I have no knowledge.

Finally, and assuming you can confirm you are in agreement to the above, if you can agree to be available by telephone tomorrow from 2:00 p.m. onward then I can forego having you subpoenaed to appear. Please consider and revert as soon as possible. [Thomas Tisdale] I have a conference call with about 8 people at 2 p.m. Otherwise I am available

Thanks very much.

Kind regards,


*Kevin J. Lennon*
Lennon, Murphy & Lennon, LLC   www.lenmur.com

The Gray Bar Building, 420 Lexington Avenue, Ste 300, New York, NY 10170
P (212) 490-6050
F (212) 490-6070

Tide Mill Landing, 2425 Post Road, Ste 302, Southport, CT 06890
P (203) 256-8600
F (203) 256-8615

*** NOTICE *** *This message is being sent by a lawyer. It may contain attorney-client or attorney work product information subject to legal privilege. If you receive this message in error, please notify the sender. Thank you.*