USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1-31-08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
PAGANE MARITIME LTD.,                            :
                                                 :      07 Civ. 10726 (PKL)
                          Plaintiff,             :
                                                 :
          -against-                              :      MEMORANDUM OPINION
                                                 :      AND ORDER
GLINGROW HOLDING LTD. and                        :
RIAS TRADING,                                    :
                          Defendants.            :
------------------------------------------------------------- x

HAIGHT, Senior District Judge:

In this admiralty action assigned to Judge Leisure, defendant Rias Trading ("Rias") made an

emergency application before the undersigned sitting in Part I for an order (1) vacating a maritime

attachment of its funds previously obtained pursuant to Rule B of the Supplemental Rules for

Admiralty or Maritime Claims, Federal Rules of Civil Procedure, and (2) dismissing the complaint

against it. Rias's motion to vacate the attachment lies under Supplemental Rule E. Its motion to

dismiss the complaint invokes Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

**I. BACKGROUND**

This case is typical of the many Rule B attachments that come before this Court. Foreign

corporations enter into a maritime contract of charter party which provides for arbitration of any

disputes in London. Disputes arise. The party asserting claims against the other initiates arbitration

in London. The parties instruct solicitors. In order to obtain security for an anticipated (or at least

hoped for) arbitration award, the solicitors for the claiming party instruct counsel in this district to

file a complaint in admiralty in this Court against the other party and obtain from the Court a writ

of maritime attachment under Rule B. The writ is conditioned upon the claim being maritime in

nature and the plaintiff's inability to find the defendant within the district for service of process. If

those conditions appear from the initial pleadings, a Judge of this Court issues the writ. The writ of

maritime attachment extends to all property of the defendant that may be found within the district,

including electronic fund transfers taking place between banks. *See Winter Storm Shipping, Ltd. v.*

*TPI,* 310 F.3d 263 (2d Cir. 2002). It is customary for counsel for such a plaintiff to cause process

of attachment to be served upon a number of New York City banks.

In the case at bar, a foreign company named Bulcom, Ltd. ("Bulcom") filed a complaint in

this Court on November 30, 2007. Bulcom's complaint alleged that as disponent owner of the M/V

PAGANE, it chartered the vessel to co-defendant Glingrow Holding Ltd. ("Glingrow"), another

foreign company, for one time chartered trip via the Black Sea for carriage of a cargo of grain to the

port of Aqaba, Jordan. Bulcom further alleged breaches of the charter party by Glingrow resulting

in amounts owing to Bulcom. Bulcom further alleged in substance that the corporate relationship

between Glingrow and co-defendant Rias, also a foreign company, was such that Rias was liable for

the debts of Glingrow under the charter party. Bulcom alleged that the charter party provided for

arbitration in London, and that it had commenced arbitration there against Glingrow. The case was

assigned on filing to District Judge Leisure. On November 30, 2007 Judge Leisure signed an *ex*

*parte* Order authorizing the issuance of Process of Maritime Attachment and Garnishment

("PMAG") against the property of both Glingrow and Rias. Counsel for Bulcom served the process

on several New York City banks. Pursuant to that process, Bulcom succeeded in attaching about

$393,000. Counsel for Rias on the present motion say that "$402,736.79 of Defendants' property

has been attached by Plaintiff," "some of which belongs to Rias and some of which belongs to

Glingrow," and that "even if the attachment of the property of Rias is vacated, as it should be,

Plaintiff will still hold over $116,000 of the assets of Glingrow . . ." Rias's Letter to the Court dated

2

January 15, 2008, at 1, 2. It would thus appear that the major portion of the attached funds are the property of Rias.

The attachment of Glingrow's and Rias's funds in New York resulted in an immediate and lively exchange of e-mails between the parties' solicitors in London, looking toward a negotiated release of the funds. Bulcom had instructed the firm of Ince & Co. ("Ince"). Glingrow and Rias had instructed the firm of More Fisher & Brown ("MFB"). The e-mail exchanges took place between Matthew Moore, an Ince partner ("Moore") and Mark Seward, an MFB partner ("Seward"). Copies are attached as exhibits to Moore's declaration dated January 15, 2008 ("Moore Decl.") in opposition to Rias's present motion. I will quote some of them.

