Wendy H. Schwartz (WS-1862)
**REED SMITH LLP**
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax (212) 521-5450
Attorneys for Defendants
Glingrow Holding Ltd. and Rias Trading.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                              :
PAGANE MARITIME LTD.                          :     <u>ECF Case</u>
                                              :
                    Plaintiff,                :     07 Civ. 10726 (PKL)
                                              :
        v.                                    :
                                              :
GLINGROW HOLDING LTD. and                     :
RIAS TRADING,                                 :
                                              :
                    Defendants.               :
                                              :
------------------------------------------------------------x

## <u>DECLARATION OF WENDY H. SCHWARTZ</u>

I, Wendy H. Schwartz, hereby declare under penalty of perjury, pursuant to 28 U.S.C. §

1746, that the following is true and correct:

1.      I am a member of Reed Smith LLP, counsel for Rias Trading ("Rias").

2.      I submit this declaration in support of the motion by Rias to dismiss the Amended

Complaint as against Rias, and for reconsideration of the Order and Opinion by Judge Charles S.

Haight, Jr. sitting in Part I, dated January 30, 2008 which denied Rias' motion pursuant to Rule

E(2)(a) of the Supplemental Rules for Admiralty or Maritime Claims, Federal Rules of Civil

Procedure for vacatur of the attachment of the assets of Rias.

3.      Attached hereto as Exhibit 1 is a true and correct copy of Declaration of Sergey Chumak, dated January 10, 2008.

4.      Attached hereto as Exhibit 2 is a true and correct copy of Reply Declaration of Sergey Chumak, dated January 16, 2008

5.      Attached hereto as Exhibit 3 is a true and correct copy of the *ex parte* Order directing the Clerk to Issue Maritime Process issued on November 30, 2007 in this matter.

6.      Attached hereto as Exhibit 4 is a true and correct copy of the December 20, 2007 Consent Order issued in this matter.

7.      Attached hereto as Exhibit 5 is a true and correct copy of the Plaintiff's Memorandum of Law In Opposition to Defendant Rias Trading's Motion to Dismiss Complaint and Vacate Attachment, dated January 15, 2008.

8.      Attached hereto as Exhibit 6 is a true and correct copy of a letter to Rias Trading from Mary Fedorchak of Lennon, Murphy & Lennon, LLC, counsel for Plaintiff, dated December 10, 2007.

9.      Attached hereto as Exhibit 7 is a true and correct copy of a letter to Glingrow Holding Ltd. from Mary Fedorchak of Lennon, Murphy & Lennon, LLC, counsel for Plaintiff, dated December 10, 2007.

10.     Attached hereto as Exhibit 8 is a true and correct copy of the January 30, 2008 Memorandum Opinion and Order issued in this matter.

11.     Attached hereto as Exhibit 9 is a true and correct copy of *Naias Marine S.A. v. Trans Pacific Carriers Co. Ltd.*, No. 07 Civ. 10640 (PKL), 2008 WL 11103 (S.D.N.Y. Jan. 10, 2008).

12.    Attached hereto as Exhibit 10 is a true and correct copy of *Tide Line, Inc. v. Eastrade Commodities, Inc.*, No. 06 Civ. 1979, 2006 U.S. Dist. LEXIS 95870 (S.D.N.Y. Aug. 15, 2006).

13.    Attached hereto as Exhibit 11 is a true and correct copy of *Deiulemar Compagnia di Navigazione SpA v. Dabkomar Bulk Carriers Ltd.*, No. 05 Civ. 8199, 2005 U.S. Dist. LEXIS 40783 (S.D.N.Y. Dec. 12, 2005).

14.    Attached hereto as Exhibit 12 is a true and correct copy of *Fesco Ocean Mgmt. v. High Seas Shipping Ltd.*, No. 06 Civ. 1055, 2007 U.S. Dist. LEXIS 19970 (S.D.N.Y. Mar. 12, 2007).

15.    Attached hereto as Exhibit 13 is a true and correct copy of *Williamson v. Recovery Limited Partnership*, No. 06 Civ. 5724, 2007 WL 102089 (S.D.N.Y. Jan. 16, 2007).

16.    Attached hereto as Exhibit 14 is a true and correct copy of *Amy Axelrod, Inc. v. Simon & Schuster, Inc.*, No. 07 Civ. 891, 2007 U.S. Dist. LEXIS 76648 (S.D.N.Y. Oct. 16, 2007).

17.    Attached hereto as Exhibit 15 is a true and correct copy of *Koehler v. Bank of Bermuda, Ltd.*, No. M18-302, 2005 WL 1119371 (S.D.N.Y. May 10, 2005).

18.    Attached hereto as Exhibit 16 is a true and correct copy of *Am. Hotel Int'l Group v. OneBeacon Ins. Co.*, No. 01 Civ. 0654, 2005 WL1176122 (S.D.N.Y. May 18, 2005).

19.    Attached hereto as Exhibit 17 is a true and correct copy of *Colodney v. Continuum Health partners, Inc.*, No. 03 Civ. 7276, 2004 WL 1857568, (S.D.N.Y. Aug. 18, 2004).

Dated: New York, New York
       February 14, 2008

                                        /s/   Wendy H. Schwartz
                                              Wendy H. Schwartz

Wendy H. Schwartz (WS-1862)
**REED SMITH LLP**
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax (212) 521-5450
Attorneys for Defendants
Glingrow Holding Ltd. and Rias Trading.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
PAGANE MARITIME LTD.                    :       <u>ECF Case</u>
                                        :
                Plaintiff,              :       07 Civ. 10726 (PKL)
                                        :
        v.                              :       DECLARATION OF
                                        :       SERGEY CHUMAK
GLINGROW HOLDING LTD. and               :
RIAS TRADING,                           :
                                        :
                Defendants.             :
------------------------------------------------------------x

    I, Sergey Chumak, hereby declare under penalty of perjury under the laws of the

United States of America, pursuant to 28 U.S.C. §1746, that the following is true and

correct:

    1.    I am the Operations Manager of Rias Trading ("Rias"), one of the named

defendants in this action.   I make this Declaration on behalf of Rias in support of its

emergency motion, pursuant to Rule E of the Supplemental Rules of Civil Procedure for

Certain Admiralty and Maritime Claims, to dismiss the complaint filed by plaintiff

Pagane Maritime Ltd. ("Plaintiff" or "Pagane") against Rias, and to vacate the attachment

of Rias' assets in New York.

1

2.      This motion is made on an expedited basis because Rias' assets have now *twice* wrongfully been made subject to restraint in this action, despite the fact that Rias has no connection to the agreement which forms the basis of this action.

3.      Because any monetary transaction Rias might make from anywhere in the world has the possibility of being routed through a New York bank, Rias' ability to conduct business is significantly affected by the current attachment order

**B.  Rias' Business and the Dispute**

4.      Rias, whose full name is RIAS Trading SA, is a Swiss company based in Lausanne, Switzerland.

5.      Rias engages in the international trade of fertilizer, food products, especially cereals, and meat and dairy products.

6.      Glingrow is a company organized under the laws of Cyprus.

7.      Glingrow engages in the business of providing chartering services.

8.      Rias and Glingrow are affiliates in the sense that they have some owners in common.  However, Rias and Glingrow are separate companies, with separate locations, separate employees and separate management.

9.      Rias contracted with co-defendant Glingrow Holding Ltd. ("Glingrow"), to obtain a vessel to ship grain to Aqaba, Jordan.

10.      Glingrow chartered a vessel, the M/V Pagane, via a charter party agreement with a company called Bulcom Ltd ("Bulcom").

11.      Rias then entered into a separate charter party agreement with Glingrow for use of that vessel.

2

12.     Pursuant to instructions from Glingrow, for certain invoices Rias received from Glingrow, Rias paid the money to Bulcom.  This was to satisfy obligations that Rias had to Glingrow.

13.     As admitted by Plaintiff in the Complaint, Rias was not named in the charter party agreement between Glingrow and Bulcom (the "Charter Agreement"), which is the agreement sued upon.

14.     Rias has no contractual relationship with Bulcom, nor with the Plaintiff, the alleged owner of the M/V "Pagane," who claims that Bulcom was its agent.

15.     Neither Plaintiff nor Bulcom is a party to the charter party agreement between Rias and Glingrow.

16.     A dispute has now arisen between Plaintiff and Glingrow regarding fees for use of the vessel under the Charter Agreement.

17.     This dispute does not concern the separate contract between Glingrow and Rias.

18.     In the Amended Complaint in this matter at ¶11, Plaintiff alleges that it has commenced arbitration against "the Defendant" (not "Defendants") in London.  Rias is not a party to that arbitration.  Exhibit 3 to Amended Complaint references Bulcom as the plaintiff in that arbitration.

C.     **This Action**

19.     This action was initially filed on or about November 30, 2007, by Bulcom. A true and correct copy of the Verified Complaint is attached as Exhibit A.

20.     On or about November 30, 2007, the Court entered an Attachment Order against Glingrow and Rias.

3

21.    On or about December 20, 2007, pursuant to a Consent Order, the funds under attachment in this action were to be released.  The payment of the released funds by the garnishee bank(s) was not to be subject to any further attachment in New York.

22.    A copy of the Consent Order is attached as Exhibit B.

23.    On December 20, 2007 an Amended Verified Complaint was filed, substituting Pagane for Bulcom Ltd as Plaintiff.

24.    A true and correct copy of the Amended Verified Complaint is attached as Exhibit C.

25.    On December 28, 2007 a new attachment issued against Glingrow and Rias.  A true and correct copy of the docket sheet reflecting the new attachment is attached as Exhibit D.

26.    By this application, Rias seeks vacation of the new attachment as against it, and dismissal from this action.

27.    No prior application for the relief requested herein or similar relief has ever been made by Rias to this or to any other Court.


Executed on:  January 10, 2008

Sergey Chumak

4

# EXHIBIT A

Nov. 30, 2007  2:04PM  Lennon, Murphy & Lennon LLC    No. 2569  P. 2

**JUDGE LEISURE**                    07  CV  10726

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

BULCOM LTD.,

                        Plaintiff,

        - against -

GLINGROW HOLDING LTD. and
RIAS TRADING,

                        Defendants.

----------------------------------------X



### VERIFIED COMPLAINT

Plaintiff, BULCOM LTD., ("Plaintiff"), by and through its attorneys, Lennon, Murphy &

Lennon, LLC as and for its Verified Complaint against the Defendants, GLINGROW

HOLDING LTD. ("Glingrow") and RIAS TRADING ("Rias") (collectively "Defendants")

alleges, upon information and belief, as follows:

     1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333. This claim involves the

breach of maritime contract of charter. This matter also arises under the Court's federal question

jurisdiction within the meaning of 28 United States § 1331 and the New York Convention on the

Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201 *et seq.*) and/or the

Federal Arbitration Act (9 U.S.C. § 1 *et seq.*).

     2.    At all times material to this action, Plaintiff was, and still is, a foreign corporation,

or other business entity, organized under, and existing by virtue of foreign law and was at all

material times the disponent owner[1] of the motor vessel "PAGANE" (hereinafter the "Vessel").

---

[1] A disponent owner controls the commercial operations of a vessel having taken the vessel on charter from the registered owner of the vessel. The disponent owner usually time charters the vessel from the registered owner and then sub-charters the vessel to charterers.

3.      Upon information and belief, Defendant Glingrow was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of the laws of Cyprus Belarus with a place of business at 15, Boumpoulinas, Povek Building, Apt. No. 301, Nicosia, Cyprus and was at all material times the Charterer of the Vessel.

4.      Upon information and belief, Defendant Rias was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law and was at all material times the alias, partner, joint venturer and/or paying, or receiving, agent of the Defendant Glingrow.

5.      By a charter party dated October 17, 2007 Plaintiff time chartered the Vessel to Defendant Glingrow for one time chartered trip (duration about 30 days) via the Black Sea for the carriage of any lawful bulk grain cargo to Aqaba, Jordan. A copy of the charter party is attached hereto as Exhibit 1.

6.      The charter party was made on the NYPE form inclusive of clauses 8, 59 and 60 by which the NYPE Interclub Agreement, and its scheme for settlement of cargo claims that may arise under the charter party, was expressly incorporated into the charter party.

7.      Plaintiff delivered the Vessel into the service of the Defendant Glingrow at Kerioh, Ukraine and has at all times fully performed its duties and obligations under the charter party.

8.      A dispute has arisen between the parties regarding Defendant Glingrow's failure to pay the hire for its use of the vessel which is due and owing to Plaintiff under the charter party contract. Clause 4 of the charter party requires Defendant Glingrow to pay for the use and hire of the Vessel at the rate of $60,000 per day, pro rata, including overtime, payable in advance every 15 days.

9.     In breach of its obligation to pay hire the Defendant Glingrow failed to remit payment to the Plaintiff on or about November 21, 2007 when a 15 day advance hire payment of became due and owing to the Plaintiff.  A copy of Plaintiff's provisional hire statement, reflecting the sum of $594,848.97 due to the Plaintiff for unpaid hire, is attached hereto as Exhibit 2.

10.     In further breach of its charter party obligations, the Defendant Glingrow has caused liability for the Plaintiff's account in respect of claim brought by non-party cargo receivers, Jordanian Ministry of Industry and Trade ("MIT"), based, *inter alia*, on allegations of cargo shortage and cargo contamination.  Plaintiff will settle MIT's shortage claim for $153,470.00 and MIT's contamination claim for US$ 289,091.50 and seeks indemnity from Defendants for such payment as per the charter party which incorporated the Interclub Agreement.

11.     As a result of Defendant Glingrow's breaches of the charter party due as aforesaid, Plaintiff has sustained damages in the total principal amount of $1,037,410.40, exclusive of interest, arbitration costs and attorneys fees.

12.     Pursuant to the charter party, disputes between the parties are to be submitted to arbitration in London subject to English law.  Plaintiff has commenced London arbitration against Defendant by appointment of its arbitrator Mr. Christopher Moss.  A copy of Plaintiff's arbitration appointment is attached hereto as Exhibit 3.

13.     This action is brought in order to obtain jurisdiction over Defendants and also to obtain security for Plaintiff's claims and in aid of arbitration proceedings.

14.     Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law.  Section 63 of the English Arbitration Act of 1996 specifically allows for

recovery of these items as part of an award in favor of the prevailing party.  As best as can now be estimated, Plaintiff expects to recover the following amounts at arbitration as the prevailing party:

| | A. | Principal claims: | $1,037,410.40 ; |
| | | [i.   Unpaid hire:   $594,848.97] | |
| | | [ii.  Indemnity for cargo shortage claim: $153,470] | |
| | | [iii. Indemnity for cargo contamination claim: $289,091.50] | |
| | B. | Estimated interest on claims –  3 years at 5.5% compounded quarterly: | $171,172.71 ; |
| | C. | Estimated arbitration costs: | $75,000; and |
| | D. | Estimated attorneys' fees and expenses: | $150,000.00. |
| | | Total: | $1,433,583.10 . |

15.    The Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendants have, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendants.

16.    Upon information and belief, Defendant Ries acts as paying agent, and/or receiving agent, or arranges for other non-parties to satisfy the debts and obligations of Defendant Glingrow, and/or receive payments being made to Defendant Glingrow.

17.    Although Ries was not named in the charter party, and had no formal relationship to the charter of the M/V "PAGANE" it paid initial hire owing to Plaintiff from Glingrow.

18.    It is not common practice in the maritime industry, nor any other business, for an independent company to pay another company's debt, where it has no formal relationship to the underlying contract.

4

Nov. 30  2007  2:04PM     Lennon, Murphy & Lennon LLC     No. 2533   P. 6

19.    The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia,* any assets of the Defendants held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendants and to secure the Plaintiff's claim as described above.

WHEREFORE, Plaintiff prays:

A.    That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Complaint failing which default judgment be entered against it;

B.    That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of $1,433,583.10 belonging to, due or being transferred to, from, or for the benefit of the Defendants, including but not limited to such property as may be held, received or transferred in Defendants' name(s) or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Complaint;

Nov. 30. 2007  3:05PM    Lennon, Murphy & Lennon LLC                No. 2553    P. 7

C.    That the Court retain jurisdiction to compel the Defendants to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

D.    That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

E.    That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court;

F.    That this Court award Plaintiff the attorneys' fees and costs incurred in this action; and

G.    That the Plaintiff has such other, further and different relief as the Court may deem just and proper.

Dated:    New York, NY
          November 30, 2007


                                    The Plaintiff,
                                    BULCOM LTD.


                                    By: _____
                                    Charles E. Murphy
                                    Kevin J. Lennon
                                    LENNON, MURPHY & LENNON, LLC
                                    420 Lexington Avenue, Suite 300
                                    New York, NY 10170
                                    (212) 490-6050 – phone
                                    (212) 490-6070 – facsimile
                                    cem@lenmur.com
                                    kjl@lenmur.com


6

Nov. 30. 2007  2:05PM    Lennon, Murphy & Lennon LLC            No. 2553   P. 8

## ATTORNEY'S VERIFICATION

State of New York    )
                     )    ss.:    City of New York
County of New York   )

1.    My name is Charles E. Murphy.

2.    I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.    I am a partner in the firm of Lennon, Murphy & Lennon, LLC attorneys for the Plaintiff.

4.    I have read the foregoing Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.    The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.    The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated:    New York, NY
          November 30, 2007

_Charles E. Murphy_
Charles E. Murphy

7

# EXHIBIT 1

# TIME CHARTER

GOVERNMENT FORM

Approved by the New York Produce Exchange

November 6th, 1913-Amended October 20th, 1921 ; August 6th, 1931 ; October 3rd, 1946

1.   This Charter Party, made and concluded in Novorossiysk ............................................ *17th* day of October 2007 ...19...

2.   Between ...Messrs Balcom Ltd... ...as disponent ...................................................................................................................

3.   Owners of the good ... ...Panama Flag... ...Steamship/Motorship ~~"Piraeus"~~ ...Description as per Clause 29 of...

4.   of........................ ...tons gross register; and ....... ...tons net register, having engines of .................................... Indicated horse-power

5.   and with hull, machinery and equipment in a thoroughly efficient state, and classed .......................................................... tons of 2240 lbs.

6.   of about ................................ ...cubic feet bale capacity, and about ................................................................................................

7.   deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity

8.   allowing a minimum of fifty tons) on a draft of........ ...feet ....... inches on ................................. Summer freeboard, inclusive of permanent bunkers

9.   which are of the capacity of about ..................................................................................... fully laden, under good weather

10.  conditions about ................. ...knots on a consumption of about ...................... of Best Welsh coal-best grade fuel oil-best grade Diesel oil

11.  now ......trading.................................................................................................................................................................

12.  .................................................................... and ... Messrs GLINGROW HOLDING LTD. ....................................Charterers of the City of ...Nicosia, Cyprus....................

13.       Witnesseth, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14.  about *1 time Charter trip via safe ports, safe berths, safe anchorages always afloat, always within IWL, via Black sea with bulk lawful grain to Aqaba,

     Jordan. Duration about 30 days,

15.  within below mentioned trading limits.

16.  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17.  the fulfillment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations hereunder.*

18.  Vessel to be placed at the disposal of the Charterers, at on *dropping outward pilot Kertch at any time day or night Sundays and Holidays included.*

19.  ...............................................................................................................................................................................................

20.  In such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No.6), as

21.  the Charterers may direct. If such dock, wharf or place be not available to count as provided for in clause No.5. Vessel on her delivery to be

22.  ready to receive cargo with clean-swept holds and tight, staunch, strong and every way fitted for the service, having water ballast, (*See Clause 42*) winches

     and ..........................................................................................................................................................................................

23.  donkey-boiler with sufficient steam power, or if not equipped with donkey-boiler, then other power sufficient to run all the winches at one and the same

24.  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25.  dise, including petroleum or its products, in proper containers, excluding (*See Clause 32*) ....................................................................................

26.  ~~vessels not to be employed in the carriage of Live Stock but~~ Charterers are to have the privilege of shipping a small number on deck at their risk

27.  all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North

28.  ~~America, and/or United States of America, and/or West Indies, and/or Central America~~ and/or Caribbean Sea, and/or Gulf of Mexico, and/or

29.  ~~Mexico, and/or South America~~ and/or Europe

30.  and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

31. October 31st and May 15th, Hudson Bay and all unsafe ports, also excluding, when out of season, White Sea, Black Sea and the Baltic,
32. (See Clause 31)
33.
34.
35. as the Charterers or their Agents shall direct, on the following conditions:
36. 1. That *whilst on hire* the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the
37. insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler *and domestic water, lubricating oil, vessel's garbage removal unless compulsory* and maintain her class and keep
38. the vessel in a thoroughly efficient state in hull, *holds and hatchcovers*, machinery and equipment *with all certificates necessary to comply with current requirements at all ports of call and exrels* for and during the service. (*See Clause 48 and 49*).
39. 2. That, *whilst on hire*, the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory and customary Pilotage, Turkish strait pilotage* , Agencies, boatage on Charterers business for clearance and cargo purpose only, Commissions, *canal dues and tolls.*
40. Consular Charges (except those pertaining to the Crew *and flag*), and all other usual expenses except those before stated, but when the vessel puts into
41. a port for causes for which ~~Owners are~~ *vessel is* responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42. illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43. charter to be for Charterers account *including loading expenses should port authorities order crew ashore for safety reasons.* ~~All other fumigations to be for charterers account after vessel has been on charter for a continuous period~~
44. ~~of six months or more.~~
45. Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, *as permitted under this Charterparty, but*
46. Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers have to allow the privilege of using shifting boards
47. for dunnage, they making good any damage thereto.
48. ~~3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~
49. ~~board the vessel at the current prices in the respective ports. the vessel to be delivered with not less than~~...........~~tone and not more than~~
50. ..............~~tons and not more than~~ .........tons. (See Clause 30).
51. 4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *US$ 40000.00 per day pro rata including overtime payable in advance every 15 days. First payment within 3 banking days upon delivery.*
52. ..............~~United States Currency/per ton on vessel's total deadweight carrying capacity, including bunkers and~~
53. ~~stores on~~ ............~~summer freeboard, per Calendar Month~~ commencing on and from the *hour* ~~day~~ of her delivery, as aforesaid, and at
54. and after the same rate for any part of a *day* ~~month~~, hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55. wear and tear excepted, to the Owners (unless lost) *at* ~~on~~ *dropping last outward sea pilot Aqaba, any time day or night, Sundays and Holidays*
56. ............~~unless otherwise mutually agreed. Charterers are to give Owners not less than~~..........days
57. ~~notice of vessels expected date of re-delivery and probable port.~~ (See Clause 30)
58. 5. Payment of said hire to be made *as per clause 39* ~~in New York in cash~~ *by transfer* in United State Currency, *every 15 days* ~~semi-monthly~~ in
59. advance, and for the last *15 days* ~~half-month~~ in
60. part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
61. due, if so required by Owners, unless bank guarantee or deposit is made by Charterers, otherwise failing the punctual and regular payment of the
62. hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
63. terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from...6 a.m. on the working day
64. following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., ~~but if required by Charterers, they to have the privilege of using vessel at once, such time used to count as hire.~~

65. Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66. to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67. of such advances.
68. 6. That the cargo or cargoes be laden and/or discharged in any safe dock or at any wharf or place that Charterers or their Agents may
69. direct, provided the vessel can safely lie always afloat at any time of tide, except at such places *In East Coast South America* where it is customary for similar size vessels to safely
70. lie aground.
71. 7. That the whole reach of the Vessel's Hold, Decks and usual places of loading (not more than she can reasonably stow and carry), *compatible with vessel's seaworthiness,* also
72. accommodations for Supercargo, if carried, shall be at Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73. tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow. Charterers
74. paying Owners.................per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are
75. incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense. *No passengers.*
76. 8. That the Captain shall prosecute his voyage with the utmost despatch, and shall render all customary assistance with ship's crew and
77. boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78. agency; and Charterers are to load, stow, and trim, *lash, secure and discharge* the cargo at their *risk and* expense under the supervision of the Captain, *all cargo claims to be settled In accordance with NYPE Interclub Agreement as amended In September 1996 (See Clauses 68/69). who is to sign Bills of Lading for*
79. cargo as presented, in conformity with Mate's or Tally Clerk's receipts.
80. 9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81. receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
82. 10. That the Charterers shall have the permission to appoint a Supercargo, who shall accompany the vessel *against signing Owners' P and I Club boarding LOI, and see that* voyage is prosecuted
83. with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84. rate of *USD 10.00 (Ten Dollars) $1.00* per day, Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their agents, to victual Tally
85. Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling. *(See Clause 37)*
86. 11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, *and / or telecommunication with copy to Owners,* and the
87. Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88. terers, their Agents or Supercargo, when required, with a true copy of daily Logs, *abstracts in English,* showing the course of the vessel and distance run and the con-
89. sumption of fuel.
90. 12. That the Captain shall use diligence in caring for the ventilation of the cargo. *Vessel has natural ventilation.*
91. 13. That the Charterers shall have the option of continuing this charter for a further period of .................
92. ................. *days previous to the expiration of the first named term of any declared option*
93. ..............on giving............days notice or their Agents............ *and should vessel*
94. 14. That if required by Charterers, time not to commence before 00:01 hours *Local Time 15th October 2007....*
95. not have given written notice of readiness *been delivered* on or before *23:59 hours Local Time 18th October 2007..... but not later than 4 p.m.* Charterers or
96. their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
97. 15. That in the event of the loss of time from deficiency *and / or default of men or including strike of Officers and / or crew or deficiency of stores,* fire, breakdown or damage to hull, machinery or equipment,

98. grounding, detention by average accidents to ship or cargo, *unless resulting from inherent vice, quality or defect to the cargo*, drydocking for the purpose of examination or painting bottom, or by any other cause *unless same is caused by Charterers or by following their instructions*, the payment of hire shall cease for the

99. preventing the full working of the vessel *unless same is caused by Charterers or by following their instructions*, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by

100. defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101. thereof, and all *directly related* expenses shall be deducted from the hire *duly substantiated*.

102. 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103. returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104. Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105. The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106. purpose of saving life and property.

107. 17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London* ~~New York~~,

108. one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for

109. the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial *shipping men. (See Clause 60.)*

110. *General Average / Arbitration in London. This Charter Party shall be governed by and construed in accordance with English Law.*

110. 18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-

111. age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112. deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113. might have priority over the title and interest of the owners in the vessel.

114. 19. That all derelicts and salvage shall be for Owners' account and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

115. Crew's proportion. General Average shall be adjusted, stated and settled, according to ~~Rule 1 to 15 inclusive, 17 to 22, inclusive, and Rule F of~~

116. York-Antwerp Rules 1974 *as amended 1994 at London (See Clause 66)* ~~1924, at such port or place in the United States as may be selected by the carrier,~~

~~and to matters not provided for by these~~

117. ~~Rules as to settlement to be made at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~

118. ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~

119. ~~the rate prevailing at the last day of discharge at the port or place of that discharge of such damaged cargo from the ship. Average agreement or~~

120. ~~bond and such additional security, as may be required by the carrier must be furnished before delivery of the goods. Such cash deposit as the carrier~~

121. ~~or his agents may deem sufficient to cover the estimated contribution of the goods and for any salvage and special charges thereon, shall, if~~

122. ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~

123. ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in the special account at the~~

124. ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~

125. ~~United States money.~~

126. ~~In the event of accident, danger, damage or disaster, before or after commencement of the voyage, resulting from any cause whatsoever,~~

127. ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~

128. ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~

129. ~~losses, expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred, in respect of the~~

130. ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~

131. ~~ships belonged to strangers.~~

132. Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. *(See Clause 66)*

133. 20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity,~~ *and shall be for*

*Owners' account.*

134. ~~cost of replacing same, to be allowed by Owners.~~

135. 21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at its~~

136. ~~convenient place, bottom cleaned and painted whenever Charterers and the Captain think necessary, at least once in every six months, reckoning from~~
137. ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138. (See Clause 70)
139. ~~22. Owners shall maintain the gear of the ship as fitted (for all derricks) capable of handling lifts up to three tons; also~~
140. ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
141. ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel *lights as on board* lanterns and oil
142. for
143. night work, *free of expense* to Charterers, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at
144. Charterers' expense. ~~The~~
145. ~~Charterers to have the use of any gear on board the vessel.~~
146. ~~23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;~~
147. ~~steamer to provide one winchman per hatch to work winches by day and night as required. Charterers agreeing to pay officers, engineers, winchmen, which men~~
148. ~~deck hands and doorkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
149. ~~port, or labor unions, prevent crew from driving winches, shore Watchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
150. ~~insufficient power to operate winches, Owners to pay for steam engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
151. ~~thereby.~~
152. ~~24.  It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
153. ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~
154. ~~etc." in respect of all cargo shipped under this Charter to or from the United States of America. It is further subject to the following clauses, both~~
155. ~~of which are to be included in all bills of lading issued hereunder:~~

U.S.A. Clause Paramount

156. This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157. 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158. any of its rights or immunities or an increase of any of its responsibilities or liabilities under the said Act. If any term of this bill of lading
159. be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

Both-to-Blame Collision Clause

160. ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
161. ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
162. ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
163. ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
164. ~~carrying ship or her owner to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
165. ~~owners as part of their claim against the carrying ship or~~
166.
167. 25. The vessel shall not be required to enter any ice-bound port or any port where lights or light-ships have been or are about to be with-
168. drawn by reason of ice, or where there is risk that in ordinary course of things the vessel will not be able on account of ice to safely enter the
169. port or to get out after having completed loading or discharging. *Ice free ports / trading. Vessel not to force ice or follow ice-breakers.*
170. 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners to remain responsible for the
171. navigation of the vessel, *acts of pilots and tugboats except of strikes except for the* Owners, insurance, crew, and all other matters, *except for time*
172. *Charterers' responsibility as agreed in this Charter and Rider,* same as when trading for their own account.
173. 27. A commission of 1.25 2 1/2 per cent is payable by the Vessel and Owners to ......*DIAMANT / ODESSA*.....
174. on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175

28. An address commission of 2 ½ per cent is payable to .....*Charterers*................. on the hire earned and paid under this Charter.

*Additional Clause 29 to 82 as attached are to be fully incorporated in this Charter Party.*

*THE OWNERS*                    *THE CHARTERERS*

This Charter Party is a computer generated copy of the NYPE(Reversed 3rd October, 1946) from printed under licence from the Association Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use at colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

**Clause 29  Vessels description**
M/V PAGANE - GEARLESS SD BC
PANAMA FLG-BLT 1982
54158 MTS DWAT ON 12.35 M SSW
GRT/NRT - 32976/20521
LOA/BEAM - 220/32.20M
DEPTH MOULDED 17 M
GRAIN IN MAIN HOLDS - 2443031.66 CFT (HA CMNGS INCLDD)
7 HOLDS/10 HATCHES
HATCH SIZES - ALL 11.60 BY 15.40M
HOLDS SIZE:
-HOLD #1 - 17.50m X 32m (AFT PART)
-HOLD #2 - 29.70m X 32m
-HOLD #3 - 18.00m X 32m
-HOLD #4 - 27.90m X 32m
-HOLD #5 - 18.00m X 32m
-HOLD #6 - 30.60m X 32m
-HOLD #7 - 15.30m X 32m (FORE PART)
HEIGHT OF ALL HOLDS - 17.90m INCLUDING COAMINGS.
MCGREGOR SIDE ROLLING TYPE - HYDRAULIC
SPEED–CONSUMPTION UNDER GOOD WEATHER AND SMOOTH WATER CONDITIONS:
ABT 11.5KN ON ABT 33MT LADEN/31MT BALLAST IFO 180 CST PLUS ABT 3.5 MT
MGO AT SEA, PORT CONS ABT 2.5 MT MGO.
VSL BURNS MGO WHILST MANOUVRING AND NAVIGATING IN NARROW WATERS,
ENTERING-LEAVING PORT, SAILING IN CONFINED WATERS, RIVERS, CANALS,
ESTUARIES AND ON STAND BY.
FUEL CAP: ABT 2000 MT IFO 180 CST ISO 8217 RMB 25
ABT 300 MT MGO ISO 8217 DMA
TPC ABT 61.0 T/CM
CONSTS ABT 500 ECXL. FW
NATURAL VENTILATION, NOT C02 FTD
CGO HOLD GRAIN B/DOWN
NO1 223328.52
NO2 473521.17
NO3 282491.75
NO4 449107.91
NO5 282491.75
NO6 492979.74
NO7 239110.80
- ALL ABT AND WOG –
OWNERS: PAGANE MARITIME LTD.
CLASS: RMRS
PANDI: INGOSTTRAKH
H+M: ALLIANZ
ISM / ISPS OK
CALL SIGN: 3 E B Z 9
INMARSAT 'C' TLX: 457127110

- HATCH SIZES: ALL 11.60 BY 15.40 M
- OWNERS GTEE AIR DFT (DISTANCE WL TO THC) IN FULL BALLAST CONDITION TO BE
   MAX 12.00 M
- LAST THREE CARGOES: STEELS, IRON ORE, CLINKER

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

I.    VSL'S STOWAGE PLAN:
- HOLD #1 - 5190.75mts - FULL
- HOLD #2 - 10400.00mts - SLACK
- HOLD #3 - EMPTY
- HOLD #4 - 10444.48mts - FULL
- HOLD #5 - EMPTY
- HOLD #6 - 11464.77mts - FULL
- HOLD #7 - 4000.00 - SLACK

TTL 41500mts
DRAFT FORE=10.39m MID=10.54m AFT=10.70m
ALL ABOVE ESTIMATIONS DONE ON BSS TRIMMED ENDS.IF LOADING WILL BE
WITH UNTRIMMED ENDS THEN STOWAGE PLAN CHANGE WILL BE .
II. WE NEED MIN 48 HRS TO BALLAST/DEBALAST HOLDS NoS 3+5.
III. RCVD MSG FM GLOBAL AGENCY ASKING FOR SOME VSL'S DETAILS.STILL
NOT REVERT,WAIT YR CONFORMATION AND INSTR.

- OWNRS WILL CONSIDER AIR DFT (DISTANCE WL TO THC) IN FULL BALLAST
INCLUDING BALLASTING CARGO HOLDS NO3 AND NO5 AND ACHEAVING REQUIRED
BY TERMINAL DRAFT ON HOLD NO 7 BY TRIMING THE VESSEL, BUT TIME LOST FOR
BALLASTING/DEBALLASTIN AND PREPARING CARGO HOLDS IN SUITABLE
CONDITION FOR LOADING ALWAYS TO BE FOR AND ACCOUNT OF CHARTERES

- OWNERS CONFIRM VSL IS GRAIN CLEAN AND HAS ON BOARD VALID DOCUMENTS
OF AUTHORIZATION FOR CARRIAGE OF GRAINS IN BULK.
- OWNERS CONFIRM THAT VESSEL IS SUITABLE FOR GRAB DISCHARGE.
- OWNERS CONFIRM VESSEL IS CLASSED HIGHEST LLOYD'S CLASS AND ISM / ISPS
CODE FITTED FOR THE WHOLE DURATION OF VOYAGE.
- OWNERS CONFIRM VESSEL HAS ALL VALID DOCUMENTS/CERTIFICATES AVAILABLE
ON BOARD FOR LOADING AND DRAFT SURVEY.
- OWNERS CONFIRM THAT VESSEL IS NOT BLACKLISTED FOR LOAD AND/OR
DISCHARGE COUNTRIES / PORTS AND SUITABLE FOR THIS TRADE.
- OWNERSHIP/CLASS/PANDI CLUB/H+M INSURANCE NOT TO BE CHANGED
THROUGHOUT WHOLE TRIP DURATION.

FOR
- ACC GLINGROW HOLDING LTD., NICOSIA, CYPRUS
RECENT DEALS:
C/P 28/08/2007 "GRAND MARKELA" ON TCT NOVO/SAUDI ARABIA 50'000 MTS BARLEY
D/OWNERS C. TRANSPORT
C/P 23/08/2007 "ERNEST" ON TCT NOVO/AQABA 33'000 MTS WHEAT
D/OWNERS - CARGILL INTERNATIONAL S.A.
C/P 21/08/2007 "SOUTHGATE" ON TCT NOVO/DAMIETTA 24'000 MTS WHEAT
D/OWNERS - NOBLE RESOURCES S.A.
C/P 20/07/2007 "THOR CONFIDENCE" ON VOYAGE BSS NOVO/ADEN 23200 MTS WHEAT
OWNERS - THORESEEN
C/P 20/06/2007 "SILVERGATE" ON VOYAGE BSS NOVO/AQABA 50'000 MTS BARLEY
D/OWNERS - INDUSTRIAL CARRIERS
C/P 01/06/2007 "LEROS" ON TCT NOVO/ADEN—HODEIDAH 40'500 MTS WHEAT
D/OWNER - CUSTODIA

8

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

**Clause 30 Bunker Clause**

Bunker on delivery to be as on board (expect IFO about 328 mts and MGO about 55 mts).
Bunker on redelivery to be about same quantity (not less) as actually on delivery. Charterers will pay
cost of bunker on delivery together with 1st hire.
Bunker prices - IFO USD 435 / MGO 745 per mt, same prices on redelivery

**Clause 31 Trading Exclusions**

One time Charter Trip to Aqaba / Jordan.

**Clause 32 Cargo Trading Clause**

Cargo is grain.

**Clause 33 – Deleted.**

**Clause 34**

Owners guarantee that the vessel is an easy trimming bulk carrier suitable for loading / carrying /
discharging a full and complete cargo of any / all kinds of grain in bulk without bagging /
strapping/securing. The vessel to have on board at all times all relevant grain loading booklets /
manuals / certificates and hold end trimming table and vessel to be able to load grain without shifting
boards / grain fittings in accordance with 1991 amendments the International Convention of SOLAS
1974 and has dispensation from trimming holds ends.

**Clause 35 Hire Payment**

Hire and all monies due to the Owners under this Charter Party will be paid to Owners' bank account.
Charterers will not agree to the assignment of hire, monies due under this Charter Party or the Charter
Party itself in any circumstances whatsoever.

First hire shall be paid within 3 banking days after vessel's delivery together with value of bunkers.
Thereafter, hire shall be settled every 15 days in advance. Greenwich Mean Time (G.M.T.) shall be
applied for hire calculation purpose.

Notwithstanding anything contained herein to the contrary, if any time during the currency of this
Charter, hire shall become due on or during a Saturday, Sunday or national holiday or outside normal
office hours, or at any time which for reasons beyond their reasonable control would prevent
Charterers from effecting payment of hire on the due date, payment of hire is to be made on the
banking day immediately preceding the date on which hire becomes due. Where there is any failure to
make hire payment on the due date because of an oversight or negligence or error or omission of
Charterers' employees, Bankers or Agents or otherwise for any reason where there is absence of
intention to fail to make payment as set out, Charterers shall be given by Owners 3 banking days'
notice to rectify the failure, where so rectified the payment shall stand as punctual and regular
payment.

**Clause 36 Charterers' Deduction**

Charterers have no right to deduct any Owners' expenses from the Charter hire. It is understood that
Owners will forward to load and/or discharge agent in advance any funds required for Owners'
expenses.

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

**Clause 37 Communication/Entertainment/Victualling**
Charterers shall pay US$ 1,250.- per month or pro rata in lieu of communication / entertainment / victualling.

**Clause 38 Delivery/Redelivery Notice**
Delivery Notices:     on fixing and then daily notices.

Redelivery Notices:    15 days approximate and 5/3/2/1 days definite notice of redelivery date and port.

**Clause 39 Stevedore Damage Clause**
Stevedores shall be employed at the risk of and paid for by the Charterers. It is understood that all tallying is to be for Charterers' account.

Charterers shall not be responsible for any damage suffered by the vessel and/or her equipment whilst loading or unloading, unless such damage is notified to Charterers' representatives/Agents in writing by the Master latest within 24 hours after the occurrence, except in case of hidden damages which to be reported latest upon completion of discharge.

In the event of stevedore damage:

a)   Such damage to be entered into the vessel's log book.

b)   Master shall also have notified the stevedores or parties responsible for such damage in writing or telex/cable with copy to Charterers.

c)   If the damage caused as above by Charterers or their stevedores affects the vessel's seaworthiness or cargo worthiness or is subject to Classification requirements then all such damage is to be repaired to the satisfaction of the vessel's Classification Society prior to leaving the loading/discharging port. Vessel remaining on hire and costs being borne by Charterers.

d)   Damages not affecting seaworthiness or cargo worthiness or is not subject to classification requirements may be repaired later together with Owners' work at Owners' time and at Charterers' expenses. Owners to provide Charterers with copies of original invoices and if required, to advise Charterers' nature of work necessary to repair damages.

e)   Master will make every attempt to obtain written acknowledgement from the party causing the damage but this without prejudice to paragraphs 'a' through 'd'.

**Clause 40 P and I Club**
Owners guarantee that the vessel is fully covered by the Ingosstrakh. Charterers have the benefit of Owners' cover granted by the P and I Club so far as the Club Rules permit.

Trip to Jordan always as per vessel's P and I club requirements which are:

= subject to previous written notification to Ingosstrakh;
= loading/discharging surveys carried out by approved surveyor of Ingosstrakh;

.10

M/V "PAGANE" - GIJNGROW - C/P DATED 17th OCTOBER 2007

### Clause 41 Return Insurance

As far as rules permit, the Charterers to have the benefit of any return insurance premium receivable by Owners from their underwriters, as and when received by Owners, by reason of vessel being in port all such time on hire.

### Clause 42 War Risk

Basic war risk insurance premium for worldwide trading to be for Owners' account, and additional premiums for hull and machinery and Officers/crew for trading to restricted area, also crew war bonus, if any, to be for Charterers' account. The orders of Owners' war risk underwriters always to be followed.

The vessel's hull and machinery value of fixing is USD 5,200,000.-

### Clause 43 On/Off-Hire Survey

Charterers to appoint a surveyor acting on their behalf for performing a joint on and off hire bunker and condition survey. Joint on hire survey to be in Owners' time unless vessel already loading and joint off hire survey to be in Charterers' time. Expenses for on/off hire survey to be shared equally between Owners and Charterers.

### Clause 44 Hold Cleaning

On arrival first load port, vessel to be grain clean and ready in every respect and in all compartments to receive Charterers' cargo to local surveyors' and/or competent authorities' satisfaction, failing which vessel to be off-hire from the time of rejection until passed again. Owners to take immediate corrective steps to expedite cleaning as fast as possible including the use of shore labour. If vessel fails inspection, all bunkers consumed after rejection and extra expenses incurred as a direct result to be for Owners' account, until vessel has been passed in all compartments again.

Charterers' option to redeliver the vessel unclean paying USD 5,000.00 in lieu of hold cleaning.

### Clause 45 Bills of Lading

The Owners undertake to instruct the Master to authorise Charterers or Charterers' Agents if required to issue and sign Bill(s) of Lading on Charterers' usual form on Owners' and Master's behalf for cargo as presented in conformity with Mate's receipts. Charterers to keep Owners harmless should Charterers' servants not issue Bills of Lading per Owners'/Master's strict authority.

Should original Bill(s) of Lading not be available prior to vessels' arrival to the discharging port(s) in time, Owners to agree to release entire cargo without production of original Bill(s) of Lading, if so requested by Charterers or their agent(s), against a fax presentation of Letter of Indemnity under Owners' P and I Club wording which to be singly signed by Charterers or signed by sub-Charterers together with Charterers' joint signature.

No liner or through Bills of Lading or Seaway Bill may be issued/used during the currency of present Charter Party.

Charterers are not to issue or cause to be issued Bs/L which are subject to Hamburg rules.

### Clause 46 ISM Clause

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both

11

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Owners shall indemnify Charterers for any and all loss, expense and/or damage and/or consequences sustained by Charterers resulting from partial or full non-compliance with this clause. Any and all delays to the vessel resulting from such partial or full non-compliance with this clause shall not count as laytime or, if laytime has expired, as time on demurrage respectively, as the case may be, as on-hire time.

### Clause 47 Deratisation Certificate
The vessel to have valid deratisation certificate and/or equivalent fumigation certificate on board at time of delivery. The validity of which is to be maintained by Owners in their time and at their expense during the currency of this Charter Party.

### Clause 48 Quarantine/Smuggling
Normal quarantine time and expenses for entering ports shall be for Charterers' account. The Owners shall be liable for any delay in quarantine arising from the Master or any of the deck or engine Officers or crew having communication with the shore at any infected area without the written consent or instructions of Charterers or their Agents, also for any loss of time through detention by customs or other authorities caused by smuggling or their infraction of local law on the part of the Master or any of the deck or engine crew. Any delay, expenses and/or fines incurred on account of smuggling, if caused by the Charterers' supercargo and/or their staff or Agents are to be for Charterers' account. Likewise, if any delay in quarantine arises as a result of Charterers' trading of the vessel and/or misinstructions or lack of proper instructions by Charterers or their Agents, servants or representatives such delay is to be for Charterers' account.

### Clause 49 Health Certificate
The Owners shall arrange at their expense that Master, Officers and crew of vessel hold valid vaccination certificates against yellow fever, smallpox, cholera or other necessary health certificates during the Charter.

### Clause 50 Vessel's Equipment
Vessel's equipment shall comply with the regulations of the countries in which vessel will be employed and Owners are to ensure that vessel is at all times in possession of valid and up-to-date certificates as required. If stevedores, longshoremen or other workmen are not permitted to work due to failure of the Master and/or the Owners and/or Owners' Agents to comply with the aforementioned regulations or because the vessel is not in possession of such valid and up-to-date certificates as required, then Charterers may suspend hire for the time thereby lost and Owners shall pay all proven extra direct expenses incurred incidental to and resulting from such failure.

### Clause 51 Safety Regulation
It is understood that the vessel will comply with all safety regulations and/or requirements in effect at ports of loading and/or discharging. It is agreed that should the vessel not meet safety rules and regulations, Owners will take corrective action and vessel is to be off-hire.

### Clause 52 Canal Certificate

<u>M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007</u>

The vessel is fully fitted for Panama/Suez Canal transit and in possession of valid necessary certificate on board, in conformity with current canal regulations/requirements.

<u>Clause 53 Crew Service</u>
During the currency of this Charter Party and provided weather and local stevedore and port regulations permit, Charterers to have the option to use crew to perform the following services as a means toward an efficient cargo operation:

a)   At each port all of the hatch opening and closing;
b)   Preparing vessel for sea;
c)   Removal and disposal of dunnage to be for Charterers' account;
d)   Gangway watchmen for the vessel to be for Owners' account.
     Compulsory cargo watchmen to be for Charterers' account;
e)   Before and upon arrival at a port, vessel's Officers/crew to shape up vessel's hatches, and gangway in order to commence loading and/or discharging without delay. Opening/closing of all hatchcovers and erecting and dismantling of shifting boards, if necessary, shall be done by Officers/crew provided shore regulations permit.

<u>Clause 54 War Cancellation</u>
If war breaks out between any two or more of the following countries: United Kingdom, U.S.A., C.I.S., P.R.C., Japan, directly affecting the performance of this Charter, both Owners and Charterers shall have the option of cancelling this Charter whereupon Charterers shall redeliver vessel to Owners, if she has cargo on board after discharge thereof at destination, or, if debarred from reaching or entering it, at a near, open and safe port as directed by Charterers, or if she has no cargo on board, at a port at which she stays or if at sea at a near and safe port as directed by Charterers. In all cases, hire shall be paid until vessel's redelivery.

<u>Clause 55 Requisition</u>
Should the vessel be requisitioned by any government or governmental authority due to Owners/Managers/vessel's fault, or due to vessel's flag or Ownership during the period of this Charter, she shall be off-hire during the period of such requisition and any hire or other compensation paid by any government or governmental authority in respect of such requisition shall be for Owners' account.

<u>Clause 56 Extra Period</u>
Should the vessel be placed off-hire during the currency of this Charter for any reason whatsoever, the Charterers have the option of adding all or any part of such off-hire period to the original period.

<u>Clause 57 Cancellation Clause</u>
If the vessel is placed off-hire more than 30 consecutive days, Charterers have the right to cancel the balance period of this Charter by giving notice to Owners without prejudice to any other right the Charterers may have under this Charter and provided vessel is free of cargo.

<u>Clause 58 Capture/Seizure/Arrest</u>
Should the vessel be seized or detained or arrested or delayed by any authority during the currency of this Charter Party, the Charterers' liability for seizure or detention or arrest or delay is ceased immediately from the time of her seizure or detention or arrest or delay and all time lost by this reason shall be treated as off-hire until the time of her release unless such seizure or detention or arrest or delay is occasioned by any personal act or omission or default of Charterers or their Agents. Extra

13

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

expenses incurred directly from above seizure or detention or arrest or delay to be for Owners' account.

**Clause 59 Cargo Claim**

Cargo Claims To Be Settled As Per NYPE Interclub Agreement 1996

**Clause 60 Small Claims Procedure Clause**

Notwithstanding anything contained in the Arbitration Clause to the contrary, should neither the claims nor the counterclaims exceed USD 100,000.00 exclusive of interest on the sum claimed, costs of the arbitration and legal expenses, if any, it is hereby agreed the dispute is to be governed by the London Maritime Arbitrators' Association Small Claim Procedure, revised 1st January, 1994.

**Clause 61 Deviation/Put Back**

Should the vessel put back whilst on voyage by reason of an accident or breakdown or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness or accident to the crew or any person on board the vessel or by reason of the refusal of the Master or crew to perform duties, the hire shall be suspended from the time of inefficiency, unless caused by Charterers and/or Charterers' servants until the vessel is again efficient in the same position (or in Charterers' option at a point equidistant to the vessel's next destination) and voyage resumed therefrom. All direct expenses incurred including bunkers consumption during the period of suspended hire shall be for Owners' account.

**Clause 62 Water Pollution**

A.    For Bulk Carriers:

(1)    Owners warrant that throughout the currency of this Charter they will provide the vessel with the following certificates:

      (a)    Certificates issued pursuant to Section 311 (p) of the U.S. Federal Water Pollution Control Act, as amended (Title 33 U.S Code, Section 1321(p)) up to (insert the date upon which such certificate(s) is/are due to expire).

      (b)    Certificates issued pursuant to Section 1016(a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended in accordance with Part 138 of Coast Guard Regulations 33 CFR, from (indicate the earliest date upon which the Owners may be required to deliver the vessel into the Charter or, if later, the date inserted in sub-paragraph (a) above), so long as these can be obtained by the Owners from or by (identify the applicable scheme or schemes).

(2)    Notwithstanding anything whether printed or typed herein to the contrary:

      (a)    Save as required for compliance with paragraph (1) hereof, Owners shall not be required or establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter.

14

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

(b) Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(c) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any Bills of Lading issued pursuant to this Charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or water, other than to the extent provided in paragraph (1) hereof.

## Clause 63 Owners' Agents

Charterers may agree to have their Agents attend to the Owners' matters such as delivery, redelivery, general average, drydocking, repair, hospitalisation, repatriation of crew, supply of the vessel's stores and provisions, etc., with Owners paying Charterers' Agents actual expenses including attendance fee and agency fee according to the Charterers' tariff rate. Charterers may also agree to have their Agents to attend to trivial Owners' matters, such as, cash advance, crew mail, arranging shore pass with Owners paying actual expenses including attendance fee, if any, but without agency fee. (See Clause 36).

## Clause 64 Taxes

Export and/or import permits for Charterers' cargo to be at Charterers' risk and expense. Taxation or levies on cargo or freight to be for Charterers' account and to be paid by Charterers.

## Clause 65 Paramount Clause

General Paramount Clause to apply

## Clause 66 Additional Clause

New Jason Clause, P and I Bunkering Clause, New Both-to-Blame Collision Clause and Baltime War Risk Clause, as attached, to be incorporated in this Charter Party and all Bill(s) of Lading issued hereunder.

## Clause 67 Drydock Clause

The Owners have no option to make her drydock during this Charter period except emergency cases, or unless otherwise agreed.

## Clause 68 - Deleted

## Clause 69 Bulk Carrier Safety Clause

(A) The Charterers shall instruct the terminal operators or their representatives to cooperate with the Master in completing the IMO Ship/Shore Safety Checklist and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

(B) In addition to the above and notwithstanding any provision in this Charter Party in respect of

15

<u>M/V "PAGANE" - GLENGROW - C/P DATED 17th OCTOBER 2007</u>

loading/discharging rates, the Charterers shall instruct the terminal operators to load/discharge the vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the vessel's draught, trim, stability, stress or any other factor which may affect the safety of the vessel.

(C)     At any time during cargo operations, the Master may, if he deems it necessary for reasons of safety of the vessel, instruct the terminal operators or their representatives to slow down or stop the loading or discharging.

(D)     Compliance with the provisions of this Clause shall not affect the counting of hire.

**Clause 70 Stowaway Clause**
Any time lost including but not limited to time on demurrage and any losses, liabilities and cost incurred by reason of stowaways on board shall be for Owners' account.

**Clause 71 Ocean Route Clause**
Evidence of weather conditions to be taken from independent weather bureau reports. Owners to be represented by the findings of 'Aerospace' Ocean Routing Company. In case of dispute between Owners and Charterers' ocean routing companies, the matter to be taken into further arbitration. In any case, Master always entitled to choose vessel's routing related to vessel and crew safety.

Owners' ocean routing company full style/address as follows:

Aerospace & Marine International Corporation,
6920 Santa Teresa Boulevard, Suite 209,
San Jose, CA 95119, U.S.A.
Tel:        408-360-0440
Fax:       408-360-0450
Tlx:        149158
Email:    ops@weather3000.com
Web-port:   www.amiwx.com

**Clause 72 Mobile Crane Clause**
Deleted.

**Clause 73 Split Bills of Lading Clause**
Charterers and/or Agents are hereby authorised by Owners/Master to split Bills of Lading and issue ship delivery orders in negotiable and transferable forms against collection of full set of original Bills of Lading. Delivery orders to conform with all terms and conditions and exceptions of Bills of Lading and shall not prejudice shipowners' rights.

**Clause 74 Oil Pollution**
As a condition of this Charter Party, Owners guarantee that Owners and vessel are and will remain throughout the currency of the Charter Party insured for pollution liability with respect to trading within, to and from ranges and areas specified in this Charter, said insurance to have a limit of not less than U.S.$1 billion. At any time before or subsequent to the fixture date of this Charter, Owners, upon reasonable notice from Charterers, shall furnish to Charterers or its representative proof, satisfactory to Charterers, of such insurance. Without prejudice to Charterers' other rights, Owners shall indemnify Charterers for any and all loss, expense and/or damage sustained by Charterers resulting

16

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

from non-compliance with this Clause. Any and all delay to the vessel resulting from such non-compliance shall not count as laytime or, if laytime has expired, as time on demurrage.

**Clause 75**
Vessel's crew contracts are bona fide employment agreement.

**Clause 76**
The vessel to remain always in seaworthy trim/condition to safely sail between ports/berths to Master's satisfaction.

**Clause 77**
Deleted.

**Clause 78 ISPS Clause**
(a)  (i)  From the date of coming into force of the International Code for the security of ships and of port facilities and the relevant amendments to chapter XI of SOLAS (ISPS code) in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the vessel and "the company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The owners shall provide the Charterers with the full style contact details of the company security officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this clause shall be for the Owners' account.

(b)  (i)  The Charterers shall provide the CSO and the ship security officer (SSO)/master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-Charter Parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this clause shall be for the Charterers' account.

(c)  Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result

17

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

solely from the owners' negligence, crew's nationality/visa issues, or costs or expenses directly arising from vessel's ownership or other crewing matters.

(d) If either party makes a payment which is for the other party's account according to this clause, the other party shall indemnify the paying party.

**Clause 79**
All negotiations/trade are to be made in accordance with English Law. English Law to apply. Arbitration, if any, to be in London in accordance with the Arbitration Clause of the Charter Party.

**Clause 80**
Charterers have the option to perform a general condition survey of the vessel at any time. Survey to be at Charterers' time and expenses.

**Clause 81**
Owners to provide following certificates as per L/C requirements (see attached):

1.  Certificate issued and signed by (P and I) Club or their representative or by their agent to the effect that the carrying vessel is a member to that (p and i) club having representative or agent in Jordan.

2.  Certificate issued and signed by shipping register or their agent certifying that the carrying vessel is classified 100a1 or its equivalent and free from any outstanding recommendations.

**Clause 82**

Negotiations and fixture, if any, to be kept private & confidential by all parties involved.

18

M/V "PAGANE" - GLINCROW - C/P DATED 17th OCTOBER 2007

## BOTH-TO-BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:

### New Both-to-Blame Collision Clause

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact"
and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

### GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

### New Jason Clause

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.
If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery"

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

<u>M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007</u>

### BALTIME 1939 WAR CLAUSE

(A)  The vessel unless the consent of the Owners be first obtained not to be ordered nor continue to any place or on any voyage nor be used on any service which will bring her within a zone which is dangerous as the result of any actual or threatened act of war, war hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or state whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of Sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any Government or Ruler.

(B)  Should the vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (1) the Owners to be entitled from time to time to insure their interests in the vessel and/or hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand; and (2) notwithstanding the terms of Clause 11, hire to be paid for all time lost including any loss owing to loss of or injury to the Master, Officers or crew or to the action of the crew in refusing to proceed in such zone or to be exposed to such risks.

(C)  In the event of the wages of the Master, Officers and crew or the cost of provisions and/or stores for deck and/or engine room and/or insurance premiums being increased by reason of or during the existence of any of the matters mentioned in section (A) the amount of any increase to be added to the hire and paid by the Charterers on production of the Owners' account therefore, such account being rendered monthly.

(D)  The vessel to have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other wise whatsoever given by the Government of the nation under whose flag the vessel sails or any other Government or any person (or body) acting or purporting to act with the authority of such Government or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such orders or directions.

(E)  In the event of the nation under whose flag the vessel sails becoming involved in war, hostilities, warlike operations, revolution or civil commotion, both the Owners and the Charterers may cancel the Charter and, unless otherwise agreed, the vessel to be redelivered to the Owners at the port of destination or, if prevented through the provisions of Section (A) from reaching or entering it, then at a near open and safe port at the Owners' option, after discharge of any cargo on board.

(F)  If in compliance with the provisions of this clause anything is done or is not done, such not to be deemed a deviation.

Section (C) is optional and should be considered deleted unless agreed according to Baltime 1939.

20

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

### P. AND I. BUNKER CLAUSE

The vessel shall have liberty as part of the Contract Voyage to proceed to any port or ports at which bunker oil is available for the purpose of bunkering at any stage of the voyage whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the ports of loading or discharge named in this Charter and may there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks and deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

### BIMCO STANDARD ISM CLAUSE

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirements of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by the failure on the part of the Owners or 'the Company' to comply with the ISM Code shall be for Owners' account.

### SECA CLAUSE

During the currency of this contract the performing vessel will consume bunkers in accordance with ISO 8217 specifications. In the event that emissions regulations, laws or guidelines require or recommend the stemming or consumption of bunkers with a quality that has a higher value than the price for high sulphur fuel oil, then such excess price will be paid for by Charterers for bunkers consumed whilst in an emission controlled area. Upon request Owners to provide documentary proof for such price differential together with the actual bunker consumption in these emission controlled areas.

### BUNKER FUEL SULPHUR CONTENT CLAUSE FOR TIME CHARTER PARTIES 2005

(A) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the vessel is ordered to trade within that zone. The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with regulations 14 and 18 of Marpol Annex VI, including the guidelines in respect of sampling and the provision of bunker delivery notes.

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this sub-Clause (A).

(B)  Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with sub-Clause (A), the Owners warrant that:

   (i)  The vessel shall comply with regulations 14 and 18 of Marpol Annex VI and with the requirements of any emission control zone; and

   (ii)  The vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the vessel with fuels in accordance with sub-Clause (A), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the vessel's failure to comply with regulations 14 and 18 of Marpol Annex VI.

(C)  For the purpose of this Clause, 'emission control zone' shall mean zones as stipulated in Marpol Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the E.U. and the U.S. Environmental Protection Agency.

22

# EXHIBIT 2

From: 35725586898        Page: 1/1    Date: 11/29/2007 15:25:30 PM

## Provisional Hire statement MV PAGANE
### cp dd 17.10.2007/GLINGROW HOLDING LTD.
### Voyage PAG/2007/03/TC

|  |  |  |  |  | US$ Debit |
|---|---|---|---|---|---|
| **Hire from:** |  |  |  |  |  |
| 18.10.2007 01:00 GMT DOP KERCH |  |  |  |  |  |
| 01.12.2007 19:00 GMT |  |  |  |  |  |
| 44,708333 | days | @ | 60 000,00 |  | 2 682 500,00 |
| Bunkers on delivery: |  |  |  |  |  |
| 365,257 | IFO mts | @ | 435,00 |  | 158 886,80 |
| 46,646 | MDO mts | @ | 745,00 |  | 34 751,27 |
|  |  |  |  |  | 6 000,00 |
| ILOHC |  |  |  | m/v | 1 541,97 |
| C / V / E | 37,00000 | @ | 1 250,00 | subtotal debit | 2 882 679,73 |

|  |  |  |  |  | **Credit** |
|---|---|---|---|---|---|
| **less:** |  |  |  |  |  |
| commission | 3,75 % |  |  |  | 100 593,76 |
|  |  |  |  |  |  |
| **Owners expenses:** |  |  |  |  |  |
| on-hire survey | 50% |  |  |  | 400,00 |
| off-hire survey | 50% |  |  |  | 750,00 |
|  |  |  |  |  |  |
| **Off-hire:** |  |  |  |  |  |
| at Iport Novo | 6,701389 | days |  |  | 387 005,21 |
| bunker consumed |  |  |  |  | 11 970,66 |
| at Suez Canal | 1,587539 | days |  |  | 87 066,15 |
| bunker consumed |  |  |  |  | 2 807,98 |
|  |  |  |  |  |  |
| **Bunkers on re-delivery:** |  |  |  |  |  |
| 365,257 | IFO mts | @ | 435,00 |  | 158 886,80 |
| 15,000 | MDO mts | @ | 745,00 |  | 11 175,00 |
|  |  |  |  |  |  |
| **Payments:** |  |  |  |  |  |
| 1. |  |  |  |  | 1 061 013,80 |
| 2. |  |  |  |  | 440 966,18 |
| 3. |  |  |  |  | 26 184,84 |
|  |  |  | subtotal | credit | 2 287 830,77 |

grand total in favour OWNERS     debit    594 848,97

payment to be arranged to:

| BENEFICIARY | BULCOM LTD. |
|---|---|
| ACC. No: | 726731ZG |
| WITH: | BNP PARIBAS (SUISSE) S.A. |
|  | PLACE DE HOLLANDE, 2 |
|  | CH-1211, GENEVA 11 |
|  | SWITZERLAND |
| SWIFT: | BPPBCHGG |
| IBAN: | CH69 0868 6001 0726 7300 2 |

# EXHIBIT 3

**From:** Marianne Brookes
**Sent:** 29 November 2007 11:50
**To:** arbitration@christophermoss.com
**Subject:** M/V Pagane C/P DD.17.10.2007

Dear Sir,

We act for Butcom Ltd, the disponent owners of the above vessel.

Under a time charter on the NYPE form (copy attached), disponent owners chartered their vessel to Glingrow Holding Ltd for 1 time charter trip for the carriage of grain from the Black Sea to Aqaba.

Under Clause 17 of the charterparty, any disputes between owners and charterers shall be referred to three persons in London and be determined in accordance with English Law.

Disputes have arisen between the parties. You are hereby appointed as owners' arbitrator. Kindly confirm acceptance of your appointment.

Best regards,

Brookes & Co.

Brookes & Co., Solicitors, 60 Lombard Street, London, EC3V 9EA, United Kingdom.
Tel: +44 (0)20 3159 4330  Fax: +44 (0)20 7691 7773.  General office email address: mail@brookes-and-co.co.uk
Principal: Marianne Brookes
Brookes & Co. is regulated by the Solicitors Regulation Authority
Confidentiality Note
The contents of this email and any attachments are strictly confidential and must not be copied to, used by or disclosed to any person other than the named recipient(s). Please let us know immediately by telephoning +44 (0)20 3159 4330 if this email has been sent to you in error.

# EXHIBIT B

Dec. 19. 2007  4:26PM   Lennon, Murphy & Lennon LLC          No. 2811   P. 3

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12. 21. 07
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------X

BULCOM LTD.,                                   :        07 CV 10726

                              Plaintiff,       :        ECF CASE

        - against -                            :        CONSENT ORDER

GLINGROW HOLDING LTD. and                      :
RIAS TRADING,                                  :

                              Defendants.      :
--------------------------------------------------X

        It is hereby stipulated and agreed between the parties, by their undersigned attorneys, that

the funds that are currently under attachment in this action are to be released.  The garnishee

bank(s) are hereby instructed to release the attached funds pursuant to joint instructions to be

provided by letter and signed by the undersigned counsel.  The payment of the released funds by

the garnishee bank(s) shall not be subject to any further attachment in New York after those

funds are released by the garnishee bank(s).

The Plaintiff                                  The Defendants
BULCOM LTD.                                    GLINGROW HOLDING LTD. and
                                               RIAS TRADING

By: _____                    By: _____
    Kevin J. Lennon                                Thomas L. Tisdale
LENNON, MURPHY & LENNON LLC                     TISDALE LAW OFFICES, LLC
420 Lexington Avenue, Suite 300                 11 West 42nd Street, Suite 900
New York, NY 10170                              New York, NY 10036
(212) 490-6050                                  (212) 354-0025 – phone
(212) 490-6070                                  (212) 869-0067 – fax
klennon@lenmur.com                              ttisdale@tisdale-law.com

SO ORDERED:              12/20/07

_____
Honorable Peter K. Leisure, U.S.D.J.

EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

PAGANE MARITIME LTD.,

                              Plaintiff,

    - against -

GLINGROW HOLDING LTD. and
RIAS TRADING,

                              Defendants.

------------------------------------------------------------X



## AMENDED VERIFIED COMPLAINT

Plaintiff, PAGANE MARITIME LTD[1], ("Plaintiff"), by and through its attorneys,

Lennon, Murphy & Lennon, LLC, as and for its Amended Verified Complaint against the

Defendants, GLINGROW HOLDING LTD. ("Glingrow") and RIAS TRADING ("Rias")

(collectively "Defendants") alleges, upon information and belief, as follows:

    1.       This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333.  This claim involves the

breach of maritime contract of charter.  This matter also arises under the Court's federal question

jurisdiction within the meaning of 28 United States § 1331 and the New York Convention on the

Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201 et seq.) and/or the

Federal Arbitration Act (9 U.S.C. § 1 et seq.).

---

[1] This action was originally filed in the name of Bulcom Ltd.  However, the charter party discussed in the Complaint was erroneously drawn by the broker reflecting Bulcom Ltd. instead of Pagane Maritime Ltd.  Plaintiff is substituting the correct party in interest pursuant to Fed. R. Civ. P. 17(a) and this action shall be deemed to have been commenced in the name of Pagane Maritime Ltd as the real party in interest.

2.    At all times material to this action, Plaintiff was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law and was at all material times the disponent owner[2] of the motor vessel "PAGANE" (hereinafter the "Vessel").

3.    Upon information and belief, Defendant Glingrow was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of the laws of Cyprus Belarus with a place of business at 15, Boumpoulinas, Povek Building, Apt. No. 301, Nicosia, Cyprus and was at all material times the Charterer of the Vessel.

4.    Upon information and belief, Defendant Rias was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law and was at all material times the alias, partner, joint venturer and/or paying, or receiving, agent of the Defendant Glingrow.

5.    By a charter party dated October 17, 2007 Plaintiff time chartered the Vessel to Defendant Glingrow for one time chartered trip (duration about 30 days) via the Black Sea for the carriage of any lawful bulk grain cargo to Aqaba, Jordan.  A copy of the charter party is attached hereto as Exhibit 1.[3]

6.    Plaintiff delivered the Vessel into the service of the Defendant Glingrow at Kertch, Ukraine and has at all times fully performed its duties and obligations under the charter party.

7.    A dispute has arisen between the parties regarding Defendant Glingrow's failure to pay the hire for its use of the vessel which is due and owing to Plaintiff under the charter party contract.  Clause 4 of the charter party requires Defendant Glingrow to pay for the use and hire

---

[2] A 'disponent owner' controls the commercial operations of a vessel having taken the vessel on charter from the registered owner of the vessel. The disponent owner usually time charters the vessel from the registered owner and then sub-charters the vessel to charterers.
[3] Please note that the annexed charter party incorrectly identifies Bulcom Ltd. as the disponent vessel owner.

of the Vessel at the rate of $60,000 per day, pro rata, including overtime, payable in advance every 15 days.

8.     In breach of its obligation to pay hire the Defendant Glingrow failed to remit payment to the Plaintiff on or about November 21, 2007 when a 15 day advance hire payment of became due and owing to the Plaintiff.

9.     Defendant Glingrow did remit a partial payment of the outstanding hire due to the Plaintiff but there remains a balance unpaid of $498,754.67. A copy of the Plaintiff's revised provisional hire statement is attached hereto as Exhibit 2.

10.     As a result of Defendant Glingrow's breaches of the charter party due as aforesaid, Plaintiff has sustained damages in the total principal amount of $498,754.67, exclusive of interest, arbitration costs and attorneys fees.

11.     Pursuant to the charter party, disputes between the parties are to be submitted to arbitration in London subject to English law. Plaintiff has commenced London arbitration against Defendant by appointment of its arbitrator Mr. Christopher Moss. A copy of Plaintiff's arbitration appointment is attached hereto as Exhibit 3.

12.     This action is brought in order to obtain jurisdiction over Defendants and also to obtain security for Plaintiff's claims and in aid of arbitration proceedings.

13.     Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law. Section 63 of the English Arbitration Act of 1996 specifically allows for recovery of these items as part of an award in favor of the prevailing party. As best as can now be estimated, Plaintiff expects to recover the following amounts at arbitration as the prevailing party:

|   |   |   |   |
|---|---|---|---|
| A. | Unpaid hire: | | $498,754.67; |
| B. | Estimated interest on claims - 3 years at 6.0% compounded quarterly: | | $89,775.84; |

| | | |
|---|---|---|
| C. | Estimated arbitration costs: | $30,000; and |
| D. | Estimated attorneys' fees and expenses: | $70,000.00. |
| **Total:** | | **$688,530.51.** |

14.    The Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendants have, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendants.

15.    Upon information and belief, Defendant Rias acts as paying agent, and/or receiving agent, or arranges for other non-parties to satisfy the debts and obligations of Defendant Glingrow, and/or receive payments being made to Defendant Glingrow.

16.    Although Rias was not named in the charter party, and had no formal relationship to the charter of the M/V "PAGANE" it paid initial hire owing to Plaintiff from Glingrow.

17.    It is not common practice in the maritime industry, nor any other business, for an independent company to pay another company's debt, where it has no formal relationship to the underlying contract.

18.    The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the Defendants held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendants and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A.      That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Amended Complaint failing which default judgment be entered against it;

B.      That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of $688,530.51 belonging to, due or being transferred to, from, or for the benefit of the Defendants, including but not limited to such property as may be held, received or transferred in Defendants' name(s) or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Amended Complaint;

C.      That the Court retain jurisdiction to compel the Defendants to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

D.      That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

E.      That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court;

F.     That this Court award Plaintiff the attorneys' fees and costs incurred in this

action; and

G.     That the Plaintiff has such other, further and different relief as the Court

may deem just and proper.

Dated:     New York, NY
           December 20, 2007

                          The Plaintiff,
                          PAGANE MARITIME LTD.

                   By: _____
                          Charles E. Murphy
                          Kevin J. Lennon
                          LENNON, MURPHY & LENNON, LLC
                          420 Lexington Avenue, Suite 300
                          New York, NY 10170
                          (212) 490-6050 - phone
                          (212) 490-6070 - facsimile
                          cem@lenmur.com
                          kjl@lenmur.com

## ATTORNEY'S VERIFICATION

State of New York    )
                     )    ss.:    City of New York
County of New York   )

1.    My name is Charles E. Murphy.

2.    I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3.    I am a partner in the firm of Lennon, Murphy & Lennon, LLC attorneys for the Plaintiff.

4.    I have read the foregoing Amended Verified Complaint and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5.    The reason why this Verification is being made by the deponent and not by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now within this District.

6.    The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Plaintiff and agents and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated:    New York, NY
          December 20, 2007

                                          _____
                                                Charles E. Murphy

7

# EXHIBIT 1

# TIME CHARTER

GOVERNMENT FORM
Approved by the New York Produce Exchange
November 6th, 1913, Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946.

1.   **This Charter Party**, made and concluded in *Novorossiysk* ...................................................... *17th* day of *October 2007* ......19......
2.   Between ...*Messrs Bulcom Ltd.*............................ as disponent.
3.   Owners of the good ............. Panama Flag......*Steamship/Motorship "Pagani". Description as per Clause 29* of........................................
4.   of............... tons gross register ~~and~~ .................tons net register, having engines of.......................................indicated horse power
5.   ~~and with hull, machinery and equipment in a thoroughly efficient state, and classed~~ ...............................
6.   at...............of about...........................cubic feet bale capacity, and about..............................tons of 2240 lbs.
7.   ~~deadweight capacity (cargo and bunkers, including fresh water and store not exceeding one and one-half percent of ship's deadweight capacity,~~
8.   ~~allowing a minimum of fifty tons) on a draft of~~ ..............feet...........inches on ..................................................
9.   ~~which are of its capacity of about~~ ................................................Summer freeboard, inclusive of permanent bunkers.
10.  ~~conditions about~~ ...............knots on a consumption of about ...........tons of best, and capable of steaming, fully laden, under good weather
11.  ~~now~~ ......*trading*..........................................................................of best Welsh coal best grade fuel oil best grade Diesel oil,
12.  .................................

13.  .................................and ... *Messrs GLINGROW HOLDING LTD.*.....................Charterers of the City of ... *Nicosia, Cyprus*.......

14.  **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
15.  about *1 time Charter trip via safe ports, safe berths, safe anchorages always afloat, always within IWL, via Black sea with bulk lawful grain to Aqaba, Jordan. Duration about 30 days.*
16.  within below mentioned trading limits.
17.  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
18.  the fulfillment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations hereunder.*
19.  Vessel to be placed at the disposal of the Charterers, at *on dropping outward pilot Kertch at any time day or night Sundays and Holidays included.*

20.  in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No.6), as
21.  the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No.5. Vessel on her delivery to be
22.  ready to receive cargo with clean-swept holds and tight, staunch, strong and every way fitted for the service, having water ballast, *(See Clause 42)* winches
23.  and

23.  ~~denkey boiler with sufficient steam power, or if not equipped with donkey boiler, then either power sufficient to run all the winches at one and the same~~
24.  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25.  ~~dise, including petroleum or its products, in proper containers,~~ excluding *(See Clause 32),*
26.  ~~(vessel not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~
27.  ~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North~~
28.  ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~
29.  ~~Mexico, and/or South America,~~                                                                 ~~and/or Europe~~
30.  ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~

31. October 31st and May 15th. Hudson Bay and all unsafe ports, also excluding, when out of season, White Sea, Black Sea and the Baltic.
32.
33. (See Clause 31)
34.
35. as the Charterers or their Agents shall direct, on the following conditions:
36.     1. That whilst on hire the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the
37. insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler and domestic water, lubricating oil, vessel's
       garbage removal unless compulsory and maintain her class and keep
38. the vessel in a thoroughly efficient state in hull, holds and hatchcovers, machinery and equipment with all certificates necessary to comply with current
       requirements at all ports of call and canals for and during the service. (See Clause 48 and 49).
39.     2. That, whilst on hire, the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, compulsory and customary
       Pilotages, Turkish strait pilotage , Agencies, boatage on Charterers business for clearance and cargo purpose only, Commissions, canal dues and
       tolls,
40. Consular Charges (except those pertaining to the Crew and flag), and all other usual expenses except those before stated, but when the vessel puts into
41. a port for causes for which Owners are vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42. illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43. charter to be for Charterers account including loading expenses should port authorities order crew ashore for safety reasons. All other fumigations to be
       for charterers account after vessel has been on charter for a continuous period
44. of six months or more.
45. Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, as permitted under
       this Charterparty, but
46. Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47. for dunnage, they making good any damage thereto.
48.     3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on
       board the vessel at the current price in the respective ports, the vessel to be delivered with not less than................tons and not more than
49.
50. ................tons and to be re-delivered with not less than................tons and not more than................tons. (See Clause 30),
51.     4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of US$ 60000.00 per day pro rata including overtime payable in
       advance every 15 days. First payment within 3 banking days upon delivery.
52. ..................................................United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and
53. stores, on................summer freeboard, per Calendar Month, commencing on and from this hour day of her delivery, as aforesaid, and at
54. and after the same rate for any part of a day month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55. wear and tear excepted, to the Owners (unless lost) at on dropping last outward sea pilot Aqaba, any time day or night, Sundays and Holidays
56. included..................................unless otherwise mutually agreed. Charterers are to give Owners not less than.........................days
57. notice of vessel's expected date of re-delivery, and probable port. (See Clause 33)
58.     5. Payment of said hire to be made as per clause 35 in New York in cash by transfer in United States Currency, every 15 days semi-monthly in
59. advance, and for the last 15 days half-month of
       part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60. due, if so required by Owners, unless bank guarantee or deposit is made by Charterers, otherwise failing the punctual and regular payment of the
61. hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62. terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day
63. following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they
64. to have the privilege of using vessel at once, such time used to count as hire.

65.  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66.  to 2 1/2% commission and such advance shall be deducted from the hire. The Charterer, however, shall in no way be responsible for the application
67.  of such advances.
68.
69.  6. That the cargo or cargoes be laden and/or discharged in any safe dock or at any wharf or place that Charterers or their Agents may
     direct, provided the vessel can safely lie always afloat at any time of tide, except at such places In East Coast South America where it is customary for similar
70.  size vessels to safely
71.  lie aground.

     7. That the whole reach of the Vessel's Hold, Decks and usual places of loading (not more than she can reasonably stow and carry), compatible with
     vessel's seaworthiness, also
72.  accommodations for Supercargo, if carried, shall be at Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73.  tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodation allow, Charterers
74.  paying Owners................... per day per passenger for accommodation and meals. However, it is agreed that in case any fines or extra expenses are
75.  incurred in the consequence of the carriage of passengers. Charterers are to bear such risk and expense. No passengers.
76.
77.  8. That the Captain (although appointed by the Owners), shall prosecute his voyage with the utmost dispatch, and shall render all customary assistance with ship's crew and
     boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78.  agency; and Charterers are to load, stow, and trim, lash, secure and discharge the cargo at their risk and expense under the supervision of the Captain, all
     cargo claims to be settled in accordance with NYPE Interclub Agreement as amended in September 1996 (See Clauses 59/60). who is to sign
     Bills of Lading for
79.  cargo as presented, in conformity with Mate's or Tally Clerk's receipts.
80.  9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81.  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
82.  10. That the Charterers shall have the permission to appoint a Supercargo, who shall accompany the vessel against signing Owners' P and I Club
     boarding LOI and see that voyage is prosecuted
83.  with the utmost dispatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84.  rate of USD 10.00 (Ten Dollars) $1.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their agents, to
     victual Tally
85.  Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling. (See Clause 37)
86.  11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and / or
     telecommunication with copy to Owners, and the
87.  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88.  terers, their Agents or Supercargo, when required, with a true copy of daily Logs, abstracts in English, showing the course of the vessel and distance run and
     the con-
89.  sumption of fuel.
90.  12. That the Captain shall use diligence in caring for the ventilation of the cargo. Vessel has natural ventilation.
91.  13. That the Charterers shall have the option of continuing this charter for a further period of .............................
92.
93.  on giving written notice thereof to the Owners or their Agents........................ days previous to the expiration of the first named term or any declared option.
94.  14. That if required by Charterers, time not to commence before 00:01 hours Local Time 18th October 2007.
95.  not have given written notice of readiness been delivered on or before 23:59 hours Local Time 18th October 2007... but not later than 4 p.m. Charterers or
96.  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
97.  15. That In the event of the loss of time from deficiency and/or default of men or including strike of Officers and / or crew or deficiency of stores,
     fire, breakdown or damages to hull, machinery or equipment,

98. grounding, detection by average accidents to ship or cargo, *unless resulting from inherent vice, quality or defect to the cargo*, drydocking for the purpose
of examination or painting bottom, or by any other cause

99. preventing the full working of the vessel *unless same is caused by Charterers or by following their instructions*, the payment of hire shall cease for the
time thereby lost; and if upon the voyage the speed be reduced by

100. defect or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101. thereof, and all extra *directly related expenses* shall be deducted from the hire *duly substantiated*.

102. 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103. returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104. Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105. The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106. purpose of saving life and property.

107. 17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at ~~London~~ **New York**,

108. one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for

109. the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial *shipping men*. *(See Clause 60.)*

110. *General Average / Arbitration in London. This Charter Party shall be governed by and construed in accordance with English Law.*

111. 18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-

112. age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

113. deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

114. might have priority over the title and interest of the owners in the vessel.

115. 19. That all derelicts and salvage shall be for Owners' account and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

116. Crew's proportion. General Average shall be adjusted, stated and settled, according to ~~Rules 1 to 15 inclusive, 17 to 22, inclusive and Rule F of~~

117. ~~York-Antwerp Rules 1974 as amended 1994 at London (See Clause 66)~~ 1994, at such port or place in the United States as may be selected by the carrier,

118. ~~Rules, according to the law and usage at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~

119. ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~

120. ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~

121. ~~bond and such additional security as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~

122. ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~

123. ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~

124. ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in the special account at the~~

125. ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~

126. ~~United States money.~~

127. ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~

128. ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~

129. ~~goods, the shippers and the consignees, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~

130. ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~

131. ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~

132. ~~ships belonged to strangers.~~

133. Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder, *(See Clause 65)*

134. 20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity~~, *and shall be for*

135. *Owners' account.* the ~~cost of replacing same, to be allowed by Owners.~~

135. 21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a

136. ~~convenient place, bottom cleaned and painted whenever Charterers and the Captain think necessary, at least once in every six months, reckoning from~~
137. ~~time-e-last painting, and payment of the hire is to be suspended until she is again in proper state for the service.~~
138. ~~(See Clause 70)~~
139.
140. ~~22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~
141. ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
142. ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel *lights as on board* lanterns and oil
for

143. night work, *free of expense to Charterers*, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at

144. Charterers' expense. The ~~Charterers to have the use of any gear on board the vessel.~~
145. ~~Charterers to have the use of any gear on board the vessel.~~
146. ~~23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;~~
147. ~~steamer to provide one winchman per hatch to work winches day and night, as required. Charterers agreeing to pay officers, engineers, winchmen,~~
148. ~~deck hands and donkeyman for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
149. ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
150. ~~insufficient power to operate winches, Owners to pay for shore engine, in lieu thereof if required, and pay any loss of time occasioned~~
151. thereby.
152. ~~24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
153. ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels;~~
154. ~~etc.", in respect of all cargo shipped under this Charter to or from the United States of America. It is further subject to the following clauses, both~~
155. ~~of which are to be included in all bills of lading issued hereunder.~~
156. U.S.A., Clause Paramount
157. This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
158. 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
159. any of its rights or immunities or an increase of any of its responsibilities or liabilities under the said Act. If any term of this bill of lading
160. be repugnant to said Act to any extent, such term shall be void to that extent, but no further.
161. ~~Both-to-Blame Collision Clause~~
162. ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
163. ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
164. ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
165. ~~or liability represents loss of or damage to or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
166. ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
167. ~~owners as part of their claim against the carrying ship or carrier.~~
168. 25. The vessel shall not be required to enter any ice-bound port or any port where lights or light-ships have been or are about to be with-
169. drawn by reason of ice, or where there is risk that in ordinary course of things the vessel will not be able on account of ice to safely enter the
170. port or to get out after having completed loading or discharging. *Ice free ports / trading. Vessel not to force ice or follow ice-breakers.*
171. 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners to remain responsible for the
navigation of the vessel, *acts of pilots and tugboats except of strikes not against the Owners*, insurance, crew, and all other matters, *except for time*
*Charterers' responsibility as agreed in this Charter and Rider*, same as when trading for their own account.

172. 27. A commission of *1.25 2.5* per cent. is payable by the Vessel and Owners to ......*DIAMANT / ODESSA*
173.
174. on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175

28. An address commission of 2 ¾ per cent is payable to .....Charterers................... on the hire earned and paid under this Charter.

*Additional Clause 29 to 82 as attached are to be fully incorporated in this Charter Party.*

*THE CHARTERERS*

*THE OWNERS*

This Charter Party is a computer generated copy of the NYPE(Reversed 3rd October, 1946) form printed under licence from the Association Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

**Clause 29  Vessels description**
M/V PAGANE - GEARLESS SD BC
PANAMA FLG-BLT 1982
54158 MTS DWAT ON 12.35 M SSW
GRT/NRT - 32976/20521
LOA/BEAM - 220/32.20M
DEPTH MOULDED 17 M
GRAIN IN MAIN HOLDS - 2443031.66 CFT (HA CMNGS INCLDD)
7 HOLDS/10 HATCHES
HATCH SIZES - ALL 11.60 BY 15.40M
HOLDS SIZE:
-HOLD #1 - 17.50m X 32m (AFT PART)
-HOLD #2 - 29.70m X 32m
-HOLD #3 - 18.00m X 32m
-HOLD #4 - 27.90m X 32m
-HOLD #5 - 18.00m X 32m
-HOLD #6 - 30.60m X 32m
-HOLD #7 - 15.30m X 32m (FORE PART)
HEIGHT OF ALL HOLDS - 17.90m INCLUDING COAMINGS.
MCGREGOR SIDE ROLLING TYPE - HYDRAULIC
SPEED+CONSUMPTION UNDER GOOD WEATHER AND SMOOTH WATER CONDITIONS:
ABT 11.5KN ON ABT 33MT LADEN/31MT BALLAST IFO 180 CST PLUS ABT 3.5 MT
MGO AT SEA, PORT CONS ABT 2.5 MT MGO.
VSL BURNS MGO WHILST MANOUVRING AND NAVIGATING IN NARROW WATERS,
ENTERING-LEAVING PORT, SAILING IN CONFINED WATERS, RIVERS, CANALS,
ESTUARIES AND ON STAND BY.
FUEL CAP: ABT 2000 MT IFO 180 CST ISO 8217 RME 25
ABT 300 MT MGO ISO 8217 DMA
TPC ABT 61.0 T/CM
CONSTS ABT 500 ECXL. FW
NATURAL VENTILATION, NOT C02 FTD
CGO HOLD GRAIN B/DOWN
NO1 223328.52
NO2 473521.17
NO3 282491.75
NO4 449107.91
NO5 282491.75
NO6 492979.74
NO7 239110.80
- ALL ABT AND WOG -
OWNERS: PAGANE MARITIME LTD.
CLASS: RMRS
PANDI: INGOSTTRAKH
H+M: ALLIANZ
ISM / ISPS OK
CALL SIGN: 3 E B Z 9
INMARSAT 'C' TLX: 437127110

- HATCH SIZES: ALL 11.60 BY 15.40 M
- OWNERS GTEE AIR DFT (DISTANCE WL TO THC) IN FULL BALLAST CONDITION TO BE
  MAX 12.00 M
- LAST THREE CARGOES: STEELS, IRON ORE, CLINKER

7

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

I.     VSL'S STOWAGE PLAN:
       -HOLD #1 - 5190.75mts - FULL
       -HOLD #2 - 10400.00mts - SLACK
       -HOLD #3 - EMPTY
       -HOLD #4 - 10444.48mts - FULL
       -HOLD #5 - EMPTY
       -HOLD #6 - 11464.77mts - FULL
       -HOLD #7 - 4000.00 - SLACK
       ------------------------------------------------
       TTL 41500mts
       DRAFT FORE=10.39m MID=10.54m AFT=10.70m
       ALL ABOVE ESTIMATIONS DONE ON BSS TRIMMED ENDS.IF LOADING WILL
       BE
       WITH UNTRIMMED ENDS THEN STOWAGE PLAN CHANGE WILL BE .
       II. WE NEED MIN 48 HRS TO BALLAST/DEBALAST HOLDS NoS 3÷5.
       III. RCVD MSG FM GLOBAL AGENCY ASKING FOR SOME VSL'S
       DETAILS.STILL
       NOT REVERT,WAIT YR CONFORMATION AND INSTR.

- OWNRS WILL CONSIDER AIR DFT (DISTANCE WL TO THC) IN FULL BALLAST
INCLUDING BALLASTING CARGO HOLDS NO3 AND NO5 AND ACHEAVING REQUIRED
BY TERMINAL DRAFT ON HOLD NO 7 BY TRIMING THE VESSEL, BUT TIME LOST FOR
BALLASTING/DEBALLASTIN AND PREPARING CARGO HOLDS IN SUITABLE
CONDITION FOR LOADING ALWAYS TO BE FOR AND ACCOUNT OF CHARTERES

- OWNERS CONFIRM VSL IS GRAIN CLEAN AND HAS ON BOARD VALID DOCUMENTS
  OF AUTHORIZATION FOR CARRIAGE OF GRAINS IN BULK.
- OWNERS CONFIRM THAT VESSEL IS SUITABLE FOR GRAB DISCHARGE.
- OWNERS CONFIRM VESSEL IS CLASSED HIGHEST LLOYD'S CLASS AND ISM / ISPS
  CODE FITTED FOR THE WHOLE DURATION OF VOYAGE.
- OWNERS CONFIRM VESSEL HAS ALL VALID DOCUMENTS/CERTIFICATES AVAILABLE
  ON BOARD FOR LOADING AND DRAFT SURVEY.
- OWNERS CONFIRM THAT VESSEL IS NOT BLACKLISTED FOR LOAD AND/OR
  DISCHARGE COUNTRIES / PORTS AND SUITABLE FOR THIS TRADE.
- OWNERSHIP/CLASS/PANDI CLUB/H=M INSURANCE NOT TO BE CHANGED
  THROUGHOUT WHOLE TRIP DURATION.

FOR
- ACC GLINGROW HOLDING LTD., NICOSIA, CYPRUS
RECENT DEALS:
C/P 28/08/2007 "GRAND MARKELA" ON TCT NOVO/SAUDI ARABIA 50'000 MTS BARLEY
D/OWNERS C. TRANSPORT
C/P 23/08/2007 "ERNEST" ON TCT NOVO/AQABA 33'000 MTS WHEAT
D/OWNERS - CARGILL INTERNATIONAL S.A.
C/P 21/08/2007 "SOUTHGATE" ON TCT NOVO/DAMIETTA 24'000 MTS WHEAT
D/OWNERS - NOBLE RESOURCES S.A.
C/P 20/07/2007 "THOR CONFIDENCE" ON VOYAGE BSS NOVO/ADEN 23200 MTS WHEAT
OWNERS - THORESEEN
C/P 20/06/2007 "SILVERGATE" ON VOYAGE BSS NOVO/AQABA 50'000 MTS BARLEY
D/OWNERS - INDUSTRIAL CARRIERS
C/P 01/06/2007 "LEROS" ON TCT NOVO/ADEN÷HODEIDAH 40'500 MTS WHEAT
D/OWNER - CUSTODIA

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

### Clause 30 Bunker Clause

Bunker on delivery to be as on board (expect IFO about 328 mts and MGO about 55 mts).
Bunker on redelivery to be about same quantity (not less) as actually on delivery. Charterers will pay
cost of bunker on delivery together with 1st hire.
Bunker prices - IFO USD 435 / MGO 745 per mt, same prices on redelivery

### Clause 31 Trading Exclusions

One time Charter Trip to Aqaba / Jordan.

### Clause 32 Cargo Trading Clause

Cargo is grain.

### Clause 33 – Deleted.

### Clause 34

Owners guarantee that the vessel is an easy trimming bulk carrier suitable for loading / carrying /
discharging a full and complete cargo of any / all kinds of grain in bulk without bagging /
strapping/securing. The vessel to have on board at all times all relevant grain loading booklets /
manuals / certificates and hold end trimming table and vessel to be able to load grain without shifting
boards / grain fittings in accordance with 1991 amendments the International Convention of SOLAS
1974 and has dispensation from trimming holds ends.

### Clause 35 Hire Payment

Hire and all monies due to the Owners under this Charter Party will be paid to Owners' bank account.
Charterers will not agree to the assignment of hire, monies due under this Charter Party or the Charter
Party itself in any circumstances whatsoever.

First hire shall be paid within 3 banking days after vessel's delivery together with value of bunkers.
Thereafter, hire shall be settled every 15 days in advance. Greenwich Mean Time (G.M.T.) shall be
applied for hire calculation purpose.

Notwithstanding anything contained herein to the contrary, if any time during the currency of this
Charter, hire shall become due on or during a Saturday, Sunday or national holiday or outside normal
office hours, or at any time which for reasons beyond their reasonable control would prevent
Charterers from effecting payment of hire on the due date, payment of hire is to be made on the
banking day immediately preceding the date on which hire becomes due. Where there is any failure to
make hire payment on the due date because of an oversight or negligence or error or omission of
Charterers' employees, Bankers or Agents or otherwise for any reason where there is absence of
intention to fail to make payment as set out, Charterers shall be given by Owners 3 banking days'
notice to rectify the failure, where so rectified the payment shall stand as punctual and regular
payment.

### Clause 36 Charterers' Deduction

Charterers have no right to deduct any Owners' expenses from the Charter hire. It is understood that
Owners will forward to load and/or discharge agent in advance any funds required for Owners'
expenses.

M/V "PAGANE" - GI.INGROW - C/P DATED 17th OCTOBER 2007

### Clause 37 Communication/Entertainment/Victualling

Charterers shall pay US$ 1,250.- per month or pro rata in lieu of communication / entertainment / victualling.

### Clause 38 Delivery/Redelivery Notice

Delivery Notices:       on fixing and then daily notices.

Redelivery Notices:    15 days approximate and 5/3/2/1 days definite notice of redelivery
                       date and port.

### Clause 39 Stevedore Damage Clause

Stevedores shall be employed at the risk of and paid for by the Charterers. It is understood that all tallying is to be for Charterers' account.

Charterers shall not be responsible for any damage suffered by the vessel and/or her equipment whilst loading or unloading, unless such damage is notified to Charterers' representatives/Agents in writing by the Master latest within 24 hours after the occurrence, except in case of hidden damages which to be reported latest upon completion of discharge.

In the event of stevedore damage:

a)    Such damage to be entered into the vessel's log book.

b)    Master shall also have notified the stevedores or parties responsible for such damage in writing or telex/cable with copy to Charterers.

c)    If the damage caused as above by Charterers or their stevedores affects the vessel's seaworthiness or cargo worthiness or is subject to Classification requirements then all such damage is to be repaired to the satisfaction of the vessel's Classification Society prior to leaving the loading/discharging port. Vessel remaining on hire and costs being borne by Charterers.

d)    Damages not affecting seaworthiness or cargo worthiness or is not subject to classification requirements may be repaired later together with Owners' work at Owners' time and at Charterers' expenses. Owners to provide Charterers with copies of original invoices and if required, to advise Charterers' nature of work necessary to repair damages.

e)    Master will make every attempt to obtain written acknowledgement from the party causing the damage but this without prejudice to paragraphs 'a' through 'd'.

### Clause 40 P and I Club

Owners guarantee that the vessel is fully covered by the Ingosstrakh. Charterers have the benefit of Owners' cover granted by the P and I Club so far as the Club Rules permit.

Trip to Jordan always as per vessel's P and I club requirements which are:

= subject to previous written notification to Ingosstrakh;
= loading/discharging surveys carried out by approved surveyor of Ingosstrakh;

10

M/V "PAGANE" - GLNGROW - C/P DATED 17th OCTOBER 2007

**Clause 41 Return Insurance**
As far as rules permit, the Charterers to have the benefit of any return insurance premium receivable by Owners from their underwriters, as and when received by Owners, by reason of vessel being in port all such time on hire.

**Clause 42 War Risk**
Basic war risk insurance premium for worldwide trading to be for Owners' account, and additional premiums for hull and machinery and Officers/crew for trading to restricted area, also crew war bonus, if any, to be for Charterers' account. The orders of Owners' war risk underwriters always to be followed.

The vessel's hull and machinery value of fixing is USD 5,200,000.-

**Clause 43 On/Off-Hire Survey**
Charterers to appoint a surveyor acting on their behalf for performing a joint on and off hire bunker and condition survey. Joint on hire survey to be in Owners' time unless vessel already loading and joint off hire survey to be in Charterers' time. Expenses for on/off hire survey to be shared equally between Owners and Charterers.

**Clause 44 Hold Cleaning**
On arrival first load port, vessel to be grain clean and ready in every respect and in all compartments to receive Charterers' cargo to local surveyors' and/or competent authorities' satisfaction, failing which vessel to be off-hire from the time of rejection until passed again. Owners to take immediate corrective steps to expedite cleaning as fast as possible including the use of shore labour. If vessel fails inspection, all bunkers consumed after rejection and extra expenses incurred as a direct result to be for Owners' account, until vessel has been passed in all compartments again.

Charterers' option to redeliver the vessel unclean paying USD 5,000.00 in lieu of hold cleaning.

**Clause 45 Bills of Lading**
The Owners undertake to instruct the Master to authorise Charterers or Charterers' Agents if required to issue and sign Bill(s) of Lading on Charterers' usual form on Owners' and Master's behalf for cargo as presented in conformity with Mate's receipts. Charterers to keep Owners harmless should Charterers' servants not issue Bills of Lading per Owners'/Master's strict authority.

Should original Bill(s) of Lading not be available prior to vessels' arrival to the discharging port(s) in time, Owners to agree to release entire cargo without production of original Bill(s) of Lading, if so requested by Charterers or their agent(s), against a fax presentation of Letter of Indemnity under Owners' P and I Club wording which to be singly signed by Charterers or signed by sub-Charterers together with Charterers' joint signature.

No liner or through Bills of Lading or Seaway Bill may be issued/used during the currency of present Charter Party.

Charterers are not to issue or cause to be issued Bs/L which are subject to Hamburg rules.

**Clause 46 ISM Clause**
From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both

M/V "PAGANE" - GLINCROW - C/P DATED 17th OCTOBER 2007

the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Owners shall indemnify Charterers for any and all loss, expense and/or damage and/or consequences sustained by Charterers resulting from partial or full non-compliance with this clause. Any and all delays to the vessel resulting from such partial or full non-compliance with this clause shall not count as laytime or, if laytime has expired, as time on demurrage respectively, as the case may be, as on-hire time.

### Clause 47 Deratisation Certificate
The vessel to have valid deratisation certificate and/or equivalent fumigation certificate on board at time of delivery. The validity of which is to be maintained by Owners in their time and at their expense during the currency of this Charter Party.

### Clause 48 Quarantine/Smuggling
Normal quarantine time and expenses for entering ports shall be for Charterers' account. The Owners shall be liable for any delay in quarantine arising from the Master or any of the deck or engine Officers or crew having communication with the shore at any infected area without the written consent or instructions of Charterers or their Agents, also for any loss of time through detention by customs or other authorities caused by smuggling or their infraction of local law on the part of the Master or any of the deck or engine crew. Any delay, expenses and/or fines incurred on account of smuggling, if caused by the Charterers' supercargo and/or their staff or Agents are to be for Charterers' account. Likewise, if any delay in quarantine arises as a result of Charterers' trading of the vessel and/or misinstructions or lack of proper instructions by Charterers or their Agents, servants or representatives such delay is to be for Charterers' account.

### Clause 49 Health Certificate
The Owners shall arrange at their expense that Master, Officers and crew of vessel hold valid vaccination certificates against yellow fever, smallpox, cholera or other necessary health certificates during the Charter.

### Clause 50 Vessel's Equipment
Vessel's equipment shall comply with the regulations of the countries in which vessel will be employed and Owners are to ensure that vessel is at all times in possession of valid and up-to-date certificates as required. If stevedores, longshoremen or other workmen are not permitted to work due to failure of the Master and/or the Owners and/or Owners' Agents to comply with the aforementioned regulations or because the vessel is not in possession of such valid and up-to-date certificates as required, then Charterers may suspend hire for the time thereby lost and Owners shall pay all proven extra direct expenses incurred incidental to and resulting from such failure.

### Clause 51 Safety Regulation
It is understood that the vessel will comply with all safety regulations and/or requirements in effect at ports of loading and/or discharging. It is agreed that should the vessel not meet safety rules and regulations, Owners will take corrective action and vessel is to be off-hire.

### Clause 52 Canal Certificate

12

<u>M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007</u>

The vessel is fully fitted for Panama/Suez Canal transit and in possession of valid necessary certificate on board, in conformity with current canal regulations/requirements.

### Clause 53 Crew Service
During the currency of this Charter Party and provided weather and local stevedore and port regulations permit, Charterers to have the option to use crew to perform the following services as a means toward an efficient cargo operation:

a)   At each port all of the hatch opening and closing;

b)   Preparing vessel for sea;

c)   Removal and disposal of dunnage to be for Charterers' account;

d)   Gangway watchmen for the vessel to be for Owners' account.
     Compulsory cargo watchmen to be for Charterers' account;

e)   Before and upon arrival at a port, vessel's Officers/crew to shape up vessel's hatches, and gangway in order to commence loading and/or discharging without delay. Opening/closing of all hatchcovers and erecting and dismantling of shifting boards, if necessary, shall be done by Officers/crew provided shore regulations permit.

### Clause 54 War Cancellation
If war breaks out between any two or more of the following countries: United Kingdom, U.S.A., C.I.S., P.R.C., Japan, directly affecting the performance of this Charter, both Owners and Charterers shall have the option of cancelling this Charter whereupon Charterers shall redeliver vessel to Owners, if she has cargo on board after discharge thereof at destination, or, if debarred from reaching or entering it, at a near, open and safe port as directed by Charterers, or if she has no cargo on board, at a port at which she stays or if at sea at a near and safe port as directed by Charterers. In all cases, hire shall be paid until vessel's redelivery.

### Clause 55 Requisition
Should the vessel be requisitioned by any government or governmental authority due to Owners/Managers/vessel's fault, or due to vessel's flag or Ownership during the period of this Charter, she shall be off-hire during the period of such requisition and any hire or other compensation paid by any government or governmental authority in respect of such requisition shall be for Owners' account.

### Clause 56 Extra Period
Should the vessel be placed off-hire during the currency of this Charter for any reason whatsoever, the Charterers have the option of adding all or any part of such off-hire period to the original period.

### Clause 57 Cancellation Clause
If the vessel is placed off-hire more than 30 consecutive days, Charterers have the right to cancel the balance period of this Charter by giving notice to Owners without prejudice to any other right the Charterers may have under this Charter and provided vessel is free of cargo.

### Clause 58 Capture/Seizure/Arrest
Should the vessel be seized or detained or arrested or delayed by any authority during the currency of this Charter Party, the Charterers' liability for seizure or detention or arrest or delay is ceased immediately from the time of her seizure or detention or arrest or delay and all time lost by this reason shall be treated as off-hire until the time of her release unless such seizure or detention or arrest or delay is occasioned by any personal act or omission or default of Charterers or their Agents. Extra

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

expenses incurred directly from above seizure or detention or arrest or delay to be for Owners' account.

**Clause 59 Cargo Claim**

Cargo Claims To Be Settled As Per NYPE Interclub Agreement 1996

**Clause 60 Small Claims Procedure Clause**

Notwithstanding anything contained in the Arbitration Clause to the contrary, should neither the claims nor the counterclaims exceed USD 100,000.00 exclusive of interest on the sum claimed, costs of the arbitration and legal expenses, if any, it is hereby agreed the dispute is to be governed by the London Maritime Arbitrators' Association Small Claim Procedure, revised 1st January, 1994.

**Clause 61 Deviation/Put Back**

Should the vessel put back whilst on voyage by reason of an accident or breakdown or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness or accident to the crew or any person on board the vessel or by reason of the refusal of the Master or crew to perform duties, the hire shall be suspended from the time of inefficiency, unless caused by Charterers and/or Charterers' servants until the vessel is again efficient in the same position (or in Charterers' option at a point equidistant to the vessel's next destination) and voyage resumed therefrom. All direct expenses incurred including bunkers consumption during the period of suspended hire shall be for Owners' account.

**Clause 62 Water Pollution**
A.   For Bulk Carriers:

(1)   Owners warrant that throughout the currency of this Charter they will provide the
      vessel with the following certificates:

      (a)   Certificates issued pursuant to Section 311 (p) of the U.S. Federal Water Pollution Control
            Act, as amended (Title 33 U.S Code, Section 1321(p)) up to (insert the date upon which
            such certificate(s) is/are due to expire).

      (b)   Certificates issued pursuant to Section 1016(a) of the Oil Pollution Act 1990, and Section
            108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act
            1980, as amended in accordance with Part 138 of Coast Guard Regulations 33 CFR, from
            (indicate the earliest date upon which the Owners may be required to deliver the vessel
            into the Charter or, if later, the date inserted in sub-paragraph (a) above), so long as these
            can be obtained by the Owners from or by (identify the applicable scheme or schemes). ·

(2)   Notwithstanding anything whether printed or typed herein to the contrary:

      (a)   Save as required for compliance with paragraph (1) hereof, Owners shall not be required
            or establish or maintain financial security or responsibility in respect of oil or other
            pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place,
            territorial or contiguous waters of any country, state or territory in performance of this
            Charter.

14

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

(b) Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (I) hereof.

(c) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any Bills of Lading issued pursuant to this Charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or water, other than to the extent provided in paragraph (I) hereof.

**Clause 63 Owners' Agents**
Charterers may agree to have their Agents attend to the Owners' matters such as delivery, redelivery, general average, drydocking, repair, hospitalisation, repatriation of crew, supply of the vessel's stores and provisions, etc., with Owners paying Charterers' Agents actual expenses including attendance fee and agency fee according to the Charterers' tariff rate. Charterers may also agree to have their Agents to attend to trivial Owners' matters, such as, cash advance, crew mail, arranging shore pass with Owners paying actual expenses including attendance fee, if any, but without agency fee. (See Clause 36).

**Clause 64 Taxes**
Export and/or import permits for Charterers' cargo to be at Charterers' risk and expense. Taxation or levies on cargo or freight to be for Charterers' account and to be paid by Charterers.

**Clause 65 Paramount Clause**
General Paramount Clause to apply

**Clause 66 Additional Clause**
New Jason Clause, P and I Bunkering Clause, New Both-to-Blame Collision Clause and Baltime War Risk Clause, as attached, to be incorporated in this Charter Party and all Bill(s) of Lading issued hereunder.

**Clause 67 Drydock Clause**
The Owners have no option to make her drydock during this Charter period except emergency cases, or unless otherwise agreed.

**Clause 68 – Deleted**

**Clause 69 Bulk Carrier Safety Clause**
(A) The Charterers shall instruct the terminal operators or their representatives to cooperate with the Master in completing the IMO Ship/Shore Safety Checklist and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

(B) In addition to the above and notwithstanding any provision in this Charter Party in respect of

15

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

loading/discharging rates, the Charterers shall instruct the terminal operators to load/discharge the vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the vessel's draught, trim, stability, stress or any other factor which may affect the safety of the vessel.

(C)  At any time during cargo operations, the Master may, if he deems it necessary for reasons of safety of the vessel, instruct the terminal operators or their representatives to slow down or stop the loading or discharging.

(D)  Compliance with the provisions of this Clause shall not affect the counting of hire.

### Clause 70 Stowaway Clause
Any time lost including but not limited to time on demurrage and any losses, liabilities and cost incurred by reason of stowaways on board shall be for Owners' account.

### Clause 71 Ocean Route Clause
Evidence of weather conditions to be taken from independent weather bureau reports. Owners to be represented by the findings of 'Aerospace' Ocean Routing Company. In case of dispute between Owners and Charterers' ocean routing companies, the matter to be taken into further arbitration. In any case, Master always entitled to choose vessel's routing related to vessel and crew safety.

Owners' ocean routing company full style/address as follows:

Aerospace & Marine International Corporation,
6920 Santa Teresa Boulevard, Suite 209,
San Jose, CA 95119, U.S.A.
Tel:        408-360-0440
Fax:        408-360-0450
Tlx:        149158
Email:      ops@weather3000.com
Web-port:   www.amiwx.com

### Clause 72 Mobile Crane Clause
Deleted.

### Clause 73 Split Bills of Lading Clause
Charterers and/or Agents are hereby authorised by Owners/Master to split Bills of Lading and issue ship delivery orders in negotiable and transferable forms against collection of full set of original Bills of Lading. Delivery orders to conform with all terms and conditions and exceptions of Bills of Lading and shall not prejudice shipowners' rights.

### Clause 74 Oil Pollution
As a condition of this Charter Party, Owners guarantee that Owners and vessel are and will remain throughout the currency of the Charter Party insured for pollution liability with respect to trading within, to and from ranges and areas specified in this Charter, said insurance to have a limit of not less than U.S.$1 billion. At any time before or subsequent to the fixture date of this Charter, Owners, upon reasonable notice from Charterers, shall furnish to Charterers or its representative proof, satisfactory to Charterers, of such insurance. Without prejudice to Charterers' other rights, Owners shall indemnify Charterers for any and all loss, expense and/or damage sustained by Charterers resulting

M/V "PAGANE" - GLINCROW - C/P DATED 17th OCTOBER 2007

from non-compliance with this Clause. Any and all delay to the vessel resulting from such non-compliance shall not count as laytime or, if laytime has expired, as time on demurrage.

**Clause 75**
Vessel's crew contracts are bona fide employment agreement.

**Clause 76**
The vessel to remain always in seaworthy trim/condition to safely sail between ports/berths to Master's satisfaction.

**Clause 77**
Deleted.

**Clause 78 ISPS Clause**

(a)  (i)  From the date of coming into force of the International Code for the security of ships and of port facilities and the relevant amendments to chapter XI of SOLAS (ISPS code) in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the vessel and "the company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The owners shall provide the Charterers with the full style contact details of the company security officer (CSO).

   (ii)  Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this clause shall be for the Owners' account.

(b)  (i)  The Charterers shall provide the CSO and the ship security officer (SSO)/master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-Charter Parties they enter into during the period of this Charter Party contain the following provision:

   "The Charterers shall provide the owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

   (ii)  Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this clause shall be for the Charterers' account.

(c)  Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result

17

<u>M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007</u>

solely from the owners' negligence, crew's nationality/visa issues, or costs or expenses directly arising from vessel's ownership or other crewing matters.

(d) If either party makes a payment which is for the other party's account according to this clause, the other party shall indemnify the paying party.

**<u>Clause 79</u>**
All negotiations/trade are to be made in accordance with English Law. English Law to apply. Arbitration, if any, to be in London in accordance with the Arbitration Clause of the Charter Party.

**<u>Clause 80</u>**
Charterers have the option to perform a general condition survey of the vessel at any time. Survey to be at Charterers' time and expenses.

**<u>Clause 81</u>**
Owners to provide following certificates as per L/C requirements (see attached):

1.  Certificate issued and signed by (P and I) Club or their representative or by their agent to the effect that the carrying vessel is a member to that (p and i) club having representative or agent in Jordan.

2.  Certificate issued and signed by shipping register or their agent certifying that the carrying vessel is classified 100a1 or its equivalent and free from any outstanding recommendations.

**<u>Clause 82</u>**

Negotiations and fixture, if any, to be kept private & confidential by all parties involved.

18

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

## BOTH-TO-BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:

### New Both-to-Blame Collision Clause

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact"
and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

### New Jason Clause

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.
If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery"

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

## BALTIME 1939 WAR CLAUSE

(A)   The vessel unless the consent of the Owners be first obtained not to be ordered nor continue to any place or on any voyage nor be used on any service which will bring her within a zone which is dangerous as the result of any actual or threatened act of war, war hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or state whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of Sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any Government or Ruler.

(B)   Should the vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (1) the Owners to be entitled from time to time to insure their interests in the vessel and/or hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand; and (2) notwithstanding the terms of Clause 11, hire to be paid for all time lost including any loss owing to loss of or injury to the Master, Officers or crew or to the action of the crew in refusing to proceed in such zone or to be exposed to such risks.

(C)   In the event of the wages of the Master, Officers and crew or the cost of provisions and/or stores for deck and/or engine room and/or insurance premiums being increased by reason of or during the existence of any of the matters mentioned in section (A) the amount of any increase to be added to the hire and paid by the Charterers on production of the Owners' account therefore, such account being rendered monthly.

(D)   The vessel to have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other wise whatsoever given by the Government of the nation under whose flag the vessel sails or any other Government or any person (or body) acting or purporting to act with the authority of such Government or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such orders or directions.

(E)   In the event of the nation under whose flag the vessel sails becoming involved in war, hostilities, warlike operations, revolution or civil commotion, both the Owners and the Charterers may cancel the Charter and, unless otherwise agreed, the vessel to be redelivered to the Owners at the port of destination or, if prevented through the provisions of Section (A) from reaching or entering it, then at a near open and safe port at the Owners' option, after discharge of any cargo in board.

(F)   If in compliance with the provisions of this clause anything is done or is not done, such not to be deemed a deviation.

Section (C) is optional and should be considered deleted unless agreed according to Baltime 1939.

<u>M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007</u>

### P. AND I. BUNKER CLAUSE

The vessel shall have liberty as part of the Contract Voyage to proceed to any port or ports at which bunker oil is available for the purpose of bunkering at any stage of the voyage whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the ports of loading or discharge named in this Charter and may there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks and deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

### BIMCO STANDARD ISM CLAUSE

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by the failure on the part of the Owners or 'the Company' to comply with the ISM Code shall be for Owners' account.

### SECA CLAUSE

During the currency of this contract the performing vessel will consume bunkers in accordance with ISO 8217 specifications. In the event that emissions regulations, laws or guidelines require or recommend the stemming or consumption of bunkers with a quality that has a higher value than the price for high sulphur fuel oil, then such excess price will be paid for by Charterers for bunkers consumed whilst in an emission controlled area. Upon request Owners to provide documentary proof for such price differential together with the actual bunker consumption in these emission controlled areas.

### BUNKER FUEL SULPHUR CONTENT CLAUSE FOR
### TIME CHARTER PARTIES 2005

(A) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the vessel is ordered to trade within that zone. The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with regulations 14 and 18 of Marpol Annex VI, including the guidelines in respect of sampling and the provision of bunker delivery notes.

21

<u>M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007</u>

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this sub-Clause (A).

(B)  Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with sub-Clause (A), the Owners warrant that:

(i)  The vessel shall comply with regulations 14 and 18 of Marpol Annex VI and with the requirements of any emission control zone; and

(ii)  The vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the vessel with fuels in accordance with sub-Clause (A), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the vessel's failure to comply with regulations 14 and 18 of Marpol Annex VI.

(C)  For the purpose of this Clause, 'emission control zone' shall mean zones as stipulated in Marpol Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the E.U. and the U.S. Environmental Protection Agency.

# EXHIBIT 2

Provisional Hire statement MV PAGANE
cp dd 17.10.2007/GLINGROW HOLDING LTD.
Voyage PAG/2007/03/TC

|  |  |  |  | US$ Debit |
|---|---|---|---|---|
| Hire from: | | | | |
| 18.10.2007 21:00 GMT DOP KERCH | | | | |
| 05.12.2007 15:30 GMT DLOSP AQABA | | | | |
| 48,604167 | days | @ | 60 000,00 | 2 916 250,00 |
| Bunkers on delivery: | | | | |
| 363,257 | IFO mts | @ | 435,00 | 158 886,80 |
| 49,645 | MDO mts | @ | 745,00 | 34 761,27 |
| Owners bunker consumed in Aqaba: | | | | |
| 32,900 | MDO mts | @ | 745,00 | 24 510,50 |
| ILOHC | | | | 5 000,00 |
| C/V/E | 40,38514 | | 1 250,00 | m/r | 1 683,13 |
| Difference in bunker prices: ($890-$745)x49,645mt | | | | 8 763,57 |
| | | subtotal | debit | 3 141 061,70 |
|  |  |  |  | Credit |
| less: | | | | |
| commission | 3,76 % | | | 106 359,35 |
| Owners expenses: | | | | |
| on-hire survey | 50% | | | 400,00 |
| off-hire survey | 50% | | | 750,00 |
| Off-hire: | | | | |
| at !port Novo | 6,791269 | days | | 387 005,21 |
| bunker consumed | | | | 11 970,66 |
| at Suez Canal | 1,507639 | days | | 87 088,15 |
| bunker consumed | | | | 2 807,98 |
| Bunkers on re-delivery: | | | | |
| 407,500 | IFO mts | @ | 435,00 | 177 262,50 |
| 0,000 | MDO mts | @ | 745,00 | 0,00 |
| Payments: | | | | |
| 1. | | | | 1 061 013,00 |
| 2. | | | | 440 968,18 |
| 3. | | | | 353 723,97 |
| | | subtotal | credit | 2 642 327,63 |
| grand total in favour OWNERS | | | | |
| payment to be arranged to: | | debit | | 498 734,57 |

| | |
|---|---|
| BENEFICIARY | BULCOM LTD. |
| ACC. No: | 72673/2G |
| WITH: | BNP PARIBAS (SUISSE) S.A. |
| | PLACE DE HOLLANDE, 2 |
| | CH-1211, GENEVA 11 |
| | SWITZERLAND |
| SWIFT: | BPPBCHGG |
| IBAN: | CH69 0885 6001 0728 7300 2 |

Please always quote our invoice number when effecting payments.



# EXHIBIT 3

From: Marianne Brookes
Sent: 29 November 2007 11:50
To: arbitration@christophermoss.com
Subject: M/V Pagane C/P DD.17.10.2007

Dear Sir,

We act for Bulcom Ltd, the disponent owners of the above vessel.

Under a time charter on the NYPE form (copy attached), disponent owners chartered their vessel to Glingrow Holding Ltd for 1 time charter trip for the carriage of grain from the Black Sea to Aqaba.

Under Clause 17 of the charterparty, any disputes between owners and charterers shall be referred to three persons in London and be determined in accordance with English Law.

Disputes have arisen between the parties. You are hereby appointed as owners' arbitrator. Kindly confirm acceptance of your appointment.

Best regards,

Brookes & Co.

Brookes & Co., Solicitors, 60 Lombard Street, London, EC3V 9EA, United Kingdom.
Tel: +44 (0)20 3159 4330  Fax: +44 (0)20 7681 7773.  General office email address: mail@brookes-and-co.co.uk
Principal: Marianne Brookes
Brookes & Co. is regulated by the Solicitors Regulation Authority
Confidentiality Note
The contents of this email and any attachments are strictly confidential and must not be copied to, used by or disclosed to any person other than the named recipient(s). Please let us know immediately by telephoning +44 (0)20 3159 4330 if this email has been sent to you in error.

EXHIBIT D

ECF

# U.S. District Court
## United States District Court for the Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:07-cv-10726-PKL

| | |
|---|---|
| Pagane Maritime Ltd. v. Glingrow Holding Ltd. et al | Date Filed: 11/30/2007 |
| Assigned to: Judge Peter K. Leisure | Jury Demand: None |
| Demand: $1,400,000 | Nature of Suit: 120 Contract: Marine |
| Cause: 28:1333 Admiralty | Jurisdiction: Federal Question |

**Plaintiff**

**Bulcom Ltd.**
*TERMINATED: 12/20/2007*

represented by **Charles Edmund Murphy**
Lennon, Murphy & Lennon, LLC
The GrayBar Building
420 Lexington Avenue
Suite 300
New York, NY 10170
(212) 490-6050
Fax: (212) 490-6070
Email: cem@lenmur.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Pagane Maritime Ltd**

represented by **Charles Edmund Murphy**
Lennon, Murphy & Lennon, LLC
420 Lexington Avenue
Suite 300
New York, NY 10170
(212) 490-6050
Fax: (212) 490-6070
Email: cem@lenmur.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Glingrow Holding Ltd.**

**Defendant**

**Rias Trading**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/30/2007 | 1 | COMPLAINT against Glingrow Holding Ltd., Rias Trading. (Filing Fee $ 350.00, Receipt Number 634721)Document filed by Bulcom Ltd.. (mbe) (Entered: 12/05/2007) |
| 11/30/2007 | | SUMMONS ISSUED as to Glingrow Holding Ltd., Rias Trading. (mbe) (Entered: 12/05/2007) |
| 11/30/2007 | | Magistrate Judge Ronald L. Ellis is so designated. (mbe) (Entered: 12/05/2007) |
| 11/30/2007 | | Case Designated ECF. (mbe) (Entered: 12/05/2007) |
| 11/30/2007 | 2 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Bulcom Ltd..(mbe) (Entered: 12/05/2007) |
| 12/04/2007 | | MARITIME ATTACHMENT AND GARNISHMENT ISSUED as to Glingrow Holding Ltd., Rias Trading on 11/30/2007 in the amount of $1,433,583.10. (jpo) (Entered: 12/10/2007) |
| 12/04/2007 | 4 | EX PARTE ORDER FOR PROCESS OF MARITIME ATTACHMENT pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, the Clerk of Court shall issue Process of Maritime Attachment and Garnishment against all tangible or intangible property, credits, letters of credit, etc. or any other funds of property up to the amount of $1,433,583.10 belonging to, due or being transferred to, from or for the benefit of the Defendant, including but not limited but not limited to such property as may be held, received or transferred in Defendant's name(s), or as may be held, received or transferred for its benefit at, moving though, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishes to be named, or later identified, on whom a copy of the Process of Maritime Attachment and Garnishment may be served. Supplemental process enforcing the Court's Order may be issued by the Clerk upon application without further Order of the Court. Pursuant to F.R.C.P. 5(b) (2)(D) each garnishee may consent, in writing, to accept service by any other means. So Ordered. (Signed by Judge Peter K. Leisure on 11/30/07) (jco) (Entered: 12/17/2007) |
| 12/06/2007 | 3 | AFFIDAVIT of Kevin J. Lennon in Support. Document filed by Bulcom Ltd.. (Lennon, Kevin) (Entered: 12/06/2007) |
| 12/20/2007 | 6 | AMENDED COMPLAINT amending 1 Complaint against Glingrow Holding Ltd., Rias Trading. Document filed by Pagane Maritime Ltd. Related document: 1 Complaint filed by Bulcom Ltd. (jco) (Entered: 12/27/2007) |
| 12/21/2007 | 5 | CONSENT ORDER: The funds that are currently under attachment in this action are to be released. The garnishee bank(s) are hereby instructed to release the attached funds pursuant to joint instructions to be provided by letter and signed by the undersigned counsel. The Payment of the release funds by the garnishee bank(s) shall not be subject to any further |

| | | |
|---|---|---|
| | | attachment in New York after those funds are released by the garnishee bank(s). (Signed by Judge Peter K. Leisure on 12/20/2007) (jar) (Entered: 12/21/2007) |
| 12/28/2007 | | MARITIME ATTACHMENT AND GARNISHMENT ISSUED as to Glingrow Holding Ltd., Rias Trading on 12/28/07 in the amount of $688,530.51. (tro) (Entered: 01/03/2008) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 01/07/2008 11:24:19 | | |
| **PACER Login:** rs0055 | **Client Code:** | 999995/20001/3235 |
| **Description:** Docket Report | **Search Criteria:** | 1:07-cv-10726-PKL |
| **Billable Pages:** 2 | **Cost:** | 0.16 |

Wendy H. Schwartz (WS-1862)
**REED SMITH LLP**
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax (212) 521-5450
Attorneys for Defendants
Glingrow Holding Ltd. and Rias Trading.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

| | | |
|---|---|---|
| PAGANE MARITIME LTD. | : | <u>ECF Case</u> |
| | : | |
| Plaintiff, | : | 07 Civ. 10726 (PKL) |
| | : | |
| v. | : | REPLY DECLARATION |
| | : | OF SERGEY CHUMAK |
| GLINGROW HOLDING LTD. and | : | |
| RIAS TRADING, | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------x

    I, Sergey Chumak, hereby declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. §1746, that the following is true and correct:

    1.    I am the Operations Manager of Rias Trading ("Rias"), one of the named defendants in this action.   I make this Reply Declaration on behalf of Rias in further support of its emergency motion, pursuant to Rule E of the Supplemental Rules of Civil Procedure for Certain Admiralty and Maritime Claims, to dismiss the complaint filed by plaintiff Pagane Maritime Ltd. ("Plaintiff" or "Pagane") against Rias, and to vacate the attachment of Rias' assets in New York.

1

2.      I am not employed by Glingrow Holding Ltd. I do not have, and never had, authority to speak for or authorize actions by Glingrow in connection with this matter.

3.      As stated in my prior declaration in this matter, on or about October 17, 2007, Rias entered into a charter party agreement with Glingrow Holding Ltd. (the "Rias Charter"). A copy of this charter party agreement is attached hereto as Exhibit A.

4.      As stated in my prior declaration in this matter, Glingrow issued invoices to Rias for use of the vessel chartered under the Rias Charter. Rias paid these invoices in accordance with instructions it received from Glingrow in the invoices. Copies of the invoices received by Rias from Glingrow are attached as Exhibit B.

5.      Rias has never concluded an agreement with Pagane that funds of Rias would stand as security for Glingrow's alleged breaches of an agreement between Glingrow and Bulcom or Pagane pending the result of any arbitration among those parties.

6.      Rias seeks vacation of all attachments against it in this matter, and dismissal of the complaint.


Executed on:   January 16, 2008


_____
Sergey Chumak

2

# EXHIBIT A

10-DEC-2007 15:45 From:                                   To:0078612530387                P.1/32

# TIME CHARTER

## GOVERNMENT FORM
Approved by the New York Produce Exchange
November 6th 1913-Amended October 20th, 1921 ; August 6th, 1931 ; October 3rd, 1946

1  **This Charter Party**, made and concluded in *Novorossiysk* .................................................................................... *17th* day of *October 2007* .... 49..

2  Between : *Messrs Glingrow Holding LTD* ...... *as disponent* .......................................................................................................................................................

3  Owners of the good .......... *Panama* Flag ................. Steamship/Motorship "*Pagana*" *Description as per Clause 29 of.* ...............................................................

4  of ....................................... tons gross register, and ................................... tons net register, having engines of ............................ indicated horse-power

5  and with hull, machinery and equipment in a thoroughly efficient state, and classed .............................................................................................................

6  at ......................................................................................... of about ....................... cubic feet bale capacity, and about ....................................... tons of 2240 lbs.

7  deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one half percent of ship's deadweight capacity,

8  allowing a minimum of fifty tons) on a draft of .......................................................................................................... Summer freeboard inclusive of permanent bunkers,

9  which are of the capacity of about ...................................... feet .................... inches on ....................................... tons of fuel, and capable of steaming, fully laden, under good weather

10  conditions about ........................................... knots on a consumption of about ....................................... of best Welsh coal-best grade fuel oil-best-grade Diesel oil.

11  now ......... *trading* ......................................................................................................................................................................................................

12  ....................................................................................................................................................................................................................................

13  ......... and .... *Messrs RIAS-TRADING S.A.* ................................................................................... Charterers of the City of .... *Lausanne, Switzerland* .........

14  **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

15  about *1 time Charter trip via safe ports, safe berths, safe anchorages always afloat, always within IWL, via Black sea with bulk lawful grain to Aqaba,*

16  *Jordan. Duration about 30 days.* .................................................................................................................................................................................................

17  within below mentioned trading limits.

18  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

19  the fulfillment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations hereunder.*

20  Vessel to be placed at the disposal of the Charterers, at *on dropping outward pilot Kertch at any time day or night Sundays and Holidays Included.*

21  ...........................................................................................................................................................................................................................................

22  in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No.6), as

23  the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No.5. Vessel on her delivery to be

24  ready to receive cargo with clean-swept holds and tight, staunch, strong and every way fitted for the service, having water ballast, *(See Clause 42)* winches

25  and ....................................................................................................................................................................................................................................

26  donkey-boiler with sufficient steam power, or if not equipped with donkey-boiler, then other power sufficient to run all the winches at one and the same

27  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

28  dise, including petroleum or its products, in proper containers, excluding (See Clause 47)..........................................................................................................

29  ....................................................................................................................................................................................................................................

30  all necessary fittings and-other equipment for the carriage of Live Stock, but Charterers to provide suitable in such cases all fittings such

31  (vessel is not to be employed in the carriage of Live-Stock, but Charterers of any kind of shipping a small number on deck at their risk,

32  at necessary fittings and other equipment...... only to be for account of Charterers,...... between safe port and/or ports in British-North

33  America; and/or United States, and/or Canada-Central Americaand/or European See, and/or Gulf of Mexico, and/or

34  Mexico, and/or South America .......................................................................................................................................................... and/or Europe

35  and/or Africa, and/or Asia, and/or Australia, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

To:0078612530387
P.2/22
10-DEC-2007 15:46 From:

31. as the Charterers or their Agents shall direct, on the following conditions:

32. 1. That ~whilst on hire~ the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the

33. insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler and domestic water, *lubricating oil, vessel's*

34. *garbage removal unless compulsory* and maintain her class and keep

35. the vessel in a thoroughly efficient state in hull, *holds and hatchcovers,* machinery and equipment *with all certificates necessary to comply with current*

36. *requirements at all ports of call and canals* for and during the service. *(See Clause 48 and 49).*

37. 2. That, ~whilst on hire~, the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory and customary*

38. Pilotages, *Turkish strait pilotage*, Agencies, *boatage on Charterers business for clearance and cargo purpose only,* Commissions, *canal dues and*

39. *tolls,* ~for charterers account after vessel has been on charter for a continuous period~ ~of six months or more~

40. Consular Charges (except those pertaining to the Crew *and flag*), and all other usual expenses except those before stated, but when the vessel puts into

41. a port for causes for which ~Owners are~ *vessel is* responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42. illness ~to be for Charterers account~ *including loading expenses should port authorities order crew ashore for safety reasons. All other fumigations to be*

43. *charter to be for Owners account.* ~Fumigations ordered because of~

44. Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, *as permitted under*

45. *this Charterparty,* but Owners to allow them the use of any dunnage and shifting boards already aboard vessel. *Charterers to have the privilege of using shifting boards*

46. Owners to allow them the use of any dunnage and shifting boards already aboard vessel.

47. for dunnage, they making good any damage thereto.

48. 3. That the Charterers, ~at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~

49. ~board the vessel at the current prices in the respective ports,~ ~the vessel to be delivered with not less than~ ... ~tons and not more than~

50. ... ~tons, and to be re-delivered with not less than~ ... *tons. (See Clause 30).*

51. ... ~tons and not more than~ ... *tons. (See Clause 30).*

52. 4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *US$ 60000.00 per day pro rata including overtime payable in*

53. *advance every 15 days. First payment within 1 banking days upon delivery.*
~United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and~

54. ~stores, on~ ... ~summer freeboard, per Calendar Month,~ commencing on and from the *hour*/day of her delivery, as aforesaid, and at

55. and after the same rate for any part of a day/*month,* hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

56. wear and tear excepted, to the Owners (unless lost) at ... *dropping last outward sea pilot, Aqaba, any time day or night, Sundays and Holidays*

57. *included.* ... unless otherwise mutually agreed. Charterers are to give Owners not less than ... *days*

58. *notice of vessel's expected date of re-delivery, and probable port. (See Clause 38)*

59. 5. Payment of said hire to be made *as per clause 35* in New York in cash *by transfer* in United States Currency, *every 15 days* ~semi-monthly~ in

60. advance, and for the last *15 days* ~half-month~ or

61. part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

62. due. If so required by Owners, unless bank guarantee or deposit is made by Charterers, otherwise failing the punctual and regular payment of the

63. hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

64. terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. *Time to count from 7 a.m. on the working day*
*following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers they*
~to have the privilege of using vessel at once, such time used to count as hire.~

10-DEC-2007 15:47 From:                                          To:0078612530387                P.3/32

65. Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66. to 2 1/2% commission and such advance shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67. of such advances.

68. 6. That the cargo or cargoes be laden and/or discharged in any safe dock or at any wharf or place that Charterers or their Agents may
69. direct, provided the vessel can safely lie always afloat at any time of tide, except at such places *in East Coast South America* where it is customary for similar
70. size vessels to safely
71. lie aground.

72. 7. That the whole reach of the Vessel's Hold, Decks and usual places of loading (not more than she can reasonably stow and carry), *compatible with*
73. *vessel's seaworthiness*, also
74. accommodations for Supercargo, if carried, shall be at Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
75. tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charterers
76. paying Owners..................per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are
77. incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense. *No passengers.*

78. 8. That the Captain shall prosecute his voyage with the utmost despatch, and shall render all customary assistance with ships crew and
79. boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
80. agency, and Charterers are to load, stow, and trim, *lash, secure and discharge* the cargo at their *risk and* expense under the supervision of the Captain, *all*
81. *cargo claims to be settled in accordance with NYPE Interclub Agreement as amended in September 1996 (See Clauses 59/60), who is to sign*
82. Bills of Lading for
83. cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

84. 9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
85. receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

86. 10. That the Charterers shall have the permission to appoint a Supercargo, who shall accompany the vessel *against signing Owners' P and I Club*
87. *boarding LOI*, and see that voyages are prosecuted
88. with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
89. rate of *USD 10.00 (Ten Dollars) $1.00* per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their agents, to
90. victual Tally
91. Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal for all such victualling. *(See Clause 37)*

85. 11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, *and / or*
86. *telecommunication with copy to Owners*, and the

87. Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88. terers, their Agents or Supercargo, when required, with a true copy of daily Logs, *abstracts in English*, showing the course of the vessel and distance run and
89. the con-
90. sumption of fuel.

90. 12. That the Captain shall use diligence in caring for the ventilation of the cargo. *Vessel has natural ventilation.*
91. 13. That the Charterers shall have the option of continuing the charter for a further period of.................

92. 13. That the Charterers shall have the option of continuing the charter for a further period of.................

93. on giving written notice thereof to the Owners or their Agents..................days previous to the expiration of the first-named term, or any declared option.
94. 14. That if required by Charterers, time not to commence before *08:01 hours Local Time 18th October 2007*..................and should vessel
95. not have given written notice of readiness *been delivered* on or before *23:59 hours Local Time 18th October 2007*..................*but not later than 4 p.m.* Charterers or
96. their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
97. 15. That in the event of the loss of time from deficiency *and/or default* of men or *including strike of Officers and / or crew or deficiency of* stores,
fire, breakdown or *damages* to hull, machinery or equipment,

98. grounding, detection by average accidents to ship or cargo, *unless resulting from inherent vice, quality or defect to the cargo*, drydocking for the purpose of examination or painting bottom, or by any other cause

99. preventing the full working of the vessel *unless same is caused by Charterers or by following their instructions*, the payment of hire shall cease for the time thereby lost, and if upon the voyage the speed be reduced by

100. defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101. thereof, and all extra *directly related* expenses shall be deducted from the hire *and duly substantiated*.

102.    16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or of being last heard of) shall be

103. returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104. Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105. The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106. purpose of saving life and property.

107.    17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London New-York*,

108. one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for

109. the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial *shipping* men. (See Clause 60.)

110. *General Average / Arbitration in London. This Charter Party shall be governed by and construed in accordance with English Law.*

111.    18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-

112. age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

113. deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

114. might have priority over the title and interest of the owners in the vessel.

115.    19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

116. Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule E of

117. York-Antwerp Rules 1974 as amended 1994 at London (See Clause 66) *1924; at such port or place in the United States as may be selected by the carrier,*

118. ~~Rules, according to the law and usage at the port of New-York. In such adjustment disbursements in foreign currencies shall be exchanged into~~

119. ~~United States money at each of the rate prevailing on the dates made and allowances for damage claimed in foreign currency shall be converted at~~

120. ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~

121. ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~

122. ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~

123. ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~

124. ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held at the special account at the~~

125. ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid at the~~

126. ~~United States money.~~

127. ~~In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~

128. ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~

129. ~~goods, the shippers and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~

130. ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~

131. ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~

132. ~~ships belonged to strangers.~~

133.    20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and *shall be for*

134.    *Owners' account, the*

135. ~~cost of replacing same to be allowed by Owner.~~

       *Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. (See Clause 66)*

       ~~21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~

136. convenient place, bottom cleaned and painted whenever Charterers and the Captain think necessary, at least once in every six months, reckoning from
137. time of last painting and payment of the hire to be suspended until she is again in proper state for the service.
138. (See Clause 70)
139.
140. 22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also
141. providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for
142. same, otherwise on payment of hire Charterers shall be for Charterers' account. Owners also to provide on the vessel lights as on board lanterns and oil for
143. night work, *free of expense to Charterers*, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at
144. Charterers' expense. The Charterers to have the use of any gear on board the vessel.
145. 23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;
146. steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,
147. deck-hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the number of the
148. port, or labor unions, prevent crew from doing winching work, Shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or
149. insufficient power to operate winches, Owners to pay for shore engines, or engines, in lieu thereof, if required, and pay any loss of time occasioned
150. thereby.
151. 24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152. in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
153. etc." in respect of all cargo shipped under this Charter to or from the United States of America. It is further subject to the following clauses, both
154. of which are to be included in all bills of lading issued hereunder.
155. U.S.A. Clause Paramount
156. This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157. 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158. any of its rights or immunities or an increase of any of its responsibilities or liabilities under the said Act. If any term of this bill of lading
159. be repugnant to said Act to any extent, such term shall be void to that extent, but no further.
160. Both-to-Blame Collision Clause
161. If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
162. Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
163. hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
164. or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
165. carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
166. owners as part of their claim against the carrying ship or carrier.
167. 25. The vessel shall not be required to enter any port where lights or light-ships have been or are about to be with-
168. drawn by reason of ice, or where there is risk that in ordinary course of things the vessel will not be able on account of ice to safely enter the
169. port to get out, after having completed loading or discharging. *Ice free ports / loading. Vessel not to force ice or follow ice-breakers.*
170. 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners to remain responsible for the
171. navigation of the vessel, *acts of pilots and tugboats except of strikes not against the Owners*, insurance, crew, and all other matters, *except for time*
172. *Charterers' responsibility as agreed in this Charter and Rider*, same as when trading for their own account.
173. 27. A commission of 2¼ per cent is payable by the Vessel and Owners to
174. on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

11-DEC-2007 12:45 From:                          To:0078617765515          P.1/1

175

28. ~~An address commission of 2 % per cent is payable to~~ .......................... ~~on the hire earned and paid under this Charter.~~

*Additional Clause 29 to 82 as attached are to be fully incorporated in this Charter Party.*

THE OWNERS;



THE CHARTERERS

This Charter Party is a computer generated copy of the NYPE(Revised 3rd October, 1946) from printed under licence from the Association Ship Brokers & Agents (U.S.A), Inc. using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

<u>M/V "PAGANE" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007</u>

**<u>Clause 29  Vessels description</u>**
M/V PAGANE - GEARLESS SD BC
PANAMA FLG-BLT 1982
54158 MTS DWAT ON 12.35 M SSW
GR T/NRT - 32976/20521
LOA/BEAM - 220/32.20M
DEPTH MOULDED 17 M
GRAIN IN MAIN HOLDS - 2443031.66 CFT (HA CMNGS INCLDD)
7 HOLDS/10 HATCHES
HATCH SIZES - ALL 11.60 BY 15.40M
HOLDS SIZE:
-HOLD #1 - 17.50m X 32m (AFT PART)
-HOLD #2 - 29.70m X 32m
-HOLD #3 - 18.00m X 32m
-HOLD #4 - 27.90m X 32m
-HOLD #5 - 18.00m X 32m
-HOLD #6 - 30.60m X 32m
-HOLD #7 - 15.30m X 32m (FORE PART)
HEIGHT OF ALL HOLDS - 17.90m INCLUDING COAMINGS.
MCGREGOR SIDE ROLLING TYPE - HYDRAULIC
SPEED CONDITION ABT 13 KNOTS ON ABT 26/27 MT IFO 180 CST PLUS ABT 3.5 MT
MGO AT SEA, PORT CONS ABT 2.5 MT MGO.
VSL BURNS MGO WHILST MANOUVRING AND NAVIGATING IN NARROW WATERS,
ENTERING-LEAVING PORT, SAILING IN CONFINED WATERS, RIVERS, CANALS,
ESTUARIES AND ON STAND BY.
FUEL CAP: ABT 2000 MT IFO 180 CST ISO 8217 RME 25
ABT 300 MT MGO ISO 8217 DMA
TPC ABT 61.0 T/CM
CONSTS ABT 500 ECXL. FW
NATURAL VENTILATION, NOT C02 FTD
CGO HOLD GRAIN B/DOWN
NO1 223328.52
NO2 473521.17
NO3 282491.75
NO4 449107.91
NO5 282491.75
NO6 492979.74
NO7 239110.80
- ALL ABT AND WOG -
OWNERS: PAGANE MARITIME LTD.
CLASS: RMRS
PANDI: INGOSTTRAKH
H+M: ALLIANZ
ISM / ISPS OK
CALL SIGN: 3 E B Z 9
INMARSAT 'C' TLX: 437127110

- HATCH SIZES: ALL 11.60 BY 15.40 M
- OWNERS GTEE AIR DFT (DISTANCE WL TO THC) IN FULL BALLAST CONDITION TO BE
  MAX 12.00 M
- LAST THREE CARGOES: STEELS, IRON ORE, CLINKER




7

M/V "PAGANE" – RIAS-TRADING – C/P DATED 17th OCTOBER 2007

I.      VSL'S STOWAGE PLAN:
        -HOLD #1 - 5190.75mts - FULL
        -HOLD #2 - 10400.00mts - SLACK
        -HOLD #3 - EMPTY
        -HOLD #4 - 10444.48mts - FULL
        -HOLD #5 - EMPTY
        -HOLD #6 - 11464.77mts - FULL
        -HOLD #7 - 4000.00 - SLACK
        -----------------------------------------------------
        TTL 41500mts
        DRAFT FORE=10.39m MID=10.54m AFT=10.70m
        ALL ABOVE ESTIMATIONS DONE ON BSS TRIMMED ENDS,IF LOADING WILL BE
        WITH UNTRIMMED ENDS THEN STOWAGE PLAN CHANGE WILL BE .
        II. WE NEED MIN 48 HRS TO BALLAST/DEBALAST HOLDS NoS 3-5.
        III. RCVD MSG FM GLOBAL AGENCY ASKING FOR SOME VSL'S DETAILS.STILL
        NOT REVERT,WAIT YR CONFORMATION AND INSTR.

- OWNRS WILL CONSIDER AIR DFT (DISTANCE: WL TO THC) IN FULL BALLAST
INCLUDING BALLASTING CARGO HOLDS NO3 AND NO5 AND ACHEAVING REQUIRED
BY TERMINAL. DRAFT ON HOLD NO 7 BY TRIMING THE VESSEL, BUT TIME LOST FOR
BALLASTING/DEBALLASTIN AND PREPARING CARGO HOLDS IN SUITABLE
CONDITION FOR LOADING ALWAYS TO BE FOR AND ACCOUNT OF CHARTERES

• OWNERS CONFIRM VSL IS GRAIN CLEAN AND HAS ON BOARD VALID DOCUMENTS
  OF AUTHORIZATION FOR CARRIAGE OF GRAINS IN BULK.
- OWNERS CONFIRM THAT VESSEL IS SUITABLE FOR GRAB DISCHARGE.
- OWNERS CONFIRM VESSEL IS CLASSED HIGHEST LLOYD'S CLASS AND ISM / ISPS
  CODE FITTED FOR THE WHOLE DURATION OF VOYAGE.
• OWNERS CONFIRM VESSEL HAS ALL VALID DOCUMENTS/CERTIFICATES AVAILABLE
  ON BOARD FOR LOADING AND DRAFT SURVEY.
- OWNERS CONFIRM THAT VESSEL IS NOT BLACKLISTED FOR LOAD AND/OR
  DISCHARGE COUNTRIES / PORTS AND SUITABLE FOR THIS TRADE.
- OWNERSHIP/CLASS/PANDI CLUB/H+M INSURANCE NOT TO BE CHANGED
  THROUGHOUT WHOLE TRIP DURATION.

8

M/V "PAGANE" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007

### Clause 30 Bunker Clause

Bunker on delivery to be as on board (expect IFO about 328 mts and MGO about 55 mts).
Bunker on redelivery to be about same quantity (not less) as actually on delivery. Charterers will pay cost of bunker on delivery together with 1st hire.
Bunker prices - IFO USD 435 / MGO 745 per mt, same prices on redelivery

### Clause 31 Trading Exclusions

One time Charter Trip to Aqaba / Jordan.

### Clause 32 Cargo Trading Clause

Cargo is grain.

### Clause 33 – Deleted.

### Clause 34

Owners guarantee that the vessel is an easy trimming bulk carrier suitable for loading / carrying / discharging a full and complete cargo of any / all kinds of grain in bulk without bagging / strapping/securing. The vessel to have on board at all times all relevant grain loading booklets / manuals / certificates and hold end trimming table and vessel to be able to load grain without shifting boards / grain fittings in accordance with 1991 amendments the International Convention of SOLAS 1974 and has dispensation from trimming holds ends.

### Clause 35 Hire Payment

Hire and all monies due to the Owners under this Charter Party will be paid to Owners' bank account. Charterers will not agree to the assignment of hire, monies due under this Charter Party or the Charter Party itself in any circumstances whatsoever.

First hire shall be paid within 3 banking days after vessel's delivery together with value of bunkers. Thereafter, hire shall be settled every 15 days in advance. Greenwich Mean Time (G.M.T.) shall be applied for hire calculation purpose.

Notwithstanding anything contained herein to the contrary, if any time during the currency of this Charter, hire shall become due on or during a Saturday, Sunday or national holiday or outside normal office hours, or at any time which for reasons beyond their reasonable control would prevent Charterers from effecting payment of hire on the due date, payment of hire is to be made on the banking day immediately preceding the date on which hire becomes due. Where there is any failure to make hire payment on the due date because of an oversight or negligence or error or omission of Charterers' employees, Bankers or Agents or otherwise for any reason where there is absence of intention to fail to make payment as set out, Charterers shall be given by Owners 3 banking days' notice to rectify the failure, where so rectified the payment shall stand as punctual and regular payment.

### Clause 36 Charterers' Deduction

Charterers have no right to deduct any Owners' expenses from the Charter hire. It is understood that Owners will forward to load and/or discharge agent in advance any funds required for Owners' expenses.

9

M/V "PAGANE" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007

**Clause 37 Communication/Entertainment/Victualling**
Charterers shall pay US$ 1,250,- per month or pro rata in lieu of communication / entertainment / victualling.

**Clause 38 Delivery/Redelivery Notice**
Delivery Notices:       on fixing and then daily notices.

Redelivery Notices:    15 days approximate and 5/3/2/1 days definite notice of redelivery
                       date and port.

**Clause 39  Stevedore Damage Clause**
Stevedores shall be employed at the risk of and paid for by the Charterers. It is understood that all tallying is to be for Charterers' account.

Charterers shall not be responsible for any damage suffered by the vessel and/or her equipment whilst loading or unloading, unless such damage is notified to Charterers' representatives/Agents in writing by the Master latest within 24 hours after the occurrence, except in case of hidden damages which to be reported latest upon completion of discharge.

In the event of stevedore damage:

a)   Such damage to be entered into the vessel's log book.

b)   Master shall also have notified the stevedores or parties responsible for such damage in writing or telex/cable with copy to Charterers.

c)   If the damage caused as above by Charterers or their stevedores affects the vessel's seaworthiness or cargo worthiness or is subject to Classification requirements then all such damage is to be repaired to the satisfaction of the vessel's Classification Society prior to leaving the loading/discharging port. Vessel remaining on hire and costs being borne by Charterers.

d)   Damages not affecting seaworthiness or cargo worthiness or is not subject to classification requirements may be repaired later together with Owners' work at Owners' time and at Charterers' expenses. Owners to provide Charterers with copies of original invoices and if required, to advise Charterers' nature of work necessary to repair damages.

e)   Master will make every attempt to obtain written acknowledgement from the party causing the damage but this without prejudice to paragraphs 'a' through 'd'.

**Clause 40 P and I Club**
Owners guarantee that the vessel is fully covered by the Ingosstrakh. Charterers have the benefit of Owners' cover granted by the P and I Club so far as the Club Rules permit.

Trip to Jordan always as per vessel's P and I club requirements which are:

= subject to previous written notification to Ingosstrakh;
= loading/discharging surveys carried out by approved surveyor of Ingosstrakh;

10

M/V "PAGANI" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007

**Clause 41 Return Insurance**
As far as rules permit, the Charterers to have the benefit of any return insurance premium receivable by Owners from their underwriters, as and when received by Owners, by reason of vessel being in port all such time on hire.

**Clause 42 War Risk**
Basic war risk insurance premium for worldwide trading to be for Owners' account, and additional premiums for hull and machinery and Officers/crew for trading to restricted area, also crew war bonus, if any, to be for Charterers' account. The orders of Owners' war risk underwriters always to be followed.

The vessel's hull and machinery value of fixing is USD 5,200,000.-

**Clause 43 On/Off-Hire Survey**
Charterers to appoint a surveyor acting on their behalf for performing a joint on and off hire bunker and condition survey. Joint on hire survey to be in Owners' time unless vessel already loading and joint off hire survey to be in Charterers' time. Expenses for on/off hire survey to be shared equally between Owners and Charterers.

**Clause 44 Hold Cleaning**
On arrival first load port, vessel to be grain clean and ready in every respect and in all compartments to receive Charterers' cargo to local surveyors' and/or competent authorities' satisfaction, failing which vessel to be off-hire from the time of rejection until passed again. Owners to take immediate corrective steps to expedite cleaning as fast as possible including the use of shore labour. If vessel fails inspection, all bunkers consumed after rejection and extra expenses incurred as a direct result to be for Owners' account, until vessel has been passed in all compartments again.

Charterers' option to redeliver the vessel unclean paying USD 5,000.00 in lieu of hold cleaning.

**Clause 45 Bills of Lading**
The Owners undertake to instruct the Master to authorise Charterers or Charterers' Agents if required to issue and sign Bill(s) of Lading on Charterers' usual form on Owners' and Master's behalf for cargo as presented in conformity with Mate's receipts. Charterers to keep Owners harmless should Charterers' servants not issue Bills of Lading per Owners'/Master's strict authority.

Should original Bill(s) of Lading not be available prior to vessels' arrival to the discharging port(s) in time, Owners to agree to release entire cargo without production of original Bill(s) of Lading, if so requested by Charterers or their agent(s), against a fax presentation of Letter of Indemnity under Owners' P and I Club wording which to be singly signed by Charterers or signed by sub-Charterers together with Charterers' joint signature.

No liner or through Bills of Lading or Seaway Bill may be issued/used during the currency of present Charter Party.

Charterers are not to issue or cause to be issued Bs/L which are subject to Hamburg rules.

**Clause 46 ISM Clause**
From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both

11




the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Owners shall indemnify Charterers for any and all loss, expense and/or damage and/or consequences sustained by Charterers resulting from partial or full non-compliance with this clause. Any and all delays to the vessel resulting from such partial or full non-compliance with this clause shall not count as laytime or, if laytime has expired, as time on demurrage respectively, as the case may be, as on-hire time.

## Clause 47 Deratisation Certificate
The vessel to have valid deratisation certificate and/or equivalent fumigation certificate on board at time of delivery. The validity of which is to be maintained by Owners in their time and at their expense during the currency of this Charter Party.

## Clause 48 Quarantine/Smuggling
Normal quarantine time and expenses for entering ports shall be for Charterers' account. The Owners shall be liable for any delay in quarantine arising from the Master or any of the deck or engine Officers or crew having communication with the shore at any infected area without the written consent or instructions of Charterers or their Agents, also for any loss of time through detention by customs or other authorities caused by smuggling or their infraction of local law on the part of the Master or any of the deck or engine crew. Any delay, expenses and/or fines incurred on account of smuggling, if caused by the Charterers' supercargo and/or their staff or Agents are to be for Charterers' account. Likewise, if any delay in quarantine arises as a result of Charterers' trading of the vessel and/or misinstructions or lack of proper instructions by Charterers or their Agents, servants or representatives such delay is to be for Charterers' account.

## Clause 49 Health Certificate
The Owners shall arrange at their expense that Master, Officers and crew of vessel hold valid vaccination certificates against yellow fever, smallpox, cholera or other necessary health certificates during the Charter.

## Clause 50 Vessel's Equipment
Vessel's equipment shall comply with the regulations of the countries in which vessel will be employed and Owners are to ensure that vessel is at all times in possession of valid and up-to-date certificates as required. If stevedores, longshoremen or other workmen are not permitted to work due to failure of the Master and/or the Owners and/or Owners' Agents to comply with the aforementioned regulations or because the vessel is not in possession of such valid and up-to-date certificates as required, then Charterers may suspend hire for the time thereby lost and Owners shall pay all proven extra direct expenses incurred incidental to and resulting from such failure.

## Clause 51 Safety Regulation
It is understood that the vessel will comply with all safety regulations and/or requirements in effect at ports of loading and/or discharging. It is agreed that should the vessel not meet safety rules and regulations, Owners will take corrective action and vessel is to be off-hire.

12

M/V "PAGANE" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007

**Clause 52 Canal Certificate**
The vessel is fully fitted for Panama/Suez Canal transit and in possession of valid necessary certificate on board, in conformity with current canal regulations/requirements.

**Clause 53 Crew Service**
During the currency of this Charter Party and provided weather and local stevedore and port regulations permit, Charterers to have the option to use crew to perform the following services as a means toward an efficient cargo operation:

a)   At each port all of the hatch opening and closing;
b)   Preparing vessel for sea;
c)   Removal and disposal of dunnage to be for Charterers' account;
d)   Gangway watchmen for the vessel to be for Owners' account,
      Compulsory cargo watchmen to be for Charterers' account;
e)   Before and upon arrival at a port, vessel's Officers/crew to shape up vessel's hatches, and
      gangway in order to commence loading and/or discharging without delay. Opening/closing of
      all hatchcovers and erecting and dismantling of shifting boards, if necessary, shall be done by
      Officers/crew provided shore regulations permit.

**Clause 54 War Cancellation**
If war breaks out between any two or more of the following countries: United Kingdom, U.S.A., C.I.S., P.R.C., Japan, directly affecting the performance of this Charter, both Owners and Charterers shall have the option of cancelling this Charter whereupon Charterers shall redeliver vessel to Owners, if she has cargo on board after discharge thereof at destination, or, if debarred from reaching or entering it, at a near, open and safe port as directed by Charterers, or if she has no cargo on board, at a port at which she stays or if at sea at a near and safe port as directed by Charterers. In all cases, hire shall be paid until vessel's redelivery.

**Clause 55 Requisition**
Should the vessel be requisitioned by any government or governmental authority due to Owners/Managers/vessel's fault, or due to vessel's flag or Ownership during the period of this Charter, she shall be off-hire during the period of such requisition and any hire or other compensation paid by any government or governmental authority in respect of such requisition shall be for Owners' account.

**Clause 56 Extra Period**
Should the vessel be placed off-hire during the currency of this Charter for any reason whatsoever, the Charterers have the option of adding all or any part of such off-hire period to the original period.

**Clause 57 Cancellation Clause**
If the vessel is placed off-hire more than 30 consecutive days, Charterers have the right to cancel the balance period of this Charter by giving notice to Owners without prejudice to any other right the Charterers may have under this Charter and provided vessel is free of cargo.

**Clause 58 Capture/Seizure/Arrest**
Should the vessel be seized or detained or arrested or delayed by any authority during the currency of this Charter Party, the Charterers' liability for seizure or detention or arrest or delay is ceased immediately from the time of her seizure or detention or arrest or delay and all time lost by this reason shall be treated as off-hire until the time of her release unless such seizure or detention or arrest or

13

M/V "PAGANI" - RIAS-TRADING - C/P DATED 17th OCTOBER 2007

delay is occasioned by any personal act or omission or default of Charterers or their Agents. Extra expenses incurred directly from above seizure or detention or arrest or delay to be for Owners' account.

**Clause 59 Cargo Claim**

Cargo Claims To Be Settled As Per NYPE Interclub Agreement 1996

**Clause 60 Small Claims Procedure Clause**
Notwithstanding anything contained in the Arbitration Clause to the contrary, should neither the claims nor the counterclaims exceed USD 100,000.00 exclusive of interest on the sum claimed, costs of the arbitration and legal expenses, if any, it is hereby agreed the dispute is to be governed by the London Maritime Arbitrators' Association Small Claim Procedure, revised 1st January, 1994.

**Clause 61 Deviation/Put Back**
Should the vessel put back whilst on voyage by reason of an accident or breakdown or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness or accident to the crew or any person on board the vessel or by reason of the refusal of he Master or crew to perform duties, the hire shall be suspended from the time of inefficiency, unless caused by Charterers and/or Charterers' servants until the vessel is again efficient in the same position (or in Charterers' option at a point equidistant to the vessel's next destination) and voyage resumed therefrom. All direct expenses incurred including bunkers consumption during the period of suspended hire shall be for Owners' account.

**Clause 62 Water Pollution**
A.   For Bulk Carriers:

(1)   Owners warrant that throughout the currency of this Charter they will provide the vessel with the following certificates:

    (a)   Certificates issued pursuant to Section 311 (p) of the U.S. Federal Water Pollution Control Act, as amended (Title 33 U.S Code, Section 1321(p)) up to (insert the date upon which such certificate(s) is/are due to expire).

    (b)   Certificates issued pursuant to Section 1016(a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response. Compensation and Liability Act 1980, as amended in accordance with Part 138 of Coast Guard Regulations 33 CFR, from (indicate the earliest date upon which the Owners may be required to deliver the vessel into the Charter or, if later, the date inserted in sub-paragraph (a) above), so long as these can be obtained by the Owners from or by (identify the applicable scheme or schemes).

(2)   Notwithstanding anything whether printed or typed herein to the contrary:

    (a)   Save as required for compliance with paragraph (1) hereof, Owners shall not be required or establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter.

    (b)   Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage,

14

<u>M/V "PAGANE" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007</u>

liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(c) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any Bills of Lading issued pursuant to this Charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or water, other than to the extent provided in paragraph (1) hereof.

### Clause 63 Owners' Agents

Charterers may agree to have their Agents attend to the Owners' matters such as delivery, redelivery, general average, drydocking, repair, hospitalisation, repatriation of crew, supply of the vessel's stores and provisions, etc., with Owners paying Charterers' Agents actual expenses including attendance fee and agency fee according to the Charterers' tariff rate. Charterers may also agree to have their Agents to attend to trivial Owners' matters, such as, cash advance, crew mail, arranging shore pass with Owners paying actual expenses including attendance fee, if any, but without agency fee. (See Clause 36).

### Clause 64 Taxes

Export and/or import permits for Charterers' cargo to be at Charterers' risk and expense. Taxation or levies on cargo or freight to be for Charterers' account and to be paid by Charterers.

### Clause 65 Paramount Clause

General Paramount Clause to apply

### Clause 66 Additional Clause

New Jason Clause, P and I Bunkering Clause, New Both-to-Blame Collision Clause and Baltime War Risk Clause, as attached, to be incorporated in this Charter Party and all Bill(s) of Lading issued hereunder.

### Clause 67 Drydock Clause

The Owners have no option to make her drydock during this Charter period except emergency cases, or unless otherwise agreed.

### Clause 68 - Deleted

### Clause 69 Bulk Carrier Safety Clause

(A)  The Charterers shall instruct the terminal operators or their representatives to cooperate with the Master in completing the IMO Ship/Shore Safety Checklist and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

(B)  In addition to the above and notwithstanding any provision in this Charter Party in respect of loading/discharging rates, the Charterers shall instruct the terminal operators to load/discharge

15

M/V "PAGANE" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007

the vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the vessel's draught, trim, stability, stress or any other factor which may affect the safety of the vessel.

(C)   At any time during cargo operations, the Master may, if he deems it necessary for reasons of safety of the vessel, instruct the terminal operators or their representatives to slow down or stop the loading or discharging.

(D)   Compliance with the provisions of this Clause shall not affect the counting of hire.

**Clause 70 Stowaway Clause**
Any time lost including but not limited to time on demurrage and any losses, liabilities and cost incurred by reason of stowaways on board shall be for Owners' account.

**Clause 71 Ocean Route Clause**
Evidence of weather conditions to be taken from independent weather bureau reports. Owners to be represented by the findings of 'Aerospace' Ocean Routing Company. In case of dispute between Owners and Charterers' ocean routing companies, the matter to be taken into further arbitration. In any case, Master always entitled to choose vessel's routing related to vessel and crew safety.

Owners' ocean routing company full style/address as follows:

Aerospace & Marine International Corporation,
6920 Santa Teresa Boulevard, Suite 209,
San Jose, CA 95119, U.S.A.
Tel:        408-360-0440
Fax:       408-360-0450
Tlx:        149158
Email:     ops@weather3000.com
Web-port:  www.amIwx.com

**Clause 72 Mobile Crane Clause**
Deleted.

**Clause 73 Split Bills of Lading Clause**
Charterers and/or Agents are hereby authorised by Owners/Master to split Bills of Lading and issue ship delivery orders in negotiable and transferable forms against collection of full set of original Bills of Lading. Delivery orders to conform with all terms and conditions and exceptions of Bills of Lading and shall not prejudice shipowners' rights.

**Clause 74 Oil Pollution**
As a condition of this Charter Party, Owners guarantee that Owners and vessel are and will remain throughout the currency of the Charter Party insured for pollution liability with respect to trading within, to and from ranges and areas specified in this Charter, said insurance to have a limit of not less than U.S.$1 billion. At any time before or subsequent to the fixture date of this Charter, Owners, upon reasonable notice from Charterers, shall furnish to Charterers or its representative proof, satisfactory to Charterers, of such insurance. Without prejudice to Charterers' other rights, Owners shall indemnify Charterers for any and all loss, expense and/or damage sustained by Charterers resulting from non-compliance with this Clause. Any and all delay to the vessel resulting from such non-

16

M/V "PAGANE" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007

compliance shall not count as laytime or, if laytime has expired, as time on demurrage.

**Clause 75**
Vessel's crew contracts are bona fide employment agreement.

**Clause 76**
The vessel to remain always in seaworthy trim/condition to safely sail between ports/berths to Master's satisfaction.

**Clause 77**
Deleted.

**Clause 78 ISPS Clause**

(a)   (i)   From the date of coming into force of the International Code for the security of ships and of port facilities and the relevant amendments to chapter XI of SOLAS (ISPS code) in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the vessel and "the company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The owners shall provide the Charterers with the full style contact details of the company security officer (CSO).

(ii)   Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this clause shall be for the Owners' account.

(b)   (i)   The Charterers shall provide the CSO and the ship security officer (SSO)/master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-Charter Parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

(ii)   Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this clause shall be for the Charterers' account.

(c)   Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the owners' negligence, crew's nationality/visa issues, or costs or expenses

17

M/V "PAGANE" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007

directly arising from vessel's ownership or other crewing matters.

(d) If either party makes a payment which is for the other party's account according to this clause, the other party shall indemnify the paying party.

## Clause 79

All negotiations/trade are to be made in accordance with English Law. English Law to apply. Arbitration, if any, to be in London in accordance with the Arbitration Clause of the Charter Party.

## Clause 80

Charterers have the option to perform a general condition survey of the vessel at any time. Survey to be at Charterers' time and expenses.

## Clause 81

Owners to provide following certificates as per L/C requirements (see attached):

1.  Certificate issued and signed by (P and I) Club or their representative or by their agent to the effect that the carrying vessel is a member to that (p and i) club having representative or agent in Jordan.

2.  Certificate issued and signed by shipping register or their agent certifying that the carrying vessel is classified 100a1 or its equivalent and free from any outstanding recommendations.

## Clause 82

Negotiations and fixture, if any, to be kept private & confidential by all parties involved.

18

M/V "PAGANE" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007

## BOTH-TO-BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

### New Both-to-Blame Collision Clause

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact"
and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

### New Jason Clause

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.
If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery"

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

19

<u>M/V "PAGANO" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007</u>

## BALTIME 1939 WAR CLAUSE

(A)  The vessel unless the consent of the Owners be first obtained not to be ordered nor continue to any place or on any voyage nor be used on any service which will bring her within a zone which is dangerous as the result of any actual or threatened act of war, war hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or state whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of Sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any Government or Ruler.

(B)  Should the vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (1) the Owners to be entitled from time to time to insure their interests in the vessel and/or hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand; and (2) notwithstanding the terms of Clause 11, hire to be paid for all time lost including any loss owing to loss of or injury to the Master, Officers and crew or to the action of the crew in refusing to proceed in such zone or to be exposed to such risks.

(C)  In the event of the wages of the Master, Officers and crew or the cost of provisions and/or stores for deck and/or engine room and/or insurance premiums being increased by reason of or during the existence of any of the matters mentioned in section (A) the amount of any increase to be added to the hire and paid by the Charterers on production of the Owners' account therefore, such account being rendered monthly.

(D)  The vessel to have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other wise whatsoever given by the Government of the nation under whose flag the vessel sails or any other Government or any person (or body) acting or purporting to act with the authority of such Government or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such orders or directions.

(E)  In the event of the nation under whose flag the vessel sails becoming involved in war, hostilities, warlike operations, revolution or civil commotion, both the Owners and the Charterers may cancel the Charter and, unless otherwise agreed, the vessel to be redelivered to the Owners at the port of destination or, if prevented through the provisions of Section (A) from reaching or entering it, then at a near open and safe port at the Owners' option, after discharge of any cargo in board.

(F)  If in compliance with the provisions of this clause anything is done or is not done, such not to be deemed a deviation.

Section (C) is optional and should be considered deleted unless agreed according to Baltime 1939.

20

M/V "PAGANE" - RIAS-TRADING - C/P DATED 17th OCTOBER 2007

## P. AND I. BUNKER CLAUSE

The vessel shall have liberty as part of the Contract Voyage to proceed to any port or ports at which bunker oil is available for the purpose of bunkering at any stage of the voyage whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the ports of loading or discharge named in this Charter and may there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks and deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

## BIMCO STANDARD ISM CLAUSE

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by the failure on the part of the Owners or 'the Company' to comply with the ISM Code shall be for Owners' account.

## SECA CLAUSE

During the currency of this contract the performing vessel will consume bunkers in accordance with ISO 8217 specifications. In the event that emissions regulations, laws or guidelines require or recommend the stemming or consumption of bunkers with a quality that has a higher value than the price for high sulphur fuel oil, then such excess price will be paid for by Charterers for bunkers consumed whilst in an emission controlled area. Upon request Owners to provide documentary proof for such price differential together with the actual bunker consumption in these emission controlled areas.

## BUNKER FUEL SULPHUR CONTENT CLAUSE FOR
## TIME CHARTER PARTIES 2005

(A) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the vessel is ordered to trade within that zone. The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with regulations 14 and 18 of Marpol Annex VI, including the guidelines in respect of sampling and the provision of bunker delivery notes.

21

## M/V "PAGANE" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this sub-Clause (A).

(B) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with sub-Clause (A), the Owners warrant that:

(i) The vessel shall comply with regulations 14 and 18 of Marpol Annex VI and with the requirements of any emission control zone; and

(ii) The vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the vessel with fuels in accordance with sub-Clause (A), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the vessel's failure to comply with regulations 14 and 18 of Marpol Annex VI.

(C) For the purpose of this Clause, 'emission control zone' shall mean zones as stipulated in Marpol Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the E.U. and the U.S. Environmental Protection Agency.





# EXHIBIT B

PAYÉ *22.10.07.*

# GLINGROW HOLDING LTD.

15, BOUMPOULINAS, POVEK BUILDING, APT.NO: 301, NICOSIA, CYPRUS

To:  **RIAS TRADING S.A.**

Rue du Grand-Chene 6,

Lausanne 1003, CP no.7267 1002 Switzerland

22, October 2007       **ORIGINAL INVOICE  no.1019/H**

Dear Sirs,

We hereby invoice you as below:

| Charter Party dated | 17.10.2007 |
|---|---|
| Disponent Shipowners | GLINGROW HOLDING LTD., Nicosia, Cyprus |
| Charterers | RIAS TRADING S.A., Lausanne, Switzerland |
| Vessel | PAGANE |
| Time-Charter trip | from Kertch via Novorossiysk to Aqaba |
| Hire time | 18.10.2007 01:00 – 02.11.2007 01:00 |
| Amount for payment, USA $ | 1 061 013.00 |

Total for payment:

**\*Only One Million Sixty One Thousand Thirteen, 00/100 USA Dollars\***

Please kindly remit **USA $ 1 061 013.00** on our behalf to following bank account:

| Beneficiary bank | BNP Paribas (Suisse) S.A. Place de Hollande, 2 Case Postale 1211 Geneva 1, Switzerland |
|---|---|
| Beneficiary bank SWIFT code | BPPBCHGG |
| Beneficiary name | Bulcom Ltd. |
| Beneficiary address | KANIKA COMPLEX LIDO HOUSE 1 5TH FLOOR, SUITE 564 P.O.BOX 58021 CY-3730 LIMASSOL, CYPRUS |
| USD account number | 72673/2G |
| Beneficiary IBAN no. | CH69 0868 6001 0726 7300 2 |
| Payment details | m/v "PAGANE"/GLINGROW – 1-st hire |

In accordance with the Charter Party terms transfer to be executed within one banking day after receipt of this invoice.

All bank charges to be for the invoiced party.

Sincerely yours,
Glingrow Holding Ltd.

| Joc. nr *4293* | Date *22.10.07* |
|---|---|
| **Text** | |
| **DEBIT** | **CREDIT** |
| ACCOUNT | AMOUNT | ACCOUNT | AMOUNT |
| *4240* | | *2001/7* | |
| | | | *1.10640* |

COMPTABILISE

PAYÉ  07.11.07  BNP

# GLINGROW HOLDING LTD.

15, BOUMPOULINAS, POVEK BUILDING, APT.NO. 501, NICOSIA, CYPRUS

To:  **RIAS TRADING S.A.**

Rue du Grand-Chene 6,

Lausanne 1003, CP no.7267 1002 Switzerland

07, November 2007

## ORIGINAL INVOICE  no.1022/H

Dear Sirs,

We hereby invoice you as below:

| Charter Party dated | 17.10.2007 |
|---|---|
| Disponent Shipowners | GLINGROW HOLDING LTD., Nicosia, Cyprus |
| Charterers | RIAS TRADING S.A., Lausanne, Switzerland |
| Vessel | PAGANE |
| Time-Charter trip | from Kertch via Novorossiysk to Aqaba |
| Amount for payment, USA $ | 440 968.18 |

Total for payment:

**\*Only Fore Hundred Forty Thousand Nine Hundred Sixty Eight, 18/100 USA Dollars\***

Please kindly remit **USA $ 440 968.18** on our behalf to following bank account:

| Beneficiary bank | BNP Paribas (Suisse) S.A. Place de Hollande, 2 Case Postale 1211 Geneva 1, Switzerland |
|---|---|
| Beneficiary bank SWIFT code | BPPBCHGG |
| Beneficiary name | Bulcom Ltd. |
| Beneficiary address | KANIKA COMPLEX LIDO HOUSE 1 5TH FLOOR, SUITE 564 P.O.BOX 58021 CY-3730 LIMASSOL, CYPRUS |
| USD account number | 72673/2G |
| Beneficiary IBAN no. | CH69 0868 6001 0726 7300 2 |
| Payment details | m/v "PAGANE"/GLINGROW – 2-nd hire |

In accordance with the Charter Party terms transfer to be executed within one banking day after receipt of this invoice.

All bank charges to be for the invoiced party.

Sincerely yours,
Glingrow Holding Ltd.

COMPTABILISE

DEBIT   CREDIT

PAYE    COMPTABILISE

# GLINGROW HOLDING LTD.

15, BOUMPOULINAS, POVEK BUILDING, APT.NO: 301, NICOSIA, CYPRUS

To:  **RIAS TRADING S.A.**

Rue du Grand-Chene 6,

Lausanne 1003, CP no.7267 1002 Switzerland

21, November 2007

## ORIGINAL INVOICE  no.1023/H

Dear Sirs,

We hereby invoice you as below:

| | |
|---|---|
| Charter Party dated | 17.10.2007 |
| Disponent Shipowners | GLINGROW HOLDING LTD., Nicosia, Cyprus |
| Charterers | RIAS TRADING S.A., Lausanne, Switzerland |
| Vessel | PAGANE |
| Time-Charter trip | from Kertch via Novorossiysk to Aqaba |
| Amount for payment, USA $ | 25 194.04 |

Total for payment:

**\*Only Twenty Five Thousand One Hundred Ninety Four, 04/100 USA Dollars\***

Please kindly remit **USA $ 25 194.04** on our behalf to following bank account:

| | |
|---|---|
| Beneficiary bank | BNP Paribas (Suisse) S.A.<br>Place de Hollande, 2<br>Case Postale 1211<br>Geneva 1, Switzerland |
| Beneficiary bank SWIFT code | BPPBCHGG |
| Beneficiary name | Bulcom Ltd. |
| Beneficiary address | KANIKA COMPLEX<br>LIDO HOUSE 1<br>5TH FLOOR, SUITE 564<br>P.O.BOX 58021<br>CY-3730 LIMASSOL, CYPRUS |
| USD account number | 72673/2G |
| Beneficiary IBAN no. | CH69 0868 6001 0726 7300 2 |
| Payment details | m/v "PAGANE"/GLINGROW – 3-rd hire |

In accordance with the Charter Party terms transfer to be executed within one banking day after receipt of this invoice.

All bank charges to be for the invoiced party.

Sincerely yours,
Glingrow Holding Ltd.

**P A Y É** *03.11.07. BNP*

# GLINGROW HOLDING LTD.

15, BOUMPOULINAS, POVEK BUILDING, APT.NO: 301, NICOSIA, CYPRUS

To:   **RIAS TRADING S.A.**

Rue du Grand-Chene 6,

Lausanne 1003, CP no.7267 1002 Switzerland

29, November 2007

## ORIGINAL INVOICE  no.1025/H

Dear Sirs,

We hereby invoice you as below:

| Charter Party dated | 17.10.2007 |
|---|---|
| Disponent Shipowners | GLINGROW HOLDING LTD., Nicosia, Cyprus |
| Charterers | RIAS TRADING S.A., Lausanne, Switzerland |
| Vessel | PAGANE |
| Time-Charter trip | from Kertch via Novorossiysk to Aqaba |
| Amount for payment, USA $ | 447 311.56 |

Total for payment:

*Only **Four Hundred Forty Seven Thousand Three Hundred Eleven, 56/100** USA Dollars*

Please kindly remit **USA $ 447 311.56** to our following bank account:

| Beneficiary bank | FBME BANK LTD |
|---|---|
| Beneficiary bank SWIFT code | FBMECY2N |
| Beneficiary account no. | 054872USD-CACC-001-1 |
| Beneficiary IBAN no. | CY97 1150 1001 0548 72US DCAC C001 |
| Beneficiary name | Glingrow Holding Ltd. |
| Beneficiary address | 15, Boumpoulinas, Povek Building, Apt.no: 301, Nicosia, Cyprus |
| Payment details | m/v "PAGANE– 4-th hire |

In accordance with the Charter Party terms transfer to be executed within one banking day after receipt of this invoice.

All bank charges to be for the invoiced party.

**COMPTABILISE**

Sincerely yours,
Glingrow Holding Ltd.

| DEBIT | | CREDIT | |
|---|---|---|---|
| ACCOUNT | AMOUNT | ACCOUNT | AMOUNT |
| | | | |

**JUDGE LEISURE**            **07 CV 10726**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

BULCOM LTD.,                                  :

           Plaintiff,                  :

   - against -                                 :

GLINGROW HOLDING LTD. and           :
RIAS TRADING,                                 :

         Defendants.            :
-------------------------------------------------------X

07 CV ....

ECF CASE

**EX PARTE ORDER
FOR PROCESS
OF MARITIME
ATTACHMENT**

USDC SDNY
DOCUMENT
07 CV ...ECTRONICALLY FILED
ECF CASE  12/4/07

      **WHEREAS,** on November 30, 2007 Plaintiff, BULCOM LTD., filed a Verified

Complaint, herein for damages amounting to **$1,433,583.10** inclusive of interest, costs and

reasonable attorney's fee, and praying for the issuance of Process of Maritime Attachment and

Garnishment pursuant to Rule B of the Supplemental Admiralty Rules for Certain Admiralty and

Maritime Claims of the Federal Rules and Civil Procedure; and

      **WHEREAS,** the Process of Maritime Attachment and Garnishment would command that

the United States Marshal, or other designated process server, attach any and all of the

Defendants' property within the District of this Court; and

      **WHEREAS,** the Court has reviewed the Verified Complaint and the Supporting

Affidavit, and the conditions of Supplemental Admiralty Rule B appearing to exist:

      **NOW,** upon motion of the Plaintiff, it is hereby:

      **ORDERED,** that pursuant to Rule B of the Supplemental Rules for Certain Admiralty

and Maritime Claims, the Clerk of the Court shall issue Process of Maritime Attachment and

Garnishment against all tangible or intangible property, credits, letters of credit, bills of lading,

effects, debts and monies, electronic funds transfers, freights, sub-freights, charter hire, sub-

charter hire or any other funds or property up to the amount of $1,433,583.10 belonging to, due or being transferred to, from or for the benefit of the Defendant(s), including but not limited to such property as may be held, received or transferred in Defendants' name(s) or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named on whom a copy of the Process of Maritime Attachment and Garnishment may be served; and it is further

ORDERED that supplemental process enforcing the Court's Order may be issued by the Clerk upon application without further Order of the Court; and it is further

ORDERED that following initial service by the U.S. Marshal, or other designated process server, upon each garnishee, that supplemental service of the Process of Maritime Attachment and Garnishment, as well as this Order, may be made by way of facsimile transmission or other verifiable electronic means, including e-mail, to each garnishee; and it is further

ORDERED that service on any garnishee as described above is deemed effective continuous service throughout the day from the time of such service through the opening of the garnishee's business the next business day; and it is further

ORDERED that pursuant to Federal Rule of Civil Procedure 5(b)(2)(D) each garnishee may consent, in writing, to accept service by any other means.

Dated: November 30, 2007          SO ORDERED:

*John F. Keenan*
U.S.D.J.

A CERTIFIED COPY
MICHAEL McMAHON,

CLERK

Dec. 19. 2007  4:26PM   Lennon, Murphy & Lennon LLC                No. 2811   P. 3

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __12. 21. 07__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
BULCOM LTD.,

                                          Plaintiff,                    07 CV 10726

           - against -                                               ECF CASE

GLINGROW HOLDING LTD. and                                 CONSENT ORDER
RIAS TRADING,

                                          Defendants.
------------------------------------------------------------X

       It is hereby stipulated and agreed between the parties, by their undersigned attorneys, that

the funds that are currently under attachment in this action are to be released.  The garnishee

bank(s) are hereby instructed to release the attached funds pursuant to joint instructions to be

provided by letter and signed by the undersigned counsel.  The payment of the released funds by

the garnishee bank(s) shall not be subject to any further attachment in New York after those

funds are released by the garnishee bank(s).

The Plaintiff                                    The Defendants
BULCOM LTD.                                       GLINGROW HOLDING LTD. and
                                                  RIAS TRADING

By: _____                       By: _____
      Kevin J. Lennon                                  Thomas L. Tisdale
LENNON, MURPHY & LENNON LLC                       TISDALE LAW OFFICES, LLC
420 Lexington Avenue, Suite 300                   11 West 42nd Street, Suite 900
New York, NY 10170                                New York, NY 10036
(212) 490-6050                                    (212) 354-0025 – phone
(212) 490-6070                                    (212) 869-0067 – fax
klennon@lenmur.com                                ttisdale@tisdale-law.com

SO ORDERED:                    12/20/07

_____
Honorable Peter K. Leisure, U.S.D.J.

LENNON, MURPHY & LENNON, LLC
Attorneys for Plaintiff
PAGANE MARITIME LTD.
The Gray Bar Building
420 Lexington Avenue, Suite 300
New York, New York 10170
Telephone:    (212) 490-6050
Facsimile:    (212) 490-6070
Kevin J. Lennon
Charles E. Murphy

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
PAGANE MARITIME LTD.,                          :        07 CV 10726  (PKL)
                                                         :
                        Plaintiff,               :        ECF CASE
                                                         :
        - against -                              :
                                                         :
GLINGROW HOLDING LTD. and              :
RIAS TRADING,                                  :
                                                         :
                        Defendants.              :
-------------------------------------------------------------X

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT RIAS TRADING'S MOTION TO DISMISS COMPLAINT AND VACATE ATTACHMENT

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................................1

STATEMENT OF FACTS ...........................................................................................................3

ARGUMENT................................................................................................................................4

POINT ONE
PAGANE HAS SATISFIED ITS BURDEN OF PROOF UNDER SUPPLEMENTAL
ADMIRALTY RULES B AND E(4)(f) .......................................................................................4

POINT TWO
RIAS SHOULD BE EQUITABLY ESTOPPED FROM CONTESTING THE CONSENT
ORDER AND THE AGREEMENT FOR THE ATTACHED FUNDS TO SERVE AS
SECURITY IN LONDON ...........................................................................................................10

POINT THREE
RIAS MOTION TO DISMISS PLAINTIFF'S COMPLAINT IS DEFECTIVE..............................12

CONCLUSION ...........................................................................................................................13

## PRELIMINARY STATEMENT

Pagane's attachment should be sustained because this Court validly granted an *ex parte* attachment Order pursuant to Supplemental Admiralty Rule B of the Federal Rules of Civil Procedure and in accord with the United States Court of Appeals for the Second Circuit's decision in Aqua Stoli Shipping Ltd. v. Gardner Smith, 460 F.3d 434 (2d Cir. 2006). The Order was proper because: (1) Pagane has a valid *prima facie* admiralty claim against Glingrow and Rias arising from a breach of a charter party contract dated October 17, 2007; (2) neither Defendant can be "found" within the Southern District of New York; (3) the Defendants have property interests in the $402,736.79 that has been restrained within the District; and (4) there is no statutory bar to the attachment.

As a result, and for the further reasons set forth below, Plaintiff has satisfied its burden under Rule E(4) to show cause why its attachment should not be vacated. The burden of proof now shifts to Defendant Rias Trading ("Rias") establish one of the limited equitable grounds for vacatur. As will be demonstrated herein. Rias cannot satisfy its burden of proof to justify vacatur. Further, the facts and circumstance of this case warrant a finding by this Court that Rias should be equitably estopped from challenging the attachment in respect of the attached funds governed by the Consent Order.

Judge Preska summarized the state of the law in this regard in upholding a maritime attachment in Transportes Navieros Y Terrestes, S.A. de C.V. v. Fairmount Heavy Transport, N.A., 2007 U.S. Dist. LEXIS 50260, 2007 AMC 1993 (S.D.N.Y 2007). Judge Preska held that "[a]lthough the Court of Appeals has not stated exactly what a plaintiff must show to make out a 'prima facie admiralty claim,' many district courts that have examined this issue since Aqua Stoli have adopted the 'limited inquiry contemplated by Aqua Stoli' and have adopted a basic

definition of the term prima facie." *Id.* In her decision, Judge Preska re-confirmed that a plaintiff need not prove its case or present evidence at a Rule E(4)(f) hearing because a proper Verified Complaint is all that is required to satisfy Rule B and to withstand a motion to vacate attachment. The Transportes Navieros Y Terrestes court held as follows:

> The Court of Appeals in Aqua Stoli stated that "our conclusion leads us to reject the reasoning of the more recent district court decisions that have engaged in a broader Rule E(4)(f) inquiry" including a district court vacatur inquiry that would impose a "fact-intensive inquiry" into a Rule E(4)(f) vacatur hearing. 460 F.3d at 445, 447.

> In examining Aqua Stoli, Chief Judge Wood stated that the "Court of Appeals' holding and rationale in Aqua Stoli Shipping Ltd. also strongly undermine the standard, stated in a number of cases that the hearing pursuant to Supplemental Rule E (4)(f) is intended to make a preliminary determination whether there were reasonable grounds for issuing the warrant of the attachment." Tide Line, Inc. v. Eastrade Commodities, Inc., No. 06-1979, 2006 U.S. Dist. LEXIS 95870 at *14 (S.D.N.Y. Aug. 15, 2006) (internal citations and quotations omitted). Although Aqua Stoli did not explicitly address the "probable cause" or "reasonable grounds" standard, which would place a higher burden of proof on a plaintiff to justify an attachment, the Aqua Stoli Court did state that a fact-intensive inquiry is "improper because Rule B specifies the sum total of what must be shown for a valid maritime attachment" and that implies that the "probable cause" or "reasonable grounds" standard is improper insofar as it purports to go beyond this limited inquiry. Tide Line Inc., 2006 U.S. Dist. LEXIS 95870 at *15 (quoting Aqua Stoli, 460 F.3d. at 445). Using the less burdensome prima facie standard, Judge Wood explained that *a proper Verified Complaint is all that is required to satisfy Rule B and to prevail against a Rule E(4)(f) motion to vacate. Id. at \*15-16 ("Thus to show that it has a prima facie claim, a plaintiff seeking a maritime attachment need not provide any supporting evidence; its complaint should suffice.)* Furthermore Aqua Stoli implies that a plaintiff is likewise not required to provide evidence showing that it has a claim against defendant, to carry its burden under Supplemental Rule E(4)(f).")(internal footnote omitted).

> Thus, maritime plaintiffs are not required to prove their cases at this stage of a Rule E(4) hearing. SPL Shipping Ltd., 2007 WL 831810 at *2 (internal citation omitted). [Plaintiff] TNT submitted a Verified Complaint in which it alleged a proper admiralty claim against [defendant] FHT and fulfilled all of the other filing and service requirements of Rules B and E. Based on the prima facie standard approved by the Court of Appeals and employed by other district courts, TNT's maritime attachment satisfies the requirements of the admiralty rules that govern maritime attachment matters and is thus sufficient.

*Id.* (emphasis added).

The limited inquiry under Rias' Rule E(4)(f) application is whether Pagane's Verified Complaint alleged a legally sufficient maritime claim for the purpose of an attachment under Supplemental Rule B. Notwithstanding Rias' contrary claims, it is clear that the Verified Complaint alleged a legally sufficient maritime claim and the attachment should be maintained.

### STATEMENT OF FACTS

Rias has informed the Court concerning some facts and circumstances relevant to its motion to vacate. Importantly, Rias acknowledges the existence of the Consent Order (*see* Declaration of Sergey Chumak at ¶21, Exhibit B). Most importantly, the Consent Order, and the agreement which underpins the Consent Order, cuts off any right Rias may have had to challenge the attachment of these funds. Notably, Rias' motion papers are utterly silent regarding the basis upon which it believes the Consent Order was submitted to the Court nor any argument as to why the Court's Order does not now preclude it from challenging the attachment of the funds covered by the Consent Order.

To fill the gaps left by Rias in its motion papers, Pagane herein submits the Declarations of Matthew Moore and Kevin J. Lennon. These Declarations abundantly demonstrate that Glingrow and Rias agreed to have all funds restrained in New York as of the time of the Consent Order released from attachment and sent to London to serve as security for Pagane's claims. The evidence shows that:

- Glingrow and Rias acted as one, through one lawyer in London, and one lawyer in New York;
- Rias never reserved any rights in respect of the funds attached in New York prior to the Consent Order being submitted to, and eventually signed by, the Court;
- at no time was there ever any discussion that the attached funds should be divisible as between Glingrow and Rias; and rather, all funds were to be remitted to London to serve as security; and

- in accord with the agreement underpinning the Consent Order, Pagane twice ceased and desisted service of its attachment Order thereby allowing Glingrow and Rias unfettered access to the New York banking system to carry out their commercial banking transactions.

In light of the foregoing, it is respectfully submitted that RIAS' motion should be denied. Plaintiff has established the predicate for a maritime attachment under Rule B. Further, Rias should be equitably estopped from arguing that its funds restrained in the District should not be remitted to London to stand as security for Pagane's claims. Additionally, even if the Court does not equitably estop Rias from raising this argument, Pagane's Complaint is sufficient to withstand the challenge under Rule E(4)(f).

### ARGUMENT

### POINT I

### PAGANE HAS SATISFIED ITS BURDEN OF PROOF UNDER SUPPLEMENTAL ADMIRALTY RULES B AND E(4)(f)

Pagane has carried its burden to demonstrate that this Court's attachment order was validly issued. Under Supplemental Rule B, an order of maritime attachment must issue upon a minimal prima facie showing provided that the defendant cannot be found within the district in which the assets are sought to be attached. Supplemental Rule B provides, in relevant part:

> If a defendant is not found within the district…, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property – up to the amount sued for – in the hands of garnishees named in the process. The plaintiff or the plaintiff's attorney must sign and file with the complaint an affidavit stating that, to the affiant's knowledge, or on information and belief, the defendant cannot be found within the district. The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing process of attachment and garnishment. The clerk may issue supplemental process enforcing the court's order upon application without further court order.

Fed. R. Civ. P. Supp. Rule B(1).  As recently summarized by the Court of Appeals for the

Second Circuit:

> To begin the process, a plaintiff must file a verified complaint praying for an
> attachment and an affidavit stating that, to the best of the plaintiff's knowledge,
> the defendant cannot be found within the judicial district.  [Fed.R.Civ.P. Supp.
> Rule B(1).]  If the plaintiff's filings comply with these conditions, the court must
> enter an order authorizing the attachment, which the plaintiff may then serve on
> any persons in possession of the defendant's property located within the district.
> The order of attachment may be requested and granted ex parte, though notice of
> the attachment to the defendant via appropriate service is required.  Id.  Supp.
> Rules B(2), E(3).

Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 438 (2d Cir. 2006).  "The

power to grant attachments in admiralty is an inherent component of the admiralty jurisdiction

given to the federal courts under Article III of the Constitution," and its "historical purpose has

been two-fold:  first, to gain jurisdiction over an absent defendant; and second, to assure

satisfaction of a judgment."  *Id. accord* Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263, 268

(2d Cir. 2002).

    Furthermore, in respect of the right to challenge the validity of a maritime attachment

under Supplemental Rule E(4)(f), the Second Circuit held in Aqua Stoli that a plaintiff need only

demonstrate that the attachment order was properly issued, *i.e.*, (1) that it has a valid *prima facie*

admiralty claim; (2) the defendant cannot be found within the district; (3) the defendant's

property may be found in the district; and (4) there is no statutory bar.  Once the plaintiff has

made such a showing, a properly issued attachment order may be vacated only if the challenger

can prove any of four limited circumstances, none of which RIAS has proved in this case.

    This standard, first announced by the Second Circuit in 2006, was more recently restated

and followed by Chief Judge Wood in Tide Line, Inc. v. Eastrade Commodities, Inc., 2006 U.S.

Dist. LEXIS 95870, 2007 AMC 252 (S.D.N.Y. 2006) where the court held:

Furthermore, "[w]henever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules."  Rule E(4)(f) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure (Supplemental Rule E(4)(f)").  The Court of Appeals for the Second Circuit has recently, for the first time, spoken "directly on the showing necessary to vacate a maritime attachment under Rule E," Aqua Stoli Shipping Ltd., 2006 WL 2129336, at *4, 2006 U.S. App. LEXIS 19302, at *12 – holding that "once a plaintiff has carried his burden to show that his attachment satisfies the requirements of Supplemental Rule B, a district court may vacate an attachment only upon [certain] circumstances," which "can occur where 1) the defendant is present in a convenient adjacent jurisdiction; 2) the defendant is present in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for a judgment." Id., 2006 WL 2129336, at *1, 2006 U.S. App. LEXIS 19302, at *2.

Id. at *8.  More specifically, in Aqua Stoli the Court of Appeals held at greater length that while

it is a plaintiff's burden to prove that it has complied with the technical requirements of Rule B,

it is the moving party's burden to prove one of the limited equitable bases for vacatur.  The Court

of Appeals held as follows:

We therefore hold that, in addition to having to meet the filing and service requirements of Rules B and E, an attachment should issue if the plaintiff shows that 1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment.  Conversely, a district court must vacate an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rules B and E.  We believe vacatur is appropriate in other limited circumstances.  While, as we have noted, the exact scope of a district court's vacatur power is not before us, we believe that a district court may vacate the attachment if the defendant shows at the Rule E hearing that 1) the defendant is subject to suit in a convenient adjacent jurisdiction; 2) the plaintiff could obtain in personam jurisdiction over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise. n.5.

n.5 Rule E(4)(f) clearly places the burden on the plaintiff to show that an attachment was properly ordered and complied with the requirements of Rule B and E.  Although Rule E does not explicitly mention a district court's equitable power to vacate an attachment or who bears such a burden, former Local Rule 12

6

required the defendant to establish any equitable grounds for vacatur, and we believe that defendants still bear that burden under the Supplemental Rules.

Aqua Stoli, 460 F.3d at 445. Former Local Rule 12, to which the Second Circuit cited in note 5

of Aqua Stoli, provided as follows:

> Where property is arrested or attached, any person claiming an interest in the property arrested or attached may, upon showing of any improper practice or a manifest want of equity on the part of the plaintiff, be entitled to an order requiring that plaintiff to show cause why the arrest or attachment should not be vacated or other relief granted, consistent with theses rules or the supplemental rules.

*Id.*

The Second Circuit emphasized that "Rule B specifies the sum total of what must be shown for a valid maritime attachment." *Id.* at 447. Moreover, the Second Circuit held that upon the plaintiff's showing that the attachment was properly ordered, and that it complied with the requirements of Rules B and E, the "defendant bears the burden of "establish[ing] any equitable grounds for vacatur." *Id.* at 436. As explained above, the Rule(E)(4)(f) hearing is not intended to resolve the dispute between the parties, but merely to determine if the technical requirements of the Rule were met. Thus, as long as the plaintiff establishes that it has alleged a *prima facie* maritime claim, the defendant is not present in the district, the defendant's property has been restrained in the district and no other statutory bar to the attachment exists, the attachment should be upheld. *Id.* at 444. Once a plaintiff has established the technical requirements required by Rule B, the burden then shifts to the defendant to establish one of the limited bases for vacatur. *Id.*

Pagane has carried its burden to demonstrate that this Court's attachment order was validly issued because: (1) the Verified Complaint alleges a valid *prima facie* admiralty claim against the Defendants for breach of a charter party contract (2) the Defendants, who are foreign

7

companies, cannot be "found" within the Southern District of New York; (3) the Defendants have property interest in the funds attached in the district and; and (4) there is no statutory bar to the attachment.

In support of its request that the attachment be vacated, and Plaintiff's Complaint be dismissed as to it, Rias asserts that it was not a party to the contract between Plaintiff and Glingrow and that Plaintiff has not made a prima facie showing of a claim against it. Rias is incorrect on both fronts.

As per Rias' own concession, it paid charter hire due and owing to the Plaintiff on behalf of Glingrow at the direction of Glingrow. Thus, it readily admits that it acted as Glingrow's paying agent as asserted in the Plaintiff's Complaint. While Rias seeks comfort in setting up straw men such as whether Rias is a guarantor of the charter party obligations of Glingrow or an alter ego of Glingrow[1], it is important to note that Pagane has not asserted such claims against Rias. Thus, the Court should not be swayed by such non-issues.

Rias has admitted to acting in a manner wholly inconsistent with sound business practices by making payments on behalf of an entity, Glingrow, with which it claims it is only loosely associated. See Declaration of Sergey Chumak at ¶8. It is questionable exactly what this relationship is since while Rias submitted Declaration claims that the Defendants had a contract that related to the contract between Plaintiff and Glingrow it has deliberately chosen to deprive the Court and Pagane from considering such a contract which is not appended to its papers submitted to the Court. Further, while there is some very vague assertion of a connection to mutual owners (i.e., vessel owners) this is not explained in any detail. Finally, a key point of analysis should be the nature of the payments being made, or received by, Rias that were

---

[1] While not alleged in the Plaintiff's Complaint this basis of liability on the part of Rias is not waived and Plaintiff reserves its right to allege this theory of recovery as against Rias.

attached in this district. On this issue, Rias has chosen, yet again, to keep the Court and Pagane in the dark.

It is admitted that on at least one occasion, if not more, Rias made a payment on behalf of Glingrow including the initial charter payment to Plaintiff. *See* Rias Memorandum of Law at 5, Declaration of Sergey Chumak at ¶12. Thus, it is quite reasonable to assume that the funds attached in this district represent exactly what Pagane claims in its Complaint: funds being remitted, or received, by Rias on behalf Glingrow. As such, these funds are properly reached by the Plaintiff's attachment.

Two recent maritime attachment decisions issued by the Court support the Plaintiff's positon. In <u>Essar Int'l, Ltd. v. Martrade Gulf Logistics</u> the Court held that a "[A] plaintiff need not aver an alter-ego relationship in the Complaint for a Rule B attachment to be proper. *Maersk, Inc. v. Neewra, Inc.*, 443 F. Supp. 2d 519, 527-30 (S.D.N.Y. Aug. 1, 2006) (holding that an analysis of whether reasonable grounds exist for a Rule B attachment is not limited to the allegations in the Complaint). As stated, Defendant Martrade had an interest in the June 1 EFT sufficient to uphold its attachment under Rule B. Accordingly, the requirement that the property attached be that of the named defendant is satisfied." See <u>Essar Int'l, Ltd. v. Martrade Gulf Logistics</u>, 2007 U.S. Dist. LEXIS 61713 (S.D.N,.Y. 2007).

Further, the Court's decision in <u>Chiquita Int'l Ltd. v. M/V Bosse</u>, sustaining a challenged attachment held as follows:

> [The] Second Circuit has held that 'property' should be construed broadly.  See *Essar Int'l, Ltd. v. Martrade Gulf Logistics*, No. 07 Civ. 3439, 2007 U.S. Dist. LEXIS 61713, 2007 WL 2456629, at *2 (S.D.N.Y. Aug. 23, 2007)(citing *Winter Storm Shipping, Ltd.*, 310 F.3d at 275). Further, '[u]nder Rule B, it is also possible for more than one party to have an interest in the same property.' Id.
>
> The Court finds that Chiquita/GWF have met their burden under the Supplemental Admiralty Rules and Second Circuit case law of proving a valid prima facie claim.

Further, Chiquita/GWF have demonstrated that Holy House has an interest in the property sufficient to uphold the attachment and that the funds were properly restrained. Holy House's *assertions regarding agency and ownership of the attached funds are unpersuasive. Regardless of Holy House's management. role with respect to the other non-party shipowners with whom it does business, it is undisputed that the funds were directed to or from defendant Holy House's bank accounts.* (Blidberg Decl. PP 11-16; Blidberg Reply Decl. PP 3-5.) Holy House's intended use of the funds that were in its account is irrelevant here. Therefore, the restraint of funds was proper under Second Circuit precedent. See Aqua Stoli, 460 F.3d at 436; see also Ronda Ship Mgmt. Inc., 2007 U.S. Dist. LEXIS 72694, 2007 WL 2812897, at *3.

See Chiquita Int'l Ltd. v. M/V Bosse,, 518 F. Supp. 2d 589, 2007 U.S. Dist LEXIS 75726, *10-11 (S.D.N.Y.2007) (emphasis added).

Based on the foregoing, Rias' motion to vacate should be denied as Pagane has satisfied the requirements for issuance of a Rule B attachment.

## POINT II

## RIAS SHOULD BE EQUITABLY ESTOPPED FROM CONTESTING THE CONSENT ORDER AND THE AGREEMENT FOR THE ATTACHED FUNDS TO SERVE AS SECURITY IN LONDON

Rias should be equitably estopped from challenging Pagane's maritime attachment because it unambiguously represented to Pagane that the funds attached in New York would be released and transferred to the United Kingdom to be held as security for Pagane's claims. This was the exact purpose of the Consent Order that was signed by Rias' former attorneys and by the Court. Importantly, by representing that it had agreed to transfer the funds overseas into an escrow account, Rias effectively waived any right that it otherwise had to challenge the attachment of those funds. Stated differently, Rias could not have challenged the attachment of property that had already departed the Southern District of New York by agreement of the parties. The Court is directed to the Declarations of Kevin J. Lennon and Matthew Moore, and

10

the exhibits attached thereto, which convincingly demonstrate the agreement by the parties in respect of the funds attached in New York.

Under these circumstances, the doctrine of equitable estoppel applies to bar Rias' motion where Pagane justifiably and detrimentally relied upon Rias' representations that the attached funds would be transferred out of New York and held as Pagane's security for its claims which are subject to resolution in London arbitration. This was the *only* reason why Pagane ceased and desisted from attaching additional funds after the entry of the Consent Order.

As was the holding in <u>Marvel Characters, Inc. v. Simon</u>, 310 F.3d 280, 292 (2d Cir. 2002), a party will be estopped from pursuing a claim whenever it misrepresents a fact with knowledge that the other party will rely on it, and where the other party does, in fact, rely on the misrepresentation to its detriment. In respect of equitable estoppel, the Second Circuit held in <u>Marvel Characters, Inc.</u> as follows

> The doctrine of equitable estoppel can be raised "where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." <u>Kosakow v. New Rochelle Radiology Assocs., P.C.</u>, 274 F.3d 706, 725 (2d Cir. 2001). Under federal law . . . a party can be estopped from pursuing a claim where: (1) the party makes a misrepresentation of fact to another party with reason to believe that the other party will rely on it; (2) the other party relies on the misrepresentation to his detriment. <u>See</u> <u>id.</u>

*Id.* at 292.

As applied to the facts of the facts here, Pagane easily satisfies the elements for equitable estoppel. The Consent Order itself is perhaps the best evidence that Rias had agreed to transfer the attached funds to London to be held as security for Pagane's underlying claims. There is no other logical reason for the Consent Order. It is also telling that Rias' representation was made to Pagane by Rias' former New York attorney and former English solicitor. It is interesting indeed that Rias' motion does not include any submission from these attorneys who are, after all,

the ones with direct knowledge of the negotiations with Pagane. Further, it cannot be reasonably disputed that the only reason that Pagane ceased in its efforts to attach additional funds in New York was because of the agreement that the disputed funds would be held as partial security for Pagane's claims and with Rias and/or Glingrow to provide "top off" security at a later date. Pagane detrimentally relied upon Rias' representation when it forewent its rights to continually serve the attachment order until such time as full security was obtained in New York.

For these reasons, Rias' motion to vacate should be denied on the basis of equitable estoppel under circumstances where Rias' representation induced Pagane to stop serving the attachment order in New York at a time when full security might have been obtained.

## POINT III

## RIAS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT IS DEFECTIVE

Rias has purposefully availed itself of the procedure allowed under Supplemental Rule E(4)(f) that calls for an emergency hearing on three days notice, unless other ordered by the Court. Here, the Court issued the Order to Show Cause and granted Plaintiff a hearing within four days. However, this hearing is limited to the inquiry of whether Plaintiff has met the requirements of Supplemental Rule B.

It is entirely altogether another matter whether Plaintiff's Complaint has adequately pled a cause of action against Rias and that question must be resolved under Federal Rule 12(b)(6) and "… the Court [should] not consider such an argument lest Rule 12(b)(6) be completely subsumed by Supplemental Rule E(4)(f)." See Maersk, Inc. v. Neewra, Inc., 443 F. Supp. 2d 519, 531 (S.D.N.Y. 2006).

If Rias wants to pursue the relief allowed under Rule 12(b)(6) it should be required to file a separate motion on notice and to follow the requirements of Local Rule 6.1(b) concerning

briefing time periods.  Allowing Rias' motion to dismiss to be considered under the rouse of an

emergency application under Rule E(4)(f) is patently improper.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, and upon the Declarations of Kevin J.

Lennon and Matthew Moore, Pagane respectfully requests that this Court deny the Motion to

Vacate Attachment and Dismiss Complaint filed by Rias Trading.

Dated: January 15, 2008
      New York, NY


                            LENNON, MURPHY & LENNON, LLC
                            *Attorneys for Plaintiff*
                            PAGANE MARITIME LTD.


                    By:    _____
                           KEVIN J. LENNON
                           The GrayBar Building
                           420 Lexington Avenue, Suite 300
                           New York, NY 10170
                           (212) 490-6050 - phone
                           (212) 490-6070 - facsimile
                           kjl@lenmur.com


TO:    REED SMITH
       *Attorney for Defendants*
       599 Lexington Avenue
       New York, NY  10022-7650
       Attn:  Wendy H. Schwartz, Esq,
       (212) 521-5400 -- phone
       (212) 521-5450
       WSchwartz@ReedSmith.com

13

**AFFIRMATION OF SERVICE**

I hereby certify that on January 15, 2008 a copy of the foregoing MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO VACATE ATTACHMENT was filed electronically and served by mail on anyone unable to accept electronic filing.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

Kevin J. Lennon

# LENNON, MURPHY & LENNON, LLC – *Attorneys at Law*

The GrayBar Building
420 Lexington Ave., Suite 300
New York, NY 10170
*phone* (212) 490-6050
*fax* (212) 490-6070

Patrick F. Lennon - *pfl@lenmur.com*
Charles E. Murphy – *cem@lenmur.com*
Kevin J. Lennon – *kjl@lenmur.com*
Nancy R. Peterson - *nrp@lenmur.com*

Tide Mill Landing
2425 Post Road
Southport, CT 06890
*phone* (203) 256-8600
*fax* (203) 256-8615

December 10, 2007

***VIA Express Courier***
Rias Trading
Rue du Grand-6
1000 Lausanne
Switzerland

**Re:    Bulcom Ltd. v. Glingrow Holding Ltd. and Rias Trading**
Docket Number: 07 Civ. 10726
Our Reference Number: 07-1306

Dear Sir or Madam:

We represent the Plaintiff, Bulcom Ltd in the above referenced lawsuit. We write to
advise you that pursuant to an Ex Parte order of maritime attachment and garnishment issued in
the above referenced lawsuit, your property was attached on or about December 7, 2007 at BNP
Paribas in the amounts listed below.

$11,135.00
$262,671.38
$6,629.15
$3,895.14
$273,195.67

Please find enclosed herein a copy of all pleadings filed in the above referenced lawsuit
including, but not limited to, the Summons and Complaint. Please also find enclosed copies of
the Ex Parte Order and Writ of Maritime Attachment and Garnishment as well as a copy of
Judge Leisure's rules. If you have any questions or concerns, please contact us at your
convenience. This letter is sent pursuant to Local Rule B.2 of the Local Rules for the United
States District Court for the Southern District of New York.

Kind regards,

Mary Fedorchak

/Enclosures

# LENNON, MURPHY & LENNON, LLC — *Attorneys at Law*

The GrayBar Building
420 Lexington Ave., Suite 300
New York, NY 10170
*phone* (212) 490-6050
*fax* (212) 490-6070

Patrick F. Lennon - *pfl@lenmur.com*
Charles E. Murphy - *cem@lenmur.com*
Kevin J. Lennon – *kjl@lenmur.com*
Nancy R. Peterson - *nrp@lenmur.com*

Tide Mill Landing
2425 Post Road
Southport, CT 06890
*phone* (203) 256-8600
*fax* (203) 256-8615

December 10, 2007

***VIA Express Courier***
Glingrow Holding Ltd.
15, Boumpoulinas
Povek Building, Apt. No. 301
Nicosia, Cyprus.

**Re:    Bulcom Ltd. v. Glingrow Holding Ltd. and Rias Trading**
        Docket Number: 07 Civ. 10726
        Our Reference Number: 07-1306

Dear Sir or Madam:

        We represent the Plaintiff, Bulcom Ltd in the above referenced lawsuit. We write to
advise you that pursuant to an Ex Parte order of maritime attachment and garnishment issued in
the above referenced lawsuit, your property was attached on or about December 7, 2007 at
Deutsche Bank in the amounts of $22,125.00 and $96,281.12.

        Please find enclosed herein a copy of all pleadings filed in the above referenced lawsuit
including, but not limited to, the Summons and Complaint. Please also find enclosed copies of
the Ex Parte Order and Writ of Maritime Attachment and Garnishment as well as a copy of
Judge Leisure's rules. If you have any questions or concerns, please contact us at your
convenience. This letter is sent pursuant to Local Rule B.2 of the Local Rules for the United
States District Court for the Southern District of New York.

Kind regards,

Mary Fedorchak

/Enclosures

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------- x

PAGANE MARITIME LTD.,                                                07 Civ. 10726 (PKL)

                                    Plaintiff,

        -against-                                                    MEMORANDUM OPINION
                                                                     AND ORDER

GLINGROW HOLDING LTD. and
RIAS TRADING,
                                    Defendants.
--------------------------------------------------------------- x

HAIGHT, Senior District Judge:

        In this admiralty action assigned to Judge Leisure, defendant Rias Trading ("Rias") made an

emergency application before the undersigned sitting in Part I for an order (1) vacating a maritime

attachment of its funds previously obtained pursuant to Rule B of the Supplemental Rules for

Admiralty or Maritime Claims, Federal Rules of Civil Procedure, and (2) dismissing the complaint

against it. Rias's motion to vacate the attachment lies under Supplemental Rule E. Its motion to

dismiss the complaint invokes Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## I. BACKGROUND

        This case is typical of the many Rule B attachments that come before this Court. Foreign

corporations enter into a maritime contract of charter party which provides for arbitration of any

disputes in London. Disputes arise. The party asserting claims against the other initiates arbitration

in London. The parties instruct solicitors. In order to obtain security for an anticipated (or at least

hoped for) arbitration award, the solicitors for the claiming party instruct counsel in this district to

file a complaint in admiralty in this Court against the other party and obtain from the Court a writ

of maritime attachment under Rule B. The writ is conditioned upon the claim being maritime in

nature and the plaintiff's inability to find the defendant within the district for service of process. If

those conditions appear from the initial pleadings, a Judge of this Court issues the writ. The writ of maritime attachment extends to all property of the defendant that may be found within the district, including electronic fund transfers taking place between banks. *See Winter Storm Shipping, Ltd. v. TPI*, 310 F.3d 263 (2d Cir. 2002). It is customary for counsel for such a plaintiff to cause process of attachment to be served upon a number of New York City banks.

In the case at bar, a foreign company named Bulcom, Ltd. ("Bulcom") filed a complaint in this Court on November 30, 2007. Bulcom's complaint alleged that as disponent owner of the M/V PAGANE, it chartered the vessel to co-defendant Glingrow Holding Ltd. ("Glingrow"), another foreign company, for one time chartered trip via the Black Sea for carriage of a cargo of grain to the port of Aqaba, Jordan. Bulcom further alleged breaches of the charter party by Glingrow resulting in amounts owing to Bulcom. Bulcom further alleged in substance that the corporate relationship between Glingrow and co-defendant Rias, also a foreign company, was such that Rias was liable for the debts of Glingrow under the charter party. Bulcom alleged that the charter party provided for arbitration in London, and that it had commenced arbitration there against Glingrow. The case was assigned on filing to District Judge Leisure. On November 30, 2007 Judge Leisure signed an *ex parte* Order authorizing the issuance of Process of Maritime Attachment and Garnishment ("PMAG") against the property of both Glingrow and Rias. Counsel for Bulcom served the process on several New York City banks. Pursuant to that process, Bulcom succeeded in attaching about $393,000. Counsel for Rias on the present motion say that "$402,736.79 of Defendants' property has been attached by Plaintiff," "some of which belongs to Rias and some of which belongs to Glingrow," and that "even if the attachment of the property of Rias is vacated, as it should be, Plaintiff will still hold over $116,000 of the assets of Glingrow ..." Rias's Letter to the Court dated

2

January 15, 2008, at 1, 2. It would thus appear that the major portion of the attached funds are the property of Rias.

The attachment of Glingrow's and Rias's funds in New York resulted in an immediate and lively exchange of e-mails between the parties' solicitors in London, looking toward a negotiated release of the funds. Dulcom had instructed the firm of Ince & Co. ("Ince"). Glingrow and Rias had instructed the firm of More Fisher & Brown ("MFB"). The e-mail exchanges took place between Matthew Moore, an Ince partner ("Moore") and Mark Seward, an MFB partner ("Seward"). Copies are attached as exhibits to Moore's declaration dated January 15, 2008 ("Moore Decl.") in opposition to Rias's present motion. I will quote some of them.

In an e-mail sent on December 17, 2007 at 16:47[1] by Moore to Seward, Moore, responding to a proposal by Seward, said:

> For the avoidance of any doubt, we set out below our understanding of what is being proposed:
>
> 1. The $393,000 caught pursuant to the Rule B will be held in New York pending it being transferred to an escrow account in London. This money will stand as security for our Clients' claim for hire and related expenses, interest and costs.
>
> 2. Glingrow will settle their contribution to the cargo shortage claim by making a payment of US$ 76,735 to us or our client (to be confirmed).
>
> 3. We will instruct our Clients' New York lawyers to seek to ensure that no further funds are attached or detained pending the escrow being established and the cargo claim being settled.
>
> 4. The Rule B will be discontinued/withdrawn when (a) the cargo shortage settlement monies amounting to US$ 76,735 have been paid and (b) the US$ 393,000 has been transferred into escrow in London.

---

[1] The e-mails use military times. 16:47 hours is 4:47 p.m. local time.

3

If you are in a position to confirm this approach is in order we will send the requisite instructions to our Clients' lawyers in New York.

Seward responded to Moore in an e-mail sent on December 17 at 16:53:

Yes, I will get a formal OK but that is what I propose and what I understand Glingrow agree.

On December 17 at 17:29, Seward e-mailed Moore:

Yes agreed; please confirm when Kevin has stopped serving.

The only possible reading of this e-mail is that Seward received the express authority of his clients to agree to the proposed agreement to release the funds attached in New York and transfer them to an escrow in London. "Kevin" in Seward's e-mail is a reference to Kevin J. Lennon, a partner in the New York law firm of Lennon, Murphy & Lennon ("Lennon"). Ince instructed Lennon to represent Bulcom in this district. The phrase "Kevin has stopped serving" reflects the agreement that in consideration of the transfer of the attached funds to escrow in London, Bulcom would cease serving PMAGs upon New York banks in pursuit of Glingrow and Rias funds. Lennon's firm had filed the complaint in this Court and obtained the order of attachment. MFB instructed Thomas Tisdale, a partner in the Tisdale Law Office firm ("Tisdale"), to represent Glingrow and Rias in this district.

Lennon and Tisdale drafted a consent order to be presented to Judge Leisure in New York, and cleared the text with the solicitors for the parties in London. Seward understandably wished the matter to be expedited, since the attached funds belonged to his client Rias. On December 17 at 19:52 Seward e-mailed Lennon directly, with a copy to Moore:

Kevin

No escrow is yet agreed; I can put one over tonight to Ince. However, I do not think it is necessary as we are all grown ups.

4

My understanding is that we agree the consent order and present it on opening (agreed it is too late today) The money will then make its way to London – there are no other claimants to our knowledge. It will be held by us or ince pending agreement on escrow terms.

You cease pmags now and agree not to restart them

the rule b is released only when the 50% is received by ince or their clients

In accordance with the agreement negotiated by the parties' London solicitors, Lennon and Tisdale presented a Consent Order to Judge Leisure which the Judge endorsed "So Ordered" on December 20, 2007. The Consent Order reads in its entirety:

> It is hereby stipulated and agreed between the parties, by their undersigned attorneys, that the funds that are currently under attachment in this action are to be released. The garnishee bank(s) are hereby instructed to release the attached funds pursuant to joint instructions to be provided by letter and signed by the undersigned counsel. The payment of the released funds by the garnishee bank(s) shall not be subject to any further attachment in New York after those funds are released by the garnishee bank(s).

Lennon signed the Consent Order on behalf of plaintiff Bulcom Ltd. Tisdale signed on behalf of defendants Glingrow and Rias. Lennon issued a cease and desist order to the garnishee banks, which had the bargained for effect of freeing any other Rias funds from attachment in New York.

On December 18 and succeeding days, the solicitors in London considered drafts of escrow agreements, the issue being whether Ince or MFB should hold the funds in escrow after the funds had been released from attachment in New York and transferred to London. Seward did not regard that question as particularly difficult; on December 18 at 08.37 he e-mailed Moore:

> This is my standard escrow, please review and approve/comment. If you want a complex one I have one of those too but, frankly, I do not see the point.

As the text of the Consent Order Judge Leisure signed on December 20 reflects, as of that time the

5

London solicitors had not yet worked out the details of the escrow. The holiday season then seems to have intervened. On January 3, 2008 at 14:02 Seward e-mailed Moore:

> I refer to our discussions and exchanges and in particular my email sent to you on 27th.[2] Have you had any thoughts on that? Secondly the monies are now being held as you know in New York and they need to be remitted to an escrow to be held either by you or me. Are we yet agreed on where they will go?
>
> I have no preference and if your clients feel strongly they should be in your hands then I am prepared to agree to that. However I would like to get the money out of New York and the Rule B lifted and my New York lawyers paid so we can move on to chapter 2. I await your constructive comments in relation to the points I have raised on time issues.

It also appears that MFB and Ince were engaged in discussions about the giving of further security in London for the shipowner's claims, and a possible settlement of all disputes arising out of the charter party, short of arbitration. As to the first subject, Moore says:

> After the Consent Order was signed correspondence was exchanged in relation to the provision of top up (additional) security to be given over and above the funds already attached in New York where they were being held pending their transfer to the London escrow account.

Moore Decl., ¶ 12. As to the second subject, on January 8, 2008 at 06:54 Seward e-mailed Moore:

> I am glad that after a lot of wasted money I have managed to find out via New York what has been going on. I am sure that you will agree, that should not have been necessary. If we cannot settle, and I turn to that now, will you accept an escrow containing the full principal amount of your claim. In a claim for unpaid hire, this seems reasonable.

Seward's January 8 e-mail to Moore goes on to describe the terms of an overall settlement of the disputes arising out of the charter party. However, before any reply by Moore, on January 10 at 06:37 Seward sent him this terse e-mail:

---

[2] The e-mail of December 27 is not included in the papers submitted on this motion.

6

Matthew

Good morning. Please be aware that I no longer represent Glingrow Holding Ltd. in this matter. Please address all future correspondence to:

ANDREY ASTAPOV
ASTAPOV LAWYERS (at an address in the Ukraine)

Kind regards
Mark Seward
Partner
MFB Solicitors

Seward could have added "farewell," but perhaps that would have been unprofessional.

There was a comparable changing of the guard in New York. Presumably acting on instructions from the newly retained Ukrainian lawyers, the Tisdale firm withdrew as counsel for Glingrow and Rias in the case before this Court, being replaced by the firm of Reed Smith. Reed Smith makes the present motion on Rias's behalf.

Before addressing the merits of that motion, I must recount additional events that took place in this case. On December 20, 2007, after the Consent Order had been submitted to Judge Leisure but not yet signed by him, Ince instructed the Lennon firm that the complaint and attachment should be amended to reflect that a company called Pagane Maritime Ltd. ("Pagane") should be substituted for Bulcom as the real party in interest.[1] Ince also instructed Lennon to reduce the amount sued for from $1,433,583.10 to $688,530.51. Lennon filed an amended complaint for the reduced amount, naming Pagane as plaintiff. On December 28 Chief Judge Wood, sitting in Part I, issued an amended *ex parte* order of attachment in the reduced amount. Lennon "obtained a fresh PMAG and had the same served on the garnishee banks in order to attach in Pagane's name the funds previously

---

[1] In the sometimes shadowy world of corporate shipowning, the name of the owner of a particular vessel is not always readily ascertainable.

7

attached in Bulcom's name." Declaration of Kevin J. Lennon ("Lennon Decl.") ¶ 15. These events did not change the amount of Glingrow's and Rias's funds actually attached, which remained $393,000. It is important to note that while money is generally regarded as fungible, in this case the parties agree that the Glingrow and Rias funds attached in the hands of a garnishee bank pursuant to Chief Judge Woods's later order are precisely the same funds that were originally attached under Judge Leisure's order.

Lennon acknowledges that "despite the cease and desist agreement and due to the oversight of the undersigned, the attachment was mistakenly again served on the garnishee banks." Lennon Decl. ¶ 16. Daily service was made on the banks on January 2, 3 and 4, 2008. An additional amount of $6,767 in Rias funds was captured. Lennon adds: "However, in light of the parties' prior agreements and the Consent Order, as above described, those funds were subsequently released on January 7, 2008. We also issued a second cease and desist notice to the garnishee banks." Id.

The Reed Smith firm now moves for an order vacating the attachment of Rias's funds and dismissing Pagane's complaint against that defendant. It is evident from Rias's submissions on the motion that it has no intention of transferring the funds attached in New York to an escrow fund in London as security for Pagane's claims under the charter party. Rias simply wants the funds released to it unconditionally.

## II. DISCUSSION

For the reasons that follow, I deny Rias's motion to vacate the attachment because I conclude that Rias is equitably estopped from asking for that relief. Sitting as a Part I Judge, I reach no other issue.

"[I]t is axiomatic that a district court sitting in admiralty exercises powers akin to those of

8

a court of equity." *Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 364 (2d Cir. 1995). Because this case arises within the court's federal admiralty jurisdiction, federal law principles of equitable estoppel govern. *Cf. Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 725 (2d Cir. 2001) ("Because this is an equitable estoppel claim under a federal statute, federal law principles of equitable estoppel are applicable.") (citation omitted). The Second Circuit summarized those principles in *Kosakow*:

> The doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct. Under federal law, a party may be estopped from pursuing a claim or defense where: 1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; 2) and the other party reasonably relies upon it; 3) to her detriment.

*Id.* (citations omitted). In the case at bar, solicitors in London authorized to act for Rias (as well as for Glingrow) agreed with London solicitors for the disponent owner of the chartered vessel (thought to be Bulcom, now identified as Pagane) that if the plaintiff in this action released Rias's funds attached in New York and refrained from any further attachments, those funds would be transferred to an escrow account in London as security for the owner's claims in the pending arbitration. Plaintiff performed its end of the bargain. It entered into a Consent Order that directed the attached funds "to be released" and (with the exception of an inadvertent additional attachment speedily released) refrained from seeking further security in New York. By agreeing through its London solicitors to send the attached funds to an escrow account in London, Rias implicitly represented that it would not seek by proceedings in this Court to vacate the attachment. Rias clearly intended and believed that Pagane would rely on that representation. And Pagane reasonably and justifiably relied

9

upon that representation to its detriment by refraining from further attachments. Thus, all three elements of equitable estoppel are demonstrated by the record. Rias is equitably estopped from making a Rule E motion to vacate the attachment of its funds in New York.

Rias's arguments to the contrary are unpersuasive. Sergey Chumak, Rias's operations manager, says in his reply declaration at ¶ 5 that "Rias has never concluded an agreement *with Pagane* that funds of Rias would stand as security for Glingrow's alleged breaches of an agreement between Glingrow and Bulcom or Pagane pending any arbitration among those parties." (emphasis added). This seemingly careful language stops short of denying that Rias concluded that precise agreement *with Bulcom*. On the evidence in the record no such denial could succeed. It is clearly established that at the times the London solicitors negotiated the agreement for the release of the attached funds, Mr. Seward and his firm, MFB, were acting with the authority of both Glingrow and Rias (Rias being a co-defendant in the case at bar and the owner of funds attached in New York). The promises and representations exchanged by the London solicitors constituted the resolution of a discrete aspect of the parties' disputes: How and under what conditions could the attached funds be liberated? Rias is bound by the promises and representations, explicit or implied, that Seward and MFB made on its behalf during the e-mailed exchanges with Moore and Ince.

That would be so, even if Rias now contended that MFB lacked the authority to make those promises and representations on its behalf (although I do not understand Rias to make that particular argument). Second Circuit case law "presume[s] that an attorney-of-record who enters into a settlement agreement, purportedly on behalf of a client, had authority to do so," so that "any party challenging an attorney's authority to settle the case under such circumstances bears the burden of proving by affirmative evidence that the attorney lacked authority." *In re Artha Mgmt., Inc.*, 91 F.3d

10

326, 329 (2d Cir. 1996) (settlement agreement binding on client where attorney signed agreement and client did not). This rule, grounded in "the unique nature of the attorney-client relationship" and "the public policy favoring settlements," *id.*, applies by analogy to the representations made by the London solicitors in this case, acting in accordance with the instructions and manifest authority of their clients.

If Rias is contending that the substitution of Pagane for Bulcom as party plaintiff in the case at bar relieves Rias of the obligations imposed by the promises and representations MFB made on its behalf, the contention is unappealing to a court of equity. Upon receiving Ince's instruction that Pagane and not Bulcom was the real party in interest, the Lennon firm was required to amend the complaint accordingly. Rule 17(a) of the Federal Rules of Civil Procedure provides: "Every action shall be prosecuted in the name of the real party in interest." The substantive allegations of the original and amended complaints are identical, as are the Rule B averments in support of the original and amended orders of attachment. These are procedural changes. They do not affect the substantive content and effect of the words spoken on Rias's behalf by its London solicitors, as evidenced by the e-mail exchanges in the record.

Nor can Rias argue convincingly, and consistently with equitable principles, that its representation that the funds, once released from attachment in New York, would be transferred to a London escrow account escrow is vitiated because the garnishee bank(s) never received "joint instructions to be provided by letter and signed by the undersigned counsel." While the Consent Order conditioned the banks' release of the funds upon receipt of such joint instructions, they were not furnished immediately only because the London solicitors were discussing whether the transferred funds would be deposited into Ince's escrow account or MFB's a relatively non-

11

controversial question to which the solicitors, understandably enough, attached no particular significance. The material provisions of the agreement—the promises that were of the essence —were the plaintiff's undertakings to release Rias's attached funds and attach no others, and Rias's representation that the attached funds, once released, would be transferred to a London escrow account to stand as security for an arbitration award. Certainly Rias did not intend for Pagane to continue attaching funds up until the final escrow details were worked out. The plaintiff at bar has acted in reasonable reliance on Rias's words to its detriment. Rias is equitably estopped from pursuing a Rule E motion to release the attached funds free of any obligation to transfer them to a London escrow fund.

Rias also stresses that other issues between the parties, while discussed by the London solicitors, were not resolved by the attachment release agreement: the posting by the charterer of additional "top-up" security in London, and a possible settlement of all charter party disputes. Again, these discussions were aborted when Rias withdrew MFB's instructions. These matters do nothing to negate Rias's representation that the funds would be transferred when released, or Pagane's justifiable reliance upon that representation to its detriment.

### III. CONCLUSION

Given the totality of the circumstances revealed by this record, I conclude without difficulty that Rias is equitably estopped from making a motion under Rule E to vacate the Rule B attachment of its funds.

The parties' submissions raise other issues. Rias moves under Rules 12(b)(1) and 12(b)(6) to dismiss the complaint against it on the ground that the complaint does not sufficiently allege a claim against Rias. Pagano asks this Court to direct Rias to arrange for the transfer of the attached

12

funds to some escrow account, somewhere in London. Sitting as a Part I Judge, I decline to reach either of these questions. They are more appropriately addressed to Judge Leisure, the assigned Trial Judge, whose command of the legal and equitable issues involved is at the very least equal to mine. In Part I, I am concerned solely with Rias's emergency and expedited motion to vacate the attachment of its funds. For the reason stated, on the present record Rias is equitably estopped from seeking that relief. Its Part I motion is denied for that reason.

It is SO ORDERED.

Dated: New York, New York
January 30, 2008

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

13

TOTAL P.14

Slip Copy                                                                                                    Page 1
Slip Copy, 2008 WL 111003 (S.D.N.Y.)
**(Cite as: 2008 WL 111003 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
NAIAS MARINE S.A., Plaintiff,
v.
TRANS PACIFIC CARRIERS CO. LTD., Defendant.
No. 07 Civ. 10640(PKL).

Jan. 10, 2008.

Chalos, O'Connor & Duffy, LLP, Owen Francis Duffy, III, Esq., George Edmund Murray, Esq., Port Washington, NY, for Plaintiff.

Freehill Hogan & Mahar, LLP, James L. Ross, Esq., Pamela L. Schultz, Esq., New York, NY, for Defendant.

### OPINION AND ORDER

LEISURE, District Judge.

**\*1** Defendant Trans Pacific Carriers Co. Ltd. ("Trans Pacific") moves this Court pursuant to Rule E(4)(f) of the Supplemental Admiralty Rules of the Federal Rules of Civil Procedure for an order vacating the process of maritime attachment and garnishment levied in favor of plaintiff Naias Marine S.A. ("Naias") pursuant to this Court's *ex parte* order dated November 28, 2007 and for dismissal of the Complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. For the following reasons, Trans Pacific's motion is GRANTED.

### BACKGROUND

This action arises out of a maritime contract charter party agreement between Naias and Trans Pacific. Naias, a foreign business entity operating under an address in the Marshall Islands, owns the vessel M/V Stentor and charters the vessel to others for the carriage of cargo. Trans Pacific, a foreign business entity operating under an address in Seoul, Korea, is a transporter of cargo by ocean vessels. On August 14, 2007, Naias and Trans Pacific entered into

a charter party contract whereby Trans Pacific hired the M/V Stentor for two to three voyages of a minimum of sixty days and a maximum of one-hundred days. This charter party provides that disputes arising out of the contract shall be governed by English law and referred to arbitration in London. (Cross Decl. Ex. A.)

On October 1, 2007, Trans Pacific gave notice that it would not continue for a third voyage and that it would deliver the M/V Stentor on or about October 20 or 21, 2007. Naias contends that Trans Pacific also stated that its message was to serve as its twenty-day redelivery notice under the charter party. (Complaint ¶ 10.) Naias states that it accepted the notice and made arrangements to charter the vessel to others. (Complaint ¶ 11.) Later that same day, October 1, 2007, Naias asserts that Trans Pacific "began to indicate that it wished to revoke its redelivery notice." (Complaint ¶ 12.) Naias did not accept the revocation, and instead accepted redelivery of the vessel.

On October 25, 2007, Trans Pacific sued Naias in the Southern District of New York alleging that Naias was in breach of the charter party for wrongfully withdrawing the vessel prior to performance of the third voyage. In that action, *Trans Pacific Carriers Co. Ltd. v. Naias Marine S.A.,* No. 07 Civ. 9544, Trans Pacific sought security for a claim that was to be arbitrated in London and for costs associated with the arbitration (the *"Trans Pacific* action"). Judge Louis L. Stanton granted the attachment request and thereafter Trans Pacific attached $711,605.60 of Naias's assets. (Def.'s Reply at 9.) Naias did not seek countersecurity in the *Trans Pacific* action. (Def.'s Mot. at 2.) Trans Pacific voluntarily dismissed the action after Naias provided security to Trans Pacific in the form of a Letter of Guarantee from HSBC Bank for $978,238--$590,863 for the principal claim, $137,375 for interest, and $250,000 for estimated costs of London arbitration. (Duffy Aff. Ex. C-D.) Thus, on November 14, 2007, Judge Stanton signed

a Notice of Dismissal and ordered that the funds under attachment be released.

**\*2** On November 28, 2007, Naias filed this action against Trans Pacific. Naias sought an *ex parte* order directing the clerk to issue process of maritime attachment and garnishment against Trans Pacific pursuant to Admiralty Rule B of the Federal Rules of Civil Procedure in an amount up to $250,000. On November 28, 2007, the Court issued such an order.

The basis of Naias's Complaint is a claim for estimated costs for defending against Trans Pacific's maritime claims in the London arbitration. Naias states that it expects to succeed in arbitration and recover its costs in the arbitration from Trans Pacific. Naias alleges that Trans Pacific has refused to provide Naias with security for costs that will be incurred to defend the arbitration, leading it to seek security for $250,000.00, the expected costs of defending the London arbitration.

On December 11, 2007, Trans Pacific filed an Order to Show Cause pursuant to Rule E(4)(f), seeking an order vacating the process of attachment levied pursuant to the November 28, 2007 order. Trans Pacific also seeks dismissal of the action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. On December 14, 2007, Naias filed papers in opposition to this motion. Trans Pacific filed its reply papers on December 17, 2007. On December 19, 2007, the Court held a hearing pursuant to Rule E(4)(f) (the "December 19 hearing"). [FN1]

> FN1. Once defendant's property has been restrained by a maritime attachment order, Rule E(4)(f) provides defendant an opportunity to appear before the Court to contest the attachment. *See* Fed.R.Civ.P. Supp. R. E(4)(f). At a Rule E(4)(f) hearing, defendant can attack "the complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings." Fed.R.Civ.P. Supp. Rule E(4)(f), advisory committee's note.

### DISCUSSION

Trans Pacific moves to vacate the order of attachment and dismiss the complaint against it on the ground that this Court has no subject matter jurisdiction over Naias's claim for costs and fees. [FN2]

> FN2. Although the parties focused their arguments on Trans Pacific's motion to vacate, the Court first addresses whether it has subject matter jurisdiction over the case. *See Professional Traders Fund, LLC v. Prairie Oil & Gas, Inc.,* No. 06 Civ. 1012, 2007 WL 4027494, at \*2 (S.D.N.Y. Nov. 16, 2007) (holding that prior decision on the merits must be vacated because the Court lacks subject matter jurisdiction and stating that the Second Circuit has "foreclos[ed] the practice of assuming jurisdiction and deciding a case on the merits against the party asserting jurisdiction"); *see also Alliance For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.,* 436 F .3d 82, 85-86 (2d Cir.2006).

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000) (citing *Malik v. Meissner,* 82 F.3d 560, 562 (2d Cir.1996)); *see also Brocsonic Co., Ltd. v. M/V Mathilde Maersk,* 120 F.Supp.2d 372, 375 (S.D.N.Y.2000) ("A plaintiff 'seeking to invoke the subject matter jurisdiction of the district court bears the burden of showing that he [is] properly before that court.' " (quoting *Scelsa v. City Univ. of New York,* 76 F.3d 37, 40 (2d Cir.1996))). Naias asserts jurisdiction under Rule 9(h) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1333. (Complaint ¶ 1.) Federal district courts have original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction ...." 28 U.S.C. § 1333(1). Naias has not alleged any alternative grounds for subject matter jurisdiction in this action. (12/19/07 Tr. at 14:17-24.)

Trans Pacific asserts that this Court lacks subject matter jurisdiction because Naias's claim is for leg-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

al defense costs and not a maritime claim. (Def.'s Mot. at 11.) Trans Pacific states that "[s]ince under either English or American law a claim for legal fees and costs is not maritime, this Court lacks subject matter jurisdiction and the Naias[ ] Complaint should be dismissed." (Def.'s Mot. at 12.) Naias asserts that it has a valid maritime claim because its arbitration defense costs arise out of the parties' arbitration agreement in the charter party, which is a maritime contract. (Pl.'s Opp. at 7.)

**3** The parties agree that English law governs the substantive claims of their dispute under the charter party; however, they dispute what law governs the validity of the claim. Trans Pacific asserts that English law governs the validity of Naias's claim, [FN3] while Naias asserts that American federal law should control. [FN4] Regardless of which law applies, the outcome is the same. Naias has failed to meet its burden of showing that its Complaint contains a maritime claim.

> FN3. Although Trans Pacific maintains that English law governs, Trans Pacific asserts that the same result would be reached under American law, stating that "[u]nder English and American jurisprudence a claim based solely on potential costs in defending a maritime claim in arbitration is not a valid maritime claim." (Def .'s Mot. at 6.) Trans Pacific, supported by a Declaration from its English counsel, Max Cross, argues that, under English law, the costs of defending arbitration can only be awarded if Naias prevails at arbitration. (Def.'s Mot. at 7.) Further, a claim for arbitration costs "does not sound in admiralty" under English law. (Def.'s Mot. at 7.) In addition, Trans Pacific contends that because Naias has not asserted any counter-claim against Trans Pacific, the security for costs is not "ancillary" to any claim for breach of a maritime agreement. (Def.'s Mot. at 7.)

> FN4. Naias responds that American federal law must govern the validity of the claim.

(Pl.'s Opp. at 5-6.) Naias states that Rule B is a procedural remedy and federal law applies to procedural issues, even if foreign law governs the underlying contract. (Pl.'s Opp. at 6.) Thus, Naias asserts that the Court should disregard Trans Pacific's contention that Naias's claim for costs does not constitute an maritime claim under English law and, similarly, disregard Mr. Cross's Declaration in support of Trans Pacific's motion. (Pl.'s Opp. at 7.) Naias contends that under federal law, it has set forth a maritime claim. Specifically, Naias states that because its arbitration defense costs arise out of the parties' arbitration agreement in the charter party, which is a maritime contract, its claim for legal costs is a maritime claim. (Pl.'s Opp. at 7.)

Under English law, Naias has failed to meet its burden of showing that it has a maritime claim. [FN5] Indeed, Naias fails to put forth any argument as to whether it has a valid claim under English law. Rather than rebut the assertions of Trans Pacific and Mr. Cross with its own interpretation of English law, or a declaration from its own English counsel, [FN6] Naias asks the Court to disregard Trans Pacific's arguments and Mr. Cross's Declaration. (Pl.'s Opp. at 7-9.)

> FN5. Other courts in this district have held that the validity of a prima facie admiralty claim is a substantive issue to be decided by the Court. In considering whether a plaintiff's complaint pleaded a valid prima facie admiralty claim, the Court in *Sonito Shipping Co ., Ltd. v. Sun United Maritime Ltd.* plainly stated that "[t]his is a question of substantive law." 478 F.Supp.2d 532, 536 (S.D.N.Y.2007) (holding that English law, the applicable substantive law of the underlying contract, applies to the Court's consideration of whether plaintiff has demonstrated a valid prima facie admiralty claim). Similarly, in *T & 0 Shipping, Ltd.*

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

*v. Lydia Mar Shipping Co. S.A.,* the Court stated that "[t]he law of the contract applies to the guestion of whether a claim has accrued, but federal law governs the determination of whether an attachment is reasonable ." 415 F.Supp.2d 310, 314 (S.D.N.Y.2006). The parties agreed that English law would govern under the charter party, thus, the Court considers whether Naias has asserted a maritime claim under English law.

FN6. Although the record makes clear that Naias has consulted with English counsel in connection with this dispute, Naias did not submit a declaration from its English counsel. (Duffy Aff. at 10-11 .) However, its American counsel, Owen F. Duffy, Esq., submitted an affidavit.

Mr. Cross states that "[u]nder English law, defense legal costs awarded in arbitration do not fall within the English law definition of an 'admiralty claim.' " (Cross Decl. ¶ 16.) In support of his conclusion, Mr. Cross states that "[t]he English legal system draws a clear distinction between the damages in the substantive sense, for example a claim for damages under a [charter party], and the legal costs/ attorney fees awarded after the claim has been decided. The costs are determined after the Court has ruled on the substantive merits." (Cross Decl. ¶ 18.) Substantive damages under a charter party would be a "claim arising out of any agreement relating to the carriage of goods in a ship or to the use or hire of a ship." (Cross Decl. Ex. B at 1.) A claim for legal costs and fees, however, arises out of an arbitration award, "which is distinct from the charter-party [sic] and which is not [an] 'agreement in relation to the use or hire of a ship.' " (Cross Decl. ¶ 20; Ex. B.) Thus, if Naias is successful at arbitration, it would have a claim for legal fees and costs, but such a claim would not be an admiralty claim under English law.

As discussed above, Naias bears the burden of showing that it has subject matter jurisdiction. *See*

*Makarova,* 201 F.3d at 113. Naias asserts that the Court should disregard Trans Pacific's arguments and Mr. Cross's Declaration, but has failed to put forth any alternative interpretation of English law. (Pl.'s Opp. at 7-9.) Further, at the December 19 hearing, Naias's counsel stated that he was "not going to disagree with [Mr. Cross's] characterization of English law ...." (12/19/07 Tr. at 16:1-3.) Naias's counsel went on to state that if Mr. Cross is correct that a claim for costs is not an admiralty claim under English law, then Trans Pacific should not have received a Rule B attachment for its costs in the *Trans Pacific* action. (12/19/07 Tr. at 16:3-9.) Trans Pacific's counsel noted in response, however, that "the key distinction is that [Trans Pacific] ha[s] a claim for damages and the costs were part of that claim, whereas on the defense side [Naias] do[es] not have any claim." (12/19/07 Tr. at 16:11-13.) In the *Trans Pacific* action, Trans Pacific set forth a valid prima facie admiralty claim for breach of the charter party agreement, and obtained an attachment for that claim, with an ancillary claim for costs. Naias asserts no such underlying substantive claim. Naias's sole claim is for estimated costs arising out of the London arbitration. Although that arbitration arises out of its alleged breach of a maritime contract, this does not make a claim for arbitration costs, with nothing more, maritime in nature.

**\*4** Under American federal law, Naias also has failed to meet its burden of showing that it has a maritime claim. Although it is not plainly defined, *see, e.g., Fednav, Ltd. v. Isoramar, S.A.,* 925 F.2d 599, 601 (2d Cir.1991); *Maritima Petroleo E Engenharia LTDA v. Ocean Rig 1 AS,* 78 F.Supp.2d 162, 166-67, (S.D.N.Y.1999), under federal law, an admiralty claim must relate to maritime activity. For example, considering the nature of an admiralty claim relating to a contract, the Court in *Dolco Investments, Ltd. v. Moonriver Development, Ltd.* stated that "[i]n determining whether a contract falls within the admiralty jurisdiction, the 'true criterion is the nature and subject matter of the contract, having reference to maritime service or maritime transactions.' " 486 F.Supp.2d 261, 266

(S.D.N.Y.2007) (quoting *Exxon Corp. v. Central Gulf Lines, Inc.,* 500 U.S. 603, 610 (1991)); *see also Fednav, Ltd.,* 925 F.2d at 601 ("We have recognized that if the subject matter of the contract relates to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea or to maritime employment[,] it is fairly said to constitute a maritime contract." (internal quotations omitted)).

The Court's decision in *Pires v. Heller* also is instructive. *See Pires v. Heller,* No. 04 Civ. 9069, 2004 WL 2711075 (S.D.N.Y. Nov. 24, 2004). In that case, plaintiffs brought claims arising out of a dispute for legal fees in connection with a prior maritime action, Seeking to invoke the federal jurisdiction afforded to mairitime claims, defendant asserted that plaintiffs' claims were maritime claims. The Court disagreed, holding that the Court lacked subject matter jurisdiction because "[a] breach of contract claim will invoke admiralty jurisdiction if the contract 'incorporates a *u niquely maritime concern.*' " *Id.* at *2 (quoting *Am. Home Assur. Co. v. Merck & Co., Inc.,* 329 F.Supp.2d 436, 440 (S.D.N.Y.2004)). [FN7] Although Naias's claim for fees and costs is not a breach of contract claim, the *Pires* decision is helpful in the Court's determination. Naias's claim is one for legal costs arising out of an arbitration, which is not a "uniquely maritime concern." *Id.* Rather, as in *Pires,* Naias's claim relates to legal representation. Thus, Naias's claims are "too tangential to maritime law to be considered 'maritime claims.' " *Id.*

> FN7. Similarly, as to tort claims, the *Pires* Court held that "the propriety of admiralty jurisdiction over particular torts depends on the tort's relationship to 'traditional maritime activity .' " *Pires,* 2004 WL 2711075, at *2 (quoting *Am. Home Assur. Co .,* 329 F.Supp.2d at 440).

The *Pires* Court also stated that "[s]imply labeling these claims as 'maritime' does not make them so. Nor can the fact that the previous lawsuit involved maritime claims be sufficient to establish admiralty

jurisdiction over any future lawsuits arising between the parties." *Id.* at *3. Similarly, in the instant case, just because the *Trans Pacific* action and the London arbitration involve maritime claims, that alone is not sufficient to establish admiralty jurisdiction over Naias's action. Thus, Naias's claim is for legal costs, which are not a maritime concern.

**\*5** Although its lawsuit "was initiated for the specific purpose of employing the Rule B Maritime Attachment Procedure ...," (Complaint ¶ 15), in support of its argument that it has a maritime claim, Naias relies on case law under Rules E(7) and E(2) (b). (Pl's. Opp. at 10-12.) Rule E(7) provides for security on a counterclaim. *See* Fed.R.Civ.P. Supp. R. E(7) (allowing defencants to seek counter-security when the "counterclaim arises from the same transaction or occurrence that is the subject of the original action"). Naias has not asserted a counterclaim, rather, it has asserted an independent claim in a separate action. [FN8] In considering a counterclaim, which "arises from the same transaction or occurrence that is the subject of the original action," *id.,* the Court's analysis differs from the consideration here of whether Naias's independent claim affords subject matter jurisdiction. [FN9] Similarly, although Rule E(2)(b) governs security for costs, *see* Fed.R.Civ.P. Supp. R. E(2)(b), Naias did not seek security under that rule. *See, e.g., Seaplus Line Co. Ltd. v. Bulkhandling Handymax AS,* 409 F.Supp.2d 316, 324 n. 3 (S.D.N.Y.2005) (denying request for counter-security where party sought security under Rule E(7), but should have sought security under Rule E(2)(b)). Rule E(2)(b) merely demonstrates that if Naias asserted a maritime claim, it likely would be entitled to security for costs as well. Naias, however, has asserted only a claim for legal costs, without more. While Rules E(2)(b) and E(7) may be indicative of the Court's ability to grant security for costs under other circumstances, here, where Naias has failed to set forth a maritime claim, those rules do not apply.

> FN8. The question of whether Naias would have had a valid claim for counter-security

under Rule E(7) is not appropriate in this action. Naias missed its opportunity to assert such a counterclaim by failing to do so while the *Trans Pacific* action was still pending.

FN9. Additionally, the standards applied to Rule E(7), differ from those under Rule B. *See, e.g., North Offshore AS v. Rolv Berg Drive AS,* No. 07 Civ. 3095, 2007 WL 4233014, at *2 (S.D.N.Y. Nov. 29, 2007) (noting that the "standard for a Rule B attachment is not the standard that applies to motions for countersecurity brought pursuant to Rule E(7)"). Notably, Rule B allows a party to obtain security *ex parte,* while Rule E(7) does not. *Compare* Fed.R.Civ.P. Supp. R. B, *with* Fed.R.Civ.P. Supp. R. E(7). Further, as Trans Pacific notes in its submission to the Court, "[c]rucially, unlike Rule B attachments, there is no requirement under Rule E(7) that the defendant prove that it has a valid *prima facie* maritime claim against the plaintiff." (Def.'s Reply at 7.)

Naias has failed to meet its burden of showing that maritime or admiralty jurisdiction exists. The Court lacks subject matter jurisdiction over this case. Therefore, Trans Pacific's motion to dismiss for lack of subject matter jurisdiction is GRANTED. Naias's Complaint is DISMISSED and, thus, the attachment must be VACATED.

**CONCLUSION**

For the reasons set forth above, defendant Trans Pacific's motion to dismiss for lack of subject matter jurisdiction is hereby GRANTED. This action is hereby DISMISSED for lack of subject matter jurisdiction. The Court hereby orders that its November 28, 2007 *ex parte* order of attachment be VACATED and directs the garnishees to release all restrained funds.

**SO ORDERED.**

Slip Copy, 2008 WL 111003 (S.D.N.Y.)

END OF DOCUMENT

LEXSEE 2006 US DIST LEXIS 95870

**TIDE LINE, INC., Plaintiff, -against- EASTRADE COMMODITIES, INC., and TRANSCLEAR, S.A., Defendants.**

**06 CV 1979 (KMW)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2006 U.S. Dist. LEXIS 95870; 2007 AMC 252*

**August 15, 2006, Decided**

**SUBSEQUENT HISTORY:** Request granted *Tide Line, Inc. v. Eastrade Commodities, Inc., 2006 U.S. Dist. LEXIS 60770 (S.D.N.Y., Aug. 25, 2006)*

**COUNSEL:** [*1] For Tide Line, Inc., Plaintiff: Thomas Leonard Tisdale,LEAD ATTORNEY, Charles Edmund Murphy, Tisdale & Lennon, LLC, New York, NY.

For Transclear S.A., Defendant: Dan J. Schulman, LEAD ATTORNEY, Salans, New York, NY.

For Transclear S.A., Counter Claimant: Dan J. Schulman, LEAD ATTORNEY, Salans, New York, NY.

**JUDGES:** Kimba M. Wood, United States District Judge.

**OPINION BY:** Kimba M. Wood

**OPINION**

ORDER

WOOD, U.S.D.J.:

I. Overview

Defendant Transclear, S.A. ("Transclear") moves to vacate this Court's March 14, 2006, Ex Parte Order for Process of Maritime Attachment, as to Transclear only. For the reasons given below, the Court grants Defendant Transclear, S.A.'s motion to vacate this Court's March 14, 2006, Ex Parte Order for Process of Maritime Attachment, as to Transclear only, grants Tide Line's request for leave to file an Amended Verified Complaint with a new request for an Attachment Order so long as no

objections are filed by August 23, 2006, directs that Tide Line file the Amended Verified Complaint with a new request for an Attachment Order by August 25, 2006, and stays the release of the attached funds pending the issuance of a new Attachment Order in connection [*2] with the Amended Verified Complaint and the serving of a new writ of attachment on the bank, so long as the writ of attachment is served by August 30, 2006. [1]

> 1   Transclear has also filed an Answer and Counterclaims against Tide Line Inc. ("Tide Line"), seeking damages for the attachment; Tide Line has moved to dismiss those counterclaims. Transclear's counterclaims and Tide Line's motion to dismiss those counterclaims will be addressed in a separate order.

II. Background

On March 14, 2006, Tide Line Inc. ("Tide Line") filed a Verified Complaint (the "Complaint"), against Eastrade Commodities Inc. ("Eastrade Inc.") and Transclear, seeking an ex parte order for process of maritime attachment and garnishment pursuant to *Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims* of the Federal Rules of Civil Procedure ("*Supplemental Rule B*") and to the Federal Arbitration Act (originally the United States Arbitration Act), *9 U.S.C. §§ 1* and *8*. The [*3] Complaint alleges that: 1) Tide Line, "a foreign company duly organized and operating under the laws of Greece," Compl. P 2, chartered a vessel it owns, the M/V "Levantes A" (the "Vessel"), to Eastrade Inc., which is, upon information and belief, "a foreign corporation, or other business entity, organized under, and existing by virtue of foreign

2006 U.S. Dist. LEXIS 95870, *3; 2007 AMC 252

law, with principal place of business in Panama," Compl. P 5; 2) disputes arose during the course of the charter party contract; 3) Eastrade Inc. breached the contract, resulting in damages to Tide Line for a total sum of $ 193,198.15; and 4) Tide Line was therefore preparing to initiate arbitration proceedings against Eastrade Inc. (but not Transclear) in London, and expected to recover a total sum of $ 292,636.28 (including the principal claim, interest, attorneys' fees and costs, and arbitration costs). The Complaint also alleges, upon information and belief, that Transclear "was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law, with principal place of business in Nyon, Switzerland," Compl. P 4, and that "Upon information and belief, Defendant Transclear acts as paying [*4] agent, or arranges for other non-parties to satisfy the debts and obligations of Defendant Eastrade," Compl. P 13. This is the only allegation in the Complaint as to Transclear's alleged involvement in the matter. Finally, the Complaint alleges that defendants Eastrade Inc. and Transclear cannot be found within this District within the meaning of *Supplemental Rule B* but have assets within the district.

On March 14, 2006, based on the Verified Complaint, and the Affidavit in Support of Prayer for Maritime Attachment of Thomas L. Tisdale, Tide Line's counsel ("Tisdale Aff."), and pursuant to *Supplemental Rule B*, the Court granted Tide Line an Ex Parte Order for Process of Maritime Attachment ("Ex Parte Attachment Order") against the defendants, for the amount of damages stated in the Verified Complaint. On March 22, 2006, Tide Line, pursuant to the Ex Parte Attachment Order, attached the sum of $ 270,000, belonging to Transclear, at Citibank. See Letter from Thomas L. Tisdale to Transclear S.A. (Mar. 22, 2006), attached as Ex. A to Affidavit of Service, which is attached as Ex. 1 to Tide Line's Proof of Service, dated May 11, 2006. An exchange of correspondence between [*5] counsel for Tide Line and Transclear followed; ultimately, Tide Line did not release the attachment.

On June 22, 2006, Transclear moved to vacate the Ex Parte Attachment Order as to Transclear. Judge William H. Pauley III, sitting in Part I, signed an Order to Show Cause, ordering Tide Line to show cause why an order should not be issued, pursuant to Rules B and E of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, vacating this Court's March 14, 2006, Ex Parte Attachment Order

as to Transclear, and setting an inquest for assessment of damages against Tide Line for attaching and failing to voluntarily release funds belonging to Transclear. [2] A hearing as to Transclear's motion to vacate was held on July 14, 2006. [3]

> 2   In addition to moving to have the Ex Parte Attachment Order vacated as to it, Transclear filed an Answer and Counterclaims (for "wrongful attachment and abuse of process related to the attachment" and "wrongful attachment and abuse of process related to Plaintiff's refusal to release the funds that are the subject of the attachment"), seeking damages against Tide Line, and requesting that Tide Line post counter-security in the amount of $ 2 million, pursuant to *Rule E(7)(a) of the Supplemental Rules for Certain Admiralty and Maritime Claims* of the Federal Rules of Civil Procedure. See Defendant Transclear, S.A.'s Answer and Counterclaims ("Answer and Countercl."). Tide Line has filed Cross-Motion to Dismiss Counterclaims. Transclear's counterclaims, and Tide Line's motion to dismiss them, will be addressed in a separate order.

[*6]

> 3   Under *Rule E(4)(f) of the Supplemental Rules for Certain Admiralty and Maritime Claims* ("*Supplemental Rule E(4)(f)*"),   "[w]henever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." According to this Court's Local Rules, "[t]he adversary hearing following arrest or attachment or garnishment that is called for in *Supplemental Rule E(4)(f)* shall be conducted by a judicial officer within three court days, unless otherwise ordered." *Local Admiralty Rule E.1*. In this case, Judge William H. Pauley III, sitting in Part I, signed the Order to Show Cause, setting the date of the hearing for July 11, 2006. As explained in this Court's Order dated July 11, 2006, the Court adjourned the hearing for further submissions to be made.

III. Discussion

A. Legal Standard

Case 1:07-cv-10726-PKL    Document 23-15    Filed 02/14/2008    Page 3 of 15

Page 3
2006 U.S. Dist. LEXIS 95870, *6; 2007 AMC 252

*Supplemental Rule B* provides, in relevant part:

> If a defendant is not found within the district . . ., a verified **[*7]** complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property -- up to the amount sued for -- in hands of garnishees named in the process. The plaintiff or the plaintiff's attorney must sign and file with the complaint an affidavit stating that, to the affiant's knowledge, or on information and belief, the defendant cannot be found within the district. The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing process of attachment and garnishment. The clerk may issue supplemental process enforcing the court's order upon application without further court order.

Fed. R. Civ. P. *Supp. Rule B(1)*. As recently summarized by the Court of Appeals for the Second Circuit:

> To begin the process, a plaintiff must file a verified complaint praying for an attachment and an affidavit stating that, to the best of the plaintiff's knowledge, the defendant cannot be found within the judicial district. [Fed.R.Civ.P. *Supp. Rule B(1)*.] If the plaintiff's filings comply with these conditions, the court must enter an order authorizing the attachment, **[*8]** which the plaintiff may then serve on any persons in possession of the defendant's property located within the district. The order of attachment may be requested and granted ex parte, though notice of the attachment to the defendant via appropriate service is required. Id. *Supp. Rules B(2)*, E(3).

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 438, 2006 WL 2129336, at *3, 2006 U.S. App. LEXIS 19302, at *8-*9 (2d Cir. 2006)*. See also Fed. R. Civ. P. *Supp. R. B* advisory committee's note to 1985 Amendment ("[*Supplemental Rule B(1)*] envisions that the order will issue when the plaintiff makes a prima facie showing that he has a maritime claim against the defendant in the amount sued for and the defendant is not present in the district."). "The power to grant attachments in admiralty is an inherent component of the admiralty jurisdiction given to the federal courts under Article III of the Constitution," and its "historical purpose has been two-fold: first, to gain jurisdiction over an absent defendant; and second, to assure satisfaction of a judgment." *Aqua Stoli Shipping Ltd., 460 F.3d at 437-438, 2006 WL 2129336, at *2, 2006 U.S. App. LEXIS 19302, at *6-*7*. **[*9]** Accord *Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263, 268 (2d Cir. 2002)*.

Furthermore, "[w]henever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." *Rule E(4)(f) of the Supplemental Rules for Certain Admiralty and Maritime Claims* of the Federal Rules of Civil Procedure ("*Supplemental Rule E(4)(f)*"). The Court of Appeals for the Second Circuit has recently, for the first time, [4] spoken "directly on the showing necessary to vacate a maritime attachment under *Rule E*," *Aqua Stoli Shipping Ltd., 460 F.3d at 439, 2006 WL 2129336, at *4, 2006 U.S. App. LEXIS 19302, at *12* - holding that "once a plaintiff has carried his burden to show that his attachment satisfies the requirements of *Supplemental Rule B*, a district court may vacate an attachment only upon [certain] circumstances," which "can occur where 1) the defendant is present in a convenient adjacent jurisdiction; 2) the defendant **[*10]** is present in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for a judgment," *id., 460 F.3d at 436, 2006 WL 2129336, at *1, 2006 U.S. App. LEXIS 19302, at *2-*3*. [5] The Court of Appeals stated, at greater length:

> We therefore hold that, in addition to having to meet the filing and service requirements of Rules B and E, an attachment should issue if the plaintiff shows that 1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment. Conversely, a district court must vacate an attachment if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rules

B and E. We also believe vacatur is appropriate in other limited circumstances. While, as we have noted, the exact scope of a district court's vacatur power is not before us, we believe that a district court may vacate the attachment if the defendant shows at the Rule E hearing that 1) the defendant is subject to suit in a convenient [**11**] adjacent jurisdiction; 2) the plaintiff could obtain in personam jurisdiction over the defendant in the district where the plaintiff is located; or 3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise.

*Id., 460 F.3d at 444-445, 2006 WL 2129336, at *9, 2006 U.S. App. LEXIS 19302, at *28-*29* (footnotes omitted). The Court emphasized that "*Rule B* specifies the sum total of what must be shown for a valid maritime attachment." *Id., 460 F.3d at 447, 2006 WL 2129336, at *11, 2006 U.S. App. LEXIS 19302, at *35*.

4    Because the Court of Appeals' Aqua Stoli decision was issued on July 31, 2006, and this Court asked the parties for some further short letter briefs on a specific point in light of Aqua Stoli, this Court's issuance of an order in this action was accordingly delayed.

5    "Rule E(4)(f) clearly places the burden on the plaintiff to show that an attachment was properly ordered and complied with the requirements of *Rules B* and *E*." *Aqua Stoli Shipping Ltd., 460 F.3d at 445, 2006 WL 2129336, at *11 n.5, 2006 U.S. App. LEXIS 19302, at *30 n.5*. However, the Court of Appeals believes that, under these Supplemental Rules, defendant bears the burden of "establish[ing] any equitable grounds for vacatur." Id.

[**12**] In so holding, the Court of Appeals "reject[ed] the reasoning of the more recent district court decisions that have engaged in a broader Rule E(4)(f) inquiry," *id., 460 F.3d at 445, 2006 WL 2129336, at *10, 2006 U.S. App. LEXIS 19302, at *30* -- including those that adopted "a needs test, requiring the plaintiff to show that, even if the defendant cannot be found within the district, the attachment is necessary to obtain jurisdiction over a defendant or to secure a potential judgment," *id., 460 F.3d at 446, 2006 WL 2129336, at *10, 2006 U.S.*

*App. LEXIS 19302, at *32 & n.8* (citing *Ullises Shipping Corp. v. FAL Shipping Co., 415 F. Supp. 2d 318 (S.D.N.Y. 2006); T & O Shipping, Ltd. v. Lydia Mar Shipping Co., 415 F. Supp. 2d 310 (S.D.N.Y. 2006); Erne Shipping Inc. v. HBC Hamburg Bulk Carriers GmbH & Co., 409 F. Supp. 2d 427 (S.D.N.Y. 2006); Seaplus Line Co. Ltd. v. Bulkhandling Handymax, 409 F. Supp. 2d 316, 319-20 (S.D.N.Y. 2005); Allied Mar., Inc. v. Rice Corp., No. 04 Civ. 7029, 2004 WL 2284389, 2004 U.S. Dist. LEXIS 20353 (S.D.N.Y. Oct. 12, 2004))*. 6 The Court "also [**13**] reject[ed] the approach taken by the district court in *Royal Swan Navigation Co. v. Global Container Lines, Ltd., 868 F. Supp. 599 (S.D.N.Y. 1994),*" which "would impose a fact-intensive inquiry into the substantiality and nature of a defendant's presence in an adjacent district before deciding whether an attachment should be vacated." *Aqua Stoli Shipping Ltd., 460 F.3d at 446-447, 2006 WL 2129336, at *11, 2006 U.S. App. LEXIS 19302, at *34-*35*.

6    In vacating the judgment of the district court below, the Court of Appeals also rejected what it characterized as the "needs-plus-balancing test," *Aqua Stoli Shipping Ltd., 460 F.3d at 438-439, 2006 WL 2129336, at *4, 2006 U.S. App. LEXIS 19302, at *10,* adopted by the district court, under which, even if the plaintiff meets its burden of showing a need for the attachment, a court may vacate the attachment if the defendant shows that "the hardship the attachment order imposes on it or others substantially outweighs any benefit to the plaintiff," *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 384 F. Supp. 2d 726, 729 (S.D.N.Y. 2005).*

[**14**] The Court of Appeals' holding and rationale in Aqua Stoli Shipping Ltd. also strongly undermine the standard, stated in a number of cases, that the hearing pursuant to *Supplemental Rule E(4)(f)* is intended to "'make a preliminary determination whether there were reasonable grounds for issuing the warrant,'" *Ullises Shipping Corp., 415 F. Supp. 2d at 322 & n.37* (quoting *Salazar v. "Atlantic Sun", 881 F.2d 73, 79-80 (3d Cir. 1989)),* or the attachment, see *Ullises Shipping Corp., 415 F. Supp. 2d at 323 n.37* (noting that "[t]he standard applies to post-attachment cases as well as post-arrest cases"). "This standard has been defined as 'probable cause' or 'reasonable grounds.'" *Id. at 323 n.37* (quoting *Linea Navira De Cabotaje, C.A. v. Mar Caribe De Navegacion, C.A., 169 F. Supp. 2d 1341, 1359 (M.D. Fla.*

Case 1:07-cv-10726-PKL     Document 23-15     Filed 02/14/2008     Page 5 of 15

Page 5

2006 U.S. Dist. LEXIS 95870, *14; 2007 AMC 252

*2001*)). Under this standard, in order to justify the maintenance of an attachment under *Supplemental Rule E(4)(f)*, a plaintiff bears a higher burden than that imposed by *Supplemental Rule B*: as a decision adopting this standard states, "although a minimal prima facie showing is sufficient to justify [**15**] an attachment under *Rule B*, under Rule E(4)(f), [plaintiff] has the burden of presenting some evidence showing reasonable grounds for the attachment." *Id. at 325*. Although Aqua Stoli does not explicitly address this "probable cause" or "reasonable grounds" standard, the decision's emphasis that "*Rule B* specifies the sum total of what must be shown for a valid maritime attachment," *id., 460 F.3d at 447, 2006 WL 2129336, at *11, 2006 U.S. App. LEXIS 19302, at *35* -- including a "valid prima facie admiralty claim against the defendant," *id., 460 F.3d at 444-445, 2006 WL 2129336, at *9, 2006 U.S. App. LEXIS 19302, at *28* -- implies that the "probable cause" or "reasonable grounds" standard is improper insofar as it purports to go beyond this limited inquiry.

For a plaintiff to show that "it has a valid prima facie admiralty claim against the defendant," *id., 460 F.3d at 444-445, 2006 WL 2129336, at *9, 2006 U.S. App. LEXIS 19302, at *28*, in the context of maritime attachment, it appears that a plaintiff need not provide anything beyond its Verified Complaint, pursuant to *Supplemental Rules B and E*. A court relies only on a plaintiff's complaint [**16**] to determine if the plaintiff has shown that it has such a claim against the defendant (and on a plaintiff's affidavit to determine whether it appears that the defendant cannot be found within the district). See Fed. R. Civ. P. *Supp. Rule B(1)* ("The court must review the complaint and affidavit and, if the conditions of this *Rule B* appear to exist, enter an order so stating and authorizing process of attachment and garnishment."); see also *Aqua Stoli Shipping Ltd., 460 F.3d at 438, 2006 WL 2129336, at *3, 2006 U.S. App. LEXIS 19302, at *8-*9* ("a plaintiff must file a verified complaint praying for an attachment and an affidavit stating that, to the best of the plaintiff's knowledge, the defendant cannot be found within the judicial district" and "[i]f the plaintiff's filings comply with these conditions, the court must enter an order authorizing the attachment"). Thus, to show that it has a prima facie claim, a plaintiff seeking a maritime attachment need not provide any supporting evidence; its complaint should suffice. [7] Furthermore, Aqua Stoli implies that a plaintiff is likewise not required to provide evidence showing that it has a claim against defendant, [**17**] to carry its burden under *Supplemental Rule*

*E(4)(f)*. See *Aqua Stoli Shipping Ltd., 460 F.3d at 439, 2006 WL 2129336, at *4, 2006 U.S. App. LEXIS 19302, at *12* (holding that "once a plaintiff has carried his burden to show that his attachment satisfies the requirements of *Supplemental Rule B*, a district court may vacate an attachment only upon [certain] circumstances," which are very limited, as discussed above).

[7] In this sense, the use of the phrase "prima facie claim," in the maritime attachment context, differs from the use of that phrase in other contexts, where it implies an evidentiary standard, see, e.g., *Pittston Coal Group v. Sebben, 488 U.S. 105, 117, 109 S. Ct. 414, 102 L. Ed. 2d 408 (1988)*; *Zuckerbraun v. General Dynamics Corp., 935 F.2d 544, 547 (2d Cir. 1991)* - particularly, the context of employment discrimination claims, see *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 510, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)* ("The prima facie case [of employment discrimination] under *McDonnell Douglas [Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)]*, however, is an evidentiary standard, not a pleading requirement.") (The phrase "prima facie case" - which "not only may denote the establishment of a legally mandatory, rebuttable presumption, but also may be used by courts to describe the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue," *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)* - is sometimes used interchangeably with "prima facie claim." See, e.g., *Furnco Constr. Corp. v. Waters, 438 U.S. 567, 575, 98 S. Ct. 2943, 57 L. Ed. 2d 957 (1978)*; *Qi Hang Guo v. United States DOJ, 422 F.3d 61, 64 (2d Cir. 2005)*; *Tsombanidis v. W. Haven Fire Dep't, 352 F.3d 565, 575 (2d Cir. 2003)*; *Mitchell v. Washingtonville Cent. School Dist., 190 F.3d 1, 6 (2d Cir. 1999)*; *Chere Amie, Inc. v. Windstar Apparel, Corp., 191 F. Supp. 2d 343, 349 (S.D.N.Y. 2001)*.)

[**18**] But the reverse issue is less clear: when a defendant seeks to have an attachment order vacated, may a plaintiff provide and rely on other submissions, beyond the complaint, to show that plaintiff indeed has a prima facie claim against the defendant, if the plaintiff's complaint is not sufficient in and of itself? One recent case suggests that a plaintiff may rely on other

Case 1:07-cv-10726-PKL    Document 23-15    Filed 02/14/2008    Page 6 of 15

Page 6

2006 U.S. Dist. LEXIS 95870, *18; 2007 AMC 252

submissions to justify the maintenance of an attachment. See *Maersk, Inc. v. Neewra, Inc.,* 443 F. Supp. 2d 519, 530, 2006 WL 2168452, at *10, 2006 U.S. Dist. LEXIS 53395, at *30 (S.D.N.Y. 2006) (noting that "[t]he current motion to vacate [plaintiffs' maritime attachment], however, is not a motion to dismiss; it is a specialized maritime proceeding with the singular purpose of determining the ongoing propriety of a maritime attachment"; further stating that, "[a]ccordingly, the Court's review of whether reasonable grounds exist for the attachment is not limited to allegations in the Complaint"; and concluding that "[t]he totality of Plaintiffs' allegations, including those offered in their opposition briefs, their affidavits, and at the hearing, provide reasonable grounds to [*19] believe that [the movant] was intricately involved in events alleged in the Complaint, whether as [a named defendant] or other individuals identified therein"). That case adopts the "reasonable grounds" standard implicitly rejected by Aqua Stoli. But, as discussed above, Aqua Stoli's implicit rejection of that standard is based on the assumption that the standard places a higher burden on a plaintiff, to show more than what is required by *Supplemental Rule B*; it is not clear that Aqua Stoli implicitly rejects the possibility that a plaintiff could reply on other submissions to bolster its complaint. At least one case, however, suggests that an attachment must be vacated insofar as it pertains to a claim not made in plaintiff's complaint. See *T & O Shipping, Ltd. v. Lydia Mar Shipping Co. S.A.,* 415 F. Supp. 2d 310, 316-17 (S.D.N.Y. 2006) (vacating the attachment insofar as it pertained to security for plaintiff's direct losses, because plaintiff made no claim for direct damages in its complaint, even though plaintiff claimed that the complaint sufficiently alleged direct damages, and plaintiff also pointed to his opposition papers and other submissions). [*20] But this case also adopts an approach explicitly rejected by Aqua Stoli, insofar as it focuses on the need for security as a requirement to maintain the attachment; furthermore, the claim it refers to is not the plaintiff's main claim against the defendant but rather a specific claim for a particular category of relief. These cases, and what Aqua Stoli appears to imply, suggest two possible approaches: first, if a plaintiff's complaint does not, after all, state a prima facie claim in and of itself, the maritime attachment must generally be vacated, because the attachment order should not have been issued under *Supplemental Rule B*, which focuses only on the complaint (and a plaintiff's affidavit for the separate question of whether the defendant cannot be found in the district); or, second, insofar as the main

concern is whether a plaintiff has a "valid prima facie admiralty claim against the defendant," a court must not vacate the attachment on the sole basis that the complaint does not, in and of itself, sufficiently state a prima facie claim, if plaintiff can show that it has such a claim based on a combination of its complaint and any other allegations in other submissions [*21] plaintiff provides at that point. Rather than attempting to set forth a general conclusion, the Court will examine this issue further in the specific context of this case, in the next section.

Independently of whether a plaintiff may rely on allegations in submissions other than the complaint, the Court believes that, for the complaint to show a prima facie claim, the complaint must comply with the relevant federal pleading requirements. Tide Line argues that "Rule 9(f) does not afford a defendant the opportunity to challenge the sufficiency of the plaintiff's pleadings." Letter from Tide Line to the Court 1 (Aug. 4, 2006). Tide Line, id. at 5, points to *Maersk, Inc.,* 443 F. Supp. 2d at 530, 2006 WL 2168452, at *10, 2006 U.S. Dist. LEXIS 53395, at *30 (noting the argument, advanced by the movant seeking to vacate the attachment, "that the Complaint does not sufficiently allege any claim against him, much less a maritime claim . . . because it does not plead fraud with particularity as required by *Rule 9(b) of the Federal Rules of Civil Procedure*," but refusing to address this argument because the movant filed a motion to vacate a [*22] maritime attachment order and not a motion to dismiss, and therefore "the Court will not consider such an argument lest *Rule 12(b) (6)* be completely subsumed by *Supplemental Rule E(4)(f)*"). The Court recognizes that a motion to vacate a maritime attachment is different from a motion to dismiss a complaint. But the Court of Appeals recognized, in Aqua Stoli, that "[w]ithout doubt the Rule E(4)(f) hearing provides defendants with an opportunity to argue that the requirements of *Rule B* were not in fact met - for example, that the defendant turned out to be 'found within the district.'" *Aqua Stoli Shipping Ltd.,* 460 F.3d at 438, 2006 WL 2129336, at *3, 2006 U.S. App. LEXIS 19302, at *9. Thus, in seeking to have an attachment vacated, a defendant may argue that a plaintiff does not have a "valid prima facie admiralty claim against the defendant." For the reasons discussed above, it does not appear that the basis of defendant's argument may be that plaintiff has not provided sufficient evidence of such a claim. But it seems that defendant may, under *Supplemental Rule E(4)(f)*, argue that plaintiff's pleadings are themselves insufficient to state such a claim; otherwise, [*23] it is

Case 1:07-cv-10726-PKL    Document 23-15    Filed 02/14/2008    Page 7 of 15

Page 7

2006 U.S. Dist. LEXIS 95870, *23; 2007 AMC 252

not clear how a defendant could argue that the "prima facie claim" requirement of *Supplemental Rule B* has not actually been met.

Generally, when an action is brought in federal court, a complaint must contain, inter alia, only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2).* "Such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Swierkiewicz v. Sorema N. A., 534 U.S. 506, 512, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)* (quoting *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).* See also *Pelman v. McDonald's Corp., 396 F.3d 508, 511 (2d Cir. 2005).* (referring to the "bare-bones notice-pleading requirements of *Rule 8(a)*"). "The liberal notice pleading of *Rule 8(a)* is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim." *Swierkiewicz, 534 U.S. at 514.* "*Rule 8(a)*'s simplified pleading standard applies to all civil actions, with limited exceptions. *Rule 9(b),* for example, provides for greater particularity in [*24] all averments of fraud or mistake. [The Supreme] Court, however, has declined to extend such exceptions to other contexts." *Id. at 513.*

*Rule E(2) (a) of the Supplemental Rules for Certain Admiralty and Maritime Claims ("Supplemental Rule E(2)(a)"),* however, requires that, in an action in personam with process of maritime attachment and garnishment, a complaint "state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." *Fed. R. Civ. P. Supp. R. E(2) (a).* "This standard for the particularity of complaints is more stringent than the pleading requirements of the Federal Rules of Civil Procedure." *United States v. 4492 S. Livonia Rd., 889 F.2d 1258, 1266 (2d Cir. 1989).*

B. Analysis

The Court now turns to consider whether Tide Line has adequately shown that: "1) it has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found [*25] within the district; and 4) there is no statutory or maritime law bar to the attachment." *Aqua Stoli Shipping Ltd., 460 F.3d at 444-445, 2006 WL 2129336, at *9, 2006 U.S. App. LEXIS*

*19302, at *28-*29.* [8] Defendant has made no showing, nor is there any indication that, this case presents any of the limited circumstances under which the Court of Appeals found, in Aqua Stoli Shipping Ltd., that a court could equitably vacate a maritime attachment.

[8] Transclear does not claim that Tide Line has failed "to meet the filing and service requirements of Rules B and E." *Aqua Stoli Shipping Ltd., 460 F.3d at 444-445, 2006 WL 2129336, at *9, 2006 U.S. App. LEXIS 19302, at *28.*

1. Requirements Other than Prima Facie Claim

The main issue presented here is whether Tide Line has a "prima facie admiralty claim" against Transclear. Tide Line has met the other requirements necessary for the maritime attachment to be maintained: the defendant cannot be found within the district; the defendant's property [*26] may be found within the district; there is no statutory or maritime law bar to the attachment.

The second factor - that Transclear cannot be found within this district - is undisputed. Letter from Transclear to the Court 3 (Aug. 3, 2006).

As for the third factor - that Transclear's property may be found within this district - it is shown by the very fact of the attachment. But Transclear argues that the Court of Appeals' Aqua Stoli decision raises a "serious question as to whom Electronic Funds Transfers ("EFTs") belong while in transit," Letter from Transclear to the Court 3 (Aug. 3, 2006); the funds attached here are EFTs. [9] "Under the law of this circuit, EFTs to or from a party are attachable by a court as they pass through banks located in that court's jurisdiction." *Aqua Stoli Shipping Ltd., 460 F.3d at 436, 2006 WL 2129336, at *1, 2006 U.S. App. LEXIS 19302, at *4* (citing *Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263 (2d Cir. 2002)).* [10] In Aqua Stoli, the Court of Appeals questioned Winter Storm, "especially its reliance on *[United States v.] Daccarett, 6 F.3d [37,] 55 [(2d Cir. 1993)],* to hold that EFTs [*27] are property of the beneficiary or sender of an EFT." *Aqua Stoli Shipping Ltd., 460 F.3d at 446, 2006 WL 2129336, at *11 n.6, 2006 U.S. App. LEXIS 19302, at *31 n.6.* [11] Nevertheless, the Court of Appeals has not overturned *Winter Storm;* this Court therefore continues to be bound by that decision.

[9] EFTs function in the following way:

Case 1:07-cv-10726-PKL    Document 23-15    Filed 02/14/2008    Page 8 of 15

Page 8

2006 U.S. Dist. LEXIS 95870, *27; 2007 AMC 252

When a customer wants to commence an EFT, its bank sends a message to the transfer system's central computer, indicating the amount of money to be transferred, the sending bank, the receiving bank, and the intended beneficiary. The central computer then adjusts the account balances of the sending and receiving banks and generates a printout of a debit ticket at the sending bank and a credit ticket at the receiving bank. After the receiving bank gets the credit ticket, it notifies the beneficiary of the transfer. If the originating bank and the destination bank belong to the same wire transfer system, then they are the only sending and receiving banks, and the transfer can be completed in one transaction. However, if the originating bank and the destination bank are not members of the same wire transfer system, which is often the case with international transfers, it is necessary to transfer the funds by a series of transactions through one or more intermediary banks.

*Aqua Stoli Shipping Ltd.,* 460 F.3d at 436, 2006 WL 2129336, at *11 n.1, 2006 U.S. App. LEXIS 19302, at *4 n.1 (quoting *United States v. Daccarett,* 6 F.3d 37, 43-44 (2d Cir. 1993)). "Because of the international nature of maritime transactions, intermediary banks are frequently used." Id.

**[*28]**

10   See also *Aqua Stoli Shipping Ltd.,* 460 F.3d at 436, 2006 WL 2129336, at *11 n.1, 2006 U.S. App. LEXIS 19302, at *4 n.1 ("*Winter Storm,* 310 F.3d at 274-78, permitted the attachment of funds while those funds are in an intermediary bank temporarily as a credit before being passed through to the beneficiary of the transaction or another intermediary bank.").

11   The Court of Appeals noted, specifically:

Because Daccarett was a

forfeiture case, its holding that EFTs are attachable assets does not answer the more salient question of whose assets they are while in transit. In the absence of a federal rule, we would normally look to state law, which in this case would be the New York codification of the Uniform Commercial Code, *N.Y. U.C.C. Law §§ 4-A-502 to 504.* Under state law, the EFT could not be attached because EFTs are property of neither the sender nor the beneficiary while present in an intermediary bank. Id. *§§ 4-A-502 cmt. 4, 4-A-504 cmt. 1.*

*Aqua Stoli Shipping Ltd.,* 460 F.3d at 446, 2006 WL 2129336, at *11 n.6, 2006 U.S. App. LEXIS 19302, at *31 n.6.

**[*29]** As for the fourth element - whether there is no statutory or maritime law bar to the attachment - Transclear argues that this "presents the most compelling argument for vacating the attachment," Letter from Transclear to the Court 2 (Aug. 3, 2006), but Transclear does not point to an actual statutory or maritime law bar to the attachment: rather, Transclear argues that "Tide Line failed to present evidence to support a finding of alter ego," id. [12] This issue is discussed below in connection with the question of whether Tide Line has shown that it has a "prima facie admiralty claim."

12   Although the factor of a "statutory or maritime law bar" is not discussed in Aqua Stoli Shipping Ltd., Transclear's argument pertains to whether or not Tide Line has met its burden of showing that it has a valid maritime claim against Transclear, not to whether there is a proscription to the attachment even if Tide Line has such a claim.

2. Valid Prima Facie Admiralty Claim

As noted earlier, Tide Line's sole allegation **[*30]** against Transclear, in its Verified Complaint, [13] is that: "Defendant Transclear acts as paying agent, or arranges for other nonparties to satisfy the debts and obligations of Defendant Eastrade." Compl. P 13. In its submissions opposing Transclear's motion to vacate the attachment,

2006 U.S. Dist. LEXIS 95870, *30; 2007 AMC 252

Tide Line argues that it has a valid in personam maritime claim against Transclear, on the sole basis that Transclear is, allegedly, the alter ego of Eastrade Inc., against whom it is undisputed that Tide Line has a valid maritime claim. Pl. Mem. 8-9. Tide Line argues that its Complaint adequately alleges a claim against Transclear based on alter ego liability, and that its other submissions (and its oral argument) in connection with the motion to vacate the attachment further allege and support such an alter ego claim. Pl. Mem. at 10-12. Furthermore, Tide Line asks that, if the Court finds that the Verified Complaint does not adequately allege that Transclear and Eastrade Inc. are alter egos, the Court allow Tide Line to submit an amended complaint containing additional allegations as to Transclear's status as an alter ego of Eastrade Inc., based on new information discovered since the filing of the **[*31]** Complaint; Tide Line also requests that the release of the attached funds be stayed until the Complaint is amended and a new writ is served upon the garnishee bank, because Tide Line claims it will suffer great prejudice if the funds are released. Pl. Mem. 11-12; see also Letter from Tide Line to the Court 1-2 (July 11, 2006) (with attached Proposed Amended Verified Complaint); Letter from Tide Line to the Court 2 (July 12, 2006). Transclear argues that Tide Line did not allege, in its Complaint, that Transclear is an alter ego of Eastrade Inc., and Tide Line may therefore not present such a claim at this point, or present evidence in support of it. [14] See Transclear S.A.'s Memorandum of Law in Support of its Motion to Vacate Maritime Attachment and Garnishment ("Def. Mem.") 10, 12; Transclear S.A.'s Reply Memorandum of Law in Further Support of its Motion to Vacate Maritime Attachment ("Def. Reply Mem.") 5-7; Letter from Transclear to the Court 3 (July 12, 2006) (arguing that, "[a]t a Rule E hearing, the court should not consider any legal theories that were not pled in the complaint on which the attachment was based"). [15] Furthermore, Transclear argues that, even **[*32]** if the Court does consider Tide Line's alter ego allegations and evidence, Tide Line has failed to prove that Transclear is the alter ego of Eastrade Inc. Def. Reply Mem. 7-9; Letter from Transclear to the Court 2 (Aug. 3, 2006).

> [13]    That is, its sole allegation apart from the claim, upon information and belief, that Transclear "was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law, with principal place of business in Nyon, Switzerland." Compl. P 4.

[14]    Transclear does not argue that an admiralty claim, and a related maritime attachment, cannot be based on alter ego liability.

[15]    At oral argument, counsel for Transclear stated that he had not seen Tide Line's motion to amend its complaint, due to a "mix-up in the fax number" which was due to a mistake on the part of Transclear, not Tide Line. See Transcript of July 14 Oral Argument at 43-44. Transclear's counsel added that Transclear "would appreciate the opportunity to respond to that." Id. at 44. To date, Transclear has not submitted any response to Tide Line's request to amend its complaint, and has not made a written request to be able to file such a response.

**[*33]** a. Alter Ego Liability

"The prerequisites for piercing the corporate veil are as clear in federal maritime law as in shoreside law" [16]: the veil will be pierced only if a corporation was used by another entity or individual to "perpetrate a fraud" or was "so dominated" and its corporate form "disregarded" such that it primarily transacted the other entity's or individual's business. *Kirno Hill Corp., 618 F.2d 982, 985 (2d Cir. 1980).* Accord Matter of Arbitration between *Holborn Oil Trading, Ltd. v. Interpol Bermuda Ltd., 774 F. Supp. 840, 844 (S.D.N.Y. 1991)* ("Federal common law in the Second Circuit involves a two pronged test for piercing the corporate veil: the party sought to be charged must have used its alter ego 'to perpetrate a fraud or have so dominated and disregarded [its alter ego's] corporate form' that the alter ego was actually carrying on the controlling party's business instead of its own.") (quoting *Kirno Hill Corp., 618 F.2d at 985*); *Ullises Shipping Corp. v. FAL Shipping Co. Ltd., 415 F. Supp. 2d 318, 323 (S.D.N.Y. 2006)* ("Federal common law allows piercing of the corporate veil where (1) a **[*34]** corporation uses its alter ego to perpetrate a fraud or (2) where it so dominates and disregards its alter ego's corporate form that the alter ego was actually carrying on the controlling corporation's business instead of its own.") (internal quotation marks omitted). "Under that standard, '. . . [a]ctual domination, rather than the opportunity to exercise control, must be shown.'" *Ullises Shipping Corp., 415 F. Supp. 2d at 323* (quoting *De Jesus v. Sears, Roebuck & Co., 87 F.3d 65, 69 (2d Cir. 1996)).* [17]

[16]    "Federal maritime law . . . is the law we apply in an admiralty case." *Kirno Hill, 618 F. 2d at 985*

Case 1:07-cv-10726-PKL    Document 23-15    Filed 02/14/2008    Page 10 of 15

Page 10

2006 U.S. Dist. LEXIS 95870, *34; 2007 AMC 252

. Cf. Matter of Arbitration between *Holborn Oil Trading Ltd. and Interpol Bermuda Ltd., 774 F.Supp. 840, 844 (S.D.N.Y. 1991)* ("Federal courts sitting in admiralty must apply federal common law when examining corporate identity."); accord *Ullises Shipping Corp. v. FAL Shipping Co. Ltd., 415 F.Supp.2d 318, 323 (S.D.N.Y. 2006).*

17   Even sole ownership of a corporation is not sufficient, by itself, to pierce the corporate veil. *Kirno Hill Corp., 618 F.2d at 985.* "Because a principal purpose for organizing a corporation is to permit its owners to limit their liability, there is a presumption of separateness between a corporation and its owners, which is entitled to substantial weight." *American Protein Corp. v. AB Volvo, 844 F.2d 56, 60 (2d Cir. 1988).*

[*35]   The Court of Appeals for the Second Circuit has enumerated ten factors that would "tend to show that defendant was a dominated corporation," *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 139 (2d Cir. 1991):*

(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if [*36] it were its own.

*Id. at 137-39.* 18 "Applying these - or any other pertinent factors -- to the infinite variety of situations that might warrant disregarding the corporate form is not an easy task because disregarding corporate separateness is a remedy that 'differs with the circumstances of each case.'" Id. (quoting *American Protein, 844 F.2d at 60).*

18   This decision addressed New York law concerning piercing the corporate veil. But "the standards for piercing the veil under New York and federal common law . . . converge, requiring a showing of either fraud or domination." Matter of Arbitration between *Holborn Oil Trading Ltd. v. Interpol Bermuda Ltd., 774 F. Supp. at 844.* In that maritime case, the Court looked to the factors set forth in *Wm. Passalacqua Builders, Inc., 933 F.2d at 137-139.*

b. Tide Line's Burden

In their submissions to the Court -- which were filed before the Court of Appeals issued its decision in Aqua Stoli [*37] Shipping Ltd. -- the parties both argued that "[a]t a post-attachment hearing, a plaintiff asserting corporate alter egos need not definitively establish domination and control, but must present enough evidence to convince the court that there are reasonable grounds for piercing the corporate veil," *Ullises Shipping Corp. v. FAL Shipping Co. Ltd., 415 F. Supp. 2d 318, 323 (S.D.N.Y. 2006).* See Pl. Mem. 7, 15 (adopting this standard but citing other cases); Letter from Transclear to the Court 3 (July 12, 2006) (stating this standard but arguing that it applies only if alter ego liability is pled in the complaint). In connection with the motion to vacate the maritime attachment order, the parties provided affirmations and declarations to support their positions as to whether or not there are "reasonable grounds to pierce the corporate veil" here, as to Transclear. See Affirmation of Tina Elliott (Executive Officer of Transclear) in Support of Motion to Vacate Maritime Attachment ("Elliot Aff."); Reply Affirmation of Tina Elliott in Further Support of Motion to Vacate Maritime Attachment ("Elliott Reply Aff."); Declaration of Nancy R. Peterson (counsel to Tide [*38] Line) in Support of Plaintiff's Opposition to Motion to Vacate Maritime Attachment and in Support of Cross-Motion to Dismiss Counterclaims ("Peterson Decl.") and attached exhibits; Declaration of Kyriakos Linas (director of Tide Line) in Support of Plaintiff Tide Line Inc.'s Opposition to Motion to Vacate the Maritime Attachment; and the Declaration of Vassiliki Sekrou (third-party employee) in Support of

Case 1:07-cv-10726-PKL     Document 23-15     Filed 02/14/2008     Page 11 of 15

Page 11

2006 U.S. Dist. LEXIS 95870, *38; 2007 AMC 252

Plaintiff's Opposition to Motion to Vacate Maritime Attachment ("Sekrou Decl."). The oral argument that was held pursuant to *Supplemental Rule E(4)(f)* (and before the Court of Appeals' Aqua Stoli decision) also focused primarily on the factual record.

However, as discussed above, the holding and overall rationale of *Aqua Stoli Shipping Ltd., 460 F.3d 434, 2006 WL 2129336, 2006 U.S. App. LEXIS 19302,* imply that the "probable cause" or "reasonable grounds" standard is generally improper when considering whether a maritime attachment must be vacated. Under this logic, the Court should not engage in a broad inquiry into evidence presented as to Transclear's relationship with Eastrade Inc. Rather, the Court must focus on the narrower question of whether Tide Line has shown that [*39] it has a valid prima facie claim against Transclear on the basis of alleged alter ego status. [19]

> 19 Transclear argues that the Court of Appeals' decision in Aqua Stoli "has absolutely no bearing on the standard of proof regarding Tide Line's belated alter ego allegations because: (i) there were no alter ego allegations at issue in Aqua Stoli, and (ii) the Second Circuit in Aqua Stoli did not address or modify the longstanding Second Circuit authority as to what needs to be proven to show alter ego liability and pierce the corporate veil." Letter from Transclear to the Court 1-2 (Aug. 3, 2006). The Court finds this argument unconvincing: although Aqua Stoli did not involve an alter ego claim, and certainly did not address the factors that tend to show alter ego liability, *Aqua Stoli* does, for the reasons already discussed, have ramifications as to a plaintiff's burden to maintain an attachment -- including when plaintiff asserts that it has a maritime claim against the defendant based on alter ego liability; there is no reason why, for such a claim, plaintiff would be held to a "probable cause" or "reasonable grounds" standard rather than the "prima facie" requirement emphasized by the Court of Appeals in Aqua Stoli. Similarly, therefore, Transclear's assertion that, although Tide Line has an admiralty claim against Eastrade, Inc., it does not have a claim against Transclear "absent a finding of alter ego" or a "prior determination that Transclear is the alter ego of Eastrade, Inc.," Letter from Transclear to the Court 1 (Aug. 3, 2006), is incorrect. Such a

"finding" or "prior determination" is not a prerequisite to maintaining the attachment.

**[*40]** c. Whether Tide Line Has Met this Burden

Tide Line argues that its Verified Complaint sufficiently alleges that Eastrade Inc. and Transclear are alter egos because "[f]ederal pleading requirements are very liberal," Pl. Mem. at 10, [20] there are "no magic words to allege alter ego," id. at 11, and "[p]aying the debts of another 'independent' company or arranging for others to pay another 'independent' company's debts is one of the main hallmarks of alter ego status," id. Tide Line further states that when it filed the Verified Complaint, it was trying to be "cautious" and to allege only those elements regarding Transclear that it could verify at that time. Id. at 11-12. In response to the Court's Order of July 11, 2006, directing the parties to provide, inter alia, a definition of "paying agent," and analysis of the legal implications to be drawn from such an allegation, Tide Line states that the term "paying agent" "is not specifically defined by statute" [21]; Tide Line offers the definition of "making payments or guaranteeing the debts of the dominated corporation," and argues that its use of the term was intended to refer to aspects of "alter ego" status (including **[*41]** factors 7 through 10 discussed above); Tide Line therefore claims that the "legal consequences of being a 'paying agent' as defined [here] is [sic] that there are reasonable grounds to find that an entity is in an alter ego relationship." Letter from Tide Line to the Court 1-2 (July 12, 2006). Tide Line thus restates its argument that the allegation in its Complaint was intended to refer to alter ego liability. Transclear responds that "Tide Line could and should have said 'alter ego,' or 'control' or 'domination,' the hallmarks of [alter ego] theory," Def. Reply Mem. 6; Transclear contends that it understood the phrase "paying agent," in the context in which it was used, "to mean an entity that acts as the 'treasurer' or agent of another entity, with the agent issuing payments for the principal out of funds provided by the principal," Letter from Transclear to the Court 1 (July 12, 2006).

> 20 Tide Line refers only to *Fed. R. Civ. P. 8(a)(2),* and does not address *Supplemental Rule E(2)(a).* Transclear does not address the question of what pleading rule applies here.

**[*42]**

> 21 Transclear likewise responds that, insofar as it is aware, "paying agent" does not have a

Case 1:07-cv-10726-PKL    Document 23-15    Filed 02/14/2008    Page 12 of 15

Page 12

2006 U.S. Dist. LEXIS 95870, *42; 2007 AMC 252

technical or specialized meaning and is not a term of art. Letter from Transclear to the Court 1 (July 12, 2006).

The Court finds that Tide Line's Verified Complaint does not, in and of itself, state a prima facie maritime claim against Transclear on the basis of alter ego liability. First, and most obviously, Tide Line does not use the phrase "alter ego" in its Verified Complaint. [22] Furthermore, although a court may find that, where "alter ego" "is not specifically pled, the factual allegations [in a complaint] may support the maintenance of a claim based on an alter ego theory of liability," *Shamis v. Ambassador Factors Corp., 34 F. Supp. 2d 879, 899 (S.D.N.Y. 1999)*, the sole allegation that an entity is a "paying agent, or arranges for other non-parties to satisfy the debts and obligations of" another entity, does not suffice to allege a prima facie claim of alter ego liability. This statement does not meet the more particularized pleading standard set forth in *Supplemental Rule* [*43] *E(2)(a)* -- nor even, arguably, the more liberal standard of *Rule 8(a)*, see *EED Holdings v. Palmer Johnson Acquisition Corp., 228 F.R.D. 508, 512 (S.D.N.Y. 2005)* (stating that "conclusory" allegations regarding veil-piercing "fail to satisfy even the more lenient *Rule 8(a)* pleading requirements").

> 22    Cf. *Tramp Oil & Marine, Ltd. v. Ocean Navigation (Hellas), No. 03 Civ. 5265, 2004 WL 1040701, at *2, 2004 U.S. Dist. LEXIS 7974, at *3 (S.D.N.Y. May 7, 2004)* (finding that order of attachment should not be vacated because plaintiff had a prima facie in personam claim against defendant, insofar as plaintiff alleged that the defendant was jointly and severally liable as a partner of another defendant). In that case, which Tide Line cites, see Pl. Mem. 7, it appears that the plaintiff specifically alleged, in the complaint, that the defendant seeking to vacate the attachment was a partner of the other defendant.

However, Tide Line has provided further allegations (and evidence) pertaining to [*44] its claim that Transclear is the alter ego of Eastrade Inc. in its submissions in connection with the motion to vacate the attachment. In addition, Tide Line asks that the Court allow Tide Line to submit an amended complaint containing these additional allegations as to Transclear's status as an alter ego of Eastrade Inc. [23] - including that: "Upon information and belief, Eastrade Commodities Inc.

is merely a shell-corporation through which Transclear conducts its business," Proposed Amended Verified Complaint (attached to Tide Line's letter to the Court dated July 11, 2006) P 13; "Transclear operates Eastrade Commodities Inc. as its 'chartering arm,' such that Eastrade has no separate, independent identity from Transclear," id. P 14; "Furthermore, Transclear is the alter ego of Eastrade Commodities Inc. because Transclear dominates and disregards Eastrade Commodities Inc. corporate form to the extent that Transclear is actually carrying on Eastrade Commodities Inc. business and operations as if the same were its own," id. P 15; "Upon information and belief, Eastrade Commodities, Inc. has no corporate existence of its own. Eastrade Commodities Inc. has no identifiable assets, [*45] employees or office in Panama," id. P 18; "Upon information and belief, Transclear makes payments on Eastrade Commodities, Inc.'s behalf where Transclear has absolutely no contractual obligation to Eastrade Commodities Inc.'s creditors; on March 11, 2005, Transclear made a hire payment to Tide Line on behalf of Eastrade Commodities Inc. even though Transclear was not referenced in the charter party, and no evidence of an indemnification agreement has been produced," id. P 21; "In another, independent maritime attachment case against Eastrade, Transclear was caught paying Eastrade Commodities Inc.'s debts once again," id. P 23; "The only person to respond to the Notice of Attachment was Ms. Tina Elliott, who indicated, on the actual facsimile sent to *Eastrade Commodities Inc.*, and [sic] that she spoke on Eastrade Commodities Inc.'s behalf," id.; "No representative of Eastrade Commodities Inc., beside Ms. Elliott, has come forward to challenge the attachment of Eastrade Commodities Inc.'s funds. Furthermore, no employee of Eastrade Commodities Inc. can be located or identified," id. P 24; "In addition, even though Transclear had no formal relationship to [*46] the LEVANTES A charter, and Eastrade Commodities Inc. was the named charterer, almost all correspondence sent to Tide Line and the charter brokers from the 'charterers' originated from Transclear," id. P 26; and "Transclear performs corporate functions on Eastrade Commodities Inc.'s behalf which should be performed solely by Eastrade Commodities Inc. Transclear appointed an arbitrator on Eastrade Commodities Inc.'s behalf in a 2001 arbitration in which Transclear itself *was not a party*," id. P 27. [24] With these proposed amended allegations, Tide Line has shown that it has a prima facie claim against Transclear on the basis of alleged alter ego status. [25]

Case 1:07-cv-10726-PKL     Document 23-15     Filed 02/14/2008     Page 13 of 15

Page 13

2006 U.S. Dist. LEXIS 95870, *46; 2007 AMC 252

23   Although Tide Line has not made this request through a formal motion to amend pursuant to *Federal Rules of Civil Procedure 15(a)*, the Court will consider the request.

24   The Proposed Amended Complaint also advances three alternative claims - that Transclear and Eastrade Commodities Inc. are "partners and/or are joint venturers," id. P 28, or that they are "affiliated companies" such that one is or soon will be holding assets belonging to the other, id. P 29, or that "Transclear is an undisclosed or partially disclosed principal in the charter parties entered into by Eastrade Commodities Inc., such that Transclear is liable for Eastrade Commodities Inc.'s debts related to those transactions," id. P 30.

[*47]

25   To re-emphasize, the Court must not decide, at this point, whether Tide Line has advanced sufficient evidence to support this claim, or whether Transclear has rebutted such evidence through its own submissions. Nor must it decide, for reasons discussed at length above, whether Tide Line has shown "probable cause" to believe that Transclear is the alter ego of Eastrade Commodities Inc.

"A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served . . . . Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." *Fed. R. Civ. P. 15(a)*. Rule 15(a) has a "lenient standard." *Parker v. Columbia Pictures Indus., 204 F.3d 326, 340 (2d Cir. 2000)*. "The Second Circuit has held that a *Rule 15(a)* motion 'should be denied only for such reasons as undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party.'" *Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 603-04 (2d Cir. 2005)* [*48] (quoting *Richardson Greenshields Securities, Inc. v. Lau, 825 F.2d 647, 653 n.6 (2d Cir. 1987)*). Although it is true that Tide Line could have brought a motion to amend earlier, the Court does not find that Tide Line's timing rises to "undue delay" in this case. Furthermore, the Court does not find that any of the other factors that would counsel against allowing the amendment are present here. The Court will therefore grant Tide Line's request to amend its Complaint, so long as no objections are filed by Transclear by August 23, 2006.

The question at this point is whether the Ex Parte Attachment Order should be vacated because the original Verified Complaint does not sufficiently state a prima facie alter ego claim against Transclear, or whether it should not be vacated because Tide Line's proposed amended allegations sufficiently state a prima facie alter ego claim against Transclear; furthermore, if the Attachment Order is vacated, the Court must consider whether the release of the attached funds should be stayed, as requested by Tide Line, until the Complaint is amended, a new Ex Parte Attachment Order is issued, and a new writ is served upon the garnishee [*49] bank. If the Court were to vacate the attachment now, after granting Tide Line's request to amend its Complaint, the entire proceedings would almost certainly be quickly repeated. [26] It seems that the interests of judicial efficiency would counsel in favor of keeping the attachment in place, in light of the amendments to the Verified Complaint. The parties have not provided any case law specifically addressing whether or not such a procedure may be adopted, and the Court has not found cases on point. [27] But, insofar as Tide Line has shown that it has a prima facie claim against Transclear on the basis of its Proposed Amended Verified Complaint, the Court does not believe that the purposes of *Supplemental Rules B* and E would be served by vacating the Attachment Order as to Transclear. However, the most appropriate procedure to follow appears to be the following: The Court will vacate the Ex Parte Attachment Order, allow Tide Line to file its Amended Verified Complaint with a new request for an Attachment Order by August 25, 2006 (so long as no objections are filed by August 23, 2006), and stay the release of the funds pending the issuance of the new Attachment Order and the serving [*50] of a new writ of attachment on the bank, so long as such service is accomplished by August 30, 2006.

26   Indeed, Tide Line's counsel confirmed as much during the hearing. Transcript of Oral Argument Heard on July 14, 2006 ("Tr.") 42, 47.

27   Transclear points to *T & O Shipping, Ltd. v. Lydia Mar Shipping Co. S.A., 415 F. Supp. 2d 310, 317 (S.D.N.Y. 2006)*, in which, as discussed earlier, the Court vacated the attachment insofar as it pertained to security for plaintiff's direct losses, because plaintiff made no claim for direct damages in its complaint. In that case, however, the plaintiff had apparently not made a request to amend its complaint in that case. The Court, after

Case 1:07-cv-10726-PKL    Document 23-15    Filed 02/14/2008    Page 14 of 15

Page 14

2006 U.S. Dist. LEXIS 95870, *50; 2007 AMC 252

vacating the attachment order, stated that if plaintiff intended to filed an amended complaint, it could do so within twenty days. *Id. at 317.* Here, Tide Line has already requested that it be allowed to filed an amended complaint, and the Court has granted leave to amend.

Tide Line cites *Shamis v. Ambassador Factors Corp., 34 F. Supp. 2d 879, 899,* which states that even if an allegation of alter ego "is not specifically pled, the factual allegations contained in the Second Amended Complaint may support the maintenance of a claim based on an alter ego theory of liability." But this is not a maritime case, and does not involve a maritime attachment; therefore, it does not provide any guidance as to whether an attachment may be maintained on the basis of a subsequent amended complaint.

**[*51]** d. Note on Transclear and Arbitration

The Court notes, however, that there appears to be a larger issue concerning Tide Line's claim against Transclear -- which, although it does not in and of itself require that the attachment be vacated, poses a problem for the unfolding of this action.

The Federal Arbitration Act ("FAA") applies to arbitration provisions in "maritime transactions." *9 U.S.C. §§ 1, 2.* Section 8 of the FAA, *9 U.S.C. § 8* - invoked by Tide Line in its Verified Complaint in seeking the maritime attachment order (along with *Section 1* of the FAA and *Supplemental Rule B*) - provides:

> If the basis of jurisdiction be a cause of action otherwise justiciable in admiralty, then, notwithstanding anything herein to the contrary, the party claiming to be aggrieved may begin his proceeding hereunder by libel and seizure of the vessel or other property of the other party according to the usual course of admiralty proceedings, and the court shall then have jurisdiction to direct the parties to proceed with the arbitration and shall retain jurisdiction to enter its decree upon the award.

"Under § 8, the plaintiff **[*52]** may seize the ship in rem, obtain a bond, and proceed with arbitration," *Thyssen, Inc. v. Calypso Shipping Corp., S.A., 310 F.3d 102, 107*

*(2d Cir. 2002)* - or, similarly, may attach other property belonging to the defendant, and proceed to arbitration.

Here, however, Tide Line is not seeking to proceed to arbitration as against Transclear. Despite the claim in Tide Line's Complaint that it sought a maritime order "for the purpose of obtaining personal jurisdiction over the Defendants, compelling them to arbitrate the claims asserted by Tide Line," Compl. P 15 (emphasis added), Tide Line has not sought, and apparently does not intend to seek, to join Transclear to the arbitration proceedings that Tide Line has initiated against Eastrade Inc. Tide Line's Verified Complaint refers to initiating arbitration only as against Eastrade Inc. Compl. P 9. Furthermore, Tide Line's submissions to the Court in connection with Transclear's motion to vacate the attachment nowhere state that Tide Line has attempted, or will seek, to involve Transclear in the arbitration proceedings.

It is not clear why Tide Line has not named Transclear in the arbitration proceedings. At the **[*53]** post-attachment hearing, when questioned by the Court regarding why Transclear is not involved in the arbitration proceeding, if Tide Line claims that Transclear is the alleged alter ego of Eastrade Inc., counsel for Tide Line stated that, although "that would be better answered by the London solicitor," he presumed that Transclear was not named in the arbitration proceeding because "arbitration is by contract" and "the only two parties named in the contract [at issue here] were Tide Line Inc. and Eastrade Commodities, Inc." Tr. 25. In response to the Court's suggestion that an alter ego could nonetheless be brought in, Tide Line's counsel replied: "In London arbitration, I don't expect that anybody would have allowed Transclear to come in when they claimed they're not a party to the contract. That's why we have Transclear here in New York." Id.

Tide Line has not sought to have this Court compel Transclear to participate in the arbitration proceedings; therefore, the Court need not decide whether Transclear could be so compelled. [28] But the Court notes that the Court of Appeals for the Second Circuit "has recognized a number of theories under which nonsignatories may be bound **[*54]** to the arbitration agreements of others," including that of "veil-piercing/alter ego." *Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995);* accord *Sarhank Group v. Oracle Corp., 404 F.3d 657, 662 (2d Cir. 2005).* It is possible that, in this case, English law applies under the arbitration agreement,

Case 1:07-cv-10726-PKL    Document 23-15    Filed 02/14/2008    Page 15 of 15

Page 15

2006 U.S. Dist. LEXIS 95870, *54; 2007 AMC 252

and would bar compelling Transclear to appear in the arbitration. But, again, this need not be resolved here.

> 28    "Under the [Federal Arbitration Act], as interpreted by the Supreme Court, the general presumption is that the issue of arbitrability should be resolved by the courts." *Alliance Bernstein Inv. Research & Mgmt., 445 F.3d 121, 125* (citing *First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944-45, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995)*; *AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 649, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986))*; accord *Contec Corp. v. Remote Solution Co., Ltd., 398 F.3d 205, 208 (2d Cir. 2005).*

[*55] Even if Transclear cannot be compelled to join in the arbitration proceedings against Eastrade Inc., Tide Line has provided no support for its position that it may, instead, litigate against Transclear in this Court, see Letter from Tide Line to the Court at 4 (July 11, 2006), on the basis of an alter ego theory, as the arbitration proceeds against Eastrade Inc. Indeed, nothing in the framework set out by *Sections 1* and *8* of the FAA, and *Supplemental Rule B*, suggests that a plaintiff may attach a defendant's property, and litigate the liability of the defendant in federal court, rather than proceeding to arbitration. Although this does not suggest that Tide Line does not have a prima facie claim against Transclear, it does indicate that, at this point, it is unclear how Tide

Line may proceed with that claim in this Court. This will need to be addressed further.

IV. Conclusion

For the reasons given above, the Court grants Defendant Transclear, S.A.'s motion to vacate this Court's March 14, 2006, Ex Parte Order for Process of Maritime Attachment, as to Transclear only, grants Tide Line's request for leave to file an Amended Verified Complaint with a new request [*56] for an Attachment Order so long as no objections are filed by August 23, 2006, directs that Tide Line file the Amended Verified Complaint with a new request for an Attachment Order by August 25, 2006, and stays the release of the attached funds pending the issuance of a new Attachment Order in connection with the Amended Verified Complaint and the serving of a new writ of attachment on the bank, so long as the writ of attachment is served by August 30, 2006.

SO ORDERED.

Dated: New York, New York

August 15, 2006

Kimba M. Wood

United States District Judge

LEXSEE 2005 US DIST LEXIS 40783

DEIULEMAR COMPAGNIA DI NAVIGAZIONE SpA, Plaintiff, -against-
DABKOMAR BULK CARRIERS LIMITED, DABKOMAR DENIZCILIK VE
TICARET AS, a/k/a "Dabkomar Denizcili Acentelik Marina Isletmeleri Turizm Ve
Sinai Mamuller Ticaret Anonim Sirketi," a/k/a Dabkomar Shipping & Trading,"
a/k/a "Dabkomar Shipping S.A.," Defendants.

05 Civ. 8199 (RMB) (HBP)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

2005 U.S. Dist. LEXIS 40783

December 12, 2005, Decided
December 12, 2005, Filed

**SUBSEQUENT HISTORY:** Adopted by, Motion granted by, Claim dismissed by, Sanctions disallowed by *Deiulemar Compagnia di Navigazione SpA v. Dabkomar Bulk Carriers Ltd., 2006 U.S. Dist. LEXIS 8331 (S.D.N.Y., Feb. 10, 2006)*

**COUNSEL:** **[*1]** For Deiulemar Compagnia Di Navigazione SpA, Plaintiff: Jack A. Greenbaum, Healy & Baillie, LLP, New York, NY.

For Dabkomar Denizcilik Ve Ticaret As, also known as Dabkomar Denizcili Acentelik Marina Isletmeleri Turizm Ve Sinai Mamuller Ticaret Anonim Sirketi also known as Dabkomar Shipping & Trading also known as Dabkomar Shipping S.A., Defendant: John James Sullivan, Hill, Rivkins and Hayden, NY, NY.

For Nordea Bank of Finland PLC, Garnishee: Erika Jane Duthiers, Nixon Peabody LLP, New York, NY.

**JUDGES:** HENRY PITMAN, United States Magistrate Judge. HONORABLE RICHARD M. BERMAN, United States District Judge.

**OPINION BY:** HENRY PITMAN

**OPINION**

*REPORT AND RECOMMENDATION*

PITMAN, United States Magistrate Judge:

TO THE HONORABLE RICHARD M. BERMAN, United States District Judge

I. *Introduction*

Dabkomar Denizcilik ve Ticaret Anonim Sirketi Instanbul/Turkey, sued herein as Dabkomar Denizcilik ve Ticaret AS ("Dabkomar AS"), moves by way of Order to Show Cause for an Order pursuant to *Rule E(4)(f) of the Supplemental Rules for Certain Admiralty and Maritime Claims* of the Federal Rules of Civil Procedure (the "Admiralty Rules"), vacating the Amended Order of Attachment issued in this action **[*2]** on October 3, 2005 (Docket Item 6) and dismissing the complaint as to Dabkomar AS pursuant to *Fed.R.Civ.P. 12(b)(2)* and *12(b)(6)* for lack of personal jurisdiction and failure to state a claim upon which relief can be granted. Dabkomar AS also moves, in the alternative, for security for its costs. Plaintiff has cross-moved for sanctions pursuant to *Fed.R.Civ.P. 11*.

For the reasons set forth below, I respectfully recommend that: (1) Dabkomar AS's motion to vacate the attachment be granted; (2) Dabkomar AS's motion to dismiss the complaint as to it for lack of personal jurisdiction be granted; (3) Dabkomar AS's motion to dismiss the complaint for failure to state a claim and for security be denied as moot, and (4) plaintiff's motion for sanctions be denied.

II. *Facts*

A. *Plaintiff's Claim*

This is an admiralty action arising out of the breach of a charter party.

As alleged in plaintiff's amended verified complaint ("Am. Compl."), on or about March 16, 2005, plaintiff chartered a vessel to Dabkomar Bulk Carriers Ltd. ("Dabkomar Bulk") for approximately [*3] two and one-half years at the rate of $ 45,000 per day (Am. Compl. P4). Plaintiff alleges that Dabkomar Denizcilik ve Ticaret AS, a/k/a "Dabkomar Denizcili Acentelik Marina Isletmeleri Turizm ve Sinai Mamuller Ticaret Anonim Sirketi," a/k/a "Dabkomar Shipping & Trading," a/k/a "Dabkomar Shipping S.A.," guaranteed Dabkomar Bulk's performance of the charter party (the "Charter") (Am. Compl. P5). [1] According to plaintiff, Dabkomar Bulk used the vessel for approximately six months and then repudiated the Charter, despite the fact that it still had approximately two years to run (Am. Compl. P6).

> 1    The Charter itself provides that it is an agreement between plaintiff and "Messrs. Dabkomar Bulk Carriers Limited (whose performance to be wholly guaranteed by Messrs. Dabkomar Deniz Acenteligi Marina Isletmeleri Turizm ve Sinai Mamuller, A.S., Istanbul, Turkey . . ." (Exhibit 1 to the Declaration of William N. France, Esq., dated November 2, 2005 ("France Decl."), at 1. Curiously, the Charter was never signed by any party to it (Declaration of Trifon Tsentides, dated November 1, 2005 ("Tsentides Decl.") P26).

[*4] Plaintiff seeks to recover damages for Dabkomar Bulk's use of the vessel up to the date of repudiation and the difference between the contract price and the fair market value of the use of the vessel for the unexpired term of the Charter, together with interest and attorney's fees (Am. Compl. PP7-12). Exclusive of interest, costs, arbitration fees and attorney's fees, the amount sought by plaintiff is $ 14,547,137.00 (Am. Compl. P12).

B. *Proceedings to Date*

Plaintiff commenced this action on September 23, 2005 and on that date secured an Order of Maritime Attachment and Garnishment pursuant to *Admiralty Rule*

*B.* The Order of Attachment was predicated on the existence of a maritime claim and the fact that Dabkomar AS could not be found within the Southern District of New York (*see* Admiralty Rule B(1)(a)); plaintiff did not argue that collection of any judgment would be in jeopardy absent the order of attachment (*see* Memorandum of Law in Support of Plaintiff's Petition for Issuance of an Admiralty Rule B Process of Maritime Attachment and Garnishment, dated September 22, 2005 (Docket Item 3)).

By October 7, 2005, plaintiff had garnished assets belonging to Dabkomar AS [*5] with a face value of $ 20,000 (Declaration of John J. Sullivan, Esq., undated (Docket Item 17), P4). On October 21, Dabkomar AS made the pending motions and secured an Order staying further attachments pending the resolution of these motions (Docket Items 10, 11).

Dabkomar AS argues that the Order of Attachment should be vacated and the action dismissed as to it because: (1) it is not a party to the alleged guaranty; (2) the alleged guaranty of performance was made by an individual who had no authority to bind Dabkomar AS; (3) the Charter is governed by English law and, under English law, the language of the alleged guaranty does not give rise to a guaranty, and (4) plaintiff has admitted that it has no claim against Dabkomar AS (Sullivan Decl., P7; Reply Memorandum of Law (Corrected) of Defendant Dabkomar Denizcilik ve Ticaret A.S. in Support of Its Order to Show Cause to Vacate Maritime Attachments Against It, dated November 15, 2005 ("Dabkomar AS Reply Mem."), at 4-5).

In addition to the proceedings in this Court, plaintiff has also commenced an arbitration proceeding in London against Dabkomar Bulk and has attempted to commence both an arbitration proceeding and a legal action [*6] against Dabkomar AS in the Commercial Court of the Queen's Bench Division of the High Court in London (Declaration of Nicholas John Ashley Shaw, dated November 2, 2005 (11-2-05 Shaw Decl."), P10). Dabkomar AS has not consented to the jurisdiction of the arbitrator, resulting in the action in the High Court in which plaintiff seeks a declaration that Dabkomar AS is bound to guarantee the performance of Dabkomar Bulk (11-2-05 Shaw Decl., P10). At last report, plaintiff had commenced the High Court proceeding but was still attempting to effectuate service on Dabkomar AS (Declaration of Nicholas John Ashley Shaw, dated

November 21, 2005 (11-21-05 Shaw Decl."), P3).

III. *Analysis*

A. *Plaintiff's Burden under Admiralty Rule E(4)(f)*

Where, as here, a plaintiff has secured an *ex parte* order of attachment under *Admiralty Rule B*, Admiralty Rule E(4)(f) imposes the burden on such plaintiff, upon defendant's motion, "to show why the . . . attachment should not be vacated . . . ." It appears that a plaintiff discharges this burden when it shows that the order of attachment was properly issued under Admiralty Rule B(1)(a). *See Blake Maritime, Inc. v. Petrom S.A., 2005 U.S. Dist. LEXIS 26310, 05 Civ. 8033 (PAC), 2005 WL 2875335* **[*7]** *at *2 (S.D.N.Y. Oct. 31, 2005); Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 384 F. Supp.2d 726, 729 (S.D.N.Y. 2005); HBC Hamburg Bulk Carriers GMBH & Co. KG v. Proteinas Y Oleicos S.A., 2005 U.S. Dist. LEXIS 8009, 04 Civ. 6884 (NRB), 2005 WL 1036127 at *2 (S.D.N.Y. May 4, 2005).* [2]

> [2] *Aqua Stoli Shipping* suggests that, in addition to "all technical requirements," the plaintiff must show at the Rule E(4)(f) hearing that the attachment "is reasonably calculated to serve at least one of the two historical purposes of obtaining jurisdiction or securing a judgment and is not simply a tactical device designed to harass the adversary in an ongoing litigation." *384 F. Supp.2d at 729.* As noted in *Aqua Stoli Shipping*, courts have reached conflicting results concerning the existence of this broader requirement. *See 384 F. Supp.2d at 729.* Since Dabkomar AS's arguments here are limited to plaintiff's alleged failure to meet the "technical requirements" for a maritime order of attachment, I need not address whether the broader showing suggested in *Aqua Stoli Shipping* need be made.

**[*8]** A maritime order of attachment is properly issued "when the plaintiff makes a *prima facie* showing that he has a maritime claim against the defendant in the amount sued for and the defendant is not present in the district." 1985 Advisory Committee Note to Admiralty Rule B; *see also Blake Maritime, Inc. v. Petrom S.A., supra, 2005 U.S .Dist. LEXIS 26310, 2005 WL 2875335 at *2; Parkroad Corp. v. China Worldwide Shipping Co., 2005 U.S. Dist. LEXIS 11122, 05 Civ. 5085 (GBD), 2005 WL 1354034 at *1-*2 (S.D.N.Y. June 6, 2005); Maritima Petroleo e Engenharia Ltda v. Ocean Rig IA, 78 F. Supp.2d 162, 166 (S.D.N.Y. 1999);* 2 Thomas J. Schoenbaum, *Admiralty & Maritime Law* § 21-2 at 393 (4th ed. 2004). Dabkomar AS does not argue that it is present in the District; rather the only issue is whether plaintiff has made a *prima facie* showing that it has a maritime claim.

The law is not well defined concerning what a plaintiff must prove to discharge its burden of making a *prima facie* showing that it has a maritime claim. *See Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., supra, 384 F. Supp.2d at 728.* Some courts have found that the standard is satisfied if plaintiff demonstrates **[*9]** that the complaint meets the standards of *Fed.R.Civ.P. 12(b)(6)* and states a claim upon which relief can be granted. *E.g., Maritima Petroleo E Engenharia LTDA v. Ocean Rig 1 AS, supra, 78 F. Supp.2d at 166.* Other courts have found the standard satisfied where plaintiff submits evidence which, without regard to the evidence opposing it, could sustain a verdict in plaintiff's favor. *E.g., Maritime Ventures Int'l., Inc. v. Caribbean Trading & Fid., Ltd., 689 F. Supp. 1340, 1348, 1356 (S.D.N.Y. 1988).* Other courts have interpreted Admiralty Rule E(4)(f) as establishing a probable cause standard. *E.g., Salazar v. "Atlantic Sun", 881 F.2d 73, 79 (3rd Cir. 1989).* And one court has applied a *Fed.R.Civ.P. 12(b)(6)* standard but considered evidence beyond the complaint. *Cashman Equipment Corp. v. Trans Caribbean Transport Co., Ltd., 1996 U.S. Dist. LEXIS 16307, Civ. A. No. 96-3116, 1996 WL 626294 at *2 (E.D. La. Oct. 29, 1996).*

I conclude that the second-listed standard is the most appropriate one. First, as noted above, the Advisory Committee Notes to the 1985 Amendments **[*10]** to *Admiralty Rule B* state that plaintiff's burden is to make a "*prima facie* showing that he has a maritime claim." Although "*prima facie* showing" is used in many different contexts with many different meanings, it is most commonly understood as requiring evidence or, at least, allegations of fact which, if true, could sustain the ultimate proposition in issue. *New Moon Shipping Co. v. Man B & W Diesel AG, 121 F.3d 24, 29 (2d Cir. 1997)* (*prima facie* showing of personal jurisdiction is made "by alleging facts which, if true, would support the exercise of the court's jurisdiction"); *Fisher v. Vassar College, 114 F.3d 1332, 1336 (2d Cir. 1997) (en banc), abrogated on other grounds, Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)* ("'*Prima facie* case' denotes what evidence a

plaintiff must offer to avoid dismissal after presentation of the plaintiff's direct case."); *see also LaGrant v. Gulf & Western Mfg. Co., 748 F.2d 1087, 1090 (6th Cir. 1984)*; *In re Chicago Rys. Co., 175 F.2d 282, 289-90 (7th Cir. 1949)*; *Lamarca v. United States, 31 F. Supp.2d 110, 124 (E.D.N.Y. 1998)*; **[\*11]** *Husbands v. Pennsylvania, 395 F. Supp. 1107, 1139 (E.D. Pa. 1975)*.

Second, the Advisory Committee Notes to the 1985 Amendments to *Admiralty Rule B* indicate that the amended rule was intended to insure that attachments in admiralty were "consistent with the principles of procedural due process enunciated by the Supreme Court in *Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S. Ct. 1820, 23 L. Ed. 2d 349 (1969)*; and later developed in *Fuentes v. Shevin, 407 U.S. 67, 92 S. Ct. 1983, 32 L. Ed. 2d 556 (1972)*; *Mitchell v. W.T. Grant Co., 416 U.S. 600, 94 S. Ct. 1895, 40 L. Ed. 2d 406 (1974)*; and *North Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601, 95 S. Ct. 719, 42 L. Ed. 2d 751 (1975)*." The common theme of these cases is that when a plaintiff seeks a prejudgment seizure of a defendant's property, *Due Process* requires an evidentiary showing of the claimant's probable entitlement either before or shortly after the seizure. [3] Maritime claims can be easily alleged. To hold that Admiralty Rule B(1)(a) is satisfied by a plaintiff's merely stating a maritime claim upon which relief can be granted sets too low a standard and is inconsistent with the decisions cited above.

> [3] For example, in an effort to comply with the holding of *North Georgia Finishing,* New York requires that a party who has obtained an *ex parte* order of attachment show "the probability that [it] will succeed on the merits" at a post-attachment confirmation hearing. *N.Y. C.P.L.R. § 6223(b)*; *see also* Joseph M. McLaughlin, Practice Commentary to *N.Y. C.P.L.R. § 6223* at C6223:5 (McKinney 1980).

**[\*12]** The parties' own conduct here acknowledges that inquiry beyond the face of the pleadings is appropriate. As noted above, the putative guarantor identified in the Charter at issue has a name slightly different from Dabkomar AS's. Nevertheless, as discussed below, plaintiff has offered the declaration of Tevfik Gur, along with a number of exhibits, to establish that the two names refer to the same entity. Thus, plaintiff itself has construed this motion as requiring something more than a bare *Rule 12(b)(6)* showing (*see* Plaintiff's

Memorandum of Law in Opposition to Dabkomar AS's Order to Show Cause and in Support of a Cross-Motion for Award of Costs and Fees for Dabkomar's Violations of *Rule 11, Fed.R.Civ.P.*, dated Nov. 2, 2005 ("Plaintiff's Memo."), at 10).

Finally, even if the proper standard is the probable cause standard suggested by plaintiff (*see* Plaintiff's Memo. at 9), the outcome in this case would not change. Although probable cause does not require a showing that the proposition in issue is more likely true than not true, *Brinegar v. United States, 338 U.S. 160, 176, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949)*; *United States v. Gotti, 794 F.2d 773, 777 (2d Cir. 1986)*; **[\*13]** *United States v. Travisano, 724 F.2d 341, 346 (2d Cir. 1983)*; *see also United States v. Wagner, 989 F.2d 69, 72 (2d Cir. 1993)*; *United States v. Nersesian, 824 F.2d 1294, 1306 (2d Cir. 1987)*, it does require that there be a "substantial chance" that the proposition is true. *Illinois v. Gates, 462 U.S. 213, 244 n.13, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)*; *United States v. Harwood, 998 F.2d 91, 96 (2d Cir. 1993)*; *Feinberg v. City of New York, 2004 U.S. Dist. LEXIS 16098, 99 Civ. 12127 (RC), 2004 WL 1824373 at \*2 (S.D.N.Y. Aug. 13, 2004)*. For the reasons explained at pages 13-19, below, there is no "substantial chance" that plaintiff will prevail on its guarantee claim against Dabkomar AS.

**B.** *Dabkomar AS's Arguments*

Turning to Dabkomar AS's specific arguments, as explained below, I find that plaintiff has not shown that it has a *prima facie* maritime case against Dabkomar AS.

First, Dabkomar AS claims that it is not a party to the Charter and that there is no document evidencing a guaranty in its name. Dabkomar AS's argument here is based on the fact that the Charter refers to a putative guarantee by "Messrs. Dabkomar Deniz Acenteligi **[\*14]** Marina Isletmeleri Turizm ve Sinai Mamuller, A.S., Istanbul, Turkey . . . ." (France Decl., Ex. 1 at 1), while Dabkomar AS's name is Dabkomar Denizcilik ve Ticaret Anonim Sirketi Instanbul/Turkey. Dabkomar AS argues that it is a different entity than that named in the Charter. In response, plaintiff has offered evidence that the two entities are one and the same. For example, plaintiff has offered evidence that in December 2004 Dabkomar Denizcilik Acentelik Marina Isletmeleri Turizm ve Sinai Mamuller, Ticaret Anonim Sirketi changed its name to Dabkomar Denizcilik ve Ticaret Anonim Sirketi (Declaration of Tevfik Gur, dated November 2, 2005

("Gur. Decl."), P7 and Exs. 1 and 2 thereto). There also appears to be substantial overlap between the founders of Dabkomar Denizcilik Acentelik Marina Isletmeleri Turizm ve Sinai Mamuller, Ticaret Anonim Sirketi and Dabkomar AS (Gur. Decl., PP6, 9). This evidence is sufficient to sustain a jury finding that Dabkomar Denizcilik Acentelik Marina Isletmeleri Turizm ve Sinai Mamuller, Ticaret Anonim Sirketi and Dabkomar Denizcilik ve Ticaret Anonim Sirketi are the same entity and plaintiff has, therefore, established a *prima facie* case that Dabkomar [*15] AS is the entity named in the Charter.

Dabkomar AS next argues that the individual who negotiated the Charter on behalf of Dabkomar Bulk and, allegedly, on behalf of itself, was not its agent and had no authority to bind Dabkomar AS to the alleged guaranty.

The Charter was negotiated by Trifon Tesentides on behalf of plaintiff and Sarp Sentuna, purportedly on behalf of Dabkomar Bulk and Dabkomar AS (Tsentides Decl., PP5-27). Although plaintiff does not specify how Sentuna had authority to bind Dabkomar AS, there are only two possible theories -- actual authority and apparent authority. Under either theory, Sentuna's own statements and conduct are inadmissible to prove his alleged authority. *Karavos Compania Naviera S.A. v. Atlantica Exp. Corp., 588 F.2d 1, 10 (2d Cir. 1978)*; *United States v. Consol. Laundries Corp., 291 F.2d 563, 576 (2d Cir. 1961)*; *Tarstar Shipping Co. v. Century Shipline, Ltd., 451 F. Supp. 317, 323 (S.D.N.Y. 1978)*; *Marvin v. Wilber, 52 N.Y. 270, 273 (1873)*. Since there is not a shred of evidence, apart from Sentuna's own statements and conduct, that Sentuna had actual authority to bind Dabkomar [*16] AS to the alleged guarantee, the only possibly viable theory is apparent authority.

"Apparent authority arises from the 'written or spoken words or another conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have [an] act done on his behalf by the person purporting to act for him.'" *Dinaco, Inc. v. Time Warner, Inc., 346 F.3d 64, 69 (2d Cir. 2003), quoting Minskoff v. Am. Express Travel Servs. Co., 98 F.3d 703, 708 (2d Cir. 1996)*; *accord Bd. of Educ. v. Conn. Gen. Life Ins. Co., 309 F. Supp.2d 416, 420-21 (E.D.N.Y. 2004)*. The only conduct arguably attributable to Dabkomar AS -- Sentuna's putative principal -- that might have conferred apparent authority on Sentuna is his use of an e-mail address with the suffix

"@dabkomar.com.tr" (Tsentides Decl., Ex. TT *passim*). However, even if I assume that Sentuna's use of this e-mail address was authorized by Dabkomar AS -- although there is no evidence on this issue -- and make the further assumption that this e-mail suffix is the web site of Dabkomar AS, the evidence is still insufficient as a matter of law to sustain [*17] a finding of apparent authority.

Strikingly similar facts were present in *Karavos Compania Naviera S.A. v. Atlantica Export Corp., supra, 588 F.2d 1*. In that case, plaintiff, the disponent owner of a ship, alleged that the defendant had breached a charter agreement and sought to enforce the arbitration clause in the charter agreement. Like the Charter here, the charter agreement in *Karavos Compania Naviera* was not signed, and allegedly resulted from a series of telephone and telex [4] exchanges. *588 F.2d at 3*. The trial court found for plaintiff, and defendant argued on appeal that there was insufficient evidence that its putative agent -- Repetti -- had apparent authority to bind it to the charter agreement.

4  In the context of the present dispute, telexes are indistinguishable from e-mails.

The Court of Appeals, in an opinion by Judge Friendly, squarely held that Repetti's use of defendant's communication facilities and his own claims of authority were insufficient to support [*18] a finding of apparent authority and that the owner's agent had an affirmative duty to make inquiry concerning Repetti's authority:

The court's finding of apparent authority was based largely on Atlantica's having permitted Repetti to work in its San Francisco office and to receive telex' and receive and make telephone calls. We do not follow the court in concluding that this alone justified Grundvig [a ship broker] in believing that Repetti was authorized to commit Atlantica to a costly charter, with many more to come, and relieved him of the duty of reasonable inquiry. *Restatement of Agency 2d § 8, comments a & c, § 27, comment a*; 2 Mechem, Agency § 1721, at 1307 (1914 ed.); Mechem, *Outlines of the Law of Agency* P94, at 661-62 (1952 ed.). Grundvig had had no previous dealings with Atlantica; indeed had never heard of it. Neither had he had

any previous dealings with Resources. Prior to Repetti's trip to California, he had been told that the [an entity other than Atlantica] would be the charterer. Apart from Repetti's presence in Atlantica's office and use of its communication facilities, his sole bases for thinking that Repetti **[*19]** had authority to bind Atlantica were that Kenard [an individual not employed by Atlantica] allegedly told him that Repetti was an Atlantica employee a statement which, as indicated above, was not corroborated by Kenard and that Repetti told him he had authority to act. Neither of these afforded any ground for holding Atlantica. Professor Mechem stated many years ago that "the authority of an agent, and its nature and extent . . ., can only be established by tracing it to its source in some word or act of the alleged principal. The agent cannot confer authority upon himself or make himself agent merely by saying that he is one." 1 Mechem, *Agency* § 285, at 205 (1914 ed.). See also *Restatement of Agency 2d § 27, comment a, § 285*; *Edwards v. Dooley, 120 N.Y. 540, 551, 24 N.E. 827 (1890)*; *National Surety Corp. v. Inland Properties, Inc., 286 F.Supp. 173, 180 (E.D. Ark. 1968), aff'd, 416 F.2d 457 (8 Cir. 1969)* . As Judge Levet shrewdly observed in *Dr. Beck & Co. v. General Electric Co., 210 F. Supp. 86, 90 (S.D.N.Y. 1962), aff'd, 317 F.2d 538 (2 Cir. 1963)*: **[*20]**

> While agents are often successful in creating an appearance of authority by their own acts and statements, such an appearance does not create apparent authority. Mechem, *Agency* 61 (4 ed. 1952).

Moreover, even if Grundvig had been justified in believing that Repetti was an Atlantica employee, he was bound to inquire what his authority was; not every employee of a trading company has authority to fix a time charter, let alone a series of such charters. See *Seacoast Electric Co. v. Franchi Bros. Const. Corp., 437 F.2d 1247, 1249-50 (1 Cir. 1971)* ; *P. D. Marchessini & Co., (New York), Inc. v. H. W. Robinson & Co., 287 F. Supp. 728, 733-34 (S.D.N.Y. 1967)*; *People's Broadcasting Corp. v. George Batten Co., Inc., 231 App. Div. 446, 247 N.Y.S. 569 (1st Dept.), aff'd, 258 N.Y. 551, 180 N.E. 328 (1931)*; *Engel v. Simmons, 230 App. Div. 454, 245 N.Y.S. 384 (1st Dept. 1930), aff'd, 257 N.Y. 612, 178 N.E. 817 (1931)*.

*588 F.2d at 10.*

*Karavos Compania Naviera* was followed in *Herlofson Mgmt. AS v. Ministry of Supply, Kingdom of Jordan, 765 F. Supp. 78 (S.D.N.Y. 1991)*. **[*21]** *Herlofson* also involved a claim to compel arbitration arising out of the breach of an unsigned charter party. The principal issue in *Herlofson* was whether Ward Marine, a ship broker, had the authority to bind the Jordanian Ministry of Supply. Like the present case and *Karavos,* the alleged charter agreement in *Herlofson* was the product of a number of telex exchanges between Ward Marine and the owner's ship broker.

After finding that Ward Marine lacked actual authority, the Honorable Robert L. Carter, United States District Judge, concluded that, in light of the decision in *Karavos,* defendant could not be bound under a theory of apparent authority:

> The mere act of hiring Ward as its broker does not make the Ministry responsible for any belief by the petitioners' agents that Ward was authorized to fix contracts for the Ministry without its approval. Although it is customary in the shipping industry to do business through brokers, it is also customary for a broker to get the principal's approval before fixing a binding contract. . . . Thus, the hiring of Ward as a broker could not have created a reputation of authority to fix contracts

without approval.

. . . [*22] .

The *Karavos* case, like the present case, involved a petition to compel arbitration on an alleged fixture of a ship charter. The respondent in that case, Atlantica, had allowed an agent, Repetti, to use its telephone lines for the purpose of finding a vessel for Atlantica to charter. *Id. at 6-7.* The Second Circuit held that Atlantica's actions were insufficient, as a matter of law, to give Repetti apparent authority to fix a vessel. *Id. at 10.*

Petitioners attempt to distinguish *Karavos* by asserting that Repetti was not a broker but an alleged employee of Atlantica. P.Rep. 7. Repetti was, in fact, a representative of an independent trading company. *Karavos, 588 F.2d at 3.* Nonetheless, it is not important whether Repetti is called a "broker" or something else, since it is clear that Repetti's function was to secure vessels for Atlantica. *See id. at 6.* As petitioners point out, "not every employee of a trading company has authority to fix a time charter," *id. at 10,* but it is also true that not every employee of a ship broker has authority to fix a voyage charter.

In addition, petitioners had a duty of reasonable inquiry [*23] to determine the scope of McDaniel's authority. *See id. at 10.* To be sure, *Herbert Construction [Co. v. Continental Ins. Co., 931 F.2d 989, 995 (2d Cir. 1991)],* holds that reasonable inquiry is not a prerequisite to maintaining a cause of action based on apparent authority under New York law; rather, "in the apparent authority context, the duty to inquire only arises when the facts and circumstances are such as to put [the third party] on inquiry, the transaction is extraordinary, or the novelty of the transaction alerts the third party to the danger of fraud." *Id. at 996,* (internal quotation marks and citations omitted). However, the duty of inquiry in this case

is governed by federal maritime law, as expounded in *Karavos,* rather than by New York state law, as expounded in *Herbert Construction. See supra* note 7. Moreover, the "novelty" of McDaniel's claim of authority to fix without consulting the Ministry, together with rumors in the market calling Ward's authority into doubt, put [plaintiff's broker] on actual notice of the danger of fraud. *See supra* page 7. Seeking and obtaining [the] assurances [of the individual [*24] at Ward assigned to the matter], without more, is insufficient to relieve [plaintiff's broker] of the duty of reasonable inquiry. *See Karavos, supra, 588 F.2d at 9.*

765 F. Supp. at 88-89.

These cases compel the conclusion that plaintiff does not have a viable maritime claim against Dabkomar AS. Plaintiff has no evidence of any statements or conduct attributable to Dabkomar AS that could create an appearance of Sentuna's authority other than Sentuna's e-mail address. *Karavos* teaches that the use of a putative principal's communications facilities, such as an e-mail address, is insufficient as a matter of law to sustain a finding of apparent authority, and that, in any event, plaintiff had a duty, as a matter of maritime law, to make inquiry to Dabkomar AS concerning Sentuna's authority. Plaintiff's failure to muster additional evidence of Sentuna's apparent authority and its failure to offer any evidence of its making inquiry concerning the scope of Sentuna's authority is fatal to its claim against Dabkomar AS. [5]

5    The closest plaintiff comes to offering evidence of Sentuna's apparent authority is its citation to the results of Google search for the terms "dabkomar sentuna." This search yielded the following response:

**Dabkomar** Shipping SA - Ship Management Contact Us . . . SARP **SENTUNA:** CHARTERING & OPERATIONS DEPT. MANAGER. Mobile +90-532-436 77    79,    E-Mail: *sarpsentuna@**dabkomar**.com.tr,*

Case 1:07-cv-10726-PKL    Document 23-16    Filed 02/14/2008    Page 8 of 9

Page 8
2005 U.S. Dist. LEXIS 40783, *24

AZRU          .          .          .
*www.dabkomar.com.tr/default/asp?page=Contact%20&language=n* ...
Result- Cached - Similar pages

(France Decl. Ex. 5). On December 12, 2005, I attempted to access the hyperlink set forth in the Google response and received a response that the page could not be displayed because "it might have been removed, had its name changed, or is temporarily unavailable." Plaintiff makes no claim that it relied on this Google response in entering into the Charter.

Given the obvious hearsay issue with respect to the Google search response, the absence of any evidence concerning Dabkomar AS's role, if any, in generating the Google search response, the absence of any evidence concerning when the hyperlink in the Google search response became inoperative and the absence of any evidence that plaintiff even knew of the Google search at the time it entered into the Charter, the Google search does not constitute evidence that Dabkomar AS invested Sentuna with the appearance of authority.

[*25] I have considered whether discovery would alter this result and conclude that it would not. The existence of apparent authority, or even a question of fact concerning apparent authority, turns on Dabkomar AS's conduct, if any, toward plaintiff at the time the alleged Charter was fixed and the facts known to plaintiff at that time. Plaintiff presently knows as much as it ever will concerning its knowledge at that time. Discovery will not, therefore, change the result.

Thus, Dabkomar AS's motion to vacate the order of attachment should be granted on the ground that plaintiff cannot show that it has a *prima facie* maritime claim against Dabkomar AS.

In the interest of completeness and to minimize the possibility of a remand, I note that Dabkomar AS's remaining arguments are not persuasive. To the extent Dabkomar AS is claiming that the language of the putative guarantee is insufficient to constitute a guaranty of performance under English law, it relies on a single case -- *Wedge Marine Ltd. v. Oriental Union & Holdings Ltd.,* [2005] H.K.E.C. 1010 (C.F.I.), 2005 WL 835988 -- decided by the Court of First Instance of the High Court of the Hong Kong Special Administrative [*26] Region.

Although neither side has briefed the issue, it appears from its name and the decision that the Court of First Instance is, as its name implies, a trial court and not an appellate court. *See Martindale-Hubbel Int'l Law Digest* HK-5 (2005). It is unreasonable on its face to conclude that the decision of a trial court in Hong Kong constitutes binding precedent in England. I intend no disrespect to the courts of Hong Kong, and I assume that Hong Kong follows English precedent, but in a common law country, such as England, trial courts simply do not have the power to pronounce binding precedent.

Dabkomar AS's final argument, that plaintiff has admitted it has no claim against Dabkomar AS is contrary to law. Dabkomar AS bases this argument on the statement in plaintiff's memorandum of law that "'Dabkomar will have no liability unless and until liability is imposed and damages are determined against Dabkomar [Bulk]'" (Dabkomar AS's Reply Memorandum of Law, dated Nov. 15, 2005, at 4-5, *quoting* Plaintiff's Memo. at 13). This does not constitute an admission that no claim against Dabkomar AS currently exists. As a matter of substantive law, it is well settled that a creditor may [*27] pursue a claim against a guarantor without first asserting a claim against the principal debtor. *Terry v. Tubman, 92 U.S. 156, 160, 23 L. Ed. 537 (1875)*; *Joe Heaston Tractor & Implement Co. v. Securities Acceptance Corp., 243 F.2d 196, 199-200 (10th Cir. 1957).* Plaintiff's claim against Dabkomar AS is also free from any procedural defect in this regard. *Rule 8(e)(2) of the Federal Rules of Civil Procedure* expressly permits a plaintiff to set forth claims "alternatively or hypothetically." *See General Acquisition, Inc. v. GenCorp Inc., 766 F. Supp. 1460, 1476 (S.D. Ohio)* ("Simply because [a claim] is phrased as an 'if-then' allegation does not warrant dismissal."). There is, therefore, no defect in asserting a hypothetical claim against Dabkomar AS as a guarantor.

Because plaintiff cannot prevail on its guarantee claim against Dabkomar AS, it cannot establish a *prima facie* admiralty claim and cannot meet its burden under Admiralty Rule E(4)(f). The Order of Attachment should, therefore, be vacated. In addition, because the attachment is the only basis for the assertion of jurisdiction over Dabkomar [*28] AS, its vacatur requires the dismissal of the action as to Dabkomar AS for lack of personal jurisdiction. *Blueye Navigation, Inc. v. Oltenia Navigation, Inc., 1995 U.S. Dist. LEXIS 1844, 94 Civ. 1500 (LAP), 94 Civ. 2653 (LAP), 1995 WL 66654 at*

*4-*5 (S.D.N.Y. Feb. 17, 1995)*; Int'l Marine Consultants, Inc. v. Karavias, 1985 U.S. Dist. LEXIS 19272, 82 Civ. 8296 (CMM), 1985 WL 1515 at *3, *5-*6 (S.D.N.Y. June 3, 1985)*; see generally Swift & Co. Packers v. Compania Columbiana Del Caribe, 339 U.S. 684, 693, 70 S. Ct. 861, 94 L. Ed. 1206 (1950)*; Linea Naviera de Cabotaje, C.A. v. Mar Caribe de Navegacion, C.A., 169 F. Supp.2d 1341, 1351 (M.D. Fla. 2001)*. Finally, Dabkomar AS's motion for security should be dismissed as moot as should its motion to dismiss the complaint for failure to state a claim. Plaintiff's motion for Rule 11 sanctions should be denied since I conclude that Dabkomar AS's motion is meritorious.

IV. *Conclusion*

Accordingly, for all the foregoing reasons, I respect-fully recommend that: (1) Dabkomar AS's motion to vacate the attachment be granted; (2) Dabkomar AS's motion to dismiss the complaint as to it for lack or personal jurisdiction be granted; (3) Dabkomar AS's motion to dismiss **[*29]** the complaint for failure to state a claim and for security be denied as moot, and (4) plaintiff's motion for sanctions be denied.

V. *Objections*

Pursuant to *28 U.S.C. § 636(b)(1)(C)* and *Rule 72(b) of the Federal Rules of Civil Procedure*, the parties shall have ten (10) days from the date of this Report and Recommendation to file written objections. *See also Fed. R. Civ. P. 6(a)* and *6(e)*. Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Richard M. Berman, United States District Judge, Room 201, 40 Centre Street, New York, New York 10007 and to the chambers of the undersigned, Room 750, 500 Pearl Street, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Berman. FAILURE TO OBJECT WITHIN TEN (10) DAYS **WILL** RESULT IN a WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW. *Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985)*; *United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997)*; **[*30]** *IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993)*; *Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992)*; *Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988)*; *McCarthy v. Manson, 714 F.2d 234, 237 & n.2 (2d Cir. 1983)*.

Dated: New York, New York

December 12, 2005

Respectfully submitted,

HENRY PITMAN

United States Magistrate Judge

LEXSEE 2007 US DIST LEXIS 19970

**FESCO OCEAN MANAGEMENT LTD., d/b/a FESCO PACIFIC LINE, c/o FESCO
AGENCIES N.A. INC., Plaintiff, - against - HIGH SEAS SHIPPING LTD. and
UNITED INTERNATIONAL TRADING, Defendants.**

**06 Civ. 1055 (NRB)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2007 U.S. Dist. LEXIS 19970*

**March 12, 2007, Decided
March 12, 2007, Filed**

**SUBSEQUENT HISTORY:** Reconsideration denied by,
Sanctions disallowed by, Motion denied by *Fesco Ocean
Mgmt. Ltd. v. High Seas Shipping Ltd., 2007 U.S. Dist.
LEXIS 34479 (S.D.N.Y., May 9, 2007)*

**COUNSEL:** **[*1]** For Far East Shipping Company PLC,
Plaintiff: Kevin John Lennon, LEAD ATTORNEY,
Tisdale & Lennon, L.L.C., New York, NY.

For FESCO Ocean Management Ltd. doing business as
FESCO Pacific Line c/o Fesco Agencies N.A. Inc.,
Plaintiff: Kevin John Lennon, LEAD ATTORNEY,
Tisdale & Lennon, LLC, New York, NY.

For Altomar Maritime Inc., United International Trading,
Defendants: Peter A. Junge, LEAD ATTORNEY, Junge
& Mele, LLP, New York, NY.

**JUDGES:** NAOMI REICE BUCHWALD, UNITED
STATES DISTRICT JUDGE.

**OPINION BY:** NAOMI REICE BUCHWALD

**OPINION**

**MEMORANDUM & ORDER**

**NAOMI REICE BUCHWALD**

**UNITED STATES DISTRICT JUDGE**

　　Plaintiff Far Eastern Shipping Company ("FESCO")
brings this action for maritime attachment and

garnishment, seeking to secure defendants' assets in
connection with an arbitration in London. As of January,
2007, FESCO had attached approximately $ 225,319 in
funds owned by defendant United International Trading
("United") pursuant to a Process of Maritime Attachment
and Garnishment issued by this Court on December 7,
2006. FESCO attached these funds under the theory that
United is an alter ego of defendant High Seas, against
whom FESCO has presented a valid maritime claim. **[*2]**
1 United now moves to vacate the attachment and to
dismiss United as a defendant in this case, arguing that
United is not an alter ego of High Seas. For the reasons
discussed below, we hold that FESCO has offered
reasonable grounds for sustaining an attachment against
United on an alter ego theory of liability and, thus, that
United should not be dismissed from the case.

> 1  *See* Plaintiff's Amended Verified Complaint,
> dated December 7, 2006, and *Rule B of the
> Supplemental Rules for Certain Admiralty and
> Maritime Claims* (plaintiff must allege a prima
> facie maritime claim, defendant must not be
> "present" in the district, and plaintiff must seek to
> attach funds owned by defendant).

**BACKGROUND**

　　United first moved to vacate the attachment and to be
dismissed from this case on January 10, 2007. 2 In
support of its motion, United submitted a declaration,
dated January 10, 2007, from John Pragelas, the
self-described "North American Agent" of United "for at
least the past ten years" (the "First Pragelas

Declaration"). **[\*3]** [3] In that declaration, Mr. Pragelas unequivocally represented that United is not an alter ego of High Seas, stating, in pertinent part, that "United is a totally independent corporation which has never had any affiliation, relationship or business contact with High Seas" and that United "does not have any involvement whatsoever" with the maritime contract between FESCO and High Seas (the "maritime contract"). [4] Given these facts, United argued that it could not be responsible for any claims against High Seas and, thus, should be dismissed from the case.

2    *See* Defendant's Order to Show Cause, dated January 10, 2007.
3    First Pragelas Declaration at 1-2.
4    *Id.*

FESCO responded to United's motion on January 16, 2007, arguing that the Court should not vacate the attachment because FESCO had already met *Supplemental Rule B*'s requirements for maintaining a maritime attachment against High Seas [5] and because FESCO had also provided reasonable grounds for its theory that United is an alter ego of **[\*4]** High Seas. [6] FESCO also urged the Court to reject the statements in the First Pragelas Declaration because that declaration contains "knowing falsehoods". [7] FESCO argued, for instance, that while the declaration claims that United "never had any affiliation, relationship or business contact with High Seas" and that United "does not have any involvement whatsoever" with the maritime contract, FESCO has proof that, on more than one occasion, it received payments from United under the maritime contract and on behalf of High Seas. [8]

5    *See supra* note 1.
6    FESCO plead, *inter alia,* that Mr. Pragelas and his partner, Peter Salway, are principals involved with High Seas, United, Altomar Maritime, Inc. ("Altomar"), Global Logistics Group ("GLG"), American Global Logistics ("AGL") and Transult Marine Services ("Transult"), "all of which have been purposefully used to shield assets from FESCO for the debt owed to it by [High Seas]". To support these allegations, FESCO states that: (1) although FESCO only contracted with High Seas and was never advised of an assignment of rights under the contract with High Seas, FESCO received multiple hire payments under the contract from both United and GLG in addition to

the payments it received from High Seas, and (2) communications to FESCO regarding High Seas always originated from Mr. Pragelas at Altomar, rather than from High Seas. *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Vacate the attachment ("Mem. in Opp."), dated January 16, 2007, at 5-8 (noting other grounds for the alter ego theory as well).

**[\*5]**

7    *Id.* at 23.
8    *See id.* at 8. The First Pragelas Declaration also states that GLG "has no relationship with High Seas", yet FESCO offers proof that it received payments from GLG in satisfaction of High Seas' obligations under the maritime contract as well. *Id.*

On January 17, 2007, United submitted a supplemental declaration from Mr. Pragelas to answer the arguments raised by FESCO on January 16th (the "Supplemental Pragelas Declaration"). The Supplemental Pragelas Declaration tacitly acknowledged that statements in the First Pragelas Declaration were misleading, if not false. Correcting the claim that High Seas and United "never had any affiliation, relationship or business contact with High Seas", for instance, the new declaration noted that Transult, Mr. Pragelas' personal consulting company, "introduced" High Seas to United in 2003 and that United gave High Seas "credit in 2005 against assignment of receivables and control of payables with any differences left over returning to [High Seas]." [9] Nevertheless, the Supplemental Pragelas Declaration also maintained that United **[\*6]** is not an alter ego of High Seas, arguing instead that United provided a loan to High Seas in return for High Seas' receivables and that United only made payments to FESCO on behalf of High Seas in accordance with that arrangement (the "factoring agent explanation"). [10]

9    Supplemental Pragelas Declaration at 1-4.
10    *Id.*

United maintained this factoring agent explanation at oral argument on January 25, 2007, relying on the Supplemental Pragelas Declaration and asking the Court to vacate the attachment and to dismiss United from the case on that basis. After hearing from both sides, this Court stated that it did not find the factoring agent explanation compelling. However, we did not deny

2007 U.S. Dist. LEXIS 19970, *6

United's motions at that time. Instead, we reserved judgment in order to give United an opportunity to offer documentary support for its factoring agent explanation.

On February 1, 2007, United submitted the "Second Supplemental Declaration of John Pragelas" with two "Line of Credit Arrangements" attached, one between [**7**] United and High Seas, dated July 15, 2005, and one between United and GLG, dated May 3, 1996. United then argued that these documents, in addition to Mr. Pragelas' declarations, demonstrate that United is merely a factoring agent for High Seas and not its alter ego.

FESCO responded by letter on February 1, 2007. In its response, FESCO reiterated that the Court should sustain its attachment under *Supplemental Rule B* because FESCO has presented reasonable grounds to support its alter ego theory and noted several problems with United's latest submission to the Court. For one, FESCO pointed out that the "Line of Credit Arrangement" between High Seas and United, dated July 15, 2005, fails to explain why United made payments to FESCO on behalf of High Seas under the maritime contract given that FESCO received some of those payments in August of 2003. FESCO also noted a new inconsistency between Mr. Pragelas' declarations. In his Supplemental Declaration, Mr. Pragelas stated that "Transult introduced [GLG] to United in 1997", yet the Line of Credit Arrangement between United and GLG, attached to his Second Supplemental Declaration, is dated May 3, 1996. [11]

11    *See* Supplemental Pragelas Declaration at 2 and Second Supplemental Pragelas Declaration, Ex. B.

[**8**] DISCUSSION

A. Legal Standard

There has been some disagreement in the Second Circuit regarding the standard that district courts should apply when deciding whether to vacate a maritime attachment challenged at a *Supplemental Rule E(4)(f)* hearing. *See Aqua Stoli Shipping Ltd. v. Gardner Smith PTY Ltd., 460 F.3d 434, 445 (2d Cir. 2006).* Prior to *Aqua Stoli,* at least one case required that a plaintiff present "reasonable grounds" for sustaining an attachment in order to overcome the defendant's motion to vacate. *Ullises Shipping Corp. v. FAL Shipping Co., 415 F.Supp.2d 318, 322-23 (S.D.N.Y. 2006)* (a plaintiff asserting corporate alter egos need not definitively

establish domination and control, but must present enough evidence to convince the court that there are reasonable grounds for piercing the corporate veil). *Aqua Stoli,* however, strongly suggests that courts should limit their *Rule B* inquiries to whether the plaintiff has stated a prima facie basis for the maritime attachment at issue. *See Tide Line, Inc. v. Eastrade Commodities, Inc., 2006 U.S. Dist. LEXIS 60770, *1 (S.D.N.Y. 2006)* (referring to Order dated [**9**] August 15, 2006); *see also Wajilam Exps. (Singapore) PTE, Ltd. v. ATL Shipping Ltd., No. 05 Civ. 7955, 475 F. Supp. 2d 275, 2006 U.S. Dist. LEXIS 77033, 2006 WL 3019558, *1 (S.D.N.Y.)* (plaintiff should not be required to prove its case in order to defeat a motion to vacate - discovery has not been had and it would defeat the purpose of a *Rule B* maritime attachment to require a plaintiff asserting a valid prima facie maritime claim to prove that the facts in the complaint are true) (*citing Japan Line, Ltd. v. Willco Oil Ltd., 424 F.Supp. 1092, 1094 (D.Conn. 1976)*). Thus, after *Aqua Stoli,* it appears that courts should simply consider whether a plaintiff seeking to maintain a maritime attachment has pled a prima facie case justifying that attachment under *Rule B.* As discussed below, however, we hold that FESCO has adequately plead its theory that United is an alter ego of High Seas and that FESCO has provided reasonable grounds to support this theory as well. Accordingly, we need not choose between the *Aqua Stoli* and *Ullises* standards in addressing United's motions.

B. Analysis

When assessing whether a plaintiff has adequately plead an alter ego theory of liability, [**10**] courts consider a number of factors, including whether the plaintiff has alleged that the alter egos intermingled funds; overlapped in ownership, officers, directors, and personnel; shared common office space, addresses and telephone numbers; and/or whether payments or guarantees of one corporation's debts have been paid or held by the other. *MAG Portfolio Consultant, GMBH v. Merlin Biomed Group LLC, 268 F.3d 58, 63 (2d Cir. 2001).* In this case, FESCO has repeatedly made such allegations. For example, FESCO alleged in its application for the attachment that United's "sole purpose is to hold or transfer monies on behalf of [High Seas]" so as to hinder, delay or defraud creditors of [High Seas]; that United "is merely a shell-corporation through which [High Seas] conducts its business"; and that United "makes payments on [High Seas'] behalf where [United]

has absolutely no contractual obligation to [High Seas'] creditors. [12] These pleadings are more than sufficient to assert a prima facie case for alter ego liability against United. [13]

    12  *See* Plaintiff's Amended Verified Complaint PP 10-22.

**[*11]**

    13  *See Ullises, 415 F.Supp.2d at 318, 322-23.*

FESCO has also provided reasonable grounds for its alter ego theory. FESCO offers proof that, *inter alia, United:* (1) made no fewer than ten payments pursuant to the maritime contract between FESCO and High Seas, though United was never a party to that contract; [14] (2) made at least one of those payments before United and High Seas entered into the Line of Credit Arrangement attached to the Second Supplemental Pragelas Declaration; [15] and (3) made at least one other payment to FESCO on behalf of High Seas under a different maritime contract between High Seas and FESCO. [16] FESCO further states that all of FESCO's communications with *High Seas* originated with Mr. Pragelas, the self-described North American agent of *United,* and that Mr. Pragelas initiated these communications from Altomar, a company that shares an address with at least two other companies associated with Mr. Pragelas and High Seas. [17]

    14  Mem. in Opp. at 8.
    15  Plaintiff's Letter, dated February 1, 2007, at 2.

**[*12]**

    16  Mem. in Opp. at 8.
    17  Mem. in Opp. at 8.

To counter the reasonable grounds provided by FESCO, United strenuously argues that it is not an alter ego of High Seas and directs the Court to the declarations and documents submitted on United's behalf. We are not persuaded, however, by United's submissions. We are not convinced by Mr. Pragelas' three declarations because

they have proven to be misleading, at best, regarding the relationships between United, High Seas, Altomar, GLG, Mr. Pragelas and other companies affiliated with Mr. Pragelas. In fact, the inconsistencies between the First Pragelas Declaration and the Supplemental Pragelas Declaration suggest that Mr. Pragelas endeavored to hide some or all of these relationships from the Court. Moreover, we are not persuaded by the limited documentation offered by United with the Second Supplemental Pragelas Declaration because it does not support United's factoring agent explanation. Mr. Pragelas insists that United is merely a factoring agent of High Seas and submitted a copy of a "Line of Credit Arrangement" between High Seas and United **[*13]** to support this claim. However, even leaving aside Mr. Pragelas' initial insistance that United and High Seas *never* had *any* business relationship with one another, which raises a number of questions about this credit arrangement, the arrangement fails to explain the payments that FESCO received from United in August of 2003 because it was signed more than one year later, in July of 2005.

**CONCLUSION**

Accordingly, we find that FESCO has satisfied the requirements for sustaining the attachment based on the theory that United is an alter ego of High Seas and, thus, that United is an appropriate defendant in this action. We deny United's motion to vacate the attachment and likewise deny United's motion to be dismissed from the case.

**SO ORDERED.**

    Dated: New York, New York

    March 12, 2007

    NAOMI REICE BUCHWALD

    UNITED STATES DISTRICT JUDGE

Not Reported in F.Supp.2d                                                                        Page 1
Not Reported in F.Supp.2d, 2007 WL 102089 (S.D.N.Y.)
**(Cite as: 2007 WL 102089 (S.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Michael WILLIAMSON, the Estate of Don C.
Craft, Kirk O'Donnel, John Lettow,
Timothy McGinnis, Fred Newton, William Watson,
Chris Hancock, Dale Schoneman,
and International Deep Sea Survey, Inc. Plaintiffs,
v.
RECOVERY LIMITED PARTNERSHIP, Colum-
bus Exploration, LLC, Columbus-America
Discovery Group, Inc., Columbus Exploration Lim-
ited Partnership, Omni
Engineering, Inc., Omni Engineering of Ohio, Inc.,
Economic Zone Resource
Associates, Economic Zone Resource Associates
Ltd., Ezra, Inc., Ezra of Ohio,
Inc., Econ Engineering Associates, Inc., Doe.e,
Inc., Thomas G. Thompson,
Gilman D. Kirk, Jr., James F. Turner, Michael J.
Ford, Jr., and W. Arthur
Cullman, Jr. Defendants.
**No. 06Civ.5724(LTS)(FM).**

Jan. 16, 2007.

*MEMORANDUM ORDER*

SWAIN, J.

**\*1** This is a dispute arising from alleged nonpay-
ment under contracts entered into in connection
with the search for the *S.S. Central America* ship-
wreck in the mid-1980s. The effort to recover treas-
ure from the wreck, and the contractual relation-
ships of the parties here, are also the subject of oth-
er litigation. On or about July 28, 2006, in the
emergency part of this Court, Plaintiffs obtained an
ex parte order for the issuance of a writ of attach-
ment pursuant to Rule B of the Supplemental Rules
for Certain Admiralty and Maritime Claims
("Admiralty Supplemental Rules") authorizing the
attachment of assets of each of the defendants in

the amount of $11,808,600. By order to show cause
signed on October 16, 2006, Defendants seek va-
catur of the writ and the attachments achieved
thereunder, dismissal of the complaint, and attor-
neys fees and costs incurred in connection with the
application. The Court has heard arguments and re-
ceived pre-and post-hearing briefs and evidentiary
submissions. Plaintiffs here are a company that sup-
plied side scan sonar equipment and individuals
who contracted to participate in the S.S. Central
America search and recovery efforts. Defendants
are several companies that were allegedly respons-
ible for or involved in the search and recovery op-
eration or are allegedly successors or alter egos of
those companies, as well as several individuals who
allegedly are or were parties to certain contracts, or
are or were directors or officers of one or more of
the defendant companies.

For the following reasons, the application to vacate
the writ of attachment is granted as to all defend-
ants other than Economic Zone Resources Asso-
ciates, Inc. ("EZRA"), Recovery Limited Partner-
ship ("RLP"), Columbus Exploration LLC,
("CXLLC"), and Thomas G. Thompson. The mo-
tion to dismiss the complaint is denied.

*DISCUSSION*

This is a matter invoking the admiralty jurisdiction
of the Court. Defendants seek vacatur of the writ of
attachment pursuant to Admiralty Supplemental
Rule E(4)(f). "Rule E(4)(f) is designed to satisfy the
constitutional requirement of due process by guar-
anteeing to [the property owner] a prompt post-
seizure hearing at which [the property owner] can
attack the complaint, the arrest, the security deman-
ded, or any other alleged deficiency in the proceed-
ings." Fed.R.Civ.P., Adm. Supp. R. E(4)(f), Advis-
ory Committee's Note. The Second Circuit has ex-
pounded upon the Rule E(4)(f) inquiry, ruling that
an attachment should issue only if a plaintiff estab-
lishes four factors: (1) that the plaintiff has a valid
prima facie admiralty claim against the defendant;
(2) that the defendant cannot be found within the

district; (3) that the defendant's property may be found within the district; and (4) that there is no statutory or maritime law bar to the attachment. *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.,* 460 F.3d 434, 445 (2d Cir.2006). Before examining Plaintiffs' arguments for the validity of their writ of attachment as to particular defendants, the Court will consider Defendants' arguments for vacatur of the writ in its entirety.

*Application to vacate Order and Writ in their Entirety*

**\*2** The first issue under the *Aqua Stoli* standard is whether plaintiff has shown that it has a valid prima facie admiralty claim against the defendant. The standard most commonly applied in a Rule E(4)(f) analysis is that the plaintiff must demonstrate that "reasonable grounds" exist for the attachment. *Ullises Shipping Corp. v. FAL Shipping Co.,* 415 F.Supp.2d 318, 322-23 (S.D.N.Y.2006), *overruled on other grounds* by *Aqua Stoli,* 460 F.3d at 445.

Defendants' principal argument as to this prong of the standard rests on choice of law clauses in the side scan sonar lease and non-disclosure agreements on which plaintiffs rely. Specifically, a contract pursuant to which Defendant RLP leased a side scan sonar from Plaintiff International Deep Sea Survey, Inc. ("IDSS") provides that the contract is to be construed in accordance with the internal laws of the State of Ohio. Substantially the same language appears in a number of non-disclosure agreements prohibiting certain plaintiffs from competing with certain defendants during the search and recovery operations for the *S.S. Central America.* Defendants contend essentially that the provisions choosing internal laws of the state of Ohio negate any potential applicability of federal maritime law to the parties' disputes and, thus, preclude maritime jurisdiction of the issues raised in this action. The Supreme Court, in *Norfolk Southern Railway Co. v. James N. Kirby Pty Ltd.,* 543 U.S. 14, 24 (2004), made it clear, though, that admiralty jurisdiction of a contract claim is determined based on the nature and character of the contract rather on

any than choice of law provision. 543 U.S. 14, 24 (2004). Here, the sonar and non-disclosure agreements were by their terms entered into in connection with maritime commercial venture and are therefore maritime in nature; thus, the Court has jurisdiction of the claims brought thereunder pursuant to 28 U.S.C. § 1333. The choice of law clauses, whatever their significance in the ultimate determination of the merits of the dispute, do not divest the federal court of subject matter jurisdiction. Accordingly, Plaintiffs have met their prima facie burden of demonstrating that they have asserted valid admiralty claims. [FN1]

> FN1. The Court will examine, *infra,* the extent to which Plaintiffs have demonstrated that they have a reasonable basis for asserting these claims against particular defendants.

Defendants also argue that the order and writs of attachment should be vacated because Plaintiffs have failed to give them prompt notice of the attachments as required by Supplemental Rule B. Here, the record demonstrates that notice of the actual attachments achieved pursuant to the writ has been given promptly upon Plaintiffs becoming aware of the attachment of particular assets. This is sufficient compliance with the notice requirement of Supplemental Rule B.

In addition to vacatur based on a plaintiff's failure to satisfy the requirements of Rules B and E, vacatur "is appropriate in other limited circumstances." *Aqua Stoli,* 460 F.3d at 445. These include, for instance, where another alternative (i.e., adjacent) convenient forum is available. *Id.* Here, however, there is no adjacent convenient district with jurisdiction over all of the parties. Nor does any of the other bases for vacatur that are delineated in *Aqua Stoli* warrant vacatur here. *See Aqua Stoli,* F.3d at 445.

*Application to Vacate as Against Particular Defendants*

**\*3** The non-disclosure agreements ("NDAs") at is-sue in this case, which were executed by Defendant Thompson, recite that Thompson was acting for himself and "interests, in addition to his own, of certain other science professionals and individuals, including one or more entities." (*e.g.,* Supplemental Shirley Aff., Ex. H). The agreements do not further identify any of these individuals or entities. *Id.*

Plaintiffs assert that the other individual defendants are among those for whom Thompson was acting in executing the NDAs. In support of this contention, Plaintiffs proffer their attorney's iteration, pur-portedly composed in the year 2000, of a statement purportedly made to him and a deceased plaintiff by Thompson in 1999, to the effect that "at the time the non-disclosure agreements were executed by the deceased plaintiff and the members of his group, and subsequently when he responded to their ques-tions regarding interpretation of those agreements, [Thompson] had authority to speak for all the in-vestors, partners and other interests in the treasure." (Shirley Aff. at 10, October 23, 2006). This state-ment, which neither identifies the defendants whose assets have been attached here as parties to the agreement nor even asserts directly that Mr. Thompson intended to bind them as individuals to the NDAs, and was authorized to do so, is insuffi-cient to constitute the requisite *Aqua Stoli* showing of a prima facie admiralty claim against the defend-ants other than Thompson with respect to the NDAs. The verified complaint's assertion, at para-graph 54, that Thompson was acting for all of the other defendants in entering into the NDAs adds nothing by way of evidentiary support to Plaintiff's argument, in that the complaint is verified by Plaintiffs' attorney. The individual Defendants have proffered affidavits in support of their vacatur ap-plication in which they specifically deny any con-tractual relationship with Plaintiffs and deny that Thompson was authorized to bind them under the NDAs.

Plaintiffs' allegations regarding the liability of the other corporate entities are supported merely by

generalized assertions in the attorney-verified com-plaint in this action, unsworn court filings in related actions, and documentation showing common busi-ness addresses and management. On this record, Plaintiffs' showing is insufficient to make out the requisite prima facie admiralty claim based on the NDAs against the defendants other than Thompson and, for the reasons explained in the following paragraph, RLP, EZRA, and CXLLC.

Plaintiffs proffer some evidence that RLP and EZRA were involved in the performance of the NDAs. For example, some of the NDAs were prin-ted on EZRA letterhead, and some instructions re-garding the NDAs were issued in the name of RLP. These proffers further indicate that Mr. Thompson was the general partner of RLP and the president of EZRA. Plaintiffs' showing is sufficient at this stage to demonstrate the existence of a prima facie admir-alty claim based on the NDAs against Mr. Thompson, RLP and EZRA. In that Plaintiffs have also proffered evidence that CXLLC has assumed RLP's liabilities, Plaintiff's showing is sufficient to sustain the writ of attachment as against CXLLC as well. Based on their proffers concerning CXLLC's responsibility for RLP's liabilities, Plaintiffs' show-ing is also sufficient as against RLP and CXLLC with respect to their claim based on RLP's lease of the side sonar scanning equipment from IDSS.

**\*4** The remaining Aqua Stoli factors have also suf-ficiently been addressed as to these defendants. De-fendants do not argue that they may be found with-in the district. Moreover, Defendants' property has been found and attached in the district, and they have not raised a valid statutory or maritime law bar to the attachment.

The challenged attachment is also based, in part, on a penalty wage claim asserted by the Estate of de-ceased Plaintiff Craft pursuant to 46 U.S.C. § 10504 against Defendant Kirk "and some or all of the remaining Defendants" for an unpaid recovery-percentage portion of Craft's NDA compensation. Section 10504 renders a vessel "master or owner" liable for two days' wages for each day a wage pay-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

ment is delayed. Plaintiffs have proffered no evidence of ownership or master status as to the vessel of any of the named defendants other than Kirk. As to Kirk, they proffer only a hearsay statement in a book titled *Ship of Gold in the Deep Blue Sea.* Kirk has tendered an affidavit denying that he owned the vessel. On this record, Plaintiffs have failed to make the required *Aqua Stoli* showing as to the Craft Estate's wage claim and the writ of attachment is accordingly vacated insofar as it secures that claim.

The remainder of Plaintiff's arguments for the propriety of the attachment of the assets of the defendants other than Thompson, EZRA, RLP and CXLLC are premised on veil-piercing arguments and/or arguments that the individual Director Defendants are liable on Plaintiff's claims because they have mismanaged CXLLC's affairs. As evidentiary support for these assertions, Plaintiffs proffer the aforementioned documentation of overlapping business addresses and personnel, as well as unsworn court filings from related actions in which investors in the various entities allege that the individual defendants have failed to observe corporate formalities as to director elections for CXLLC, have refused to provide access to books and financial records of the companies, have refused to disclose the status and value of the recovered treasure, and have failed to make payments allegedly required by the various agreements relating to the investments and the recovery operations. Plaintiffs' proffers of facts, allegations and inferences that might, if proven, support findings of mismanagement, breach of duty to investors and, possibly, use of certain corporate entities for the benefit of others, are insufficient at this stage to demonstrate that Plaintiffs have the requisite prima facie admiralty claim against any defendants other than Thompson, EZRA, RLP and CXLLC.

### CONCLUSION

Accordingly, the original and amended orders authorizing the issuance of writs of attachment are hereby vacated as against all Defendants other than Thompson, EZRA, RLP and CXLLC. All assets of any of the other Defendants shall immediately be released and no further attachments pursued as to such other Defendants.

The motion to dismiss the complaint, which is not addressed to any substantive degree in Defendants' papers, is denied.

**\*5** Defendants' request for a hearing as to the amount of the security attached implicates an issue that goes ultimately to the merits of the case. Plaintiffs have done enough at this stage to support the amount of the attachment by proffering the figures cited in the pleadings and raising issues as to the unavailability of accounting records. The request for a hearing is denied.

Defendants' Rule 11 application for attorneys' fees, costs, and damages, is denied as the procedural requirements of the Rule have not been satisfied. Defendants have demonstrated no other grounds warranting an award of fees, costs of damages.

SO ORDERED.

Not Reported in F.Supp.2d, 2007 WL 102089 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

LEXSEE 2007 US DIST LEXIS 76648

**AMY AXELROD, INC. and AMY AXELROD, Plaintiffs, -v- SIMON & SCHUSTER, INC., Defendant.**

**07 Civ. 891 (DLC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 76648*

**October 16, 2007, Decided
October 16, 2007, Filed**

**PRIOR HISTORY:** *Amy Axelrod, Inc. v. Simon & Schuster, Inc., 2007 U.S. Dist. LEXIS 62572 (S.D.N.Y., Aug. 27, 2007)*

**COUNSEL:** **[*1]** For Plaintiffs: Paul C. Rapp, Housatonic, Massachusetts.

For Defendants: Marcia B. Paul, Christopher J. Robinson, Davis Wright Tremaine LLP, New York, New York.

**JUDGES:** DENISE COTE, United States District Judge.

**OPINION BY:** DENISE COTE

**OPINION**

*MEMORANDUM OPINION AND ORDER*

DENISE COTE, District Judge:

Plaintiffs Amy Axelrod ("Axelrod") and Amy Axelrod, Inc. ("AAI"), move for reconsideration of the August 27, 2007 Opinion and Order (the "Opinion") dismissing Axelrod's cause of action for fraud and denying her request to file an amended complaint alleging breach of fiduciary duty. For the following reasons, plaintiffs' motion is denied.

BACKGROUND

As described in greater detail in the Opinion, Axelrod is a children's book author. Pursuant to a series of contracts with defendant publishing company Simon & Schuster ("S&S"), S&S has published hardcover and paperback versions of eight titles Axelrod authored. Sales of those titles have markedly decreased in recent years, and in the instant lawsuit Axelrod attributes that decline to S&S and seeks to hold the company liable. According to plaintiffs, the defendant "engineered the demise of Plaintiffs' publishing career" by "surreptitiously" withdrawing Axelrod's books from the **[*2]** general market and turning to rogue rebinders to meet market demand for hardcover copies.

After transfer from the United States District Court for the Northern District of New York, plaintiffs filed an amended complaint on April 4, 2007, alleging that S&S 1) breached the publishing agreements, 2) violated the covenant of good faith and fair dealing, 3) engaged in fraud, 4) infringed Axelrod's copyright by exceeding the terms of the publishing agreements, which are "licenses by which the Defendants [sic] have certain limited rights to exploit the Plaintiffs' copyrights," 5) contributed to the rogue rebinders' infringements of Axelrod's copyrights, and 6) mischaracterized special sales. S&S moved to dismiss the amended complaint, and plaintiffs cross-moved to amend the complaint. The Opinion, dated August 27, granted in part and denied in part the motion to dismiss; the cross-motion to amend the complaint was denied.

The Opinion held that plaintiffs had stated claims against S&S for copyright infringement and contributory or vicarious infringement, but had failed to state a claim for fraud because such a claim will not lie under New York law if it arises "out of the same facts as plaintiff's **[*3]** breach of contract claim." *Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 196 (2d Cir. 2001)* (citation

omitted). Plaintiffs had not alleged any legal duty separate from those contained in the contract, nor any collateral representation, that could have supported a fraud cause of action. Likewise, because plaintiffs' proposed language for a breach of fiduciary duty claim did not allege the "extraordinary circumstances," *Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield, 276 F.3d 123, 130 (2d Cir. 2002)* (citation omitted), required to transform a generic contractual relationship into a fiduciary one, the cross-motion to amend the complaint was denied as futile.

DISCUSSION

Plaintiffs now move for reconsideration, ostensibly arguing that "important factual and legal issues" were overlooked in the Opinion. A motion for reconsideration should be granted only where the moving party demonstrates that the court has overlooked factual matters or controlling precedent that were presented to it on the underlying motion and that would have changed its decision. *See* S.D.N.Y. Local Civil Rule 6.3; *Shrader v. CSX Transp. Inc., 70 F.3d 255, 257 (2d Cir. 1995).* Reconsideration "should not **[*4]** be granted where the moving party seeks solely to relitigate an issue already decided." *Id. at 257.*

Local Rule 6.3 "is to be narrowly construed and strictly applied in order to discourage litigants from making repetitive arguments on issues that have been thoroughly construed by the court." *Zoll v. Jordache Enters., No. 01 Civ. 1339 (CSH), 2003 U.S. Dist. LEXIS 6991, 2003 WL 1964054, at *2 (S.D.N.Y. Apr. 24, 2003)* (citation omitted). The moving party may not "advance new facts, issues or arguments not previously presented to the Court." *Geneva Pharms. Tech. Corp. v. Barr Labs., Inc., No. 98 Civ. 3607 (RWS), 2002 WL 1933881, at *1 (S.D.N.Y. Aug. 21, 2002)* (citation omitted). The decision to grant or deny the motion is within the sound discretion of the district court. *See Devlin v. Transp. Commc'n Int'l Union, 175 F.3d 121, 132 (2d Cir. 1999).*

Plaintiffs first argue that the Opinion erred in denying their cross-motion to amend the complaint because it overlooked New York legal precedent finding a fiduciary relationship between publisher and author "pursuant to special circumstances or in cases where a publisher's conduct is sufficiently egregious that mere breach causes of action provide insufficient relief." **[*5]**

None of this law was cited in plaintiffs' cross-motion to amend. Indeed, plaintiffs offered absolutely no legal support--other than a citation to the legal standard for amendment--for their cross-motion. Rather, based on the facts pleaded in support of the other causes of action, plaintiffs sought to add a claim that, "[b]y virtue of the author/publisher relationship, Defendant owes a fiduciary duty to Plaintiffs not to tolerate or participate in infringing or other activity that damages the value or commercial viability of literary property." As the Opinion held, this statement, without more, is incorrect as a matter of law, and thus amendment of the complaint would have been futile.

Second, plaintiffs contend that they sufficiently pleaded a cause of action for fraud in their complaint because they alleged fraud in the inducement, a breach of fiduciary duty, and a failure of reasonable care. They claim that these are the requisite duties separate from the contract or misrepresentations collateral to the contract, which the Opinion deemed absent from the complaint, thus providing no basis for a fraud cause of action under New York law. As noted in the Opinion, the complaint's sole **[*6]** averment sounding in fraud was that "[d]efendant's statements amount to fraud with the intent to hide Defendant's wrongful acts." This was insufficient to plead a fraud cause of action, and it remains so. Plaintiffs' efforts, made for the first time on this motion for reconsideration, to cast the complaint's allegations in a new light to salvage a fraud claim are precisely the sorts of "repetitive arguments on issues that have been thoroughly considered by the court," *Zoll, 2003 U.S. Dist. LEXIS 6991, 2003 WL 1964054, at *2* (citation omitted), that must be rejected on a motion for reconsideration.

CONCLUSION

Plaintiffs' September 12 motion to reconsider the August 27 Opinion and Order is denied.

SO ORDERED:

Dated: New York, New York

October 16, 2007

DENISE COTE

United States District Judge

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 1119371 (S.D.N.Y.)
**(Cite as: 2005 WL 1119371 (S.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Lee N. KOEHLER, Plaintiff,
v.
THE BANK OF BERMUDA LIMITED, Defend-
ant.
**No. M18-302(CSH).**

May 10, 2005.

MEMORANDUM AND ORDER
HAIGHT, Senior J.

**\*1** On the application of respondent-counter-
claimant The Bank of Bermuda ("BBL"), the Court
strikes the self-styled "Petitioner's Supplement to
Memorandum of Law in Support of Motion for Re-
consideration" filed and served by counsel for peti-
tioner Lee N. Koehler.

Motions for reconsideration are governed by Local
Civil Rule 6.3. The Rule provides that in respect of
"the court's determination of the original motion," a
motion for reconsideration must be accompanied by
"a memorandum setting forth concisely the matters
or controlling decisions which counsel believes the
court has overlooked." It is implicit in this language
that a motion for *reconsideration* cannot assert new
arguments or claims which were not before the
court on the original motion and consequently can-
not be said to have been *considered. See, e.g., Ku-
nica v. St. Jean Financial, Inc., 63 F.Supp.2d 342,
346 (S.D.N.Y.1999)* ("[A] party in its motion for
reargument may not advance new facts, issues or
arguments not previously presented to the court.")
(citation and internal quotation marks omitted). As
counsel for BBL correctly point out, the discussion
and contentions centered principally upon N.Y.
CPLR § 3211(a) which Koehler now seeks to insert
on page 8 of its original memorandum in support of
reconsideration introduce arguments which are en-

tirely new in the annals of this protracted litigation.
Counsel for Koehler's bland statement that this new
material "was inadvertently omitted" from their ori-
ginal brief, Supplement at 2, flies in the face of the
cases governing motions for reconsideration. In
consequence, BBL need not respond to these new
arguments in opposing the present motion.

As Koehler also requests, the Court will amend
Koehler's original memorandum so that the refer-
ences on page 8 to "1997" are changed to "1993."
That typographical correction will be accomplished
by the Court's handwritten notations, with the un-
dersigned's initials and the date of the corrections
being entered in the margin.

It is SO ORDERED.

Not Reported in F.Supp.2d, 2005 WL 1119371
(S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                  Page 1
Not Reported in F.Supp.2d, 2005 WL 1176122 (S.D.N.Y.)
**(Cite as: 2005 WL 1176122 (S.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
AMERICAN HOTEL INTERNATIONAL GROUP
INC., Aramarine Brokerage, Inc., ARA
Purchasing Group, Inc., ASTA PG, Inc., Livery PG,
Inc., NAA Purchasing Group,
Inc., Restaurant Group, Inc., d/b/a Restaurant
Group Delaware, Inc., and Silver
CAR Purchasing Group, Inc., Plaintiffs,
v.
ONEBEACON INSURANCE COMPANY and Po-
tomac Insurance Company of Illinois,
Defendants.
**No. 01 Civ. 0654(RCC).**

May 18, 2005.

MEMORANDUM & ORDER
CASEY, J.

**\*1** Plaintiffs have filed an untimely motion for re-
consideration of this Court's March 26, 2004
Memorandum and Order, granting in part and deny-
ing in part Defendants' motion for summary judg-
ment. [FN1] For the reasons set forth below,
Plaintiffs' motion for reconsideration is denied.

> FN1. At the time the motion was decided,
> Defendant OneBeacon Insurance Company
> was known as CGU Insurance Company.
> Plaintiffs entered into many of their agree-
> ments with General Accident, CGU's pre-
> decessor. In this memorandum the Court
> refers to all of these corporations and any
> predecessors as "Defendants."

I. Background

The Court presumes familiarity with the circum-
stances giving rise to this action and the present
motion. Essentially, the dispute stems from a series
of agreements between Plaintiffs and Defendants

through which Plaintiffs acted as an insurance
broker placing possible business with Defendants.
Plaintiffs brought this suit alleging breach of con-
tract after Defendants terminated those agreements.
Defendants counterclaimed for the return of com-
missions it had paid to Plaintiffs for premiums that
had since been refunded.

II. Discussion

A. Standard

A motion for reconsideration is appropriate where a
court overlooks "controlling decisions or factual
matters that were put before it on the underlying
motion ... and which, had they been considered,
might have reasonably altered the result before the
court." *Range Road Music, Inc. v. Music Sales
Corp.,* 90 F.Supp.2d 390, 392 (S.D.N.Y.2000); *see
also Shrader v. CSX Transp. Inc.,* 70 F.3d 255, 257
(2d Cir.1995) ("The standard for granting a motion
[for reconsideration] is strict, and ... will generally
be denied unless the moving party can point to con-
trolling decisions or data that the court over-
looked...."). "On such a motion, a party may not ad-
vance new facts, issues, or arguments not previ-
ously presented to the Court." *Polsby v. St. Martin's
Press,* No. 97 Civ. 690(MBM), 2000 WL 98057, at
\*1 (S.D.N.Y. Jan. 18, 2000). Alternatively, a mo-
tion for reconsideration may be granted to "correct
a clear error or prevent manifest injustice." *Doe v.
New York City Dep't of Soc. Servs.,* 709 F.2d 782,
789 (2d Cir.1983). There is a ten-day time limit for
bringing a motion for reconsideration. *See* S.D.N.Y.
Local Rule 6.3 (requiring that a motion for recon-
sideration or reargument be served within ten days
after the docketing of the court's determination of
the original motion).

Local Rule 6.3 should be "narrowly construed and
strictly applied so as to avoid repetitive arguments
on issues that have been considered fully by the
Court." *Dellefave v. Access Temps., Inc.,* No. 99
Civ. 6098, 2001 WL 286771, at \*1 (S.D.N.Y. Mar.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1176122 (S.D.N.Y.)
**(Cite as: 2005 WL 1176122 (S.D.N.Y.))**

22, 2001). A motion for reconsideration should not be considered an opportunity to "reargue those issues already considered when a party does not like the way the original motion was resolved." *In re Houbigant, Inc.,* 914 F.Supp. 997, 1001 (S.D.N.Y.1996). Similarly, the purpose of Rule 6.3 is to "ensure the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters." *Carolco Pictures, Inc. v. Sirota,* 700 F.Supp. 169, 170 (S.D.N.Y.1988).

B. Plaintiffs Have Not Presented Grounds for Reconsideration

**\*2** Plaintiffs' attempt to reargue issues that were carefully considered by this Court in March 2004 fails. First, the motion is untimely as the Memorandum and Order was docketed on March 29, 2004 and Plaintiffs did not file their motion to reconsider until April 23, 2004, well after the ten-day window permitted under Local Rule 6 .3. Plaintiffs' motion could be denied on this basis alone. *See, e.g., Gibson v. Wise,* 331 F.Supp.2d 168, 169 (E.D.N.Y.2004) (denying motion for reconsideration as untimely); *Siemans Westinghouse Power Corp. v. Dick Corp.,* 219 F.R.D. 552, 554 (S.D.N .Y.2004) (same); *Snall v. City of New York,* No. 97 Civ. 5204, 1999 WL 1129054, at \*3-4 (E.D.N.Y. Oct. 19, 1999) (same). Second, Local Rule 6.3 "precludes a party from advancing new facts, issues or arguments not previously presented to the Court." *Bank Leumi Trust Co. v. Istim, Inc.,* 902 F.Supp. 46, 48 (S.D.N.Y.1995). There is no indication that any of the affidavits or exhibits submitted in conjunction with this motion were unavailable to Plaintiffs at the time of the briefing. The Court will not condone Plaintiffs' attempts to add to the record considered by the Court on summary judgment. *See Carolco Pictures,* 700 F.Supp. at 170.

Finally, Plaintiffs have not raised any issues of fact or law previously overlooked by this Court, nor have they argued or demonstrated that reconsideration is necessary to prevent manifest injustice. As pertinent here, in its March 26 Memorandum, this Court held that (1) New York law governed the various oral agreements between the parties; *see* March 26 Memorandum at 6-8, (2) an oral agreement to modify the written at-will Brokers Agreement violated New York's statute of frauds, *see id.* at 10-12; (3) the purchasing group Plaintiffs' breach of contract claims failed because those Plaintiffs did not have the authority to lawfully bind Defendants since they were not licensed brokers or agents, *see id.* at 12-13; (4) Plaintiffs failed to offer evidence of contracts with which the Defendants interfered to support their tortious interference claim, *see id.* at 13; and (5) an alleged oral agreement between a Plaintiff purchasing group and Defendants that allegedly would have negated that Plaintiff's obligation to return commissions it earned on refunded policies was unenforceable under New York's statute of frauds, *see id.* at 14-15.

Plaintiffs now argue that (1) the Court overlooked relationships with other states; (2) Pennsylvania law, which governs the 1995 Brokers Agreement, permits oral amendments; (3) the purchasing group Plaintiffs' breach of contract claims encompassed more than whether these Plaintiffs could bind Defendants to insurance policies; (4) the tortious interference claims were broader than the Court recognized; and (5) the oral agreement regarding a purchasing group Plaintiff's mandated return of commissions was actually an interpretation of a written term. All of these arguments either rely on new affidavits that the Court will not consider or were considered and rejected by the Court at the summary judgment stage. Accordingly, the Plaintiffs' motion for reconsideration is denied.

III. Conclusion

**\*3** For the reasons set forth above, Plaintiffs' motion to reconsider this Court's March 26, 2004 Memorandum and Order is denied.

So Ordered.

Not Reported in F.Supp.2d, 2005 WL 1176122 (S.D.N.Y.)

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1176122 (S.D.N.Y.)
**(Cite as: 2005 WL 1176122 (S.D.N.Y.))**

END OF DOCUMENT

Not Reported in F.Supp.2d                                           Page 1

Not Reported in F.Supp.2d, 2004 WL 1857568 (S.D.N.Y.)

**(Cite as: 2004 WL 1857568 (S.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Nathan J. COLODNEY, Plaintiff,
v.
CONTINUUM HEALTH PARTNERS, INC., Ms.
Gail Donovan, Coo, Mr. Peter Kelley, CEO &
President, Mr. Morton Hyman, Chairman, Mr.
James Marden, Trustee, Beth Israel
Medical Center, St. Luke's-Roosevelt Hospital,
Long Island College Hospital,
Defendants.
**No. 03 Civ. 7276(DLC).**

Aug. 18, 2004.

Nathan J. Colodney, Alexandria, Virginia, for the
Plaintiff, pro se.

David O. Simon, Barbara A. Gross, Shaub, Ah-
muty, Citrin, & Spratt, LLP, New York, New York,
for the Defendants.

*MEMORANDUM OPINION AND ORDER*
COTE, J.

**\*1** *Pro se* plaintiff Nathan J. Colodney
("Colodney") brought this diversity action against
his former employer, Continuum Health Partners
("Continuum"), and seven other defendants. In his
original complaint filed on September 17, 2003,
and in an amended complaint filed on November 5,
Colodney alleged, *inter alia,* twenty-one counts of
defamation against the defendants. [FN1] In an
Opinion dated April 15, 2004, the Court granted in
part the defendants' motion to dismiss, and among
other things, dismissed with prejudice all of Colod-
ney's defamation claims. [FN2] *Colodney v. Con-
tinuum Health Partners, Inc.,* No. 03 Civ.
7276(DLC), 2004 WL 829158, \*1 (S.D.N.Y. April
15, 2004) ("April Opinion"). On May 7, [FN3]
Colodney moved for reconsideration of the dis-
missal of the defamation claims. [FN4] For the

reasons that follow, the motion for reconsideration
is denied.

FN1. Specifically, Colodney's amended
complaint, which was 76 pages long, and
consisted of 353 numbered paragraphs al-
leging 41 separate claims, charged the de-
fendants with: breach of good faith
(Claims 1-3), defamation (Claims 4-18,
27-29, 31-33), breach of implied contract
(Claim 19), negligent supervision (Claims
20-22), fraud (Claim 23), "failure to
provide opportunity to transition to CO-
BRA" (Claim 24), intentional infliction of
emotional distress (Claim 25), fraudulent
inducement (Claim 26), conversion (Claim
30), negligence (Claims 34-36), negligent
recruitment (Claim 37), a violation of 42
U.S.C. § Section 1983 ("Section 1983")
(Claim 38), a violation of the Employee
Retirement Income Security Act of 1974,
29 U.S.C. § 1001 *et seq.* ("ERISA") (Claim
39), and a breach of ERISA (Claims
40-41).

FN2. The April Opinion declined to dis-
miss Colodney's claims for fraudulent in-
ducement and for conversion with respect
to the $1,500 in business travel expenses
he incurred while employed by Con-
tinuum, and dismissed without prejudice to
amendment Colodney's fraud claim in con-
nection with reimbursement for $1,500 in
business travel expenses and his COBRA
claim.

FN3. The defendants point out that this
motion should be dismissed as untimely
because Colodney filed it more than ten
days after the April 15 Opinion was issued,
in violation of S.D.N.Y. Local Rule 6.3.
Colodney's motion was filed on May 7, the
date on which he was ordered to file his
second amended complaint. It is unneces-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

sary to reach the defendants' argument since Colodney's motion for reconsideration is denied.

FN4. Despite the dismissal with prejudice of Colodney's defamation claims, on May 7, Colodney filed in conjunction with this motion a second amended complaint re-pleading all the defamation claims in substantially the same fashion as in the first amended complaint.

*Legal Standard*

"A motion for reconsideration should be granted only where the moving party demonstrates that the Court has overlooked factual matters or controlling precedent that were presented to it on the underlying motion and that would have changed its decision." *In re Worldcom, Inc. Securities Litigation,* 308 F.Supp.2d 214, 224 (S.D.N.Y.2004). *See also In Re BDC 56 LLC,* 330 F.3d 111, 123 (2d Cir.2003); S.D.N.Y. Local Civil Rule 6.3. Courts narrowly construe this standard and apply it strictly against the moving party "so as to avoid repetitive arguments on issues that have already been considered fully by the court." *Cohen v. Koenig,* 932 F.Supp. 505, 506-507 (S.D.N.Y.1996) (citation omitted); *Shrader v. CSX Transp. Inc.,* 70 F.3d 255, 257 (2d Cir.1995) (reconsideration "should not be granted where the moving party seeks solely to relitigate an issue already decided"). In addition, the moving party may not "advance new facts, issues, or arguments not previously presented to the Court." *Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories, Inc.,* No. 98 Civ. 3607(RWS), 2002 WL 1933881, at *1 (S.D.N.Y. Aug. 21, 2002) (citation omitted). The decision to grant or deny the motion is within the sound discretion of the district court. *See Devlin v. Transportation Communications Int'l Union,* 175 F.3d 121, 132 (2d Cir.1999) (citing *McCarthy v. Manson,* 714 F.2d 234, 237 (2d Cir.1983)).

*Discussion*

Familiarity with the April Opinion is assumed. Colodney's defamation claims center on his assertion that Gail Donovan ("Donovan"), his supervisor at Continuum, had "maliciously and falsely" attributed statements to Colodney regarding his role in aiding an outside consulting group's (the "Feld Group") bid for a Continuum contract, and had mischaracterized Colodney's subsequent description to Donovan of what he had done. *Colodney,* 2004 WL 829158, at *7. According to Colodney, Donovan concocted the statements in order to " 'ensure that a stigma attached' to Colodney," and to conceal Donovan's own fraud. *Id.*

*2 Relying on Colodney's pleadings, the April Opinion determined that he had undermined his own defamation claims by admitting that he had made the statements and undertaken the actions that Donovan had allegedly fabricated.

> In his pleading, Colodney admits that he gave materials to the Feld Group, that he made disparaging comments to them about Continuum executives, and that he lied to Donovan about what he had said to them. Colodney admits that when Donovan confronted him at their July 22 meeting about the statements he had made to the Feld Group, Colodney did not disclose to her either that he had turned over [another executive's] study, or that he had discussed with them how to tailor their proposal to beat [that executive's] offer. *Thus, Colodney has actually alleged that Donovan's allegedly libelous statements about Colodney were true.*

*Colodney,* 2004 WL 829158, at *7 (emphasis supplied). The April Opinion thus held that Colodney did not state a claim for slander because "the facts contained in his own pleading contradict any naked assertion that Donovan's statements about him were false." *Id.* (relying on *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1092 (2d Cir.1995) (the court need not credit general conclusory allegations that "are belied by more specific allegations of the complaint")).

In support of his motion for reconsideration, Colod-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1857568 (S.D.N.Y.)
**(Cite as: 2004 WL 1857568 (S.D.N.Y.))**

Page 3

ney argues that he never made the admissions upon which the Court relied in dismissing the defamation claims. According to Colodney, he "never admit[ted] that he lied to Donovan ... that he gave away proprietary information, or that he made disparaging remarks about Continuum's executives." He asserts that, in finding that he made these admissions, the April Opinion made impermissible inferences in favor of the defendants.

Colodney does not identify any argument, fact or law presented by the parties and overlooked by the Court in concluding that Colodney's pleadings undermined his defamation claims. Rather, Colodney rehashes arguments in support of this motion originally asserted by him in opposition to the defendants' motion to dismiss. For example, Colodney's disagreement with the April Opinion's finding that he admitted turning over company materials to the Feld Group is premised on the same argument he previously stated: because Continuum did not have a "proprietary document" policy, he did nothing wrong by showing the documents to the Feld Group. The April Opinion, however, did not rely on the existence of a company policy with respect to proprietary documents in reaching its conclusion. Material to the ruling was Colodney's express admission that he turned over to the Feld Group Continuum's internal documents in order to bolster the Feld Group's bid for a consulting contract with Continuum. With this admission, Colodney's defamation claim could not be premised on alleged statements by Donovan that Colodney turned over company materials to the Feld Group.

**\*3** Colodney's denial that he made disparaging remarks about Continuum executives to the Feld Group is also based on arguments he previously made, to wit, that the statements were factually true and not disparaging. Colodney argues that the April Opinion's finding that the comments were disparaging can only be based on inferences taken in favor of the defendants. The April Opinion did not make any inferences; rather, it relied on the facts as asserted in the pleadings. In his complaint, Colod-

ney stated that, unbeknownst to his superiors, he met privately with the Feld Group and

> described to them "what was happening" at Continuum so that the Feld Group could make a "competitive" proposal. Colodney discussed with the Feld Group the "mess" at the technology department caused by Donovan's lack of management skills, described "the roles that each executive played" in the outsourcing agreement, and gave specific examples of Donovan and Loughlin's managerial shortcomings.

*Colodney,* 2004 WL 829158, at \*3.

The gravamen of Colodney's request for reconsideration appears to be his disagreement with the manner in which his pleadings were construed. A motion for reconsideration cannot be granted, however, solely on a party's disagreement with the Court's ruling. In order to succeed, Colodney would have to point to some fact or legal precedent overlooked by the Court that would alter its conclusion that his defamation claims were undermined by his own admissions. This he does not do.

Colodney's motion is an attempt to relitigate issues already considered and rejected in the April Opinion. Because a simple disagreement with the conclusions reached in that Opinion is not a sufficient basis for reconsideration, Colodney's motion must be denied.

*Conclusion*

The plaintiff's motion for reconsideration of the April 15 Opinion is denied. It is hereby

ORDERED that the defamation claims in the May 7, 2004 amended complaint are stricken.

SO ORDERED:

Not Reported in F.Supp.2d, 2004 WL 1857568 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.