LENNON, MURPHY & LENNON LLC
Attorneys for Plaintiff
PAGANE MARITIME LTD.
The Gray Bar Building
420 Lexington Avenue, Suite 300
New York, NY 10170
(212) 490-6050 - phone
(212) 490-6070 - facsimile
Kevin J. Lennon
Charles E. Murphy

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

| | | |
|---|---|---|
| PAGANE MARITIME LTD., | : | 07-CV-10726 (PKL) |
| Plaintiff, | : | **ECF CASE** |
| - against - | | |
| | : | **DECLARATION OF** |
| GLINGROW HOLDING LTD. and | | **KEVIN J. LENNON** |
| RIAS TRADING, | : | |
| Defendant. | : | |

-----------------------------------------------------X

KEVIN J. LENNON, having been duly sworn, deposes and states the following upon the penalties of perjury as per 28 U.S.C. § 1746:

1.      I am a member admitted to the Bar of this Honorable Court and am a partner in the firm of Lennon, Murphy & Lennon LLC, attorneys for the Plaintiff, PAGANE MARITIME LTD. ("Pagane").

2.      I submit this Declaration in opposition to Defendant RIAS TRADING's ("Rias") Motion to Dismiss.

3.      Attached hereto as Exhibit 1 is a true and accurate copy of Judge Haight's Memorandum Opinion and Order entered January 31, 2008 denying Rias's Motion to Vacate Attachment.

4.    Attached hereto as Exhibit 2 is a true and accurate copy of Judge Berman's Order entered June 21, 2007 in *Flora Maritime Ltd. v. Inter Eltra Int'l GMBH*, 06 Civ. 6372 (RMB).

5.    Attached hereto as Exhibit 3 is a true and accurate copy of Pagane's Proposed Second Amended Verified Complaint.  As explained more fully in Pagane's Memorandum of Law in Opposition to Motion to Reconsideration and Motion to Dismiss dated March 13, 2008, in the event that this Honorable Court finds that the Amended Verified Complaint is defective, Plaintiff seeks leave to amend pursuant to Federal Rule of Civil Procedure 15(a).

Executed at Southport, CT this 13th day of March, 2008.

Kevin J. Lennon

EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

PAGANE MARITIME LTD.,          :

               Plaintiff,          :

        -against-          :

GLINGROW HOLDING LTD. and       :
RIAS TRADING,                   :
          Defendants.          :

------------------------------------------------------------ x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1-31-08

07 Civ. 10726 (PKL)

MEMORANDUM OPINION
AND ORDER

HAIGHT, Senior District Judge:

      In this admiralty action assigned to Judge Leisure, defendant Rias Trading ("Rias") made an emergency application before the undersigned sitting in Part I for an order (1) vacating a maritime attachment of its funds previously obtained pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims, Federal Rules of Civil Procedure, and (2) dismissing the complaint against it. Rias's motion to vacate the attachment lies under Supplemental Rule E. Its motion to dismiss the complaint invokes Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## I. BACKGROUND

      This case is typical of the many Rule B attachments that come before this Court. Foreign corporations enter into a maritime contract of charter party which provides for arbitration of any disputes in London. Disputes arise. The party asserting claims against the other initiates arbitration in London. The parties instruct solicitors. In order to obtain security for an anticipated (or at least hoped for) arbitration award, the solicitors for the claiming party instruct counsel in this district to file a complaint in admiralty in this Court against the other party and obtain from the Court a writ of maritime attachment under Rule B. The writ is conditioned upon the claim being maritime in nature and the plaintiff's inability to find the defendant within the district for service of process. If

those conditions appear from the initial pleadings, a Judge of this Court issues the writ. The writ of maritime attachment extends to all property of the defendant that may be found within the district, including electronic fund transfers taking place between banks. *See Winter Storm Shipping, Ltd. v. TPI,* 310 F.3d 263 (2d Cir. 2002). It is customary for counsel for such a plaintiff to cause process of attachment to be served upon a number of New York City banks.

In the case at bar, a foreign company named Bulcom, Ltd. ("Bulcom") filed a complaint in this Court on November 30, 2007. Bulcom's complaint alleged that as disponent owner of the M/V PAGANE, it chartered the vessel to co-defendant Glingrow Holding Ltd. ("Glingrow"), another foreign company, for one time chartered trip via the Black Sea for carriage of a cargo of grain to the port of Aqaba, Jordan. Bulcom further alleged breaches of the charter party by Glingrow resulting in amounts owing to Bulcom. Bulcom further alleged in substance that the corporate relationship between Glingrow and co-defendant Rias, also a foreign company, was such that Rias was liable for the debts of Glingrow under the charter party. Bulcom alleged that the charter party provided for arbitration in London, and that it had commenced arbitration there against Glingrow. The case was assigned on filing to District Judge Leisure. On November 30, 2007 Judge Leisure signed an *ex parte* Order authorizing the issuance of Process of Maritime Attachment and Garnishment ("PMAG") against the property of both Glingrow and Rias. Counsel for Bulcom served the process on several New York City banks. Pursuant to that process, Bulcom succeeded in attaching about $393,000. Counsel for Rias on the present motion say that "$402,736.79 of Defendants' property has been attached by Plaintiff," "some of which belongs to Rias and some of which belongs to Glingrow," and that "even if the attachment of the property of Rias is vacated, as it should be, Plaintiff will still hold over $116,000 of the assets of Glingrow . . ." Rias's Letter to the Court dated

2

January 15, 2008, at 1, 2. It would thus appear that the major portion of the attached funds are the property of Rias.

The attachment of Glingrow's and Rias's funds in New York resulted in an immediate and lively exchange of e-mails between the parties' solicitors in London, looking toward a negotiated release of the funds. Bulcom had instructed the firm of Ince & Co. ("Ince"). Glingrow and Rias had instructed the firm of More Fisher & Brown ("MFB"). The e-mail exchanges took place between Matthew Moore, an Ince partner ("Moore") and Mark Seward, an MFB partner ("Seward"). Copies are attached as exhibits to Moore's declaration dated January 15, 2008 ("Moore Decl.") in opposition to Rias's present motion. I will quote some of them.

In an e-mail sent on December 17, 2007 at 16:47[1] by Moore to Seward, Moore, responding to a proposal by Seward, said:

> For the avoidance of any doubt, we set out below our understanding of what is being proposed:
>
> 1. The $393,000 caught pursuant to the Rule B will be held in New York pending it being transferred to an escrow account in London. This money will stand as security for our Clients' claim for hire and related expenses, interest and costs.
>
> 2. Glingrow will settle their contribution to the cargo shortage claim by making a payment of US$ 76,735 to us or our client (to be confirmed).
>
> 3. We will instruct our Clients' New York lawyers to seek to ensure that no further funds are attached or detained pending the escrow being established and the cargo claim being settled.
>
> 4. The Rule B will be discontinued/withdrawn when (a) the cargo shortage settlement monies amounting to US$ 76,735 have been paid and (b) the US$ 393,000 has been transferred into escrow in London.

---

[1] The e-mails use military times. 16:47 hours is 4:47 p.m. local time.

3

> If you are in a position to confirm this approach is in order we will send the
> requisite instructions to our Clients' lawyers in New York.

Seward responded to Moore in an e-mail sent on December 17 at 16:53:

> Yes, I will get a formal OK but that is what I propose and what I understand
> Glingrow agree.

On December 17 at 17:29, Seward e-mailed Moore:

> Yes agreed; please confirm when Kevin has stopped serving.

The only possible reading of this e-mail is that Seward received the express authority of his clients

to agree to the proposed agreement to release the funds attached in New York and transfer them to

an escrow in London. "Kevin" in Seward's e-mail is a reference to Kevin J. Lennon, a partner in the

New York law firm of Lennon, Murphy & Lennon ("Lennon"). Ince instructed Lennon to represent

Bulcom in this district.   The phrase "Kevin has stopped serving" reflects the agreement that in

consideration of the transfer of the attached funds to escrow in London, Bulcom would cease serving

PMAGs upon New York banks in pursuit of Glingrow and Rias funds. Lennon's firm had filed the

complaint in this Court and obtained the order of attachment.   MFB instructed Thomas Tisdale, a

partner in the Tisdale Law Office firm ("Tisdale"), to represent Glingrow and Rias in this district.

Lennon and Tisdale drafted a consent order to be presented to Judge Leisure in New York,

and cleared the text with the solicitors for the parties in London. Seward understandably wished the

matter to be expedited, since the attached funds belonged to his client Rias. On December 17 at

19:52 Seward e-mailed Lennon directly, with a copy to Moore:

> Kevin
>
> No escrow is yet agreed; I can put one over tonight to Ince. However, I do
> not think it is necessary as we are all grown ups.

4

> My understanding is that we agree the consent order and present it on
> opening (agreed it is too late today) The money will then make its way to
> London – there are no other claimants to our knowledge. It will be held by
> us or ince pending agreement on escrow terms.
>
> You cease pmags now and agree not to restart them
>
> the rule b is released only when the 50% is received by ince or their clients

In accordance with the agreement negotiated by the parties' London solicitors, Lennon and

Tisdale presented a Consent Order to Judge Leisure which the Judge endorsed "So Ordered" on

December 20, 2007. The Consent Order reads in its entirety:

> It is hereby stipulated and agreed between the parties, by their undersigned
> attorneys, that the funds that are currently under attachment in this action are
> to be released. The garnishee bank(s) are hereby instructed to release the
> attached funds pursuant to joint instructions to be provided by letter and
> signed by the undersigned counsel. The payment of the released funds by the
> garnishee bank(s) shall not be subject to any further attachment in New York
> after those funds are released by the garnishee bank(s).

Lennon signed the Consent Order on behalf of plaintiff Bulcom Ltd. Tisdale signed on behalf of

defendants Glingrow and Rias. Lennon issued a cease and desist order to the garnishee banks, which

had the bargained-for effect of freeing any other Rias funds from attachment in New York.

On December 18 and succeeding days, the solicitors in London considered drafts of escrow

agreements, the issue being whether Ince or MFB should hold the funds in escrow after the funds

had been released from attachment in New York and transferred to London. Seward did not regard

that question as particularly difficult; on December 18 at 08:37 he e-mailed Moore:

> This is my standard escrow, please review and approve/comment. If you
> want a complex one I have one of those too but, frankly, I do not see the
> point.

As the text of the Consent Order Judge Leisure signed on December 20 reflects, as of that time the

5

London solicitors had not yet worked out the details of the escrow. The holiday season then seems

to have intervened. On January 3, 2008 at 14:02 Seward e-mailed Moore:

> I refer to our discussions and exchanges and in particular my email sent to
> you on 27th.[2] Have you had any thoughts on that? Secondly the monies are
> now being held as you know in New York and they need to be remitted to an
> escrow to be held either by you or me. Are we yet agreed on where they will
> go?
>
> I have no preference and if your clients feel strongly they should be in your
> hands then I am prepared to agree to that. However I would like to get the
> money out of New York and the Rule B lifted and my New York lawyers
> paid so we can move on to chapter 2. I await your constructive comments in
> relation to the points I have raised on time issues.

It also appears that MFB and Ince were engaged in discussions about the giving of further

security in London for the shipowner's claims, and a possible settlement of all disputes arising out

of the charter party, short of arbitration. As to the first subject, Moore says:

> After the Consent Order was signed correspondence was exchanged in
> relation to the provision of top-up (additional) security to be given over and
> above the funds already attached in New York where they were being held
> pending their transfer to the London escrow account.

Moore Decl., ¶ 12. As to the second subject, on January 8, 2008 at 06:54 Seward e-mailed Moore:

> I am glad that after a lot of wasted money I have managed to find out via New
> York what has been going on. I am sure that you will agree, that should not
> have been necessary. If we cannot settle, and I turn to that now, will you
> accept an escrow containing the full principal amount of your claim. In a
> claim for unpaid hire, this seems reasonable.

Seward's January 8 e-mail to Moore goes on to describe the terms of an overall settlement of the

disputes arising out of the charter party. However, before any reply by Moore, on January 10 at

06:37 Seward sent him this terse e-mail:

---

[2] The e-mail of December 27 is not included in the papers submitted on this motion.

Matthew

Good morning. Please be aware that I no longer represent Glingrow Holding
Ltd. in this matter. Please address all future correspondence to:

ANDREY ASTAPOV
ASTAPOV LAWYERS (at an address in the Ukraine)

Kind regards
Mark Seward
Partner
MFB Solicitors

Seward could have added "farewell," but perhaps that would have been unprofessional.

There was a comparable changing of the guard in New York. Presumably acting on
instructions from the newly retained Ukrainian lawyers, the Tisdale firm withdrew as counsel for
Glingrow and Rias in the case before this Court, being replaced by the firm of Reed Smith. Reed
Smith makes the present motion on Rias's behalf.

Before addressing the merits of that motion, I must recount additional events that took place
in this case. On December 20, 2007, after the Consent Order had been submitted to Judge Leisure
but not yet signed by him, Ince instructed the Lennon firm that the complaint and attachment should
be amended to reflect that a company called Pagane Maritime Ltd. ("Pagane") should be substituted
for Bulcom as the real party in interest.[3] Ince also instructed Lennon to reduce the amount sued for
from $1,433,583.10 to $688,530.51. Lennon filed an amended complaint for the reduced amount,
naming Pagane as plaintiff. On December 28 Chief Judge Wood, sitting in Part I, issued an amended
*ex parte* order of attachment in the reduced amount. Lennon "obtained a fresh PMAG and had the
same served on the garnishee banks in order to attach in Pagane's name the funds previously

---

[3] In the sometimes shadowy world of corporate shipowning, the name of the owner of a
particular vessel is not always readily ascertainable.

7

attached in Bulcom's name." Declaration of Kevin J. Lennon ("Lennon Decl.") ¶ 15. These events did not change the amount of Glingrow's and Rias's funds actually attached, which remained $393,000. It is important to note that while money is generally regarded as fungible, in this case the parties agree that the Glingrow and Rias funds  attached in the hands of a garnishee bank pursuant to Chief Judge Woods's later order are precisely the same funds that were originally attached under Judge Leisure's order.

Lennon acknowledges that "despite the cease and desist agreement and due to the oversight of the undersigned, the attachment was mistakenly again served on the garnishee banks." Lennon Decl. ¶ 16. Daily service was made on the banks on January 2, 3 and 4, 2008. An additional amount of $6,767 in Rias funds was captured. Lennon adds: "However, in light of the parties' prior agreements and the Consent Order, as above described, those funds were subsequently released on January 7, 2008. We also issued a second cease and desist notice to the garnishee banks." *Id.*

The Reed Smith firm now moves for an order vacating the attachment of Rias's funds and dismissing Pagane's complaint against that defendant. It is evident from Rias's submissions on the motion that it has no intention of transferring the funds attached in New York to an escrow fund in London as security for Pagane's claims under the charter party. Rias simply wants the funds released to it unconditionally.

## II. DISCUSSION

For the reasons that follow, I deny Rias's motion to vacate the attachment because I conclude that Rias is equitably estopped from asking for that relief. Sitting as a Part I Judge, I reach no other issue.

"[I]t is axiomatic that a district court sitting in admiralty exercises powers akin to those of

8

a court of equity." *Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 364 (2d Cir. 1995). Because this case arises within the court's federal admiralty jurisdiction, federal law principles of equitable estoppel govern. *Cf. Kosakow v. New Rochelle Radiology Assocs.*, 274 F.3d 706, 725 (2d Cir. 2001) ("Because this is an equitable estoppel claim under a federal statute, federal law principles of equitable estoppel are applicable.") (citation omitted). The Second Circuit summarized those principles in *Kosakow*:

> The doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct. Under federal law, a party may be estopped from pursuing a claim or defense where: 1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; 2) and the other party reasonably relies upon it; 3) to her detriment.

*Id.* (citations omitted). In the case at bar, solicitors in London authorized to act for Rias (as well as for Glingrow) agreed with London solicitors for the disponent owner of the chartered vessel (thought to be Bulcom, now identified as Pagane) that if the plaintiff in this action released Rias's funds attached in New York and refrained from any further attachments, those funds would be transferred to an escrow account in London as security for the owner's claims in the pending arbitration. Plaintiff performed its end of the bargain. It entered into a Consent Order that directed the attached funds "to be released" and (with the exception of an inadvertent additional attachment speedily released) refrained from seeking further security in New York. By agreeing through its London solicitors to send the attached funds to an escrow account in London, Rias implicitly represented that it would not seek by proceedings in this Court to vacate the attachment. Rias clearly intended and believed that Pagane would rely on that representation. And Pagane reasonably and justifiably relied

9

upon that representation to its detriment by refraining from further attachments. Thus, all three elements of equitable estoppel are demonstrated by the record. Rias is equitably estopped from making a Rule E motion to vacate the attachment of its funds in New York.

