Wendy H. Schwartz (WS-1862)
**REED SMITH LLP**
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax (212) 521-5450
Attorneys for Defendants
Glingrow Holding Ltd. and Rias Trading.


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
|  | : |  |
| PAGANE MARITIME LTD. | : | <u>ECF Case</u> |
|  | : |  |
| Plaintiff, | : | 07 Civ. 10726 (PKL) |
|  | : |  |
| v. | : |  |
|  | : |  |
| GLINGROW HOLDING LTD. and | : |  |
| RIAS TRADING, | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |
------------------------------------------------------------x

## <u>REPLY DECLARATION OF WENDY H. SCHWARTZ</u>

I, Wendy H. Schwartz, hereby declare under penalty of perjury, pursuant to 28 U.S.C. §
1746, that the following is true and correct:

1.      I am a member of Reed Smith LLP, counsel for Rias Trading ("Rias").

2.      I submit this reply declaration in support of the motion by Rias to dismiss the
Amended Complaint as against Rias, and for reconsideration of the Order and Opinion by Judge
Charles S. Haight, Jr. sitting in Part I, dated January 30, 2008 which denied Rias' motion
pursuant to Rule E(2)(a) of the Supplemental Rules for Admiralty or Maritime Claims, Federal

Rules of Civil Procedure for vacatur of the attachment of the assets of Rias and which declined

to consider Rias motion to dismiss pursuant to Fed. R. Civ. P. Rules 12(b)(1) and 12(b)(6).

3.      Attached hereto as Exhibit 1 is a true and correct copy of *Sheer v. Israel Discount*

*Bank of New York*, No. 06 Civ. 4995 (PAC), 2007 WL 700822 (S.D.N.Y. Mar. 7, 2007).

4.      Attached hereto as Exhibit 2 is a true and correct copy of *OGI Oceangate*

*Transportation Co., Ltd. v. RP Logistics PVT. Ltd.*, No. 06 Civ. 9441 (RWS), 2007 U.S. Dist.

LEXIS 46841) (S.D.N.Y. Jun. 26, 2007).

5.      Attached hereto as Exhibit 3 is a true and correct copy of *Essar Int'l. Ltd. v.*

*Martrade Gulf Logistics, FZCO*, No. 07 Civ. 3439 (WHP) 2007 U.S. Dist. LEXIS 61713

(S.D.N.Y. Aug. 23, 2007).

6.      Attached hereto as Exhibit 4 is a true and correct copy of *Brave Bulk Transport*

*Ltd. v. Spot On Shipping, Ltd.*, No. 07 Civ. 4546(CM), 2007 WL 3255823 (S.D.N.Y. Oct. 30,

2007).

Dated: New York, New York
       March 27, 2008

                                          _____/s/  Wendy H. Schwartz_____
                                                        Wendy H. Schwartz

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2007 WL 700822 (S.D.N.Y.), 41 Employee Benefits Cas. 1652
**(Cite as: Not Reported in F.Supp.2d)**

Sheer v. Israel Discount Bank of New York
S.D.N.Y.,2007.

United States District Court,S.D. New York.
Arie SHEER, Plaintiff,
v.
ISRAEL DISCOUNT BANK OF NEW YORK
Defendant.
**No. 06 Civ. 4995(PAC).**

March 7, 2007.

*OPINION AND ORDER*

CROTTY, J.
**\*1** This action for breach of an employment contract and violations of New York State and New York City anti-discrimination laws was filed in State court on May 31, 2006. Defendant timely removed to this Court on June 28, 2006 on the theory that the employment contract severance provisions fell within the pre-emptive powers of ERISA, 29 U.S.C. § 1132, et seq. On August 18, 2006, Plaintiff filed a motion to remand the matter to state court. For the reasons below, the Court grants the motion.

FACTS

Plaintiff Arie Sheer ("Sheer") was hired by Defendant Israel Discount of New York ("Bank") in 1996 to serve as its President and CEO, pursuant to an employment contract. The contract provided a severance package for Sheer of one year's base salary ($480,000) payable in a lump-sum. Additionally, Sheer received a supplemental benefit under the "Supplemental Executive Retirement Plan" ("SERP") if a "change in control" were to occur.

Sheer was terminated in the spring of 2006. He alleges that he was fired "without cause" and therefore, under the contract, he is owed one year's base salary. Sheer further alleges that the Bank changed control prior to his termination so he is also owed the lump-sum payment under that provision of the SERP. The Bank denies that Sheer is entitled to

any relief. The Bank removed the State court action on the ground that Sheer's claim is "dependent upon and constitutes a claim for severance benefits pursuant to plans established and maintained by [the Bank] and in accordance with ... ERISA."Sheer contends that there is no federal question jurisdiction because neither the SERP nor the contract constitute a "plan" under ERISA. In the alternative, the Bank should be equitably estopped from invoking ERISA.[FN1]

> FN1. It is undisputed that there is no diversity jurisdiction.

APPLICABLE LAW

A defendant may remove "[a]ny civil action of which the district courts have original jurisdiction founded on a claim or right arising under the constitution, treaties or laws of the United States...."28 U.S.C. § 1441(a). On a motion to remand, "the defendant bears the burden of demonstrating the propriety of the removal."*Cal. Pub. Employee's Ret. Sys. v. WorldCom, Inc.,* 368 F.3d 86, 100 (2d Cir.2004) (quoting *Grimo v. Blue Cross/Blue Shield of Vt.,* 34 F.3d 148, 151 (2d Cir.1994)).

Typically, the basis for federal jurisdiction must be alleged in the complaint itself; however, an exception to this well-pleaded complaint rule is the "complete preemption" exception under which "Congress may so completely pre-empt a particular area that any civil complaint raising this select group of claims is necessarily federal in nature."*Metro. Life Ins. Co. v. Taylor,* 481 U.S. 58, 63-64 (1987). ERISA completely pre-empts any state law cause of action which falls within its civil enforcement provisions. *See id.*

Pursuant to ERISA, federal jurisdiction lies where a recipient of an "employee welfare benefit plan" seeks to "recover benefits due to him under the terms of his plan."29 U.S.C. § § 1002(1), 1132(a)(1)(B) & (e)(1). Whether a particular program is a "plan" under ERISA depends in part upon whether that program "requires an ongoing administrative program to meet the employer's obligation."*Kaskow v. New Rochelle Radiology,* 274 F.3d 706, 736 (2d Cir.2001) (quoting

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 700822 (S.D.N.Y.), 41 Employee Benefits Cas. 1652
(Cite as: Not Reported in F.Supp.2d)

*Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1 (1987))*. Most, but not all, employer undertakings or obligations to pay severance benefits are "plans" under ERISA. *Schonholz v. Long Island Jewish Med. Ctr.,* 87 F.3d 72, 75 (2d Cir.1996). The Second Circuit has held that a "plan" may exist **\*2** (1) where an employer's undertaking required managerial discretion, that is, where the undertaking could not be fulfilled without ongoing, particularized, administrative analysis of each case; (2) where a reasonable employee would perceive an ongoing commitment by the employer to provide some employee benefits; (3) where the employer was required to analyze the circumstances of each employee's termination separately in light of certain criteria.

*Kaskow,* 274 F.3d at 737 (quoting *Schonholz,* 87 F.3d at 76) (internal citations and quotes omitted). The court has not decided "which one or more of these factors will be determinative in every case," nor did it "preclude the possibility that other factors might be relevant in different factual settings."*Tischmann v. ITT/Sheraton Corp.,* 145 F.3d 561, 566 (2d Cir.1998). Contract provisions that call for a simple, "one-time, lump-sum payment triggered by a single event," are not "plans" under ERISA because they require "no administrative scheme" to meet the employer's obligation. *Fort Halifax,* 482 U.S. at 12.

In *Schonholz,* the court held that an employer had created a "plan" under ERISA because of its promise to pay severance benefits to discharged senior employees in amounts based upon each employee's length of employment and prospects for reemployment. 87 F.3d at 76-77. In *Tischmann,* the court found a "plan" where the [plan] clearly contemplates application of significant managerial discretion, and case-by-case analysis of each termination, by [the employer].... [The employer] is required under the plan to examine the circumstances of each covered employee's termination and to determine whether it was 'for cause'; if so, the employee is ineligible for benefits." 145 F.3d. at 567. In *James v. Fleet/Norstar Fin. Group, Inc.,* the court held that an employer's undertaking to give employees 60 days of pay following the last day of work, if employees would remain on the job until internal consolidation was completed, did not create a "plan" within meaning of ERISA. 992 F.2d 463 (2d Cir.1993). "Simple arithmetical calculations," do not amount to an "ongoing, particularized, administrative, discretionary analysis." *Id.* at 468.