In an e-mail sent on December 17, 2007 at 16:47[1] by Moore to Seward, Moore, responding to a proposal by Seward, said:

> For the avoidance of any doubt, we set out below our understanding of what is being proposed:
>
> 1. The $393,000 caught pursuant to the Rule B will be held in New York pending it being transferred to an escrow account in London. This money will stand as security for our Clients' claim for hire and related expenses, interest and costs.
>
> 2. Glingrow will settle their contribution to the cargo shortage claim by making a payment of US$ 76,735 to us or our client (to be confirmed).
>
> 3. We will instruct our Clients' New York lawyers to seek to ensure that no further funds are attached or detained pending the escrow being established and the cargo claim being settled.
>
> 4. The Rule B will be discontinued/withdrawn when (a) the cargo shortage settlement monies amounting to US$ 76,735 have been paid and (b) the US$ 393,000 has been transferred into escrow in London.

---

[1] The e-mails use military times. 16:47 hours is 4:47 p.m. local time.

If you are in a position to confirm this approach is in order we will send the requisite instructions to our Clients' lawyers in New York.

Seward responded to Moore in an e-mail sent on December 17 at 16:53:

Yes, I will get a formal OK but that is what I propose and what I understand Glingrow agree.

On December 17 at 17:29, Seward e-mailed Moore:

Yes agreed; please confirm when Kevin has stopped serving.

The only possible reading of this e-mail is that Seward received the express authority of his clients to agree to the proposed agreement to release the funds attached in New York and transfer them to an escrow in London. "Kevin" in Seward's e-mail is a reference to Kevin J. Lennon, a partner in the New York law firm of Lennon, Murphy & Lennon ("Lennon"). Ince instructed Lennon to represent Bulcom in this district.   The phrase "Kevin has stopped serving" reflects the agreement that in consideration of the transfer of the attached funds to escrow in London, Bulcom would cease serving PMAGs upon New York banks in pursuit of Glingrow and Rias funds. Lennon's firm had filed the complaint in this Court and obtained the order of attachment. MFB instructed Thomas Tisdale, a partner in the Tisdale Law Office firm ("Tisdale"), to represent Glingrow and Rias in this district.

Lennon and Tisdale drafted a consent order to be presented to Judge Leisure in New York, and cleared the text with the solicitors for the parties in London. Seward understandably wished the matter to be expedited, since the attached funds belonged to his client Rias. On December 17 at 19:52 Seward e-mailed Lennon directly, with a copy to Moore:

Kevin

No escrow is yet agreed; I can put one over tonight to Ince. However, I do not think it is necessary as we are all grown ups.

My understanding is that we agree the consent order and present it on opening (agreed it is too late today) The money will then make its way to London – there are no other claimants to our knowledge. It will be held by us or ince pending agreement on escrow terms.

You cease pmags now and agree not to restart them

the rule b is released only when the 50% is received by ince or their clients

In accordance with the agreement negotiated by the parties' London solicitors, Lennon and Tisdale presented a Consent Order to Judge Leisure which the Judge endorsed "So Ordered" on December 20, 2007. The Consent Order reads in its entirety:

> It is hereby stipulated and agreed between the parties, by their undersigned attorneys, that the funds that are currently under attachment in this action are to be released. The garnishee bank(s) are hereby instructed to release the attached funds pursuant to joint instructions to be provided by letter and signed by the undersigned counsel. The payment of the released funds by the garnishee bank(s) shall not be subject to any further attachment in New York after those funds are released by the garnishee bank(s).

Lennon signed the Consent Order on behalf of plaintiff Bulcom Ltd. Tisdale signed on behalf of defendants Glingrow and Rias. Lennon issued a cease and desist order to the garnishee banks, which had the bargained-for effect of freeing any other Rias funds from attachment in New York.

On December 18 and succeeding days, the solicitors in London considered drafts of escrow agreements, the issue being whether Ince or MFB should hold the funds in escrow after the funds had been released from attachment in New York and transferred to London. Seward did not regard that question as particularly difficult; on December 18 at 08:37 he e-mailed Moore:

> This is my standard escrow, please review and approve/comment. If you want a complex one I have one of those too but, frankly, I do not see the point.