Rias's arguments to the contrary are unpersuasive. Sergey Chumak, Rias's operations manager, says in his reply declaration at ¶ 5 that "Rias has never concluded an agreement *with Pagane* that funds of Rias would stand as security for Glingrow's alleged breaches of an agreement between Glingrow and Bulcom or Pagane pending any arbitration among those parties." (emphasis added). This seemingly careful language stops short of denying that Rias concluded that precise agreement *with Bulcom*. On the evidence in the record no such denial could succeed. It is clearly established that at the times the London solicitors negotiated the agreement for the release of the attached funds, Mr. Seward and his firm, MFB, were acting with the authority of both Glingrow and Rias (Rias being a co-defendant in the case at bar and the owner of funds attached in New York). The promises and representations exchanged by the London solicitors constituted the resolution of a discrete aspect of the parties' disputes: How and under what conditions could the attached funds be liberated? Rias is bound by the promises and representations, explicit or implied, that Seward and MFB made on its behalf during the e-mailed exchanges with Moore and Ince.

That would be so, even if Rias now contended that MFB lacked the authority to make those promises and representations on its behalf (although I do not understand Rias to make that particular argument). Second Circuit case law "presume[s] that an attorney-of-record who enters into a settlement agreement, purportedly on behalf of a client, had authority to do so," so that "any party challenging an attorney's authority to settle the case under such circumstances bears the burden of proving by affirmative evidence that the attorney lacked authority." *In re Artha Mgmt., Inc.*, 91 F.3d

326, 329 (2d Cir. 1996) (settlement agreement binding on client where attorney signed agreement and client did not). This rule, grounded in "the unique nature of the attorney-client relationship" and "the public policy favoring settlements," *id.*, applies by analogy to the representations made by the London solicitors in this case, acting in accordance with the instructions and manifest authority of their clients.

If Rias is contending that the substitution of Pagane for Bulcom as party plaintiff in the case at bar relieves Rias of the obligations imposed by the promises and representations MFB made on its behalf, the contention is unappealing to a court of equity. Upon receiving Ince's instruction that Pagane and not Bulcom was the real party in interest, the Lennon firm was required to amend the complaint accordingly. Rule 17(a) of the Federal Rules of Civil Procedure provides: "Every action shall be prosecuted in the name of the real party in interest." The substantive allegations of the original and amended complaints are identical, as are the Rule B averments in support of the original and amended orders of attachment. These are procedural changes. They do not affect the substantive content and effect of the words spoken on Rias's behalf by its London solicitors, as evidenced by the e-mail exchanges in the record.

Nor can Rias argue convincingly, and consistently with equitable principles, that its representation that the funds, once released from attachment in New York, would be transferred to a London escrow account escrow is vitiated because the garnishee bank(s) never received "joint instructions to be provided by letter and signed by the undersigned counsel." While the Consent Order conditioned the banks' release of the funds upon receipt of such joint instructions, they were not furnished immediately only because the London solicitors were discussing whether the transferred funds would be deposited into Ince's escrow account or MFB's: a relatively non-

11

controversial question to which the  solicitors, understandably enough, attached no particular significance.  The material provisions of the agreement—the promises that were of the essence —were the plaintiff's undertakings to release Rias's attached funds and attach no others, and Rias's representation that the attached funds, once released, would be transferred to a London escrow account to stand as security for an arbitration award.  Certainly Rias did not intend for Pagane to continue attaching funds up until the final escrow details were worked out. The plaintiff at bar has acted in reasonable reliance on Rias's words to its detriment. Rias is equitably estopped from pursuing a Rule E motion to release the attached funds free of any obligation to transfer them to a London escrow fund.

Rias also stresses that other issues between the parties, while discussed by the London solicitors, were not resolved by the attachment release agreement: the posting by the charterer of additional "top-up" security in London, and a possible settlement of all charter party disputes. Again, these discussions were aborted when Rias withdrew MFB's instructions.  These matters do nothing to negate Rias's representation that the funds would be transferred when released, or Pagane's justifiable reliance upon that representation to its detriment.

### III. CONCLUSION

Given the totality of the circumstances revealed by this record, I conclude without difficulty that Rias is equitably estopped from making a motion under Rule E to vacate the Rule B attachment of its funds.

The parties' submissions raise other issues. Rias moves under Rules 12(b)(1) and 12(b)(6) to dismiss the complaint against it on the ground that the complaint does not sufficiently allege a claim against Rias. Pagane asks this Court to direct Rias to arrange for the transfer of the attached

12

funds to some escrow account, somewhere in London. Sitting as a Part I Judge, I decline to reach either of these questions. They are more appropriately addressed to Judge Leisure, the assigned Trial Judge, whose command of the legal and equitable issues involved is at the very least equal to mine. In Part I, I am concerned solely with Rias's emergency and expedited motion to vacate the attachment of its funds. For the reason stated, on the present record Rias is equitably estopped from seeking that relief. Its Part I motion is denied for that reason.

It is SO ORDERED.

Dated:  New York, New York
       January 30, 2008

                         CHARLES S. HAIGHT, JR.
                 SENIOR UNITED STATES DISTRICT JUDGE

13

EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

FLORA MARITIME LTD.,

                Plaintiff,

           -against-

INTER ELTRA INTERNATIONAL GMBH,
INTER ELTRA GROUP, INTER ELTRA
GLOBAL STL, ELTRA-ZAREVODAR,
MISHAN AGRO, ALPHAMATE LIMITED,
AGROCOM TRADERS AND BROKERS
OHG, AGROCOM BROKERS AND
TRADERS OHG, RENE EIKEL, MICHAELA
EIKEL, NATHALIE EIKEL, and ANDREY
LYUMBIMOV,

              Defendants.
-------------------------------------------------------------X

06 Civ. 6372 (RMB)

**ORDER**

## I.    Background

On or about August 22, 2006, Flora Maritime Ltd. ("Plaintiff") filed a complaint

("Complaint") against Inter Eltra International GMBH ("Inter Eltra"), alleging that Inter Eltra

breached a maritime contract (the "charter-party"), dated August 11, 2006, to ship a cargo of

barley on Plaintiff's vessel, and seeking damages of $370,000 and "issuance of process of

maritime attachment so that it may obtain security for its claims." (Complaint at 4-5.) On the

same day, the Court ordered that process of maritime attachment be issued pursuant to Rule B of

the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil

Procedure ("Rule B"). (See Order dated Aug. 22, 2006.) On or about August 23, 2006, Plaintiff

amended the Complaint to seek damages of $510,940. (See First Amended Verified Complaint

dated Aug. 23, 2006.)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 21, 2007

On or about September 29, 2006, Plaintiff, with permission of the Court (see Memo Endorsed letter dated Sept. 29, 2006), filed a Second Amended Verified Complaint which added as a defendant Agrocom Traders and Brokers OHG and Agrocom Brokers and Traders OHG ("Agrocom"). (See Second Amended Verified Complaint dated Sept. 29, 2006.) On or about March 12, 2007, Plaintiff, again with permission of the Court (see Memo Endorsed letter dated Mar. 7, 2007), filed a Third Amended Verified Complaint which added as defendants Inter Eltra Group, Inter Eltra Global SRL, Eltra-Zarevodar, Mishan Agro, Alphamate Limited, Rene Eikel, Michaela Eikel, Nathalie Eikel, and Andrey Lyumbimov. (See Third Amended Verified Complaint ("Third Am. Compl."), dated Mar. 12, 2007.) The Second and Third Amended Verified Complaints state that Plaintiff "has a valid in personam claim" against the added defendants "based upon alter ego liability." (Third Am. Compl. at 8.) On September 29, 2007, and again on March 13, 2007, the Court ordered that process of maritime attachment be issued pursuant to Rule B against all defendants. (See Orders dated Sept. 29, 2006; Mar. 13, 2007.)

By Order to Show Cause, dated May 2, 2007, defendants Agrocom, Alphamate Limited, Rene Eikel, Michaela Eikel, Nathalie Eikel, and Andrey Lyubimov ("Defendants" or "Moving Defendants") filed a motion to vacate the maritime attachments against them ("Motion to Vacate") pursuant to Rule E of the Supplemental Rules of Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule E"), arguing that (1) "[P]laintiff's alter ego allegations are too conclusory, too superficial and too lacking in evidentiary substance to support admiralty jurisdiction" and (2) the Third Amended Verified Complaint and the Order for Issuance of a Process of Maritime Attachment dated March 13, 2007 ("March 13 Order"), "are

defective in several crucial respects." (Def. Mem. at 1, 3, 16 ("those documents do not identify all of the moving defendants" and "there is no defendant GUJARAT in this case").)[1]

On or about May 10, 2007, Plaintiff opposed Defendants' Motion to Vacate, arguing that "Plaintiff has adequately alleged a prima facie alter-ego claim against the Moving Defendants," whose arguments to the contrary "ignore the recent case law of this district and are unavailing." (Pl. Mem. at 3.)[2]

On May 10, 2007, the Court held a post-attachment hearing pursuant to Rule E. (See Hearing Transcript, May 10, 2007.)

**For the reasons stated below, Defendants' Motion to Vacate is denied.**

## II.    Legal Standard

Rule B is "a relatively broad maritime attachment rule, under which the attachment is quite easily obtained," and a maritime attachment "may be vacated only in certain limited circumstances." Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd., 460 F.3d 434, 443-45 (2d Cir. 2006). An attachment should not be vacated if the plaintiff shows that it "has satisfied the requirements of Rules B and E," including, among other things, that "it has a valid prima facie admiralty claim against the defendant." Id. at 445. A plaintiff "need not provide any supporting evidence" to oppose a motion to vacate an attachment, "its complaint should suffice," and "the basis of defendant's argument" to vacate an attachment "may [not] be that plaintiff has not provided sufficient evidence of such a claim." Tide Line, Inc. v. Eastrade Commodities, Inc., No. 06 Civ. 1979, 2006 U.S. Dist. LEXIS 95870, at *16, 22 (S.D.N.Y. Aug. 15, 2006).

---

[1] Defendants' memorandum of law states that Plaintiff incorrectly sued Defendant Andrey Lyubimov as "Andrey Lyumbimov." (Def. Mem. at 1.)

[2] Plaintiff does not address Defendants' claim that the Third Amended Verified Complaint and March 13 Order contain defects.

3

## III.    Analysis

### (1)    Alter Ego Claims

Defendants argue that the Third Amended Verified Complaint "does not assert any involvement by the moving defendants in the charter-party," and "[P]laintiff has offered no evidence of any kind to support its alter ego allegations involving the moving defendants." (Def. Mem. at 10, 13 (emphasis original).)  Plaintiff responds that it has "properly alleged a legally sufficient claim for alter-ego liability against the moving defendants" and "has set forth facts upon which its claim is based." (Pl. Mem. at 11.)

To establish a prima facie admiralty claim, Rule E requires that a complaint "state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." Fed. R. Civ. P. Supp. Rule E(2)(a).

The Third Amended Verified Complaint cites several grounds for Plaintiff's claim that Defendants are alter egos of Inter Eltra, including, among others, "such unity of ownership" that "the corporate form of [Inter Eltra] has been disregarded"; "overlapping ownership, management, personnel and purposes" such that Inter Eltra and Defendants "did not operate at arms length"; "common addresses [and] common contact information"; and "intermingling of funds." (Third Am. Compl. at 7-8.)  These factors are "among the list of factors a court may consider when alter ego status has been pled, and are sufficient to state a valid admiralty claim." SPL Shipping Ltd. v. Gujarat Cheminex Ltd., 06 Civ. 15375, 2007 U.S. Dist. LEXIS 18562, at *11 (S.D.N.Y. Mar. 15, 2007); see also Wm. Passalacqua Builders v. Resnick Developers S., 933 F.2d 131, 139 (2d Cir. 1991).  Defendants "can hardly argue that [they] ha[ve] been unable to commence an investigation of the facts and frame a responsive pleading, because [they] ha[ve]

4

already done both." <u>Wajilam Exp. (Singapore) Pte. Ltd. v. ATL Shipping Ltd.</u>, 475 F. Supp. 2d 275, 282 (S.D.N.Y. 2006).

Defendants' argument that Plaintiff has failed to offer "evidence of any kind to support its alter ego allegations" is unpersuasive. (<u>See</u> Def. Mem. at 13.) Among other things, Plaintiff submitted a number of exhibits in support of its alter ego claims, including financial statements and other documents which indicate overlapping ownership and management among Inter Eltra and the Moving Defendants. (<u>See</u> Plaintiff's Declaration in Opposition to Defendants' Motion, Ex. 3-4.) Defendants' "arguments go to the ultimate merits of the claims," <u>World Reach Shipping Ltd. v. Indus. Carriers Inc.</u>, No. 06 Civ. 3756, 2006 U.S. Dist. LEXIS 83224, at *7 (S.D.N.Y. Nov. 9, 2006), while, at this stage, the Court must "look only to Plaintiff's pleadings, and not to any evidence submitted by the parties, to determine whether Plaintiff has made a legally sufficient claim." <u>SPL Shipping Ltd.</u>, 2007 U.S. Dist. LEXIS 18562, at *10. In conformity with the requirements of Rule B and E, Plaintiff has "allege[d] sufficient facts to support an inference" of alter ego liability. <u>Wajilam Exp. (Singapore) Pte. Ltd.</u>, 475 F. Supp. 2d at 283.

### (2)    Defective Pleadings

Defendants argue that "in paragraph Forty-fifth of its Third Amended Verified Complaint," Plaintiff states that Defendants "'are the alter-egos of Defendant GUJARAT'," although "there is no defendant in this case named GUJARAT." (Def. Mem. at 16-17.) Defendants argue that "[a]lthough this undoubtedly is a typographical error," it occurs "in the very paragraph asserting the ultimate allegation of alter ego liability to sustain maritime jurisdiction over the moving defendants." (Def. Mem. at 17.) Defendants also state that the

March 13 Order "does not name [all] of the moving defendants." (Def. Mem. at 16.) Plaintiff does not dispute Defendants' arguments that Plaintiff's submissions contain defects.

Pursuant to the "liberal policy in non-habeas civil proceedings of allowing amendments to correct a defective pleading," the Court will allow Plaintiff ten days from the date of this Order to correct these errors by filing a Fourth Amended Verified Complaint, along with a request for an amended Order for Issuance of a Process of Maritime Attachment pursuant to Rule B. See Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 815 (2d Cir. 2000).

## IV.    Conclusion and Order

For the reasons stated herein, Defendants' Motion to Vacate is denied. Defendants' assets shall remain attached per the terms of the March 13 Order, which is construed to apply to all named defendants. Plaintiff shall file a Fourth Amended Verified Complaint and a request for an amended Order for Issuance of a Process of Maritime Attachment in accordance with the determinations in this Order, on or before July 5, 2007.

Dated: New York, New York
      June 21, 2007

RICHARD M. BERMAN, U.S.D.J.

6

EXHIBIT 3

259966

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

PAGANE MARITIME LTD.,                               :

                                Plaintiff,        :

     - against -                                       :

GLINGROW HOLDING LTD. and                          :
RIAS TRADING,                                      :

                         Defendants.       :

-------------------------------------------------------------------X

07 CV 10726 (PKL)

ECF CASE

## SECOND AMENDED VERIFIED COMPLAINT

Plaintiff, PAGANE MARITIME LTD[1], ("Plaintiff"), by and through its attorneys,

Lennon, Murphy & Lennon, LLC, as and for its Amended Verified Complaint against the

Defendants, GLINGROW HOLDING LTD. ("Glingrow") and RIAS TRADING ("Rias")

(collectively "Defendants") alleges, upon information and belief, as follows:

      1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure and 28 United States Code § 1333.  This claim involves the

breach of maritime contract of charter.  This matter also arises under the Court's federal question

jurisdiction within the meaning of 28 United States § 1331 and the New York Convention on the

Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201 *et seq.*) and/or the

Federal Arbitration Act (9 U.S.C. § 1 *et seq.*).

---

[1] This action was originally filed in the name of Bulcom Ltd.  However, the charter party discussed in the Complaint was erroneously drawn by the broker reflecting Bulcom Ltd. instead of Pagane Maritime Ltd.  Plaintiff is substituting the correct party in interest pursuant to Fed. R. Civ. P. 17(a) and this action shall be deemed to have been commenced in the name of Pagane Maritime Ltd as the real party in interest.

2.    At all times material to this action, Plaintiff was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law and was at all material times the disponent owner[2] of the motor vessel "PAGANE" (hereinafter the "Vessel").

3.    Upon information and belief, Defendant Glingrow was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of the laws of Cyprus with a place of business at 15, Boumpoulinas, Povek Building, Apt. No. 301, Nicosia, Cyprus and was at all material times the Charterer of the Vessel.

4.    By a charter party dated October 17, 2007 Plaintiff time chartered the Vessel to Defendant Glingrow for one time chartered trip (duration about 30 days) via the Black Sea for the carriage of any lawful bulk grain cargo to Aqaba, Jordan.  A copy of the Pagane – Glingrow charter party dated October 17, 2007 is attached hereto as Exhibit 1.[3]

5.    Plaintiff delivered the Vessel into the service of the Defendant Glingrow at Kertch, Ukraine and has at all times fully performed its duties and obligations under the charter party.

6.    A dispute has arisen between the parties regarding Defendant Glingrow's failure to pay hire for its use of the vessel which is due and owing to Plaintiff under the charter party contract.  Clause 4 of the Pagane – Glingrow charter party requires Glingrow to pay for the use and hire of the Vessel at the rate of $60,000 per day, pro rata, including overtime, payable in advance every 15 days.