## DISCUSSION

In applying the three *Schonholz* factors here, the Court concludes that neither the employment contract nor the SERP constitute "plans" under ERISA.

First, the Bank's undertaking did not require ongoing managerial discretion. There is no discretion as to the amount of the severance benefits. Although the amounts may be different for all three executives because their base salaries may be different, nothing more than simple arithmetic calculations are needed to ascertain those amount. In short, "there does not appear to be anything discretionary about the timing, form, or amount of payments."*Fludgate v. Mngt. Tech., Inc.,* 885 F.Supp. 645, 649 (S.D.N.Y.1995).

Second, a reasonable employee of the Bank would not conclude that the Bank was making an "ongoing commitment" to employees to provide benefits. There are no ongoing responsibilities on the part of the Bank or the employees pursuant to either agreement once the employee receives her severance payment and leaves the company. This case is unlike *Tischmann* which had a lump-sum payment and a "for cause" determination of the circumstances of the termination, as here; but the *Tischmann* employee had to "to be available" to render services to the company under "reasonable circumstances." 145 F.3d at 567. Furthermore, benefits could be terminated if the employee violated one of the other enumerated provisions of the agreement. *Id.* These continuing obligations do not exist here.

**\*3** Nor does *Schonholz* dictate a different conclusion. The court found an ERISA plan there because, *interalia,* the agreement required the employee to make reasonable attempts to find other employment, otherwise the payments would cease. *Schonholz,* 87 F.3d at 76-77. Again, no such commitment exists here. Finally, the Bank reserved the right to amend or terminate the severance plans at its discretion, without advance notice (*See* Maher Decl. Ex. B ¶ VIII.) In such circumstances, it is less likely that a reasonable employee would perceive an ongoing commitment by the employer. *See*Tischmann, 145 F.3d at 566 ("This provision [which empowers the employer to terminate or amend the plan] weighs against the conclusion, under the second *Schonholz* factor, that a reasonable employee would perceive the plan as an "ongoing commitment.").

Third, although there is some amount of managerial

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 3
Not Reported in F.Supp.2d, 2007 WL 700822 (S.D.N.Y.), 41 Employee Benefits Cas. 1652
**(Cite as: Not Reported in F.Supp.2d)**

discretion here, it is not the type of discretion ERISA covers. The contract and the SERP cover employees who are involuntarily terminated without "cause." The Bank argues that the determination of the "for cause" issue requires a finding that this is a "plan" under ERISA similar to holdings in *Tischmann* and *Schonholz.* The facts of this case, however, are more akin to *Taverna v. Credit Suisse First Boston,* 02 cv 5240, 2003 U.S. Dist. Lexis 1607 (S.D.N .Y. Feb. 4, 2003). In *Taverna,* the "separation agreement" provided for a lump-sum payment equivalent to one month's salary for each year worked provided that the employee performed her job responsibilities in a "satisfactory manner." *Id.* at *9. The Court held that the requirement that employees perform their jobs in a "satisfactory manner" entails only a "minimal quantum of discretion" and "does not require the exercise of discretion of the type contemplated by ERISA." *Id.*

Here, too, the contract and SERP provide for lump-sum payments. And although the agreements require the employer to make a determination of whether the discharge is "for cause," it is not the type of managerial discretion contemplated by ERISA. Specifically, the employment contract defines "cause" to include six triggering events: (a) conviction of a felony or a crime of "moral turpitude," and other crimes the Board believes could harm the reputation of the company, (b) regulatory barring of the Executive to continue holding his position, (c) willful refusal to attempt to perform duties under the Agreement, (d) gross negligence or willful misconduct with regard to the business, (e) willful breach of a fiduciary duty owed to the bank, and (f) any other breach of the employment contract. (*See* Maher Decl Ex. A ¶ 7(a)(iii).) The SERP defines "cause" to be (a) misappropriation of company funds or property, (b) felony conviction for fraud, embezzlement, larceny or dishonesty, and (c) regulatory barring. (*See* Maher Decl. Ex. B ¶ II(C).) This type of discretion is not open-ended, but rather requires the employer to analyze only a fixed set of criteria.

**\*4** Finally, it should be noted, as the *Taverna* court noted, that it appears there were "none of the usual earmarks of an ERISA plan" here.
[T]here were no "plan documents," but only the letter setting forth the Separation Agreement; there was no indication of a "plan administrator"; there were no plan "fiduciaries"; there was no provision for seeking administrative review; there were no employee contributions; there were no procedures for submitting "claims"; and there were no monies set

aside or held in trust.

*Taverna,* 2003 U.S. Dist. LEXIS at *10.

The employment contract makes no reference whatsoever to ERISA, nor to a plan or regulatory scheme of any kind, nor a defined group of plan participants. *See Fludgate, 885 F.Supp. at 649.* The choice of law provision strictly calls for the application of New York law, without reference to ERISA or any federal law. (*See* Maher Decl Ex. A ¶ 16.) The Bank has simply not properly alleged an ongoing administrative scheme that would be necessary to effectuate this agreement. First and foremost, we are dealing with a dispute under an employment contract: "It was not the intent of ERISA to protect employment agreements of the type in dispute." *Id.*

Although the SERP makes reference to a plan administrator and a claims process, the Bank has not pointed to any other facts which would support any compliance with ERISA requirements. ERISA is mentioned in only two sentences in the entire SERP. (*See* Maher Decl. Ex. B ¶ VII(D).) The Bank relies only on the rather cramped language of the SERP which provides that "[t]his Plan is intended to qualify as an 'unfunded plan for management or other highly compensated individuals' under ERISA." (Cassirer Decl. Ex. A ¶ (5 .1).) This assertion, however, does not transform an employment benefit into an ERISA "plan." Furthermore, this provision is found in an old version of the SERP, dated January 1, 2000. The version in effect at the time of Sheer's termination seems to be the July 30, 2004 SERP, which does not include language explicitly indicating that the plan was intended to qualify as an ERISA plan. (*See* Maher Decl. Ex. B.) After examining both agreements, the Court concludes that Defendant Bank has not met its burden of demonstrating federal jurisdiction and the propriety of removal in this instance.

CONCLUSION

The employment contract at issue here, together with its various termination benefits, does not fall within the purview of ERISA. Consequently, this Court lacks subject matter jurisdiction.[FN2] Accordingly, Plaintiff's motion to remand is GRANTED and the case is ORDERED to be remanded to the Supreme Court of New York, pursuant to 28 U.S.C. § 1447(c).

Not Reported in F.Supp.2d                                                                        Page 4
Not Reported in F.Supp.2d, 2007 WL 700822 (S.D.N.Y.), 41 Employee Benefits Cas. 1652
**(Cite as: Not Reported in F.Supp.2d)**

The Clerk of Court is directed to close out this case.

> FN2. Having remanded the case for lack of subject matter jurisdiction, the Court declines to reach the merits of Plaintiff's equitable estoppel argument.

SO ORDERED

S.D.N.Y.,2007.
Sheer v. Israel Discount Bank of New York
Not Reported in F.Supp.2d, 2007 WL 700822
(S.D.N.Y.), 41 Employee Benefits Cas. 1652

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2007 U.S. DIST. LEXIS 46841

**OGI OCEANGATE TRANSPORTATION CO. LTD., Plaintiff, -against- RP LOGISTICS PVT. LTD. and R. PIYARELALL INTERNATIONAL PVT. LTD., Defendants.**

**06 Civ. 9441 (RWS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 46841*

**June 21, 2007, Decided**
**June 26, 2007, Filed**

**SUBSEQUENT HISTORY:** Reconsideration denied by, Stay denied by *Ogi Oceangate Transp. Co. v. RP Logistics Pvt. Ltd., 2007 U.S. Dist. LEXIS 74180 (S.D.N.Y., Oct. 4, 2007)*

**COUNSEL:** [*1] For Plaintiff: LENNON, MURPHY & LENNON, LLC, New York, NY, By: Nancy Rebecca Peterson, Esq.

For Defendants: CHALOS, O'CONNOR & DUFFY, LLP, Port Washington, NY, By: Owen Francis Duffy, III, Esq.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINION BY:** ROBERT W. SWEET

**OPINION**

**Sweet, D.J.**

Defendants RP Logistics Pvt. Ltd. ("RPL") and R. Piyarelall International Pvt. Ltd. ("RPI") (collectively "the Defendants") have moved under Supplemental Rule E(4)(f), Fed. R. Civ. P., to vacate the process of maritime attachment and garnishment issued in this matter on October 17, 2006, upon motion by the plaintiff OGI Oceangate Transportation Co. Ltd. ("OGI" or the "Plaintiff") and, in the alternative, for an order pursuant to Supplemental Rule E(7)(a), Fed. R. Civ. P., for security. This dispute between foreign corporations OGI,

the ship owner doing business in Bejing, the Peoples Republic of China, and RPL (the charterer) and RPI, both doing business in Kolkata (Calcutta), India, has so far engaged courts in China and India relating to a charter party which has a provision for mandatory Hong Kong arbitration. For the reasons set forth below, the motion to vacate the attachment is granted.