As the text of the Consent Order Judge Leisure signed on December 20 reflects, as of that time the

London solicitors had not yet worked out the details of the escrow.  The holiday season then seems

to have intervened.  On January 3, 2008 at 14:02 Seward e-mailed Moore:

> I refer to our discussions and exchanges and in particular my email sent to
> you on 27th.[2] Have you had any thoughts on that?  Secondly the monies are
> now being held as you know in New York and they need to be remitted to an
> escrow to be held either by you or me.  Are we yet agreed on where they will
> go?
>
> I have no preference and if your clients feel strongly they should be in your
> hands then I am prepared to agree to that.  However I would like to get the
> money out of New York and the Rule B lifted and my New York lawyers
> paid so we can move on to chapter 2.  I await your constructive comments in
> relation to the points I have raised on time issues.

It also appears that MFB and Ince were engaged in discussions about the giving of further

security in London for the shipowner's claims, and a possible settlement of all disputes arising out

of the charter party, short of arbitration.  As to the first subject, Moore says:

> After the Consent Order was signed correspondence was exchanged in
> relation to the provision of top-up (additional) security to be given over and
> above the funds already attached in New York where they were being held
> pending their transfer to the London escrow account.

Moore Decl., ¶ 12.  As to the second subject, on January 8, 2008 at 06:54 Seward e-mailed Moore:

> I am glad that after a lot of wasted money I have managed to find out via New
> York what has been going on.  I am sure that you will agree, that should not
> have been necessary.  If we cannot settle, and I turn to that now, will you
> accept an escrow containing the full principal amount of your claim.  In a
> claim for unpaid hire, this seems reasonable.

Seward's January 8 e-mail to Moore goes on to describe the terms of an overall settlement of the

disputes arising out of the charter party.  However, before any reply by Moore, on January 10 at

06:37 Seward sent him this terse e-mail:

---

[2] The e-mail of December 27 is not included in the papers submitted on this motion.

Matthew

Good morning. Please be aware that I no longer represent Glingrow Holding
Ltd. in this matter. Please address all future correspondence to:

ANDREY ASTAPOV
ASTAPOV LAWYERS (at an address in the Ukraine)

Kind regards
Mark Seward
Partner
MFB Solicitors

Seward could have added "farewell," but perhaps that would have been unprofessional.

There was a comparable changing of the guard in New York. Presumably acting on

instructions from the newly retained Ukrainian lawyers, the Tisdale firm withdrew as counsel for

Glingrow and Rias in the case before this Court, being replaced by the firm of Reed Smith. Reed

Smith makes the present motion on Rias's behalf.

Before addressing the merits of that motion, I must recount additional events that took place

in this case. On December 20, 2007, after the Consent Order had been submitted to Judge Leisure

but not yet signed by him, Ince instructed the Lennon firm that the complaint and attachment should

be amended to reflect that a company called Pagane Maritime Ltd. ("Pagane") should be substituted

for Bulcom as the real party in interest.[3] Ince also instructed Lennon to reduce the amount sued for

from $1,433,583.10 to $688,530.51. Lennon filed an amended complaint for the reduced amount,

naming Pagane as plaintiff. On December 28 Chief Judge Wood, sitting in Part I, issued an amended

*ex parte* order of attachment in the reduced amount. Lennon "obtained a fresh PMAG and had the

same served on the garnishee banks in order to attach in Pagane's name the funds previously

---

[3] In the sometimes shadowy world of corporate shipowning, the name of the owner of a
particular vessel is not always readily ascertainable.

attached in Bulcom's name." Declaration of Kevin J. Lennon ("Lennon Decl.") ¶ 15. These events did not change the amount of Glingrow's and Rias's funds actually attached, which remained $393,000. It is important to note that while money is generally regarded as fungible, in this case the parties agree that the Glingrow and Rias funds attached in the hands of a garnishee bank pursuant to Chief Judge Woods's later order are precisely the same funds that were originally attached under Judge Leisure's order.