---

[2] A 'disponent owner' controls the commercial operations of a vessel having taken the vessel on charter from the registered owner of the vessel. The disponent owner usually time charters the vessel from the registered owner and then sub-charters the vessel to charterers.
[3] Please note that the annexed charter party incorrectly identifies Bulcom Ltd. as the disponent vessel owner.

7.     In breach of its obligation to pay hire the Defendant Glingrow failed to remit payment to the Plaintiff on or about November 21, 2007 when a 15 day advance hire payment became due and owing to the Plaintiff.

8.     Defendant Glingrow did remit a partial payment of the outstanding hire due to the Plaintiff but there remains a balance unpaid of $498,754.67. A copy of the Plaintiff's revised provisional hire statement is attached hereto as Exhibit 2.

9.     As a result of Defendant Glingrow's breaches of the charter party due as aforesaid, Plaintiff has sustained damages in the total principal amount of $498,754.67, exclusive of interest, arbitration costs and attorneys fees.

10.     Pursuant to the charter party, disputes between the parties are to be submitted to arbitration in London subject to English law. Plaintiff has commenced London arbitration against Defendant by appointment of its arbitrator Mr. Christopher Moss. A copy of Plaintiff's arbitration appointment is attached hereto as Exhibit 3.

11.     This action is brought in order to obtain jurisdiction over Defendants and also to obtain security for Plaintiff's claims and in aid of arbitration proceedings.

12.     Interest, costs and attorneys' fees are routinely awarded to the prevailing party under English Law. Section 63 of the English Arbitration Act of 1996 specifically allows for recovery of these items as part of an award in favor of the prevailing party. As best as can now be estimated, Plaintiff expects to recover the following amounts at arbitration as the prevailing party:

|   |   |   |
|---|---|---|
| A. | Unpaid hire: | $498,754.67; |
| B. | Estimated interest on claims - 3 years at 6.0% compounded quarterly: | $89,775.84; |
| C. | Estimated arbitration costs: | $30,000; and |
| D. | Estimated attorneys' fees and expenses: | $70,000.00. |

**Total:**                                             **$688,530.51.**

13.    The Defendants cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but, upon information and belief, Defendants have, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court, held in the hands of garnishees within the District which are believed to be due and owing to the Defendants.

14.    Upon information and belief, Defendant Rias was, and still is, a foreign corporation, or other business entity, organized under, and existing by virtue of foreign law and was at all material times the alter ego, alias, partner, joint venturer and/or paying, or receiving, agent of the Defendant Glingrow.

15.    Defendant Rias was the putative vessel sub-charterer under the terms of a charter party from Defendant Glingrow, as disponent vessel owner, to Defendant Rias.  A copy of the Glingrow  - Rias charter party dated October 17, 2007 is attached hereto as Exhibit 4.

16.    Clause 4 of the Glingrow - Rias charter party requires Defendant Glingrow to pay Rias for the use and hire of the Vessel at the rate of $60,000 per day, pro rata, including overtime, payable in advance every 15 days.  The Glingrow – Rias charter party is on identical terms to the Pagane – Glingrow charter party.  Upon information and belief, Rias did not receive any consideration from the sub charter party with Rias since it was obliged to pay to Pagane the exact same rate of hire.  The Glingrow – Rias charter party does not indicate that Glingrow received any commission, or other consideration, under the charter party.

17.    Clause 35 of the Glingrow – Rias charter party requires hire to be paid (by Rias) to Owner's (Glingrow) bank account.  Clause 35 further provides that Charterers (Rias) will not

agree to assignment of hire, monies due under the charter party or the charter party itself in "any circumstances." However, as admitted by Defendant Rias[4], it received, and paid, invoices from Glingrow for payment of hire due under the Glingrow – Rias charter that called for payment to be made to Bulcom Ltd. and not Glingrow Holding Ltd.

18.    The payments made by Rias to a party as directed by Glingrow on its invoices demonstrates that the Pagane – Glingrow charter party was used merely to insulate Rias, as the actual vessel charterer for the purposes of shipping cargo for its account, from Pagane by using Glinrow as an intermediary charterer. See Glingrow invoices attached hereto as Exhibit 5.

19.    Upon information and belief, Defendant Glingrow is merely a shell-corporation through which Defendant Rias conducts its business of chartering vessels and shipping cargo, or vice versa.

20.    Upon information and belief, Defendants share, or shared, common ownership and operation.

21.    Upon information and belief, Defendant Glingrow has no bona fide separate, independent identity from Defendant Rias.

22.    Upon information and belief, Defendant Glingrow is owned, operated and controlled by Defendant Rias.

23.    Upon information and belief, Defendants are owned, operated, controlled and managed as a single economic enterprise ultimately controlled by common and overlapping shareholders, directors, officers, and/or managers.

24.    Upon information and belief, Defendant Glingrow acts as the chartering arm of Defendant Rias and these companies are effectively one and the same.

---

[4] See ¶4 of Reply Declaration of Sergey Chumak dated January 16, 2008.

25.     Based on the foregoing, as well as other activities, the Defendants should be considered as a single economic unit with no corporate distinction between or among them, rendering each liable for the debts of the other, and all assets of each Defendant susceptible to attachment and/or restraint for the debts of Glingrow to Pagane.

26.     By virtue of the foregoing, Defendant Rias is properly considered a party to the Pagane – Glingrow charter party as the alter ego, alias, partner and/or joint venturer, of Defendant Glingrow.

27.     Defendant Rias is the alter ego of Defendant Glingrow because its so dominates and disregards Glingrow's corporate form to the extent that Rias is actually carrying on Glingrow's business and operations as if the same were its own, or vice versa.

28.     In the alternative, Defendants Glingrow and Rias are partners and/or are joint venturers.

29.     In the further alternative, Defendants are affiliated companies such that Glingrow is now, or will soon be, holding assets belonging to Rias, or vice versa.

30.     Upon information and belief, Defendant Rias acts as paying agent, and/or receiving agent, or arranges for other non-parties to satisfy the debts and obligations of Defendant Glingrow, and/or receive payments being made to Defendant Glingrow.  To wit, Rias paid Glingrow's debts under the Pagane – Glingrow charter party on at least three occasions and, upon information and belief, the funds belonging to Rias which have been attached in this action were payments being made to satisfy Glingrow's debts.

31.     The Plaintiff seeks an order from this Court directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the

Defendants held by any garnishees within the District for the purpose of obtaining personal jurisdiction over the Defendants and to secure the Plaintiff's claim as described above.

**WHEREFORE**, Plaintiff prays:

A.    That process in due form of law issue against the Defendants, citing them to appear and answer under oath all and singular the matters alleged in the Amended Complaint failing which default judgment be entered against it;

B.    That since the Defendants cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all goods, chattels, credits, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds up to the amount of **$688,530.51** belonging to, due or being transferred to, from, or for the benefit of the Defendants, including but not limited to such property as may be held, received or transferred in Defendants' name(s) or as may be held, received or transferred for its benefit at, moving through, or within the possession, custody or control of banking/financial institutions and/or other institutions or such other garnishees to be named, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B answer the matters alleged in the Amended Complaint;

C.    That the Court retain jurisdiction to compel the Defendants to arbitrate in accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.*;

D.    That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims currently pending, or which may be initiated in the future, including any appeals thereof;

E.      That this Court recognize and confirm any arbitration award(s) or judgment(s) rendered on the claims set forth herein as a Judgment of this Court;

F.      That this Court award Plaintiff the attorneys' fees and costs incurred in this action;

G.      That in the alternative, this Court enter judgment against the Defendant on the claims set forth herein; and

H.      That the Plaintiff has such other, further and different relief as the Court may deem just and proper.

Dated:      New York, NY
            March __, 2008

                            The Plaintiff,
                            PAGANE MARITIME LTD.


                    By:_____
                            Charles E. Murphy
                            Kevin J. Lennon
                            LENNON, MURPHY & LENNON, LLC
                            420 Lexington Avenue, Suite 300
                            New York, NY 10170
                            (212) 490-6050 - phone
                            (212) 490-6070 - facsimile
                            cem@lenmur.com
                            kjl@lenmur.com

## ATTORNEY'S VERIFICATION

State of New York  )
                   )    ss.:    City of New York
County of New York )

1.    My name is Charles E. Murphy.

2.    I am over 18 years of age, of sound mind, capable of making this

Verification, and fully competent to testify to all matters stated herein.

3.    I am a partner in the firm of Lennon, Murphy & Lennon, LLC attorneys for the

Plaintiff.

4.    I have read the foregoing Amended Verified Complaint and know the contents

thereof and believe the same to be true and accurate to the best of my knowledge, information

and belief.

5.    The reason why this Verification is being made by the deponent and not

by the Plaintiff is that the Plaintiff is a business organization with no officers or directors now

within this District.

6.    The source of my knowledge and the grounds for my belief are the

statements made, and the documents and information received from, the Plaintiff and agents

and/or representatives of the Plaintiff.

7.    I am authorized to make this Verification on behalf of the Plaintiff.

Dated:    New York, NY
          March __, 2008


                                   _____
                                          Charles E. Murphy

9

EXHIBIT 1

# TIME CHARTER

GOVERNMENT FORM

Approved by the New York Produce Exchange

November 6th, 1913-Amended October 20th, 1921 ; August 6th, 1931 ; October 3rd, 1946

1. **This Charter Party**, made and concluded in *Novorossiysk* ............................................................ **17th** day of *October 2007* ......19.......
2. Between ..*Messrs Bulcom Ltd.* ........................................................................................................**as disponent**
3. Owners of the good ..... ...........*Panama Flag*........ .....Steamship/Motorship *"Pagane"* ....**Description as per Clause 29** of ............................
4. of.................... tons gross register, and .................... tons net register, having engines of .................... ................................indicated horse power
5. and with hull, machinery and equipment in a thoroughly efficient state, and classed .....................................................................................
6. at........................ ...........of about .................... ....................cubic feet bale capacity, and about..............................tons of 2240 lbs
7. deadweight capacity (cargo and bunkers, including fresh water and store not exceeding one and one half percent of ship's deadweight capacity,
8. allowing a minimum of fifty tons) on a draft of .................... feet .................... inches on .................... Summer freeboard, inclusive of permanent bunkers,
9. which are of the capacity of about .................... ..........................................tons of fuel, and capable of steaming, fully laden, under good weather
10. conditions about .................... knots on a consumption of about.................... ......................of best Welsh coal best grade fuel oil best grade Diesel oil,
11. now .....**trading** ......... .................................................................................................................................................
12. ................................................and ... *Messrs GLINGROW HOLDING LTD.* ...................................................................................................
13. .......................................................................................................................Charterers of the City of ... *Nicosia, Cyprus.* ......................
14. **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
15. about *1 time Charter trip via safe ports, safe berths, safe anchorages always afloat, always within IWL, via Black sea with bulk lawful grain to Aqaba,*
16. *Jordan. Duration about 30 days.*
    within below mentioned trading limits.
17. Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
18. the fulfillment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations hereunder.*
19. Vessel to be placed at the disposal of the Charterers, at *on dropping outward pilot Kertch at any time day or night Sundays and Holidays included.*
20. in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No.6), as
21. the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No.5. Vessel on her delivery to be
22. ready to receive cargo with clean-swept holds and tight, staunch, strong and every way fitted for the service, having water ballast, *(See Clause 42)* winches
    and
23. donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
24. time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25. dise, including petroleum or its products, in proper containers, excluding *(See Clause 32)*........................................................................................
26. (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,
27. all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North
28. America and/or United States of America, and/or West Indies, and/or Central America and/or Caribbean Sea, and/or Gulf of Mexico, and/or
29. Mexico, and/or South America .................................................................................................................and/or Europe
30. and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

31. October 31st and May 15th, Hudson Bay and all unsafe ports, also excluding when out of season, White Sea, Black Sea and the Baltic,
32. (See Clause 31)
33.
34. .................................................................................................................................................................................................................
35. as the Charterers or their Agents shall direct, on the following conditions:
36. 1. That whilst on hire the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the
37. insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler and domestic water, lubricating oil, vessel's garbage removal unless compulsory and maintain her class and keep
38. the vessel in a thoroughly efficient state in hull, holds and hatchcovers, machinery and equipment with all certificates necessary to comply with current requirements at all ports of call and canals for and during the service. (See Clause 48 and 49).
39. 2. That, whilst on hire, the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, compulsory and customary Pilotages, Turkish strait pilotage, Agencies, boatage on Charterers business for clearance and cargo purpose only, Commissions, canal dues and tolls,
40. Consular Charges (except those pertaining to the Crew and flag), and all other usual expenses except those before stated, but when the vessel puts into
41. a port for causes for which Owners are vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42. illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43. charter to be for Charterers account including loading expenses should port authorities order crew ashore for safety reasons. All other fumigations to be for charterers account after vessel has been on charter for a continuous period
44. of six months or more.
45. Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, as permitted under this Charterparty, but
46. Owners to allow them, the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47. for dunnage, they making good any damage thereto.
48. 3. That the Charterers, at the port of delivery, and the Owners, at the port of delivery, shall take-over and pay for all fuel remaining on
49. board the vessel at the current prices in the respective ports the vessel to be delivered with not less than .................... tons and not more than
50. .................... tons and to be re-delivered with not less than .................... tons and not more than .................... tons. (See Clause 30).
51. 4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of US$ 60000.00 per day pro rata including overtime payable in advance every 15 days. First payment within 3 banking days upon delivery.
52. .................... United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and
53. stores, on .................... summer freeboard, per Calendar Month, commencing on and from the hour day of her delivery, as aforesaid, and at
54. and after the same rate for any part of a day month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55. wear and tear excepted, to the Owners (unless lost) at on dropping last outward sea pilot Aqaba, any time day or night, Sundays and Holidays included
56. .................... unless otherwise mutually agreed. Charterers are to give Owners not less than .................... days
57. notice of vessel's expected date of re-delivery, and probable port. (See Clause 38)
58. 5. Payment of said hire to be made as per clause 35 in New York in cash by transfer in United States Currency, every 15 days semi monthly in
59. advance, and for the last 15 days half month or
60. part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
61. due, if so required by Owners, unless bank guarantee or deposit is made by Charterers, otherwise failing the punctual and regular payment of the
62. hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
63. terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day
64. following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they to have the privilege of using vessel at once, such time used to count as hire.

65. Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66. to 2-1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67. of such advances.
68. 6. That the cargo or cargoes be laden and/or discharged in any **safe** dock or at any wharf or place that Charterers or their Agents may
69. direct, provided the vessel can safely lie always afloat at any time of tide, except at such places **in East Coast South America** where it is customary for similar
70. size vessels to safely
71. lie aground.

7. That the whole reach of the Vessel's Hold, Decks and usual places of loading (not more than she can reasonably stow and carry), **compatible with vessel's seaworthiness**, also

72. accommodations for Supercargo, if carried, shall be at Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73. tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodation allow. Charterers
74. paying Owners..........per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are
75. incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense. **No passengers.**
76. 8. That the Captain shall prosecute his voyage with the utmost despatch, and shall render all customary assistance with ship's crew and
77. boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78. agency; and Charterers are to load, stow, **and** trim, **lash, secure and discharge** the cargo at their **risk and** expense under the supervision of the Captain, **all cargo claims to be settled in accordance with NYPE Interclub Agreement as amended in September 1996 (See Clauses 59/60)**, who is to sign
79. Bills of Lading for

cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

80. 9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81. receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
82. 10. That the Charterers shall have the permission to appoint a Supercargo, who shall accompany the vessel **against signing Owners' P and I Club boarding LOI.** and see that voyage is prosecuted
83. with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84. rate of **USD 10.00 (Ten Dollars)** $1.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their agents, to victual Tally
85. Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal for all such victualling. **(See Clause 37)**
86. 11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, **and / or telecommunication with copy to Owners**, and the
87. Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88. terers, their Agents or Supercargo, when required, with a true copy of daily Logs, **abstracts in English**, showing the course of the vessel and distance run and the con-
89. sumption of fuel.
90. 12. That the Captain shall use diligence in caring for the ventilation of the cargo. **Vessel has natural ventilation.**
91. 13. That the Charterers shall have the option of continuing this charter for a further period of
92. .....................................................................................................................................................................................................
93. on giving written notice thereof to the Owners or their Agents...............days previous to the expiration of the first named term, or any declared option.
94. 14. That if required by Charterers, time not to commence before **00:01 hours Local Time 18th October 2007**................and should vessel
95. not have given written notice of readiness **been delivered** on or before **23:59 hours Local Time 18th October 2007**... **but not later than 4 p.m.** Charterers or
96. their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
97. 15. That in the event of the loss of time from deficiency **and/or default** of men or **including strike of Officers and / or crew or deficiency of** stores, fire, breakdown or damages to hull, machinery or equipment,

98. grounding, detection by average accidents to ship or cargo, *unless resulting from inherent vice, quality or defect to the cargo,* drydocking for the purpose of examination or painting bottom, or by any other cause

99. preventing the full working of the vessel *unless same is caused by Charterers or by following their instructions,* the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by

100. defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101. thereof, and all extra *directly related* expenses shall be deducted from the hire *duly substantiated.*
102. 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103. returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104. Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105. The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106. purpose of saving life and property.
107. 17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at ~~London~~ New-York,
108. one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
109. the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial *shipping* men. *(See Clause 60.)*
110. *General Average / Arbitration in London. This Charter Party shall be governed by and construed in accordance with English Law.*
111. 18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
112. age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
113. deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
114. might have priority over the title and interest of the owners in the vessel.
115. 19. That all derelicts and salvage shall be for Owners' account and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
116. Crew's proportion. General Average shall be adjusted, stated and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~
    York-Antwerp Rules *1974 as amended 1994 at London (See Clause 66)* ~~1924, at such port or place in the United States as may be selected by the carrier,~~
117. ~~Rules, according to the law and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
118. ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
119. ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120. ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121. ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
122. ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
123. ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in the special account at the~~
124. ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125. ~~United States money.~~
126. ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127. ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128. ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129. ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130. ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as a fully and in the same manner as if such salving ship or~~
131. ~~ships belonged to strangers.~~
132. Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. *(See Clause 66)*
133. 20. Fuel used by the vessel while off hire, *also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity,* and *shall be for*
    *Owners' account.* the
134. ~~cost of replacing same, to be allowed by Owners.~~
135. 21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~

136. convenient place, bottom cleaned and painted whenever Charterers and the Captain think necessary, at least once in every six months, reckoning from
137. time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.
138. (See Clause 70)
139.
140. 22. Owners shall maintain the gear of the ship as fitted, providing gear for all derricks, capable of handling lifts up to three tons, also
141. providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for
142. same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *lights as on board* lanterns and oil
143. night work, *free of expense to Charterers,* and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The
144. Charterers to have the use of any gear on board the vessel.
145. 23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging.
146. steamer to provide one winchman per hatch to work winches day and night, as required. Charterers agreeing to pay officers, engineers, winchmen,
147. deck hands and donkeyman for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the
148. port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or
149. insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
150. thereby.
151. 24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152. in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels;
153. etc." in respect of all cargo shipped under this Charter to or from the United States of America. It is further subject to the following clauses, both
154. of which are to be included in all bills of lading issued hereunder.
155. U.S.A. Clause Paramount
156. This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157. 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158. any of its rights or immunities or liabilities under the said Act. If any term of this bill of lading
159. be repugnant to said Act to any extent, such term shall be void to that extent, but no further.
160. Both-to-Blame Collision Clause
161. If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
162. Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
163. hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
164. or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non
165. carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
166. owners as part of their claim against the carrying ship or carrier.
167. 25. The vessel shall not be required to enter any ice-bound port or any port where lights or light-ships have been or are about to be with-
168. drawn by reason of ice, or where there is risk that in ordinary course of things the vessel will not be able on account of ice to safely enter the
169. port or to get out after having completed loading or discharging. *Ice free ports / trading, Vessel not to force ice or follow ice-breakers.*
170. 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners to remain responsible for the
171. navigation of the vessel, *acts of pilots and tugboats except of strikes not against the Owners,* insurance, crew, and all other matters, *except for time*
172. *Charterers' responsibility as agreed in this Charter and Rider,* same as when trading for their own account.
173. 27. A commission of *1.25 2-¾* per cent is payable by the Vessel and Owners to .....*DIAMANT / ODESSA*
174. on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175    28. An address commission of 2 ¼ per cent is payable to ......**Charterers**...................... on the hire earned and paid under this Charter.

*Additional Clause 29 to 82 as attached are to be fully incorporated in this Charter Party.*

*THE OWNERS*

*THE CHARTERERS*

This Charter Party is a computer generated copy of the NYPE(Reversed 3rd October, 1946) from printed under licence from the Association Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

**Clause 29  Vessels description**
M/V PAGANE - GEARLESS SD BC
PANAMA FLG-BLT 1982
54158 MTS DWAT ON 12.35 M SSW
GRT/NRT - 32976/20521
LOA/BEAM - 220/32.20M
DEPTH MOULDED 17 M
GRAIN IN MAIN HOLDS - 2443031.66 CFT (HA CMNGS INCLDD)
7 HOLDS/10 HATCHES
HATCH SIZES - ALL 11.60 BY 15.40M
HOLDS SIZE:
-HOLD #1 - 17.50m X 32m (AFT PART)
-HOLD #2 - 29.70m X 32m
-HOLD #3 - 18.00m X 32m
-HOLD #4 - 27.90m X 32m
-HOLD #5 - 18.00m X 32m
-HOLD #6 - 30.60m X 32m
-HOLD #7 - 15.30m X 32m (FORE PART)
HEIGHT OF ALL HOLDS - 17.90m INCLUDING COAMINGS.
MCGREGOR SIDE ROLLING TYPE - HYDRAULIC
SPEED+CONSUMPTION UNDER GOOD WEATHER AND SMOOTH WATER CONDITIONS:
ABT 11.5KN ON ABT 33MT LADEN/31MT BALLAST IFO 180 CST PLUS ABT 3.5 MT
MGO AT SEA, PORT CONS ABT 2.5 MT MGO.
VSL BURNS MGO WHILST MANOUVRING AND NAVIGATING IN NARROW WATERS,
ENTERING-LEAVING PORT, SAILING IN CONFINED WATERS, RIVERS, CANALS,
ESTUARIES AND ON STAND BY.
FUEL CAP: ABT 2000 MT IFO 180 CST ISO 8217 RME 25
ABT 300 MT MGO ISO 8217 DMA
TPC ABT 61.0 T/CM
CONSTS ABT 500 ECXL. FW
NATURAL VENTILATION, NOT C02 FTD
CGO HOLD GRAIN B/DOWN
NO1 223328.52
NO2 473521.17
NO3 282491.75
NO4 449107.91
NO5 282491.75
NO6 492979.74
NO7 239110.80
- ALL ABT AND WOG -
OWNERS: PAGANE MARITIME LTD.
CLASS: RMRS
PANDI: INGOSTTRAKH
H+M: ALLIANZ
ISM / ISPS OK
CALL SIGN: 3 E B Z 9
INMARSAT 'C' TLX: 437127110

- HATCH SIZES: ALL 11.60 BY 15.40 M
- OWNERS GTEE AIR DFT (DISTANCE WL TO THC) IN FULL BALLAST CONDITION TO BE
  MAX 12.00 M
- LAST THREE CARGOES: STEELS, IRON ORE, CLINKER

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

I.      VSL'S STOWAGE PLAN:
        -HOLD #1 - 5190.75mts - FULL
        -HOLD #2 - 10400.00mts - SLACK
        -HOLD #3 - EMPTY
        -HOLD #4 - 10444.48mts - FULL
        -HOLD #5 - EMPTY
        -HOLD #6 - 11464.77mts - FULL
        -HOLD #7 - 4000.00 - SLACK
        --------------------------------------------------------------
        TTL 41500mts
        DRAFT FORE=10.39m MID=10.54m AFT=10.70m
        ALL ABOVE ESTIMATIONS DONE ON BSS TRIMMED ENDS.IF LOADING WILL
        BE
        WITH UNTRIMMED ENDS THEN STOWAGE PLAN CHANGE WILL BE .
        II. WE NEED MIN 48 HRS TO BALLAST/DEBALAST HOLDS NoS 3+5.
        III. RCVD MSG FM GLOBAL AGENCY ASKING FOR SOME VSL'S
        DETAILS.STILL
        NOT REVERT,WAIT YR CONFORMATION AND INSTR.

- OWNRS WILL CONSIDER AIR DFT (DISTANCE WL TO THC) IN FULL BALLAST
INCLUDING BALLASTING CARGO HOLDS NO3 AND NO5 AND ACHEAVING REQUIRED
BY TERMINAL  DRAFT ON HOLD NO 7 BY TRIMING THE VESSEL, BUT TIME LOST FOR
BALLASTING/DEBALLASTIN AND PREPARING CARGO HOLDS IN SUITABLE
CONDITION FOR LOADING ALWAYS TO BE FOR AND ACCOUNT OF CHARTERES

- OWNERS CONFIRM VSL IS GRAIN CLEAN AND HAS ON BOARD VALID DOCUMENTS
  OF AUTHORIZATION FOR CARRIAGE OF GRAINS IN BULK.
- OWNERS CONFIRM THAT VESSEL IS SUITABLE FOR GRAB DISCHARGE.
- OWNERS CONFIRM VESSEL IS CLASSED HIGHEST LLOYD'S CLASS AND ISM / ISPS
  CODE FITTED FOR THE WHOLE DURATION OF VOYAGE.
- OWNERS CONFIRM VESSEL HAS ALL VALID DOCUMENTS/CERTIFICATES AVAILABLE
  ON BOARD FOR LOADING AND DRAFT SURVEY.
- OWNERS CONFIRM THAT VESSEL IS NOT BLACKLISTED FOR LOAD AND/OR
  DISCHARGE COUNTRIES / PORTS AND SUITABLE FOR THIS TRADE.
- OWNERSHIP/CLASS/PANDI CLUB/H+M INSURANCE NOT TO BE CHANGED
  THROUGHOUT WHOLE TRIP DURATION.

FOR
- ACC GLINGROW HOLDING LTD., NICOSIA, CYPRUS
RECENT DEALS:
C/P 28/08/2007 "GRAND MARKELA" ON TCT NOVO/SAUDI ARABIA 50'000 MTS BARLEY
D/OWNERS C. TRANSPORT
C/P 23/08/2007 "ERNEST" ON TCT NOVO/AQABA 33'000 MTS WHEAT
D/OWNERS - CARGILL INTERNATIONAL S.A.
C/P 21/08/2007 "SOUTHGATE" ON TCT NOVO/DAMIETTA 24'000 MTS WHEAT
D/OWNERS - NOBLE RESOURCES S.A.
C/P 20/07/2007 "THOR CONFIDENCE" ON VOYAGE BSS NOVO/ADEN 23200 MTS WHEAT
OWNERS - THORESEEN
C/P 20/06/2007 "SILVERGATE" ON VOYAGE BSS NOVO/AQABA 50'000 MTS BARLEY
D/OWNERS - INDUSTRIAL CARRIERS
C/P 01/06/2007 "LEROS" ON TCT NOVO/ADEN+HODEIDAH 40'500 MTS WHEAT
D/OWNER - CUSTODIA

### Clause 30 Bunker Clause

Bunker on delivery to be as on board (expect IFO about 328 mts and MGO about 55 mts).
Bunker on redelivery to be about same quantity (not less) as actually on delivery. Charterers will pay cost of bunker on delivery together with 1st hire.
Bunker prices - IFO USD 435 / MGO 745 per mt, same prices on redelivery

### Clause 31 Trading Exclusions

One time Charter Trip to Aqaba / Jordan.

### Clause 32 Cargo Trading Clause

Cargo is grain.

### Clause 33 --Deleted.

### Clause 34

Owners guarantee that the vessel is an easy trimming bulk carrier suitable for loading / carrying / discharging a full and complete cargo of any / all kinds of grain in bulk without bagging / strapping/securing. The vessel to have on board at all times all relevant grain loading booklets / manuals / certificates and hold end trimming table and vessel to be able to load grain without shifting boards / grain fittings in accordance with 1991 amendments the International Convention of SOLAS 1974 and has dispensation from trimming holds ends.

### Clause 35 Hire Payment

Hire and all monies due to the Owners under this Charter Party will be paid to Owners' bank account. Charterers will not agree to the assignment of hire, monies due under this Charter Party or the Charter Party itself in any circumstances whatsoever.

First hire shall be paid within 3 banking days after vessel's delivery together with value of bunkers. Thereafter, hire shall be settled every 15 days in advance. Greenwich Mean Time (G.M.T.) shall be applied for hire calculation purpose.

Notwithstanding anything contained herein to the contrary, if any time during the currency of this Charter, hire shall become due on or during a Saturday, Sunday or national holiday or outside normal office hours, or at any time which for reasons beyond their reasonable control would prevent Charterers from effecting payment of hire on the due date, payment of hire is to be made on the banking day immediately preceding the date on which hire becomes due. Where there is any failure to make hire payment on the due date because of an oversight or negligence or error or omission of Charterers' employees, Bankers or Agents or otherwise for any reason where there is absence of intention to fail to make payment as set out, Charterers shall be given by Owners 3 banking days' notice to rectify the failure, where so rectified the payment shall stand as punctual and regular payment.

### Clause 36 Charterers' Deduction

Charterers have no right to deduct any Owners' expenses from the Charter hire. It is understood that Owners will forward to load and/or discharge agent in advance any funds required for Owners' expenses.

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

### Clause 37 Communication/Entertainment/Victualling
Charterers shall pay US$ 1,250.- per month or pro rata in lieu of communication / entertainment / victualling.

### Clause 38 Delivery/Redelivery Notice
Delivery Notices:      on fixing and then daily notices.

Redelivery Notices:    15 days approximate and 5/3/2/1 days definite notice of redelivery
                       date and port.

### Clause 39  Stevedore Damage Clause
Stevedores shall be employed at the risk of and paid for by the Charterers. It is understood that all tallying is to be for Charterers' account.

Charterers shall not be responsible for any damage suffered by the vessel and/or her equipment whilst loading or unloading, unless such damage is notified to Charterers' representatives/Agents in writing by the Master latest within 24 hours after the occurrence, except in case of hidden damages which to be reported latest upon completion of discharge.

In the event of stevedore damage:

a)     Such damage to be entered into the vessel's log book.

b)     Master shall also have notified the stevedores or parties responsible for such damage in writing or telex/cable with copy to Charterers.

c)     If the damage caused as above by Charterers or their stevedores affects the vessel's seaworthiness or cargo worthiness or is subject to Classification requirements then all such damage is to be repaired to the satisfaction of the vessel's Classification Society prior to leaving the loading/discharging port. Vessel remaining on hire and costs being borne by Charterers.

d)     Damages not affecting seaworthiness or cargo worthiness or is not subject to classification requirements may be repaired later together with Owners' work at Owners' time and at Charterers' expenses. Owners to provide Charterers with copies of original invoices and if required, to advise Charterers' nature of work necessary to repair damages.

e)     Master will make every attempt to obtain written acknowledgement from the party causing the damage but this without prejudice to paragraphs 'a' through 'd'.

### Clause 40 P and I Club
Owners guarantee that the vessel is fully covered by the Ingosstrakh. Charterers have the benefit of Owners' cover granted by the P and I Club so far as the Club Rules permit.

Trip to Jordan always as per vessel's P and I club requirements which are:

= subject to previous written notification to Ingosstrakh;
= loading/discharging surveys carried out by approved surveyor of Ingosstrakh;

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

### Clause 41 Return Insurance
As far as rules permit, the Charterers to have the benefit of any return insurance premium receivable by Owners from their underwriters, as and when received by Owners, by reason of vessel being in port all such time on hire.

### Clause 42 War Risk
Basic war risk insurance premium for worldwide trading to be for Owners' account, and additional premiums for hull and machinery and Officers/crew for trading to restricted area, also crew war bonus, if any, to be for Charterers' account. The orders of Owners' war risk underwriters always to be followed.

The vessel's hull and machinery value of fixing is USD 5,200,000.-

### Clause 43 On/Off-Hire Survey
Charterers to appoint a surveyor acting on their behalf for performing a joint on and off hire bunker and condition survey. Joint on hire survey to be in Owners' time unless vessel already loading and joint off hire survey to be in Charterers' time. Expenses for on/off hire survey to be shared equally between Owners and Charterers.

### Clause 44 Hold Cleaning
On arrival first load port, vessel to be grain clean and ready in every respect and in all compartments to receive Charterers' cargo to local surveyors' and/or competent authorities' satisfaction, failing which vessel to be off-hire from the time of rejection until passed again. Owners to take immediate corrective steps to expedite cleaning as fast as possible including the use of shore labour. If vessel fails inspection, all bunkers consumed after rejection and extra expenses incurred as a direct result to be for Owners' account, until vessel has been passed in all compartments again.

Charterers' option to redeliver the vessel unclean paying USD 5,000.00 in lieu of hold cleaning.

### Clause 45 Bills of Lading
The Owners undertake to instruct the Master to authorise Charterers or Charterers' Agents if required to issue and sign Bill(s) of Lading on Charterers' usual form on Owners' and Master's behalf for cargo as presented in conformity with Mate's receipts. Charterers to keep Owners harmless should Charterers' servants not issue Bills of Lading per Owners'/Master's strict authority.

Should original Bill(s) of Lading not be available prior to vessels' arrival to the discharging port(s) in time, Owners to agree to release entire cargo without production of original Bill(s) of Lading, if so requested by Charterers or their agent(s), against a fax presentation of Letter of Indemnity under Owners' P and I Club wording which to be singly signed by Charterers or signed by sub-Charterers together with Charterers' joint signature.

No liner or through Bills of Lading or Seaway Bill may be issued/used during the currency of present Charter Party.

Charterers are not to issue or cause to be issued Bs/L which are subject to Hamburg rules.

### Clause 46 ISM Clause
From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both

the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Owners shall indemnify Charterers for any and all loss, expense and/or damage and/or consequences sustained by Charterers resulting from partial or full non-compliance with this clause. Any and all delays to the vessel resulting from such partial or full non-compliance with this clause shall not count as laytime or, if laytime has expired, as time on demurrage respectively, as the case may be, as on-hire time.

### Clause 47 Deratisation Certificate
The vessel to have valid deratisation certificate and/or equivalent fumigation certificate on board at time of delivery. The validity of which is to be maintained by Owners in their time and at their expense during the currency of this Charter Party.

### Clause 48 Quarantine/Smuggling
Normal quarantine time and expenses for entering ports shall be for Charterers' account. The Owners shall be liable for any delay in quarantine arising from the Master or any of the deck or engine Officers or crew having communication with the shore at any infected area without the written consent or instructions of Charterers or their Agents, also for any loss of time through detention by customs or other authorities caused by smuggling or their infraction of local law on the part of the Master or any of the deck or engine crew. Any delay, expenses and/or fines incurred on account of smuggling, if caused by the Charterers' supercargo and/or their staff or Agents are to be for Charterers' account. Likewise, if any delay in quarantine arises as a result of Charterers' trading of the vessel and/or misinstructions or lack of proper instructions by Charterers or their Agents, servants or representatives such delay is to be for Charterers' account.

### Clause 49 Health Certificate
The Owners shall arrange at their expense that Master, Officers and crew of vessel hold valid vaccination certificates against yellow fever, smallpox, cholera or other necessary health certificates during the Charter.

### Clause 50 Vessel's Equipment
Vessel's equipment shall comply with the regulations of the countries in which vessel will be employed and Owners are to ensure that vessel is at all times in possession of valid and up-to-date certificates as required. If stevedores, longshoremen or other workmen are not permitted to work due to failure of the Master and/or the Owners and/or Owners' Agents to comply with the aforementioned regulations or because the vessel is not in possession of such valid and up-to-date certificates as required, then Charterers may suspend hire for the time thereby lost and Owners shall pay all proven extra direct expenses incurred incidental to and resulting from such failure.

### Clause 51 Safety Regulation
It is understood that the vessel will comply with all safety regulations and/or requirements in effect at ports of loading and/or discharging. It is agreed that should the vessel not meet safety rules and regulations, Owners will take corrective action and vessel is to be off-hire.

### Clause 52 Canal Certificate

The vessel is fully fitted for Panama/Suez Canal transit and in possession of valid necessary certificate on board, in conformity with current canal regulations/requirements.

### Clause 53 Crew Service
During the currency of this Charter Party and provided weather and local stevedore and port regulations permit, Charterers to have the option to use crew to perform the following services as a means toward an efficient cargo operation:

a)  At each port all of the hatch opening and closing;
b)  Preparing vessel for sea;
c)  Removal and disposal of dunnage to be for Charterers' account;
d)  Gangway watchmen for the vessel to be for Owners' account.
    Compulsory cargo watchmen to be for Charterers' account;
e)  Before and upon arrival at a port, vessel's Officers/crew to shape up vessel's hatches, and gangway in order to commence loading and/or discharging without delay. Opening/closing of all hatchcovers and erecting and dismantling of shifting boards, if necessary, shall be done by Officers/crew provided shore regulations permit.

### Clause 54 War Cancellation
If war breaks out between any two or more of the following countries: United Kingdom, U.S.A., C.I.S., P.R.C., Japan, directly affecting the performance of this Charter, both Owners and Charterers shall have the option of cancelling this Charter whereupon Charterers shall redeliver vessel to Owners, if she has cargo on board after discharge thereof at destination, or, if debarred from reaching or entering it, at a near, open and safe port as directed by Charterers, or if she has no cargo on board, at a port at which she stays or if at sea at a near and safe port as directed by Charterers. In all cases, hire shall be paid until vessel's redelivery.

### Clause 55 Requisition
Should the vessel be requisitioned by any government or governmental authority due to Owners/Managers/vessel's fault, or due to vessel's flag or Ownership during the period of this Charter, she shall be off-hire during the period of such requisition and any hire or other compensation paid by any government or governmental authority in respect of such requisition shall be for Owners' account.

### Clause 56 Extra Period
Should the vessel be placed off-hire during the currency of this Charter for any reason whatsoever, the Charterers have the option of adding all or any part of such off-hire period to the original period.

### Clause 57 Cancellation Clause
If the vessel is placed off-hire more than 30 consecutive days, Charterers have the right to cancel the balance period of this Charter by giving notice to Owners without prejudice to any other right the Charterers may have under this Charter and provided vessel is free of cargo.

### Clause 58 Capture/Seizure/Arrest
Should the vessel be seized or detained or arrested or delayed by any authority during the currency of this Charter Party, the Charterers' liability for seizure or detention or arrest or delay is ceased immediately from the time of her seizure or detention or arrest or delay and all time lost by this reason shall be treated as off-hire until the time of her release unless such seizure or detention or arrest or delay is occasioned by any personal act or omission or default of Charterers or their Agents. Extra

<u>M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007</u>

expenses incurred directly from above seizure or detention or arrest or delay to be for Owners' account.

### Clause 59 Cargo Claim

Cargo Claims To Be Settled As Per NYPE Interclub Agreement 1996

### Clause 60 Small Claims Procedure Clause
Notwithstanding anything contained in the Arbitration Clause to the contrary, should neither the claims nor the counterclaims exceed <u>USD 100,000.00</u> exclusive of interest on the sum claimed, costs of the arbitration and legal expenses, if any, it is hereby agreed the dispute is to be governed by the London Maritime Arbitrators' Association Small Claim Procedure, revised 1st January, 1994.

### Clause 61 Deviation/Put Back
Should the vessel put back whilst on voyage by reason of an accident or breakdown or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness or accident to the crew or any person on board the vessel or by reason of the refusal of he Master or crew to perform duties, the hire shall be suspended from the time of inefficiency, unless caused by Charterers and/or Charterers' servants until the vessel is again efficient in the same position (or in Charterers' option at a point equidistant to the vessel's next destination) and voyage resumed therefrom. All direct expenses incurred including bunkers consumption during the period of suspended hire shall be for Owners' account.

### Clause 62 Water Pollution
A.   For Bulk Carriers:

(1)   Owners warrant that throughout the currency of this Charter they will provide the vessel with the following certificates:

   (a)   Certificates issued pursuant to Section 311 (p) of the U.S. Federal Water Pollution Control Act, as amended (Title 33 U.S Code, Section 1321(p)) up to (insert the date upon which such certificate(s) is/are due to expire).

   (b)   Certificates issued pursuant to Section 1016(a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended in accordance with Part 138 of Coast Guard Regulations 33 CFR, from (indicate the earliest date upon which the Owners may be required to deliver the vessel into the Charter or, if later, the date inserted in sub-paragraph (a) above), so long as these can be obtained by the Owners from or by (identify the applicable scheme or schemes).

(2)   Notwithstanding anything whether printed or typed herein to the contrary:

   (a)   Save as required for compliance with paragraph (1) hereof, Owners shall not be required or establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter.

14

M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007

(b)   Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(c)   Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any Bills of Lading issued pursuant to this Charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or water, other than to the extent provided in paragraph (1) hereof.

## Clause 63 Owners' Agents

Charterers may agree to have their Agents attend to the Owners' matters such as delivery, redelivery, general average, drydocking, repair, hospitalisation, repatriation of crew, supply of the vessel's stores and provisions, etc., with Owners paying Charterers' Agents actual expenses including attendance fee and agency fee according to the Charterers' tariff rate. Charterers may also agree to have their Agents to attend to trivial Owners' matters, such as, cash advance, crew mail, arranging shore pass with Owners paying actual expenses including attendance fee, if any, but without agency fee. (See Clause 36).

## Clause 64 Taxes

Export and/or import permits for Charterers' cargo to be at Charterers' risk and expense. Taxation or levies on cargo or freight to be for Charterers' account and to be paid by Charterers.

## Clause 65 Paramount Clause

General Paramount Clause to apply

## Clause 66 Additional Clause

New Jason Clause, P and I Bunkering Clause, New Both-to-Blame Collision Clause and Baltime War Risk Clause, as attached, to be incorporated in this Charter Party and all Bill(s) of Lading issued hereunder.

## Clause 67 Drydock Clause

The Owners have no option to make her drydock during this Charter period except emergency cases, or unless otherwise agreed.

## Clause 68 - Deleted

## Clause 69 Bulk Carrier Safety Clause

(A)   The Charterers shall instruct the terminal operators or their representatives to cooperate with the Master in completing the IMO Ship/Shore Safety Checklist and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

(B)   In addition to the above and notwithstanding any provision in this Charter Party in respect of

loading/discharging rates, the Charterers shall instruct the terminal operators to load/discharge the vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the vessel's draught, trim, stability, stress or any other factor which may affect the safety of the vessel.

(C)   At any time during cargo operations, the Master may, if he deems it necessary for reasons of safety of the vessel, instruct the terminal operators or their representatives to slow down or stop the loading or discharging.

(D)   Compliance with the provisions of this Clause shall not affect the counting of hire.

**Clause 70 Stowaway Clause**
Any time lost including but not limited to time on demurrage and any losses, liabilities and cost incurred by reason of stowaways on board shall be for Owners' account.

**Clause 71 Ocean Route Clause**
Evidence of weather conditions to be taken from independent weather bureau reports. Owners to be represented by the findings of 'Aerospace' Ocean Routing Company. In case of dispute between Owners and Charterers' ocean routing companies, the matter to be taken into further arbitration. In any case, Master always entitled to choose vessel's routing related to vessel and crew safety.

Owners' ocean routing company full style/address as follows:

Aerospace & Marine International Corporation,
6920 Santa Teresa Boulevard, Suite 209,
San Jose, CA 95119, U.S.A.
Tel:        408-360-0440
Fax:       408-360-0450
Tlx:        149158
Email:     ops@weather3000.com
Web-port:  www.amlwx.com

**Clause 72 Mobile Crane Clause**
Deleted.

**Clause 73 Split Bills of Lading Clause**
Charterers and/or Agents are hereby authorised by Owners/Master to split Bills of Lading and issue ship delivery orders in negotiable and transferable forms against collection of full set of original Bills of Lading. Delivery orders to conform with all terms and conditions and exceptions of Bills of Lading and shall not prejudice shipowners' rights.

**Clause 74 Oil Pollution**
As a condition of this Charter Party, Owners guarantee that Owners and vessel are and will remain throughout the currency of the Charter Party insured for pollution liability with respect to trading within, to and from ranges and areas specified in this Charter, said insurance to have a limit of not less than U.S.$1 billion. At any time before or subsequent to the fixture date of this Charter, Owners, upon reasonable notice from Charterers, shall furnish to Charterers or its representative proof, satisfactory to Charterers, of such insurance. Without prejudice to Charterers' other rights, Owners shall indemnify Charterers for any and all loss, expense and/or damage sustained by Charterers resulting

<u>M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007</u>

from non-compliance with this Clause. Any and all delay to the vessel resulting from such non-compliance shall not count as laytime or, if laytime has expired, as time on demurrage.

### Clause 75
Vessel's crew contracts are bona fide employment agreement.

### Clause 76
The vessel to remain always in seaworthy trim/condition to safely sail between ports/berths to Master's satisfaction.

### Clause 77
Deleted.

### Clause 78 ISPS Clause
(a)    (i)    From the date of coming into force of the International Code for the security of ships and of port facilities and the relevant amendments to chapter XI of SOLAS (ISPS code) in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the vessel and "the company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The owners shall provide the Charterers with the full style contact details of the company security officer (CSO).

(ii)    Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this clause shall be for the Owners' account.

(b)    (i)    The Charterers shall provide the CSO and the ship security officer (SSO)/master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-Charter Parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

(ii)    Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this clause shall be for the Charterers' account.

(c)    Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result

<u>M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007</u>

solely from the owners' negligence, crew's nationality/visa issues, or costs or expenses directly arising from vessel's ownership or other crewing matters.

(d) If either party makes a payment which is for the other party's account according to this clause, the other party shall indemnify the paying party.

### Clause 79

All negotiations/trade are to be made in accordance with English Law. English Law to apply. Arbitration, if any, to be in London in accordance with the Arbitration Clause of the Charter Party.

### Clause 80

Charterers have the option to perform a general condition survey of the vessel at any time. Survey to be at Charterers' time and expenses.

### Clause 81

Owners to provide following certificates as per L/C requirements (see attached):

1.  Certificate issued and signed by (P and I) Club or their representative or by their agent to the effect that the carrying vessel is a member to that (p and i) club having representative or agent in Jordan.

2.  Certificate issued and signed by shipping register or their agent certifying that the carrying vessel is classified 100a1 or its equivalent and free from any outstanding recommendations.

### Clause 82

Negotiations and fixture, if any, to be kept private & confidential by all parties involved.

<u>M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007</u>

## BOTH-TO-BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

### New Both-to-Blame Collision Clause

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact"

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

### New Jason Clause

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery"

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

## BALTIME 1939 WAR CLAUSE

(A)   The vessel unless the consent of the Owners be first obtained not to be ordered nor continue to any place or on any voyage nor be used on any service which will bring her within a zone which is dangerous as the result of any actual or threatened act of war, war hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or state whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of Sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any Government or Ruler.

(B)   Should the vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (1) the Owners to be entitled from time to time to insure their interests in the vessel and/or hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand; and (2) notwithstanding the terms of Clause 11, hire to be paid for all time lost including any loss owing to loss of or injury to the Master, Officers or crew or to the action of the crew in refusing to proceed in such zone or to be exposed to such risks.

(C)   In the event of the wages of the Master, Officers and crew or the cost of provisions and/or stores for deck and/or engine room and/or insurance premiums being increased by reason of or during the existence of any of the matters mentioned in section (A) the amount of any increase to be added to the hire and paid by the Charterers on production of the Owners' account therefore, such account being rendered monthly.

(D)   The vessel to have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other wise whatsoever given by the Government of the nation under whose flag the vessel sails or any other Government or any person (or body) acting or purporting to act with the authority of such Government or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such orders or directions.

(E)   In the event of the nation under whose flag the vessel sails becoming involved in war, hostilities, warlike operations, revolution or civil commotion, both the Owners and the Charterers may cancel the Charter and, unless otherwise agreed, the vessel to be redelivered to the Owners at the port of destination or, if prevented through the provisions of Section (A) from reaching or entering it, then at a near open and safe port at the Owners' option, after discharge of any cargo in board.

(F)   If in compliance with the provisions of this clause anything is done or is not done, such not to be deemed a deviation.

Section (C) is optional and should be considered deleted unless agreed according to Baltime 1939.

<u>M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007</u>

## P. AND I. BUNKER CLAUSE

The vessel shall have liberty as part of the Contract Voyage to proceed to any port or ports at which bunker oil is available for the purpose of bunkering at any stage of the voyage whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the ports of loading or discharge named in this Charter and may there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks and deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

## BIMCO STANDARD ISM CLAUSE

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by the failure on the part of the Owners or 'the Company' to comply with the ISM Code shall be for Owners' account.

## SECA CLAUSE

During the currency of this contract the performing vessel will consume bunkers in accordance with ISO 8217 specifications. In the event that emissions regulations, laws or guidelines require or recommend the stemming or consumption of bunkers with a quality that has a higher value than the price for high sulphur fuel oil, then such excess price will be paid for by Charterers for bunkers consumed whilst in an emission controlled area. Upon request Owners to provide documentary proof for such price differential together with the actual bunker consumption in these emission controlled areas.

## BUNKER FUEL SULPHUR CONTENT CLAUSE FOR
## TIME CHARTER PARTIES 2005

(A) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the vessel is ordered to trade within that zone. The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with regulations 14 and 18 of Marpol Annex VI, including the guidelines in respect of sampling and the provision of bunker delivery notes.

<u>M/V "PAGANE" - GLINGROW - C/P DATED 17th OCTOBER 2007</u>

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this sub-Clause (A).

(B)    Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with sub-Clause (A), the Owners warrant that:

   (i)    The vessel shall comply with regulations 14 and 18 of Marpol Annex VI and with the requirements of any emission control zone; and

   (ii)   The vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the vessel with fuels in accordance with sub-Clause (A), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the vessel's failure to comply with regulations 14 and 18 of Marpol Annex VI.

(C)    For the purpose of this Clause, 'emission control zone' shall mean zones as stipulated in Marpol Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the E.U. and the U.S. Environmental Protection Agency.