*Prior Proceedings and the Verified Complaint*

This action [*2] was commenced on October 17, 2006, by the filing of a verified complaint by OGI which alleged that OGI is a foreign company, that RPL and RPI are Indian companies, and that RPL chartered the M/V IKAL, owned by OGI, by charter party dated June 21, 2006. (Compl. PP 2-6.) The parties disputed certain freight and demurrage charges. The dispute was resolved by an agreement which included the consignee China Metals and required the payment of $ 45,000, which was paid by RPI. (*Id.* PP 7-9.) A subsequent dispute. allegedly arose concerning demurrage accrued at the discharge port. (*Id.* P 10.)

In September 2006, according to OGI, RPL wrongfully arrested the M/V UTHAI in India. (*Id.* PP 11-14.)

Pursuant to the charter party, all disputes are to be submitted to arbitration in Hong Kong and OGI is preparing to initiate such an arbitration. (*Id.* PP 15-16.) According to OGI, it expects to recover $ 1,441,464.21 in the arbitration, including over $ 930,000 in damages from the alleged wrongful arrest of the M/V UTHAI in India. (

*Id.* P 17.)

According to OGI, RPL is a shell corporation through which RPI conducts its business without separate identity and is the alter ego of RPI, which pays RFL obligations. **[\*3]** (*Id.* PP 18-24.) OGI further asserts that RPL is one of several companies operated as an entity known as the R. Piyarelall Group (*id.* PP 25-26), which is controlled by the Agarwal Family (*id.* P 27). The organization hierarchy, representatives, offices, and control of the R. Piyarelall Group, as described, result in the allegation that RPI is a party to the charter party between OGI and RPL (*id.* PP 28-35) or, alternatively, a partner, joint venturer, or affiliate (*id.* PP 36-37). The Complaint requests an order of attachment and garnishment on funds held in eleven enumerated banks. (*Id.* P 38.)

On October 17, 2006, an ex parte order of attachment was filed. An Electronic Fund Transfer ("EFT") in the amount of $ 430,898.44, a freight payment made by RPI as a shipper of cargo, was restrained. (Duffy Aff., Nov. 21, 2006 (the "Duffy Aff."), PP 86-87.)

The instant motion to vacate the attachment was heard on December 7, 2006.

### The Facts

Counsel for the parties have submitted affidavits and exhibits setting forth the following facts.

RPI, incorporated in India on November 10, 1988, is an exporter of agro-products, industrial and mineral products, and one of its directors is also a director of RPL. **[\*4]** (*Id.* PP 17, 19, 21.) RPL was incorporated on September 9, 2003, and provides logistical and transportation support to shippers (*id.* PP 10, 12), files its tax returns on an independent basis, and maintains its own bank accounts (*id.* PP 14-15). According to OGI, RPL and RPI have the same address, phone number, overlapping directors, and are dominated by the R. Piyarelall Group. (Peterson Aff., Dec. 4, 2006 (the "Peterson Aff."), PP 58-69.)

In June 2006, RPI entered into an agreement with China National Mineral Co. Ltd. ("China National") to sell 11,000 metric tons of iron ore fines to China National to be shipped from India and delivered to China with the express understanding that, upon completion of the initial shipment, China National would purchase two further

cargos of 20,000 metric tons each. (Duffy Aff. PP 25-26.)

RPI retained RPL on June 21, 2006, to arrange as a disponent owner, on behalf of RPI, as sub charterer/shippers, for the carriage of the iron ore cargo from India to China on board the M/V IKAL. (*Id.* P 27.) Pursuant to a "Fixture Note" and a "Charter Party" agreement dated June 21, 2006, RPL chartered the vessel, M/V IKAL, from OGI pursuant to which the M/V IKAL was to **[\*5]** carry the cargo of iron ore from India to China in exchange for the payment of freight. (*Id.* P 28.)

According to OGI, RPL presented or forged authorization on an unauthorized bill of lading. (Peterson Aff. PP 16-21.)

The M/V IKAL loaded a portion of the cargo on June 24 and 25, 2006, but was delayed by a "stability problem" and was unable to load all 11,000 tons. (Duffy Aff. PP 35-39.) The M/V IKAL sailed on July 4, 2006, for China. (*Id.* P 42.) On arrival at the discharge port of Fang Chang, OGI disputed demurrage calculations and refused to berth the vessel. (*Id.* PP 46-48.) On July 22, 2006, RPI, OGI, and China National agreed that the payment of $ 45,000 would resolve OGI's claims. (*Id.* P 50.) Although the payment was made, the cargo was not delivered. (*Id.* PP 53-55.) China National commenced an action in China resulting in a court order to release the cargo (*id.* P 57), and China National cancelled the contracts for future deliveries (*id.* P 60).

On October 13, 2006, RPL and RPI commenced proceedings in the High Court of Kolkata to arrest the M/V UTHAI NAVEE as security for their claim against OGI and the vessel was arrested. (*Id.* PP 63-66.) The M/V UTHAI NAVEE had been chartered by **[\*6]** OGI, and its owner succeeded in lifting the arrest early in November 2006. (Peterson Aff. PP 42, 47.)

### Discussion

### 1. The Burden of Proof for Vacating a Maritime Attachment

To begin the process by which a party may attach another party's assets, a plaintiff must file a verified complaint seeking attachment and an affidavit stating that, to the best of the plaintiff's knowledge, the defendant cannot be found within the judicial district. Fed. R. Civ. P. *Supp. Rule B(1)*. Thereafter, Rule E(4)(f), Fed. R. Civ. P. *Supp. Rule E*, provides that any person

2007 U.S. Dist. LEXIS 46841, *6

claiming an interest in the attached property is "entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules." *Id. Supp. Rule E(4)(f)*.

Under *Aqua Stoli Shipping, Ltd. v. Gardner Smith Pty, Ltd., 460 F.3d 434 (2d Cir.2006)*, in a Rule E(4)(f) inquiry challenging a Rule B attachment, a plaintiff has the burden to show not only that it has met the filing and service requirements of *Rules B* and *E*, but also that: (1) it has a prima facie admiralty claim; (2) the named defendants cannot be found within the district; (3) the attached **[*7]** defendant's property was within the district; and (4) there is no statutory or maritime law bar to the attachment. *Aqua Stoli, 460 F.3d at 445*. At the Rule E(4)(f) hearing, the defendant can attack "the complaint, the arrest, the security demanded, or any other alleged deficiency in the proceedings." Fed. R. Civ. P. *Supp. Rule E(4)(f)*, advisory committee's note.

If the plaintiff meets its burden, the defendant may show that vacatur of the attachment would still be appropriate under certain limited circumstances, including when: "(1) the defendant is subject to suit in a convenient adjacent jurisdiction; (2) the plaintiff could obtain *in personam* jurisdiction over the defendant in the district where the plaintiff is located; or (3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise." *Aqua Stoli, 460 F.3d at 445*.

**2. The Motion to Vacate the Attachment Is Granted**

The Defendants have not contested that they cannot be found within the district or that the attached property of the defendant RPI was within the district. Nor have the Defendants asserted that there is a statutory or maritime law bar to the attachment. Rather, the issues **[*8]** presented here are whether OGI has shown that it has a valid prima facie admiralty claim against RPI and, if so, whether the Defendants have shown that the attachment warrants vacatur on other grounds.

**A. Prima Facie Admiralty Claims**

**i. The Standard**

To sustain the attachment, OGI must demonstrate that it has "an *in personam* claim against the defendant which is cognizable in admiralty. . . . In other words, the plaintiff's claim must be one which will support a finding of admiralty jurisdiction under *28 U.S.C. § 1333*." *Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263, 268 (2d Cir. 2002)* (quoting Robert M. Jarvis, *An Introduction to Maritime Attachment Practice Under Rule B*, 20 Journal of Maritime Law and Commerce, No 4 (October 1989) at 526 & n. 20).