Lennon acknowledges that "despite the cease and desist agreement and due to the oversight of the undersigned, the attachment was mistakenly again served on the garnishee banks." Lennon Decl. ¶ 16. Daily service was made on the banks on January 2, 3 and 4, 2008. An additional amount of $6,767 in Rias funds was captured. Lennon adds: "However, in light of the parties' prior agreements and the Consent Order, as above described, those funds were subsequently released on January 7, 2008. We also issued a second cease and desist notice to the garnishee banks." *Id.*

The Reed Smith firm now moves for an order vacating the attachment of Rias's funds and dismissing Pagane's complaint against that defendant. It is evident from Rias's submissions on the motion that it has no intention of transferring the funds attached in New York to an escrow fund in London as security for Pagane's claims under the charter party. Rias simply wants the funds released to it unconditionally.

## II. DISCUSSION

For the reasons that follow, I deny Rias's motion to vacate the attachment because I conclude that Rias is equitably estopped from asking for that relief. Sitting as a Part I Judge, I reach no other issue.

"[I]t is axiomatic that a district court sitting in admiralty exercises powers akin to those of

a court of equity." *Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359,

364 (2d Cir. 1995). Because this case arises within the court's federal admiralty jurisdiction, federal

law principles of equitable estoppel govern. *Cf. Kosakow v. New Rochelle Radiology Assocs.*, 274

F.3d 706, 725 (2d Cir. 2001) ("Because this is an equitable estoppel claim under a federal statute,

federal law principles of equitable estoppel are applicable.") (citation omitted). The Second Circuit

summarized those principles in *Kosakow*:

> The doctrine of equitable estoppel is properly invoked where the
> enforcement of the rights of one party would work an injustice upon
> the other party due to the latter's justifiable reliance upon the former's
> words or conduct. Under federal law, a party may be estopped from
> pursuing a claim or defense where: 1) the party to be estopped makes
> a misrepresentation of fact to the other party with reason to believe
> that the other party will rely upon it; 2) and the other party reasonably
> relies upon it; 3) to her detriment.

*Id.* (citations omitted). In the case at bar, solicitors in London authorized to act for Rias (as well as

for Glingrow) agreed with London solicitors for the disponent owner of the chartered vessel (thought

to be Bulcom, now identified as Pagane) that if the plaintiff in this action released Rias's funds

attached in New York and refrained from any further attachments, those funds would be transferred

to an escrow account in London as security for the owner's claims in the pending arbitration.

Plaintiff performed its end of the bargain. It entered into a Consent Order that directed the attached

funds "to be released" and (with the exception of an inadvertent additional attachment speedily

released) refrained from seeking further security in New York. By agreeing through its London

solicitors to send the attached funds to an escrow account in London, Rias implicitly represented that

it would not seek by proceedings in this Court to vacate the attachment. Rias clearly intended and

believed that Pagane would rely on that representation. And Pagane reasonably and justifiably relied

upon that representation to its detriment by refraining from further attachments. Thus, all three elements of equitable estoppel are demonstrated by the record. Rias is equitably estopped from making a Rule E motion to vacate the attachment of its funds in New York.

Rias's arguments to the contrary are unpersuasive. Sergey Chumak, Rias's operations manager, says in his reply declaration at ¶ 5 that "Rias has never concluded an agreement *with Pagane* that funds of Rias would stand as security for Glingrow's alleged breaches of an agreement between Glingrow and Bulcom or Pagane pending any arbitration among those parties." (emphasis added). This seemingly careful language stops short of denying that Rias concluded that precise agreement *with Bulcom*. On the evidence in the record no such denial could succeed. It is clearly established that at the times the London solicitors negotiated the agreement for the release of the attached funds, Mr. Seward and his firm, MFB, were acting with the authority of both Glingrow and Rias (Rias being a co-defendant in the case at bar and the owner of funds attached in New York). The promises and representations exchanged by the London solicitors constituted the resolution of a discrete aspect of the parties' disputes: How and under what conditions could the attached funds be liberated? Rias is bound by the promises and representations, explicit or implied, that Seward and MFB made on its behalf during the e-mailed exchanges with Moore and Ince.