# EXHIBIT 2

## Provisional Hire statement MV PAGANE
### cp dd 17.10.2007/GLINGROW HOLDING LTD.
#### Voyage PAG/2007/03/TC

|  |  |  |  | US$<br>**Debit** |
|---|---|---|---|---|
| **Hire from:** | | | | |
| 18.10.2007 01:00 GMT DOP KERCH | | | | |
| 05.12.2007 15:30 GMT DLOSP AQABA | | | | |
| 48,604187 | days | @ | 60 000,00 | 2 916 250,00 |
| **Bunkers on delivery:** | | | | |
| 365,257 | IFO mts | @ | 435,00 | 158 886,80 |
| 46,646 | MDO mts | @ | 745,00 | 34 751,27 |
| **Owners bunker consumed in Aqaba:** | | | | |
| 32,900 | MDO mts | @ | 745,00 | 24 510,50 |
| **ILOHC** | | | | 5 000,00 |
| C / V / E | 40,39514 | @ | 1 250,00    m/r | 1 693,13 |
| Difference in bunker prices: ($890-$745)x46,646mt | | | | 6 763,67 |
| | | | subtotal    debit | 3 141 081,70 |

|  |  |  |  | **Credit** |
|---|---|---|---|---|
| **less:** | | | | |
| commission | 3,75 % | | | 109 359,38 |
| **Owners expenses:** | | | | |
| on-hire survey | 50% | | | 400,00 |
| off-hire survey | 50% | | | 750,00 |
| **Off-hire:** | | | | |
| at Iport Novo | 6,701389 | days | | 387 005,21 |
| bunker consumed | | | | 11 970,66 |
| at Suez Canal | 1,507639 | days | | 87 086,15 |
| bunker consumed | | | | 2 807,98 |
| **Bunkers on re-delivery:** | | | | |
| 407,500 | IFO mts | @ | 435,00 | 177 262,50 |
| 0,000 | MDO mts | @ | 745,00 | 0,00 |
| **Payments:** | | | | |
| 1. | | | | 1 061 013,00 |
| 2. | | | | 440 968,18 |
| 3. | | | | 353 723,97 |
| | | | subtotal    credit | 2 642 327,03 |
| **grand total in favour OWNERS** | | | debit | 498 754,67 |
| payment to be arranged to: | | | | |

| | |
|---|---|
| **BENEFICIARY** | **BULCOM LTD.** |
| **ACC. No:** | 72673/2G |
| **WITH:** | BNP PARIBAS (SUISSE) S.A. |
| | PLACE DE HOLLANDE, 2 |
| | CH-1211, GENEVA 11 |
| | SWITZERLAND |
| **SWIFT:** | BPPBCHGG |
| **IBAN:** | CH69 0868 6001 0726 7300 2 |

Please always quote our invoice number when effecting payments.



# EXHIBIT 3

**From:** Marianne Brookes
**Sent:** 29 November 2007 11:50
**To:** arbitration@christophermoss.com
**Subject:** M/V Pagane C/P DD.17.10.2007

Dear Sir,

We act for Bulcom Ltd, the disponent owners of the above vessel.

Under a time charter on the NYPE form (copy attached), disponent owners chartered their vessel to Glingrow Holding Ltd for 1 time charter trip for the carriage of grain from the Black Sea to Aqaba.

Under Clause 17 of the charterparty, any disputes between owners and charterers shall be referred to three persons in London and be determined in accordance with English Law.

Disputes have arisen between the parties. You are hereby appointed as owners' arbitrator. Kindly confirm acceptance of your appointment.

Best regards,

Brookes & Co.

Brookes & Co., Solicitors, 60 Lombard Street, London, EC3V 9EA. United Kingdom.
Tel: +44 (0)20 3159 4330   Fax: +44 (0)20 7691 7773.   General office email address: mail@brookes-and-co.co.uk
Principal: Marianne Brookes
Brookes & Co. is regulated by the Solicitors Regulation Authority
Confidentiality Note
The contents of this email and any attachments are strictly confidential and must not be copied to, used by or disclosed to any person other than the
named recipient(s). Please let us know immediately by telephoning +44 (0)20 3159 4330 if this email has been sent to you in error.

# EXHIBIT 4

# TIME CHARTER

GOVERNMENT FORM

Approved by the New York Produce Exchange

November 6th, 1913-Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

17th day of October 2007 ...19...

1  **This Charter Party**, made and concluded in Novorossiysk
2  Between ... *Messrs Gingrow Holding LTD* ... as disponent.
3  Owners of the good ... *Panama Flag* ... Steamship/Motorship *"Pagano"* ... Description as per Clause 29 of ...
4  of ... tons gross register, and ... tons net register, having engines of ... indicated horse-power
5  and with hull, machinery and equipment in a thoroughly efficient state, and classed ...
6  at ... of about ... stable-feet bale capacity, and about ... tons of 2240 lbs
7  deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,
8  allowing a minimum of fifty tons) on a draft of ... feet ... inches on ...
9  which are at the capacity of about ...
10  condition about ... tons of fuel, and capable of steaming, fully laden, under good weather
11  now ... *trading* ... of best Welsh coal, best-grade fuel oil best-grade Diesel oil.
12

........ and ... *Messrs RIAS TRADING S.A.* ........... Charterers of the City of ... Lausanne, Switzerland

**Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

13  about *1 time Charter trip via safe ports, safe berths, safe anchorages always afloat, always within IWL, via Black sea with bulk lawful grain to Aqaba,*
14  *Jordan. Duration about 30 days.*
within below mentioned trading limits.
15  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
16  the fulfillment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations hereunder.*
17  Vessel to be placed at the disposal of the Charterers, at ... *on dropping outward pilot Kertch at any time day or night Sundays and Holidays included.*
18
19
20  in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No.6), as
21  the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No.5. Vessel on her delivery to be
22  ready to receive cargo with clean-swept holds and tight, staunch, strong and every way fitted for the service, having water ballast, *(See Clause 42)* winches
and
23  donkey-boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
24  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25  dise, including petroleum or its products-in proper containers, excluding *(See Clause 47)*
26  (vessel is not to be employed in the carriage of live stock, but Charterers are ... of shipping a small number of ... cattle at their risk,
27  all necessary fittings and other ... to be for account of Charterers) ... between safe port and/or ports in British North
28  America and/or United States of America, and/or ... such ... European Sea and/or Gulf of Mexico, and/or
29  Mexico, and/or South America ... Central ... River, River St. Lawrence between
30  and/or Africa, and/or Asia ... Australia ... Tasmania, and/or New Zealand but excluding Magdalena River, and/or Europe between

31. ~~October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding when out of season, White Sea, Black Sea and the Baltic.~~
32. (See Clause 31)
33.
34.
35.    as the Charterers or their Agents shall direct, on the following conditions:
36.    1. That *whilst on hire* the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the
37.    insurance of the vessel, also *for all* the cabin, deck, engine-room and other necessary stores, including boiler and *domestic* water, *lubricating oil, vessel's*
38.    *garbage removal unless compulsory* and maintain her class and keep
       the vessel in a thoroughly efficient state in hull, *holds and hatchcovers,* machinery and equipment *with all certificates necessary to comply with current*
       *requirements at all ports of call and canals for* and during the service. *(See Clause 48 and 49).*
39.    2. That, *whilst on hire,* the Charterers shall provide and pay for all the fuel except as otherwise agreed. Port Charges, *compulsory and customary*
       Pilotages, *Turkish strait pilotage* , Agencies, *boatage* on Charterers business for clearance and cargo purpose only, Commissions, *canal dues and*
       *tolls,*
40.    Consular Charges (except those pertaining to the Crew *and flag),* and all other usual expenses except those before stated but when the vessel puts into
41.    a port for causes for which *Owners are vessel* is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42.    illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43.    charter to be for Charterers account *including loading expenses should port authorities order crew ashore for safety reasons.* All other fumigations to be
       for charterers account after vessel has been on charter for a continuous period
44.    ~~of six month are no more.~~
45.    Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite    for a special trade or unusual cargo, *as permitted under*
       *this Charterparty,* but
46.    Owners to allow them the use of any dunnage already aboard vessel. Charterers to have the privilege of using shifting boards
47.    for dunnage, they making good any damage thereto.
48.    3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on
49.    board the vessel at the current prices in the respective ports. the vessel to be delivered with not less than........... tons and not more than.............
50.    ...........................tons and to be re-delivered with not less than............................. tons and not more than............ tons. (See Clause 30).
51.    4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *US$ 69000.00 per day pro rata  including overtime payable in*
       *advance every 15 days. First payment within 1 banking  days upon delivery.*
52.    ........................................................................United States Currency, per ton on vessel's total deadweight carrying capacity, including bunkers and
53.    stores, on .........................................summer freeboard, per Calendar Month, commencing on and from the *hour* day of her delivery, as aforesaid, and at
54.    and after the same rate for any part of a day month, hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55.    wear and tear excepted, to the Owners (unless lost) *at on dropping last outward sea pilot Aqaba, any time day or night, Sundays and Holidays* .........days
56.    *included*                            unless otherwise mutually agreed. Charterers are to give Owners not less than.............................
57.    *notice* of vessels expected date of re-delivery and probable port. *(See Clause 39)*
58.    5. Payment of said hire to be made *as per clause 35 in New York in each by transfer* in United States Currency, *every 15 days semi* monthly in
       advance, and for the last *15* days half month or
59.    part of same the same rate for any part of a day month, hire to continue until the actual time, hire is to be paid for the balance day by day, as it becomes
60.    due, if so required by Owners, unless bank guarantee or deposit is made by Charterers, otherwise failing the punctual and regular payment of the
61.    hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62.    terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers.   Time to count from 7 a.m. on the working day
63.    *following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they*
64.    to have the privilege of using vessel at once, such time used to count as hire.

10-DEC-2007 15:47 From:                                To:0078612530387          P.3/32

65  ~~Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject~~
66  ~~to 2 1/2% commission and such advance shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application~~
67  ~~of such advances.~~
68  6  That the cargo or cargoes be laden and/or discharged in any **safe** dock or at any wharf or place that Charterers or their Agents may
69  direct, provided the vessel can safely lie always afloat at any time of tide, except at such places *in East Coast South America* where it is customary for similar
70  size vessels to safely
71  lie aground
      7  That the whole reach of the Vessel's Hold, Decks and usual places of loading (not more than she can reasonably stow and carry), *compatible with*
72  *vessel's seaworthiness,* also
73  ~~accommodations for Supercargo, if carried,~~ shall be at Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew
74  ~~tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charterers~~
75  ~~paying Owners ......... per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~
76  ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense. No passengers.~~
77  8  That the Captain shall prosecute his voyage with the utmost despatch, and shall render all customary assistance with ship's crew and
78  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
      agency, and Charterers are to load, stow, and trim, *lash, secure and discharge* the cargo at their *risk* and expense under the supervision of the Captain, *all*
      *cargo claims to be settled in accordance with NYPE Interclub Agreement as amended in September 1996 (See Clauses 59/60), who to do eigh*
      ~~Bills of Lading for~~
      ~~cargo as presented, in conformity with Mate's or Tally Clerk's receipts.~~
78  9  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
80  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
81  10  That the Charterers shall have the permission to appoint a Supercargo, who shall accompany the vessel *against signing Owners' P and I Club*
82  *boarding LOI,* and who ~~that voyages be proceeded~~ with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
83  rate of *USD 10.00 (Ten Dollars) $4.00* per day, Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their agents, to
84  victual Tally
      Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling. *(See Clause 37)*
85  11  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, *and / or*
86  *telecommunication with copy to Owners,* and the
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of daily Logs, *abstracts in English,* showing the course of the vessel and distance run and
      the con-
      sumption of fuel.
89  12  That the Captain shall use diligence in caring for the ventilation of the cargo. *Vessel has natural ventilation.*
90  13  ~~That the Charterers shall have the option of continuing this charter for a further period of ..................~~
91  ~~........................................................... days previous to the expiration of the first named term, or any declared option.~~
92  ~~on giving written notice thereof to the Owners or their Agents ...............................................~~
93  14  That if required by Charterers, time not to commence before *00:01 hours Local Time 18th October 2007.* ............... and should vessel
94  not have given written notice of readiness *been delivered* on or before *23:59 hours Local Time 18th October 2007.* ......... but not later than 4 p.m. Charterers or
95  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
96  15  That in the event of the loss of time from deficiency *and/or default* of men or *including strike of Officers and / or crew or deficiency of* stores,
97  fire, breakdown or ~~damages~~ to hull, machinery or equipment,

98   grounding, detection by average accidents to ship or cargo, *unless resulting from inherent vice, quality or defect to the cargo*, drydocking for the purpose

99   of examination or painting bottom, or by any other cause preventing the full working of the vessel *unless same is caused by Charterers or by following their instructions*, the payment of hire shall cease for the

100   time thereby lost, and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101   thereof, and all extra *directly related* expenses shall be deducted from the hire *duly substantiated*

102   16. That should the Vessel be lost, money paid in advance and not earned [reckoning from the date of loss or being last heard of] shall be

103   returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104   Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105   The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106   purpose of saving life and property.

107   17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at ~~London~~ New York,

108   one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and to

109   the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial shipping men. (See Clause 60)

110   *General Average / Arbitration in London. This Charter Party shall be governed by and construed in accordance with English Law.*

110   18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-

111   age contributions, and the Charterer is to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112   deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113   might have priority over the title and interest of the owners in the vessel.

114   19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

115   Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule f of

116   York-Antwerp Rules 1974 *as amended 1994 at London (See Clause 66)* ~~1994, at such port or place in the United States as may be selected by the carrier,~~

117   ~~and as to matters not provided for by these Rules, according to the law and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~

118   ~~United States money at the rate prevailing on the dates made and allowances for cargo claimed in foreign currency shall be converted at~~

119   ~~the rate prevailing on the last day of discharge at the port or place at which discharge of that damaged cargo from the ship. Average agreement or~~

120   ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~

121   ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~

122   ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~

123   ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in the special account at the~~

124   ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~

125   ~~United States money.~~

126   ~~In the event of accident, danger, damage, or disaster, before or after the commencement of the voyage resulting from any cause whatsoever,~~

127   ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~

128   ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~

129   ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~

130   ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~

131   ~~ships belonged to strangers.~~

132   ~~Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. (See Clause 66)~~

133   20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and *shall be for*

134   *Owners' account.* ~~the~~

135   ~~cost of replacing same, to be allowed by Owners.~~ ~~21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~

10-DEC-2007 15:50 From:
To:0078612530387
P.5/32

136. convenient place, bottom cleaned and painted whenever Charterers and the Captain think necessary, at least once in every six months, reckoning from
137. time of last painting, and payment of the fume to be suspended until she is again in proper state for the service.
138. *(See Clause 70)* ....................................................................................................

139. 22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks capable of handling lifts up to three tons) also
140. providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for
141. same, otherwise equipment and gear for heavier lifts shall be for Charterers account. Owners also to provide on the vessel *lights as on board* lanterns and oil
142. for
143. night work, *free of expense to Charterers*, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at
Charterers' expense. The

144. 23. Vessel to work night and day, if required by Charterers, and all overtime to be at Charterers' disposal during loading and discharging.
Charterers to have the use of any gear on board the vessel.

145. 24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
146. steamer to provide one winchman per hatch for every day and night, as required. Charterers agreeing to pay officers, engineers, winchmen,
147. deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the
148. port or labor unions prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or
149. insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
thereby.

150. in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,
151. etc.," in respect of all cargo shipped under this Charter to or from the United States of America. It is further subject to the following clauses, both
152. of which are to be included in all bills of lading issued hereunder.
153. U.S.A. Clause Paramount
154. This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
155. 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
156. any of its rights or immunities or an increase of any of its responsibilities or liabilities under the said Act. If any term of this bill of lading
157. be repugnant to said Act to any extent, such term shall be void to that extent, but no further.
158. Both-to-Blame Collision Clause

159.
160. If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
161. Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
162. hereunder will indemnify the Carrier against all loss or liability to the other or non carrying ship or her owners in so far as such loss
163. or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non
164. carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non carrying ship or her
165. owners as part of their claim against the carrying ship or carrier.

166. 25. The vessel shall not be required to enter any ice-bound port or any port where lights or light-ships have been or are about to be with-
167. drawn by reason of ice, or where there is risk that in ordinary course of things the vessel will not be able on account of ice to safely enter the
168. port or to get out after having completed loading of discharging. *Ice free ports / trading. Vessel not to force ice or follow ice-breakers.*

169.
170. 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners to remain responsible for the
171. navigation of the vessel, *acts of pilots and tugboats except of strikes not against the Owners,* insurance, crew, and all other matters, *except for time*
Charterers' responsibility as agreed in this Charter and Rider, same as when trading for their own account.

172. 27. A commission of 2½ per cent is payable by the Vessel and Owners to
173. on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
174.

11-DEC-2007 12:45 From:

To:0078617762515          P.1/1

175

28. ~~An address commission of 2 ¼ percent is payable to~~ ................ ................ on the hire earned and paid under this Charter.

*Additional Clause 29 to 82 as attached are to be fully incorporated in this Charter Party.*

THE OWNERS:



THE CHARTERERS



This Charter Party is a computer generated copy of the NYPE(Reversed 3rd October, 1946) from printed under licence from the Association Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

<u>M/V "PAGANE" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007</u>

<u>Clause 29  Vessels description</u>
M/V PAGANE - GEARLESS SD BC
PANAMA FLG-BLT 1982
54158 MTS DWAT ON 12.35 M SSW
GRT/NRT - 32976/20521
LOA/BEAM - 220/32.20M
DEPTH MOULDED 17 M
GRAIN IN MAIN HOLDS - 2443031.66 CFT (HA CMNGS INCLDD)
7 HOLDS/10 HATCHES
HATCH SIZES - ALL 11.60 BY 15.40M
HOLDS SIZE:
-HOLD #1 - 17.50m X 32m (AFT PART)
-HOLD #2 - 29.70m X 32m
-HOLD #3 - 18.00m X 32m
-HOLD #4 - 27.90m X 32m
-HOLD #5 - 18.00m X 32m
-HOLD #6 - 30.60m X 32m
-HOLD #7 - 15.30m X 32m (FORE PART)
HEIGHT OF ALL HOLDS - 17.90m INCLUDING COAMINGS.
MCGREGOR SIDE ROLLING TYPE - HYDRAULIC
SPEED CONSUMPTION ABT 12.5 KTS ON ABT IFO 180 CST PLUS ABT 3.5 MT
MGO AT SEA, PORT CONS ABT 2.5 MT MGO.
VSL BURNS MGO WHILST MANOUVRING AND NAVIGATING IN NARROW WATERS.
ENTERING-LEAVING PORT, SAILING IN CONFINED WATERS, RIVERS, CANALS,
ESTUARIES AND ON STAND BY.
FUEL CAP: ABT 2000 MT IFO 180 CST ISO 8217 RME 25
ABT 300 MT MGO ISO 8217 DMA
TPC ABT 61.0 T/CM
CONSTS ABT 500 ECXL. FW
NATURAL VENTILATION, NOT C02 FTD
CGO HOLD GRAIN B/DOWN
NO1 223328.52
NO2 473521.17
NO3 282491.75
NO4 449107.91
NO5 282491.75
NO6 492979.74
NO7 239110.80
- ALL ABT AND WOG -
OWNERS: PAGANE MARITIME LTD.
CLASS: RMRS
PANDI: INGOSTTRAKH
H+M: ALLIANZ
ISM / ISPS OK
CALL SIGN: 3 E B Z 9
INMARSAT 'C' TLX: 437127110

- HATCH SIZES: ALL 11.60 BY 15.40 M
- OWNERS GTEE AIR DFT (DISTANCE WL TO THC) IN FULL BALLAST CONDITION TO BE
MAX 12.00 M
- LAST THREE CARGOES: STEELS, IRON ORE, CLINKER



7

M/V "PAGANE" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007

I.     VSL'S STOWAGE PLAN:
       -HOLD #1 - 5190.75mts - FULL
       -HOLD #2 - 10400,00mts - SLACK
       -HOLD #3 - EMPTY
       -HOLD #4 - 10444.48mts - FULL
       -HOLD #5 - EMPTY
       -HOLD #6 - 11464.77mts - FULL
       -HOLD #7 - 4000.00 - SLACK
       ----------------------------------------------------
       TTL 41500mts
       DRAFT FORE=10,39m MID=10.54m AFT=10.70m
       ALL ABOVE ESTIMATIONS DONE ON BSS TRIMMED ENDS,IF LOADING WILL
       BE
       WITH UNTRIMMED ENDS THEN STOWAGE PLAN CHANGE WILL BE .
       II. WE NEED MIN 48 HRS TO BALLAST/DEBALAST HOLDS NoS 3 I 5.
       III. RCVD MSG FM GLOBAL AGENCY ASKING FOR SOME VSL'S
       DETAILS.STILL
       NOT REVERT,WAIT YR CONFORMATION AND INSTR.

- OWNRS WILL CONSIDER AIR DFT (DISTANCE WL TO THC) IN FULL BALLAST
INCLUDING BALLASTING CARGO HOLDS NO3 AND NO5 AND ACHEAVING REQUIRED
BY TERMINAL. DRAFT ON HOLD NO 7 BY TRIMING THE VESSEL, BUT TIME LOST FOR
BALLASTING/DEBALLASTIN AND PREPARING CARGO HOLDS IN SUITABLE
CONDITION FOR LOADING ALWAYS TO BE FOR AND ACCOUNT OF CHARTERES

- OWNERS CONFIRM VSL IS GRAIN CLEAN AND HAS ON BOARD VALID DOCUMENTS
  OF AUTHORIZATION FOR CARRIAGE OF GRAINS IN BULK.
- OWNERS CONFIRM THAT VESSEL IS SUITABLE FOR GRAB DISCHARGE.
- OWNERS CONFIRM VESSEL IS CLASSED HIGHEST LLOYD'S CLASS AND ISM / ISPS
  CODE FITTED FOR THE WHOLE DURATION OF VOYAGE.
- OWNERS CONFIRM VESSEL HAS ALL VALID DOCUMENTS/CERTIFICATES AVAILABLE
  ON BOARD FOR LOADING AND DRAFT SURVEY.
- OWNERS CONFIRM THAT VESSEL IS NOT BLACKLISTED FOR LOAD AND/OR
  DISCHARGE COUNTRIES / PORTS AND SUITABLE FOR THIS TRADE.
- OWNERSHIP/CLASS/PANDI CLUB/H+M INSURANCE NOT TO BE CHANGED
  THROUGHOUT WHOLE TRIP DURATION.

8

M/V "PAGANE" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007

### Clause 30 Bunker Clause

Bunker on delivery to be as on board (expect IFO about 328 mts and MGO about 55 mts).
Bunker on redelivery to be about same quantity (nor less) as actually on delivery. Charterers will pay
cost of bunker on delivery together with 1st hire.
Bunker prices - IFO USD 435 / MGO 745 per mt, same prices on redelivery

### Clause 31 Trading Exclusions

One time Charter Trip to Aqaba / Jordan.

### Clause 32 Cargo Trading Clause

Cargo is grain.

### Clause 33 –Deleted.

### Clause 34

Owners guarantee that the vessel is an easy trimming bulk carrier suitable for loading / carrying /
discharging a full and complete cargo of any / all kinds of grain in bulk without bagging /
strapping/securing. The vessel to have on board at all times all relevant grain loading booklets /
manuals / certificates and hold end trimming table and vessel to be able to load grain without shifting
boards / grain fittings in accordance with 1991 amendments the International Convention of SOLAS
1974 and has dispensation from trimming holds ends.

### Clause 35 Hire Payment

Hire and all monies due to the Owners under this Charter Party will be paid to Owners' bank account.
Charterers will not agree to the assignment of hire, monies due under this Charter Party or the Charter
Party itself in any circumstances whatsoever.

First hire shall be paid within 3 banking days after vessel's delivery together with value of bunkers.
Thereafter, hire shall be settled every 15 days in advance. Greenwich Mean Time (G.M.T.) shall be
applied for hire calculation purpose.

Notwithstanding anything contained herein to the contrary, if any time during the currency of this
Charter, hire shall become due on or during a Saturday, Sunday or national holiday or outside normal
office hours, or at any time which for reasons beyond their reasonable control would prevent
Charterers from effecting payment of hire on the due date, payment of hire is to be made on the
banking day immediately preceding the date on which hire becomes due. Where there is any failure to
make hire payment on the due date because of an oversight or negligence or error or omission of
Charterers' employees, Bankers or Agents or otherwise for any reason where there is absence of
intention to fail to make payment as set out, Charterers shall be given by Owners 3 banking days'
notice to rectify the failure, where so rectified the payment shall stand as punctual and regular
payment.

### Clause 36 Charterers' Deduction

Charterers have no right to deduct any Owners' expenses from the Charter hire. It is understood that
Owners will forward to load and/or discharge agent in advance any funds required for Owners'
expenses.

9

M/V "PAGANE" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007

**Clause 37 Communication/Entertainment/Victualling**
Charterers shall pay US$ 1,250.- per month or pro rata in lieu of communication / entertainment / victualling.

**Clause 38 Delivery/Redelivery Notice**
Delivery Notices:       on fixing and then daily notices.

Redelivery Notices:     15 days approximate and 5/3/2/1 days definite notice of redelivery
                        date and port.

**Clause 39  Stevedore Damage Clause**
Stevedores shall be employed at the risk of and paid for by the Charterers. It is understood that all tallying is to be for Charterers' account.

Charterers shall not be responsible for any damage suffered by the vessel and/or her equipment whilst loading or unloading, unless such damage is notified to Charterers' representatives/Agents in writing by the Master latest within 24 hours after the occurrence, except in case of hidden damages which to be reported latest upon completion of discharge.

In the event of stevedore damage:

a)    Such damage to be entered into the vessel's log book.

b)    Master shall also have notified the stevedores or parties responsible for such damage in writing or telex/cable with copy to Charterers.

c)    If the damage caused as above by Charterers or their stevedores affects the vessel's seaworthiness or cargo worthiness or is subject to Classification requirements then all such damage is to be repaired to the satisfaction of the vessel's Classification Society prior to leaving the loading/discharging port. Vessel remaining on hire and costs being borne by Charterers.

d)    Damages not affecting seaworthiness or cargo worthiness or is not subject to classification requirements may be repaired later together with Owners' work at Owners' time and at Charterers' expenses. Owners to provide Charterers with copies of original invoices and if required, to advise Charterers' nature of work necessary to repair damages.

e)    Master will make every attempt to obtain written acknowledgement from the party causing the damage but this without prejudice to paragraphs 'a' through 'd'.

**Clause 40 P and I Club**
Owners guarantee that the vessel is fully covered by the Ingosstrakh. Charterers have the benefit of Owners' cover granted by the P and I Club so far as the Club Rules permit.

Trip to Jordan always as per vessel's P and I club requirements which are:

= subject to previous written notification to Ingosstrakh;
= loading/discharging surveys carried out by approved surveyor of Ingosstrakh;

10

## M/V "PAGANINI" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007

### Clause 41 Return Insurance

As far as rules permit, the Charterers to have the benefit of any return insurance premium receivable by Owners from their underwriters, as and when received by Owners, by reason of vessel being in port all such time on hire.

### Clause 42 War Risk

Basic war risk insurance premium for worldwide trading to be for Owners' account, and additional premiums for hull and machinery and Officers/crew for trading to restricted area, also crew war bonus, if any, to be for Charterers' account. The orders of Owners' war risk underwriters always to be followed.

The vessel's hull and machinery value of fixing is USD 5,200,000.-

### Clause 43 On/Off-Hire Survey

Charterers to appoint a surveyor acting on their behalf for performing a joint on and off hire bunker and condition survey. Joint on hire survey to be in Owners' time unless vessel already loading and joint off hire survey to be in Charterers' time. Expenses for on/off hire survey to be shared equally between Owners and Charterers.

### Clause 44 Hold Cleaning

On arrival first load port, vessel to be grain clean and ready in every respect and in all compartments to receive Charterers' cargo to local surveyors' and/or competent authorities' satisfaction, failing which vessel to be off-hire from the time of rejection until passed again. Owners to take immediate corrective steps to expedite cleaning as fast as possible including the use of shore labour. If vessel fails inspection, all bunkers consumed after rejection and extra expenses incurred as a direct result to be for Owners' account, until vessel has been passed in all compartments again.

Charterers' option to redeliver the vessel unclean paying USD 5,000.00 in lieu of hold cleaning.

### Clause 45 Bills of Lading

The Owners undertake to instruct the Master to authorise Charterers or Charterers' Agents if required to issue and sign Bill(s) of Lading on Charterers' usual form on Owners' and Master's behalf for cargo as presented in conformity with Mate's receipts. Charterers to keep Owners harmless should Charterers' servants not issue Bills of Lading per Owners'/Master's strict authority.

Should original Bill(s) of Lading not be available prior to vessels' arrival to the discharging port(s) in time, Owners to agree to release entire cargo without production of original Bill(s) of Lading, if so requested by Charterers or their agent(s), against a fax presentation of Letter of Indemnity under Owners' P and I Club wording which to be singly signed by Charterers or signed by sub-Charterers together with Charterers' joint signature.

No .iner or through Bills of Lading or Seaway Bill may be issued/used during the currency of present Charter Party.

Charterers are not to issue or cause to be issued Bs/L which are subject to Hamburg rules.

### Clause 46 ISM Clause

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both

11

M/V "PAGANI!" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007

the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Owners shall indemnify Charterers for any and all loss, expense and/or damage and/or consequences sustained by Charterers resulting from partial or full non-compliance with this clause. Any and all delays to the vessel resulting from such partial or full non-compliance with this clause shall not count as laytime or, if laytime has expired, as time on demurrage respectively, as the case may be, as on-hire time.

### Clause 47 Deratisation Certificate

The vessel to have valid deratisation certificate and/or equivalent fumigation certificate on board at time of delivery. The validity of which is to be maintained by Owners in their time and at their expense during the currency of this Charter Party.

### Clause 48 Quarantine/Smuggling

Normal quarantine time and expenses for entering ports shall be for Charterers' account. The Owners shall be liable for any delay in quarantine arising from the Master or any of the deck or engine Officers or crew having communication with the shore at any infected area without the written consent or instructions of Charterers or their Agents, also for any loss of time through detention by customs or other authorities caused by smuggling or their infraction of local law on the part of the Master or any of the deck or engine crew. Any delay, expenses and/or fines incurred on account of smuggling, if caused by the Charterers' supercargo and/or their staff or Agents are to be for Charterers' account. Likewise, if any delay in quarantine arises as a result of Charterers' trading of the vessel and/or misinstructions or lack of proper instructions by Charterers or their Agents, servants or representatives such delay is to be for Charterers' account.

### Clause 49 Health Certificate

The Owners shall arrange at their expense that Master, Officers and crew of vessel hold valid vaccination certificates against yellow fever, smallpox, cholera or other necessary health certificates during the Charter.

### Clause 50 Vessel's Equipment

Vessel's equipment shall comply with the regulations of the countries in which vessel will be employed and Owners are to ensure that vessel is at all times in possession of valid and up-to-date certificates as required. If stevedores, longshoremen or other workmen are not permitted to work due to failure of the Master and/or the Owners and/or Owners' Agents to comply with the aforementioned regulations or because the vessel is not in possession of such valid and up-to-date certificates as required, then Charterers may suspend hire for the time thereby lost and Owners shall pay all proven extra direct expenses incurred incidental to and resulting from such failure.

### Clause 51 Safety Regulation

It is understood that the vessel will comply with all safety regulations and/or requirements in effect at ports of loading and/or discharging. It is agreed that should the vessel not meet safety rules and regulations, Owners will take corrective action and vessel is to be off-hire.



12

M/V "PAGANE" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007

### Clause 52 Canal Certificate

The vessel is fully fitted for Panama/Suez Canal transit and in possession of valid necessary certificate on board, in conformity with current canal regulations/requirements.

### Clause 53 Crew Service

During the currency of this Charter Party and provided weather and local stevedore and port regulations permit, Charterers to have the option to use crew to perform the following services as a means toward an efficient cargo operation:

a)    At each port all of the hatch opening and closing;

b)    Preparing vessel for sea;

c)    Removal and disposal of dunnage to be for Charterers' account;

d)    Gangway watchmen for the vessel to be for Owners' account.
       Compulsory cargo watchmen to be for Charterers' account;

e)    Before and upon arrival at a port, vessel's Officers/crew to shape up vessel's hatches, and gangway in order to commence loading and/or discharging without delay. Opening/closing of all hatchcovers and erecting and dismantling of shifting boards, if necessary, shall be done by Officers/crew provided shore regulations permit.

### Clause 54 War Cancellation

If war breaks out between any two or more of the following countries: United Kingdom, U.S.A., C.I.S., P.R.C., Japan, directly affecting the performance of this Charter, both Owners and Charterers shall have the option of cancelling this Charter whereupon Charterers shall redeliver vessel to Owners, if she has cargo on board after discharge thereof at destination, or, if debarred from reaching or entering it, at a near, open and safe port as directed by Charterers, or if she has no cargo on board, at a port at which she stays or if at sea at a near and safe port as directed by Charterers. In all cases, hire shall be paid until vessel's redelivery.

### Clause 55 Requisition

Should the vessel be requisitioned by any government or governmental authority due to Owners/Managers/vessel's fault, or due to vessel's flag or Ownership during the period of this Charter, she shall be off-hire during the period of such requisition and any hire or other compensation paid by any government or governmental authority in respect of such requisition shall be for Owners' account.

### Clause 56 Extra Period

Should the vessel be placed off-hire during the currency of this Charter for any reason whatsoever, the Charterers have the option of adding all or any part of such off-hire period to the original period.

### Clause 57 Cancellation Clause

If the vessel is placed off-hire more than 30 consecutive days, Charterers have the right to cancel the balance period of this Charter by giving notice to Owners without prejudice to any other right the Charterers may have under this Charter and provided vessel is free of cargo.

### Clause 58 Capture/Seizure/Arrest

Should the vessel be seized or detained or arrested or delayed by any authority during the currency of this Charter Party, the Charterers' liability for seizure or detention or arrest or delay is ceased immediately from the time of her seizure or detention or arrest or delay and all time lost by this reason shall be treated as off-hire until the time of her release unless such seizure or detention or arrest or

13

M/V "PAGANE" - RIAS-TRADING - C/P DATED 17th OCTOBER 2007

delay is occasioned by any personal act or omission or default of Charterers or their Agents. Extra expenses incurred directly from above seizure or detention or arrest or delay to be for Owners' account.

### Clause 59 Cargo Claim

Cargo Claims To Be Settled As Per NYPE Interclub Agreement 1996

### Clause 60 Small Claims Procedure Clause
Notwithstanding anything contained in the Arbitration Clause to the contrary, should neither the claims nor the counterclaims exceed USD 100,000.00 exclusive of interest on the sum claimed, costs of the arbitration and legal expenses, if any, it is hereby agreed the dispute is to be governed by the London Maritime Arbitrators' Association Small Claim Procedure, revised 1st January, 1994.

### Clause 61 Deviation/Put Back
Should the vessel put back whilst on voyage by reason of an accident or breakdown or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness or accident to the crew or any person on board the vessel or by reason of the refusal of he Master or crew to perform duties, the hire shall be suspended from the time of inefficiency, unless caused by Charterers and/or Charterers' servants until the vessel is again efficient in the same position (or in Charterers' option at a point equidistant to the vessel's next destination) and voyage resumed therefrom. All direct expenses incurred including bunkers consumption during the period of suspended hire shall be for Owners' account.

### Clause 62 Water Pollution
A.   For Bulk Carriers:

(1)   Owners warrant that throughout the currency of this Charter they will provide the vessel with the following certificates:

    (a)   Certificates issued pursuant to Section 311 (p) of the U.S. Federal Water Pollution Control Act, as amended (Title 33 U.S Code, Section 1321(p)) up to (insert the date upon which such certificate(s) is/are due to expire).

    (b)   Certificates issued pursuant to Section 1016(a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended in accordance with Part 138 of Coast Guard Regulations 33 CFR, from (indicate the earliest date upon which the Owners may be required to deliver the vessel into the Charter or, if later, the date inserted in sub-paragraph (a) above), so long as these can be obtained by the Owners from or by (identify the applicable scheme or schemes).

(2)   Notwithstanding anything whether printed or typed herein to the contrary:

    (a)   Save as required for compliance with paragraph (1) hereof, Owners shall not be required or establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this Charter.

    (b)   Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage,

14

M/V "PAGANE" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007

liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

(c) Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any Bills of Lading issued pursuant to this Charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or water, other than to the extent provided in paragraph (1) hereof.

### Clause 63 Owners' Agents

Charterers may agree to have their Agents attend to the Owners' matters such as delivery, redelivery, general average, drydocking, repair, hospitalisation, repatriation of crew, supply of the vessel's stores and provisions, etc., with Owners paying Charterers' Agents actual expenses including attendance fee and agency fee according to the Charterers' tariff rate. Charterers may also agree to have their Agents to attend to trivial Owners' matters, such as, cash advance, crew mail, arranging shore pass with Owners paying actual expenses including attendance fee, if any, but without agency fee. (See Clause 36).

### Clause 64 Taxes

Export and/or import permits for Charterers' cargo to be at Charterers' risk and expense. Taxation or levies on cargo or freight to be for Charterers' account and to be paid by Charterers.

### Clause 65 Paramount Clause

General Paramount Clause to apply

### Clause 66 Additional Clause

New Jason Clause, P and I Bunkering Clause, New Both-to-Blame Collision Clause and Baltime War Risk Clause, as attached, to be incorporated in this Charter Party and all Bill(s) of Lading issued hereunder.

### Clause 67 Drydock Clause

The Owners have no option to make her drydock during this Charter period except emergency cases, or unless otherwise agreed.

### Clause 68 - Deleted

### Clause 69 Bulk Carrier Safety Clause

(A) The Charterers shall instruct the terminal operators or their representatives to cooperate with the Master in completing the IMO Ship/Shore Safety Checklist and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

(B) In addition to the above and notwithstanding any provision in this Charter Party in respect of loading/discharging rates, the Charterers shall instruct the terminal operators to load/discharge

15



the vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the vessel's draught, trim, stability, stress or any other factor which may affect the safety of the vessel.

(C) At any time during cargo operations, the Master may, if he deems it necessary for reasons of safety of the vessel, instruct the terminal operators or their representatives to slow down or stop the loading or discharging.

(D) Compliance with the provisions of this Clause shall not affect the counting of hire.

**Clause 70 Stowaway Clause**

Any time lost including but not limited to time on demurrage and any losses, liabilities and cost incurred by reason of stowaways on board shall be for Owners' account.

**Clause 71 Ocean Route Clause**

Evidence of weather conditions to be taken from independent weather bureau reports. Owners to be represented by the findings of 'Aerospace' Ocean Routing Company. In case of dispute between Owners and Charterers' ocean routing companies, the matter to be taken into further arbitration. In any case, Master always entitled to choose vessel's routing related to vessel and crew safety.

Owners' ocean routing company full style/address as follows:

Aerospace & Marine International Corporation,
6920 Santa Teresa Boulevard, Suite 209,
San Jose, CA 95119, U.S.A.
Tel:        408-360-0440
Fax:       408-360-0450
Tlx:        149158
Email:     ops@weather3000.com
Web-port: www.amiwx.com

**Clause 72 Mobile Crane Clause**

Deleted.

**Clause 73 Split Bills of Lading Clause**

Charterers and/or Agents are hereby authorised by Owners/Master to split Bills of Lading and issue ship delivery orders in negotiable and transferable forms against collection of full set of original Bills of Lading. Delivery orders to conform with all terms and conditions and exceptions of Bills of Lading and shall not prejudice shipowners' rights.

**Clause 74 Oil Pollution**

As a condition of this Charter Party, Owners guarantee that Owners and vessel are and will remain throughout the currency of the Charter Party insured for pollution liability with respect to trading within, to and from ranges and areas specified in this Charter, said insurance to have a limit of not less than U.S.$1 billion. At any time before or subsequent to the fixture date of this Charter, Owners, upon reasonable notice from Charterers, shall furnish to Charterers or its representative proof, satisfactory to Charterers, of such insurance. Without prejudice to Charterers' other rights, Owners shall indemnify Charterers for any and all loss, expense and/or damage sustained by Charterers resulting from non-compliance with this Clause. Any and all delay to the vessel resulting from such non-

16



M/V "PAUANE" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007

compliance shall not count as laytime or, if laytime has expired, as time on demurrage.

### Clause 75
Vessel's crew contracts are bona fide employment agreement.

### Clause 76
The vessel to remain always in seaworthy trim/condition to safely sail between ports/berths to Master's satisfaction.

### Clause 77
Deleted.

### Clause 78 ISPS Clause
(a)  (i)  From the date of coming into force of the International Code for the security of ships and of port facilities and the relevant amendments to chapter XI of SOLAS (ISPS code) in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the vessel and "the company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The owners shall provide the Charterers with the full style contact details of the company security officer (CSO).

     (ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this clause shall be for the Owners' account.

(b)  (i)  The Charterers shall provide the CSO and the ship security officer (SSO)/master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-Charter Parties they enter into during the period of this Charter Party contain the following provision:

     "The Charterers shall provide the owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

     (ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this clause shall be for the Charterers' account.

(c)  Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the owners' negligence, crew's nationality/visa issues, or costs or expenses

17

M/V "PAGANE" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007

directly arising from vessel's ownership or other crewing matters.

(d) If either party makes a payment which is for the other party's account according to this clause, the other party shall indemnify the paying party.

### Clause 79

All negotiations/trade are to be made in accordance with English Law. English Law to apply. Arbitration, if any, to be in London in accordance with the Arbitration Clause of the Charter Party.

### Clause 80

Charterers have the option to perform a general condition survey of the vessel at any time. Survey to be at Charterers' time and expenses.

### Clause 81

Owners to provide following certificates as per L/C requirements (see attached):

1. Certificate issued and signed by (P and I) Club or their representative or by their agent to the effect that the carrying vessel is a member to that (p and i) club having representative or agent in Jordan.

2. Certificate issued and signed by shipping register or their agent certifying that the carrying vessel is classified 100a1 or its equivalent and free from any outstanding recommendations.

### Clause 82

Negotiations and fixture, if any, to be kept private & confidential by all parties involved.



18



M/V "PAGANE" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007

## BOTH-TO-BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

### New Both-to-Blame Collision Clause

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact"

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

### New Jason Clause

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery"

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

19

M/V "PAGANE" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007

## BALTIME 1939 WAR CLAUSE

(A)  The vessel unless the consent of the Owners be first obtained not to be ordered nor continue to any place or on any voyage nor be used on any service which will bring her within a zone which is dangerous as the result of any actual or threatened act of war, war hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or state whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of Sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any Government or Ruler.

(B)  Should the vessel approach or be brought or ordered within such zone, or be exposed in any way to the said risks, (1) the Owners to be entitled from time to time to insure their interests in the vessel and/or hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand; and (2) notwithstanding the terms of Clause 11, hire to be paid for all time lost including any loss owing to loss of or injury to the Master, Officers or crew or to the action of the crew in refusing to proceed in such zone or to be exposed to such risks.

(C)  In the event of the wages of the Master, Officers and crew or the cost of provisions and/or stores for deck and/or engine room and/or insurance premiums being increased by reason of or during the existence of any of the matters mentioned in section (A) the amount of any increase to be added to the hire and paid by the Charterers on production of the Owners' account therefore, such account being rendered monthly.

(D)  The vessel to have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other wise whatsoever given by the Government of the nation under whose flag the vessel sails or any other Government or any person (or body) acting or purporting to act with the authority of such Government or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such orders or directions.

(E)  In the event of the nation under whose flag the vessel sails becoming involved in war, hostilities, warlike operations, revolution or civil commotion, both the Owners and the Charterers may cancel the Charter and, unless otherwise agreed, the vessel to be redelivered to the Owners at the port of destination or, if prevented through the provisions of Section (A) from reaching or entering it, then at a near open and safe port at the Owners' option, after discharge of any cargo on board.

(F)  If in compliance with the provisions of this clause anything is done or is not done, such not to be deemed a deviation.

Section (C) is optional and should be considered deleted unless agreed according to Baltime 1939.

20

<u>M/V "PAGANE" - RIAS-TRADING - C/P DATED 17th OCTOBER 2007</u>

### F. AND L BUNKER CLAUSE

The vessel shall have liberty as part of the Contract Voyage to proceed to any port or ports at which bunker oil is available for the purpose of bunkering at any stage of the voyage whatsoever and whether such ports are on or off the direct and/or customary route or routes between any of the ports of loading or discharge named in this Charter and may there take oil bunkers in any quantity in the discretion of Owners even to the full capacity of fuel tanks and deep tanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.

### BIMCO STANDARD ISM CLAUSE

From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and 'the Company' (as defined by the ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by the failure on the part of the Owners or 'the Company' to comply with the ISM Code shall be for Owners' account.

### SECA CLAUSE

During the currency of this contract the performing vessel will consume bunkers in accordance with ISO 8217 specifications. In the event that emissions regulations, laws or guidelines require or recommend the stemming or consumption of bunkers with a quality that has a higher value than the price for high sulphur fuel oil, then such excess price will be paid for by Charterers for bunkers consumed whilst in an emission controlled area. Upon request Owners to provide documentary proof for such price differential together with the actual bunker consumption in these emission controlled areas.

### BUNKER FUEL SULPHUR CONTENT CLAUSE FOR
### TIME CHARTER PARTIES 2005

(A) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the vessel is ordered to trade within that zone. The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with regulations 14 and 18 of Marpol Annex VI, including the guidelines in respect of sampling and the provision of bunker delivery notes.

21

<u>M/V "PAGANE" – RIAS-TRADING - C/P DATED 17th OCTOBER 2007</u>

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this sub-Clause (A).

(B)   Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with sub-Clause (A), the Owners warrant that:

(i)   The vessel shall comply with regulations 14 and 18 of Marpol Annex VI and with the requirements of any emission control zone; and

(ii)   The vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the vessel with fuels in accordance with sub-Clause (A), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the vessel's failure to comply with regulations 14 and 18 of Marpol Annex VI.

(C)   For the purpose of this Clause, 'emission control zone' shall mean zones as stipulated in Marpol Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the E.U. and the U.S. Environmental Protection Agency.




EXHIBIT 5

PAYÉ *22.10.07*

# GLINGROW HOLDING LTD.

15, BOUMPOULINAS, POVEK BUILDING, APT.NO: 301, NICOSIA, CYPRUS

To:  **RIAS TRADING S.A.**

Rue du Grand-Chene 6,

Lausanne 1003, CP no.7267 1002 Switzerland

22, October 2007        **ORIGINAL INVOICE  no.1019/H**

Dear Sirs,

We hereby invoice you as below:

| Charter Party dated | 17.10.2007 |
|---|---|
| Disponent Shipowners | GLINGROW HOLDING LTD., Nicosia, Cyprus |
| Charterers | RIAS TRADING S.A., Lausanne, Switzerland |
| Vessel | PAGANE |
| Time-Charter trip | from Kertch via Novorossiysk to Aqaba |
| Hire time | 18.10.2007 01:00 – 02.11.2007 01:00 |
| Amount for payment, USA $ | 1 061 013.00 |

Total for payment:

*Only **One Million Sixty One Thousand Thirteen, 00/100 USA Dollars***

Please kindly remit **USA $ 1 061 013.00** on our behalf to following bank account:

| Beneficiary bank | BNP Paribas (Suisse) S.A.<br>Place de Hollande, 2<br>Case Postale 1211<br>Geneva 1, Switzerland |
|---|---|
| Beneficiary bank SWIFT code | BPPBCHGG |
| Beneficiary name | Bulcom Ltd. |
| Beneficiary address | KANIKA COMPLEX<br>LIDO HOUSE 1<br>5TH FLOOR, SUITE 564<br>P.O.BOX 58021<br>CY-3730 LIMASSOL, CYPRUS |
| USD account number | 72673/2G |
| Beneficiary IBAN no. | CH69 0868 6001 0726 7300 2 |
| Payment details | m/v "PAGANE"/GLINGROW – 1-st hire |

In accordance with the Charter Party terms transfer to be executed within one banking day after receipt of this invoice.

All bank charges to be for the invoiced party.

Sincerely yours,
Glingrow Holding Ltd.

| Doc. nr *1293* | | Date *22.10.07* |
|---|---|---|
| Text | | |
| **DEBIT** | | **CREDIT** |
| ACCOUNT | AMOUNT | ACCOUNT |
| *4270* | | *2001/7* |
| | | *1.16640* |

COMPTABILISE

PAYÉ *07 11 07 BNP*

# GLINGROW HOLDING LTD.

15, BOUMPOULINAS, POVEK BUILDING, APT.NO: 301, NICOSIA, CYPRUS

To: **RIAS TRADING S.A.**

Rue du Grand-Chene 6,

Lausanne 1003, CP no.7267 1002 Switzerland

07, November 2007

## ORIGINAL INVOICE no.1022/H

Dear Sirs,

We hereby invoice you as below:

| Charter Party dated | 17.10.2007 |
|---|---|
| Disponent Shipowners | GLINGROW HOLDING LTD., Nicosia, Cyprus |
| Charterers | RIAS TRADING S.A., Lausanne, Switzerland |
| Vessel | PAGANE |
| Time-Charter trip | from Kertch via Novorossiysk to Aqaba |
| Amount for payment, USA $ | 440 968.18 |

Total for payment:

**\*Only Fore Hundred Forty Thousand Nine Hundred Sixty Eight, 18/100 USA Dollars\***

Please kindly remit **USA $ 440 968.18** on our behalf to following bank account:

| Beneficiary bank | BNP Paribas (Suisse) S.A. Place de Hollande, 2 Case Postale 1211 Geneva 1, Switzerland |
|---|---|
| Beneficiary bank SWIFT code | BPPBCHGG |
| Beneficiary name | Bulcom Ltd. |
| Beneficiary address | KANIKA COMPLEX LIDO HOUSE 1 5TH FLOOR, SUITE 564 P.O.BOX 58021 CY-3730 LIMASSOL, CYPRUS |
| USD account number | 72673/2G |
| Beneficiary IBAN no. | CH69 0868 6001 0726 7300 2 |
| Payment details | m/v "PAGANE"/GLINGROW – 2-nd hire |

In accordance with the Charter Party terms transfer to be executed within one banking day after receipt of this invoice.

All bank charges to be for the invoiced party.

Sincerely yours,
Glingrow Holding Ltd.

COMPTABILISE

PAYÉ *payé 22.11.07*

COMPTABILISE *61642*

# GLINGROW HOLDING LTD.

15, BOUMPOULINAS, POVER BUILDING, APT.NO: 301, NICOSIA, CYPRUS

To:   **RIAS TRADING S.A.**

Rue du Grand-Chene 6,

Lausanne 1003, CP no.7267 1002 Switzerland

21, November 2007

## ORIGINAL INVOICE  no.1023/H

Dear Sirs,

We hereby invoice you as below:

| Charter Party dated | 17.10.2007 |
|---|---|
| Disponent Shipowners | GLINGROW HOLDING LTD., Nicosia, Cyprus |
| Charterers | RIAS TRADING S.A., Lausanne, Switzerland |
| Vessel | PAGANE |
| Time-Charter trip | from Kertch via Novorossiysk to Aqaba |
| Amount for payment, USA $ | 25 194.04 |

Total for payment:

**\*Only Twenty Five Thousand One Hundred Ninety Four, 04/100 USA Dollars\***

Please kindly remit **USA $ 25 194.04** on our behalf to following bank account:

| Beneficiary bank | BNP Paribas (Suisse) S.A. Place de Hollande, 2 Case Postale 1211 Geneva 1, Switzerland |
|---|---|
| Beneficiary bank SWIFT code | BPPBCHGG |
| Beneficiary name | Bulcom Ltd. |
| Beneficiary address | KANIKA COMPLEX LIDO HOUSE 1 5TH FLOOR, SUITE 564 P.O.BOX 58021 CY-3730 LIMASSOL, CYPRUS |
| USD account number | 72673/2G |
| Beneficiary IBAN no. | CH69 0868 6001 0726 7300 2 |
| Payment details | m/v "PAGANE"/GLINGROW – 3-rd hire |

In accordance with the Charter Party terms transfer to be executed within one banking day after receipt of this invoice.

All bank charges to be for the invoiced party.

Sincerely yours,
Glingrow Holding Ltd.