Of the courts in this district that have considered the issue, the majority have interpreted *Aqua Stoli* to require the application of the prima facie standard when considering the adequacy of the claim asserted in the context of a maritime attachment. *Compare SPL Shipping, Ltd. v. Gujarat Cheminex. Ltd., No. 06-CV-15375 (KMK), 2007 U.S. Dist. LEXIS 18562, 2007 WL 31810, at *3 (S.D.N.Y. Mar. 15, 2007)*; *Fesco Ocean Mgmt. v. High Seas Shipping, Ltd., No. 06 Civ. 1055 NRB, 2007 U.S. Dist. LEXIS 19970, 2007 WL 76615, at *2 (S.D.N.Y. Mar. 12, 2007)*; **[*9]** *Secil Martima U.E.E. v. Malev Shipping, et al.,* No. 06 Civ. 6345 (S.D.N.Y. Oct. 10, 2006) (transcript of Rule E(4) (f) hearing denying vacatur motion); *Route Holding Inc. v. Int'l Oil Overseas, Inc.,* No. 06 Civ. 3428 (S.D.N.Y. Sept. 29, 2006) (order denying vacatur of maritime attachment); *Tide Line, Inc. v. Eastrade Commodities, Inc., No. 06 Civ. 1979, 2006 U.S. Dist. LEXIS 95870 (S.D.N.Y. Aug. 15, 2006)* (order vacating attachment), *with Wajilam Exps. (Singapore) Pte. Ltd. v. ATL Shipping Ltd., 475 F. Supp. 2d 275, 2006 U.S. Dist. LEXIS 77033 (S.D.N.Y. Oct. 23, 2006)* (holding that the applicable standard for establishing the *Aqua Stoli* factors is "reasonable grounds" for an attachment). The relevant inquiry is therefore whether OGI has pled a prima facie admiralty claim against RPI. *See Fesco Ocean Mgmt. Ltd., 2007 U.S. Dist. LEXIS 19970, 2007 WL 766115, at *2* ("courts should simply consider whether a plaintiff seeking to maintain a maritime attachment has pled a prima facie case justifying that attachment under Rule B").

Suits in admiralty are subject to *Supplemental Rule E(2)(a)*, which provides that:

> In actions to which this rule is applicable the complaint shall state the circumstances from which the claim **[*10]** arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a

Case 1:07-cv-10726-PKL    Document 29-3    Filed 03/27/2008    Page 4 of 6

Page 4
2007 U.S. Dist. LEXIS 46841, *10

responsive pleading.

Fed. R. Civ. P. *Supp. Rule E(2)(a)*. "This heightened pleading standard is not some pettifogging technicality meant to trap the unwary, but, rather, a legal rule designed to counterbalance the unique and drastic remedies that are available in *in rem* admiralty proceedings." *P.R. Ports Auth. v. Barge KATY-B, 427 F.3d 93, 105 (1st Cir. 2005)* (noting that "[o]rdinary notice pleading does not satisfy the stringencies of [the supplemental] rules").

Here, the Complaint has alleged damages arising out of the RPL breach of the charter party and the unlawful arrest of the M/V UTHAI NAVEE in Kolkata. (Compl. P 14.) Although the Complaint has alleged the liability of RPI as the alter ego, partner, joint venturer, or affiliate of RPL (*id.* PP 35-37), OGI has asserted that it has also alleged "a proper direct maritime claim for wrongful arrest damages against both RPL and RPI." (Pl.'s Mem. in Opp'n 2.) Because none of these allegations establish a valid prima facie admiralty claim against RPI, OGI cannot [*11] meet its burden to sustain the attachment. Even if it could, however, there are other grounds sufficient to support vacating the attachment.

### ii. Breach of the Charter Party

In the Complaint, OGI has asserted that a dispute arose during the course of the charter regarding RPL's failure to pay dead freight and demurrage, but that the dispute was resolved by a tripartite agreement under which OGI was paid $ 45,000 by RPI to resolve the dispute. (Compl. PP 7-9.) The Complaint further alleges that another dispute arose regarding RPL's failure to pay demurrage accrued at the discharge port. (*Id.* P 10.) The details of this second alleged dispute are not made clear in any of the Plaintiff's submissions, which instead indicate that it is the Defendants' protests regarding the validity of the tripartite agreement that form the basis of OGI's claim for RPL's breach of the charter party. (Pl.'s Mem. in Opp'n 7.) OGI, however, continues to assert that the tripartite agreement is valid. (*Id.*)

Any claim for breach of the charter party regarding dead freight, demurrage and detention at load and discharge ports appears to have been satisfied by the payment made to OGI under the tripartite agreement. OGI [*12] has accepted that payment, and does not dispute the validity of the agreement. Therefore, OGI does not have a valid prima facie claim for breach of the

charter party.

Even if OGI were to have a valid prima facie claim against RPL for breach of the charter party sufficient to sustain the attachment, the receipt of the $ 45,000 in satisfaction of the tripartite agreement militates in favor of vacatur, as will be discussed further below.

### iii. Wrongful Arrest

Although the Defendants contend that OGI has failed to assert a direct claim against RPI for wrongful arrest (Defs.' Mem. in Supp. 10), they concede that both RPL and RPI caused the arrest in question (Defs.' Reply 1). Furthermore, it appears from the High Court of Kolkata documents that RPI was a plaintiff together with RPL in the allegedly unlawful arrest of the M/V UTHAI NAVEE. (Duffy Aff. Ex. 16.) Even assuming that OGI may rely on submissions other than the Complaint to justify maintenance of the attachment based on a direct claim of wrongful arrest against RPI, *see Tide Line,* 06 Civ. 1979, at 13-16, 32-39 (allowing plaintiff to amend complaint where additional allegations and evidence have been submitted to support a claim); *Maersk, Inc. v. Neewra, Inc., 443 F. Supp. 2d 519, 527 (S.D.N.Y. 2006)* [*13] ("A court may also consider any allegations or evidence offered in the parties' papers or at the post-attachment hearing."), it is not clear that OGI has sufficiently pled a prima facie claim of wrongful arrest against either of the Defendants.

In the Complaint, OGI asserts that the M/V UTHAI NAVEE was arrested by RPL in September 2006, that the arrest was wrongful, and that OGI was damaged in the amount of $ 930,962.01 as a result. (Compl. PP 11, 12, 14, 17.) With regard to the instant motion, OGI has further asserted that during the arrest proceedings, RPL and RPI inaccurately alleged that OGI had an interest in the M/V UTHAI NAVEE when OGI had only chartered the vessel from the vessel's head owner. (Peterson Aff. PP 41-42.)

Neither party has made a choice of law argument with respect to OGI's wrongful arrest claim. Without citing relevant case law, Defendants have asserted that to sustain a claim for wrongful arrest "in the U.S. or anywhere else, the claimant must establish that the arrest arose from malice, bad faith or reckless disregard of the other party's legal rights" (Defs.' Reply 2), and that OGI has not asserted any such allegations against either of the Defendants.

Case 1:07-cv-10726-PKL     Document 29-3     Filed 03/27/2008     Page 5 of 6

Page 5
2007 U.S. Dist. LEXIS 46841, *13

Without **[\*14]** deciding the choice of law question, it appears fairly certain that United States law would not apply to the wrongful arrest claim here. *See Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co., Ltd., 426 F.3d 580, 586 (2d Cir. 2005)* (citing *Hellenic Lines Ltd. v. Rhoditis, 398 U.S. 306, 309, 90 S. Ct. 1731, 26 L. Ed. 2d 252 (1970)*; *Lauritzen v. Larsen, 345 U.S. 571, 583-92, 73 S. Ct. 921, 97 L. Ed. 1254 (1953)*; *Carbotrade S.P.A. v. Bureau Veritas, 99 F.3d 86, 90 (2d Cir.1996)*) (enumerating factors for choice-of-law analysis involving maritime tort as follows: (1) the place of the wrongful act; (2) the law of the ship's flag; (3) the domicile of the injured party; (4) the domicile of the shipowner; (5) the place of the contract; (6) the inaccessibility of the foreign forum; (7) the law of the forum; and (8) the shipowner's base of operations); *Hawkspere Shipping Co., Ltd. v. Intamex, S.A., 330 F.3d 225, 234-35 (4th Cir. 2003)* (citing *Lauritzen v. Larsen, 345 U.S. 571, 73 S. Ct. 921, 97 L. Ed. 1254 (1953)*) (same); *Arochem Corp. v. Wilomi, Inc., 962 F.2d 496, 498-99 (5th Cir. 1992)* (citing *Lauritzen, 345 U.S. at 582*; *Gulf Trading & Transp. Co. v. Vessel Hoegh Shield, 658 F.2d 363 (5th Cir. Unit A 1981), cert. denied, 457 U.S. 1119, 102 S. Ct. 2932, 73 L. Ed. 2d 1332 (1982)*) (same).

Without an understanding **[\*15]** of the applicable law, the Court is unable to determine whether OGI has a valid prima facie claim of wrongful arrest. Since OGI has the burden of affirmatively showing that it has such a claim, taking the strictest approach to this analysis and without more information, Plaintiff has failed to meet its burden with respect to this claim of wrongful arrest.

### iv. Alter Ego

OGI has also contended that RPL's acts in connection with the charter party and the unlawful arrest of the M/V UTHAI NAVEE were as the alter ego of RPI. Because it has been determined that there is no claim for breach of the charter party and it appears that any claim for wrongful arrest can be asserted directly against RPI, it is not necessary for the Court to determine whether OGI has sufficiently alleged its alter ego claim.

### B. Vacatur

Based on the foregoing analysis, OGI has failed to show that it has a prima facie admiralty claim in satisfaction of its burden to withstand a vacatur motion under *Aqua Stoli*. Even if OGI could meet this burden, however, Defendants have sufficiently shown that

vacatur would still be appropriate under the limited circumstances articulated in *Aqua Stoli*.

First, the Second Circuit held in *Aqua* **[\*16]** *Stoli* that even if the plaintiff meets its burden, vacatur would be appropriate if "the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise." *Aqua Stoli, 460 F.3d at 445*. Here, with respect to OGI's claim for breach of the charter party, OGI has already received $ 45,000 from RPI in satisfaction of the tripartite agreement resolving that dispute. This is roughly the amount that OGI is claiming for demurrage, dead freight and other charges in connection with its claim of breach of the charter party.

Second, the Second Circuit articulated that an attachment would be properly vacated "if the plaintiff and defendant are both present in the same district and would be subject to jurisdiction there, but the plaintiff goes to another district to attach the defendant's assets." *Id. at 444-45*. As pointed out by the Defendants, with respect to OGI's claim for wrongful arrest, both OGI and the Defendants are present in the same jurisdiction during the arrest proceedings, namely Kolkata. OGI did make an appearance during that proceeding and even contemplated posting security to secure the release of the vessel. (Defs.' Mem. in Supp. 9; Peterson **[\*17]** Aff. 46-47.)

Lastly, the Second Circuit also held in *Aqua Stoli* that "vacatur may be warranted when the defendant can show that it would be subject to *in personam* jurisdiction in another jurisdiction convenient to the plaintiff." *Id. at 444*. Although the *Aqua Stoli* court indicated that the concept of convenience was to be narrowly circumscribed, the court was addressing the issue in the context of the proximity of the Eastern and Southern Districts. *See id.* Here, it is questionable whether the Southern District of New York is more convenient to OGI than the other jurisdictions implicated in this matter, including Kolkata and Hong Kong. Furthermore, there is the consideration that United States law most likely does not apply to the wrongful arrest claim and that the arrest itself was authorized by the court in India, thereby implicating issues of international comity. *See Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc., 466 F.3d 88, 94 (2d Cir. 2006)* (citing *Finova Capital Corp. v. Ryan Helicopters U.S.A., Inc., 180 F.3d 896, 898-99 (7th Cir. 1999)*; *Bigio v. Coca-Cola Co., 239 F.3d 440, 454 (2d Cir. 2000)*) (indicating proper

2007 U.S. Dist. LEXIS 46841, *17

consideration of international comity principles **[*18]** requires evaluation of various factors, "such as the similarity of the parties, the similarity of the issues, the order in which the actions were filed, the adequacy of the alternate forum, the potential prejudice to either party, the convenience of the parties, the connection between the litigation and the United States, and the connection between the litigation and the foreign jurisdiction").

Thus, when combined with these comity considerations, the convenience issue speaks even more strongly against the exercise of jurisdiction and therefore in favor of vacating the attachment.

*Conclusion*

Accordingly, for the forgoing reasons, the motion to vacate the order of maritime attachment is granted and the Complaint is dismissed without prejudice.

It is so ordered.

**New York, NY**

**June 21, 2007**

**ROBERT W. SWEET**

**U.S.D.J.**

LEXSEE 2007 U.S. DIST. LEXIS 61713

**ESSAR INT'L LTD., Plaintiff, -against- MARTRADE GULF LOGISTICS, FZCO, Defendant.**

**07 Civ. 3439 (WHP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2007 U.S. Dist. LEXIS 61713; 2007 AMC 2017*

**August 23, 2007, Decided**
**August 23, 2007, Filed**

**COUNSEL:** **[*1]** For Plaintiff: Manuel Antonio Molina, Esq., Freehill, Hogan & Mahar, LLP, New York, NY

For Defendant: Keith B. Dalen, Esq., Hill Rivkins & Hayden LLP, New York, NY.

**JUDGES:** WILLIAM H. PAULEY III, U.S.D.J.

**OPINION BY:** WILLIAM H. PAULEY III

**OPINION**

MEMORANDUM AND ORDER

WILLIAM H. PAULEY III, District Judge:

Non-party Marlog-LBG Logistics GmbH ("Marlog") moves to vacate an attachment of funds resulting from an Order of Maritime Attachment and Garnishment against Defendant Martrade Gulf Logistics, FZCO ("Martrade"). For the following reasons, Marlog's motion is denied.

BACKGROUND

On May 1, 2007, Plaintiff Essar International, Ltd. ("Essar") commenced this action seeking attachment of Martrade's assets pursuant to *Supplemental Rule B* for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("*Rule B*"). On May 2, 2007, the Court issued an Order of Maritime Attachment and Garnishment against Martrade in the amount of $ 1,327,249.78 ("the Attachment Order").

On June 1, 2007, Deutsche Bank informed Essar that it had restrained a $ 157,000 electronic funds transfer ("EFT") pursuant to the Attachment Order (the "June 1 EFT"). (Declaration of Keith B. Dalen, dated June 29, 2007 P 5.) The June 1 EFT **[*2]** originated with Marlog and was remitted to Inchape Shipping Services ("Inchape"). Deutsche Bank restrained the June 1 EFT because the transaction confirmation included the description, "Grand Glory V7807 for Martrade Gulf Logistics." (Declaration of William L. Juska Jr., dated July 5, 2007 ("Juska Decl.") P 11.) The bank advised Essar that Martrade was neither the originator nor the beneficiary of the remittance, but Essar requested that the restraint be maintained, based on the transaction description in the confirmation. (Juska Decl. P 12.)

On June 29, 2007, Marlog moved to vacate the attachment of the June 1 EFT pursuant to *Supplemental Rule E(4)(f)* for *Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure ("Rule E")*. This Court heard argument on the motion on July 6, 2007. At the hearing, Martrade produced an invoice from Inchape that contained the notation, "enclosed please see payment-order from mgl-dubai [Martrade Gulf Logistics] executed from marlog-account," as well as a payment order prepared by Martrade. These documents confirm that the EFT was intended as payment for a debt owed by Martrade to Inchape. (Court Exhibit 1.) Additionally, Marlog conceded **[*3]** that the June 1 EFT represented payment of a debt owed by Martrade to Inchape, and that the transaction had been structured to circumvent the Attachment Order. (July 6, 2007 Hearing Tr. at 9 ("[T]his transfer was effected to avoid a *[Rule] B*[] attachment. We'll stipulate to that.")

2007 U.S. Dist. LEXIS 61713, *3; 2007 AMC 2017

DISCUSSION

Marlog's motion is predicated on two related arguments: First, that Martrade has no property interest in the June 1 EFT for *Rule B* purposes. Second, that its property cannot be attached because it is not a defendant in this action. Both arguments are without merit.

I. Legal Standard

"Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated." Rule E(4)(f). The Court must vacate an attachment if the plaintiff cannot, at a minimum, show that it has complied with the "filing and service requirements of *Rules B* and *E*." *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 445 (2d Cir. 2006)*.

II. Martrade's Property Interest in the June 1 EFT

*Rule B* provides, in relevant part:

> If a defendant is not found within a district ... a verified **[*4]** complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property--up to the amount sued for--in the hands of garnishees named in the process ... The court must review the complaint and affidavit and, if the conditions of this Rule B appear to exist, enter an order so stating and authorizing the process of attachment and garnishment.

Rule B(1)(a)-(b). The Second Circuit has stated that the definition of "property" under *Rule B* is broad. *Winter Storm Shipping, Ltd. v. TPI, 310 F.3d 263, 275 (2d Cir. 2002)* ("It is difficult to imagine words more inclusive than 'tangible or intangible' .... The phrase is the secular equivalent of the creed's reference to the maker 'of all there is, seen and unseen.'"). Thus, attachable property under *Rule B* includes debts owed to a defendant, "even if they have not yet matured or have only partially matured," as well as electronic funds in the possession of an intermediary bank en route to a defendant recipient. *Winter Storm, 310 F.3d at 276-78*. Under *Rule B*, it is also possible for more than one party to have an interest in the same property. For example, the sender and

recipient of an EFT may have "overlapping **[*5]** property rights," rendering the EFT attachable under *Rule B* if either party is a named defendant. *HBC Hamburg Bulk Carriers GMBH & Co. KG v. Proteinas y Oleicos S.A. de C.V., No. 04 Civ. 6884 (NRB), 2005 U.S. Dist. LEXIS 8009 at \*14, 2005 WL 1036127, at \*4 (S.D.N.Y. May 4, 2005)*.

Citing *DS Bulk Pte. Ltd. v. Calder Seacarrier Corp., No. 05 Civ. 10146 (SHS), 2006 U.S. Dist. LEXIS 39242 at \*7, 2006 WL 1643110, at \*2 (S.D.N.Y. June 13, 2006)* and *T & O Shipping, Ltd. v. Source Link Co., Ltd., No. 06-Civ-7724 (KMK), 2006 U.S. Dist. LEXIS 88153 at \*14, 2006 WL 3513638, at \*4 (S.D.N.Y. Dec. 5, 2006)*, Marlog argues that Martrade has no interest in the June 1 EFT. However, those cases involved only "bare assertion[s]" of a property interest. *DS Bulk, 2006 U.S. Dist. LEXIS 39242 at \*7, 2006 WL 1643110, at \*2*. Here, Marlog admits that the payment to Inchape was made for Martrade's benefit, and that the transfer was orchestrated to avoid the Attachment Order. [1] This establishes that Martrade had a property interest in the June 1 EFT sufficient to render it attachable under *Rule B*. See *Linea Navira De Cabotaje, C.A. v. Mar Caribe De Navegacion, C.A., 169 F. Supp. 2d 1341, 1359-60 (M.D.Fla. 2001)* (upholding the attachment of funds nominally belonging to non-parties because the plaintiff provided evidence they were controlled by the defendant); **[*6]** see also *Greenwich Marine, Inc. v. S.S. Alexandra, 339 F.2d 901, 905 (2d.Cir. 1965)* ("The inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the district judge sitting as an admiralty judge.").

> 1 *T & O Shipping* is also distinguishable because the plaintiff in that case exceeded the scope of the attachment order, whereas that is not the case here. On the contrary, the Attachment Order provided that "[t]he Clerk ... is directed ... to issue ... [process] for seizure of all tangible and intangible property ... belonging to, due, or being transferred to, from, or for the benefit of the Defendant ... including but not limited to [property] as may be held, received, or transferred for its benefit." (Emphasis added.)

III. Marlog's Non-Party Status

*Rule B* limits attachable property to that of a named defendant. "Modern conceptions of fairness ... dictate that actual notice be given to persons known to claim an

Case 1:07-cv-10726-PKL    Document 29-4    Filed 03/27/2008    Page 3 of 3

Page 3

2007 U.S. Dist. LEXIS 61713, *6; 2007 AMC 2017

interest in the property that is the subject of the action where that is reasonably practicable." *Winter Storm, 310 F.3d at 269*; see also *DS Bulk, 2006 U.S. Dist. LEXIS 39242, 2006 WL 1643110, at *2* ("The language of *Supplemental Rule B* clearly **[*7]** anticipates that only a 'defendant' will be subject to an order of attachment."); *T & O Shipping, 2006 U.S. Dist. LEXIS 88153 at *12, 2006 WL 3513638, at *4* ("*Rule B* limits the scope of an attachment to a defendant who is named in the verified complaint"). Marlog argues that, because Essar did not name it as a defendant or allege an alter-ego relationship between it and Martrade in the Complaint, it has failed to satisfy the technical requirements of *Rule B*. This Court disagrees.

A plaintiff need not aver an alter-ego relationship in the Complaint for a *Rule B* attachment to be proper. *Maersk, Inc. v. Neewra, Inc., 443 F. Supp. 2d 519, 527-30 (S.D.N.Y. Aug. 1, 2006)* (holding that an analysis of whether reasonable grounds exist for a *Rule B*

attachment is not limited to the allegations in the Complaint). As stated, Defendant Martrade had an interest in the June 1 EFT sufficient to uphold its attachment under *Rule B*. Accordingly, the requirement that the property attached be that of the named defendant is satisfied.

CONCLUSION

For the foregoing reasons, Marlog's motion to vacate the attachment of the June 1 EFT is denied.

Dated: August 23, 2007

New York, New York

SO ORDERED:

WILLIAM H. PAULEY III

U.S.D.J.

Westlaw.

Slip Copy                                                                                    Page 1
Slip Copy, 2007 WL 3255823 (S.D.N.Y.), 2007 A.M.C. 2958
(Cite as: Slip Copy)

Brave Bulk Transport Ltd. v. Spot On Shipping
Ltd.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
BRAVE BULK TRANSPORT LTD., Plaintiff,
v.
SPOT ON SHIPPING LTD., et al., Defendant.
No. 07 Civ. 4546(CM).

Oct. 30, 2007.

DECISION AND ORDER (1) DENYING DE-
FENDANTS' MOTION TO VACATE MARITIME
ATTACHMENT AGAINST SPOT ON SHIPPING
LTD., (2) GRANTING PLAINTIFF'S MOTION
TO RECONSIDER PREVIOUS ORDER VACAT-
ING THE ATTACHMENT AGAINST DEFEND-
ANT ZHANGGANG SHIPPING LIMITED (ZSL),
(3) DECLINING TO REINSTATING ATTACH-
MENT AGAINST ZSL, AND (4) GRANTING
PLAINTIFF PERMISSION TO FILE A SECOND
AMENDED COMPLAINT AND A NEW RE-
QUEST FOR A MARITIME ATTACHMENT
AGAINST ZSL, PROVIDED THOSE PAPERS
ARE FILED WITHIN 10 BUSINESS DAYS

McMAHON, J.
**1** On July 10, 2007, this Court signed an ex parte
order of attachment pursuant to Supplemental Ad-
miralty Rule B. The order covered the property of
all defendants named in the complaint, including
Zhanggang Shipping Limited (ZSL), which was al-
leged to be an alter ego of defendant Spot On Ship-
ping Ltd. Spot On was allegedly in breach of
"forward freight agreements that were alleged by
plaintiff to be maritime contracts, thereby permit-
ting plaintiff to invoke the admiralty jurisdiction of
this court.

On August 22, 2007, ZSL moved to vacate the at-
tachment of its property, pursuant to Rule E(4)(f) of

the Federal Rules of Civil Procedure, on two
grounds: the underlying contract that was allegedly
breached by Spot On was not a maritime contract,
and ZSL had not been shown to be Spot On's alter
ego. Plaintiff did not respond to the motion. In a
written decision and order dated September 14,
2007, this Court lifted the attachment as to defend-
ant ZSL, finding that, based on the information
contained in the complaint, ZSL is not an alter ego
of Spot On. In that same order, the Court ques-
tioned whether "Forward Freight Agreements" are
maritime contracts and directed plaintiff to show
cause why the attachment should not be vacated in
its entirety.

Brave Bulk has filed papers in response to the
Court's order to show cause, in which they argue
that Forward Freight Agreements are maritime con-
tracts. Plaintiff's papers also include a motion for
reconsideration of the Court's decision vacating the
attachment against ZSL, arguing that *inter alia*
plaintiff has a maritime claim and has adequately
alleged *prima facie* alter-ego claims against ZSL
and the other alter-ego defendants. Defendants, in
turn, filed papers asking the Court to vacate the at-
tachment against Spot On, and not to reconsider its
ruling vacating the ZSL attachment.

On October 5, 2007, the Court heard argument on
the motion pursuant to Rule E(4)(f).

*Forward Freight Agreements are "Salty" Contracts*

Brave Bulk and Spot On entered into a Forward
Freight Agreement for the swap of the future value
of ocean freight. This contract specified the type of
vessel to be used, the routes upon which said ves-
sels would travel and the duration of the agreement.
*See Forward Freight Agreement."*

28 U.S.C. § 1333(1) affords this Court original jur-
isdiction in "any civil case of admiralty or maritime
jurisdiction." *See Sea Transport Contractors, Ltd. v.*
*Industries Chemiques du Senegal, 411 F.Supp.2d*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

386, 2006 A.M.C. 1076, 1082 (S.D.N.Y. January 24, 2006); *see also* Stolt-Nielsen S.A. v. Celanese AG, 430 F.3d 567, 572 (2d Cir.2005). To determine the boundaries of admiralty jurisdiction, courts turn to the purpose of the grant. *See* Insurance Co. v. Dunham, 78 U.S. 1, 11 Wall. 1, 24, 20 L.Ed. 90 (1871). As recently discussed by the United States Supreme Court in Exxon Corp. v. Central Gulf Lines, Inc. 500 U.S. 603, 608 (1991), "The fundamental interest giving rise to maritime jurisdiction is 'the protection of maritime commerce.' " *Id.;* quoting Sisson v. Ruby, 497 U.S. 358, 367 (1990); quoting Foremost Ins. Co. v. Richardson, 457 U.S. 668, 674 (1982). Stated another way, where "the subject matter of the contract relates to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea or to maritime employment it is fairly said to constitute a maritime contract." Ingersoll Milling Mack Co. v. M/V BODENA, 829 F.2d 293, 302 (2d Cir.1987) (emphasis added).

**\*2** While initially skeptical about the saltiness of forward freight agreements, I am now persuaded that they are sufficiently part of the business of maritime commerce to confer admiralty jurisdiction.

Forward freight agreements, or FFAs as they are commonly known, are commitments to perform in the future a shipping service between ship owners, charterers and/or traders. The parties to the agreement contract to "pay the difference between a price agreed today and the future price of moving a product from one location to another, or for the future price of hiring a ship over a period of time."Adam Sonin, *Managing Risk with Forward Freight Agreements, Commodities Now,* June 2005, *available online at:* http://www.commodities-now.com/content/market-areas/ags-and-softs/ma-article-7.pdf?PHPSESSID=34967b.

In the shipping industry, FFAs are negotiated with the express purpose of hedging and managing market risks relating to the employment of vessels in

today's volatile freight market. For example, in the instant FFA, the parties entered into a Forward Freight Agreement to buy and sell a specified tonnage freight at an agreed price for an agreed route and time span so that both corporations could reliably predict their ocean freight revenues and costs for the duration of the contract for those ocean routes. Thus, Forward Freight Agreements can fairly be said to constitute maritime contracts.

Forward Freight Agreements have been found to be maritime cases entitled to process of maritime attachment in the following cases: *C. Transport Panamax Ltd. v. North America Steamships Ltd.,* a.k.a. N.A.S.L., 06 CV 13178(RLC); *Daeyang Shipping Co. Ltd. v. Navitrans Maritime Inc.,* 04 CV 08050(VM); *Deiulemar v. Source Link Shipping Co. Ltd.,* 07 CV 02983(SAS); *Deiulemar v. Spot On Shipping Ltd., et. al.,* 07 CV 03820(VM); *Eurotrade Inc., Liberia v. Source Link Shipping Co. Ltd., BVI,* 07 CV 3172(SAS); *Pan Oceanic Maritime Inc. v. Source Link Shipping Co. Ltd.,* 07 CV 03089(CM); *Perseveranza Di Navigazione S.P.A. v. Source Link Shipping Co. Ltd.,* 07 CV 03091(RPP); *Taiwan Maritime Transport Co. Ltd. v. Navitrans Maritime Inc. and Navigation Maritime Inc.,* 06 CV 13564(RJH), and *Setsea S.P.A. v. Source Link Shipping Co. Ltd.,* 07 CV 6230(DAB).

In *Setsea S.P.A. v. Source Link Shipping Co. Ltd.,* 07 CV 4147 (S.D.N.Y. June 5, 2007), Judge Batts initially denied the plaintiff's application for an *ex parte* order for process of maritime attachment. Judge Batts held that although the FFA in question was "not so attenuated from the business of maritime commerce that it does not implicate the concerns underlying admiralty and maritime jurisdiction," it nonetheless fell short of the Second Circuit's requirement that the contract reference "maritime service or maritime transactions." *Setsea S.P.A. v. Source Link Shipping Co. Ltd.,* 07 CV 4147, Order Denying Application for Ex Parte Order (S.D.N.Y. June 5, 2007). Judge Batts allowed Setsea leave to replead within thirty days. On July 5, 2007, Setsea submitted a Verified Amended

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Complaint laying out more specifically the nature of forward freight agreements and why they are maritime contracts. This time, the Court granted the Plaintiff's application for an ex parte order for process of maritime attachment finding the FFA to be a maritime contract. *See Complaint and Ex Parte Order for process of maritime attachment and garnishment in 07 CV 6230(DAB).*

**\*3** Plaintiff has thus met its burden of demonstrating that the subject matter of this dispute is maritime in nature.

*Plaintiff's Motion for Reconsideration of Court's Order Vacating ZSL Attachment*

Plaintiff next asks the Court to revisit its decision vacating the ZSL attachment, on the ground that the Court overlooked several controlling cases that, if taken into account, would have altered the Court's conclusion. Plaintiff's argument is essentially that the Court did not consider the Second Circuit Court of Appeals decision in *Aqua Stoli* as well as and recent (albeit not "controlling") Southern District cases like *Tide Line and Route Holding,* which stand *inter alia* for the proposition that a plaintiff need only allege a *prima facie* maritime claim against the principal defendant and *aprima facia* case against the alleged alter-ego entity in order to satisfy its pleading burden under Rule E(4)(f). Plaintiff argues that they have met that burden in their Amended Complaint. Defendants strongly oppose the motion.

"The standard for granting ... a motion [for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked-matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995) (citing *Schonberger v. Serchuk,* 742 F.Supp. 108, 119 (S.D.N.Y.1990); *Adams v. United States,* 686 F.Supp. 417, 418 (S.D.N.Y.1988)). The decision to grant or deny the

motion is committed to the sound discretion of the district court. *Devlin v. Transportation Communications Int'l Union,* 175 F.3d 121, 132 (2d Cir.1999).

In a letter dated September 17, 2007 and at the Rule E(4)(f) hearing held on October 5, 2007, plaintiff's attorneys advised the Court that they did not become aware of defendants' motion to vacate until after they received the Court's decision on the motion. I am satisfied that this is the case and so have agreed to reconsider my decision vacating the ZSL attachment in order to permit plaintiff's to respond to the motion.

The following allegations in the Amended Complaint allegedly support plaintiff's claim that ZSL is an alter ego of Spot On:

22. Upon information and belief, Zhanggang is the alter ego of Spot On because it dominates and disregards Spot On's corporate form to the extent that Zhanggang is actually carrying on Spot On's business and operations as if same were its own.

23. Upon information and belief, Defendant Zhanggang is an alias, or agent of Defendant Spot On and/or Spot On is an alias, or agent of Zhanggang.

24. Upon information and belief, Defendants Zhanggang and Spot On are commonly beneficially owned, and commonly managed, controlled and dominated, by the same individuals, including Mrs. Wei-Lu Zhang and Ms. Sammy Yu, and used to carry on such individuals' own business.

**\*4** 25. Upon information and belief, Defendant Zhanggang has no separate, independent identity from Defendant Spot On as they use their names interchangeably with design to fraudulently avoid payment of just debts to their creditors.

26. In the alternative, Defendant Zhanggang is merely a shell corporation through which Spot On conducts its business.

27. In the further alternative, Defendants Zhanggang and Spot On are partners and/or are joint venturers.

28. In the further alternative, Defendants Zhanggang and Spot On are affiliated companies such that the Defendant Zhanggang is now, or will soon

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

be, holding assets belonging to Defendant Spot On and vice versa.

*See* Verified Amended Complaint, ¶¶ 22-28, Davies Decl. Ex. "1."

In an affidavit submitted in connection with the instant motion (albeit not in its original papers), Brave Bulk's counsel has set forth the basis for the "information and belief allegations in the Verified Amended Complaint, these include:

(1) XSL and Spot On share common address and place of business at Suites: 1818-23, 18th Floor, Sun Hung Kai Centre, 30 Harbour Road, Wanchai, Hong Kong.

(2) They have the same email address

(3) An inforspectrum and a Lloyd's MIU report on the companies indicates that ZSL is ajoint venture between Spot On and Zhangdian Steel Mill of China. No information in these reports indicates that ZSL is owned by the Chinese Government or by an entity that is owned by the Chinese Government.

(4) Lloyd's MIU advised plaintiff that it telephoned ZSL and was told that ZSL is a "ship charterer."

(5) Madam Wei-Lu Zhang is president of ZSL and a principal director of Spot On (Hong Kong), which also shares an address with Spot On and ZSL.

(6) ZSL chartering manager, Ms. Sammy Yu, is also listed as the contact for Spot On on the first page of the FFA between Spot ON and Brave Bulk, where she is listed as the "contact" for Spot On.

(7) The names of Spot On and ZSL are used interchangeably in the industry.

Plaintiff bolsters each of these contentions with citations to exhibits, and avers that additional connections between Spot On and ZSL will be revealed with discovery.

*See* Declaration of Lauren C. Davies ¶¶ 23-36.

Under Rule E(4)(f), the plaintiff has the initial burden to show that its attachment satisfies the requirements of Supplemental Rules B and E. *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd.,* 460

F.Supp. 434, 445 n. 5 (2d Cir.2006). In order to sustain an attachment, a plaintiff must prove that it has satisfied the "filing and service requirements of Rules B and E" and that: (1) it has a valid *prima facie* admiralty claim against the defendant, (2) the defendant is not present in the district, (3) defendant's property can be found within the district, and (4) there is no maritime law or statutory bar to the attachment. *Aqua Stoli,* 460 F.3d at 445. The Rule(E)(4)(f) hearing is not intended to resolve the dispute between the parties, but to determine if the technical requirements of the Rule were met. *Aqua Stoli, Shipping Ltd. v. Gardner Smith Pty Ltd.,* 2006 U.S.App. LEXIS 19302, at *35 (2d Cir.2006). Thus, as long as the plaintiff can establish that it has alleged a prima facie maritime claim, that the defendant is not present in the district and that the defendant's property has been restrained in the district and no other statutory bar to the attachment exists, the attachment should be upheld. *See Aqua Stoli,* at *28-29.*Aqua Stoli's* holding marks a departure from the prior "probable cause/reasonable basis standard" that certain courts applied before *Aqua Stoli.*

**\*5** Once a plaintiff has established the technical requirements stated in Rule B, the burden shifts to the defendant to prove the limited bases for vacatur. An otherwise facially valid Rule B attachment may only be vacated if the defendant shows at post-seizure hearing that (1) the defendant is subject to suit in a convenient adjacent jurisdiction; (2) the plaintiff could obtain *in personam* jurisdiction over the defendant in the district where the plaintiff is located; or (3) the plaintiff has already obtained sufficient security for the potential judgment, by attachment or otherwise. *See Aqua Stoli,* at *27.Defendant has not moved on any of these grounds. So as long as the allegations in the Amended Complaint states a *prima facia* case that ZSL is an alter ego of Spot On, the attachment against ZSL must stand.

In the *Tide Line* case, Chief Judge Kimba M. Wood vacated an attachment that was based on overly

Slip Copy
Slip Copy, 2007 WL 3255823 (S.D.N.Y.), 2007 A.M.C. 2958
**(Cite as: Slip Copy)**

general alter-ego allegations. *See* Order dated August 15, 2006 in *Tide Line, Inc. v. Eastrade Commodities Inc. and Transclear, S.A.,* 06 Civ.1979(KMW). Chief Judge Wood found that mere allegations that entity B was the "paying agent" for entity A, and that entity B had arranged for other non-parties to pay the debts of Entity A, was insufficient to state an alter-ego claim for Rule E(4)(f) purposes. Remarking on the paucity of alter-ego allegations, the Court noted that the complaint did not even contain the phrase "alter-ego." The Chief Judge vacated the attachment but stayed the release of any funds for 15 days, to allow plaintiff time to file an amended complaint with additional alter-ego allegations and to apply for a new order of attachment. The Court adopted this procedure because plaintiffs-like Brave Bulk in the present case-submitted additional support for their alter ego allegations in their motion to vacate opposition papers.

By contrast *Route Holding Inc. and Beam Company v. IOOI and Marina World Shipping,* 06 Civ. 3428(PKC), Judge Castel held-on allegations strikingly similar to those in the amended complaint presently before the Court-that Route Holding and Beam Company has sufficiently pleaded their alter-ego claims against Marina World Shipping. The plaintiffs had alleged that Marina World Shipping was an alter-ego because it dominated and controlled the principal, IOOI. The district court found that plaintiffs' pleadings were sufficient to uphold the attachment, finding that:

the plaintiff alleges that MWS is the alter-ego of IOOI, but it does not simply leave it as a conclusory allegation. It goes on to allege that the reason it believes it is the alter-ego is because IOOI dominates an disregards MWS' corporate form to the extent that MWS is actually carrying on IOOI's business and operations as if the same were its own. It further goes on to allege that MWS, acting as paying agent, acts as paying agent or arranges for other nonparties to satisfy the debts and obligations of IOOI. It seems to me a sufficient allegation.

*6 *See* Transcript of *Route Holding* at 12, lines 14-24.

Like Brave Bulk in the case at bar and the plaintiffs in *Tide Line,* the *Route Holdings* plaintiffs submitted additional information and affidavits in support of their alter-ego claims, along with their opposition papers. Finding that the alter-ego allegations in the complaint were sufficient for Rule B purposes, Judge Castel sidestepped the open question of whether a Court assessing the validity of a maritime claim at a Rule E(4)(f) proceeding can resort to supplemental materials outside the four corners of the complaint.

The allegations set forth above are sufficient for the Court to conclude that Brave Bulk has a good faith basis for alleging that ZSL is Spot On's alter ego. However, I agree with Chief Judge Wood that the place where those allegations should appear is in the complaint-not in material submitted to the Court for the first time in opposition to a motion to vacate. The wholly conclusory allegations in the Amended Complaint are, upon reflection, simply insufficient. Were a plaintiff to be permitted to rely on such allegations to obtain an attachment against an entity that is not a party to a contract sued on, the already thinly stretched remedy of maritime attachment could disrupt the commercial activities of entities whose links to the real defendant in interest are tenuous of non-existent. By including specific factual allegations that support "on information and belief contentions in the complaint, the plaintiff's counsel subjects himself to Rule 11 sanctions should they prove erroneous. That is, it seems, a salutary result.

Upon reconsideration, thereof, I decline to vacate my original decision.

However, because the record reveals that plaintiff did have a good faith basis for alleging that ZSL was Spot On's alter ego, I will afford plaintiff 10 business days to file a second amended complaint, containing the basis for the alter ego allegations. Plaintiff may accompany this amended pleading

Slip Copy, 2007 WL 3255823 (S.D.N.Y.), 2007 A.M.C. 2958
**(Cite as: Slip Copy)**

with an application for a new order of attachment. Assuming the second amended complaint complies with this order, it will be granted.

This constitutes the decision and order of the Court.

S.D.N.Y.,2007.
Brave Bulk Transport Ltd. v. Spot On Shipping Ltd.
Slip Copy, 2007 WL 3255823 (S.D.N.Y.), 2007 A.M.C. 2958

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                    :
PAGANE MARITIME LTD.                                :        <u>ECF Case</u>
                                                    :
              Plaintiff,                            :        07 Civ. 10726 (PKL)
                                                    :
        v.                                          :
                                                    :
GLINGROW HOLDING LTD. and                           :
RIAS TRADING,                                       :
                                                    :
              Defendants.                           :
-------------------------------------------------------------x

<u>**CERTIFICATE OF SERVICE**</u>

1.     I am a member of Reed Smith LLP, counsel for defendant Rias Trading ("Rias").

2.     I hereby certify that on March 27, 2008, I caused to be served a copy of Rias
Trading's, Reply Memorandum of Law in Support of Defendant Rias Trading's Motion to (1)
Dismiss the Complaint and (2) Reconsider Vacating the Maritime Attachment and the Reply
Declaration of Wendy H. Schwartz in support upon the following attorney via the Court's ECF
system:

                         Kevin J. Lennon
                         Lennon, Murphy& Lennon, LLC
                         420 Lexington Avenue, Suite 300
                         New York, New York  10170
                         kjl@lenmur.com

                         Attorneys for Plaintiff Pagane Maritime Ltd.

Dated: New York, New York
       March 27, 2008

                                            _____
                                                /s/  Wendy H. Schwartz
                                                   Wendy H. Schwartz