That would be so, even if Rias now contended that MFB lacked the authority to make those promises and representations on its behalf (although I do not understand Rias to make that particular argument). Second Circuit case law "presume[s] that an attorney-of-record who enters into a settlement agreement, purportedly on behalf of a client, had authority to do so," so that "any party challenging an attorney's authority to settle the case under such circumstances bears the burden of proving by affirmative evidence that the attorney lacked authority." *In re Artha Mgmt., Inc.,* 91 F.3d

326, 329 (2d Cir. 1996) (settlement agreement binding on client where attorney signed agreement and client did not). This rule, grounded in "the unique nature of the attorney-client relationship" and "the public policy favoring settlements," *id.*, applies by analogy to the representations made by the London solicitors in this case, acting in accordance with the instructions and manifest authority of their clients.

If Rias is contending that the substitution of Pagane for Bulcom as party plaintiff in the case at bar relieves Rias of the obligations imposed by the promises and representations MFB made on its behalf, the contention is unappealing to a court of equity. Upon receiving Ince's instruction that Pagane and not Bulcom was the real party in interest, the Lennon firm was required to amend the complaint accordingly. Rule 17(a) of the Federal Rules of Civil Procedure provides: "Every action shall be prosecuted in the name of the real party in interest." The substantive allegations of the original and amended complaints are identical, as are the Rule B averments in support of the original and amended orders of attachment. These are procedural changes. They do not affect the substantive content and effect of the words spoken on Rias's behalf by its London solicitors, as evidenced by the e-mail exchanges in the record.

Nor can Rias argue convincingly, and consistently with equitable principles, that its representation that the funds, once released from attachment in New York, would be transferred to a London escrow account escrow is vitiated because the garnishee bank(s) never received "joint instructions to be provided by letter and signed by the undersigned counsel." While the Consent Order conditioned the banks' release of the funds upon receipt of such joint instructions, they were not furnished immediately only because the London solicitors were discussing whether the transferred funds would be deposited into Ince's escrow account or MFB's: a relatively non-

11

controversial question to which the  solicitors, understandably enough, attached no particular significance.  The material provisions of the agreement—the promises that were of the essence —were the plaintiff's undertakings to release Rias's attached funds and attach no others, and Rias's representation that the attached funds, once released, would be transferred to a London escrow account to stand as security for an arbitration award.  Certainly Rias did not intend for Pagane to continue attaching funds up until the final escrow details were worked out.  The plaintiff at bar has acted in reasonable reliance on Rias's words to its detriment.  Rias is equitably estopped from pursuing a Rule E motion to release the attached funds free of any obligation to transfer them to a London escrow fund.

Rias also stresses that other issues between the parties, while discussed by the London solicitors, were not resolved by the attachment release agreement: the posting by the charterer of additional "top-up" security in London, and a possible settlement of all charter party disputes. Again, these discussions were aborted when Rias withdrew MFB's instructions.  These matters do nothing to negate Rias's representation that the funds would be transferred when released, or Pagane's justifiable reliance upon that representation to its detriment.

### III. CONCLUSION

Given the totality of the circumstances revealed by this record, I conclude without difficulty that Rias is equitably estopped from making a motion under Rule E to vacate the Rule B attachment of its funds.

The parties' submissions raise other issues.  Rias moves under Rules 12(b)(1) and 12(b)(6) to dismiss the complaint against it on the ground that the complaint does not sufficiently allege a claim against Rias.  Pagane asks this Court to direct Rias to arrange for the transfer of the attached

12

funds to some escrow account, somewhere in London. Sitting as a Part I Judge, I decline to reach either of these questions. They are more appropriately addressed to Judge Leisure, the assigned Trial Judge, whose command of the legal and equitable issues involved is at the very least equal to mine. In Part I, I am concerned solely with Rias's emergency and expedited motion to vacate the attachment of its funds. For the reason stated, on the present record Rias is equitably estopped from seeking that relief. Its Part I motion is denied for that reason.

It is SO ORDERED.

Dated: New York, New York
      January 30, 2008

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE